UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

☐ORIGINAL

- - - - - - - - - - - - - - - x

              :

UNITED STATES OF AMERICA       :    INDICTMENT

      - v. -          :    **15 CRIM 093**

              :

SHELDON SILVER,

              :

          Defendant.

              :

- - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: FEB 19 2015

## COUNT ONE

**(Honest Services Mail Fraud)**

    The Grand Jury charges:

### Background

*Silver's Official Powers in the Assembly*

    1.    For more than 20 years, from in or about 1994 until in or about February 2015, SHELDON SILVER, the defendant, served as Speaker of the New York State Assembly (the "Assembly"), which is one of the two houses of the New York State Legislature (the "Legislature").  From in or about 1977 through the present, SILVER has been an elected member of the Assembly, representing an Assembly District that comprises much of lower Manhattan.

    2.    As Speaker of the Assembly, SHELDON SILVER, the defendant, exercised significant power, including but not limited to presiding over the Assembly and controlling legislative sessions by, among other things, determining whether certain legislation was brought to the floor for debate and otherwise

JUDGE CAPRONI

setting the priorities and direction of the Assembly.   SILVER also represented the Assembly in negotiations with the Governor of the State of New York and the Majority Leader of the New York State Senate concerning the budget of the State of New York (the "State") and other important legislative and other matters pending before the State, including legislation critical to the real estate industry.   In addition, and as set forth in more detail below, as Speaker of the Assembly, SILVER exercised power over allocation of certain State funds.

3.   SHELDON SILVER, the defendant, also has performed various constituent services both as Speaker of the Assembly for citizens of the State and as a representative of his Assembly District for residents of the District.   Such services include but are not limited to assistance related to governmental programs and funding, and referrals for professional and other private services, employment, and programs.

**Silver's Public Representations about His Outside Income**

4.   As an elected State legislator, SHELDON SILVER, the defendant, was required by law to file financial disclosure statements on an annual basis with the New York State Legislative Ethics Commission (the "Ethics Commission").   The financial disclosure statement, entitled "Annual Statement of Financial Disclosure" (the "Disclosure Form"), required sitting legislators

to disclose details about their outside income, activities, finances, and assets so that, among other things, a financial impropriety or conflict of interest could be detected.  More specifically, at all times relevant to this Indictment, the Disclosure Form required legislators to disclose "completely" the "nature and amount of any income in EXCESS of $1,000 from EACH SOURCE," and, for legislators who had outside income as attorneys, to provide a "general description of the principal subject areas" of their practice.

          5.    On the Disclosure Forms of SHELDON SILVER, the defendant, covering the years 2002 through 2013, SILVER described his law practice as representing "individual clients" in the "predominant area" or "principal subject area" of "personal injury claims."  SILVER reported receiving income from serving as "of counsel" to the law firm Weitz & Luxenberg, P.C. ("Weitz & Luxenberg"), but he did not identify receiving income from any other law firm.

          6.    In addition to the statements made on his annual Disclosure Forms, SHELDON SILVER, the defendant, made the following public representations, among others, about the nature and sources of his outside income:

          a.    SILVER claimed that his private legal work consisted of spending several hours each week evaluating legal

3

matters brought to him by potential clients and then referring
cases that appeared to have merit to attorneys at Weitz &
Luxenberg.

        b.    SILVER claimed, through his official
spokesperson, that potential clients found SILVER by virtue of his
being a "lawyer for more than 40 years," and that SILVER's ability
to find clients was "not unlike any other attorney in this state,
anywhere."

        c.    SILVER repeatedly claimed that his outside
legal work was not connected to his official position or to State
government, and that none of his clients had any business before
the State.

### Overview of Silver's Fraudulent Scheme

        7.    From at least in or about 2000 up to and including
in or about January 2015, SHELDON SILVER, the defendant, engaged
in a secret and corrupt scheme to deprive the citizens of the State
of his honest services as an elected legislator and as Speaker of
the Assembly by using the power and influence of his official
position to obtain for himself millions of dollars in bribes and
kickbacks masked as legitimate income earned by SILVER as a private
lawyer.

