**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

      v.

SHELDON SILVER,

          Defendant.

No. 15 Cr. 93 (VEC)

**DEFENDANT'S MOTION TO DISMISS INDICTMENT BASED ON**
**THE PROSECUTION'S IMPROPER EXTRAJUDICIAL STATEMENTS**

Joel Cohen
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York  10038
Telephone: (212) 806-5644
Facsimile:  (212) 806-6006

Steven F. Molo
Robert K. Kry
Justin V. Shur
MOLO LAMKEN LLP
540 Madison Avenue
New York, New York  10022
Telephone: (212) 607-8160
Facsimile:  (212) 607-8161

*Attorneys for Defendant*

February 24, 2015

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

      A.      Mr. Silver's Arrest ....................................................................................... 3

      B.      The U.S. Attorney's Press Conference ................................................... 4

      C.      The Media Blitz Continues ....................................................................... 7

ARGUMENT ..................................................................................................................... 11

I.      The U.S. Attorney's Statements Flagrantly Violated Applicable Publicity Rules ........... 12

II.      The U.S. Attorney's Violations Warrant Dismissal of the Indictment ............................ 15

      A.      The U.S. Attorney's Violations Compromised the Fairness of the Grand Jury Process .......................................................................................... 17

      B.      The U.S. Attorney's Violations Are Merely the Latest Examples of a Continuous Pattern of Official Misconduct .......................................... 19

III.      At a Minimum, the Court Should Poll the Grand Jury for Improper Influence and Order Disclosure of the Grand Jury Minutes ................................................... 23

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Coffin v. United States*, 156 U.S. 432 (1895)................................................................1

*Anilao v. Spota*, 918 F. Supp. 2d 157 (E.D.N.Y. 2013)..................................................25

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988)....................................17, 19

*Costello v. United States*, 350 U.S. 359 (1956) ............................................................16

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211 (1979)..............................25

*Fisher v. Comm. on Grievances ex rel. U.S. Dist. Court*, 759 F.3d 200
    (2d Cir. 2014).............................................................................................................25

*In re Grand Jury Investigation*, No. 87-cv-0163, 1987 WL 8073
    (E.D.N.Y. Feb. 23, 1987)...........................................................................................24

*Munoz v. City of N.Y.*, No. 11-cv-7402, 2013 WL 1953180
    (S.D.N.Y. May 10, 2013)............................................................................................25

*Sheppard v. Maxwell*, 384 U.S. 333 (1966)...................................................................23

*Skilling v. United States*, 561 U.S. 358 (2010) ..............................................................24

*Stirone v. United States*, 361 U.S. 212 (1960) ...............................................................16

*United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008)...........................................16

*United States v. Corbin*, 620 F. Supp. 2d 400 (E.D.N.Y. 2009)..............................15, 25

*United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972) .................................................16

*United States v. Fields*, 592 F.2d 638 (2d Cir. 1978) ..............................................16, 19

*United States v. Jacobs*, 547 F.2d 772 (2d Cir. 1976) ...................................................16

*United States v. Kilpatrick*, 821 F.2d 1456 (10th Cir. 1987)........................................16

*United States v. Leeper*, No. 06-CR-58A, 2006 WL 1455485
    (W.D.N.Y. May 22, 2006)..........................................................................................16

*United States v. Lord*, 565 F.2d 831 (2d Cir. 1977) ......................................................24

*United States v. Newman*, 773 F.3d 438 (2d Cir. 2014) ................................................22

*United States v. Owen*, 580 F.2d 365 (9th Cir. 1978)....................................................19

*United States v. Perryman*, No. 12-cr-0123, 2013 WL 4039374
   (E.D.N.Y. Aug. 7, 2013)...........................................................................................15

*United States v. Smith*, 985 F. Supp. 2d 506 (S.D.N.Y. 2013) ...................14, 19, 20, 23

*United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) .................................................16

*United States v. Steinberg*, No. 12-cr-00121 (S.D.N.Y. Nov. 12, 2013)......................24

*United States v. Stevenson*, No. 13-cr-161 (S.D.N.Y. Mar. 4, 2013) ...........................20

*United States v. Williams*, 504 U.S. 36 (1992) ..........................................................16

*Virgin Islands v. Fahie*, 419 F.3d 249 (3d Cir. 2005)..................................................19

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V.................................................................................................15

U.S. Const. amend. VI ..............................................................................................16

## STATUTES, REGULATIONS, AND RULES

28 C.F.R. § 50.2.......................................................................................................14

28 C.F.R. § 50.2(b)(2)..............................................................................................12

28 C.F.R. § 50.2(b)(3)..............................................................................................12

28 C.F.R. § 50.2(b)(3)(ii)..........................................................................................12

28 C.F.R. § 50.2(b)(6)..............................................................................................17

28 C.F.R. § 50.2(b)(6)(vi).........................................................................................12

28 U.S.C. § 50.2(b)(3) ..............................................................................................13

Fed. R. Crim. P. 6(e)(3)(E)(ii) ...................................................................................23

Local Civ. R. 1.5 ......................................................................................................25

Local Crim. R. 23.1...................................................................................................25

Local Crim. R. 23.1(b)..............................................................................................12

Local Crim. R. 23.1(d)..........................................................................................12, 17

Local Crim. R. 23.1(e) ..................................................................................................12

Local Crim. R. 23.1(e)(3) .............................................................................................13

Local Crim. R. 23.1(i) ..................................................................................................25

U.S. Attorneys' Manual § 1-7.401 ...............................................................................14

U.S. Attorneys' Manual § 1-7.401(D) ..........................................................................13

N.Y. Pub. Off. Law § 74(3)(a) .......................................................................................2

N.Y. Comp. Codes R. & Regs. tit. 22, §§ 605.1 *et seq.* ............................................25

N.Y. R. Prof'l Conduct 3.6 ...........................................................................................25

N.Y. R. Prof'l Conduct 3.6(a) .......................................................................................13

N.Y. R. Prof'l Conduct 3.6(b)(4) ..................................................................................17

## OTHER AUTHORITIES

Abhishek Kumar, *Preet Bharara Is the Villain in the Devyani Case*, Newsroom Post,
 Feb. 2014 ................................................................................................................21

Andrew Hawkins, *Bharara Lays Out Silver Case, Hints at More Arrests*,
 Crain's N.Y. Bus., Jan. 22, 2015 ..............................................................................7

*Assembly Speaker Sheldon Silver Expected To Be Arrested on Federal Corruption
 Charges, Report Says*, S.I. Live.Com, Jan. 22, 2015 ...............................................3

Avaneesh Pandey, *New York Assembly Speaker Sheldon Silver Might Be Arrested over
 Corruption Charges: Report*, Int'l Bus. Times, Jan. 22, 2015 ................................3

*Bharara Foes Pounce on Newman Ruling in SDNY*, Law360, Feb. 13, 2015 ...............22

Bruce Carton, *SDNY Drops the Hammer on SAC . . . But Not Steve Cohen*,
 Compliance Weekly, July 26, 2013 ..........................................................................22

Christine Simmons, *Silver Scandal Prompts Discussion of Referral Fees*, N.Y.L.J.,
 Feb. 19, 2015 .............................................................................................................2

Christine Simmons, *Weitz Firm Hires Ethics Expert to Review Practices*, N.Y.L.J.,
 Feb. 11, 2015 .............................................................................................................2

Colin Campbell, *Top Prosecutor Warns NY Politicians To 'Stay Tuned' for More
 Corruption Arrests*, Business Insider, Jan. 23, 2015 ...............................................7

Elysia Rodriguez, *Assembly Speaker Faces Corruption, Conspiracy Charges*,
WIVB4.Com, Jan. 22, 2015.............................................................................3

Erica Orden, et al., *N.Y. Assembly Speaker Sheldon Silver Accused of Abusing Power:*
*U.S. Attorney Says Politician Amassed Personal Fortune Through Kickbacks,*
*Referrals*, Wall St. J., Jan. 22, 2015...........................................................6

*Feds Right To Review Moreland Probe Files*, Newsday, Apr. 13, 2014......................................21

George Packer, *A Dirty Business: New York City's Top Prosecutor Takes on Wall Street*
*Crime*, New Yorker, June 27, 2011 ...............................................................22

