UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                          :

    -v.-                                              :          15 Cr. 093 (VEC)

SHELDON SILVER,                                     :

               Defendant.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


**THE GOVERNMENT'S MEMORANDUM
IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS**


                                    PREET BHARARA
                                    United States Attorney for the
                                    Southern District of New York
                                    One St. Andrew's Plaza
                                    New York, New York 10007

Carrie H. Cohen
Howard S. Master
Andrew D. Goldstein
James M. McDonald
Assistant United States Attorneys
      -Of Counsel-

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND....................................................................................... 2

    I.      The Complaint ................................................................................ 2

    II.     The Defendant's Arrest................................................................... 4

    III.    The Press Release And Press Conference....................................... 6

    IV.    The New York Law School Speech And The MSNBC Interview ........................ 9

    V.     The Indictment ............................................................................. 12

DISCUSSION ........................................................................................................ 12

    I.      Legal Standard ............................................................................. 12

          A.    Grand Jury Proceedings Are Presumptively Regular ............................. 12

          B.    Pre-Indictment Publicity Is Not Grounds To Dismiss An Indictment Or Seek Related Relief................................................. 13

          C.    Cases Involving Prosecutorial Misconduct Do Not Apply...................... 17

    II.     The Defendant's Motion Should Be Denied........................................ 18

    III.    The U.S. Attorney's Statements Were Proper ..................................... 21

CONCLUSION....................................................................................................... 24

**TABLE OF AUTHORITIES**

Page

Cases

*Dennis* v. *United States*, 384 U.S. 855 (1966) ..............................................................13

*Hamling* v. *United States*, 418 U.S. 87 (1974) ..............................................................13

*In re Grand Jury Investigation*, 683 F. Supp. 78 (S.D.N.Y. 1988) ................................20

*In re Grand Jury Investigation*, No. 87 Civ. 963, 1987 WL 8073
    (E.D.N.Y. Feb. 23, 1987) ............................................................................................20

*In re United States*, 441 F.3d 44 (1st Cir. 2006) ...........................................................16

*United States* v. *Brien*, 617 F.2d 299 (1st Cir. 1980) .....................................................16

*United States* v. *Boward*, 594 F.2d 345 (2d Cir. 1979) ..................................................13

*United States* v. *Burke*, 700 F.2d 70 (2d Cir. 1983) ............................................... *passim*

*United States* v. *Calandra*, 414 U.S. 338, 349 (1974) ...................................................16

*United States* v. *Chapman*, 524 F.3d 1073 (9th Cir. 2008) ............................................18

*United States* v. *Corbin*, 620 F. Supp. 2d 400 (E.D.N.Y. 2009) ....................................19

*United States* v. *Estepa*, 471 F.2d 1132 (2d Cir. 1972) ..................................................18

*United States* v. *Fields*, 592 F.2d 638 (2d Cir. 1978) .....................................................17

*United States* v. *Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001) .....................................13

*United States* v. *Jacobs*, 547 F.2d 772 (2d Cir. 1976) ...................................................18

*United States* v. *Johnson*, 319 U.S. 503 (1943) .............................................................20

*United States* v. *Kilpatrick*, 821 F.2d 1456 (10th Cir. 1987) .........................................18

*United States* v. *Leeper*, No. 06-Cr-58A, 2006 WL 1455485
    (W.D.N.Y. May 22, 2006) ...........................................................................................18

*United States* v. *Leung*, 40 F.3d 577 (2d Cir. 1994) ......................................................13

*United States* v. *Mechanik*, 475 U.S. 66 (1986) .............................................................12

*United States* v. *Myers*, 510 F. Supp. 323 (E.D.N.Y. 1980) ...........................................15

ii

Page

*United States* v. *Nunan*, 236 F.2d 576 (2d Cir. 1956) ........................................................ *passim*

*United States v. Perryman*, 12 Cr. 123 (ADS), 2013 WL 4039374
  (E.D.N.Y. Aug. 7, 2013) ...................................................................................19

*United States* v. *Polizzi*, 500 F.2d 856 (9th Cir. 1974) ....................................................16

*United States* v. *R. Enters.*, 498 U.S. 292 (1991) ........................................................12

*United States* v. *Smith*, 985 F. Supp. 2d 506 (S.D.N.Y. 2013) .................................19, 20

*United States* v. *Stein*, 541 F.3d 130 (2d Cir. 2008) ....................................................18

*United States* v. *Waldon*, 363 F.3d 1103 (11th Cir. 2004)....................................16, 17

*United States* v. *Washington*, 705 F.2d 489 (D.C. Cir. 1983) .......................................16

*United States* v. *Williams*, 504 U.S. 36 (1992) ..........................................................17

*United States* v. *York*, 428 F.3d 1325 (11th Cir. 2005) ..............................................16

## Statutes & Rules

28 C.F.R. § 50.2 ...........................................................................................................21, 22

Local Crim. R. 23.1.......................................................................................................21, 22

N.Y. R. Prof'l Conduct 3.6 ...........................................................................................21, 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                     :

    -v.-                                                    :          15 Cr. 093 (VEC)

SHELDON SILVER,                                     :

                 Defendant.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S MEMORANDUM
## IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS

      The United States of America respectfully submits this Memorandum of Law in opposition to the defendant's Motion to Dismiss the Indictment ("Def. Mem.").   The defendant's motion relies on distortions and omissions, disregards the law, and is a transparent attempt to distract this Court and the public from the serious charges brought against the defendant.   It should be denied.

## <u>PRELIMINARY STATEMENT</u>

      The public statements made by the U.S. Attorney's Office for the Southern District of New York ("the Office") at the time of the arrest of Sheldon Silver (the "defendant" or "Silver") hewed closely to the Complaint, repeatedly emphasized that the charges were allegations, and explicitly stated that the defendant was presumed innocent unless and until proven guilty.   In subsequent remarks, the U.S. Attorney also did not in any way opine on the defendant's guilt and complied with all relevant rules and regulations in a manner consistent with his duties as the chief federal law enforcement officer in the District.

