# SHELDON SILVER VIDEO PRESS CONFERENCE TRANSCRIPT

| | |
|---|---|
| Date: | January 22, 2015 |
| Time: | 12:00:00 – 12:36:39 EST |
| Language: | English |
| Participants: | Preet Bharara        (PB) |
| | Rich Frankel         (RF) |
| | Journalist           (ASIDE) |
| Key: | Unintelligible        (UI) |
| | Inaudible            (IA) |
| | Phonetically         (PH) |
| | Stutters             (ST) |
| | Voice Overlap        // |
| | Stated Incorrectly   (SIC) |
| | Background Conversation  [ ] |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PB:   Good afternoon everyone. My name is Preet Bharara, and I'm the United States Attorney for the Southern District of New York. Today, we unseal a criminal complaint charging the longtime leader of the New York State Assembly, Sheldon Silver, with public corruption. Speaker Silver surrendered to the FBI in Manhattan earlier this morning and we expect him to be presented in Federal Court this afternoon.

Over his decades in office, Speaker Silver has amassed titanic political power. But as alleged, during that same time, Silver also amassed a tremendous personal fortune through the abuse of that political power. The complaint charges Speaker Silver in five counts with corruptly seeking legal business from a handful of people and entities with significant business or interests before the State and then corruptly profiting from the legal fees that were paid.

All told, we allege that Silver corruptly collected some $4 million in bribes and kickbacks disguised as referral fees. Those disguised bribes and kickbacks account for approximately two-thirds of all of Silver's outside income since 2002. So today, in order to prevent Silver from accessing his alleged ill-gotten gains, we also announce that the Court has issued warrants allowing us to seize approximately $3.8 million in alleged fraud proceeds that Silver had disbursed among eight different bank accounts at six different banks.

For many years, New Yorkers have asked the question, "How could Speaker Silver – one of the most powerful men in all of New York – earn

millions of dollars in outside income without deeply compromising his ability to honestly serve his constituents?" Today, we provide the answer: he didn't. As alleged, Silver corruptly used his law license and took advantage of lax outside income rules as a cover to secretly pocket millions of dollars through his official position.

For many years, New Yorkers have also asked the question: "What exactly does Speaker Silver do to earn his substantial outside income?" Well, the head scratching can come to an end on that score, too, because we answer that question today as well: he does nothing. As alleged, Speaker Silver never did any actual legal work. He simply sat back and collected millions of dollars by cashing in on his public office, and his political influence.

Now we are by no means the only ones to have sought answers to these important questions. The Moreland Commission, as you may recall, tried to get to the bottom of some of these questions also, but a deal was cut that cut off the Commission's work. To the great relief of Sheldon Silver, who furiously fought its subpoenas and urged the Commission's early shutdown, Moreland was made to close its doors after only nine months - its work barely begun, and while litigation over those subpoenas about Sheldon Silver's outside income was still pending before a State judge. So my office, as you know, took possession of all of the Moreland files and merged the Commission's incomplete investigations with our own ongoing ones. And it quickly became clear that the mystery of Silver's outside income needed to become an even greater priority. As today's charges make clear, the show-me-the-money culture of Albany has been perpetuated and promoted at the very top of the political food chain. And as the charges also show, the greedy art of secret self-reward was practiced with particular cleverness and cynicism by the Speaker himself.

Now let me get into some of the details of the charges we announced today.

The central allegation in this case is that Speaker Silver successfully sought ways to monetize his public office, and that he did so in violation of Federal law. As alleged, Silver quietly and cleverly figured out how to monetize his position as Speaker of the Assembly in two principal ways. In both cases, as alleged, Silver cynically abused his law degree and New York's lax disclosure rules to disguise kickbacks as legal referrals.

Let me talk about the first. As alleged in the complaint, in 2002 Sheldon Silver established an arrangement with the law firm of Weitz & Luxenberg, which was mostly in the business of asbestos litigation. That arrangement called for him to be paid $120,000 a year, even though Weitz & Luxenberg admits hiring him based on his official position, rather than any work he was expected to perform for clients of the firm.

But that wasn't enough for the Speaker, because Sheldon Silver understood that he could substantially supplement his income if he could cause asbestos referrals to be made to the firm. Now the problem for

Sheldon Silver was that he was neither a doctor, nor an asbestos lawyer. So Silver did not have any relevant legal or medical expertise. But what he did have, what he did have was extraordinary power over State money that he had the ability to dole out quietly, even secretly.

