```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__4/10/2015__
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

UNITED STATES OF AMERICA,                   :

                   -against-                :                    15-CR-93 (VEC)

                                            :                    MEMORANDUM
                                            :                    OPINION & ORDER

SHELDON SILVER,                             :

                                 Defendant. :

-------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

      The Court starts with several inarguable principles.  First, criminal defendants are entitled

to a fair trial.  Second, the public has a right to know about criminal prosecutions, perhaps

particularly those involving charges of public corruption.  Third, criminal cases should be tried in

the courtroom and not in the press.  Finally, people who venture close to the edge of a rule risk

falling over the edge.  The rules that govern public statements by federal prosecutors regarding

accused defendants are designed to balance the first three principles, with a heavy thumb on the

side of defendants' fair trial rights.  In this case, the U.S. Attorney, while castigating politicians

in Albany for playing fast and loose with the ethical rules that govern their conduct,[1] strayed so

close to the edge of the rules governing his own conduct that Defendant Sheldon Silver has a

non-frivolous argument that he fell over the edge to the Defendant's prejudice.

      Although the Court does not condone the Government's brinksmanship relative to the

Defendant's fair trial rights or the media blitz orchestrated by the U.S. Attorney's Office in the

days following Mr. Silver's arrest, for the reasons stated below, the Defendant's Motion to

---

[1]     *See, e.g.*, Unofficial Transcript of U.S. Attorney's Speech at New York Law School, Jan. 23, 2015 (Def. Ex. 3) at 4-5 ("And the more we do in public corruption, I think the same principles apply there as well. If everyone around you is thinking 'How close to the line can I get? What is the ethical violation precisely? How can I make sure I'm just at the left of what the outside pay rules are or how can I make sure I'm just to the left of what the disclosure obligations are or just to the left of what the campaign finance rules are.['] I mean that's great, knock yourself out. But it's going to get you in trouble.").

Dismiss the Indictment based on allegedly improper and prejudicial extrajudicial statements by the U.S. Attorney (the "Motion") is DENIED.[2]

## BACKGROUND

On January 21, 2015, the Government filed a 35-page, single-spaced, sealed Complaint before Chief Magistrate Judge Maas, charging Defendant Silver, the then-Speaker of the New York Assembly, with honest services fraud, conspiracy and extortion.  Dkt. 1.  Finding probable cause, Magistrate Judge Maas issued an arrest warrant.  Dkt. 2.  In the weeks prior to the issuance of the arrest warrant, there had been numerous newspaper articles reporting on the U.S. Attorney's investigation, including lengthy investigative journalism pieces on Silver's relationship with Weitz & Luxenberg and with Goldberg & Iryami.[3]  Shortly after midnight on January 22, 2015, although the Government's Complaint had not yet been unsealed, the press began reporting that that Silver would be arrested imminently along with the substance of the charges against him.  Mot. at 3 (citing Def. Exs. 7-13).

Pursuant to an arrangement between Silver's attorneys and the U.S. Attorney's Office, on the morning of January 22, 2015, Silver surrendered to federal authorities at the Jacob J. Javits Federal Building, where he was processed and then driven in an unmarked car to the basement of the federal courthouse.  Government's Memorandum in Opposition to the Defendant's Motion to Dismiss ("Gov't Opp.") at 4-5.  Silver was presented to Magistrate Judge Maas and granted bail. Dkt. 6.  Upon leaving the courthouse, Silver issued a short statement to the press.  Gov't Opp. at 5.

---

[2]    The Court thanks the National Association of Criminal Defense Lawyers ("NACDL") and the New York State Association of Criminal Defense Lawyers ("NYSACDL") for the *amicus curiae* memorandum submitted in support of the Defendant's Motion.

[3]    *See, e.g.*, William K. Rashbaum, et al., *U.S. Said To Investigate Sheldon Silver, New York Assembly Speaker, over Payments*, N.Y. TIMES, Dec. 29, 2014 (Def. Ex. 18); William K. Rashbaum, et al., *Firm That Paid Sheldon Silver Is Tied to Landlord with Troubled Past*, N.Y. TIMES, Dec. 30, 2014 (Def. Ex. 19).

