UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :     SUPERSEDING INDICTMENT
                                 :
          - v. -                 :     S1 15 Cr. 093 (VEC)
                                 :
SHELDON SILVER,                  :
                                 :
          Defendant.             :
                                 :
- - - - - - - - - - - - - - - - x

The Grand Jury charges:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:    APR 2 3 2015

## Background

### *Silver's Official Powers in the Assembly*

1.    For more than 20 years, from in or about 1994 until in or about February 2015, SHELDON SILVER, the defendant, served as Speaker of the New York State Assembly (the "Assembly"), which is one of the two houses of the New York State Legislature (the "Legislature").  From in or about 1977 through the present, SILVER has been an elected member of the Assembly, representing an Assembly District that comprises much of lower Manhattan.

2.    As Speaker of the Assembly, SHELDON SILVER, the defendant, exercised significant power, including but not limited to presiding over the Assembly and controlling legislative sessions by, among other things, determining whether certain legislation was brought to the floor for debate and otherwise setting the priorities and direction of the Assembly.  SILVER also represented the Assembly in negotiations with the Governor of the

State of New York and the Majority Leader of the New York State
Senate concerning the budget of the State of New York (the "State")
and other important legislative and other matters pending before
the State, including legislation critical to the real estate
industry.  In addition, and as set forth in more detail below, as
Speaker of the Assembly, SILVER exercised power over allocation
of certain State funds.

3.    SHELDON SILVER, the defendant, also has performed
various constituent services both as Speaker of the Assembly for
citizens of the State and as a representative of his Assembly
District for residents of the District.  Such services include but
are not limited to assistance related to governmental programs and
funding, and referrals for professional and other private
services, employment, and programs.

*Silver's Public Representations about His Outside Income*

4.    As an elected State legislator, SHELDON SILVER,
the defendant, was required by law to file financial disclosure
statements on an annual basis with the New York State Legislative
Ethics Commission (the "Ethics Commission").  The financial
disclosure statement, entitled "Annual Statement of Financial
Disclosure" (the "Disclosure Form"), required sitting legislators
to disclose details about their outside income, activities,
finances, and assets so that, among other things, a financial

impropriety or conflict of interest could be detected.  More
specifically, at all times relevant to this Indictment, the
Disclosure Form required legislators to disclose "completely" the
"nature and amount of any income in EXCESS of $1,000 from EACH
SOURCE," and, for legislators who had outside income as attorneys,
to provide a "general description of the principal subject areas"
of their practice.

    5.    On the Disclosure Forms of SHELDON SILVER, the
defendant, covering the years 2002 through 2013, SILVER described
his law practice as representing "individual clients" in the
"predominant area" or "principal subject area" of "personal injury
claims."  SILVER reported receiving income from serving as "of
counsel" to the law firm Weitz & Luxenberg, P.C. ("Weitz &
Luxenberg"), but he did not identify receiving income from any
other law firm.

    6.    In addition to the statements made on his annual
Disclosure Forms, SHELDON SILVER, the defendant, made the
following public representations, among others, about the nature
and sources of his outside income:

        a.    SILVER claimed that his private legal work
consisted of spending several hours each week evaluating legal
matters brought to him by potential clients and then referring

those individuals whose matters appeared to have merit to
attorneys at Weitz & Luxenberg.

      b.    SILVER claimed that potential clients found
SILVER or were recommended to SILVER by virtue of his being a
"lawyer for 40 years," and that SILVER represented only
"individuals who through some unfortunate circumstance [have
been] injured" and "call[] upon [SILVER] to represent them."

      c.    SILVER repeatedly claimed that his outside
legal work was not connected to his official position or to State
government, that he did not "represent any corporations,"
"entities that are involved in the legislative process," or
"anybody who in any way ha[d] an impact on what [the Assembly does]
legislatively," that none of his clients had any business before
the State, and that the clients he represented had "nothing to do
with the political life at all."

### Overview of Silver's Criminal Conduct

      7.    From at least in or about 2000 up to and including
in or about January 2015, SHELDON SILVER, the defendant, engaged
in a secret and corrupt scheme to deprive the citizens of the State
of his honest services as an elected legislator and as Speaker of
the Assembly and to extort others under color of official right
by using the power and influence of his official position to obtain
for himself millions of dollars in bribes and kickbacks and

extortion payments masked as legitimate income earned by SILVER as a private lawyer.

