UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                 :

    -v.-                                                 :          15 Cr. 093 (VEC)

SHELDON SILVER,                              :

                Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Carrie H. Cohen
Howard S. Master
Andrew D. Goldstein
James M. McDonald
Assistant United States Attorneys
      -Of Counsel-

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 2

   A.  Procedural Background................................................................................. 2

   B.  Factual Background ...................................................................................... 3

   C.  The Defendant's Motion To Dismiss........................................................... 5

DISCUSSION ......................................................................................................... 6

   A.  Applicable Law Concerning Motions To Dismiss Indictments...................... 6

   B.  The Indictment Properly Alleges Extortion Under Color of Official Right ...... 8

      1.  Applicable Law.................................................................................... 8

      2.  The Indictment Properly Alleges Extortion of Obtainable Property ........... 12

   C.  The Honest Services Fraud Counts Are Properly Pled.................................... 21

      1.  Applicable Law.................................................................................... 21

      2.  The Indictment Sufficiently Alleges Honest Services Fraud..................... 21

         a.  Asbestos Payments................................................................... 22

         b.  Real Estate Payments ............................................................... 24

   D.  The Indictment Sufficiently Alleges the Use of Mail and Wire Transactions.................. 26

CONCLUSION.......................................................................................................... 29

## TABLE OF AUTHORITIES

Page

*Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337 (1952) ...................................... 7

*Chang v. United States, 305 F. Supp. 2d 198 (E.D.N.Y.2004)* ................................ 17

*Costello* v. *United States*, 350 U.S. 359 (1956) ....................................................... 7

*Evans* v. *United States*, 504 U.S. 255 (1992)...................................................... 9, 16

*McNally* v. *United States*, 483 U.S. 350 (1987)................................................... 9, 21

*Re* v. *United States*, 736 F.3d 1121 (7th Cir. 2013).................................... 11, 16, 17, 18

*Ranke v. United States, 873 F.2d 1033 (7th Cir. 1989)* ........................................ 26

*Reuben H. Donnelley Corp. v. Mark I Marketing Corp.*, 893 F. Supp. 285 (S.D.N.Y. 1995) ..... 19

*Scheidler* v. *National Organization for Women, Inc.*, 537 U.S. 393 (2003)........................ *passim*

*Sekhar* v. *United States*, 133 S. Ct. 2720 (2013) ................................................ *passim*

*Skilling* v. *United States*, 561 U.S. 358 (2010) ......................................... 5, 18, 21, 23

*United States* v. *Alfonso*, 143 F.3d 772 (2d Cir. 1998)............................................. 26

*United States* v. *Bahel*, 662 F.3d 610 (2d Cir. 2011)............................................... 9

*United States* v. *Barnes*, 158 F.3d 662 (2d Cir. 1998)............................................ 28

*United States* v. *Biaggi*, 909 F.2d 662 (2d Cir. 1990) ........................................ 23, 25

*United States* v. *Bruno*, 661 F.3d 733 (2d Cir. 2011) ............................................ 23

*United States* v. *Bryant*, 655 F.3d 232 (3d Cir. 2011) ........................................... 25

*United States* v. *Cain*, 671 F.3d 271 (2d Cir. 2012) ............................................. 13

*United States* v. *Cephas*, 937 F.2d 816 (2d Cir. 1991) ........................................... 28

*United States* v. *Ciavarella*, 716 F.3d 705 (3d Cir. 2013) ...................................... 23

*United States* v. *Citron*, 783 F.2d 307 (2d Cir. 1986).......................................... 26

*United States* v. *De La Pava*, 268 F.3d 157 (2d Cir. 2001) ...................................... 6

*United States* v. *DeMizio*, 741 F.3d 373 (2d Cir. 2014) ........................................................ 23, 25

*United States* v. *Elson*, 968 F. Supp. 900 (S.D.N.Y. 1997) .................................................... 7

*United States* v. *Flaharty*, 295 F.3d 182 (2d Cir. 2002) ...................................................... 26

*United States* v. *Frias*, 521 F.3d 229 (2d Cir. 2008) ............................................................ 26

*United States* v. *Gambino*, 809 F. Supp. 1061 (S.D.N.Y. 1992) ...................................... 7

*United States* v. *Ganim*, 510 F.3d 134 (2d Cir. 2007) ........................................................ 9, 21

*United States* v. *Goldberg*, 756 F.2d 949 (2d Cir. 1985) .................................................... 7

*United States* v. *Gotti*, 459 F.3d 296 (2d Cir. 2006) ........................................................... 14

*United States* v. *Guang*, 511 F.3d 110 (2d Cir. 2007) ........................................................ 16, 17

*United States v. Hausmann*, 345 F.3d 952 (7th Cir. 2003) ............................................ 25

*United States* v. *Hernandez*, 980 F.2d 868 (2d Cir. 1992) ................................................ 8

*United States v. Larson*, 07–CR–304, 2013 WL 5573046 (W.D.N.Y. Oct. 9, 2013) .................. 11

*United States v. Lee*, 25 Fed. App'x 20 (2d Cir. 2001) ......................................................... 17

*United States* v. *Margiotta*, 688 F.2d 108 (2d Cir. 1982) ................................................. 9, 15, 18

*United States* v. *McDonough*, 56 F.3d 381 (2d Cir. 1995) ............................................... 9

*United States* v. *McDonough*, 727 F.3d 143 (1st Cir. 2013) ........................................... 16, 18, 20, 23

*United States* v. *Middlemiss*, 217 F.3d 112 (2d Cir. 2000) ............................................. 24

*United States v. Ntshona*, 156 F.3d 318 (2d Cir. 1998) ...................................................... 19

*United States* v. *Reale*, No. S4 96 Cr. 1069 (DAB), 1997 WL 580778 (S.D.N.Y. Sept. 17, 1997) .................................................................................................................................... 27

*United States* v. *Rosen*, 716 F.3d 691 (2d Cir. 2013) ........................................................ 21, 22, 23

*United States* v. *Shyres*, 898 F.2d 647 (8th Cir. 1990) .................................................. 25

*United States* v. *Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ........................................... 7, 22

*United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975) ..................................... 7

iii

*United States* v. *Tropiano*, 418 F.2d 1069 (2d Cir. 1969) ....................................................... 10, 14

*United States* v. *Upton*, 856 F. Supp. 727 (E.D.N.Y. 1994) ......................................................... 27

*United States* v. *Walsh*, 194 F.3d 37 (2d Cir. 1999) ...................................................... 6

*United States* v. *Wolf*, No. 12 Cr. 968 (JFK), 2013 WL 2359107 (S.D.N.Y. May 30, 2013) ...... 28

*United States* v. *Yannotti*, 541 F.3d 112 (2d Cir. 2008).................................................................. 7

*United States* v. *Zandstra*, No. 00 Cr. 209 (RWS), 2000 WL 1368050 (S.D.N.Y. Sept. 20, 2000) ............................................................................................................................... 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

    -v.-                                              :          15 Cr. 093 (VEC)

SHELDON SILVER,                             :

          Defendant.                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

The United States of America respectfully submits this Memorandum of Law in opposition to the defendant's Motion to Dismiss the Indictment ("Def. Mem."). For the reasons set forth below, the defendant's motion is without merit and should be denied in its entirety.