        8.    More specifically, from at least in or about 2000
through in or about January 2015, SHELDON SILVER, the defendant,

received nearly $4 million in corrupt payments through two law firms, consisting of the following:

  a.   Approximately $700,000 in undisclosed bribes and kickbacks that SILVER obtained from a real estate law firm (the "Real Estate Law Firm"), which was controlled by an attorney who previously had worked as SILVER's counsel in the Assembly ("the Real Estate Lawyer").  SILVER obtained these payments in exchange for using his power and influence as an elected legislator and as Speaker of the Assembly to cause and induce real estate developers with substantial business before the State to retain and continue to use the Real Estate Law Firm.

  b.   More than $3 million in payments from Weitz & Luxenberg that SILVER obtained by securing referrals of asbestos cases from a doctor ("Doctor-1") in exchange for SILVER's use of his official position to secretly direct $500,000 in State funds to Doctor-1's research center and provide additional official benefits to Doctor-1 and his family.

  9.   In furtherance of his corrupt scheme and to enable the scheme to continue without detection, SHELDON SILVER, the defendant, repeatedly took actions and used his official position to prevent the public, investigators, and others from learning about his corrupt arrangements with the Real Estate Law Firm and Doctor-1.  For example, SILVER made materially false and

fraudulent representations and omissions about his outside
income, including but not limited to SILVER's public statements,
statements on his Disclosure Forms, and statements to others
concerning his outside income.   In addition, from in or about 2013
to in or about 2014, SILVER sought to prevent, and in fact
prevented, the disclosure of information about his outside income
to the Moreland Commission to Investigate Public Corruption (the
"Moreland Commission"), which was created in or about July 2013
by the Governor "to probe systemic corruption and the appearance
of such corruption in state government, political campaigns and
elections in New York State."

### Means and Methods of Silver's Fraudulent Scheme

*Silver's Receipt of Kickbacks from the Real Estate Law Firm*

10.   As an elected legislator and as Speaker of the
Assembly, SHELDON SILVER, the defendant, has exercised
significant power over the real estate industry, including but not
limited to considering, negotiating, and enacting legislation
that created and maintained certain governmental programs,
subsidies, and tax incentives of importance to the industry.

11.   The Real Estate Law Firm is located in the Assembly
District of SHELDON SILVER, the defendant.   Its practice consists
almost exclusively of representing property owners that contest
the assessment of the value of their properties in an effort to

6

lower the real estate taxes imposed on them, a practice referred to as tax certiorari work.  The Real Estate Lawyer founded and controls the Real Estate Law Firm.  At all times relevant to this Indictment, the Real Estate Law Firm had only two attorneys who worked for it, namely, the Real Estate Lawyer and another attorney. Like others in the tax certiorari industry, the Real Estate Law Firm billed its clients on a contingency fee basis, typically obtaining as a fee up to 25 percent of any tax reductions it obtained on behalf of its clients.

13.   Beginning at least in or about 2000, SHELDON SILVER, the defendant, entered into a corrupt arrangement with the Real Estate Lawyer whereby SILVER used the power and influence of his official position to cause and induce two real estate developers ("Developer-1" and "Developer-2"), both of which had significant business before the State and owned properties located within SILVER's Assembly District, to retain and continue to use the Real Estate Law Firm for potentially lucrative tax certiorari work.  In exchange and in return for SILVER's use of the power and influence of his official position, SILVER obtained hundreds of thousands of dollars in kickbacks from the Real Estate Law Firm that were disguised as attorney "referral fees."