Jon Campbell, *Bharara: NY is the 'Show Me the Money' State*, Politics on the Hudson,
Feb. 5, 2015...........................................................................................7

Joseph Specter, *Top NY Lawmaker Arrested on Corruption Charges*, USA Today,
Jan. 22, 2015 .........................................................................................6

Kenneth Lovett, *Albany Lawmakers Cry Foul over Manhattan U.S. Attorney Preet*
*Bharara's Tactics*, N.Y. Daily News, Feb. 14, 2015 ....................................10

Kenneth Lovett, et al., *N.Y. Assembly Speaker Sheldon Silver Accused of $4 Million*
*Bribery and Kickback Scheme*, N.Y. Daily News, Jan. 22, 2015 ...............3

Kia Makarechi, *Tough-Talking Prosecutor Preet Bharara Is Ready for His Close-Up*,
Vanity Fair, Jan. 23, 2015 ......................................................................10

Leonica Valentine, et al., *Silver's Scandal Complicates Malcom Smith's Bribery Trial*,
N.Y. Post, Jan. 23, 2015..........................................................................20

Luca Marzorati, *Juror Illness Delays Deliberations in Malcolm Smith Trial*,
Capital New York, Feb. 3, 2015 ...............................................................24

Marc Santora, *U.S. Attorney Criticizes Albany's 'Three Men in a Room' Culture*,
N.Y. Times, Jan. 23, 2015 .......................................................................10

Massimo Calabresi, *Prosecutor Preet Bharara in His Own Words: Battling "a Creeping*
*Culture of Corruption,"* Time, Feb. 6, 2012............................................22

Matthew Chayes, *Bharara: Albany's 'Three Men in a Room' System Fosters Distrust*,
Newsday, Jan. 23, 2015 ...........................................................................10

Max Stendahl, *Bharara Foes Pounce on Newman Ruling in SDNY*, Law360,
Feb. 13, 2015 ..........................................................................................22

Max Stendahl, *Newman Sends Insider Trading Shock Waves Beyond SDNY*, Law360,
Feb. 17, 2015...........................................................................................23

Patrick Garrett, et al., *New York State Assembly Speaker Sheldon Silver Arrested on Corruption Charges*, WAMC Northeast Public Radio, Jan. 22, 2015 .....................................3

Peter Lattman, *SAC Prosecutor Hits the Media Trail*, N.Y. Times, Aug. 6, 2013......................21

Rebecca Davis O'Brien, et al., *NY State Assembly Speaker Sheldon Silver Faces Arrest on Corruption Charges*, MarketWatch.Com, Jan. 22, 2015 ......................................................3

Rebecca Jarvis, et al., *Indicted Hedge Fund SAC Capital 'Magnet for Market Cheaters,'* ABC News, July 25, 2013...........................................................................................................22

Reid Wilson, *N.Y. Assembly Speaker Sheldon Silver Arrested on Federal Corruption Charges*, Wash. Post, Jan. 22, 2015.........................................................................................7

Rich Calder, *'Bribe Pol' Claims Bharara's Pension Comments Will Prevent 'Fair Trial'*, N.Y. Post, Nov. 18, 2013 ........................................................................................................20

Rich Schapiro, et al., *U.S. Attorney Preet Bharara Sparks Buzz About His Political Future After Indictment of New York Assembly Speaker Sheldon Silver*, N.Y. Daily News, Jan. 22, 2015 ..........................................................................................7

Ross Barkan, *A Swaggering Preet Bharara Charges Sheldon Silver with Public Corruption*, Observer, Jan. 22, 2015............................................................................................6

Sashi Tharoor, *The Return of the Ugly American*, Reuters, Jan. 7, 2014 ....................................21

Steve Huff, *The Strange Case of NYPD Officer Gilberto Valle, Alleged Wannabe Cannibal*, Observer, Oct. 25, 2012 ..........................................................................................20

Stewart Bishop, *Judge Mocks US Attorney Bharara's Press Release*, Law360, Oct. 2, 2013 .............................................................................................................................20

Sybile Penhirin, *Video: Watch US Atty Preet Bharara Yuk It Up About New York's Corrupt Pols*, DNAinfo N.Y., Jan. 23, 2015 ...........................................................................10

Tom Hays, *Assembly Speaker Sheldon Silver Arrested in Corruption Case*, Assoc. Press, Jan. 23, 2015 ...............................................................................................7

U.S. Attorney's Office, *Manhattan U.S. Attorney and FBI Assistant Director-in-Charge Announce Charges Against Seven Investment Professionals for Insider Trading Scheme That Allegedly Netted More Than $61.8 Million in Illegal Profits* (Jan. 18, 2011)..........................................................................................................................21

U.S. Attorney's Office, *New York State Assembly Speaker Sheldon Silver Arrested on Corruption Charges* (Feb. 22, 2015) ..........................................................................................4

Will Bredderman, *Preet Bharara Blasts 'Three Men in a Room' After Sheldon Silver Arrest*, Observer, Jan. 23, 2015.................................................................................................10

William K. Rashbaum, et al., *Firm That Paid Sheldon Silver Is Tied to Landlord with Troubled Past*, N.Y. Times, Dec. 30, 2014 ............................................................................4

William K. Rashbaum, et al., *Sheldon Silver, Assembly Speaker, Took Millions in Payoffs, U.S. Says*, N.Y. Times, Jan. 22, 2015 ....................................................................4, 6

William K. Rashbaum, et al., *Sheldon Silver, New York Assembly Speaker, Faces Arrest on Corruption Charges*, N.Y. Times, Jan. 22, 2015 ...............................................................3

William K. Rashbaum, et al., *U.S. Said To Investigate Sheldon Silver, New York Assembly Speaker, over Payments*, N.Y. Times, Dec. 29, 2014 ................................................4

## <u>INTRODUCTION</u>

> *The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.*
>
> – *Coffin v. United States*, 156 U.S. 432, 453 (1895).

In its zeal to prosecute this case, the Government has lost sight of that basic principle. From the outset, the prosecution has changed what should be a search for truth into an unrelenting media frenzy, the flames of which are fanned at every turn with actions that show a complete disregard for the rules governing a prosecutor's conduct. The effect of the U.S. Attorney's actions is to convict in the media before even calling his first witness. Those actions have denied Mr. Silver the impartial proceedings to which he is entitled.

Sadly, this is not an isolated event. In a number of recent cases in this Court, the prosecution has taken the same approach, pleading its case to the press before the accused has his day in court. The time has come to end this. The U.S. Attorney's actions are in plain violation of rules, ethical standards, and Department of Justice guidelines that prohibit the prosecution from publicly opining on the defendant's guilt.

The U.S. Attorney's actions have already caused irreparable harm by tainting the grand jury, which returned an indictment in the midst of the media firestorm the Government created. The Court should accordingly dismiss the indictment to vindicate the defendant's right to an impartial grand jury and to deter future violations by the Government. At a minimum, the Court should poll the grand jury and order disclosure of the grand jury minutes to determine the impact of the improper publicity.

## BACKGROUND

On January 22, 2015, the U.S. Attorney's Office unsealed a criminal complaint against Sheldon Silver, former Speaker of the New York State Assembly.  The charges were based on fees that Mr. Silver earned from two law firms – Weitz & Luxenberg, a prominent personal injury firm to which he was "of counsel," and Goldberg & Iryami, a well-established firm to which he referred real estate tax certiorari work.  Of course, there is nothing wrong with a New York state legislator earning outside income from other professional pursuits:  Part-time public service has long been the norm in this State.  *See* N.Y. Pub. Off. Law § 74(3)(a).  Nor is there anything improper about an attorney earning referral fees for bringing in business to a law firm: "Rainmaking" is not a federal crime.[1]

The prosecution nonetheless insists that those payments constituted illegal "bribes" and "kickbacks" that violated the federal honest-services statute and the Hobbs Act.  That theory is wrong on both the facts and the law – a conclusion that any open-minded juror would reach if Mr. Silver were given a fair chance to clear his name.

That, however, appears never to have been the Government's plan.  Throughout this prosecution, the Government has engaged the media in a manner that has effectively convinced the public (and thus the jury venire) that Mr. Silver is guilty before he even shows up in court.