Nevertheless, in a calculated effort to malign the U.S. Attorney, and to mislead this Court and the public, the defendant misrepresents the relevant facts and fails to even cite, much less attempt to distinguish, controlling case law that squarely forecloses the unprecedented relief he seeks from this Court.    Specifically, the defendant: (a) repeatedly truncates quotations and misuses an ellipsis in an attempt to make wholly appropriate statements of the U.S. Attorney appear improper; (b) lifts quotations out of context to suggest the opposite of their intended meaning; (c) distorts the facts surrounding his arrest to claim unfair prejudice where there was none; and (d) ignores an entire body of well-established caselaw, including holdings by the Second Circuit, that directly rejects the arguments he makes here.    In truth, the U.S. Attorney's public statements related to this case and to public corruption matters more broadly have been entirely proper and in accordance with the rules of this Court, the guidelines of the Department of Justice ("DOJ"), and the New York Rules of Professional Conduct.    The defendant has suffered no unfair prejudice warranting relief of any kind.

As the defendant's motion is not supported by the facts or the law, it should be denied in its entirety.

## FACTUAL BACKGROUND

### I.    The Complaint

On January 21, 2015, before any of the statements that the defendant now alleges deprived him of an impartial grand jury were made, U.S. Magistrate Judge Frank Maas found probable cause to support issuance of an arrest warrant charging Silver with engaging in a multi-year scheme to deprive the citizens of the State of New York (the "State") of his honest services as a public official, to extort individuals and entities under color of official right, and to

2

conspire to do the same.    Magistrate Judge Maas's finding of probable cause was based on a

35-page, single-spaced sworn complaint (the "Complaint") containing detailed factual

allegations based on information obtained from dozens of witnesses and numerous documents

and other evidence.    The Complaint detailed a scheme whereby Silver received hundreds of

thousands of dollars in undisclosed payments from a real estate law firm (the "Real Estate Law

Firm") as a result of his official actions, and more than $3 million in additional payments as a

result of directing $500,000 in undisclosed State funds to the research center of a doctor

specializing in asbestos-related research ("Doctor-1") and other official actions Silver undertook

for the benefit of Doctor-1 and his family.    The Complaint further detailed numerous lies and

omissions by Silver about the nature and source of his private income in his public statements

and State disclosure forms, as well as Silver's efforts to conceal the truth through, among other

things, his efforts to undermine the Moreland Commission to Investigate Public Corruption when

it began inquiring into the source of his and other legislators' outside income.

        Notably, the defendant does not claim, because he cannot, that the Complaint failed to

establish a sufficient basis for Magistrate Judge Maas to find probable cause that Silver

committed the crimes charged therein.    Nor does the defendant contend that any of the

statements contained within the Complaint were improper in any way, or that the grand jury was

prohibited from considering the evidence set forth in the Complaint.    Indeed, the defendant's

motion does not challenge a single factual assertion in the Complaint.[1]

---

[1]        The defendant argues in his written submission that it was somehow improper and
"inconceivable" for the Government to charge the defendant initially by complaint instead of by
indictment (*see* Def. Mem. at 18 (asserting that there was "no rational basis consistent with due
process whatsoever" to proceed by complaint); *see also* Feb. 24, 2015 Tr. at 6 ("[t]here was no
basis for proceeding by way of complaint, other than to prejudice the grand jury proceedings")),

## II.      The Defendant's Arrest

As the defendant concedes, on January 21, 2015 – the same day Magistrate Judge Maas signed the Complaint and issued a warrant for the defendant's arrest – this Office contacted counsel for the defendant, informed counsel about the Complaint and arrest warrant, and offered the defendant the opportunity to surrender the following morning.   At approximately 8:00 a.m. on January 22, 2015, the defendant, who was accompanied by counsel, surrendered to the Federal Bureau of Investigation ("FBI") at the pre-arranged location of the Jacob K. Javits Federal Building at 26 Federal Plaza, New York, New York.    Thus, quite contrary to the defendant's conclusory assertions that the Office used its discretion unfairly and in a prejudicial manner, the undisputed fact is that this defendant was granted the opportunity to surrender – unlike many other defendants, including other public officials – rather than be arrested.

---

despite disavowing that position when asked about it in open court before the motion even was filed (*see* Feb. 24, 2015 Tr. at 8).   The disavowal was appropriate:   The Federal Rules of Criminal Procedure expressly provide for the use of complaints, and no rule of law or practice requires the Government to proceed by indictment when it possesses compelling evidence, as it did in this case, to the satisfaction of a neutral magistrate, that a public official had received millions of dollars in corrupt payments, and was continuing to receive those payments, while overseeing policies, programs, and funding connected to his corrupt scheme.   Indeed, it is not unusual in this District, or other districts, for prosecutions of public officials (as well as innumerable others) to proceed in the first instance by criminal complaint.   *See*, *e.g.*, *United States* v. *Seminerio*, 08 Cr. 1238 (NRB) (complaint against State Assemblyman filed S.D.N.Y. Sept. 9, 2008); *United States* v. *Kruger*, *Boyland*, *et al.*, 11 Cr. 300 (JSR) (complaint against State legislators filed S.D.N.Y. Mar. 9, 2011); *United States* v. *Smith*, *et al.*, 13 Cr. 297 (KMK) (complaint against State Senator filed S.D.N.Y. Apr. 1, 2013); *United States* v. *Stevenson*, *et al.*, 13 Cr. 161 (LAP) (complaint against State Assemblyman filed S.D.N.Y. Apr. 2, 2013); *United States* v. *Boyland*, 11 Cr. 850 (SLT) (complaint against State Assemblyman filed E.D.N.Y. Nov. 28, 2011); *United States* v. *Yee*, *et al.*, 14 Cr. 196 (CRB) (complaint against State Senator filed N.D. Ca. Mar. 24, 2014); *United States* v. *Cannon*, 14 Cr. 87 (FDW) (complaint against Charlotte Mayor filed W.D.N.C. Mar. 26, 2014); *United States* v. *Marono*, *et al.*, 13 Cr. 20796 (WJZ) (complaint against local Mayor filed S.D. Fla. Aug. 6, 2013); *United States* v. *Cammarano*, *et al.*, 10 Cr. 275 (JLL) (complaint against local Mayor filed D.N.J. July 21, 2009).   Thus, the only thing "inconceivable" is for counsel to disavow an argument in open court because it was so clearly without merit and then file a motion advancing that same meritless argument.