So Silver, as we allege, in the early 2000s, forms a relationship with a doctor who is an expert in asbestos-related disease, and who can get Silver what he wants, because he treats many patients who might have asbestos-related claims. Silver wants referrals so that he can substantially increase his income, even without doing a lick of work.

So, as alleged, he asks the doctor to refer people who have asbestos diseases to Silver at the firm of Weitz & Luxenberg, with which Silver had conveniently formed an affiliation. But the doctor, the doctor wants something too. What the doctor wants is money to fund his research at a hospital in New York. And it turns out that the doctor is in luck, because as I mentioned, Sheldon Silver has access to enormous amounts of public money, including an $8.5 million fund, from which he can in his sole discretion, without disclosure and without transparency, cause funds to be distributed to the doctor's research center. And that's exactly how it worked. Sheldon Silver tells the doctor to send referrals to Weitz & Luxenberg from which Sheldon Silver profited through referral fees and, in return, Silver, on multiple occasions, takes official action for the benefit of the doctor and the doctor's interests.

As you'll see if you look at the complaint, first, Silver causes a $250,000 State grant to go to the doctor's research center, then he causes a second $250,000 dollar grant to go to the center. Then, when the ability to secretly pay money from the State evaporated because of a sudden change in the law, Silver finds other ways to use his official position to perform favors for the doctor. Silver helps the doctor's family member get a job, Silver directs $25,000 in State funds to a not-for-profit where another family member of the doctor served on the board, and Silver even gets the Legislature to issue an official resolution honoring the doctor.

And so at the end of the day, all told, we allege that Sheldon Silver effectively converted $500,000 in public money into over $3 million in personal riches, which is a nice profit on being a public official.

By the way, as described, Silver did all of this without ever disclosing to Weitz & Luxenberg, or to the public, that he had directed a half million dollars to the doctor's research center. And as with so many things depicted in the complaint, Silver did things quietly and under the radar.

Now let me talk about the second corrupt way that Sheldon Silver illegally monetized his public position. That was based on his power over the real estate industry. Once again, Silver uses his affiliation (ST) with a law firm. In this case, a tiny real estate law firm, whose lead partner is his former Assembly Counsel. That firm has only two lawyers and a narrow, very narrow specialty: tax reductions. In other words, it helps developers make applications to the City of New York to lower their property taxes.

Unlike with the asbestos law firm, Silver keeps his financial arrangement with the real estate law firm completely secret. He doesn't even comply with State disclosure laws requiring him to identify with specificity all sources of income.

But as is the case with the asbestos referrals, Sheldon Silver does not have any relevant legal qualification - none. He has no real estate tax experience whatsoever. But what he does have, again, is tremendous authority and power - authority and power he was privileged to have by virtue of his public position – over rent control laws and tax abatement laws that are critically important - even existentially important - to the business models of some of the largest real estate developers in the state.

And he abuses that power, just as he does in the healthcare context that I just described. Let me tell you that story.

As alleged, some years ago, Sheldon Silver approaches two prominent developers of substantial properties in Manhattan; one personally, and the other though a lobbyist - which lobbyist, by the way, was hired by the developer to lobby Silver. And he asks those developers to switch law firms and hire a different law firm - the real estate law firm that Silver had a secret financial arrangement with.

And the developers - they oblige. And that is not surprising, because Silver is a powerful political leader in the state, who holds sway over so many laws and policies near and dear to the developers' bottom lines. So the developers hire the firm, and pay a cut of whatever millions of dollars the real estate law firm saves them in property taxes, and Silver gets a cut of that cut, and he gets it secretly.

In return, as alleged, Silver does not disappoint those developers when it comes to official State business that they care about. During the time that Silver is pocketing money from developers, he continues to hear out lobbyists who are working in favor of one of these very developers. And as set forth in the complaint, certain of that developer's recommendations ultimately are adopted by the Legislature. And as set forth in the complaint, when rules come up for renewal that are absolutely critical to the financial success of those developers, the developers are pleased with how Sheldon Silver comes out on their issues. In fact, as the complaint describes, on one occasion, a real estate industry group stated that landlords were surprised by how favorable Silver was to their position, and that Silver could have done more for tenants.

And so, as alleged, in exchange for exercising power over issues that were of concern to the developers, Sheldon Silver converted his public authority over property laws into $700,000 in personal profit, and none of that has ever been publicly disclosed.