Later that day, the U.S. Attorney for the Southern District of New York and the FBI Special Agent-in-Charge held a press conference, during which the U.S. Attorney described the substance of the Government's charges against Silver, while also criticizing the "the show-me-the-money culture of Albany."  Unofficial Transcript of U.S. Attorney's Press Conference, Jan. 22, 2015 (Def. Ex. 1) at 1.  During the press conference, the U.S. Attorney dutifully noted that the charges at that point were only allegations.  *See, e.g.*, *id.* at 2 ("The central allegation in this case is that Speaker Silver successfully sought ways to monetize his public office and that he did so in violation of Federal law.").  Certain portions of the U.S. Attorney's comments, however, could reasonably have been interpreted to reflect the U.S. Attorney's personal views as to Silver's character or guilt with respect to the charges filed against him.  *See, e.g.*, *id.* at 1 ("For many years New Yorkers have asked the question 'How could Speaker Silver, one of the most powerful men in all of New York, earn millions of dollars in outside income without deeply compromising his ability to honestly serve his constituents?' Today we provide the answer. He didn't."); *id.* ("And as the charges also show, the greedy art of secret self-reward was practiced with particular cleverness and cynicism by the Speaker himself.").  Given Silver's status as one of the three most powerful politicians in New York State government, it is not surprising that the U.S. Attorney's comments were covered widely in the press.  *See* Mot. at 6-7 (citing Def. Exs. 16, 21, 22, 24, 26-33).

For members of the media who missed the press conference, the U.S. Attorney's Office also issued a press release.  *See* U.S. Attorney's Office, *New York State Assembly Speaker Sheldon Silver Arrested on Corruption Charges*, Jan. 22, 2015 (Def. Ex. 2).  The press release highlighted some of the U.S. Attorney's most salient comments, in particular regarding the relationship between the charges against Silver and a broader "culture of corruption" in Albany.

*See, e.g.*, *id.* at 1 ("Politicians are supposed to be on the people's payroll, not on secret retainer to wealthy special interests they do favors for. These charges go to the very core of what ails Albany – a lack of transparency, lack of accountability, and lack of principle joined with an overabundance of greed, cronyism, and self-dealing.").  At the same time, the press release referred to the charges as "allegations," and closed by stating that "the charges contained in the Complaint are merely accusations, and the defendant is presumed innocent unless and until proven guilty." *Id.* at 4.

In addition to the press release, following the press conference, the U.S. Attorney's Office transmitted several of the U.S. Attorney's comments via Twitter.  One of the "tweets" announced that Silver had been charged with public corruption offenses and referred readers to a link to the press release.  Gov't Ex. A at 2.  Other tweets issued at the same time stated: "Bharara: Silver monetized his position as Speaker of the Assembly in two principal ways & misled the public about his outside income," *id.* at 3, and "Bharara: Politicians are supposed to be on the ppl's payroll, not on secret retainer to wealthy special interests they do favors for." *Id.* at 4.

The following day, the U.S. Attorney gave a previously-scheduled speech at New York Law School that was broadcast live on local television and covered by the press.  Gov't Opp. at 9; *see also* New York Law School, *Preet Bharara, U.S. Attorney for the Southern District of New York, Speaks at CityLaw Breakfast Series* (Def. Ex. 59).  In his opening remarks, the U.S. Attorney said he had decided to address public corruption "given the timing" and the likelihood of interest in the topic.  Unofficial Transcript of U.S. Attorney's Speech at New York Law School, Jan. 23, 2015 (Def. Ex. 3) at 1.  Addressing the recent charges brought against Silver, the U.S. Attorney noted that, apart from "the standing and stature of the person who was charged,"

the Government's charges against Silver were essentially "business as usual in our public corruption unit. Case after case after case we have brought has had at its base money and specifically a person who is in the public trust who is supposed to hold the public trust and sought ways to monetize his or her position." *Id.* at 2. At other points, the U.S. Attorney noted that he was "not talking about anything outside of the four corners of the complaint and nothing beyond what [he] said [the day before]" and emphasized that he was speaking about the "allegations" made in Silver's case. *Id.* at 3, 6.