8.     More specifically, from at least in or about 2000 through in or about January 2015, SHELDON SILVER, the defendant, received nearly $4 million in illegal payments through two law firms, consisting of the following:

a.     Approximately $700,000 in illegal payments that SILVER received through a real estate law firm (the "Real Estate Law Firm") in exchange for using his official position to obtain recurring tax certiorari legal claims (the "Tax Certiorari Business") of real estate developer clients with substantial business before the State for the Real Estate Law Firm.

b.     More than $3 million in illegal payments that SILVER received through Weitz & Luxenberg in exchange for using his official position to obtain the names and identifying information of unrepresented patients with mesothelioma (the "Mesothelioma Leads"), and the valuable legal claims connected thereto, from a doctor ("Doctor-1") to whose research SILVER secretly directed $500,000 in State funds and for whose benefit SILVER engaged in other official acts.

9.     In furtherance of his corrupt scheme and to enable the scheme to continue without detection, SHELDON SILVER, the defendant, repeatedly took actions and used his official position

to prevent the public, investigators, and others from learning about his corrupt scheme. For example, SILVER made materially false and fraudulent representations and omissions about his outside income, including but not limited to SILVER's public statements, statements on his Disclosure Forms, and statements to others concerning his outside income. In addition, from in or about 2013 to in or about 2014, SILVER sought to prevent, and in fact prevented, the disclosure of information about his outside income to the Moreland Commission to Investigate Public Corruption (the "Moreland Commission"), which was created in or about July 2013 by the Governor "to probe systemic corruption and the appearance of such corruption in state government, political campaigns and elections in New York State."

## Means and Methods of Silver's Fraudulent Scheme

### Silver's Receipt of Illegal Payments Through the Real Estate Law Firm

10. As an elected legislator and as Speaker of the Assembly, SHELDON SILVER, the defendant, has exercised significant power over the real estate industry, including but not limited to considering, negotiating, and enacting legislation that created and maintained certain governmental programs, subsidies, and tax incentives of importance to the industry.

11. The Real Estate Law Firm is located in the Assembly District of SHELDON SILVER, the defendant. Its practice consists

almost exclusively of representing property owners that contest the assessment of the value of their properties in an effort to lower the real estate taxes imposed on them, a practice referred to as tax certiorari work.  The Real Estate Law Firm is controlled by an attorney who previously had worked as SILVER's counsel in the Assembly (the "Real Estate Lawyer").  At all times relevant to this Indictment, the Real Estate Law Firm had only two attorneys who worked for it, namely, the Real Estate Lawyer and another attorney.  Like others in the tax certiorari industry, the Real Estate Law Firm billed its clients on a contingency fee basis, typically obtaining as a fee up to 25 percent of any tax reductions it obtained on behalf of its clients.

        12.  Beginning at least in or about 2000, SHELDON SILVER, the defendant, used the power and influence of his official position to obtain Tax Certiorari Business of two real estate developers ("Developer-1" and "Developer-2"), both of which had significant business before the State and owned properties located within SILVER's Assembly District, for the Real Estate Law Firm. In exchange and in return for SILVER's use of his official position, SILVER obtained hundreds of thousands of dollars in illegal payments through the Real Estate Law Firm that were disguised as attorney referral fees.

13.   In exchange for his receipt of illegal payments through the Real Estate Law Firm, SHELDON SILVER, the defendant, took numerous actions under the color of his official authority and in his official capacity as an elected legislator and as Speaker of the Assembly as the opportunities arose, including but not limited to the following:

a.   Even though SILVER had no background in real estate tax certiorari work, no experience performing or evaluating such work, and no intention of performing such work, SILVER obtained Tax Certiorari Business of Developer-1 and Developer-2, whose businesses depended in part on obtaining favorable official action from SILVER, for the Real Estate Law Firm.   Neither Developer-1 nor Developer-2 had retained or considered retaining the Real Estate Law Firm previously, and both moved Tax Certiorari Business to the Real Estate Law Firm from law firms they had been using for such work.