## PRELIMINARY STATEMENT

The charges against the defendant are well grounded in both fact and law and comport with Supreme Court and Circuit precedent. Rather than "a theory in search of a crime," (Def. Mem. at 1), the Government more than sufficiently alleges that the defendant engaged in honest services mail and wire fraud and extortion under color of official right. No amount of rhetoric by the defendant can overcome the strength and legal sufficiency of the allegations against him. As the defendant's motion is without foundation, it should be denied.

## BACKGROUND

### A.      Procedural Background

The defendant was charged by Complaint, dated January 21, 2015, with honest services fraud and extortion offenses.    (*See* Complaint, Docket No. 1).    On January 22, 2015, the defendant surrendered and was presented in this District.

On February 19, 2015, a grand jury sitting in this District returned a three-count Indictment against the defendant (the "Indictment").    Count One of the Indictment charged the defendant with honest services mail fraud in violation of Title 18, United States Code, Sections 1341 and 1346; Count Two charged the defendant with honest services wire fraud in violation of Title 18, United States Code, Sections 1343 and 1346; and Count Three charged the defendant with extortion under color of official right in violation of Title 18, United States Code, Section 1951.    On February 24, 2015, the defendant appeared before this Court, was arraigned on the Indictment, and entered a plea of not guilty on all Counts of the Indictment.

The defendant filed the instant motion on April 2, 2015.    On April 23, 2015, the same Grand Jury that returned the initial Indictment returned a seven-count Superseding Indictment (the "Superseding Indictment"), which principally: (a) realleges facts set forth in the initial Indictment, in some cases providing additional descriptive detail; (b) charges separately the asbestos and real estate aspects of the scheme; and (c) alleges an additional charge under Title 18, United States Code, Section 1957, arising out of the defendant's transfer of the proceeds of his charged offenses to lucrative private investments not available to the general public through transactions affecting interstate commerce in amounts greater than $10,000.

2

Specifically, Counts One and Two of the Superseding Indictment charge the defendant with honest services mail and wire fraud, respectively, in connection with the asbestos scheme, in violation of Title 18, United States Code, Sections 1341, 1343, and 1346; Counts Three and Four charge the defendant with honest services mail and wire fraud, respectively, in connection with the real estate scheme, in violation of Title 18, United States Code, Sections 1341, 1343, and 1346; Counts Five and Six charge the defendant with extortion under color of official right in connection with asbestos-related payments and real estate-related payments, respectively, in violation of Title 18, United States Code, Sections 1951 and 2; and Count Seven charges the defendant with engaging in monetary transactions involving crime proceeds in violation of Title 18, United States Code, Sections 1957 and 2.

### B.    Factual Background

For more than 20 years, from in or about 1994 until in or about February 2015, the defendant served as Speaker of the New York State Assembly (the "Assembly"), having been elected as a member of the Assembly in or about 1977 to represent an Assembly District that comprises much of lower Manhattan.   (Superseding Indictment ¶ 1).   As alleged, from at least in or about 2000 up to and including in or about January 2015, the defendant engaged in a secret and corrupt scheme to deprive the citizens of the State of New York (the "State") of his honest services as an elected legislator and as Speaker of the Assembly, and to extort others under color of official right by using the power and influence of his official position to obtain for himself millions of dollars in bribes and kickbacks and money obtained from extortion.   (Superseding Indictment ¶ 7).   More specifically, from at least in or about 2000 through in or about January 2015, as alleged in the Superseding Indictment, the defendant received nearly $4 million in

corrupt payments through two law firms, a real estate law firm (the "Real Estate Law Firm") and Weitz & Luxenberg, P.C. ("Weitz & Luxenberg").    (Superseding Indictment ¶ 8).

With respect to Counts One, Two, and Five of the Superseding Indictment, relating to the defendant's receipt of millions of dollars in his share of the fees from lucrative asbestos cases, beginning in or about late 2003 through at least in or about August 2014, the defendant is charged with engaging in a corrupt scheme whereby he used his official position to obtain the names and identifying information of unrepresented patients with mesothelioma (the "Mesothelioma Leads"), and the valuable legal claims connected thereto, from a doctor ("Doctor-1"), resulting in millions of dollars to the defendant personally.    In exchange, the defendant secretly directed $500,000 in State funds to Doctor-1's research and provided other official benefits to Doctor-1 and his family.    In furtherance of the scheme, the United States mail and private and commercial interstate carriers and interstate wires were used and caused to be used, including but not limited to mailings sent and received and interstate electronic mail, telephone calls, and wire transfers of funds between, among other individuals and entities, Weitz & Luxenberg and patients whose legal claims were referred to the defendant by Doctor-1. (Superseding Indictment ¶¶ 16-25).

With respect to Counts Three, Four, and Six, relating to the defendant's receipt of a share of the fees for lucrative real estate tax certiorari business, beginning at least in or about 2000, the defendant is charged with using the power and influence of his official position to secure for the Real Estate Law Firm tax certiorari legal claims of two real estate developers ("Developer-1" and "Developer-2"), both of which had significant business before the State and owned properties located within the defendant's Assembly District.    In exchange and in return for the

defendant's use of his official position, the defendant obtained hundreds of thousands of dollars in illegal payments through the Real Estate Law Firm that were disguised as attorney referral fees.   In furtherance of the scheme, the United States mail and private and commercial interstate carriers and interstate wires were used and caused to be used, including but not limited to mailings sent and received and interstate electronic mail, telephone calls, and wire transfers of funds between, among other individuals and entities, the Real Estate Law Firm, the defendant, Developer-1, and Developer-2.   (Superseding Indictment ¶¶ 10-15).

With respect to Count Seven, engaging in financial transactions involving crime proceeds, as alleged in the Superseding Indictment, from in or about 2006 through January 2015, the defendant used his relationship with an investor who had access to private, high-yield investment opportunities to distribute his proceeds obtained from the offenses charged in Counts One through Six of the Superseding Indictment across numerous high-yield investment vehicles not available to the general public, by engaging in a series of transactions through financial institutions involving amounts greater than $10,000.   (Superseding Indictment ¶¶ 28-32).

### C.     The Defendant's Motion To Dismiss

The defendant now moves to dismiss the Indictment based on the following grounds, none of which has any merit:   (1) failure to allege extortion of obtainable property under the Hobbs Act; (2) failure to allege honest services fraud, as that crime is defined after *Skilling* v. *United States*, 561 U.S. 368, 409 (2010); (3) lack of identification of specific mailings or wire transmissions; and (4) duplicitous honest services fraud and extortion charges.   As set forth more fully below, the Indictment, as further detailed by the Superseding Indictment, is legally sufficient, as it alleges that the ultimate objects of the defendant's alleged extortion were

obtainable property interests that are properly the subject of a Hobbs Act extortion charge; alleges that the defendant engaged in a secret and corrupt scheme to deprive the citizens of the State of his honest services, by doling out State benefits and taking other official acts in exchange for bribes and kickbacks in the form of personal payoffs, which he accomplished in part through material misstatements and omissions; and does not need to identify specific mailings or wire transmissions.