13.   In exchange for his receipt of kickbacks from the Real Estate Law Firm, SHELDON SILVER, the defendant, agreed to

take, and did in fact take, numerous actions under the color of his official authority and in his official capacity as an elected legislator and as Speaker of the Assembly as the opportunities arose, including but not limited to the following:

a.    Even though SILVER had no background in real estate tax certiorari work and no experience performing or evaluating such work, SILVER caused and induced Developer-1 and Developer-2 to move tax certiorari business from law firms they had been using to the Real Estate Law Firm, a firm which neither Developer-1 nor Developer-2 had retained before.

b.    During times relevant to this Indictment, SILVER spoke and met in his legislative office with representatives of and lobbyists for Developer-1 – who were retained in part to lobby SILVER – about certain real estate governmental programs, subsidies, and tax incentives and the representation of Developer-1's buildings by the Real Estate Law Firm.

c.    During times relevant to this Indictment, SILVER met with a representative of Developer-2 and discussed real estate matters of importance to Developer-2.

d.    SILVER supported legislative proposals favorable to Developer-1 and Developer-2, including but not

limited to proposals made by lobbyists for Developer-1 with respect to the Rent Act of 2011.

e.   Based on SILVER's past favorable official actions concerning Developer-1 and Developer-1's dependence on continued favorable treatment by SILVER, in or about late 2011 through early 2012, SILVER caused and induced Developer-1 to continue to retain the Real Estate Law Firm.

14.   At the Real Estate Lawyer's direction, the Real Estate Law Firm paid SHELDON SILVER, the defendant, often multiple times per year, a percentage of the fees it obtained from Developer-1 and Developer-2.   During times relevant to this Indictment, the Real Estate Law Firm paid SILVER nearly $700,000. During that time period, and at all times relevant to this Indictment, SILVER performed no work for the Real Estate Law Firm whatsoever, including in connection with the firm's representation of Developer-1 and Developer-2.

15.   In furtherance of the fraudulent scheme, the United States mail and private and commercial interstate carriers and interstate wires were used and caused to be used, including but not limited to mailings sent and received and interstate electronic mail, telephone calls, and wire transfers of funds between, among other individuals and entities, the Real Estate Law

Firm, SHELDON SILVER, the defendant, Developer-1, and Developer-2.

### *Silver's Receipt of Asbestos Referral Kickbacks*

16.   As Speaker of the Assembly, SHELDON SILVER, the defendant, exercised control over a pool of money that was available to the Assembly until in or about 2007 under legislation entitled the New York State Health Care Reform Act ("HCRA"). Specifically, until in or about 2007, up to $8.5 million was allocated to the Assembly annually under HCRA, to be disbursed through the New York State Department of Health ("DOH") at the discretion of the Speaker of the Assembly, i.e., SILVER (the "HCRA-Assembly Pool").

17.   Disbursements from the HCRA-Assembly Pool were not subject to public disclosure.  To disburse funds from the HCRA-Assembly Pool, a letter from SHELDON SILVER, the defendant, was sent to DOH, accompanied by a form called a Legislative Initiative Form, which provided the purported intended purpose of the disbursement.  DOH had no role in selecting recipients of the HCRA-Assembly Pool funds or evaluating the intended use of such funds.  Thus, SILVER was able to distribute money from the HCRA-Assembly Pool at his discretion, with no public disclosure of the disbursement, its recipient, or its intended purpose.

18.  At all times relevant to this Indictment, Doctor-1 was a well-known expert in the treatment and research of mesothelioma, a cancer that is caused almost exclusively by asbestos.  Doctor-1 treated mesothelioma patients and conducted mesothelioma research at a university located in Manhattan ("University-1") and its affiliated hospital.  Doctor-1 also created a center at University-1 that was dedicated to mesothelioma research (the "Mesothelioma Center").

19.  Weitz & Luxenberg has several practice areas, including personal injury, malpractice, and products liability. Its predominant area of focus is representing plaintiffs who suffer from asbestos-related diseases such as mesothelioma.  In or about September 2002, Weitz & Luxenberg hired SHELDON SILVER, the defendant, to be "of counsel" to the firm with an annual salary of $120,000.  Weitz & Luxenberg hired SILVER because of his official position and stature and without the expectation that SILVER would perform any work on cases, or that he would refer any asbestos cases to the firm.  Indeed, at the time SILVER joined Weitz & Luxenberg, SILVER had no prior experience with asbestos cases, and he brought no cases, matters, or clients of any kind with him to the firm.