---

[1] Indeed, immediately following Mr. Silver's arrest, Weitz & Luxenberg hired a prominent legal ethics expert – Roy Simon, Distinguished Professor Emeritus of Law at Hofstra University Law School and author of *Simon's New York Rules of Professional Conduct Annotated* (Thomson Reuters 2015) – to conduct an independent review of the firm's referral payments.  Professor Simon concluded that Mr. Silver's position at the firm was legitimate; that he regularly worked at the firm's offices when not in Albany; and that he actively contributed to the firm's work, including by obtaining the clients for which he received referral fees.  *See* Christine Simmons, *Weitz Firm Hires Ethics Expert to Review Practices*, N.Y.L.J., Feb. 11, 2015 (Ex. 5); Christine Simmons, *Silver Scandal Prompts Discussion of Referral Fees*, N.Y.L.J., Feb. 19, 2015 (Ex. 6).

### A.      Mr. Silver's Arrest

The Government arrested Mr. Silver at 8 a.m. on January 22, 2015, after agreeing with defense counsel the night before to accept his voluntary surrender and to keep the complaint under seal until his arrest.  The Government, however, applied a peculiar definition to the term "under seal" as it began waging its media campaign almost immediately.

At 1:55 a.m. – six hours *before* the arrest and unsealing of the complaint – the *New York Daily News* reported on the imminent arrest and the substance of the charges, citing unnamed "law enforcement sources."   Kenneth Lovett, et al., *N.Y. Assembly Speaker Sheldon Silver Accused of $4 Million Bribery and Kickback Scheme*, N.Y. Daily News, Jan. 22, 2015 (initially posted at 1:55 a.m.) (Ex. 7).  Similar stories appeared in various outlets throughout the night, reporting that Silver "will be" or "might be" arrested.[2]  Those stories contained detailed information about the Government's investigation, the relevant witnesses, and the nature of the charges to be brought in the (still sealed) complaint – with no suggestion that prosecutors had declined comment to the reporters.  That all transpired before 8 a.m.  Indeed, the *New York Times* – which ran the story in its morning print edition – reported that Mr. Silver's counsel had "declined to comment *on Wednesday night*" – *i.e.*, the night *before* the arrest.  *See* William K.

---

[2] *See* Avaneesh Pandey, *New York Assembly Speaker Sheldon Silver Might Be Arrested over Corruption Charges: Report*, Int'l Bus. Times, Jan. 22, 2015 (2:35 a.m.) (Ex. 8); Reuters, *The New York State Assembly Speaker Will Be Arrested on Federal Corruption Charges*, Bus. Insider, Jan. 22, 2015 (4:51 a.m.) (Ex. 9) (citing "unnamed sources with knowledge of the matter"); Elysia Rodriguez, *Assembly Speaker Faces Corruption, Conspiracy Charges*, WIVB4.Com, Jan. 22, 2015 (5:26 a.m.) (Ex. 10); Maura Grunlund, *Assembly Speaker Sheldon Silver Expected To Be Arrested on Federal Corruption Charges, Report Says*, S.I. Live.Com, Jan. 22, 2015 (6:27 a.m.) (Ex. 11); Patrick Garrett, et al., *New York State Assembly Speaker Sheldon Silver Arrested on Corruption Charges*, WAMC Northeast Public Radio, Jan. 22, 2015 (6:29 a.m.) (Ex. 12); Rebecca Davis O'Brien, et al., *NY State Assembly Speaker Sheldon Silver Faces Arrest on Corruption Charges*, MarketWatch.Com, Jan. 22, 2015 (7:13 a.m.) (Ex. 13) (citing "a person familiar with the matter").

Rashbaum, et al., *Sheldon Silver, New York Assembly Speaker, Faces Arrest on Corruption Charges*, N.Y. Times, Jan. 22, 2015 (Ex. 15) (emphasis added).[3]

Following the arrest, the Government drove Mr. Silver to the courthouse for arraignment, in custody and accompanied by federal agents.  That produced an inevitable "perp walk" effect.[4] Prejudicial images of Mr. Silver arriving in the back of a government vehicle and subsequently exiting the courthouse among a throng of reporters featured prominently in news stories throughout the day.  *See, e.g.*, William K. Rashbaum, et al., *Sheldon Silver, Assembly Speaker, Took Millions in Payoffs, U.S. Says*, N.Y. Times, Jan. 22, 2015 (Ex. 16); *see also* Ex. 17 (collecting additional coverage).

**B.     The U.S. Attorney's Press Conference**

Later that day, U.S. Attorney Preet Bharara delivered a high-profile press conference at which he made repeated, inflammatory statements about Mr. Silver's guilt.  *See* Transcript of Press Conference (Feb. 22, 2015) (Ex. 1).  Many of those statements were repeated in a press release his office issued that same day.  *See* U.S. Attorney's Office, *New York State Assembly Speaker Sheldon Silver Arrested on Corruption Charges* (Feb. 22, 2015) (Ex.  2).

"Over his decades in office," the U.S. Attorney began, "Speaker Silver has amassed titanic political power."  Ex. 1 at 1.  But "Silver also amassed a tremendous personal fortune

---

[3] Leaks to the press are nothing new in this case.  Details of the investigation had previously been leaked to the media in December 2014.  *See* William K. Rashbaum, et al., *U.S. Said To Investigate Sheldon Silver, New York Assembly Speaker, over Payments*, N.Y. Times, Dec. 29, 2014 (Ex. 18) (citing "people with knowledge of the matter, who spoke on the condition of anonymity because the investigation was continuing"); William K. Rashbaum, et al., *Firm That Paid Sheldon Silver Is Tied to Landlord with Troubled Past*, N.Y. Times, Dec. 30, 2014 (Ex. 19) (citing "people with knowledge of the matter").

[4] Googling the phrase "Sheldon Silver perp walk" produces a number of images from the day of Mr. Silver's arrest, both of his arrival at the courthouse and his departure.  *See* Google Image Search Results (Ex. 20).

through the abuse of that political power." *Id.* Mr. Bharara then proceeded to provide "the answers" to questions supposedly consuming New Yorkers' minds:

> For many years New Yorkers have asked the question "How could Speaker Silver, one of the most powerful men in all of New York, earn millions of dollars in outside income without deeply compromising his ability to honestly serve his constituents?" *Today we provide the answer. He didn't.* As alleged, Silver corruptly used his law license and took advantage of lax outside income rules as a cover to secretly pocket millions of dollars through his official position. For many years New Yorkers have also asked the question "What exactly does Speaker Silver do to earn his substantial outside income?" *Well the head scratching can come to an end on that score too because we answer that question today as well. He does nothing. As alleged, Speaker Silver never did any actual legal work. He simply sat back and collected millions of dollars by cashing in on his public office and his political influence.*

Ex. 1 at 1 (emphasis added).

Having provided those "answers," the U.S. Attorney proceeded to explain how the Government's charges "ma[de] clear" that Mr. Silver's conduct epitomized Albany's "show-me-the-money culture" and the "greedy art of secret self-reward":

> As today's charges make clear, the *show-me-the-money culture of Albany* has been perpetuated and promoted at the very top of the political food chain. And as the charges also show, *the greedy art of secret self-reward was practiced with particular cleverness and cynicism by the Speaker himself.*

Ex. 1 at 1 (emphasis added).