4

Following his surrender, the defendant was driven in an unmarked vehicle from the basement garage of the Javits Federal Building to the basement garage of the Daniel Patrick Moynihan United States Courthouse at 500 Pearl Street, New York, New York, for further processing in advance of his presentment.

The defendant claims that this drive to the courthouse "produced an inevitable 'perp walk' effect," resulting in "[p]rejudicial images of Mr. Silver arriving in the back of a government vehicle and subsequently exiting the courthouse" that were "featured prominently in news stories throughout the day."   (Def. Mem. at 4).   As the actual record makes plain, however, there was no perp walk or "perp walk effect."   To the contrary, the defendant's arrest was handled with great sensitivity – from the choice to allow the defendant to surrender, to the decision to drive the defendant to the courthouse as opposed to having federal agents walk the defendant across the plaza, to the use of an unmarked car to handle the transport.[2]   Moreover, while the defendant asserts that the arrest somehow led to "[p]rejudicial" images of him "subsequently exiting the courthouse," those images had nothing to do with the manner in which he was arrested, but rather followed his presentment in court and in fact were orchestrated by the

---

[2]      The defendant also contends – without any evidence – that prior to the unsealing of the Complaint, the Government leaked "detailed information" about the "investigation, the relevant witnesses, and the nature of the charges to be brought . . . with no suggestion that prosecutors had declined to comment to the reporters."   (Def. Mem. at 3).   This is plainly false.   The very newspaper articles cited by the defendant in support of this claim in fact specified that "[d]etails of the specific charges to be brought against Mr. Silver were unclear on Wednesday night," and that spokesmen for both the FBI and the U.S. Attorney's Office "declined to comment."   (Def. Ex. 15).   In any event, there can be no argument of prejudice based on vague, middle-of-the-night reporting of a fact that became widely public later that same morning.

defendant.[3]   It was the defendant himself who stood before reporters, photographers, and cameramen upon his exit from the courthouse to make a statement to the press on the courthouse steps – a fact noticeably omitted from the defendant's motion.

### III.   The Press Release And Press Conference

Following the defendant's surrender and travel to the courthouse for presentment, the Government issued a press release and held a press conference in which it repeatedly framed the charges against Silver as allegations and emphasized that he was innocent unless and until proven guilty.   At approximately 1:00 p.m. on January 22, 2015, the Government issued a press release (the "Press Release") (Def. Ex. 2), announcing that the defendant had been charged by Complaint and arrested on corruption-related charges.   The Press Release, which was accompanied by the Complaint, emphasized throughout that the statements contained therein and in the Complaint were allegations that had not yet been proven.   The title of the Press Release itself made clear that the release related to an arrest, rather than to a conviction or any adjudication of guilt, and that it was based on allegations in the Complaint.   (*See* Press Release (title stating that Silver "*Allegedly Used Official Position to Obtain $4 Million in Bribes and Kickbacks*")).   Moreover, the Press Release's quotations from the U.S. Attorney and the Special-Agent-in-Charge of the Criminal Division of the New York Field Office of the FBI specified that the assertions in the Complaint, as summarized in the Press Release, were "as alleged"; the factual descriptions in the Press Release were introduced with the statement: "According to the allegations contained in the Complaint unsealed today in Manhattan federal court:"; and the Press Release concluded by stating:   "The charges contained in the Complaint

---

[3]      *See*, *e.g.*, Def. Ex. 22 ("flanked by his three lawyers, [Silver] left the courthouse shortly after 3 p.m., stopping briefly to address the gathered media"); *see also* Def. Exs. 7, 14.

are merely accusations, and the defendant is presumed innocent unless and until proven guilty."
(*Id.*).

At about the same time the Press Release was issued, the U.S. Attorney and the FBI
Special Agent-in-Charge spoke about the charges at a press conference.   The statements of the
U.S. Attorney and Special Agent-in-Charge largely echoed those in the Press Release, and, like
the Press Release, the U.S. Attorney repeatedly emphasized that the allegations in the Complaint
were just that – allegations.[4]   Indeed, the U.S. Attorney began the press conference by noting
the unsealing of the Complaint, and in his first substantive statements made clear that he would
speak about what was "alleged" in the Complaint.   ("Over his decades in office, Speaker Silver
has amassed titanic political power *but as alleged*, during that same time, Silver also amassed a
tremendous personal fortune through the abuse of that political power.   *The complaint charges*
Speaker Silver in five counts . . . ." (Def. Ex. 1 at 1 (emphases added))).[5]

---

[4]      Silver also takes issue with posts on the Office's Twitter account that accompanied the
Press Release and press conference, but again misleads the Court by omitting those parts of the
Twitter feed that referenced "charges" and specifically linked to the Press Release, which in turn
contained a link to the Complaint.   (The full Twitter feed related to Silver's arrest, with time
stamps, is attached hereto as Exhibit A).   As is evident from the full Twitter feed, the statement
referring subscribers to the Press Release was issued at the exact same time as the statements that
the defendant alleges were improper.   Thus, the challenged statements cannot be viewed in
isolation, but instead must be viewed in the context of the statements in the Press Release (and
the Complaint linked to the Press Release), and at the press conference, all of which made
abundantly clear that the charges were allegations.   Moreover, it is not unusual or inappropriate
in any way for this Office to use Twitter as a means of augmenting other, more traditional,
means of providing information to the public:   The DOJ's website contains a link to numerous
Twitter accounts maintained by U.S. Attorney's Offices around the country that are used for this
purpose.   *See* http://www.justice.gov/usao (containing link to Twitter entitled "Follow U.S.
Attorneys"); https://twitter.com/TheJusticeDept/lists/u-s-attorneys-on-twitter/members (listing
60 U.S. Attorney's Offices as holders of Twitter accounts).

[5]      In support of his motion, the defendant invokes that same quotation but misleadingly
omits the use of the words "as alleged."   (Def. Mem. at 4-5).