If you look at the charts to my right, uh, they depict graphically how simple a scheme it was, and how parallel they are. As I described, with respect to the asbestos litigation kickbacks, we have Sheldon Silver, as

described in the complaint, has a relationship with a doctor, um, does official favors for that doctor to the tune of $500,000 dollars in State grants.

Similarly, in the case with the real estate kickbacks, Sheldon Silver develops a relationship with real estate developers - some of whom he knows because they lobby him - and is in a position to exercise power over real estate and tax abatement laws. And then manages to line his pockets, in both instances, essentially through law firms that serve as pass-throughs, so that he could hide what were essentially kickbacks, and bribes, as legal referrals. In that case, over $3 million, and in this case, over $700,000 dollars.

Now as you can see, a theme running through all of these charges is secrecy – the hallmark of many a criminal scheme – and Silver's was no different. Indeed, the complaint sets forth the many ways that Speaker Silver lied and misled the public about his outside income to hide his scheme. Um, you can look at the complaint to see the others, but here's one that is particularly egregious. In response to recent questions about Silver's outside income, the Speaker had his spokesperson flatly state that "None of Silver's clients had any business before the State." But as we allege, it would be hard to find a more blatant falsehood, given that Sheldon Silver was retained by one of the largest developers in the entire state, with huge business before the State Legislature that Speaker Silver himself purports to help to lead. In fact, I urge you to read the portion of the complaint that lays this out. You'll find it at paragraph 32.

In other words, what we allege is that Sheldon Silver, Speaker of the New York State Assembly, was in fact on retainer to a mammoth real estate developer, at the very same time that the chamber he dominates was considering and passing legislation vitally affecting the bottom line of that developer, at the very same time that he was hearing out lobbyists paid by that developer, and at the very same time, that he was deliberately keeping secret from the public any information about this lucrative side deal in violation of the law. And by the way, many of the laws described in the complaint that are important to the real estate industry are up for renewal in the Legislative session that has just begun.

Politicians are supposed to be on the people's payroll, not on secret retainer to wealthy special interests they do favors for. These charges, in our view, go to the very core of what ails Albany: lack of transparency, lack of accountability, and lack of principle, joined with an overabundance of greed, cronyism, and self-dealing.

But we will keep at it, because the men and women of the FBI, and of my office, still subscribe to the quaint view that no one is above the law, no matter who you are, who you know, or how much money you have. And so our unfinished fight against public corruption continues; you should stay tuned.

I want to thank the many people who brought us to this point before I turn

the podium over to the FBI. Uh, this was a lot of work on the part of a lot of people, not only because we had our own independent investigation, but then took over the burden of continuing an investigation that had already begun, with respect to the Moreland Commission. And so, this is an extraordinary example of extraordinary work by, I think, extraordinary people.

Uh, first I'm joined here by the Federal Bureau of Investigation, represented today by Rich Frankel, the Special Agent in Charge of the Criminal Division, George Khouzami, Assistant Special Agent in Charge, and James Barnacle, Supervisory Special Agent. I also want to thank, uh, those of the FBI who have helped today - make today's case possible, including FBI Special Agents Richard Wilfling, Paul Takla, and Elizabeth Bracco.

I want to recognize the dedicated career prosecutors, and criminal investigators in my office, who work so hard to make this case possible. And I don't think there's, there's a group of people anywhere who has done more to make sure that, uh, our leaders behave with integrity - and if they don't, they're accountable for it - then the group of people who are the team in my office. And they are in this case Assistant U.S. Attorneys Howard Master, Carrie Cohen, Andrew Goldstein, and James McDonald, supervised by Arlo Devlin-Brown, the chief of my office's Public Corruption Unit, and Criminal Investigators Bob Ryan and John Barry, who were absolutely essential in getting this case done.

And I also want to thank the leadership of the office, that spent uh, extra time making sure that this case got done. Uh, Deputy U.S. Attorney Rich Zabel, Criminal Division Chief Joon Kim, and Chief Counsel Dan Stein.

And I think people in New York, and elsewhere, should be really proud of the dedicated career men and women, who have done so much work on this case, and cases like it.

Now let me call Rich Frankel, Special Agent in Charge of the FBI's Criminal Division to the podium.