A couple of weeks later, but still before Silver was indicted, the U.S. Attorney was interviewed on MSNBC. When asked about the recent arrest of "one of the most powerful Democrats in New York," the U.S. Attorney discussed the importance of public corruption prosecutions generally, and then added:

> [W]hen you see somebody who's been charged with (and we've convicted many, many people before this case) – and you see somebody who has basically sold his office to line his pockets and compromised his integrity and ethics with respect to how to make decisions on all those issues I mentioned that affect people's lives, that's a big problem. And it's a big problem for democracy.

MSNBC, *In Conversation, Preet Bharara and Ari Melber*, Feb. 12, 2015 (Def. Ex. 4) at 2.

On February 19, 2015, the grand jury returned the Indictment charging Silver with honest services mail fraud, honest services wire fraud and extortion. Dkt. 9. On February 24, 2015, Silver filed the instant Motion claiming that, through his conduct, the U.S. Attorney has "caused [him] irreparable harm." Mot. at 1. In order to remedy any prejudice that he may have suffered and to deter future misconduct, Silver urges the Court to dismiss the Indictment, or, at a minimum, to poll the grand jury and order disclosure of the grand jury minutes to determine whether the grand jurors were influenced in any improper way. *Id.*

**DISCUSSION**

An individual charged with a felony is "constitutionally entitled to have his case considered by an impartial and unbiased grand jury." *United States v. Burke*, 700 F.2d 70, 82 (2d Cir. 1983) (citing *Lawn v. United States*, 355 U.S. 339, 349–50 (1958); *Costello v. United States*, 350 U.S. 359, 363 (1956)). The proceedings of a grand jury are "accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991) (quoting *United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring in the judgment)); *see also United States v. Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001) ("In order to overcome such presumption, a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity." (citation omitted)).

The Defendant argues that this standard has been satisfied because the U.S. Attorney's extrajudicial statements are "*presumed* prejudicial" pursuant to this Court's Local Criminal Rules, Department of Justice ("DOJ") regulations, and the New York Rules of Professional Conduct. Mot. at 17 (emphasis in original). Local Criminal Rule 23.1(d) states that "opinion[s] as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case" are matters that "presumptively involve a substantial likelihood" of interference with a fair trial or prejudice to the administration of justice. L. Crim. R. 23.1(d)(7). DOJ regulations similarly state that "[o]bservations about a defendant's character" and "[a]ny opinion as to the accused's guilt" will "generally tend[] to create dangers of prejudice without serving a significant law enforcement function." 28 C.F.R. § 50.2(b)(6)(i), (vi). The New York Rules of Professional Conduct are in accord, stating that "any opinion as to the guilt or innocence of a defendant or suspect in a criminal matter" is "ordinarily . . . likely to prejudice materially an adjudicative

proceeding." N.Y. R. Prof'l Conduct 3.6(b)(4).  The Defendant argues that, because the U.S.

Attorney's comments amount to "opinions" as to the Defendant's guilt, they are presumptively

prejudicial.

As an initial matter, the Court notes that this is not a disciplinary proceeding and

therefore the question of whether the U.S. Attorney's extrajudicial remarks violated any ethical

rules is not, per se, before the Court.  *See United States v. Corbin*, 620 F. Supp. 2d 400, 408

(E.D.N.Y. 2009) (noting that while certain statements may have violated the disciplinary rules by

offering opinions as to the defendant's guilt, the court was not obliged to rule on such violations

outside of the context of a disciplinary proceeding).  Rather, the issue before the Court is whether

the U.S. Attorney's comments were sufficiently prejudicial to overcome the presumption of

regularity accorded to grand jury proceedings and to warrant the extreme sanction of dismissing

the Indictment, or in the alternative, polling of the grand jurors or reviewing the grand jury

minutes.