b.   During times relevant to this Indictment, SILVER spoke and met in his legislative office with representatives of and lobbyists for Developer-1 – who were retained in part to lobby SILVER – about certain real estate governmental programs, subsidies, and tax incentives and the representation of Developer-1's buildings by the Real Estate Law Firm.

c.   During times relevant to this Indictment, SILVER met with a representative of Developer-2 and discussed real estate matters of importance to Developer-2.

d.   SILVER supported legislative proposals favorable to Developer-1 and Developer-2, including but not limited to proposals made by lobbyists for Developer-1 with respect to the Rent Act of 2011.

e.   Based on SILVER's past favorable official actions concerning Developer-1 and Developer-1's dependence on continued favorable treatment by SILVER, in or about late 2011 through early 2012, Developer-1 continued to retain the Real Estate Law Firm by executing a side agreement with SILVER and the Real Estate Law Firm.

f.   Through SILVER's appointment as Speaker of the Assembly to the State Public Authority Control Board (the "PACB"), SILVER had oversight and approval power over certain tax subsidized loans that were sought by and granted to Developer-1.

14.   At the Real Estate Lawyer's direction, the Real Estate Law Firm paid SHELDON SILVER, the defendant, often multiple times per year, a percentage of the fees it obtained from Developer-1 and Developer-2.  During times relevant to this Indictment, the Real Estate Law Firm paid SILVER nearly $700,000. During that time period, and at all times relevant to this

Indictment, SILVER performed no work for the Real Estate Law Firm whatsoever, including in connection with the firm's representation of Developer-1 and Developer-2.

15.   In furtherance of the fraudulent scheme, the United States mail and private and commercial interstate carriers and interstate wires were used and caused to be used, including but not limited to mailings sent and received and interstate electronic mail, telephone calls, and wire transfers of funds between, among other individuals and entities, the Real Estate Law Firm, SHELDON SILVER, the defendant, Developer-1, and Developer-2.

### Silver's Receipt of Illegal Asbestos Payments

16.   As Speaker of the Assembly, SHELDON SILVER, the defendant, exercised control over a pool of money that was available to the Assembly until in or about 2007 under legislation entitled the New York State Health Care Reform Act ("HCRA"). Specifically, until in or about 2007, up to $8.5 million was allocated to the Assembly annually under HCRA, to be disbursed through the New York State Department of Health ("DOH") at the discretion of the Speaker of the Assembly, i.e., SILVER (the "HCRA-Assembly Pool").

17.   Disbursements from the HCRA-Assembly Pool were not subject to public disclosure.   To disburse funds from the

HCRA-Assembly Pool, a letter from SHELDON SILVER, the defendant, was sent to DOH, accompanied by a form called a Legislative Initiative Form, which provided the purported intended purpose of the disbursement.  DOH had no role in selecting recipients of the HCRA-Assembly Pool funds or evaluating the intended use of such funds.  Thus, SILVER was able to distribute money from the HCRA-Assembly Pool at his discretion, with no public disclosure of the disbursement, its recipient, or its intended purpose.

18.  At all times relevant to this Indictment, Doctor-1 was a well-known expert in the treatment and research of mesothelioma, a cancer that is caused almost exclusively by asbestos.  Doctor-1 treated mesothelioma patients and conducted mesothelioma research at a university located in Manhattan ("University-1") and its affiliated hospital.  Doctor-1 also created a center at University-1 that was dedicated to mesothelioma research (the "Mesothelioma Center").

19.  Weitz & Luxenberg has several practice areas, including personal injury, malpractice, and products liability. One of the firm's principal areas of focus is representing plaintiffs who suffer from asbestos-related diseases such as mesothelioma.  As mesothelioma cases are extremely lucrative, law firms that practice in this area, including Weitz & Luxenberg,

spend considerable amounts of money to obtain leads to potential clients with mesothelioma.

20.   In or about September 2002, Weitz & Luxenberg hired SHELDON SILVER, the defendant, to be "of counsel" to the firm with an annual salary of $120,000.  Weitz & Luxenberg hired SILVER because of his official position and stature and without the expectation that SILVER would perform any work on cases, or that he would refer any asbestos cases to the firm.   Indeed, at the time SILVER joined Weitz & Luxenberg, SILVER had no prior experience with asbestos cases, and he brought no cases, matters, or clients of any kind with him to the firm.