The defendant's argument that the Indictment is duplicitous because the asbestos and real estate-related aspects of the scheme should have been charged separately lacks merit.   The two aspects of the scheme properly were charged together as part of the defendant's common scheme to receive illegal payments through use of his official position to obtain legal claims for firms that paid him fees.   Nevertheless, in an effort to narrow the issues and avoid unnecessary litigation, the acts relating to the asbestos-related payments on the one hand, and the real estate-related payments on the other hand, now are charged in the Superseding Indictment, as requested by the defense, as separate counts of honest services wire and mail fraud and Hobbs Act extortion under color of official right.   Accordingly, the defendant's argument that the honest services fraud and extortion counts charged in the Indictment are duplicitous now is moot.

## **DISCUSSION**

### A.   **Applicable Law Concerning Motions To Dismiss Indictments**

The dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."   *United States* v. *De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted); *United States* v. *Walsh*, 194 F.3d 37, 45 (2d Cir. 1999) (courts should not dismiss an indictment for lack of specificity absent a showing of

prejudice) (citation omitted).   The law is well-settled that "[a]n indictment returned by a legally

constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the

charge on the merits."   *Costello* v. *United States*, 350 U.S. 359, 363 (1956).   A defendant must

wait until after the close of the Government's case-in-chief at trial or after the jury's verdict

before contesting the sufficiency of the evidence.   *See* Fed. R. Crim. P. 29; *see also United*

*States* v. *Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997); *United States* v. *Gambino*, 809 F. Supp.

1061, 1079 (S.D.N.Y. 1992).   As dismissal is an extraordinary remedy, on a pretrial motion to

dismiss pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, the allegations of the

indictment must be taken as true.   *See Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337,

343 n. 16 (1952); *United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

Rule 7(c) of the Federal Rules of Criminal Procedure, governing the type of information

that must be contained in an indictment, provides that the indictment "must be a plain, concise,

and definite written statement of the essential facts constituting the offense charged."   Fed. R.

Crim. P. 7(c).   In general, to satisfy the pleading requirements, "'an indictment need do little

more than to track the language of the statute charged and state the time and place (in

approximate terms) of the alleged crime.'"   *United States* v. *Stavroulakis*, 952 F.2d 686, 693

(2d Cir. 1992) (quoting *United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)).   "An

indictment is sufficient when it charges a crime with sufficient precision to inform the defendant

of the charges he must meet and with enough detail that he may plead double jeopardy in a future

prosecution based on the same set of events."   *United States* v. *Yannotti*, 541 F.3d 112, 127 (2d

Cir. 2008) (quoting *Stavroulakis*, 952 F.2d at 693) (quotation marks omitted).   When

determining whether or not a count sufficiently alleges a violation, the indictment should be read

"in its entirety."   *United States* v. *Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992).

### B.   The Indictment Properly Alleges Extortion Under Color of Official Right

The defendant's pretrial motion to dismiss the Hobbs Act allegations of the Indictment should be denied.   The Government's initial Indictment, as made even more explicit by the additional descriptive language included in the Superseding Indictment, makes clear that the ultimate objects of the defendant's alleged extortion were obtainable property interests that properly are the subject of a Hobbs Act extortion charge – namely, (a) the Mesothelioma Leads that the defendant obtained from Doctor-1 and the valuable legal claims Doctor-1 sent to the defendant at Weitz & Luxenberg, and (b) the valuable tax certiorari legal claims that the defendant obtained for the Real Estate Law Firm, which together generated close to $4 million for the defendant.   As set forth in more detail below, the Mesothelioma Leads and connected legal claims obtained by the defendant from Doctor-1, and the tax certiorari claims obtained by the defendant for the Real Estate Law Firm, plainly were property interests that were transferable (and in fact were transferred) from one person to another, and also were extremely valuable in the hands of the defendant.   As such, the allegations in the Indictment set forth a scheme to obtain property, as required by *Scheidler* v. *National Organization for Women, Inc.*, 537 U.S. 393, 404 (2003), *Sekhar* v. *United States*, 133 S. Ct. 2720, 2725 (2013), and case law establishing the types of property that may be the subject of claims under the Hobbs Act.

### 1.   Applicable Law

The Hobbs Act provides criminal penalties for anyone who "in any way or degree obstructs, delays, or affects commerce . . . by . . . extortion or attempts or conspires to do so."   18 U.S.C. § 1951(a).   The Act defines extortion, as is applicable here, as "the obtaining of property

from another, with his consent, . . . under color of official right." *Id.* § 1951(b)(2); *see also Evans* v. *United States*, 504 U.S. 255, 268 (1992) (inducement not an element of extortion under color of official right).   To establish extortion under color of official right, the Government is required to prove only that a "'public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'"   *United States* v. *Ganim*, 510 F.3d 134, 145 (2d Cir. 2007) (quoting *Evans*, 504 U.S. at 268).   The Government is not required to prove that any specific official acts are carried out in return for the payment.   *Id.*   Under the Hobbs Act, "[t]he public officer's misuse of his office supplies the necessary element of coercion, and the wrongful use of official power need not be accompanied by actual or threatened force, violence, or fear."   *United States* v. *Margiotta*, 688 F.2d 108, 130-31 (2d Cir. 1982), *overruled on other grounds by McNally* v. *United States*, 483 U.S. 350 (1987), *as recognized in United States* v. *Bahel*, 662 F.3d 610, 633 (2d Cir. 2011); *see also United States* v. *McDonough*, 56 F.3d 381, 388 (2d Cir. 1995) (citing *Margiotta* as valid Circuit precedent on extortion under color of official right post-*McNally*); *Margiotta*, 688 F.2d at 132 ("The use of public office, with the authority to grant or withhold benefits, takes the place of pressure or threats.").

In *Scheidler* v. *National Organization for Women, Inc.*, 537 U.S. 393 (2003), the Supreme Court held that the "obtaining" property element of the Hobbs Act requires proof that an object of the charged crime is "not only the deprivation but also the acquisition of property," *id.* at 404. The "property" that the defendant must seek to obtain, however, is not limited to tangible property or money; *Scheidler* made clear that under the Hobbs Act, obtainable property simply means "something of value" that can be "exercise[d], transfer[red], or s[old]."   *Id.* at 405.   In so holding, the Supreme Court declined to disturb prior precedent holding that "property" covered

by the Hobbs Act "is not limited to physical or tangible property or things . . . but includes, in a broad sense, any valuable right considered as a source or element of wealth." *United States* v. *Tropiano*, 418 F.2d 1069, 1075 (2d Cir. 1969) (citations omitted); *see Scheidler*, 537 U.S. at 402 & n.6 (noting that "the dissent is mistaken to suggest that our decision reaches, much less rejects, lower court decisions such as *United States* v. *Tropiano*, 418 F.2d 1069, 1076 (2d Cir. 1969), in which the Second Circuit concluded that the intangible right to solicit refuse collection accounts 'constituted property within the Hobbs Act definition'").