20.  In addition to his salary, SHELDON SILVER, the defendant, was able to obtain additional income from Weitz &

Luxenberg by referring matters to the firm.   In particular, if SILVER referred an asbestos-related client to the firm, he was entitled to receive 33 percent of the firm's share of any recovery obtained by the firm on behalf of such client.

21.   Beginning in or about late 2003 through at least in or about August 2014, SHELDON SILVER, the defendant, created and maintained a corrupt arrangement with Doctor-1 whereby Doctor-1, at SILVER's request, referred patients with mesothelioma to SILVER at Weitz & Luxenberg, and in exchange, SILVER used the power and influence of his official position to benefit Doctor-1, including by providing State funding to Doctor-1's Mesothelioma Center and providing other benefits to Doctor-1 and his family.

22.   More specifically, in exchange for receipt of patient referrals from Doctor-1, SHELDON SILVER, the defendant, took numerous actions under the color of his official authority and in his official capacity as an elected legislator and as Speaker of the Assembly as the opportunities arose, including but not limited to the following:

a.   In or about July 2005, SILVER directed that a State grant in the amount of $250,000, paid for from the HCRA-Assembly Pool, be awarded to Doctor-1's Mesothelioma Center, and pursuant to SILVER's direction, the grant was awarded.

12

b. In or about November 2006, SILVER directed that another State grant in the amount of $250,000, again paid for from the HCRA-Assembly Pool, be awarded to Doctor-1's Mesothelioma Center, and pursuant to SILVER's direction, the grant was awarded.

c. In or about 2008, SILVER helped direct $25,000 in State funding to a not-for-profit organization on which a family member of Doctor-1 served as a member of its Board of Directors.

d. In or about May 2011, SILVER sponsored and obtained an official resolution adopted by the Assembly and an Assembly-issued proclamation honoring Doctor-1, which SILVER presented to Doctor-1 at an event at which Doctor-1 was honored by a nationwide cancer organization in Manhattan. During the presentation, SILVER made remarks in his official capacity praising Doctor-1.

e. In or about 2012, SILVER facilitated employment for a family member of Doctor-1 at a not-for-profit organization to which SILVER had directed millions of dollars in State funding.

23. The patient referrals from Doctor-1 to SHELDON SILVER, the defendant, were highly lucrative for SILVER. Specifically, Weitz & Luxenberg paid SILVER more than $3 million in referral fees for clients referred to him by Doctor-1. With

13

respect to these clients, SILVER did not evaluate the matters; he performed no work on the matters; he had no contact with the clients; and he did not advise the Weitz & Luxenberg attorneys assigned to the matters.

24.   In furtherance of the fraudulent scheme, the United States mail and private and commercial interstate carriers and interstate wires were used and caused to be used, including but not limited to mailings sent and received and interstate electronic mail, telephone calls, and wire transfers of funds between, among other individuals and entities, Weitz & Luxenberg and clients referred to SHELDON SILVER, the defendant, by Doctor-1.

## Silver's Concealment of His Fraudulent Scheme

25.   As part of his corrupt scheme and to avoid detection by the public, his staff, colleagues, and associates, State regulators, law enforcement, and others, SHELDON SILVER, the defendant, took numerous steps to conceal his corrupt relationships with the Real Estate Law Firm and Doctor-1.   Such steps include but are not limited to the following:

a.   SILVER made materially false and fraudulent representations and omissions on the mandatory Disclosure Forms he filed with the Ethics Commission.   Among other things, SILVER failed to disclose that he received income from the Real Estate

14

Law Firm and failed to disclose that the vast majority of his income from Weitz & Luxenberg was derived not from "the predominant area of personal injury claims" – as he stated on the forms – but rather from asbestos-related product liability cases on which he performed no legal work and that he received through the use of his official position.

       b.    SILVER lied to and misled the public about the nature and sources of his outside legal income by, among other things, claiming that none of his clients had any business before the State when, in truth and in fact, he represented large real estate developers with substantial business before the State.