The U.S. Attorney then ventured into the "details" of Mr. Silver's purported crimes. Mr. Silver, he explained, wanted to "substantially increase his income . . . without doing a lick of work." Ex. 1 at 2. He allegedly "converted $500,000 in public money into over $3 million in personal riches, which is a nice profit on being a public official." *Id.* And he supposedly "manage[d] to line his pockets . . . essentially through law firms that served as pass-throughs." *Id.* at 3. The U.S. Attorney then summed up with an explanation of how Mr. Silver's purported crimes went to the "very core of what ails Albany":

5

> Politicians are supposed to be on the people's payroll, not on secret retainer to wealthy special interests they do favors for.  *These charges in our view go to the very core of what ails Albany.  Lack of transparency, lack of accountability and lack of principle, joined with an overabundance of greed, cronyism and self-dealing.*  But we will keep at it because the men and women of the FBI and of my office still subscribe to the quaint view that no one is above the law no matter who you are, who you know or how much money you have.  And so our unfinished fight against public corruption continues.  *You should stay tuned.*

Ex. 1 at 4 (emphasis added).[5]

The press reaction was swift and predictable.  Across the country, newspapers reported Mr. Bharara's remarks, quoting extensively from his inflammatory rhetoric.  *See, e.g.*, Ross Barkan, *A Swaggering Preet Bharara Charges Sheldon Silver with Public Corruption*, Observer, Jan. 22, 2015 (Ex. 21) (quoting the "show-me-the-money culture of Albany" and "very core of what ails Albany" segments); William K. Rashbaum, et al., *Sheldon Silver, Assembly Speaker, Took Millions in Payoffs, U.S. Says*, N.Y. Times, Jan. 22, 2015 (Ex. 16) (quoting the "Today we provide the answer" segment).  Many articles featured the U.S. Attorney's rhetoric in their titles or in prominent call-out boxes.  *See, e.g.*, Erica Orden, et al., *N.Y. Assembly Speaker Sheldon Silver Accused of Abusing Power: U.S. Attorney Says Politician Amassed Personal Fortune Through Kickbacks, Referrals*, Wall St. J., Jan. 22, 2015 (Ex. 22) (referencing rhetoric in title and quoting throughout article); Joseph Specter, *Top NY Lawmaker Arrested on Corruption Charges*, USA Today, Jan. 22, 2015 (Ex. 24) (featuring "titanic political power" quote in call-out box).  Many articles also featured video clips from the press conference.  *See, e.g.*, Rashbaum,

---

[5] The U.S. Attorney's Office also sent several of Mr. Bharara's comments out over its Twitter feed shortly after the news conference.  *See* Twitter Feed – U.S. Attorney's Office for S.D.N.Y. (Jan. 22, 2015 at 1:21) (Ex. 23) ("Silver monetized his position as Speaker of the Assembly in two principal ways & misled the public about his outside income"); *id.* ("Politicians are supposed to be on the ppl's payroll, not on secret retainer to wealthy special interests they do favors for").  Those tweets were retweeted well over 50 times following Mr. Silver's arrest.

*supra* (Ex. 16).   A full compendium of the coverage of Mr. Bharara's comments that day is simply too massive to compile.[6]

### C.   The Media Blitz Continues

The U.S. Attorney's campaign only intensified over the following days.   On January 23, 2015, just one day after the arrest and initial press conference, he spoke at a breakfast sponsored by New York Law School at which he continued to talk about the prosecution.   *See* Transcript of Law School Conference (Feb. 23, 2015) (Ex. 3).

Mr. Bharara began with a twisted joke about the severity of the charges:   "I see some public officials here.   And after yesterday I guess I have two theories as to why that might be.   One is that you knew that I would be taking attendance and the other is there are a lot of folks now looking for immunity."   Ex. 3 at 1.   He then offered the following unsolicited advice to public officials: "Just try not to steal our money.   We simply want people in high office to stop

---

[6] Further representative examples include:   Rich Schapiro, et al., *U.S. Attorney Preet Bharara Sparks Buzz About His Political Future After Indictment of New York Assembly Speaker Sheldon Silver*, N.Y. Daily News, Jan. 22, 2015 (Ex. 25) (quoting the "very core of what ails Albany" segment, the "greedy art of secret self-reward" segment, and the "head-scratching can come to an end" segment, among others); Reid Wilson, *N.Y. Assembly Speaker Sheldon Silver Arrested on Federal Corruption Charges*, Wash. Post, Jan. 22, 2015 (Ex. 26) (quoting the "greedy art of secret self-reward" segment); Tom Hays, *Assembly Speaker Sheldon Silver Arrested in Corruption Case*, Assoc. Press, Jan. 23, 2015 (Ex. 27) (quoting the "show-me-the-money culture of Albany" segment); Colin Campbell, *Top Prosecutor Warns NY Politicians To 'Stay Tuned' for More Corruption Arrests*, Business Insider, Jan. 23, 2015 (Ex. 28) (quoting "the very core of what ails Albany" segment); Andrew Hawkins, *Bharara Lays Out Silver Case, Hints at More Arrests*, Crain's N.Y. Bus., Jan. 22, 2015 (Ex. 29) (quoting the "very core of what ails Albany" and "show-me-the-money culture of Albany" segments); *NYS Assembly Speaker Sheldon Silver Arrested on Corruption Charges*, CBS New York, Jan. 22, 2015 (Ex. 30) (quoting "titanic political power" segment, "show-me-the-money culture of Albany" segment, and "greedy art of secret self-reward" segment); *NY's Silver Monetized Political Office, Bharara Says*, Bloomberg Bus., Jan. 22, 2015 (Ex. 31); Jon Campbell, *Bharara: NY is the 'Show Me the Money' State*, Politics on the Hudson, Feb. 5, 2015 (Ex. 32); *NY Assembly Speaker Sheldon Silver Arrested*, Chi. Tribune, Jan. 22, 2015 (Ex. 33).

violating the law.  It seems like a simple and modest request.  People elected to make laws should not be breaking them."  *Id.*

The U.S. Attorney next continued with the following diatribe, once again singling out Mr. Silver's case and amplifying his remarks from the day before:

> In the series of cases that we have brought, . . . including the one we brought yesterday, they I think go to *the very core of what ails Albany.*  And I said this yesterday.  It's a lack of transparency, a lack of accountability and lack of principle, joined with an overabundance of greed, cronyism and self-dealing.  It seems sometimes that *Albany really is a cauldron of corruption.*  As I also said yesterday, politicians are supposed to be on the people's payroll, not on secret retainer to wealthy special interests they do favors for. . . .
>
> . . . Often corruption is about greed.  Simple as that.  Greed on the part of elected or appointed officials whose responsibility is to the public and whose salaries are paid by the taxpayer, whether it's by selling votes for cash or embezzling funds in their trust or otherwise.  There are a spate of instances where elected officials have sought to monetize their public position.  Money often seems to be at the core of the problem.  I was asked yesterday by someone how the case we brought yesterday was different from other cases.  And in some ways it is because of the standing and stature of the person who was charged.  *But in many ways it's business as usual in our public corruption unit.  Case after case after case we have brought has had at its base money and specifically a person who is in the public trust who is supposed to hold the public trust and sought ways to monetize his or her position.*

Ex. 3 at 2 (emphasis added).

The U.S. Attorney then launched into a series of appeals to the emotions of his audience (and potential jury pool):  "How should all of this make us feel as citizens and taxpayers?  And again as I've said before, I think the people of New York should be disappointed but they should be more than disappointed.  *They should maybe be angry.  When so many of their leaders can be bought for a few thousand dollars they should think about getting angry.*"  Ex. 3 at 3 (emphasis added).  He invited the audience to speculate that lawmakers like Mr. Silver were committing other, as-yet-undetected crimes:  "Given the allegations in case after case after case how many other pending bills were born of bribery?  And worse, how many past bills were born of bribery?

Or improper influence?  How about items in the budget?  *How much of the work of the city and the state government is tarnished by tawdry graft?*"  *Id.* (emphasis added).

The U.S. Attorney then proceeded to attack New York's political regime generally. "*There are, by my count, 213 men and women in the state legislature and yet it is common knowledge that only three men essentially wield all the power.  The Governor, the Assembly speaker [i.e., Mr. Silver] and the Senate president.*  So I must confess a little bit of confusion about this.  When did this come to pass?  Why has everyone just come to accept it? . . . *When did 20 million New Yorkers agree to be ruled by a triumvirate like in Roman times?*"  Ex. 3 at 3 (emphasis added).  Lest the audience forget about the defendant of the hour, he added:  "[T]he decision to federally charge the Speaker of the Assembly yesterday was made by more than three people in a room and on a serious note the concept and the dynamic of three men in a room has consequences.  Common sense will tell you that."  *Id.* at 4.