In fact, during the course of the press conference, which lasted approximately 36 minutes (a substantial portion of which was devoted to answering questions from the press in attendance), the U.S. Attorney used the words "allege(d)" or "allegation(s)" no fewer than *25 times*, and explicitly referred to the "Complaint" or the "charges" therein at least *35 times*.   Moreover, visuals present during the remarks and referenced by the U.S. Attorney during his remarks were entitled "*Alleged* Asbestos Litigation Kickbacks" and "*Alleged* Real Estate Kickbacks" (emphases added).   The defendant's motion fails to acknowledge or address this important and repeated framing of the U.S. Attorney's statements.   Indeed, the defendant, in arguing that the U.S. Attorney "offered impermissible opinions about the defendant's guilt," repeatedly omits the phrase "as alleged" from purportedly objectionable quotations by truncating the quotations or replacing those words with an ellipsis.   (*See* Def. Mem. at 14 (omitting from quotation of the U.S. Attorney's statements sentences beginning "*As alleged*, Silver corruptly used his law license . . . ." and "*As alleged*, Speaker Silver never did any actual legal work. . . ."); *supra* at n.5).[6]

The defendant also fails to acknowledge that the U.S. Attorney emphasized the presumption of innocence in his remarks at the press conference.   Specifically, in response to questioning, the U.S. Attorney stated:

> We have brought charges.   These are charges, I should make clear, as we always do with every case that we bring, we have to prove the charges.   And Sheldon Silver, just like everyone else who gets charged by this office [or] by any state prosecutor, is presumed innocent unless and until proven guilty.

(Def. Ex. 1 at 6).   *City & State* began its lead story on Silver's arrest by referring to these very

---

[6]       Because the defendant's transcription of the press conference omits a number of questions from the question and answer portion (*see*, *e.g.*, Def. Ex. 1 at 6-7), the Government has attached a complete transcription hereto as Exhibit B.

remarks:   "While announcing the corruption charges against Assembly Speaker Sheldon Silver Thursday afternoon, U.S. Attorney Preet Bharara was careful to point out that the legislative leader is 'presumed innocent, unless and until proven guilty.'"   Jon Lentz, *City & State*, *Corruption Case Against Silver Is Strong, Legal Experts Say* (Jan. 22, 2015).[7]

## IV.    The New York Law School Speech And The MSNBC Interview

On January 23, 2015, the U.S. Attorney gave a speech at New York Law School as part of a CityLaw breakfast series that had been scheduled long before the defendant's arrest.   (*See* Def. Ex. 3 at 1).   During the speech, the U.S. Attorney discussed "the problem of public corruption," and provided thoughts on "why it exists."   (*See* Def. Ex. 3 at 1).   In addressing public corruption in New York, the U.S. Attorney discussed several recent convictions obtained by this Office, including in cases against former State Assemblyman Eric Stevenson and former City Councilman Daniel Halloran.

The U.S. Attorney addressed the charges against Silver only briefly in his prepared remarks.   (*See* Def. Ex. 3 at 5-6).   During that brief discussion, the U.S. Attorney – as he did in the Press Release and in the press conference the day before – hewed closely to the Complaint and repeatedly made it clear that he was discussing only the "allegations" in the Complaint:

> I'm not talking about anything outside of *the four corners of the complaint* and *nothing beyond what I said yesterday*.   But someone asked the question yesterday, ["]does it matter[?"].   And I said part of *the allegations of the case* are that the Speaker of the Assembly was secretly giving $250,000 grants on two occasions to a doctor who was causing patients to be referred to his law firm, thus causing a stream of payments into the Assembly Speaker's pocket.   And he was

---

[7]    This article was omitted from the articles attached to the defendant's motion, but is available at http://www.cityandstateny.com/2/politics/new-york-state-articles/ new-york-state-assembly / corruption-case-against-silver-is-strong,-legal-experts-say.html %23.VMGX8HaeXCR#.VOzu3dq9KSM.

doing this, *we allege in the complaint*, in a way that had no transparency and no
one knew.

(*See* Def. Ex. 3 at 6 (emphases added); *see also id.* (describing evidence "as outlined in the

complaint" and repeatedly stating that description is of what "we allege" and what "we say in the

complaint")).

      The defendant leaves these crucial statements out of his motion.   Instead, twice in his

motion, the defendant lifts a single quotation out of context in order to suggest the U.S. Attorney

meant the *opposite* of what he actually said.   The defendant quotes part of an answer to a

question from the audience, in which the U.S. Attorney stated:   "I'm the United States

Attorney, and I'm subject to rules and to regulations and a lot of them, quite frankly, are stupid,"

in support of a scurrilous claim that the U.S. Attorney has admitted a willingness to ignore rules

governing his conduct.   (Def. Mem. at 9 n.7, 26, *citing* Def. Ex. 3 at 7).[8]   To the contrary, the

U.S. Attorney's remarks, made in response to a question about the Office's prosecutions of

"complex financial cases," plainly reflected the U.S. Attorney's desire to promote compliance

with governing rules as a minimum, but not sufficient, component of ethical conduct, rather than

lawless disregard for rules as the defendant falsely claims:

> I will concede as I will when I talk to business groups that regulations are
> not perfect and rules are not perfect.   I'm the United States Attorney, and
> I'm subject to rules and to regulations and a lot of them, quite frankly, are
> stupid.   Don't tell the regulators I said that.   Don't tell Washington.
> That can be so.   If compliance officials in industry are only teaching
> people how to follow the rules as promulgated you're not teaching them
> much of anything.   You're not teaching them to think for themselves how
> they should conduct themselves and behave properly.   A, because the
> rules might not be perfect and they're usually geared towards the lowest

---

[8]     In the second reference to this remark, for example, the defendant states: "Mr. Bharara
may believe that the rules that govern his conduct 'quite frankly, are stupid.'   Ex. 3 at 7.   But
they are the law of the land."   (Def. Mem. at 26).

> common denominator.   But also it's a violation of how we should be
> teaching about doing the right thing.   The analogy I tend to use is it's like
> if you only had teachers who were teaching to the test.   The purpose of
> school is to educate people and make them wise and teach them how to
> learn for themselves.