RF:  Good afternoon. For nearly two decades, Sheldon Silver has serve - has served as Speaker of the New York State Assembly – a position that has afforded him significant power over the workings of State Government. As alleged, Silver took advantage of this political pulpit to benefit from unlawful profits. When all was said and done, Silver amassed nearly $4 million in illegitimate proceeds. He also arranged for approximately $500,000 in State funds to be used for projects that benefited his - his personal plans. The nature of his earnings went virtually undetected, until today.

Silver's wallet was enriched through his association with a physician, to whom he issued State grants, and other favors made possible through his official position. In exchange for favors, the physician referred patients

with asbestos-related diseases to Silver at Weitz & Luxenberg - a law firm where he was affiliated as Counsel.

In the end, Silver received over $3 million in proceeds from the patients referred to him and more than $500,000 in state money was allocated for projects that directly benefited the doctor and his family.

But the special treatment did not stop there. Silver also received more than $700,000 in kickbacks after leading two real estate developers with business before the State to a law firm run by a co-conspirator with whom he had entered into a corrupt relationship. He later supported a proposal made by one of the developers, which was in substantial part enacted into legislation in 2011.

We hold our elected - we hold our elected representatives to the highest standards, and expect them to act in the best interests of their constituents. In good faith, we trust they will do so while defending the fundamental tenants of the legal system. But as we are reminded today, those who make the laws don't have the right to break the laws.

Thanks, as always, to our partners in this and so many investigations: U.S. Attorney Preet Bharara, Assistant U.S. Attorney and Chief of the Public Corruption Unit, Arlo Devlin-Brown, Assistant U.S. Attorneys Carrie Cohen, Howard Master, Andrew Goldstein, and James McDonald.

I'd also like to thank and congratulate the investigative team that worked together to address corruption in New York. I extend my sincere congratulations to Robert Ryan and John Barry, Criminal Investigators from the Southern District of New York, as well as FBI Special Agents Rich Wilfling, Paul Takla, and Elizabeth Bracco, as well as Supervisory Special Agent James Barnacle, and Assistant Special Agent in Charge George Khouzami, for their work on this important investigation. Thank you.

| | |
|---|---|
| PB: | Thanks Rich. I can't imagine you have any questions, but if you do, I'm happy to take them (chuckling). Yeah. |
| ASIDE: | I want to ask you first of all, um, you don't pull up the public corruption cases over the last few years, but when you look at this complaint, the allegations are (UI) compared to what we've seen in the past. I wanted to see what your reaction was though in comparison to the other charges - the other constant complaints we've seen in the past. Are you sad, angry, (UI) just more of the same out of Albany. What (ST) did you think? |
| PB: | First of all, I don't think any particular emotion I have matters, and is not relevant, but, uh, look – I think the complaint speaks for itself. When you have an allegation not against - any time you have an allegation, uh, especially when it's proven against a public official, that is dispiriting.<br><br>And when you have an allegation against someone who's a public official, not just in a rank and file capacity, but a leader of an entire body who, uh, |

|        |        |
|--------|--------|
|        | is known to be - in the parlance of Albany – one of the three men in the room – that is especially dispiriting. So, the nature of the person who is being charged obviously matters, and is different from the kinds of cases we have brought before. Uh, separate and apart from that, the nature of the allegations, uh, I don't know that it's that radically different from some of the other cases that we have brought, but it is, um, it is troublesome, uh, and worrisome when the charges we describe go to, what I've described as - as the core of the problem there. |
|        | It's about money, it's about lobbying, it's about powerful interests, it's about lack of transparency, it's about all of those things that, uh, that you see in case, after case, after case. All of which seem to be tied together in the allegations in this particular case. Yeah. |
| ASIDE: | There are still several Democrats in the Assembly that are standing by him. What do you make of that? |
| PB:    | You should ask them. Um, you know we (ST) have brought charges; these are charges. And, I should make clear - as we always do in every case that we bring - uh, we have to prove the charges. |
|        | And Sheldon Silver – just like everyone else who gets charged by this office, by any state prosecutor, is innocent - is presumed innocent - unless and until proven guilty. Um, but as to, you know, what the threshold is for other politicians to stand by a particular politician who holds great sway over them, you would have to ask them that question. |
| ASIDE: | You said stay tuned for more possible. Uh, are you talking about Moreland Commission stuff, or is this also from other (IA)? |
| PB:    | As I said, in this case and as we outlined in the complaint, um, we have been looking at Speaker Silver's outside income for some period of time, and then merged our investigation with new material that we got from the Moreland Commission. We have a number of public, uh, corruption investigations going on. We had them before the Moreland Commission existed, and we have them after the Moreland Commission was, uh, shut down. So I'm not going to say which are, are merger cases, and which aren't, and I'm not going to tell you which people we're looking at. So, "stay tuned" was intentionally very vague (laughing). Yeah. |
| ASIDE: | Mr. Bharara, I was wondering if you think that Governor Cuomo's decision to shut down the Moreland Commission while Sheldon Silver was filing, um, uh, charges to shut down - to prevent them from making disclosures, makes the Governor complicit in helping, uh, Speaker Silver to cover up this financial (IA)? |
| PB:    | I'm not going to comment on that. I think I've, I've made my view about the shutting down of the Moreland Commission clear. Um, that's all I'll say. Yeah. |
| ASIDE: | Is Mr. Silver accused of extorting the Governor when it comes to |