I.      **There Is No Basis to Dismiss the Indictment**

Dismissal of an indictment because of a defect in the grand jury proceedings is a "drastic

remedy" that is "rarely used."  *United States v. Martinez*, No. 10-CR-233S (1)(2)(4), 2014 WL

1794934, at *2 (W.D.N.Y. May 6, 2014) (citing *United States v. Dyman*, 739 F.2d 762, 768 (2d

Cir. 1984)); *see also United States v. Fields*, 592 F.2d 638, 647 (2d Cir. 1978) (noting that

dismissal of an indictment is an "extreme sanction").  The district court's authority to dismiss an

indictment, whether to eliminate prejudice or to deter official misconduct, is narrowly

circumscribed to instances where the misconduct at issue "amounts to a violation of one of those

'few, clear rules which were carefully drafted and approved by [the Supreme] Court and by

Congress to ensure the integrity of the grand jury's functions.'"  *United States v. Williams*, 504

U.S. 36, 46 (1992) (citing *Mechanik,* 475 U.S. at 74 (O'Connor, J., concurring in the judgment)).[4]  Notably, the Defendant does not argue that this Court's Local Rules, the DOJ Regulations or the New York Rules of Professional Conduct were drafted by the Supreme Court or Congress to ensure the integrity of the grand jury's functions; nor does he cite a single post-*Williams* case in which an indictment has been dismissed due to a violation of such rules.[5]  Thus, even if the U.S. Attorney's extrajudicial comments violated applicable disciplinary or ethical rules (and the Court is not saying that they did), that alone would be insufficient grounds to dismiss the Indictment.

Turning to controlling authority, the Defendant argues that the U.S. Attorney's extrajudicial statements and conduct violated the standards set forth in *Bank of Nova Scotia v. United States,* 487 U.S. 250, 255-256 (1988).  In that case, the Supreme Court held that dismissal of an indictment for non-constitutional error may be appropriate "'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations."  *Id.* (quoting *Mechanik*, 475 U.S. at 78).

---

[4]    Those "few, clear rules," include, for example, Rule 6 of the Federal Rules of Criminal Procedure and various provisions of the United States Code setting standards for prosecutorial conduct before grand juries.  *See Williams,* 504 U.S. at 46 n.6 (citing 18 U.S.C. §§ 6002, 6003 (establishing procedures for granting a witness immunity); § 1623 (criminalizing false declarations before grand jury); § 2515 (prohibiting grand jury use of unlawfully intercepted wire or oral communications); and § 1622 (criminalizing subornation of perjury)).

[5]    The cases cited by the Defendant support the limited view espoused by the Supreme Court in *Williams* and by Justice O'Connor in *Mechanik*.  *See, e.g.*, *United States v. Stein,* 541 F.3d 130, 158 (2d Cir. 2008) (affirming dismissal for Sixth Amendment violation and noting that "[d]ismissal of an indictment is a remedy of last resort, and is appropriate only where necessary to restore the defendant to the circumstances that would have existed had there been no constitutional error" (citation and internal quotations omitted)); *United States v. Chapman,* 524 F.3d 1073, 1085 (9th Cir. 2008) (affirming dismissal based on the Government's "flagrant" violations of *Brady v. Maryland,* 373 U.S. 83 (1963) and *Giglio v. United States,* 405 U.S. 150 (1972)); *United States v. Leeper,* No. 06-CR-58A, 2006 WL 1455485, at *4 (W.D.N.Y. May 22, 2006) (dismissing indictment for Fifth Amendment violation where prosecutor placed "significant pressure . . . upon the [second] grand jury to 'rubber stamp' the indictment out of deference to the [original] grand jury" (citation omitted)).