21.   In addition to his salary, SHELDON SILVER, the defendant, was able to obtain additional income from Weitz & Luxenberg by referring matters to the firm.  In particular, if SILVER referred a client with an asbestos-related claim to the firm, he was entitled to receive 33 percent of the firm's share of any recovery obtained by the firm on behalf of such client.

22.   Beginning in or about late 2003 through at least in or about August 2014, SHELDON SILVER, the defendant, engaged in a corrupt scheme whereby Doctor-1, at SILVER's request, provided Mesothelioma Leads, and the valuable legal claims connected thereto, to SILVER at Weitz & Luxenberg, and in exchange, SILVER used the power and influence of his official position to

12

benefit Doctor-1, including by providing State funding to Doctor-1's Mesothelioma Center and providing other benefits to Doctor-1 and his family.

23.   Doctor-1 obtained the Mesothelioma Leads and sent the valuable legal claims connected thereto to SHELDON SILVER, the defendant, at Weitz & Luxenberg in the following manner:   Doctor-1 spoke with his mesothelioma patients (and family members who were present) who did not have legal representation and, after obtaining patient consent, sent them to Weitz & Luxenberg by, among other things, providing the Mesothelioma Leads to SILVER, who in turn provided the Mesothelioma Leads to attorneys at Weitz and Luxenberg to evaluate and pursue the patients' legal claims.   In exchange for the Mesothelioma Leads, and the valuable legal claims connected thereto, SILVER took numerous actions under the color of his official authority and in his official capacity as an elected legislator and as Speaker of the Assembly as the opportunities arose, including but not limited to the following:

a.   In or about July 2005, SILVER directed that a State grant in the amount of $250,000, paid for from the HCRA-Assembly Pool, be awarded to Doctor-1's Mesothelioma Center, and pursuant to SILVER's direction, the grant was awarded.

b.   In or about November 2006, SILVER directed that another State grant in the amount of $250,000, again paid for

13

from the HCRA-Assembly Pool, be awarded to Doctor-1's Mesothelioma Center, and pursuant to SILVER's direction, the grant was awarded.

          c.    In or about 2008, SILVER helped direct $25,000 in State funding to a not-for-profit organization on which a family member of Doctor-1 served as a member of its Board of Directors.

          d.    In or about May 2011, SILVER sponsored and obtained an official resolution adopted by the Assembly and an Assembly-issued proclamation honoring Doctor-1, which SILVER presented to Doctor-1 at an event at which Doctor-1 was honored by a nationwide cancer organization in Manhattan.  During the presentation, SILVER made remarks in his official capacity praising Doctor-1.

          e.    In or about 2012, SILVER facilitated employment for a family member of Doctor-1 at a not-for-profit organization to which SILVER had directed millions of dollars in State funding.

          24.    The Mesothelioma Leads, and the valuable legal claims connected thereto, sent by Doctor-1 to SHELDON SILVER, the defendant, were highly lucrative for SILVER.  Specifically, Weitz & Luxenberg paid SILVER more than $3 million in referral fees for cases referred to him by Doctor-1.  With respect to these cases, SILVER did not evaluate the matters; he performed no work on the

14

matters; he had no contact with the clients; and he did not advise the Weitz & Luxenberg attorneys assigned to the matters.

25.   In furtherance of the fraudulent scheme, the United States mail and private and commercial interstate carriers and interstate wires were used and caused to be used, including but not limited to mailings sent and received and interstate electronic mail, telephone calls, and wire transfers of funds between, among other individuals and entities, Weitz & Luxenberg and clients referred to SHELDON SILVER, the defendant, by Doctor-1.