In *Sekhar* v. *United States*, 133 S. Ct. 2720, 2724 (2013), the Supreme Court applied *Scheidler* to a Hobbs Act conviction involving a scheme to coerce the General Counsel of the State Comptroller's Office into making a non-binding internal recommendation to approve the State's investment in a particular investment fund.   While the jury in *Sekhar* was presented with several property interests that the Government alleged were the objects of the extortion scheme of the defendant in that case, the jury only found that the defendant attempted to extort a single type of alleged property: "the General Counsel's recommendation to approve the Commitment [to invest in the defendant's fund]."   *Id.* (quotation marks omitted).   The Supreme Court was asked to consider whether the General Counsel's non-binding internal recommendation, standing alone, could be considered obtainable property for a Hobbs Act extortion charge, and it held that it could not.   *Id.*   The Court reached this conclusion based on a straightforward application of *Scheidler*, noting that "*Scheidler* rested its decision, as we do, on the term 'obtaining.'   The principle announced there – that a defendant must pursue something of value from the victim that can be exercised, transferred, or sold – applies with equal force here."   *Id.* at 2726 (citation omitted).   Because the property – as limited by the jury there, the General Counsel's right to

make a non-binding internal recommendation – was not "*transferable* – that is, capable of passing from one person to another," *id*. at 2725, the Court held that the Government had not established Hobbs Act extortion in that case.   *See id.* at 2726.

    In reaffirming *Scheidler's* holding that the property alleged to be the object of a Hobbs Act extortion scheme must be obtainable by a defendant, however, the Supreme Court in *Sekhar* expressly did not upend the large body of well-established law concerning the types of obtainable property that could be the object of a Hobbs Act extortion scheme, or the manner in which the property may be obtained by a defendant.   *See id.* at 2725 n.2 (noting that its holding did not purport to restrict the Government's ability to "charge a person who obtains money by threatening a third party, who obtains funds belonging to a corporate or governmental entity by threatening the entity's agent, or who obtains 'goodwill and customer revenues' by threatening a market competitor" (citations omitted)).   Cases decided after *Sekhar* have confirmed this reading of the decision.   *See, e.g.*, *Re* v. *United States*, 736 F.3d 1121, 1123 (7th Cir. 2013) (holding that appellant "is not right to attribute to either *Scheidler* or *Sekhar* [] a holding that 'obtaining' property requires getting it directly from the person threatened.   Section 1951(b)(2) speaks of obtaining property 'from another'; it does not say that the 'another' must be the threat's recipient"); *United States* v. *Larson*, 07–CR–304, 2013 WL 5573046, at *2 (W.D.N.Y. Oct. 9, 2013) ("The Supreme Court's holding in *Sekhar* is not new.").   Indeed, no case post-*Sekhar* has adopted the sweeping reading advocated by the defendant.   Nor has any decision citing *Sekhar* narrowed the definition of property to exclude the type of property alleged to have been transferred here, and the defendant has not cited any such case.

## 2.      The Indictment Properly Alleges Extortion of Obtainable Property

The allegations in the instant case plainly satisfy the Hobbs Act and are readily distinguishable from those deemed to be insufficient in *Sekhar*.   The Government does not allege in the Superseding Indictment (and did not allege in the original Indictment) that the property the defendant sought to obtain as a result of the scheme was merely "an employee's yet-to-be-issued recommendation."   *Sekhar*, 133 S. Ct. at 2727.   Rather, as was sufficiently clear in the Indictment and now abundantly clear in the Superseding Indictment, the object of the extortion of Doctor-1 was obtaining valuable Mesothelioma Leads, valuable legal claims connected thereto, and fees derived therefrom (Superseding Indictment ¶ 41), and that the object of the extortion of Developer-1 and Developer-2 was the defendant's receipt of tax certiorari legal claims of the developers, and fees derived therefrom.   (Superseding Indictment ¶ 43).

Each of these forms of property is transferrable and obtainable, and as the Government expects to prove at trial, was in fact obtained by the defendant through use of his official position.   With respect to the extortion of Doctor-1, the Mesothelioma Leads the defendant obtained from Doctor-1 are self-evidently transferrable and obtainable by the defendant.   As alleged in the Superseding Indictment, and as the Government further expects to prove at trial, law firms specializing in asbestos cases, including Weitz & Luxenberg, spend substantial resources attempting to obtain leads to unrepresented potential clients suffering from mesothelioma because mesothelioma cases are extremely valuable to firms.   (Superseding Indictment ¶ 19).   The Superseding Indictment also alleges, and the Government expects to prove at trial, that as a result of the defendant's extortion, Doctor-1 also sent dozens of patients with valuable legal claims who were the subject of the Mesothelioma Leads to the defendant at

Weitz & Luxenberg, thereby providing the defendant and Weitz & Luxenberg with a rich source

of revenue.   Moreover, the Government expects to prove that when the defendant for a time

ceased providing official benefits to Doctor-1, Doctor-1 began providing many of the

Mesothelioma Leads he obtained by speaking with his patients to a different law firm that began

supporting his research – further establishing that the Mesothelioma Leads were transferable

property within the meaning of the Hobbs Act.

These Mesothelioma Leads, the underlying legal claims, and the fees derived from those

claims, are transferable and valuable.   Such leads, legal claims, and fees (be it claims against

manufacturers of products containing asbestos or claims for property tax reductions) represent a

contingency law firm's principal source of revenue – and if the clients possessing such claims

are sent or transferred to different firms, that revenue goes with them.[1]   As alleged here, while

the *exact* economic value of the leads and claims obtained as a result of the scheme may not have

been known at the time the defendant obtained them for Weitz & Luxenberg and the Real Estate

Law Firm, the leads and claims obtained as a result of the defendant's extortion in this case were

indisputably "valuable in the hands of the defendant."   *United States* v. *Cain*, 671 F.3d 271, 282

(2d Cir. 2012).   The Government expects that the evidence will show that cases obtained by

Weitz & Luxenberg as a result of the defendant's extortion of Doctor-1 thus far have generated

---

[1]     Indeed, there are companies that are in the business of generating leads for law firms.
*See*, *e.g.*, "What Can Lead Generation Do For Your Law Firm," *available at*
http://www.lawyermarketing.com/articles/what-can-lead-generation-do-for-your-law-firm.
Relatedly, there are hedge funds whose entire business model is based on investing in and
purchasing legal claims.   *See, e.g.*, "Hedge Fund Betting on Lawsuits is Spreading," Bloomberg
Business, Mar. 18, 2015, *available at*
http://www.bloomberg.com/news/articles/2015-03-18/hedge-fund-betting-on-lawsuits-is-
spreading.

more than $27 million, resulting in payment of more than $9 million in fees to Weitz &
Luxenberg and more than $3 million in fees to the defendant; and the tax certiorari business of
Developer-1 and Developer-2 that the defendant obtained for the Real Estate Law firm has
generated approximately $10 million in awards or tax reductions, resulting in payment of
approximately $2.5 million in fees to the Real Estate Law Firm and close to $700,000 in fees to
the defendant.   *See, e.g.*, *Tropiano*, 418 F.2d at 1076 (proof that intangible right to solicit
business constituted "property" under Hobbs Act included evidence that the extortion victim's
"agreement not to solicit . . . customers was valued at an additional $15,000" when accounts
were later sold).   Certainly, the close to $4 million in fees directly tied to the economic value of
these leads and associated legal claims that the defendant obtained as a result of the extortion
alleged in the Superseding Indictment, unquestionably property under the Hobbs Act, reflects
both that the leads and claims had economic value, and that the defendant's motivation in
engaging in the conduct was to obtain property within the meaning of the Hobbs Act.   *See*
*United States* v. *Gotti*, 459 F.3d 296, 325 (2d Cir. 2006) ("[a] motive ultimately to profit by
cashing out the value of the property right will generally serve as powerful evidence that the
defendant's goal was to obtain the [property] right for himself, rather than merely to deprive the
victim of that right").