       c.    SILVER further lied to and misled the public about the nature and sources of his outside legal income by claiming that he derived outside income through clients who sought him out for legal services and that he spent several hours each week evaluating legal matters brought to him by potential clients. In truth and in fact, Developer-1, Developer-2, and patients of Doctor-1 did not seek out SILVER for legal representation and SILVER did not evaluate either the tax certiorari matters from which he received fees from the Real Estate Law Firm or the asbestos matters referred to him by Doctor-1.

       d.    SILVER went to great lengths to prevent others, including his staff, colleagues, and associates, from

learning about his relationship with Doctor-1 and the fact that he was receiving referral fees from the Real Estate Law Firm's representation of Developer-1 and Developer-2 and obtaining client referrals from Doctor-1.  Among other ways of concealing his corrupt relationships with the Real Estate Law Firm and with Doctor-1, SILVER:

        i.     Kept secret from attorneys at Weitz & Luxenberg that he had allocated State funding to Doctor-1's research;

        ii.     Kept secret from his legislative staff that he was receiving referral fees from the Real Estate Law Firm and client referrals from Doctor-1;

        iii.     Instructed Doctor-1 not to tell a mutual friend who had first introduced SILVER and Doctor-1 about Doctor-1's referrals of patients to SILVER; and

        iv.     Used undisclosed State funds, namely the HCRA-Assembly Pool, to provide grants to Doctor-1's research, and stopped providing such grants when the HCRA-Assembly Pool was eliminated and other possible sources of State funding would have been subject to public disclosure.

      26.  SHELDON SILVER, the defendant, took actions to conceal his corrupt sources of outside income from the Moreland Commission.  After the Moreland Commission sent letters to

certain members of the Assembly and the Senate, including to SILVER, requesting, among other things, "a description of the services you provide or have provided in exchange for compensation," and "a list of your clients in any civil matters," SILVER refused to provide the requested information.  When the Moreland Commission then subpoenaed Weitz & Luxenberg, as well as other entities that employed legislators who had refused to comply with the letter requests, for information about the non-complying legislators' outside income, SILVER caused the Assembly, at taxpayer expense, and Weitz & Luxenberg to file motions in New York State Supreme Court to quash the subpoenas.  On or about February 25, 2014, in statements made at a press conference, SILVER claimed that by subpoenaing information about legislators' outside income, the Moreland Commission was "engaged in a fishing expedition to intimidate legislators" and had exceeded its mandate and otherwise abused its power.  Subsequently and while the motions to quash the subpoenas were pending, SILVER participated in State budget negotiations that resulted in, among other things, the shutdown of the Moreland Commission, and the subpoenas seeking information on outside income were withdrawn.

### Statutory Allegations

27.   From at least in or about 2000 through in or about January 2015, in the Southern District of New York and elsewhere,

SHELDON SILVER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to SILVER's honest services as an elected legislator and as the Speaker of the Assembly, for the purpose of executing such scheme and artifice and attempting to do so, placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service and deposited and caused to be deposited a matter and thing to be sent and delivered by private and commercial interstate carrier, and took and received therefrom, such matter and thing, and knowingly caused to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, any such matter and thing, to wit, SILVER used the power and influence of his official position to obtain for himself millions of dollars in bribes and kickbacks masked as legitimate income earned by SILVER as a private lawyer, and in connection therewith and in furtherance thereof, SILVER sent and received and caused materials to be sent and received using the United States mail and private and commercial interstate carriers.

(Title 18, United States Code, Sections 1341 and 1346.)

18

## COUNT TWO

### (Honest Services Wire Fraud)

The Grand Jury further charges:

28.   The allegations contained in paragraphs 1 through 26 of this Indictment are repeated and realleged as if fully set forth herein.

29.   From at least in or about 2000 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to SILVER's honest services as an elected legislator and as the Speaker of the Assembly, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SILVER used the power and influence of his official position to obtain for himself millions of dollars in bribes and kickbacks masked as legitimate income earned by SILVER as a private lawyer, and in connection therewith and in furtherance thereof, SILVER transmitted and caused to be transmitted interstate electronic mail, telephone calls, and wire transfers of funds.