The U.S. Attorney lamented that "such a culture has become so imbedded that even a series of tough and successful prosecutions that have separated so many lawmakers from their liberty has not been enough to thwart others from following in their felonious footsteps."  Ex. 3 at 4.  "When a New York State Senator is more likely to be arrested by the authorities than defeated in election, as I said, people lose faith."  *Id.* at 5.  He ended by once again appealing to emotion:  "*It's up . . . to people to get angry*, as I've said.  People need to demand more.  It's not just enough to be fed up when, in New York, politician after politician after politician breaks bad; that's a time to say no more half measures."  *Id.* at 6 (emphasis added).[7]

---

[7] In the question and answer session, Mr. Bharara also offered the following perspective on the rules governing his Office's actions:  "*I'm the United States Attorney, and I'm subject to rules and to regulations and a lot of them, quite frankly, are stupid.*  Don't tell the regulators I said that.  Don't tell Washington."  Ex. 3 at 7 (emphasis added).

Once again, the media was more than willing to provide a public platform for the U.S. Attorney. Numerous press outlets reported on his comments, particularly his diatribe against New York's purported "three men in a room" political regime. *See, e.g.*, Marc Santora, *U.S. Attorney Criticizes Albany's 'Three Men in a Room' Culture*, N.Y. Times, Jan. 23, 2015 (Ex. 34).[8] Video coverage was also widely available. *See, e.g.*, Sybile Penhirin, *Video: Watch US Atty Preet Bharara Yuk It Up About New York's Corrupt Pols*, DNAinfo N.Y., Jan. 23, 2015 (Ex. 35).

The U.S. Attorney continued his publicity campaign just two weeks later, giving a lengthy interview to MSNBC. *See* Transcript of MSNBC Interview (Feb. 10, 2015) (Ex. 4). When asked about his recent arrest of "one of the most powerful Democrats in New York," he responded: "I think it goes to a core problem of honesty and integrity in the state legislature." *Id.* at 2. He went on to elaborate on Mr. Silver's purported crimes – pausing to note that he had "convicted many, many people before this case," lest there be any doubt over the charges here:

> [W]hen you see somebody who's been charged with (and we've convicted many, many people before this case) – and you see somebody who has basically *sold his office to line his pockets and compromised his integrity and ethics* with respect to how to make decisions on all those issues I mentioned that affect people's lives, that's a big problem. And it's a big problem for democracy.

*Id.* (emphasis added).

The U.S. Attorney's press campaign was so intense that other state legislators began complaining. According to interviews of more than a dozen legislators, officials, and other insiders, lawmakers were "fuming over . . . the powerful prosecutor's publicity seeking." Kenneth

---

[8] *See also, e.g.*, Will Bredderman, *Preet Bharara Blasts 'Three Men in a Room' After Sheldon Silver Arrest*, Observer, Jan. 23, 2015 (Ex. 36); Matthew Chayes, *Bharara: Albany's 'Three Men in a Room' System Fosters Distrust*, Newsday, Jan. 23, 2015 (Ex. 37); Kia Makarechi, *Tough-Talking Prosecutor Preet Bharara Is Ready for His Close-Up*, Vanity Fair, Jan. 23, 2015 (Ex. 38); *Bharara Lambasts 'Three Men in a Room' Culture in Albany, Says Voters Must Demand Change*, CBS New York, Jan. 23, 2015 (Ex. 39).

Lovett, *Albany Lawmakers Cry Foul over Manhattan U.S. Attorney Preet Bharara's Tactics*, N.Y. Daily News, Feb. 14, 2015 (Ex. 40).  Pointing to the U.S. Attorney's "high-profile news conference," "media interviews," and "tough-talking speech," the legislators were "particularly perturbed by what they see as Bharara's penchant for victory laps" and "grandstanding."  *Id.*

On February 19, 2015 – right in the midst of that media circus – the grand jury returned its indictment.  Dkt. 9.

## ARGUMENT

In an effort that could only serve to prejudice the jury pool, the U.S. Attorney has prosecuted this case full bore through the press.  During his many public appearances, he has ventured far beyond the neutral recitations of the charges that once accompanied such events.  Instead, he has offered his uncensored views about Mr. Silver's guilt, his character, and the severity of his crimes – always in inflammatory, over-the-top language that targets not just Mr. Silver but the entire New York State government.

One wouldn't know it from watching the U.S. Attorney's behavior here, but there are rules governing this sort of thing.  This Court's local rules, Department of Justice regulations, and governing ethics standards all flatly prohibit what the U.S. Attorney has been doing – as they should, given the obvious threat to the fairness of the proceedings.  Yet this case is no isolated incident:  The U.S. Attorney has engaged in similar conduct in other prosecutions in recent years.

This active engagement of the press comes at a grave cost.  In this case, the grand jury returned its indictment in the midst of the U.S. Attorney's media frenzy, raising an intolerable risk that the publicity compromised the fairness and impartiality of the proceedings.  The Court should accordingly dismiss the indictment to remedy the prejudice and deter future violations.  At a minimum, the Court should poll the grand jury and order disclosure of the grand jury minutes to determine the extent of the impact.

## I.    THE U.S. ATTORNEY'S STATEMENTS FLAGRANTLY VIOLATED APPLICABLE PUBLICITY RULES

Numerous sources of law dictate what prosecutors may and may not say to the media about a pending prosecution.  This Court's rules, Department of Justice regulations, and ethical standards all closely restrict those communications to ensure that defendants receive a fair trial. The U.S. Attorney violated them all.

First, this Court's rules directly address the topic.  When a grand jury or criminal investigation is pending, Local Criminal Rule 23.1(b) prohibits prosecutors from making public comments where there "is a substantial likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the administration of justice."  L. Crim. R. 23.1(b).  Rule 23.1(e) clarifies that disclosure of the "nature, substance or text of the charge, including a *brief description* of the offense charged," is normally permissible.  *Id.* R. 23.1(e)(3) (emphasis added).  But conversely, Rule 23.1(d) lists matters that "presumptively involve a substantial likelihood" of prejudice.  Among them is "*[a]ny opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case*."  *Id.* R. 23.1(d)(7) (emphasis added).

Department of Justice regulations draw that same basic distinction.  They prohibit prosecutors from making public statements that "may reasonably be expected to influence the outcome of a pending or future trial."  28 C.F.R. § 50.2(b)(2).  They permit disclosure of "[t]he substance or text of the charge, such as a complaint, indictment, or information."  *Id.* § 50.2(b)(3)(ii).  But such disclosures "should include only incontrovertible, factual matters, *and should not include subjective observations*."  *Id.* § 50.2(b)(3) (emphasis added).  Finally, like this Court's rules, the Department's regulations state that "[t]he release of certain types of information generally tends to create dangers of prejudice without serving a significant law enforcement function" – including "*[a]ny opinion as to the accused's guilt*."  *Id.* § 50.2(b)(6)(vi) (em-

phasis added); *see also* United States Attorneys' Manual § 1-7.401(D) (Nov. 2003) (incorporating those restrictions).

Finally, New York ethical rules are to the same effect.  The New York Rules of Professional Conduct prohibit all lawyers, including prosecutors, from making comments to the press that have "a substantial likelihood of materially prejudicing an adjudicative proceeding."  N.Y. R. Prof'l Conduct 3.6(a). And they clarify that a statement "ordinarily is likely to prejudice materially an adjudicative proceeding" if it constitutes an "opinion as to the guilt or innocence of a defendant or suspect in a criminal matter."  *Id.* R. 3.6(b)(4).

The U.S. Attorney surely did not comply with those restrictions here.  Far from offering only a "brief description of the offense charged," L. Crim. R. 23.1(e)(3), with only "incontrovertible, factual matters" and not "subjective observations," 28 U.S.C. § 50.2(b)(3), he delivered lengthy attacks on Mr. Silver's perceived crimes, in highly inflammatory language.  According to the U.S. Attorney, the "show-me-the-money culture of Albany has been perpetuated and promoted at the very top of the political food chain," with Mr. Silver mastering the "greedy art of secret self-reward" with "particular cleverness and cynicism."  Ex. 1 at 1.  Mr. Silver represented the "very core of what ails Albany" – "[l]ack of transparency, lack of accountability and lack of principle, joined with an overabundance of greed, cronyism and self-dealing."  *Id.* at 4; *see also* pp. 4-7, *supra*.  Or as the U.S. Attorney put it the next day:  "Albany really is a cauldron of corruption" in which "20 million New Yorkers agree to be ruled by a triumvirate like in Roman times."  Ex. 3 at 1-2, 3-4; *see also* pp. 7-10, *supra*.  Those are the sorts of impassioned exhortations suited to a Zuccotti Park soapbox, not a prosecutor's press conference.