(Def. Ex. 3 at 7) (emphasis added).[9]

The defendant also complains about the U.S. Attorney's remarks in an interview with a

reporter for MSNBC on February 10, 2015 (the "MSNBC Interview").   The MSNBC Interview

covered a wide range of topics, including terrorism, financial crimes, reform of the Rikers Island

prison facility, and public corruption.   (*See* Def. Ex. 4).   When asked about the defendant's

case, the U.S. Attorney declined to address the specific allegations of the Complaint, instead

responding with general comments on the significant issues presented by persistent public

corruption in the State legislature, as reflected by "years" of cases brought by this Office and

other offices against State legislators:

> I think any time that a significant public official who's elected by the
> people is arrested, it's a big deal.   And I think – we've seen in New York,
> in case after case after case (that's just the most recent one that you
> mentioned) – this office and some other offices had been bringing cases
> against elected officials for years now.   And I think it goes to a core
> problem of – honesty and integrity in the state legislature.
>
> People forget that the state legislature, even though people don't know the
> names of the people who represent them as well as they know some other
> names in national politics, they're incredibly important.   They decide
> how much taxes you pay in many instances.   They decide how much rent
> you pay.   They decide what schools you can go to.   They decide a lot of
> things that matter to people.
>
> And when you see somebody who's been charged with (and we've
> convicted many, many people before this case) – and you see somebody

---

[9]   The U.S. Attorney has emphasized this point publicly on numerous occasions, including
in extended remarks on the topic to the Securities Industry and Financial Markets Association.
*See* http://www.justice.gov/usao/nys/pressspeeches/2013/sifma2013.php.

> who has basically sold his office to line his pockets and compromised his
> integrity and ethics with respect to how to make decisions on all those
> issues I mentioned that affect people's lives, that's a big problem.    And
> it's a big problem for democracy.

(Def. Ex. 4 at 2).    As these comments demonstrate, the U.S. Attorney was careful not to offer

opinions about Silver's case in particular.    Rather, he answered the question by talking about

the many cases brought by this Office and other offices against New York State public officials,

many of which he noted resulted in convictions, and the problem of public corruption more

generally.    Later in the interview, when again invited to comment further about the charges

against Silver, the U.S. Attorney declined to respond, answering simply: "we stand by what we

wrote in the Complaint."    (*Id.* at 4).

## V.    The Indictment

On February 19, 2015, a grand jury sitting in this District returned a three-count

Indictment that charged the defendant with honest services mail fraud, honest services wire

fraud, and extortion under color of official right.    The defendant does not proffer any evidence

that the Indictment was not properly returned, that anything improper occurred in the grand jury,

or that he suffered any actual prejudice in the return of the Indictment.

## DISCUSSION

## I.    Legal Standard

### A.    Grand Jury Proceedings Are Presumptively Regular

Grand jury proceedings carry a "presumption of regularity, which generally may be

dispelled only upon particularized proof of irregularities in the grand jury process."    *United*

*States* v. *R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) (quoting *United States* v. *Mechanik*, 475

U.S. 66, 75 (1986) (O'Connor, J., concurring in the judgment)).   *See also*, *e.g.*, *Hamling* v.

*United States*, 418 U.S. 87, 139 n.23 (1974); *United States* v. *Leung*, 40 F.3d 577, 581 (2d Cir.

1994) (describing the "presumption of regularity that attaches to the grand jury proceedings");

*United States* v. *Nunan*, 236 F.2d 576, 594 (2d Cir. 1956) (same); *United States* v. *Gibson*, 175

F. Supp. 2d 532, 534 (S.D.N.Y. 2001) (same).

 A defendant seeking to overcome the strong presumption of regularity faces a high bar,

which can be met only in "truly extreme cases."   *United States* v. *Broward*, 594 F.2d 345, 351

(2d Cir. 1979).   Indeed, a defendant cannot carry that burden without demonstrating "some

grossly prejudicial irregularity or some other particularized need or compelling necessity" that

outweighs the Government's and the grand jury's substantial interest in secrecy.   *Gibson*, 175

F. Supp. 2d at 534; *see also Dennis* v. *United States*, 384 U.S. 855, 869, 871-72 (1966).   Such a

showing requires more than mere "speculation and surmise," *Gibson*, 175 F. Supp. 2d at 534

(internal quotation marks omitted); rather, the defendant must present "persuasive evidence of

actual grand jury prejudice" before the presumption of regularity may be overcome.   *United*

*States* v. *Burke*, 700 F.2d 70, 82 (2d Cir. 1983).

  **B.** **Pre-Indictment Publicity Is Not Grounds**
    **To Dismiss An Indictment Or Seek Related Relief**

 While not acknowledged, referred to, or distinguished anywhere in the defendant's

motion, courts in the Second Circuit and across the country consistently have rejected efforts to

dismiss an indictment, or in the alternative to permit inspection of grand jury minutes or

investigation of grand jury proceedings, based on pre-indictment publicity.   The Government is

unaware of any case, in the Second Circuit or elsewhere, in which a court has dismissed an

indictment or permitted the inspection of grand jury minutes based on pre-indictment publicity, and the defendants have pointed to no such case.

The Second Circuit itself has decided two controlling cases, *United States* v. *Burke* and *United States* v. *Nunan*, neither of which is cited by the defendant, and both of which reject the same arguments made by the defendant here.   *See Nunan*, 236 F.2d at 593; *Burke*, 700 F.2d at 82.   In *Nunan*, the Second Circuit affirmed the district court's denial of a motion seeking to dismiss the indictment, or alternatively to inspect grand jury minutes, based on pre-indictment publicity in a public corruption case concerning a former New York State legislator who later became Commissioner of Internal Revenue.   236 F.2d at 579-81.   The investigation and subsequent indictment relied on "various disclosures brought to light by" the "King Committee" – a congressional sub-committee charged with "the duty to 'Investigate the Administration of the Internal Revenue Laws.'"   *Id.* at 592-93.   The Second Circuit found that because "the various disclosures brought to light by the King Committee affected some of the highest ranking officials in the Internal Revenue Service, including appellant, it was inevitable that the resulting publicity would be sensational in character, and much of it was unfair, misleading, and at least to some extent, untrue and unwarranted."   *Id.* at 593.