|  |  |
|---|---|
|  | quashing the Moreland Commission? And if not, who is he accused on - whom is he accused of extorting? |
| PB: | Um, I think it's laid out in the complaint in counts four and five both, uh, extortion under color of official right and conspiracy to commit that extortion, with respect to the developers, um, from whom he, he tried to get money passed through a law firm. Not, not the Governor, no. Yeah. |
| ASIDE: | How commonplace do you think this practice is in Albany? |
| PB: | Well, um, when you say "this practice" - if you mean by public corruption, it's really commonplace based on the cases that we have brought. |
| ASIDE: | I mean specifically, (UI) referrals, as opposed to, you know, kickbacks and stuff? |
| PB: | Yeah. Well, we brought a case some years ago, before I was the U.S. Attorney. You know, the, the public corruption work of this Office preceded me, and will, will, you know, come after me also, or someone from the State Legislature was, uh, not a lawyer, and was taking money as a consultant. So, it's - it is, um, - it's not the first time that someone in public office has tried to figure out a way to monetize his office. I think we were up here two years ago quoting from people who were, um, taped on body wires talking about how important it was for them to figure out a way, as public officials, to capitalize on that and make money. So, the, the theme of people trying to make money from their public position is not a new one. |
| ASIDE: | So, how long did this, uh, investigation go on for? How long were you looking at (IA)? |
| PB: | I think we say in the complaint, that we began looking at some of these issues in June of 2013. |
| ASIDE: | Sir, if Mr. Silver's charged, why aren't the real estate developers charged, and why isn't the doctor charged? And how do you show the quid pro quo it's a good thing to refer patients who need help, and to delegate money from the State to help a hospital out? Where's the quid pro quo? How (IA)? |
| PB: | Yeah. As to the first, you know, we make decisions about charging based on all the facts that we have. Um, I should've said, as I always say, the investigation is open and ongoing, and is not done. |
|  | Um, with respect to the doctor, based on a lot of circumstances - um, as I think is outlined in the complaint - he received a non-prosecution agreement, uh, for his decision to cooperate with us, and provide testimony. Um, as to how you decide - you know, you figure out whether something's a quid pro quo or not - uh, as I think case law says, and common sense tells you, it is very rare that you have a written agreement |

|   |   |
|---|---|
|   | in which someone says, I'll pay you this bribe, and then you do this favor for me. There are a lot of people who are not so bright in office, but there are few who are, you know, that silly and stupid (chuckling). |
|   | Um, so you, so you prove, so you prove by circumstances - which I think are outlined, uh, fairly compellingly in the complaint - you had a person, and you should (ST) - I think there are documents that describe what the doctor's understanding was, and I think those documents make clear that the doctor's understanding was, uh, if I make sure that you have this stream of, of, uh, referrals that go to this law firm, then I can get something for that. That, I think, we believe a jury will find to be a quid pro quo. |
|   | And with respect to the real estate side - remember we're talking about two ways in which he, uh, had outside income that we think was unlawful - with respect to the real estate side of the case, um, that was a situation in which he made a direct request to the developers, in one case through the lobbyist who had been hired by the developers to go get him to do things. Uh, and by definition, they had business before the State, because presumably that's why you hire a lobbyist, to lobby on issues relating to the State, including lobbying specifically Sheldon Silver. |
|   | And as outlined in the complaint, Speaker Silver says to that lobbyist who was sent to help orient him in favor of the developers, uh, you tell them to switch law firms and send their tax abatement work to this other firm, when Sheldon Silver knew that firm was run by a former colleague of his, and he had a secret financial arrangement with them, uh, whereby he would get money. You know, a jury will decide whether or not that's a quid pro quo, uh, but we think it is. |
| ASIDE: | Another public corruption press conference like this announcing a corruption case, you mentioned a culture of Legislative problems that's come up lately, that it's nature that it's, uh – that more cases like this can (UI). Since that press conference, has any uh, State, uh, legislative action being taken, and if not, what do (IA)? |
| PB: | I don't remember which press conference you're talking about. There was this intervening Commission that started and stopped. Um, you know, I'm not a - I'm not a legislative expert. I think that I have said many, many times, both at this podium and at other places, that solving the public corruption problem in Albany, and in the City, and in other places, is more than a prosecutor's problem. The legislators themselves have to step up, the public has to step up, the press has to step up. Um, and there's no one panacea, or solution. |
|   | I'll give you an example of something by the way - I don't know if you followed this from the complaint. Uh, with respect to the asbestos side of the case, we allege that on two separate occasions, $250,000 was given out of what was essentially an $8.5 million discretionary fund from which the Speaker himself could give money at his will, and his whim. |