The Defendant argues that the U.S. Attorney improperly and "substantially" influenced the grand jury in several ways.  First, the Defendant complains that the Government improperly initiated this case by means of its 35-page Complaint, rather than by indictment, and claims the Government did so solely for the purpose of "maximiz[ing] exposure" and prejudicing the Defendant before the grand jury.  *See* Mot. at 18.  Second, the Defendant asserts that the Government improperly leaked news of the Defendant's arrest to the press hours before the Complaint was unsealed or the arrest was made.  *Id.*  Third, the Defendant claims that the Government "orchestrated the arrest and arraignment to maximize the opportunity for a 'photo op'" to enhance the "perp walk" effect.  *Id.* at 4, 18.  Finally, the Defendant argues that the U.S. Attorney created a "media circus" around Silver's arrest through his improper and prejudicial comments during the press conference, New York Law School speech and MSNBC interview.  *Id.* at 11.

The Court finds little merit in the Defendant's first three arguments.  The Government has discretion to proceed via complaint pursuant to the Federal Rules of Criminal Procedure; although the Complaint filed against Silver may have included more information than was absolutely necessary to establish probable cause, the Defendant does not argue that the Complaint itself was improper or the source of any prejudice.  As to the Defendant's claim that the Government improperly leaked news of Silver's arrest to the press, which the Government denies, the Court finds that even if the leaks occurred as the Defendant alleges, the speculative news stories published between 1:55 a.m. and 8:00 a.m. on the day of Silver's arrest could hardly have had any prejudicial impact inasmuch as Silver was arrested, the Complaint was unsealed and he appeared in court later that day.[6]  *See* Def. Exs. 7-13.  Finally, the Court agrees with the

---

[6]     This is not to say that the Court approves of leaks of sealed information or credits the idea that these particular leaks did not originate in the Government's camp.  The Defendant in this case, as in all criminal cases, is

Government that its decision to permit Silver to surrender (rather than be arrested) and then to drive him in an unmarked car to the basement of the federal courthouse showed considerable sensitivity, rather than an improper effort to set Silver up for a prejudicial "perp walk."

On the other hand, the Defendant's argument focused on the substance and timing of the U.S. Attorney's public remarks merits further discussion.  While the Court does not endorse the Defendant's view that the U.S. Attorney's comments reflected his "uncensored views" as to Silver's guilt and character, *see* Mot. at 11, neither does it accept the Government's suggestion that any prejudicial effect of otherwise improper comments is magically dispelled by sprinkling the words "allege(d)" or "allegation(s)" liberally throughout the press conference or speech, or by inserting a disclaimer that the accused is "innocent unless and until proven guilty" at the end of an otherwise improper press release.[7]  In particular, the Court is troubled by remarks by the U.S. Attorney that appeared to bundle together unproven allegations regarding the Defendant with broader commentary on corruption and a lack of transparency in certain aspects of New York State politics.  In this regard, the Court finds that it would not be unreasonable for members of the media or the public to interpret some of the U.S. Attorney's statements – for example, "[p]oliticians are supposed to be on the people's payroll, not on secret retainer to wealthy special

---

entitled to have his case tried in the courtroom, not through leaked information by either party to the press.  The parties in this case are cautioned that sealed information is to remain sealed unless and until it is unsealed.

[7]        This is particularly true given the U.S. Attorney's use, at times, of particularly odd circumlocutions that appears to be designed only to "check the box" of saying the word "alleged."  *See, e.g.*, Def. Ex. 1, at 2: "As alleged, Silver quietly and cleverly figured out how to monetize his position as Speaker of the Assembly in two principal ways.  In both cases as alleged, Silver cynically abused his law degree and New York's lax disclosure rules to disguise kickbacks as legal referrals. . . . So as alleged, he asked the doctor to refer people who have asbestos diseases to Silver at the firm of Weitz & Luxenberg with which Silver had conveniently formed an affiliation."  A better word choice, and one that more clearly conveys to the listener that the facts being relayed are merely allegations, would be:  "Silver allegedly figured out how to monetize his position as Speaker of the Assembly in two principal ways.  In both cases, Silver allegedly cynically abused his law degree and New York's lax disclosure rules to disguise kickbacks as legal referrals. . . . So he allegedly asked the doctor to refer people who have asbestos diseases to Silver at the firm of Weitz & Luxenberg with which Silver had conveniently formed an affiliation."