## Silver's Concealment of His Criminal Conduct

26.   As part of his corrupt scheme and to avoid detection by the public, his staff, colleagues, and associates, State regulators, law enforcement, and others, SHELDON SILVER, the defendant, took numerous steps to conceal his illegal conduct, including but not limited to the following:

a.   SILVER made materially false and fraudulent representations and omissions on the mandatory Disclosure Forms he filed with the Ethics Commission.  Among other things, SILVER failed to disclose that he received income from the Real Estate Law Firm and failed to disclose that the vast majority of his income from Weitz & Luxenberg was derived not from "the predominant area of personal injury claims" – as he stated on the forms – but rather

15

from asbestos-related product liability cases on which he
performed no legal work and that he received through the use of
his official position.

   b. SILVER lied to and misled the public about the
nature and sources of his outside legal income by, among other
things, claiming that none of his clients had any business before
the State when, in truth and in fact, he represented and was
receiving hundreds of thousands of dollars from large real estate
developers with substantial business before the State.

   c. SILVER further lied to and misled the public
about the nature and sources of his outside legal income by
claiming that he derived outside income through individuals who
sought him out for legal services and that he spent several hours
each week evaluating legal matters brought to him by potential
clients.  In truth and in fact, Developer-1, Developer-2, and
patients of Doctor-1 did not seek out SILVER for legal
representation, and SILVER did not evaluate either the tax
certiorari matters from which he received fees from the Real Estate
Law Firm or the asbestos matters sent to him by Doctor-1.

   d. SILVER went to great lengths to prevent
others, including his staff, colleagues, and associates, from
learning about the true nature of his relationship with Doctor-1
and that he was receiving referral fees from the Real Estate Law

Firm's representation of Developer-1 and Developer-2.  Among other ways of concealing his corrupt scheme, SILVER:

        i.     Kept secret from attorneys at Weitz & Luxenberg that he had directed State funding to Doctor-1's research and used his official position to provide other benefits to Doctor-1 and his family;

        ii.    Kept secret from his legislative staff that he was receiving referral fees from the Real Estate Law Firm and case referrals from Doctor-1;

        iii.   Instructed Doctor-1 not to tell a mutual friend who had first introduced SILVER and Doctor-1 about Doctor-1's referrals of cases to SILVER; and

        iv.    Used undisclosed State funds, namely the HCRA-Assembly Pool, to provide grants to Doctor-1's research, and stopped providing such grants when the HCRA-Assembly Pool was eliminated and other possible sources of State funding would have been subject to public disclosure.

       27.  SHELDON SILVER, the defendant, took actions to conceal his corrupt sources of outside income from the Moreland Commission.  After the Moreland Commission sent letters to certain members of the Assembly and the Senate, including to SILVER, requesting, among other things, "a description of the services you provide or have provided in exchange for

compensation," and "a list of your clients in any civil matters,"
SILVER refused to provide the requested information.   When the
Moreland Commission then subpoenaed Weitz & Luxenberg, as well as
other entities that employed legislators who had refused to comply
with the letter requests, for information about the non-complying
legislators' outside income, SILVER caused the Assembly, at
taxpayer expense, and Weitz & Luxenberg to file motions in New York
State Supreme Court to quash the subpoenas.   On or about February
25, 2014, in statements made at a press conference, SILVER claimed
that by subpoenaing information about legislators' outside
income, the Moreland Commission was "engaged in a fishing
expedition to intimidate legislators" and had exceeded its mandate
and otherwise abused its power.   Subsequently and while the
motions to quash the subpoenas were pending, SILVER participated
in State budget negotiations that resulted in, among other things,
the shutdown of the Moreland Commission, and the subpoenas seeking
information on outside income were withdrawn.

### Silver's Illicit Transactions with His Crime Proceeds

28.   Based on the illegal conduct set forth above,
SHELDON SILVER, the defendant, amassed nearly $4 million in crime
proceeds from both the Real Estate Law Firm and through asbestos
referral fees paid to him by Weitz & Luxenberg.   SILVER deposited
nearly all of these crime proceeds into a single account at a

18

financial institution in the name of "Sheldon Silver, Counselor at Law" (the "Silver Account"), thereby commingling his ill-gotten gains from both the Real Estate Law Firm and Weitz & Luxenberg. In addition, SILVER deposited his salary from Weitz & Luxenberg into the Silver Account, thereby commingling crime proceeds with funds not derived from the corrupt scheme.