The defendant argues that the Mesothelioma Leads sent by Doctor-1 to the defendant and
the valuable legal claims connected thereto could not be "obtain[ed]" by the defendant because
they were "nothing more than [Doctor-1's] recommendations that his patients take their business
to Weitz & Luxenberg."   (Def. Mem. at 8) (quotation marks omitted).   That, however, is not
an accurate characterization of the allegations in the Indictment, particularly as elaborated in the

14

Superseding Indictment, nor does it encompass what the Government expects to prove at trial. The Superseding Indictment (like the original Indictment) alleges that the defendant extorted more than mere internal "recommendations" from Doctor-1.   It alleges that the defendant obtained actual "Mesothelioma Leads" directly from Doctor-1 that could have been (and in fact were) transferred to others; that Doctor-1 sent "valuable legal claims" to the defendant at Weitz & Luxenberg as a result of the extortion scheme; and that the defendant ultimately received millions of dollars as a result of the scheme.   (Superseding Indictment ¶ 8).   Indeed, the fact that the defendant was paid millions of dollars in fees by Weitz & Luxenberg for the Mesothelioma Leads that he obtained, and the clients with valuable legal claims that Doctor-1 sent to the defendant as a result of the extortion, shows that the Mesothelioma Leads, the clients' claims, and the resulting payments were valuable property "capable of passing from one person to another."   *Sekhar*, 133 S. Ct. at 2725.[2]

It is of no legal consequence, moreover, that a portion of the property alleged to have been obtained as a result of the extortion of Doctor-1 – the legal claims of Doctor-1's patients – was not owned by Doctor-1 personally, nor that the fees received by the defendant as a result of the referrals were paid through Weitz & Luxenberg.   First, the Supreme Court in *Sekhar*

---

[2]      As the Government properly alleges that property was the object of the defendant's extortion, the defendant's argument that the Government alleges only coercion, and not extortion (Def. Mem. at 8), has no merit.   As the Supreme Court stated in *Scheidler*, "extortion necessarily involves the use of coercive conduct to obtain property."   537 U.S. at 407-08. Thus, evidence that Doctor-1 was "coerced" by the defendant's misuse of his official position, *see Margiotta*, 688 F.2d at 130-31 (under the Hobbs Act, "[t]he public officer's misuse of his office supplies the necessary element of coercion"), represents affirmative proof of the existence of the charged scheme, which along with evidence that the object of the defendant's "misuse of his office," *id.*, was "to obtain property," *Scheidler*, 537 U.S. at 407-08, and an effect on interstate commerce, establishes Hobbs Act extortion.

explicitly stated that its holding did not purport to restrict the Government's ability to prosecute

for Hobbs Act extortion "a person who obtains money by threatening a third party."    133 S. Ct.

at 2725 n.2 (quotation marks omitted).    Second, governing precedent does not require that the

extorted party personally own the property that is extorted.    *See*, *e.g.*, *Evans*, 504 U.S. at 268

(requiring proof only that a "public official has obtained a payment to which he was not entitled,

knowing that the payment was made in return for official acts" (emphasis omitted)).[3]    Third, the

plain language of the Hobbs Act does not require the extortionate conduct to be addressed to the

legal owner of the property.    *See, e.g.*, *Re* v. *United States*, 736 F.3d 1121, 1123 (7th Cir. 2013)

("Section 1951(b)(2) speaks of obtaining property 'from another'; it does not say that the

'another' must be the threat's recipient.").

    Consistent with these principles, numerous decisions, including decisions by the Second,

Seventh, and First Circuits, recognize that the extortion "victim" does not have to own personally

the property that is extorted, and that extortion payments can pass through (or even remain with)

third parties.    *See United States* v. *Guang*, 511 F.3d 110 (2d Cir. 2007); *Re* v. *United States*, 736

F.3d 1121; *United States* v. *McDonough*, 727 F.3d 143 (1st Cir. 2013).    In *Guang*, 511 F.3d 110

(2d Cir. 2007), the defendants were charged with extortion designed to generate business for a

gift shop owned by one of the defendants, which catered to Chinese tourists.    *Id.* at 114.    The

victims of the extortion scheme included, *inter alia*, "tour guides who were coerced by force and

---

[3]      The Government expects that the evidence at trial will show that the defendant was fully
aware that he was receiving millions of dollars in payments "in return for official acts," *Evans*,
504 U.S. at 268, by, among other things, direct witness testimony; by the timing and
circumstances of the case referrals to the defendant at Weitz & Luxenberg, on the one hand, and
the promise and provision of official acts by the defendant, on the other; and by the defendant's
efforts to conceal from both Weitz & Luxenberg, his staff, and the public the true nature of his
relationship with Doctor-1 and his receipt of millions of dollars in fees based on that relationship.

threats of force to steer business to [the defendant's] shop." *Id.*   As with the client legal claims

that were among the property extorted from Doctor-1, the extorted tour guides were not the legal

owners of the property that the defendant in *Guang* sought to extort.   Rather, the property was

owned by the extorted tour guides' customers, whose money would be spent at the defendant's

shop after the customers were steered there as a result of the extortion, thereby enriching the

defendant.   *Id.* at 115-17.   The Second Circuit affirmed denial of a new trial over various

challenges, characterizing the evidence of extortion as "overwhelming."   *Id.* at 120.[4]

In *Re* v. *United States*, the Seventh Circuit considered whether a defendant who

threatened a rival warehouse owner to obtain a tenant of the extortion victim for his own

warehouse could be convicted of Hobbs Act extortion after *Scheidler* and *Sekhar*.   It had little

difficulty answering the question in the affirmative.   As the Circuit Court held, the defendant

"is not right to attribute to either *Scheidler* or *Sekhar* [] a holding that 'obtaining' property

requires getting it directly from the person threatened. Section 1951(b)(2) speaks of obtaining

property 'from another'; it does not say that the 'another' must be the threat's recipient."   736

F.3d at 1123.   In that case, because "[a] jury could find that [the defendant]'s goal was to obtain

---

[4]         Indeed, a contrary finding would mean that classic organized crime extortion schemes, prosecuted routinely around the country, where victim businesses (*e.g.*, meat or produce suppliers) are directed to send their business or customers to other victim businesses (*e.g.*, restaurants) that in turn pay organized crime a cut of their profits would no longer be prosecutable as Hobbs Act extortion.   *See, e.g.*, *Chang* v. *United States*, 305 F. Supp. 2d 198, 201 (E.D.N.Y. 2004) (indictment sufficiently alleged Hobbs Act scheme to obtain property where "[t]he indictment specifically charged petitioner with engaging in extortive acts in order to require certain business owners to purchase liquor from petitioner and to refer customers to a car service he controlled.   Such purchases and referrals were the mechanisms by which he sought to obtain property."); *cf. United States* v. *Lee*, 25 Fed. App'x 20, 22 (2d Cir. 2001) (affirming denial of acceptance of responsibility credit for defendant in *Chang* where the defendant "denied responsibility for a key element of the crime – namely, that he was attempting to gain business through his threats").   That is not and cannot be the law, and no case post-*Sekhar* has so held.