(Title 18, United States Code, Sections 1343 and 1346.)

## COUNT THREE

### (Extortion Under Color of Official Right)

The Grand Jury further charges:

30.   The allegations contained in paragraphs 1 through 26 of this Indictment are repeated and realleged as if fully set forth herein.

31.   From at least in or about 2000 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, while serving as an elected legislator and as Speaker of the Assembly, willfully and knowingly, did commit extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), that is, by obtaining hundreds of thousands of dollars from Developer-1 and Developer-2, and patient referrals worth millions of dollars from Doctor-1, with their consent, such consent having been induced under color of official right, and thereby did obstruct, delay, and affect commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3).

(Title 18, United States Code, Section 1951.)

## FORFEITURE ALLEGATIONS

32.   As a result of committing one or more of the offenses alleged in Counts One through Three of the Indictment, SHELDON SILVER, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived, directly or indirectly, from proceeds traceable to the commission of the said offense(s), including but not limited to all of SILVER's right, title, and interest in:

a.   Any and all funds on deposit in HSBC Bank, Account Number 646014943, held in the name of Sheldon Silver, Counselor at Law;

b.   $368,000 on deposit in HSBC Bank, Account Number 761883860, held in the name of Joron Management LLC;

c.   $100,000 on deposit in Bank of America, Account Number 483025986924, held in the name of Counsel Financial Holdings LLC;

d.   Any and all funds on deposit in Synchrony Bank, Account Number 5005138390, held in the name of Sheldon Silver;

e.   Any and all funds and assets on deposit in Fidelity Investments, Account Number 614856932, held in the name of Sheldon Silver;

f.   Any and all funds and assets on deposit in Fidelity Investments, Account Number 613438626, held in the name of Sheldon Silver;

g.   Any and all funds and assets on deposit in Bank of New York Mellon, Account Number 980215084245, held in the name of Sheldon Silver;

h.   Any and all funds and assets on deposit in Morgan Stanley Smith Barney, Account Number 901010095, held in the name of Sheldon Silver;

i.   Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of: JoRon Management LLC; Counsel Financial Services LLC and/or Counsel Financial Holdings LLC; Alpha Orbit LLC; Clover Communities Fund I, L.P.; Clover Communities Fund II, L.P.; Clover Communities Fund III, L.P.; Clover - Brighton Square; Lerer Ventures II, L.P.; and NewSat;

j.   All right, title, and interest in the real property and appurtenances known and described as 32 Mountain Drive, Woodridge, New York, 12789;

k.   All right, title, and interest in the real property and appurtenances known and described as 550 Grand Street, Apartments G-5A and G-5B, New York, 10002;

1.    All right, title, and interest in any fees paid or to be paid to SILVER by the Real Estate Law Firm;

m.    All right, title, and interest in any fees paid or to be paid to SILVER by Weitz & Luxenberg related to any referrals from Doctor-1;

and all property traceable thereto.

### Substitute Asset Provision

33.   If any of the above-described forfeitable property, as a result of any act or omission of SHELDON SILVER, the defendant:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the

value of the above forfeitable property, including but not limited to all of SILVER's right, title, and interest in:

        a.    Any pension fund to which SILVER may be entitled as a result of his employment as a member of the New York State Assembly and as Speaker of the New York State Assembly.

        (Title 18, United States Code, Section 981,
        Title 21, United States Code, Section 853, and
        Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

24

Form No. USA-33s-274 (Ed. 9-25-58)

---

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

### UNITED STATES OF AMERICA

### - v. -

### SHELDON SILVER,

### Defendant.

---

### INDICTMENT

15 Cr. _____

(18 U.S.C. §§ 1341, 1343, 1346, 1951)

_____          PREET BHARARA
Foreperson.              United States Attorney.

---

2/19/15  Fld. Indictment, Case assigned to Judge
Caproni.

Pitman, US MJ