The U.S. Attorney repeatedly offered impermissible opinions about the defendant's guilt. His entire press conference was framed around the notion that his Office's investigation had already provided "the answer" to that question:

> For many years New Yorkers have asked the question "How could Speaker Silver, one of the most powerful men in all of New York, earn millions of dollars in outside income without deeply compromising his ability to honestly serve his constituents?" *Today we provide the answer. He didn't. . . .* For many years New Yorkers have also asked the question "What exactly does Speaker Silver do to earn his substantial outside income?" *Well the head scratching can come to an end on that score too because we answer that question today as well. He does nothing.*

Ex. 1 at 1 (emphasis added). Prosecutors announcing charges to the press should not be providing "the answer" to questions about the defendant's guilt. Yet the U.S. Attorney repeatedly violated that principle, claiming that his Office's investigation had "ma[de] clear" or "show[n]" that Mr. Silver committed the offenses charged. *See* pp. 4-10, *supra*.

Courts have found violations from similar statements – including another judge in this district reviewing conduct of this same U.S. Attorney. In *United States v. Smith*, 985 F. Supp. 2d 506 (S.D.N.Y. 2013), Judge Karas considered a challenge to statements the U.S. Attorney made at a press conference announcing another public corruption prosecution. Although ultimately denying relief on other grounds, Judge Karas found very similar statements to be objectionable. Comments about a "'show me the money' culture of corruption" and an "'unappetizing smorgasbord of graft and greed,'" he opined, could run afoul of 28 C.F.R. § 50.2 and U.S. Attorneys' Manual § 1-7.401 as impermissible "subjective observations." 985 F. Supp. 2d at 539. "[W]hatever goal these phrases were meant to serve," he noted, "it is hard to find that they had any compelling law-enforcement purpose." *Id.* Judge Karas further faulted the U.S. Attorney for referring to the defendant as a "dirty" and "corrupt" politician during a broader discussion of corruption in state politics. By "holding Defendants out as the latest examples of 'dirty' and

14

'corrupt' politicians," the judge ruled, the statements could amount to an impermissible "comment on the guilt of Defendants." *Id.* at 540.

Judge Karas cited the earlier case of *United States v. Corbin*, 620 F. Supp. 2d 400 (E.D.N.Y. 2009).  There, the U.S. Attorney for the Eastern District had issued a press release in a tax prosecution of a public official, stating:  "The defendant violated the law by failing to file truthful federal tax returns – an obligation of all taxpayers, including elected public officials. . . . The defendant will now be held to account."  *Id.* at 411.  As the court observed, "[t]hese statement[s] may violate the disciplinary rules by offering opinions as to [the defendant's] guilt."  *Id.*; *see also United States v. Perryman*, No. 12-cr-0123, 2013 WL 4039374, at *13 (E.D.N.Y. Aug. 7, 2013) (same for statement on police website that defendant was "the worst of the bunch").

If that relatively antiseptic comment on the defendant's crimes may have violated ethics rules, it is hard to see how the U.S. Attorney's comments here could come close to being permitted.  Rather than being chastened by the earlier rebuke by Judge Karas, the U.S. Attorney has turned up the rhetoric.  His statements here were a flagrant violation of the governing rules that directly implicate the fairness concerns those rules were designed to advance.

## II.   THE U.S. ATTORNEY'S VIOLATIONS WARRANT DISMISSAL OF THE INDICTMENT

Dismissal of the indictment is the appropriate remedy.  The grand jury returned its indictment in the middle of the firestorm created by the U.S. Attorney's public statements – statements that are *presumed prejudicial* precisely because of their likely impact on the public.  Moreover, given the U.S. Attorney's pattern of violating the publicity rules in these and other proceedings, dismissal is appropriate to deter future violations.

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment *or indictment of a grand jury*."  U.S. Const.

amend. V.  The grand jury serves a crucial role by "assess[ing] whether there is adequate basis for bringing a criminal charge."  *United States v. Williams*, 504 U.S. 36, 51 (1992).  For that reason, an indictment must be "returned by a legally constituted and *unbiased* grand jury." *Costello v. United States*, 350 U.S. 359, 363 (1956) (emphasis added).  And "[t]he right to have the grand jury make the charge *on its own judgment* is a substantial right which cannot be taken away."  *Stirone v. United States*, 361 U.S. 212, 218-19 (1960) (emphasis added).

To vindicate those protections, district courts have authority "to dismiss an indictment because of misconduct before the grand jury."  *Williams*, 504 U.S. at 46.  A court may dismiss an indictment on "grounds of eliminating prejudice to the defendants . . . or of deterring widespread or continuous official misconduct."  *United States v. Fields*, 592 F.2d 638, 648 (2d Cir. 1978). Courts have repeatedly invoked that authority in appropriate cases.  *See, e.g.*, *United States v. Stein*, 541 F.3d 130, 158 (2d Cir. 2008) (affirming dismissal for Sixth Amendment violation); *United States v. Jacobs*, 547 F.2d 772, 778 (2d Cir. 1976) (affirming suppression and dismissal for misconduct before the grand jury), *cert. dism'd*, 436 U.S. 31 (1978); *United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir. 1972) (ordering dismissal for misconduct before the grand jury); *United States v. Chapman*, 524 F.3d 1073, 1084-88 (9th Cir. 2008) (affirming dismissal with prejudice for discovery violations); *United States v. Kilpatrick*, 821 F.2d 1456, 1465 (10th Cir. 1987) (endorsing dismissal for "prosecutorial misconduct which is flagrant to the point that there is some significant infringement on the grand jury's ability to exercise independent judgment"); *United States v. Leeper*, No. 06-CR-58A, 2006 WL 1455485, at*4 (W.D.N.Y. May 22, 2006) (dismissing indictment where "prosecutorial misconduct has undermined the grand jury's ability to make an informed and objective evaluation of the evidence presented to it").  There are ample grounds for dismissal here.

### A. The U.S. Attorney's Violations Compromised the Fairness of the Grand Jury Process

The Court should dismiss the indictment to remedy the intolerable risk to the integrity of the grand jury process. "[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). But the defendant need not prove an impact on the decision by direct evidence. Rather, the defendant need only show "that the violation substantially influenced the grand jury's decision to indict, or [that] there is '*grave doubt*' [whether] the decision to indict was free from the substantial influence of such violations." *Id.* at 256 (emphasis added).

That standard is met here. Crucially, the rules that the U.S. Attorney violated *presume* prejudice to the accused. Thus, Local Criminal Rule 23.1(d) states that "opinion[s] as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case" are matters that "*presumptively* involve a substantial likelihood" of interference with a fair trial or prejudice to the administration of justice. L. Crim. R. 23.1(d) (emphasis added). Department of Justice regulations agree that "[a]ny opinion as to the accused's guilt" is a "type[] of information [that] *generally tends to create dangers of prejudice* without serving a significant law enforcement function." 28 C.F.R. § 50.2(b)(6) (emphasis added). And the New York ethics rules confirm that the same information "*ordinarily is likely to prejudice materially* an adjudicative proceeding." N.Y. R. Prof'l Conduct 3.6(b)(4) (emphasis added). Thus, the rules the U.S. Attorney violated already provide a basis for drawing a presumption of prejudice. They explicitly recognize that opinions as to guilt are so inherently likely to compromise the fairness of the proceedings that they are *presumed* prejudicial.

In any event, no presumption is necessary to perceive the obvious risk of prejudice here. The U.S. Attorney's inflammatory remarks were broadcast far and wide.  He took steps to maximize the exposure of his commentary.  The Government scheduled Mr. Silver's arrest for the day before the U.S. Attorney planned to speak at New York Law School.  The Government then leaked news of the arrest hours before it occurred.  The Government orchestrated the arrest and arraignment to maximize the opportunity for a "photo op."  The U.S. Attorney then held a high-profile press conference – complete with Twitter feed – that was covered by all the major media outlets.   And he continued his campaign over the following weeks by repeating his opinions to the press.

The U.S. Attorney's public commentary strayed far beyond anything in the charging documents.  His speech at the law school in particular tarred Mr. Silver with what he claimed were corruption and abuses endemic throughout state politics – expressly inviting the audience to speculate that other, uncharged crimes were being committed on an ongoing basis.  Throughout, the U.S. Attorney went out of his way to use provocative and colorful language, the effect of which was to ensure that the comments would be widely quoted and thus widely read.