But despite the "sensational," "unfair, misleading," "untrue[,] and unwarranted" publicity, the Second Circuit agreed with the district court that there were no grounds to dismiss the indictment or, in the alternative, to permit inspection of the grand jury minutes.   *Id.* at 593-94.   In reaching that conclusion, the Second Circuit contrasted the grand jury's role from that of the petit jury, explaining that the grand jury was unique in its "historic function of ferreting out crime and corruption."   *Id.* at 593.   Because the record was "barren of any

14

evidence that the grand jurors were prejudiced or coerced by the publicity or by anything said or done by any member of the King Committee," and because the defendant failed to demonstrate that the evidence was insufficient to support the grand jury's probable cause finding, the Second Circuit found that the appellant had failed to "overcome the strong presumption of regularity accorded to the deliberations and findings of grand juries," or to merit reversal of the district court's denial of his "motion for an inspection of the Grand Jury minutes."   *Id.* at 593-94.

In *Burke*, which involved participants in the highly publicized Boston College basketball "point shaving" scandal, 700 F.2d at 73, the defendants' request for a pre-indictment hearing to determine whether the grand jury was prejudiced by adverse pretrial publicity – a less-drastic form of relief not even sought by the defendant in this case – was denied by the district court. *Id.* at 82.   On appeal, the defendants claimed that the district court's ruling denying them the right to inquire into the conduct of the grand jury was in error, and that "their right to a fair, impartial trial was jeopardized due to the widespread, adverse publicity" generated by news reports of the scheme ultimately charged in the Indictment.   *Id.*   The Second Circuit rejected this argument, relying in part on *Nunan*.   Because the defendants in *Burke* "failed to cite any persuasive evidence of actual grand jury prejudice," but merely "contend[ed] in very general terms that [adverse news coverage and publicity had] prejudiced them," their argument was found to be "clearly insufficient to warrant reversal under prevailing law."   *Id.*[10]

---

[10]     While *Nunan* and *Burke* were decided post-conviction, both cases affirmed the denial of a motion to dismiss the indictment based on pre-indictment publicity without relying on the argument that a conviction renders any error before the grand jury harmless.   Moreover, district court cases that have addressed similar motions prior to trial have applied the same standard. *See, e.g.*, *United States* v. *Myers*, 510 F. Supp. 323, 325 (E.D.N.Y. 1980) ("the moving defendant bear the heavy burden of demonstrating that he has suffered actual prejudice as a result of the publicity").

Courts around the country have agreed with the Second Circuit on this issue.    In *United States* v. *Waldon*, 363 F.3d 1103 (11th Cir. 2004) (*per curiam*), for example, the Eleventh Circuit explained that the argument that pre-indictment publicity unfairly prejudiced a defendant "misconstrues the role of the grand jury, which is an 'investigative and accusatorial [body] unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial.'"    *Id.* at 1109 (quoting *United States* v. *Calandra*, 414 U.S. 338, 349 (1974)).   Any concern about "adverse publicity" arises out of "its effect on the fairness of the ensuing *trial*, and not its effect on the grand jury."    *Id.* (emphasis in original); *see also United States* v. *York*, 428 F.3d 1325, 1330-31 (11th Cir. 2005) (affirming district court's refusal to dismiss indictment based on adverse pre-trial publicity even where pre-trial publicity warranted transfer of venue for trial based on "the entirely different functions of the grand jury vis-a-vis the trial jury and the different types of evidentiary restrictions before each body"); *United States* v. *Washington*, 705 F.2d 489, 499 (D.C. Cir. 1983) ("Since the concern over adverse publicity is its effect on the fairness of the ensuing trial . . . it was not error to fail to hold an evidentiary hearing concerning the effect of pre-indictment publicity on the grand jury."); *United States* v. *Brien*, 617 F.2d 299, 313 (1st Cir. 1980) (any "taint of a grand jury will be purged by the deliberations of an untainted petit jury"); *United States* v. *Polizzi*, 500 F.2d 856, 888 (9th Cir. 1974) (same).

Indeed, several courts have suggested that pre-indictment publicity can *never* serve as a basis for dismissing an indictment.    As the D.C. Circuit has explained, "[i]t is well-settled law that pre-indictment publicity is an inadequate grounds upon which to base the dismissal of an otherwise properly returned indictment."    *Washington*, 705 F.2d at 499 (internal quotation marks omitted); *see also In re United States*, 441 F.3d 44, 64 (1st Cir. 2006) ("It is doubtful that

16

adverse publicity claimed to affect a grand jury states a basis for dismissal."); *Waldon*, 363 F.3d at 1109 ("[I]t does not appear that any indictment has thus far been dismissed on the ground that it was induced by prejudicial publicity.") (internal quotation marks and alterations omitted).

### C.    Cases Involving Prosecutorial Misconduct Do Not Apply

The defendant cannot distinguish *Nunan*, *Burke*, and cases reaching similar holdings in other Circuits by alleging that here the U.S. Attorney committed prosecutorial misconduct by purportedly causing unfair pre-trial publicity.    The holdings in these cases do not turn on the alleged source or nature of the publicity (which the Second Circuit in *Nunan* explicitly found was "unfair, misleading, and at least to some extent, untrue and unwarranted," 236 F.2d at 593), but rather on whether the defendant proffered specific evidence of actual prejudice that overcame the strong presumption of regularity of grand jury proceedings, and on the unique role that the grand jury plays in investigating criminal conduct.    Moreover, it is unremarkable that the arrest of the longtime Speaker of the Assembly on allegations that he committed a large-scale and long-running honest services fraud and extortion scheme generated substantial publicity, and it plainly would have done so regardless of any statements made by the U.S. Attorney.

In an effort to find support for his baseless argument, the defendant misleadingly characterizes several cases as supporting dismissal of an indictment when the court in those cases in fact did not grant that relief and instead noted the heavy burden faced by defendants seeking such relief.    (*See* Def. Mem. at 16 (citing *United States* v. *Williams*, 504 U.S. 36 (1992) (reversing dismissal of indictment because there is no obligation to present exculpatory evidence to the grand jury); *United States* v. *Fields*, 592 F.2d 638 (2d Cir. 1978) (reversing dismissal of indictment despite finding that attorneys with the Securities and Exchange Commission acted

improperly); *United States* v. *Kilpatrick*, 821 F.2d 1456 (10th Cir. 1987) (reversing dismissal of indictment despite finding multiple Rule 6(e) and other violations)).   The remaining cases cited by the defendant in which indictments actually were dismissed are inapposite, as they all involved actual misconduct that created real prejudice during grand jury proceedings or trial.[11]

## II.    The Defendant's Motion Should Be Denied

In light of the above facts and caselaw (and the defendant's misstatement of both), it is clear that the defendant's motion is without merit.   The defendant has not identified any "evidence of actual grand jury prejudice" resulting from adverse pretrial publicity, as he must do in order to obtain any of the relief he seeks.   *Burke*, 700 F.2d at 82; *Nunan*, 236 F.2d at 593. Nor could the defendant make any credible claim of actual prejudice here, where the grand jury's decision to indict him upon a finding of probable cause confirms the neutral magistrate judge's decision to issue an arrest warrant under that same probable cause standard, and the defendant fails to allege, much less demonstrate, that the facts set forth in the Complaint were insufficient to support Magistrate Judge Maas's or the grand jury's probable cause determinations.