|  |  |
|---|---|
|  | And, uh, the ability to do that in a secret way, and a non-transparent way, ended, uh, I think in 2007 because remarkably, there was a little bit of reform that occurred then, and as soon as the law changed, with respect to the Speaker's ability to in a non-transparent way dole out money to anybody he wants, including to the doctor with whom we say he had a corrupt relationship, that money stopped. |
|  | And as we also see in the complaint, there was nothing that prevented a very, very powerful Speaker, uh, who had other avenues to provide money to somebody with whom he had a relationship - if he cared and believed in the work that was being done, mesothelioma research, and helping people who maybe became diseased after working on 9/11 - there's nothing that prevented that Speaker with all that power, and all those purse strings, from continuing to give money to that fellow, and he stopped, we allege, because he could no longer keep it secret, because it was a corrupt relationship. So that's an example just from the complaint of something that happened in 2007. When more disclosure is required, and more disclosure is necessary, it makes it a little bit harder for bad people to do bad things. |
| ASIDE: | (UI) the 2007 (IA). |
| PB: | I think it was the Budget Reform Act? Yeah. |
| ASIDE: | (UI) theft of honest service charges against, uh, uh, Speaker Silver. Are you more confident that the Government will be able to succeed in bringing charges - these charges - given, uh, the past cases have not been as, as successful? |
| PB: | You're asking us if we hope we'll prevail? The answer is yes. |
| ASIDE: | With regards to specifically to the theft of honest services? How do you feel it's - |
| PB: | We only, we only - well, because we allege that there were - these were basically kickbacks and bribes. And, uh, and there was a Supreme Court decision a few years ago, that eliminated some ability to charge honest services fraud - which I think is what you're referring to - um, but it left clearly open the, um, prosecutor's ability to charge quid pro quos, which is why Mr. Dienst asked that excellent question. And, and we believe we make that out. |
| ASIDE: | Excuse me, was the, was the immunity needed to force attorney on the Grand Jury testimony (UI)? |
| PB: | I'm sorry – |
| ASIDE: | Was the immunity order needed to force the attorney (UI) Grand Jury testimonies and other statements to the Government? |
| PB: | We (ST) grant immunity requests very infrequently, very, very, rarely, |

|        |        |
|--------|--------|
|        | and we take those requests very seriously. And I'm not going to get into the reasoning in this, in this particular case, but from time to time, you do that in the criminal justice system, and the criminal justice system allows for it. And we felt it was appropriate in this case. |
| ASIDE: | How much of your case comes from the files of the Moreland Commission? Could you have made, and brought these charges just on what the Moreland Commission got (IA)? |
| PB:    | I'm not going to say how much was them, how much was us. Um, what we say in the complaint very clearly is we were looking at this, and we were, uh, delving into some of the details, and the Moreland Commission was asking some of the same excellent questions, and we took over, and the common - I mean, it's hypothetical. I don't know the answer to that. Um, that's all I'll say. |
| ASIDE: | What kind of sentencing are we looking at? How much time could uh, the Speaker potentially spend in prison? |
| PB:    | There are five counts. The maximum on each of the counts is 20 years. Um, again, that's just a guideline. That doesn't mean that's what the actual exposure is, because the sentence is up to the judge. In consideration of the sentencing guidelines, which are not, you know, mandatory, but those are the maximums. Yeah. |
| ASIDE: | Could you speak to the time of the arrest? Yesterday, uh, Speaker was on (UI), Cuomo was re-elected (UI) (IA)? |
| PB:    | No. We bring cases when we have the evidence, and we have crossed all the T's and dotted all the I's. If we'd been able to do the arrest, and got to the point where we could've done it two months ago, we would've done it then. If we didn't feel like we were ready to do it today, we wouldn't have done it today.