interests they do favors for" – as a commentary on the character or guilt of the Defendant.  *Cf.*
*United States v. Smith*, 985 F. Supp. 2d 506, 540 (S.D.N.Y. 2013) (noting that "[t]he
Government's effort to decouple the general comments about public corruption from this case is
tenuous."); *Corbin,* 620 F. Supp. 2d at 411 (finding that statements by a former U.S. Attorney
and a senior FBI official about how "[t]he people rightly expect their elected representatives . . .
to behave honorably," may have been improper).  The rules afford prosecutors considerable
latitude to speak about the facts of a case, the offenses charged, and even "the public policy
significance of a case," to the extent that such discussion is in furtherance of "law enforcement
goals."  *See, e.g.*, U.S. Attorney's Manual § 1-7.520; L. Crim. R. 23.1(b); 28 C.F.R. § 50.2(b)(3).
Remarks that associate the accused with a long line of convicted criminals or a broader pattern or
recognized wrongdoing, however, are of concern specifically because they tend to blur the
distinction between legitimate public commentary and improper opinion.[8]

  Finally, the Court finds the Government's argument that the timing of the U.S. Attorney's
speech at the New York Law School event was merely coincidental to be pure sophistry.  While
the New York Law School speaking engagement was apparently scheduled long before Silver's
arrest, it was the Government that decided when to arrest Silver.  Given the fact that the U.S.
Attorney apparently wanted to address the topic of public corruption in his speech,[9] a far more
prudent course – and one that would have been far more respectful of the Defendant's

---

[8]  This is especially true in the context of Twitter communications.  The Government argues that the Court
should read a tweet stating "Silver monetized his position as Speaker of the Assembly in two principal ways &
misled the public about his outside income" not in "isolation" but "in the context of the statements in the press
release (and the Complaint linked to the press release)."  This argument ignores the fact that the most problematic
tweets, including the one quoted above and "Politicians are supposed to be on the ppl's payroll, not on secret
retainer to wealthy special interests they do favors for," contained *no* links to the press release or Complaint.
Moreover, this argument disregards the substantial known risk that, in communicating via a platform that limits
messages to 140 characters and permits readers to "retweet" a single communication, one's statements will in fact be
read in isolation.

[9]  No one can disagree that public corruption is a legitimate subject about which the U.S. Attorney can and
should speak.

presumption of innocence and fair trial rights – would have been to delay the arrest until after the U.S. Attorney's speech and for the U.S. Attorney to stay focused on politicians who have actually been convicted.

Nevertheless, dismissal of the Indictment is not appropriate.  Even if the Court were to accept the Defendant's view that the U.S. Attorney's comments were improper, there is no evidence that the U.S. Attorney's comments "substantial[ly] influenced" the grand jury's decision to indict.  *See Bank of Nova Scotia,* 487 U.S. at 255-256; *cf. Burke,* 700 F.2d at 82 (adverse pre-indictment publicity is grounds to overturn a conviction only if the defendant can demonstrate actual prejudice as a result of the publicity).  The Court reaches this conclusion not in a vacuum but in the wake of established precedent holding that the existence of negative pretrial publicity is generally not sufficient to show substantial influence or actual prejudice.  For example, in *United States v. Nunan*, the Second Circuit affirmed the district court's denial of a motion to dismiss the indictment, or alternatively to inspect the grand jury minutes.  Despite there having been "sensational," "untrue[,] and unwarranted" pre-indictment publicity, the court found that, unlike a petit jury, the grand jury "is not confined to a passive role" and therefore presumptively has access to the media without being prejudiced in the absence of evidence to the contrary.  236 F.2d 576, 593-94 (2d Cir. 1956).  Other cases reflect the same basic reasoning. *See, e.g.*, *United States v. Evans*, 667 F. Supp. 974, 991-92 (S.D.N.Y. 1987); *United States v. Hong Loi Cheng*, 350 F. Supp. 67, 69 (S.D.N.Y. 1972).