29. By in or about 2006, the Silver Account held hundreds of thousands of dollars obtained by SHELDON SILVER, the defendant, and additional substantial criminal proceeds were expected. Rather than continue to maintain these funds in the Silver Account, SILVER used his relationship with an investor ("Investor-1"), who had access to private, high-yield investment opportunities, to distribute his crime proceeds across numerous high-yield investment vehicles not available to the general public.

30. More specifically, in or about 2006, at the request of SHELDON SILVER, the defendant, Investor-1 provided access to a private investment vehicle that promised a high annual rate of return with little risk ("Investment Vehicle-1"). In connection with Investment Vehicle-1, SILVER engaged in a series of transactions through financial institutions involving property greater than $10,000. Thereafter up to and including in or about January 2015, SILVER continued to obtain access to other

19

potentially high-yield private investments through Investor-1, by engaging in additional transactions through financial institutions involving property greater than $10,000.

31.   SHELDON SILVER, the defendant, did not pay any fee or remuneration to Investor-1 for Investor-1's provision of advice regarding and access to the high-yield private investments although SILVER took certain official actions as requested by Investor-1.   At no time did SILVER truthfully disclose to Investor-1 or the Investment Vehicle-1 the source and origin of the funds that SILVER provided for these investments.

32.   In or about 2011, in anticipation of a change in law requiring State legislators to more fully disclose to the public the amount of their outside income, investments, and loans, SHELDON SILVER, the defendant, transferred more than $340,000 of his investment in Investment Vehicle-1 into the name of a family member, thereby avoiding future disclosure to the public of the full amount of his investment.   By January 2015, SILVER had transferred approximately $642,000 from the Silver Account to Investment Vehicle-1, which had grown to a value of more than $1.4 million.

## Statutory Allegations

### COUNT ONE

### (Honest Services Mail Fraud:  Asbestos Payments)

33.  From at least in or about 2003 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to SILVER's honest services as an elected legislator and as the Speaker of the Assembly, for the purpose of executing such scheme and artifice and attempting to do so, placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service and deposited and caused to be deposited a matter and thing to be sent and delivered by private and commercial interstate carrier, and took and received therefrom, such matter and thing, and knowingly caused to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, any such matter and thing, to wit, SILVER used the power and influence of his official position to obtain millions of dollars in bribes and kickbacks in the form of referral fees paid to him through Weitz & Luxenberg, and in connection therewith and in furtherance thereof, SILVER

sent and received and caused materials to be sent and received using the United States mail and private and commercial interstate carriers.

(Title 18, United States Code, Sections 1341, 1346, and 2.)

## COUNT TWO

### (Honest Services Wire Fraud:  Asbestos Payments)

The Grand Jury further charges:

34.  The allegations contained in paragraphs 1 through 32 of this Indictment are repeated and realleged as if fully set forth herein.

35.  From at least in or about 2003 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to SILVER's honest services as an elected legislator and as the Speaker of the Assembly, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SILVER used the power and influence of his official position to obtain millions of dollars in bribes and kickbacks in the form of referral fees paid to him through Weitz & Luxenberg, and in connection therewith and in

furtherance thereof, SILVER transmitted and caused to be transmitted interstate electronic mail, telephone calls, and wire transfers of funds.

(Title 18, United States Code, Sections 1343, 1346, and 2.)

## COUNT THREE

### (Honest Services Mail Fraud:  Real Estate Payments)

The Grand Jury further charges:

36.  The allegations contained in paragraphs 1 through 32 of this Indictment are repeated and realleged as if fully set forth herein.

37.  From at least in or about 2000 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to SILVER's honest services as an elected legislator and as the Speaker of the Assembly, for the purpose of executing such scheme and artifice and attempting to do so, placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service and deposited and caused to be deposited a matter and thing to be sent and delivered by private and commercial interstate carrier, and took and received therefrom, such matter and thing, and knowingly caused to be

delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, any such matter and thing, to wit, SILVER used the power and influence of his official position to obtain hundreds of thousands of dollars in bribes and kickbacks in the form of referral fees paid to him through the Real Estate Law Firm, and in connection therewith and in furtherance thereof, SILVER sent and received and caused materials to be sent and received using the United States mail and private and commercial interstate carriers.

(Title 18, United States Code, Sections 1341, 1346, and 2.)