[the current tenant of the extortion victim] as a tenant," and "[t]enancy yields rental payments, a form of property," the defendant's conviction was unaffected by *Scheidler* or *Sekhar*. *Id.* Similarly, in the instant case, the fact that Doctor-1 – the victim of the defendant's extortion – did not own personally the legal claims that the defendant obtained as a result of his extortion, which yielded "[referral fee] payments, a form of property," *id.*, fits squarely within *Scheidler* and *Sekhar*. In any event, the Mesothelioma Leads plainly were owned directly by and valuable to Doctor-1, who traded them for research money, and they were valuable precisely because the Mesothelioma Leads were for patients with valuable and transferable legal claims.

In *McDonough*, which was decided months after *Sekhar*, the First Circuit upheld extortion and honest services fraud convictions against the Speaker of the Massachusetts House of Representatives (an individual named DiMasi), arising out of a scheme in which DiMasi extorted lobbyists for a company seeking state government business to obtain property not belonging to the lobbyists personally, but instead belonging to the company. 727 F.3d at 147. Moreover, DiMasi received payments not directly from the company or the lobbyists, but instead, indirectly in the form of referral fees paid through DiMasi's law partner, who shared a portion of those legal fees with DiMasi even though DiMasi performed no work on behalf of the company. *Id.* at 148-49. The law partner, like Weitz & Luxenberg in the instant case, was not aware of the scheme, and thus was not criminally charged, *see id.* at 147-49. The First Circuit had little trouble concluding that "[t]hese actions fit comfortably into what the Supreme Court has described as a 'classic kickback scheme,'" *id.* at 153 (quoting *Skilling* v. *United States*, 561 U.S. 368, 410 (2010)), and constituted a scheme to commit extortion under color of official right under the Hobbs Act, *id.* at 155-56. *See also Margiotta*, 688 F.2d at 130-32 (Hobbs Act extortion under

color of official right established where extorted funds originated with governmental body whose leaders were unaware of the scheme, passed through corporation controlled by extorted individuals, and were routed through to yet other third parties as a result of the scheme).[5]

The application of the Hobbs Act to the defendant's referral of tax certiorari business of Developer-1 and Developer-2 to the Real Estate Law Firm, and the defendant's receipt of payments as a result of that scheme, is even more straightforward.   As alleged, and as the Government expects the evidence at trial will show, the defendant directly asked principals and/or agents of developers with substantial business before the State to transfer their recurring tax certiorari claims to the Real Estate Law Firm, and the developers agreed to do so and agreed to keep their business with the Real Estate Law Firm at least in part due the defendant's official power over their business interests.   (Superseding Indictment ¶¶ 10-15).[6]

---

[5]      Moreover, even though Doctor-1 did not own the asbestos tort claims of his patients that Doctor-1 sent to the defendant at Weitz & Luxenberg, Doctor-1, like the tour guides in *Guang* and the lobbyist in *McDonough*, had the ability to direct the disposition of the claims, as Doctor-1 was a treating physician for, and thereby a fiduciary of, the patients whose claims he referred.   *See, e.g.*, *United States* v. *Ntshona*, 156 F.3d 318, 321 (2d Cir. 1998) ("a doctor . . . is involved in a fiduciary relationship with her patients"); *Reuben H. Donnelley Corp.* v. *Mark I Marketing Corp.*, 893 F. Supp. 285, 289 (S.D.N.Y. 1995) (noting that "[u]nder New York law, a fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another," and that "the attorney/client and doctor/patient relationships are sufficiently rooted in trust and confidence to trigger super-contractual fiduciary duties").   The Government expects the proof at trial to show that Doctor-1's relationship of responsibility and trust with his patients allowed him to send claims to the defendant at Weitz & Luxenberg, or to another law firm that when the defendant temporarily stopped engaging in official acts on his behalf, further supporting the conclusion that an object of the defendant's extortion scheme was actually to obtain the claims, and fees resulting therefrom, from Doctor-1.

[6]      The Government expects that the evidence at trial will show that the defendant was fully aware that he was receiving hundreds of thousands of dollars in payments "in return for official acts," *Evans*, 504 U.S. at 268, by, among other things, his regular interaction with and regulation of the developers and their lobbyists on matters critical to their business interests; his

The defendant's argument that the real estate referrals and resulting payments did not constitute extortion payments because he allegedly did not "deprive[]" the developers of the funds that he received (Def. Mem. at 8-9), finds no basis in the law and should be rejected by this Court.   Economic harm or loss are not elements of Hobbs Act extortion under color of official right, and nothing in the language of the Hobbs Act itself or the governing legal standards supports such a conclusion.   To the contrary, a Hobbs Act extortion can consist of a "classic kickback scheme" in which both the public official and the individual being extorted hope to benefit from a corrupt financial relationship.   *McDonough*, 727 F.3d at 153-56.   Here, the Government properly alleges that the defendant acquired property from the developers for the Real Estate Law Firm through the use of his official position, and that the defendant received a portion of that property in the form of fees, thus squarely meeting the requirements set forth in *Sekhar*, *Evans*, and other governing cases.   Moreover, to the extent any proof of "deprivation" of property is required, the Government expects to prove that, absent the defendant's coercive use of his official position, the developers would not have retained the Real Estate Law Firm and thus would not have paid any fees to the Real Estate Law Firm or to the defendant via the Real Estate Law Firm; it is immaterial whether the developers might have paid the same amount in fees to another firm for the same work.   Accordingly, for all the reasons set forth above, the

---

understanding through those interactions of their dependence on favorable (or at least non-harmful) official treatment by him; his failure to perform any legitimate legal work or assume any responsibility for the representation of the developers; and his efforts to conceal from the public his receipt of funds from the developers via the Real Estate Law Firm. (Superseding Indictment ¶¶ 16-20).   *See McDonough*, 56 F.3d at 390 (defendant's knowledge that funds were received in exchange for official acts established by his receipt of "substantial payments . . . without rendering services" and his "efforts to cover up the transactions").

Government more than sufficiently alleges that, through his extortion, the defendant deprived the developers of their property.