Indeed, the U.S. Attorney's very decision to initiate this case by complaint rather than indictment confirms his strategy to maximize exposure.  It is inconceivable that the U.S. Attorney proceeded by way of complaint for any reason other than to set forth colorful allegations with the intention of prejudicing Mr. Silver – allegations that were later pared back in the indictment.  There was no risk of flight, no threat to witnesses, no rational basis consistent with due process whatsoever for proceeding with the 35-page single-spaced complaint.  The U.S. Attorney should be called upon to explain that decision as well.

18

Given the incredible media exposure, it is doubtful that Mr. Silver could ever receive a fair trial in this case.  But the damage to the grand jury process has already been done.  It strains credulity to think that grand jurors who returned their indictment smack in the middle of the U.S. Attorney's press campaign would not have been affected by that coverage.  That publicity strikes at the heart of the fairness and integrity of the proceeding.

**B.**     **The U.S. Attorney's Violations Are Merely the Latest Examples of a Continuous Pattern of Official Misconduct**

The Court should also dismiss the indictment to deter future violations of publicity rules the U.S. Attorney has shown himself unwilling to follow.  Courts have made clear that dismissal is particularly appropriate in the face of such patterns of misconduct.  *See, e.g.*, *Fields*, 592 F.2d at 648 (citing need to "deter[ ] widespread or continuous official misconduct"); *Bank of Nova Scotia*, 487 U.S. at 259 (contrasting cases involving "a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment"); *see also United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978) (dismissal may be appropriate "as a prophylactic tool for discouraging future deliberate governmental impropriety of a similar nature"); *Virgin Islands v. Fahie*, 419 F.3d 249, 258 (3d Cir. 2005) (similar).

Here, there is a history of ignoring publicity rules by reaching out to the media and offering lengthy, inflammatory opinions about the defendant's guilt.  As explained above, Judge Karas has already expressed concerns about the U.S. Attorney's press strategy in another public corruption case in which he referred to a "'show me the money' culture of corruption," an "unappetizing smorgasbord of graft and greed," and "dirty" and "corrupt" politicians.  *Smith*, 985 F. Supp. 2d at 539-40.  The message obviously didn't sink in, as the U.S. Attorney violated the same rules again in this case – indeed recycling some of the very same material.

Nor was Judge Karas the only one to express concerns.  Judge Sullivan of this Court took issue with those same comments from the *Smith* case during a conference panel on public corruption.  *See* Stewart Bishop, *Judge Mocks US Attorney Bharara's Press Release*, Law360, Oct. 2, 2013 (Ex. 41).  Quoting the same references to a "show-me-the-money culture" and an "unappetizing smorgasbord of graft and greed" extending "all the way up to Albany itself," Judge Sullivan noted that the comments "seem[ed] to be designed for tabloid consumption" and raised concerns about whether they were "appropriate at the preconviction stage."  *Id.*  Har-kening back, Judge Sullivan observed that "there was a time when prosecutors would just state what the charges were and not editorialize on the matter."  *Id.*; *see also* Leonica Valentine, et al., *Silver's Scandal Complicates Malcom Smith's Bribery Trial*, N.Y. Post, Jan. 23, 2015 (Ex. 42) (reporting defense counsel's concerns that publicity around Mr. Silver's case would have a prejudicial effect on the *Smith* trial).

Similar examples abound in other cases.  In *United States v. Stevenson*, No. 13-cr-161, another public corruption case, the defendant moved for a change of venue on the ground that the U.S. Attorney was trying the case "in the court of public opinion" and making inappropriate comments about how "guys like him shouldn't get a pension."  Rich Calder, *'Bribe Pol' Claims Bharara's Pension Comments Will Prevent 'Fair Trial'*, N.Y. Post, Nov. 18, 2013 (Ex. 43).  In another well-known case from a different field, the U.S. Attorney issued a press release describ-ing a defendant as having "planned to kidnap women so that they could be raped, tortured, killed, cooked, and cannibalized," and opined that the defendant's plans "shock[ed] the conscience." Steve Huff, *The Strange Case of NYPD Officer Gilberto Valle, Alleged Wannabe Cannibal*, Observer, Oct. 25, 2012 (Ex. 44).

Many similar examples are strewn throughout the annals of the Office's press releases. *See* U.S. Attorney's Office for the Southern District of New York, *News and Press Releases*, http://www.justice.gov/usao/nys/pressreleases/.   One study found that this U.S. Attorney far exceeded other prosecutors in terms of the number of press statements he made about a given case.  *See Preet Bharara – Publicity Hound or Super Prosecutor?*, SearchIndia.Com, Mar. 15, 2014 (Ex. 45) (finding more than double the number of statements compared to the Eastern District and state prosecutor's offices).  This publicity-seeking has been widely reported in other media quarters as well, with press reports routinely pointing to the "theatrical grandstanding" and efforts to "stay in the limelight" and "make his own headlines."[9]

Perhaps most notably, the U.S. Attorney has waged an attack against what *he* considered to be insider trading, indicting more than 90 individuals and holding scores of press conferences and media interviews along the way.  *See, e.g.*, U.S. Attorney's Office, *Manhattan U.S. Attorney and FBI Assistant Director-in-Charge Announce Charges Against Seven Investment Profession-als for Insider Trading Scheme That Allegedly Netted More Than $61.8 Million in Illegal Profits* (Jan. 18, 2011) (Ex. 58) (" 'The charges unsealed today allege a corrupt circle of friends who formed a criminal club whose purpose was profit and whose members regularly bartered lucra-tive inside information so their respective funds could illegally profit.' "); Peter Lattman, *SAC Prosecutor Hits the Media Trail*, N.Y. Times, Aug. 6, 2013 (Ex. 46) (" 'The scope and the pervasiveness of the insider trading that went on at this particular place is unprecedented in the

---

[9] *See* Abhishek Kumar, *Preet Bharara Is the Villain in the Devyani Case*, Newsroom Post, Feb. 2014 (Ex. 47) ("American legal history is full of politically ambitious lawyers and state's attor-neys pursuing high profile cases to stay in the limelight and grab political office[:]  Preet Bharara is no different."); Sashi Tharoor, *The Return of the Ugly American*, Reuters, Jan. 7, 2014 (Ex. 48) ("Privately, U.S. diplomats express frustration at their helplessness in the face of theatrical grandstanding by the ambitious federal prosecutor, Preet Bharara."); *Feds Right To Review Moreland Probe Files*, Newsday, Apr. 13, 2014 (Ex. 49) ("Bharara seized the messy end of Moreland to make his own headlines to burnish his reputation.").

history of hedge funds.' ").[10]   In an eerie parallel to the claims surrounding the charges against

Mr. Silver in this case, he told *Time* in a cover story interview:

> Casual and rampant and routine insider trading tells everybody at precisely the
> wrong time that everything is rigged and only people who have a billion dollars
> and have access to and are best friends with people who are on boards of directors
> of major companies, they're the only ones who can make a true buck.  And that I
> think is wrong, as most people do, and more importantly for our purposes com-
> pletely and totally illegal.

Massimo Calabresi, *Prosecutor Preet Bharara in His Own Words: Battling "a Creeping Culture*

*of Corruption,"* Time, Feb. 6, 2012 (Ex. 50).

Of course, the Second Circuit recently held in *United States v. Newman*, 773 F.3d 438

(2d Cir. 2014), that what the U.S. Attorney considered to be "completely and totally illegal" was

in fact no crime at all.  *Newman* held, in essence, that in this frothy pursuit of corruption on Wall

Street, the U.S. Attorney attempted to criminalize conduct that was simply not illegal – whether

he likes it or not.  Similarly here, the conduct charged in Mr. Silver's indictment, already notably

scaled back from the charges in the criminal complaint that kicked off the media circus, is simply

not illegal – whether he likes it or not.