Instead, the defendant vaguely asserts that "[c]ourts have found violations from similar statements" to those he challenges here.   (Def. Mem. at 14).   But like much in the

---

[11]    (*See* Def. Mem. at 16 (citing *United States* v. *Stein*, 541 F.3d 130, 136 (2d Cir. 2008) (prosecutors violated defendants' Sixth Amendment right to counsel of choice); *United States* v. *Jacobs*, 547 F.2d 772, 778 (2d Cir. 1976) (dismissal of perjury count, while allowing substantive count to proceed, based on prosecutors' failure to warn the defendant prior to compelling her grand jury testimony that she was a target); *United States* v. *Estepa*, 471 F.2d 1132, 1137 (2d Cir. 1972) (specific evidence that the government knowingly misled the grand jury by eliciting hearsay testimony as if it was first-hand knowledge); *United States* v. *Chapman*, 524 F.3d 1073, 1090 (9th Cir. 2008) (indictment dismissed based on "egregious[ ]" violations of *Brady/Giglio* and misrepresentations to the court); *United States* v. *Leeper*, No. 06-Cr-58A, 2006 WL 1455485, at *4 (W.D.N.Y. May 22, 2006) (prosecutor failed to charge the grand jury on an essential element of the offense and otherwise misled the grand jury)).

defendant's motion, that assertion also is not accurate, and in any event, is not relevant.    In none of the cases cited by the defendant did the court rule that a violation of any legal or ethical rule had occurred, let alone a violation that would warrant inspection of grand jury minutes or dismissal of the indictment.    For example, in *United States* v. *Corbin*, the defendant sought to dismiss the indictment based on pre-indictment publicity, relying on the same argument advanced by the defendant here – namely, that prosecutorial statements violated Rule 3.6 of the New York Rules of Professional Conduct.    620 F. Supp. 2d 400, 408, 411 (E.D.N.Y. 2009). The court found no such violation, however, even though one version of the government's press release in that case did not contain any statement noting that the charges in the complaint were merely allegations, and the release quoted the United States Attorney (Benton J. Campbell at the time) as stating – without making it clear that these were allegations based on the complaint: "The defendant violated the law by failing to file truthful federal tax returns . . . .    He then compounded his crime by lying to federal agents to cover his tracks."    *Id.* at 411.    Rather, the court in *Corbin* cautioned that "[i]t is not [the court's] obligation to determine such matters involving the Rules of Professional Conduct."    *Id*.    "Instead," the court explained, "it is the Court's obligation to determine whether the press release has compromised this criminal proceeding and the future trial."    *Id.*    The court treated that question – just as did the precedents cited above – as limited to whether the defendant could ultimately obtain trial by an impartial jury, and it determined that he could.    *Id.*[12]

Likewise, in *United States* v. *Smith*, 985 F. Supp. 2d 506 (S.D.N.Y. 2013), the court did

---

[12]    The defendant also cites *United States* v. *Perryman*, 12 Cr. 123 (ADS), 2013 WL 4039374, at *13 (E.D.N.Y. Aug. 7, 2013), but that case, like *Corbin*, held that the pre-indictment statements at issue had not denied the defendant the right to a fair and impartial jury.

not, as the defendant inaccurately suggests, find a "violation" of any legal or ethical rule.   *See id.* at 539-40.   Indeed, the court entered a protective order over the defendants' opposition based on a finding that the defendants' trial rights were unaffected by statements made by the U.S. Attorney that the defendants alleged were objectionable.   *See id.*[13]

Perhaps recognizing that his effort to dismiss the Indictment finds no support in the facts or the law, the defendant ultimately retreats to a request that the grand jury transcripts be made public, or that grand jurors be subjected to *voir dire*.   But as set forth above, without a showing of actual evidence of grand jury prejudice and a particularized need – which the defendant does not even attempt to make here – grand jury materials must remain sealed.   *See, e.g., Burke*, 700 F.2d at 82; *In re Grand Jury Investigation*, 683 F. Supp. 78, 79-80 (S.D.N.Y. 1988).

Courts consistently have refused to permit inspection of grand jury transcripts or to conduct *voir dire* on similar facts for good reason:   "[T]he mere challenge, in effect, of the regularity of a grand jury's proceedings would cast upon the government the affirmative duty of proving such regularity.   Nothing could be more destructive of the workings of our grand jury system or more hostile to its historic status."   *United States* v. *Johnson*, 319 U.S. 503, 513 (1943).[14]   Moreover, if the defendant were able, on the basis of speculative allegations, to

---

[13]     The defendant also cites comments by the Honorable Richard J. Sullivan made during a panel discussion in which he questioned the appropriateness of comments made by this Office in press releases.   (Def. Mem. at 20).   Judge Sullivan, however, later noted that it was an issue about which "reasonable people can disagree."   Jacob Gershman, "Federal Judge Chides Bharara for 'Tabloid' Press Operation," *The Wall Street Journal*, Oct. 16, 2013, at http://blogs.wsj.com/law/2013/10/16/federal-judge-chides-bharara-for-tabloid-press-operation.

[14]     The defendant's reliance on *In re Grand Jury Investigation*, No. 87 Civ. 963, 1987 WL 8073 (E.D.N.Y. Feb. 23, 1987), is misplaced.   The court there conducted *voir dire* only after it determined there was actual evidence that a *prima facie* Rule 6(e) violation had occurred, as the government conceded that there had been leaks of confidential grand jury information.   *Id.* at

obtain dismissal of an indictment or an investigation of grand jury proceedings so too would

every other defendant who claims that he was subject to adverse pre-indictment publicity.   It is

for precisely this reason that the Supreme Court and the Second Circuit require real evidence of

actual prejudice, a standard that the defendant wholly fails to satisfy.