A lot of people spend a lot of time speculating about timing of things. Um, we do the case when it's ripe. |
| ASIDE: | A possible prosecution (UI). You said there was a non-prosecution agreement on the doctor's side - |
| PB:    | I'm not going to comment on who else is potentially subject to criminal liability beyond what's already in the - what's already in the complaint. |
| ASIDE: | Did he pay taxes on all this money? |
| PB:    | I'm not going to comment on what taxes he did or did not pay. |
| ASIDE: | Can we hear from the Chief of the, uh, Public Corruption, on what it was like working on this case? I'd like to hear from (IA). |
| PB:    | I don't think, I don't think Arlo wants to come up to the - I'll tell you what |

|  |  |
|---|---|
|  | it was like for him! (laughing) I'll (ST) - |
| ASIDE | The FBI, uh, person then. |
| PB: | Absolutely. |
| ASIDE: | Come up and talk about this case. What was it like working with the U.S. Attorney's Office, and what was the process (UI)? |
| RF: | All I'm going to say is that we worked extensively on, on every case we work is with the U.S. Attorney's Office. We have a great relationship with them. We work with their investigators, uh, daily, hourly. |
|  | Um, this was truly a joint effort between the FBI, and the Southern District of New York. Um, and, uh, uh, we're lucky to work with these prosecutors. Uh, we truly think we have the best prosecutors in the United States. |
| ASIDE: | Who set up the roadblocks (UI)? |
| RF: | Uh, I don't want to go into road blocks, other than to say, um, whatever road blocks we did have, you know, we'll have discussions. We'll continue to work through any of those road blocks. Uh, uh, there are always issues in cases, and you always work through those issues. |
|  | Uh, and I don't want to go into specifics at this time, because again, as the U.S. Attorney has said, this is an ongoing investigation, and we will continue on with it. |
| ASIDE: | What's the difference between a civil complaint and a civil indictment? |
| PB: | One's a complaint, and one's an indictment. It (ST) - I'm sorry. (chuckling) |
|  | A complaint, a complaint - a complaint is approved by a judge upon the affidavit of a law enforcement officer, based on probable cause. |
|  | An indictment is a document that is approved by, uh, a Grand Jury - a Federal Grand Jury. |
|  | And so, when you, when you proceed by complaint, um, that doesn't negate the necessity of ultimately having to obtain an indictment if you go forward, so you can expect an indictment in the future. |
| ASIDE: | As you said, you've been investigating since June 2013. From then 'til now, did you see any modification, or increase, uh, in attempt to hide this, in relation to the Speaker? |
|  | And respectively, if the Speaker's lawyer argues that the client referral is work, how do you (IA)? |

PB: Well, for the second question, show up in court and you'll find out. With respect to the, uh, to the first, I don't know if there's any example in the complaint that goes to your question of whether or not there were additional attempts to hide. I think what's significant is not whether or not there were, there were greater attempts to hide, uh, conduct and transactions, and bribes and kickbacks over the last period of months, but that that was a hallmark of the entire scheme that goes back many, many years. Um, there were very, very few people who knew about any aspect of this.

With respect to the real estate, uh, kickback scheme, there were virtually no human beings who knew all the details of it.

Uh, and that, you know, going back to the question someone asked earlier about what road blocks you have; that's a little bit of an investigative road block.

When someone is smart and clever about how they are hiding streams of payment, and the disclosure laws don't make it any easier for you; that can be a road block.

But, you know, luckily we were able to clear away the road block, and proceed to the point where we are. Last question.

ASIDE: (IA)?

PB: Yes we have.

ASIDE: (IA)?

PB: Uh, it's frozen (chuckling) -

ASIDE: Yes...

PB: And, and he (ST) can't access it, uh, without leave of the Court, and at such time as there is a conviction, uh, then we take the proceeds, basically. Thanks everybody.