The Defendant argues that *Nunan* is inapposite because it deals with adverse press coverage generally rather than press initiated by the prosecutor, which the Defendant asserts is inherently more harmful.  Def. Reply at 4-5.  Courts have, however, declined to dismiss indictments due to improper extrajudicial statements made by government officials.  In *United*

*States v. Myers,* for example, defendants claimed that DOJ officials caused a "massive amount" of damaging pre-trial publicity by disclosing information regarding the investigation to the media, "in contravention of numerous statutes, internal regulations and ethical norms" and argued that the court should dismiss the indictments "as a sanction for the prosecutorial misconduct." 510 F. Supp. 323, 324 (E.D.N.Y. 1980). The court "accept[ed] defendants' version of the relevant facts," including that the public been "deluged" with hostile print and broadcast publicity. *Id.* at 324. Although the court also noted that "the conduct of the government officers who disclosed information [regarding] the investigation was grossly improper and possibly illegal," it nonetheless declined to dismiss the indictments. *Id.* at 324-25. In reaching its decision, the court specifically rejected two arguments that the Defendant makes here: first, that "because of the extent and nature of the publicity" the court should "apply a standard of 'presumptive' or 'inherent' prejudice," *id.* at 326, and second, that a lower standard for dismissal should apply where the publicity has been generated by the government. *Id.* at 326-27 ("To the extent that 'trial by newspaper' was indulged in by Federal law enforcement officials, it is to be regretted and condemned. But the issues raised by the defendant's motion require an examination into the existence and prejudicial effect of the publicity, rather than its source and inspiration." (quoting *United States v. Dioguardi*, 20 F.R.D. 33, 34-35 (S.D.N.Y. 1956))); *see also United States v. Curcio*, 712 F.2d 1532, 1544 (2d Cir. 1983) ("[E]ven publicity partly engendered by the Government would not warrant the extreme remedy of dismissal of an indictment before a *voir dire.*").

Significantly, while the Defendant seeks to distinguish the relevant precedent, he is unable to cite a single case where a court has taken the extreme step of dismissing an indictment solely based on pre-indictment publicity, whether instigated by the prosecutor or simply derived

from the media at large. *See Myers*, 510 F. Supp. at 325 ("[W]hile the issue has been raised innumerable times, defendants have been unable to point to a final decision in a single case where an indictment has been dismissed upon the ground that the grand jury was prejudiced by pre-trial publicity." (citing cases)); *see also In re Grand Jury Investigation*, No. 87-CV-0163, 1987 WL 8073, at *7 n.4 (E.D.N.Y. Feb. 23, 1987) (noting the absence of any case in which a court exercised its supervisory powers to dismiss an indictment solely due to pre-indictment publicity (citation omitted)). While dismissal might be appropriate in instances where the defendant can show "a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment," the Court finds that standard has not been met here. *See Bank of Nova Scotia*, 487 U.S. at 259.

## II.      There is No Basis to Poll the Grand Jury or Review the Grand Jury Minutes

Grand jury proceedings "shall generally remain secret." *In re Petition of Craig*, 131 F.3d 99, 101 (2d Cir. 1997). Courts may, however, direct the disclosure of information regarding the grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). A defendant seeking disclosure of grand jury materials must demonstrate a "'particularized need' that outweighs the presumption of secrecy." *United States v. Moten,* 582 F.2d 654, 662 (2d Cir. 1978) (quoting *Dennis v. United States,* 384 U.S. 855, 868 (1966)). "Speculation and surmise as to what occurred before the grand jury is not a substitute for fact." *United States v. Shaw*, No. S1 06-CR-41 (CM), 2007 WL 4208365, at *6 (S.D.N.Y. Nov. 20, 2007) (citing *United States v. Wilson,* 565 F. Supp. 1416, 1436 (S.D.N.Y. 1983)).