## COUNT FOUR

### (Honest Services Wire Fraud:   Real Estate Payments)

The Grand Jury further charges:

38.   The allegations contained in paragraphs 1 through 32 of this Indictment are repeated and realleged as if fully set forth herein.

39.   From at least in or about 2000 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to SILVER's honest services as an elected legislator and as the Speaker of the

24

Assembly, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SILVER used the power and influence of his official position to obtain hundreds of thousands of dollars in bribes and kickbacks in the form of referral fees paid to him through the Real Estate Law Firm, and in connection therewith and in furtherance thereof, SILVER transmitted and caused to be transmitted interstate electronic mail, telephone calls, and wire transfers of funds.

(Title 18, United States Code, Sections 1343, 1346 and 2.)

## COUNT FIVE

### (Extortion Under Color of Official Right:  Asbestos Payments)

The Grand Jury further charges:

40.   The allegations contained in paragraphs 1 through 32 of this Indictment are repeated and realleged as if fully set forth herein.

41.   From at least in or about 2003 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, while serving as an elected legislator and as Speaker of the Assembly, willfully and knowingly, did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion as

that term is defined in Title 18, United States Code, Section 1951(b)(2), to wit, SILVER obtained Mesothelioma Leads, and the valuable legal claims connected thereto, for Weitz & Luxenberg and fees resulting therefrom through extortion under color of official right.

(Title 18, United States Code, Sections 1951 and 2.)

COUNT SIX

**(Extortion Under Color of Official Right:   Real Estate Payments)**

The Grand Jury further charges:

42.   The allegations contained in paragraphs 1 through 32 of this Indictment are repeated and realleged as if fully set forth herein.

43.   From at least in or about 2000 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, while serving as an elected legislator and as Speaker of the Assembly, willfully and knowingly, did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), to wit, SILVER obtained Tax Certiorari Business of Developer-1 and Developer-2 for the Real Estate Law Firm and fees

resulting therefrom through extortion under color of official
right.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT SEVEN

(Monetary Transactions Involving Crime Proceeds)

44. The allegations contained in paragraphs 1 through
32 of this Indictment are repeated and realleged as if fully set
forth herein.

45. From at least in or about 2006 through in or about
January 2015, in the Southern District of New York and elsewhere,
SHELDON SILVER, the defendant, willfully and knowingly, within the
United States and involving United States persons, in an offense
involving and affecting interstate and foreign commerce, did
engage and attempt to engage in monetary transactions in
criminally derived property of a value greater than $10,000 that
was derived from specified unlawful activity, to wit, SILVER
transferred the proceeds of the offenses charged in Counts One
through Six of this Indictment to investments not available to the
general public, in transactions affecting interstate commerce and
through the use of checks in amounts greater than $10,000 drawn
on financial institutions and deposited into bank accounts held
at financial institutions, including the following transactions:

a. In or about July 2010, SILVER transferred a

27

check in the amount of $100,000 from the Silver Account to Investment Vehicle-1;

b.    In or about July 2011, SILVER transferred a checks in the amount of $29,997.40 from the Silver Account to an account at a financial institution controlled in part by Investor-1 (the "Investor-1 Account"), which money was then distributed to an investment vehicle on behalf of SILVER;

c.    In or about July 2011, SILVER transferred a check in the amount of $10,243.96 from the Silver Account to the Investor-1 Account, which money was then distributed to an investment vehicle on behalf of SILVER.

d.    In or about June 2012, SILVER transferred a check in the amount of $27.879.15 from the Silver Account to the Investor-1 Account, which money was then distributed to an investment vehicle on behalf of SILVER.

e.    In or about July 2012, SILVER transferred a check in the amount of $33,668.58 from the Silver Account to the Investor-1 Account, which money was then distributed to an investment vehicle on behalf of SILVER;

f.    In or about February 2013, SILVER transferred a check in the amount of $50,000 from the Silver Account to the Investor-1 Account, which money was then distributed to an investment vehicle on behalf of SILVER.

g.   In or about April 2013, SILVER transferred a check in the amount of $19,005.12 from the Silver Account to the Investor-1 Account, which money was then distributed to an investment vehicle on behalf of SILVER.

h.   In or about May 2014, SILVER transferred a check in the amount of $16,397.72 from the Silver Account to the Investor-1 Account, which money was then distributed to an investment vehicle on behalf of SILVER.