### C.     The Honest Services Fraud Counts Are Properly Pled

#### 1.     Applicable Law

For purposes of the mail and wire fraud statutes, 18 U.S.C. § 1346 provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."   In 1988, Congress enacted § 1346 to overturn *McNally* v. *United States*, 483 U.S. 350, 360 (1987), which had held that only tangible property rights, not intangible rights, were protected from schemes to defraud.   In *Skilling* v. *United States*, 561 U.S. 358, 409 (2010), the Supreme Court interpreted § 1346 to criminalize "*only* the bribe-and-kickback core of the pre-*McNally* case law."   What distinguishes bribes and kickbacks from non-criminal activity, such as mere undisclosed conflicts of interest, is a *quid pro quo*.   Put differently, to establish honest services fraud under either a bribery or kickback theory, the Government must "prove that the defendant had a specific intent to give [or receive] something of value *in exchange* for an official act," *United States* v. *Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) (quotation marks omitted), which "includes any act taken 'under color of official authority,'" *id.* (quoting *United States* v. *Ganim*, 510 F.3d 134, 142 (2d Cir. 2007).

#### 2.     The Indictment Sufficiently Alleges Honest Services Fraud

The Indictment (and Superseding Indictment) more than adequately allege – and the Government expects to prove at trial – that the defendant engaged in a secret and corrupt scheme to deprive the citizens of the State of New York of his honest services, by doling out State benefits and taking other official acts in exchange for bribes and kickbacks in the form of

21

personal payoffs, which he accomplished in part through material misstatements and omissions. In his effort to avoid the plain implications of his actions, the defendant attempts to portray these bribes and kickbacks as mere "self dealing or conflicts of interest, not bribery or kickbacks." (Def. Mem. at 11).   The defendant's effort, however, ignores the allegations of the Indictment (which are realleged in the Superseding Indictment), and thus should be rejected.

### a.       Asbestos Payments

With respect to the millions of dollars in fees the defendant received as a result of his relationship with Doctor-1, the defendant contends that, because he received the payments from a law firm with which he was associated (Weitz & Luxenberg) pursuant to a referral fee arrangement, his failure to disclose those payments, at most, constitutes self-dealing or a conflict of interest.   (Def. Mem. at 11).   But the distinguishing feature between self-dealing or conflicts of interest, on the one hand, and bribery or kickbacks on the other, is the *quid pro quo* – that is, self-dealing or conflicts of interest become bribes and kickbacks when a public official receives something of value in exchange for the exercise of his official influence.   *See Rosen*, 716 F.3d at 700.   As alleged, the defendant obtained the Mesothelioma Leads and valuable legal claims connected thereto in exchange for the use of his official position, in particular, his direction of State funds to Doctor-1's research and other official acts that benefited Doctor-1 and his family. (Superseding Indictment ¶ 23).   Accordingly, the Superseding Indictment properly alleges the requisite *quid pro quo*, and should not be dismissed.   *See* Fed. R. Crim. P. 7(c); *United States* v. *Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).

It is of course true that, in the course of receiving bribes and kickbacks, the defendant *also* engaged in self-dealing and possessed concealed conflicts of interest, but that fact simply

serves as evidence of and underscores his consciousness of his own guilt – it does not somehow wash away the criminal nature of those bribes and kickbacks.   *See, e.g.*, *Rosen*, 716 F.3d at 703 (noting that bribor's "fail[ure] fully to disclose the payments to [the public official] on the required disclosure forms" constituted circumstantial evidence of guilt); *United States* v. *Bruno*, 661 F.3d 733, 745 (2d Cir. 2011) (public official's "failure to disclose the transaction" in question constituted circumstantial evidence of a *quid pro quo*).   Indeed, as the Third Circuit has explained, "while the evidence of nondisclosure by itself may not constitute honest services fraud based on a conflict-of-interest theory" after *Skilling*, "where there is also evidence of bribery or kickbacks, . . . then the [undisclosed conflict] evidence may be relevant to proof of a scheme to defraud under a bribery-and-kickback theory of honest services fraud."   *United States* v. *Ciavarella*, 716 F.3d 705, 729 (3d Cir. 2013).

Contrary to the defendant's contention (Def. Mem. at 11), the fact that the bribes and kickbacks were ultimately funneled through Weitz & Luxenberg as part of a fee arrangement does not alter this conclusion.   *See United States* v. *Biaggi*, 909 F.2d 662, 683 (2d Cir. 1990) (affirming extortion and bribery convictions and rejecting argument that payments were lawful because they were made pursuant to formalized, "of counsel," relationship with law firm). Indeed, the defendant's enlistment of Weitz & Luxenberg in his scheme fits the "classic" pattern of "kickback scheme[s]" recognized by the Supreme Court in *Skilling*: that is, where a state official, in exchange for awarding state funds to a "middleman," "arrange[s] for that [middleman] to share the [funds] with entities in which the official has an interest."   *Skilling*, 561 U.S. at 410; *see also United States* v. *DeMizio*, 741 F.3d 373, 382-83 (2d Cir. 2014) (citing cases); *McDonough*, 727 F.3d at 153 (scheme described *supra*, involving corrupt payments via

law firm that was not a knowing participant in the scheme to Speaker of the Massachusetts

House of Representatives, is "classic kickback scheme").  That "classic kickback scheme" is

precisely what the Indictment and the Superseding Indictment allege, and what the evidence at

trial will prove beyond a reasonable doubt.

<b>b.      Real Estate Payments</b>

Incorporating many of the same arguments, the defendant contends that the real

estate-related allegations also do not constitute honest services fraud.    (Def. Mem. at 12).

Specifically, the defendant contends that his failure to comply with attorney ethics rules amounts

only to "a mere conflict of interest."    (Def. Mem. at 13).    But the fact that the defendant

violated the relevant ethics rules while carrying out the real estate referral scheme does not

somehow render lawful the bribes and kickbacks paid to the defendant as part of the scheme.

Quite the contrary, those ethics violations serve as further evidence of the defendant's

consciousness of his own guilt.    *See, e.g.*, *United States* v. *Middlemiss*, 217 F.3d 112, 119 (2d

Cir. 2000) (The defendants "contend that the ethical violations they committed by not disclosing

their interest . . . do not rise to the level of criminal culpability[,] [but] the jury rationally could

infer criminal intent from the nondisclosure.").

The only additional argument put forward by the defendant is that the Government fails

to allege that the legal services provided to the Developers "were unsatisfactory" or that the

Developers "were charged too much for the services provided."    (Def. Mem. at 12).    The

Indictment (and Superseding Indictment), however, clearly allege that the defendant received

kickbacks through the Real Estate Law Firm "[i]n exchange and in return for SILVER's use of

the power and influence of his official position."    (Superseding Indictment ¶¶ 10-15).    That is

24

precisely the *quid pro quo* that *Skilling* requires.   The defendant's argument to the contrary
amounts to nothing more than an effort to present a competing factual theory – which he will be
entitled to do at trial, but which does not provide a valid basis to challenge the Indictment at this
stage.   *See DeMizio*, 741 F.3d at 386 ("At bottom, the jury was presented with two factual
theories:   [the defendant's] argument that the payments . . . were for legitimate work and the
government's argument that the payments were, instead, kickbacks made to improperly obtain
Morgan Stanley's business;" "[t]he fact that [the jury] returned a guilty verdict reflects that it
agreed with the government beyond a reasonable doubt that the payments were kickbacks"
(quotation marks omitted)).