The fallout from *Newman* has been extraordinary.  Numerous defendants are now seeking

relief from their insider trading convictions in this Court or on appeal.  *See* Max Stendahl,

*Bharara Foes Pounce on Newman Ruling in SDNY*, Law360, Feb. 13, 2015 (Ex. 51) (noting that

"12 other defendants in the Southern District of New York have specifically cited the *Newman*

---

[10] *See also, e.g.*, Rebecca Jarvis, et al., *Indicted Hedge Fund SAC Capital 'Magnet for Market
Cheaters,'* ABC News, July 25, 2013 (Ex. 52) (" 'S.A.C. became, over time, a veritable magnet
for market cheaters.  The S.A.C. Companies operated a compliance system that appeared to talk
the talk, but almost never walked the walk.' "); George Packer, *A Dirty Business: New York
City's Top Prosecutor Takes on Wall Street Crime*, New Yorker, June 27, 2011 (Ex. 53); Bruce
Carton, *SDNY Drops the Hammer on SAC . . . But Not Steve Cohen*, Compliance Weekly, July
26, 2013 (Ex. 54); *Recap: Liveblog of U.S. Attorney Preet Bharara's Press Conference on SAC*,
LawBlog, July 25, 2013 (Ex. 55).

ruling in requests to overturn convictions, vacate guilty pleas, dismiss charges or receive leniency at sentencing").  Similar filings are being made nationwide.  *See* Max Stendahl, *Newman Sends Insider Trading Shock Waves Beyond SDNY*, Law360, Feb. 17, 2015 (Ex. 56) (citing 18 additional cases from outside the Southern District).

If ever a situation called out for the dismissal of an indictment to deter a prosecutor from continued misconduct, this is it.  "[L]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper."  *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966).  Just like the defendants in *Newman* and every other defendant in America, Mr. Silver is presumed innocent and entitled to a fair trial.  And it is incumbent upon the prosecutor – whose first duty is to seek justice – to see that that happens.

## III. AT A MINIMUM, THE COURT SHOULD POLL THE GRAND JURY FOR IMPROPER INFLUENCE AND ORDER DISCLOSURE OF THE GRAND JURY MINUTES

Even if the Court determines that dismissal of the indictment is not warranted at this stage, it should still take more modest remedial measures.  It should poll the grand jurors and order disclosure of the grand jury minutes to determine whether the U.S. Attorney's inflammatory statements had any impact on their deliberations.

Although grand jury proceedings are normally secret, the Federal Rules permit this Court to inquire into the proceedings where "a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  That is the case here.  The U.S. Attorney has violated this Court's rules, Department regulations, and ethics standards, all of which were designed to preserve the integrity of judicial proceedings, including grand jury proceedings.  Those rules, moreover, recognize a *presumption* of prejudice from the sorts of statements that were made here.  At a minimum, therefore, further investigation is warranted to determine the full impact of the U.S. Attorney's violations.

The Supreme Court and Second Circuit have repeatedly stressed the importance of questioning jurors to ferret out potential prejudice from publicity.  *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 389 (2010) (approving detailed, multi-stage voir dire to determine effects of pretrial publicity); *United States v. Lord*, 565 F.2d 831, 837-39 (2d Cir. 1977) (reversing convictions where trial court refused to poll jurors about their knowledge of articles containing prejudicial and inadmissible information even though court had admonished jurors generally to avoid the media).  In *United States v. Steinberg*, No. 12-CR-00121 (S.D.N.Y. Nov. 12, 2013), Judge Sullivan recently granted a request for "individualized questioning" of jurors because "the amount of publicity surrounding this case risk[ed] prejudicing the jury."  Dkt. No. 319 at 2.  And in the *Smith* trial, Judge Karas recently agreed to question the jurors about the impact of the publicity in *Mr. Silver's* case.  *See* Luca Marzorati, *Juror Illness Delays Deliberations in Malcolm Smith Trial*, Capital New York, Feb. 3, 2015 (Ex. 57) (noting that Judge Karas "polled the jury . . . after the arrest of former Assembly speaker Sheldon Silver, which could have altered the supposed independence of the jurors").

Courts apply similar techniques to grand jurors.  For example, in *In re Grand Jury Investigation*, No. 87-cv-0163, 1987 WL 8073 (E.D.N.Y. Feb. 23, 1987), the court considered allegations that certain press reports may have influenced an ongoing grand jury proceeding.  Noting its "concern over the serious nature of the allegations," the court "inquired into the effect, if any, the press reports may have had on [the grand jurors'] deliberations."  *Id.* at *6.  "Each of the grand jurors [was] polled to determine whether they had read or seen any press reports concerning the investigation of petitioners' affairs and, if so, whether these reports had affected their ability to evaluate impartially the evidence presented before them or their ability to decide what

24

to do based solely on the evidence presented to the grand jury." *Id.*  That same detailed inquiry is warranted here.

For similar reasons, the Court should order disclosure of the grand jury minutes.  A party seeking grand jury minutes must show that "the need for disclosure is greater than the need for continued secrecy." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979).  The interest in secrecy, however, is much reduced in a case like this where the grand jury has already concluded its work.  *Id.*  Access to the grand jury minutes is essential here to determine whether the U.S. Attorney's publicity violations affected the grand jury's deliberations.  *See, e.g.*, *Anilao v. Spota*, 918 F. Supp. 2d 157, 177 (E.D.N.Y. 2013) (ordering disclosure of grand jury minutes because defendants were "entitled to see . . . what evidence and legal instructions led to those impermissible charges").  The minutes should accordingly be disclosed.[11]

## CONCLUSION

To be sure, the U.S. Attorney should vigorously ferret out and prosecute cases of public corruption.  But those cases should be based on conduct that is illegal, not merely something he may not like.  And even in those cases where the U.S. Attorney charges someone with conduct recognized by the law to be illegal, he must respect the presumption of innocence.  And he must

---

[11] The Court, of course, also has the power to refer this matter to the relevant disciplinary authorities.  Local Criminal Rule 23.1 provides that "[a]ny lawyer who violates the terms of this rule may be disciplined pursuant to Local Civil Rule 1.5."  L. Crim. R. 23.1(i).  That rule, in turn, provides for complaints to be heard by a Committee on Grievances composed of the Chief Judge of this Court and a panel of attorneys appointed by him.  L. Civ. R. 1.5; *see, e.g.*, *Fisher v. Comm. on Grievances ex rel. U.S. Dist. Court*, 759 F.3d 200 (2d Cir. 2014).  Similarly, the Appellate Division's Departmental Disciplinary Committee has authority to adjudicate violations of state ethics rules like Rule 3.6 of the New York Rules of Professional Conduct.  *See* Rules and Procedures of the Departmental Disciplinary Committee, N.Y. Comp. Codes R. & Regs. tit. 22, §§ 605.1 *et seq.*  Courts have repeatedly recognized the appropriateness of remedying publicity violations through the disciplinary process.  *See, e.g.*, *Munoz v. City of New York*, No. 11-cv-7402, 2013 WL 1953180, at *1 (S.D.N.Y. May 10, 2013) ("[T]he appropriate remedy for any violation of Rule 3.6 is a disciplinary complaint . . . ."); *United States v. Corbin*, 620 F. Supp. 2d 400, 411 (E.D.N.Y. 2009) (similar).

honor the rules, regulations, and policies – of this Court, the State of New York, and his own Department of Justice – that were adopted to protect that presumption and ensure a fair trial. Mr. Bharara may believe that the rules that govern his conduct "quite frankly, are stupid." Ex. 3 at 7. But they are the law of the land. To paraphrase Mr. Bharara: "We simply want people in high office to stop violating the law. It seems like a simple and modest request. People [appointed] to [enforce] laws should not be breaking them." Ex. 3 at 1.

Accordingly, the Court should dismiss the indictment with prejudice, or in the alternative, poll the grand jurors and order disclosure of the grand jury minutes to determine the impact of the improper pretrial publicity.


Dated:   February 24, 2015                          Respectfully submitted,
         New York, New York


Joel Cohen                                          Steven F. Molo
STROOCK & STROOCK & LAVAN LLP                       Robert K. Kry
180 Maiden Lane                                     Justin V. Shur
New York, New York  10038                           MOLO LAMKEN LLP
Telephone: (212) 806-5644                           540 Madison Avenue
Facsimile:  (212) 806-6006                          New York, New York  10022
                                                    Telephone: (212) 607-8160
                                                    Facsimile:  (212) 607-8161

                            *Attorneys for Defendant*