## III.    The U.S. Attorney's Statements Were Proper

With no argument that comes close to meeting the standard required for the relief he

seeks, the defendant is left with a series of baseless and disparaging personal attacks on the U.S.

Attorney alleging violations of certain ethical rules, guidelines, and policies.   These pejorative

arguments provide no conceivable basis for dismissing the Indictment or the other relief sought

in the motion and fail even on their own terms.[15]   The U.S. Attorney's statements violated no

ethical rule, did not unfairly prejudice the defendant, and were consistent with the stated mission

of the DOJ.

The ethical rules cited by the defendant provide that lawyers, including prosecutors, have

a duty not to make out-of-court statements that "will have a substantial likelihood of materially

prejudicing an adjudicative proceeding in the matter."   N.Y. R. Prof'l Conduct 3.6(a); *see also*

Local Crim. Rule 23.1(a); 28 C.F.R. § 50.2(b)(2).   The rules further provide that a "statement

ordinarily is likely to prejudice materially an adjudicative proceeding" if it expresses "any

---

*6.    Here, of course, the defendant does not claim, and the Government does not concede, that a Rule 6(e) violation occurred, and there is no evidence of any such violation.

[15]    The defendant's reliance on unrelated opinion pieces from India consisting largely of *ad hominem* attacks on the U.S. Attorney, and on articles referencing this Office's wholly unrelated prosecution of insider trading cases, the vast majority of which remain unaffected by a recent reversal in the Second Circuit (currently being challenged by the DOJ and the Securities and Exchange Commission) (Def. Mem. at 21-23), is misplaced and highlights the complete lack of any legitimate basis for the defendant's motion.

opinion as to the guilt or innocence of a defendant."   N.Y. R. Prof'l Conduct 3.6(b)(4); *see also* Local Crim. Rule 23.1(d)(7); 28 C.F.R. § 50.2(b)(6)(vi).

As set forth in detail above, the U.S. Attorney was careful not to express "any opinion as to the guilt" of the defendant, and indeed stressed repeatedly that the defendant "is presumed innocent unless and until proven guilty."   (Def. Ex. 1 at 6).   Moreover, the U.S. Attorney's statements about the defendant's case hewed closely to the allegations in the Complaint and were appropriately framed as allegations.   Indeed, despite all the defendant's accusations, he cannot identify a single factual statement made about this case that falls outside the four corners of the Complaint.   Thus, at the end of the day, the defendant is left to complain, not about substance, but about the language the U.S. Attorney used when describing the Complaint's allegations to the public.   But none of the legal or ethical sources invoked by the defendant requires a verbatim recitation of the Complaint or the use of any magic words.

When the defendant's rhetorical objections and mischaracterizations are swept aside, the remaining challenged statements by the U.S. Attorney simply describe accurately the broader context in which these charges were brought and attempt to "provide federal leadership in preventing and controlling crime," one of the DOJ's core missions.[16]   Since 2007, at least 18

---

[16]     The DOJ's full Mission Statement is: "To enforce the law and defend the interests of the United States according to the law; to ensure public safety against threats foreign and domestic; to provide federal leadership in preventing and controlling crime; to seek just punishment for those guilty of unlawful behavior; and to ensure fair and impartial administration of justice for all Americans."   *See* http://www.justice.gov/about.

In addition, the FBI, a component of the DOJ, has made combating public corruption its top priority among criminal investigations nationwide due to the grievous harm public corruption inflicts on the public, and the central role that federal authorities must play in combating corruption wherever it may be found.   *See* FBI: Public Corruption, *available at* http://www.fbi.gov/about-us/investigate/corruption ("Public corruption poses a fundamental

22

current or former New York State legislators have been convicted of serious crimes by federal, state, and local prosecutors and charges are pending against three other members of the Legislature, including the defendant.[17]   These numbers do not include many other individuals who were convicted after they sought improper benefits from State legislators or otherwise abused their positions of trust in State government.   Accordingly, this Office, consistent with the DOJ's mission and priorities, has dedicated resources and provided federal leadership, both before and during the tenure of this U.S. Attorney, to combating public corruption through prosecutions of public officials who use their office for self-enrichment or who otherwise abuse their official positions; calling the public's attention to how public corruption afflicts our State's public institutions; and seeking ways to prevent and control it.

In light of the DOJ's mission and the multitude of public corruption convictions in New York, the majority of which were obtained in cases brought by this Office, it is squarely within the role and duty of the U.S. Attorney, as the chief federal law enforcement officer in this District, to speak out about the causes of public corruption and potential means of combating it. The U.S. Attorney's comments about the underlying causes of public corruption are no different than his comments about the causes of gang violence in Newburgh, the heroin and prescription pill epidemic, securities fraud on Wall Street, or civil rights abuses on Rikers Island.

Nothing in any of the legal or ethical sources cited by the defendant prohibits the Government from describing its charges to the public, from placing those charges in context, and

threat to our national security and way of life.   It impacts everything from how well our borders are secured and our neighborhoods protected … to verdicts handed down in courts … to the quality of our roads, schools, and other government services. And it takes a significant toll on our pocketbooks, wasting billions in tax dollars every year.").

[17]    The entire State Legislature consists of only 213 members.

from speaking more broadly on issues of criminal justice.    Nor do those sources require the U.S. Attorney to refrain from providing federal leadership on preventing and controlling persistent, serious crimes, in accordance with the DOJ's mission, at the same time the Office is investigating and prosecuting individuals accused of engaging in those crimes.    The statements made by the U.S. Attorney that are challenged here are fully compatible with the proper and fair administration of justice and did not violate the defendant's rights in any way.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court deny the defendant's motion in its entirety.

Dated:    March 5, 2015
           New York, New York

                          Respectfully submitted,

                          PREET BHARARA
                          United States Attorney


                          By: _____/s/_____
                               Carrie H. Cohen/Howard S. Master/
                               Andrew D. Goldstein/James M. McDonald
                               Assistant United States Attorneys