In determining whether disclosure of information regarding the grand jury's proceedings is appropriate, courts weigh the need for disclosure against the public interest in maintaining secrecy over such proceedings. *Anilao v. Spota*, 918 F. Supp. 2d 157, 174 (E.D.N.Y. 2013) (citing *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 223 (1979)). Where, as here, the proceedings have concluded, the interest in maintaining the secrecy of grand jury records is reduced, but not eliminated. *See Douglas Oil Co.,* 441 U.S. at 222; *see also United States v. Sobotka,* 623 F.2d 764, 767 (2d Cir. 1980) ("We conclude that while the necessity here be less compelling in view of the termination of the grand jury, nonetheless some necessity need be shown by the party seeking disclosure.").

Most of the cases cited by the Defendant in which courts have permitted individualized questioning of jurors regarding pretrial publicity involved petit juries, not grand juries. *See* Mot. at 24 (citing *Skilling v. United States*, 561 U.S. 358, 389 (2010); *United States v. Lord*, 565 F.2d 831, 837-39 (2d Cir. 1977)).[10] This distinction is significant in light of the recognition that, unlike a petit jury, the "grand jury need not deliberate in a sterile chamber, completely immunized from reports of those events transpiring about it." *Myers*, 510 F. Supp. at 325 (citing *Nunan*, 236 F.2d at 593). *See also id.* at 326 (noting that the grand jury historically has differed from a petit jury in that "the same freedom from outside influences is not required." (citation and quotation omitted)). Moreover, given the dynamics of a grand jury,[11] it could not have been a

---

[10]     The Defendant cites one case in which the court permitted polling of grand jurors, but there the court found a prima facie violation of Rule 6(e) of the Federal Rules of Criminal Procedure with respect to an ongoing grand jury investigation, a circumstance which is not present here. *See In re Grand Jury Investigation*, 1987 WL 8073, at *4, 6 (permitting polling of grand jurors following reports that government officials had leaked secret information regarding a pending grand jury investigation to the media).

[11]     The most current statistics available from the Department of Justice indicate that, of the 29,770 criminal suspects that U.S. Attorneys declined to prosecute nation-wide from October 1, 2011 through September 30, 2012, only 14 suspects (or less than .05%) were not prosecuted due to a grand jury's failure to return a true bill. *See* U.S. Department of Justice, *Federal Justice Statistics 2012—Statistical Tables*, at Table 2.3 (January 2015), http://www.bjs.gov/content/pub/pdf/fjs12st.pdf.

surprise to any member of the grand jury that heard this matter and voted a true bill that the U.S. Attorney's Office – including the U.S. Attorney who signed the Indictment on which they were asked to vote – believed Mr. Silver to be guilty.

In short, the Court finds that the Defendant's speculative claim that the grand jurors *may* have been prejudiced by the U.S. Attorney's comments falls short of establishing a "particularized need" that outweighs the presumption of secrecy so as to justify the disclosure of the grand jury minutes or polling of the grand jurors. *See Nunan*, 236 F.2d at 593-94 (affirming the denial of defendant's motion for an inspection of the grand jury minutes because the record was "barren of any evidence that the grand jurors were prejudiced or coerced by the [challenged] publicity"); *Burke*, 700 F.2d at 82 (affirming the denial of a hearing on pre-indictment publicity where defendants "failed to cite any persuasive evidence of actual grand jury prejudice," but merely "contend[ed] in very general terms that [adverse news coverage and publicity had] prejudiced them").

## CONCLUSION

For the foregoing reasons, the Defendant's Motion is DENIED.[12]  Nevertheless, the parties are cautioned that this case is to be tried in the courtroom and not in the press.  The Clerk of Court is respectfully requested to terminate the open motions at docket numbers 12 and 27.

**SO ORDERED.**

Dated: April 10, 2015
   New York, NY

VALERIE CAPRONI
United States District Judge

---

[12]     The Defendant's request for oral argument on its Motion is further DENIED as moot.