(Title 18, United States Code, Sections 1957 and 2.)

## FORFEITURE ALLEGATIONS: COUNTS ONE THROUGH SIX

46.   As a result of committing one or more of the offenses alleged in Counts One through Six of the Indictment, SHELDON SILVER, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived, directly or indirectly, from proceeds traceable to the commission of the said offense(s), including but not limited to all of SILVER's right, title, and interest in:

a.   Any and all funds on deposit in HSBC Bank, Account Number 646014943, held in the name of Sheldon Silver, Counselor at Law;

b.   $368,000 on deposit in HSBC Bank, Account Number 761883860, held in the name of JoRon Management LLC;

29

c.     $100,000 on deposit in Bank of America, Account Number 483025986924, held in the name of Counsel Financial Holdings LLC;

d.     Any and all funds on deposit in Synchrony Bank, Account Number 5005138390, held in the name of Sheldon Silver;

e.     Any and all funds and assets on deposit in Fidelity Investments, Account Number 614856932, held in the name of Sheldon Silver;

f.     Any and all funds and assets on deposit in Fidelity Investments, Account Number 613438626, held in the name of Sheldon Silver;

g.     Any and all funds and assets on deposit in Bank of New York Mellon, Account Number 980215084245, held in the name of Sheldon Silver;

h.     Any and all funds and assets on deposit in Morgan Stanley Smith Barney, Account Number 901010095, held in the name of Sheldon Silver;

i.     Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of: JoRon Management LLC; Counsel Financial Services LLC and/or Counsel Financial Holdings LLC; Alpha Orbit LLC; Clover Communities Fund I, L.P.; Clover Communities Fund II, L.P.; Clover

Communities Fund III, L.P.; Clover - Brighton Square; Lerer

Ventures II, L.P.; and NewSat;

        j.   All right, title, and interest in the real

property and appurtenances known and described as 32 Mountain

Drive, Woodridge, New York, 12789;

        k.   All right, title, and interest in the real

property and appurtenances known and described as 550 Grand

Street, Apartments G-5A and G-5B, New York, 10002;

        l.   All right, title, and interest in any fees

paid or to be paid to SILVER by the Real Estate Law Firm;

        m.   All right, title, and interest in any fees

paid or to be paid to SILVER by Weitz & Luxenberg related to any

referrals from Doctor-1;

and all property traceable thereto.

Substitute Asset Provision

    47.  If any of the above-described forfeitable

property, as a result of any act or omission of SHELDON SILVER,

the defendant:

        (1) cannot be located upon the exercise of due

diligence;

        (2) has been transferred or sold to, or deposited

with, a third person;

31

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property, including but not limited to all of SILVER's right, title, and interest in:

a.    Any pension fund to which SILVER may be entitled as a result of his employment as a member of the New York State Assembly and as Speaker of the New York State Assembly.

(Title 18, United States Code, Section 981,
Title 21, United States Code, Section 853, and
Title 28, United States Code, Section 2461.)

### FORFEITURE ALLEGATIONS: COUNT SEVEN

48.    As the result of committing the offense alleged in Count Seven of this Indictment, SHELDON SILVER, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, all property, real and personal, involved in the offense and all property traceable to such property, including but not limited to all of SILVER's right,

32

title, and interest in the properties listed in paragraphs 46(a)

through paragraph 46(m) of this Indictment as set forth above.

### Substitute Asset Provision

47.  If any of the above-described forfeitable

property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due

diligence;

(2) has been transferred or sold to, or deposited with,

a third person;

(3) has been placed beyond the jurisdiction of the

Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot

be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. §

982(b), to seek forfeiture of any other property of said

defendants, up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982 and 1957.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

33

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

SHELDON SILVER,

Defendant.

SUPERSEDING INDICTMENT

S1 15 Cr. 093 (VEC)

(18 U.S.C. §§ 1341, 1343, 1346, 1951,
1957, & 2.)

_____        PREET BHARARA
Foreperson               United States Attorney.

─TRUE BILL ₹ SUPERCEDING INDICTMENT

─ MAG. JUDGE RONALD L. ELLIS
4-23-15