It bears noting, however, that even if the defendant could establish at trial that the
kickbacks he received arose out of legal fees paid for legitimate services actually rendered, that
still would not support dismissal of this charge during trial.   This is because "[a] valid purpose
that partially motivates a transaction does not insulate participants in an unlawful transaction
from criminal liability."   *Biaggi*, 909 F.2d at 683; *see also United States* v. *Bryant*, 655 F.3d
232, 242 (3d Cir. 2011) (affirming honest services fraud and bribery convictions because there
was sufficient evidence of a *quid pro quo*, and rejecting the defendant's argument explaining
"[t]hat [the defendant's] actions may also have benefited his constituents is irrelevant").[7]

---

[7]      *See also, e.g.*, *United States* v. *Hausmann*, 345 F.3d 952, 957 (7th Cir. 2003) (affirming
pre-*Skilling* honest services fraud conviction on kickback theory, rejecting defendant's argument
that "no harm resulted to [the defendant's] clients, who were deprived of nothing to which they
were entitled," and explaining that the defendant's "reasoning ignores the reality that [the
defendant] deprived his clients of their right to know the truth about his compensation," and that
"[i]t is of no consequence that . . . [the relevant] fees . . . were competitive, or that the clients
received the same net benefit as they would have absent the kickback scheme"); *United States* v.
*Shyres*, 898 F.2d 647, 653 (8th Cir. 1990) (affirming pre-*Skilling* honest-services-fraud
conviction on kickback theory, explaining that "even if *all* the invoices represented services

For all of these reasons, the honest services fraud counts are alleged sufficiently and should not be dismissed.

### D.       The Indictment Sufficiently Alleges the Use of Mail and Wire Transactions

The defendant further argues that the honest services mail and wire fraud counts should be dismissed for failure to allege specific mailings and wire transmissions, respectively.   (Def. Mem. at 13-15).   As fully set forth above, however, the Second Circuit repeatedly has held that to satisfy the requisite notice requirements and the provisions of Rule 7(c) of the Federal Rule of Criminal Procedure, "an indictment need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, . . . state time and place in approximate terms."     *United States* v. *Flaharty*, 295 F.3d 182, 198 (2d Cir. 2002) (quotation marks and citation omitted) (holding that the indictment at issue sufficiently charged an offense because it closely tracked the relevant statutory language); *see also United States* v. *Frias*, 521 F.3d 229, 235 (2d Cir. 2008) (quoting *Flaharty*); *United States* v. *Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (noting that "[i]t is well settled that that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense" and further reiterating that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime") (quotation marks and citations omitted); *United States* v. *Citron*,

_____

actually performed, the jury could have found on the evidence that [the defendant] deprived Anheuser-Busch of the right to pay for services alone, not for services plus kickbacks"); *Ranke* v. *United States*, 873 F.2d 1033, 1040 (7th Cir. 1989) (affirming pre-*Skilling* honest services fraud conviction on kickback theory, explaining that "regardless of whether Century's price appeared to be reasonable and competitive, we cannot assume that Building Systems bargained to also pay money [through a kickback] to [the defendant]").

783 F.2d 307, 314 (2d Cir. 1986) ("[w]here . . . an indictment tracks the statutory language and specifies the nature of the criminal activity . . . it is sufficiently specific to withstand a motion to dismiss") (quotation marks and citation omitted).

The defendant does not dispute, as he cannot, that the Indictment (and Superseding Indictment) track the statutory language and apprise him of the general nature, including time and place in approximate terms, of the charged offenses.   (*See* Superseding Indictment ¶¶ 33-39).   Rather, the defendant argues that the Indictment must be dismissed because it fails to provide additional information, specifically, the identity of each "letter, package, telephone call, postcard, e-mail, or tweet" that the Government alleges is at issue.   (Def. Mem. at 14-15).

It is well settled law, however, that lack of specificity regarding the mailings or wire transactions in a mail or wire fraud indictment does not warrant dismissal of the indictment. *See United States* v. *Zandstra*, No. 00 Cr. 209 (RWS), 2000 WL 1368050, at *4 (S.D.N.Y. Sept. 20, 2000) (mail fraud indictment does not need to identify exact mailing dates); *United States* v. *Reale*, No. S4 96 Cr. 1069 (DAB), 1997 WL 580778, at *13-*14 (S.D.N.Y. Sept. 17, 1997) (dismissal of indictment for mail and wire fraud inappropriate even though indictment did not identify specific mailings or wire transfers);[8] *United States* v. *Upton*, 856 F. Supp. 727, 739 (E.D.N.Y. 1994) (wire fraud indictment does not need to list particular electronic transactions or telephone calls to be sufficient under Rule 7(c)).

Dismissal is particularly inappropriate here because there is no mystery as to the mailings

---

[8]      The defendant incorrectly cites *Reale* in support of his argument for dismissal.   (Def. Mem. at 14).   The Court in *Reale* refused to dismiss the indictment and held that "the lack of specificity does not warrant dismissing these counts at this time since the Government can provide Defendants with a Bill of Particulars detailing the individual mailings and wire transfers."   *Id.* at *14.

and wires at issue in this case.    As alleged in the Indictment (and realleged in the Superseding

Indictment), and as further particularized in the Complaint, Weitz & Luxenberg used the mail

and wire transmissions to communicate with the mesothelioma clients who were the subject of

the Mesothelioma Leads and whom Doctor-1 sent to the defendant, as well as to receive

payments and provide payments to clients and the defendant.    Likewise, the Real Estate Law

Firm used the mail and wire transmissions in connection with its representation of Developer-1

and Developer-2, as well as to receive payments and provide payments to those clients and the

defendant and Developer-1 and Developer-2 engaged in wire communications connected to the

representation.    In addition, the Government has provided the defendant with extensive

discovery (and an index to such discovery), including evidence of such mail and wire

transmissions.    The defendant thus is able to determine which wires or mailings are at issue and

prepare his defense.    *See United States* v. *Wolf*, No. 12 Cr. 968 (JFK), 2013 WL 2359107

(S.D.N.Y. May 30, 2013) (denying motion to dismiss and in the alternative for a bill of

particulars in part because the information at issue was provided in discovery (citing *United

States* v. *Cephas*, 937 F.2d 816, 823 (2d Cir. 1991) and *United States* v. *Barnes*, 158 F.3d 662,

665-66 (2d Cir. 1998)).

Nevertheless, again in an attempt to narrow the issues and in response to a letter

requesting detail as to mailings and wires sent to the Government by the defense on April 8,

2015 (one week after filing the instant motion), the Government will provide the defendant with

greater detail as to the mailings and wire transactions at issue prior to the next conference in this

matter, scheduled for May 7, 2015.

## <u>CONCLUSION</u>

For the reasons set forth above, the Government respectfully requests that the Court deny

the defendant's motion in its entirety.

Dated:   April 24, 2015
       New York, New York

                      Respectfully submitted,

                      PREET BHARARA
                      United States Attorney

By: _____/s/_____
         Carrie H. Cohen/Howard S. Master/
         Andrew D. Goldstein/James M. McDonald
         Assistant United States Attorneys