UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA              :

    -v.-              :        S1 15 Cr. 093 (VEC)

SHELDON SILVER,              :

             Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS THE
## SUPERSEDING INDICTMENT

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Carrie H. Cohen
Howard S. Master
Andrew D. Goldstein
James M. McDonald
Assistant United States Attorneys
    -Of Counsel-

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ................................................................................................................... 3

   A.   Procedural Background ........................................................................................... 3

   B.   The Superseding Indictment ................................................................................... 5

   C.   The Defendant's Motion To Dismiss ...................................................................... 7

DISCUSSION ....................................................................................................................... 8

   A.   Applicable Law Concerning Motions To Dismiss Indictments ............................. 8

   B.   The Superseding Indictment Properly Alleges Extortion Under Color of Official Right .. 9

       1.   Applicable Law ................................................................................................. 10

       2.   The Superseding Indictment Properly Alleges Extortion of Obtainable Property ....... 14

   C.   The Honest Services Fraud Counts Are Properly Pled ....................................... 24

       1.   Applicable Law ................................................................................................. 24

       2.   The Superseding Indictment Sufficiently Alleges Honest Services Fraud ................. 25

           a.   The Asbestos Scheme ............................................................................. 25

           b.   The Real Estate Scheme .......................................................................... 27

       3.   The Superseding Indictment Sufficiently Alleges the Use of Mail and Wire Transmissions ................................................................................................... 29

   D.   The Section 1957 Charge is Not Unconstitutionally Vague ............................... 32

       1.   Applicable Law ................................................................................................. 33

       2.   Silver's Vagueness Challenge to Section 1957 Is Meritless ............................ 35

i

E. None Of The Challenged Allegations In The Superseding Indictment Should Be Stricken ................................................................................................................... 39

 1. Applicable Law ...................................................................................... 39

 2. The Challenged Allegations Are Proper ................................................... 40

CONCLUSION ............................................................................................................... 43

## TABLE OF AUTHORITIES

<u>Federal Cases</u>

*Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337 (1952)................................................. 9, 36

*Chang* v. *United States*, 305 F. Supp. 2d 198 (E.D.N.Y. 2004)…………………………………21

*Costello* v. *United States*, 350 U.S. 359 (1956) ........................................................................... 8

*Evans* v. *United States*, 504 U.S. 255 (1992)........................................................................ *passim*

*Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010) ................................................. 33, 35, 36

*Kolender* v. *Lawson*, 461 U.S. 352, 357 (1983) ................................................................ 33, 35, 36

*McNally* v. *United States*, 483 U.S. 350 (1987)........................................................................ 11, 24

*Old Chief* v. *United States*, 519 U.S. 172 (1997)........................................................................ 41

*Ranke* v. *United States*, 873 F.2d 1033 (7th Cir. 1989) .......................................................... 28, 29

*Re* v. *United States*, 736 F.3d 1121 (7th Cir. 2013)........................................................ 13, 20, 21, 22

*Scheidler* v. *National Organization for Women, Inc.*, 537 U.S. 393 (2003)......................... *passim*

*Sekhar* v. *United States*, 133 S. Ct. 2720 (2013) ....................................................................... *passim*

*Skilling* v. *United States*, 561 U.S. 368 (2010) ....................................................................... *passim*

*United States* v. *Ahmed*, No. 10 Cr. 131 (PKC), 2011 WL 5041456 (S.D.N.Y. Oct. 21, 2011) .. 40

*United States* v. *Alfonso*, 143 F.3d 772 (2d Cir. 1998) ................................................................. 30

*United States* v. *Amer*, 110 F.3d 873 (2d Cir. 1997) ............................................................ 33, 37

*United States* v. *Bahel*, 662 F.3d 610 (2d Cir. 2011)................................................................. 11

*United States* v. *Baker*, 19 F.3d 605 (11th Cir. 1994) .................................................... 35, 37, 38

*United States* v. *Barnes*, 158 F.3d 662 (2d Cir. 1998)................................................................. 32

*United States* v. *Bazazpour*, 690 F.3d 796 (6th Cir. 2012).................................................... *passim*

*United States* v. *Biaggi*, 909 F.2d 662 (2d Cir. 1990) ............................................................ 26, 29

*United States* v. *Bin Laden*, 91 F. Supp. 2d 600 (S.D.N.Y. 2000)................................................. 39

iii

*United States* v. *Blarek*, Nos. 98-1291, 98-1292, 1998 WL 907429, 166 F.3d 1202
   (2d Cir. Dec. 23, 1998) .......................................................................................... 33, 34, 35, 36

*United States* v. *Bruno*, 661 F.3d 733 (2d Cir. 2011) ................................................... 26

*United States* v. *Bryant*, 655 F.3d 232 (3d Cir. 2011) .................................................. 29

*United States* v. *Cain*, 671 F.3d 271 (2d Cir. 2012) ..................................................... 17

*United States* v. *Cephas*, 937 F.2d 816 (2d Cir. 1991) ................................................. 32

*United States* v. *Chen*, 378 F.3d 151 (2d Cir. 2004)..................................................... 32

*United States* v. *Ciavarella*, 716 F.3d 705 (3d Cir. 2013) ........................................... 26

*United States* v. *Citron*, 783 F.2d 307 (2d Cir. 1986).................................................. 30

*United States* v. *Coffey*, 361 F. Supp. 2d 102 (E.D.N.Y. 2005) ................................... 39

*United States* v. *De La Pava*, 268 F.3d 157 (2d Cir. 2001) ........................................... 8

*United States* v. *DeMizio*, 741 F.3d 373 (2d Cir. 2014) .......................................... 27, 28

*United States* v. *Elson*, 968 F. Supp. 900 (S.D.N.Y. 1997)......................................... 8, 9

*United States* v. *Facciolo*, 753 F. Supp. 449 (S.D.N.Y. 1990).................................... 32

*United States* v. *Figueroa*, 618 F.2d 934 (2d Cir. 1980) ............................................. 42

*United States* v. *Flaharty*, 295 F.3d 182 (2d Cir. 2002) ............................................. 30

*United States* v. *Frias*, 521 F.3d 229 (2d Cir. 2008) ................................................... 30

*United States* v. *Ganim*, 510 F.3d 134 (2d Cir. 2007) ...................................... 2, 11, 24

*United States* v. *Goldberg*, 756 F.2d 949 (2d Cir. 1985)............................................... 9

*United States* v. *Gotti*, 459 F.3d 296 (2d Cir. 2006)................................................... 18

*United States* v. *Guang*, 511 F.3d 110 (2d Cir. 2007) ........................................... 20, 22

*United States* v. *Hausmann*, 345 F.3d 952 (7th Cir. 2003)......................................... 28

*United States* v. *Hernandez*, 980 F.2d 868 (2d Cir. 1992)............................................ 9

*United States* v. *Hernandez*, 85 F.3d 1023 (2d Cir. 1996).................................... 40, 41

*United States* v. *Larson*, 07–CR–304, 2013 WL 5573046 (W.D.N.Y. Oct. 9, 2013) .................. 13

*United States* v. *Lee*, 25 Fed. App'x 20 (2d Cir. 2001)…………..…..……………………………21

*United States* v. *Margiotta*, 688 F.2d 108 (2d Cir. 1982)................................................. 11, 19, 22

*United States* v. *Markoll*, No. 300 Cr. 133 (EBB), 2001 WL 173763 (D. Conn. Jan. 24, 2001) . 40

*United States* v. *McDonough*, 56 F.3d 381 (2d Cir. 1995) .................................................... 11, 22

*United States* v. *McDonough*, 727 F.3d 143 (1st Cir. 2013) ................................................. *passim*

*United States* v. *Middlemiss*, 217 F.3d 112 (2d Cir. 2000)........................................................ 27

*United States* v. *Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) ................................................ 40

*United States* v. *Mulder*, 273 F.3d 91 (2d Cir. 2001) ........................................................... 39, 40

*United States* v. *Piervinanzi*, 23 F.3d 670 (2d Cir. 1994)............................................................. 38

*United States* v. *Reale*, No. S4 96 Cr. 1069 (DAB)............................................................... 30, 31

*United States* v. *Rosen*, 716 F.3d 691 (2d Cir. 2013) ......................................................... *passim*

*United States* v. *Scarpa*, 913 F.2d 993 (2d Cir. 1990)........................................................... 39, 40

*United States* v. *Shyres*, 898 F.2d 647 (8th Cir. 1990) ................................................................ 29

*United States* v. *Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ..................................................... 9, 26

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990)…………………………………………...32

*United States* v. *Tramunti*, 513 F.2d 1087 (2d Cir. 1975) ............................................................. 9

*United States* v. *Tropiano*, 418 F.2d 1069 (2d Cir. 1969) ..................................................... 12, 17

*United States* v. *Upton*, 856 F. Supp. 727 (E.D.N.Y. 1994) ....................................................... 31

*United States* v. *Walsh*, 194 F.3d 37 (2d Cir. 1999) ............................................................... 8, 32

*United States* v. *Wolf*, No. 12 Cr. 968 (JFK), 2013 WL 2359107 (S.D.N.Y. May 30, 2013) ...... 32

*United States* v. *Yannotti*, 541 F.3d 112 (2d Cir. 2008)................................................................ 9

*United States* v. *Zandstra*, No. 00 Cr. 209 (RWS), 2000 WL 1368050 (S.D.N.Y. Sept. 20, 2000)
................................................................................................................................................... 30

## Federal Statutes

18 U.S.C. § 1341 ................................................................................................. 4

18 U.S.C. § 1343 ................................................................................................. 4

18 U.S.C. § 1346 ............................................................................................. 4, 24

18 U.S.C. § 1951 ......................................................................................... *passim*

18 U.S.C. § 1956 ............................................................................................... 33

18 U.S.C. § 1957 ......................................................................................... *passim*

18 U.S.C. § 1961 ............................................................................................... 33

## Federal Rules

Fed. R. Crim. P. 7 ..................................................................................... *passim*

Fed. R. Crim. P. 12……………………………………………………………… *passim*

Fed. R. Crim. P. 29 ..................................................................................... 8, 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                    :

   -v.-                                                     :         S1 15 Cr. 093 (VEC)

SHELDON SILVER,                             :

                    Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**THE GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS THE
SUPERSEDING INDICTMENT**

The United States of America respectfully submits this Memorandum of Law in

opposition to the defendant's Motion to Dismiss the Superseding Indictment ("Def. Mem.").

For the reasons set forth below, the defendant's motion is without merit and should be denied in

its entirety.

## PRELIMINARY STATEMENT

The Superseding Indictment returned by the grand jury in this case (like the original

indictment before it) charges the defendant, Sheldon Silver, with engaging in a long-running

scheme to illegally enrich himself by using his official position to solicit and accept millions of

dollars in bribes and kickbacks, and by exploiting his enormous power over New York State

legislation, policy, and funding to extort property from individuals and entities seeking his

official favor.   In his motion, Silver contends that this conduct – even accepting all of the

allegations in the Superseding Indictment as true – violated no federal law.   Silver argues that

because New York legislators generally are permitted to receive outside income, and because

lawyers are permitted to receive fees for referring cases to law firms under certain circumstances, there is "nothing wrong" with taking official action and otherwise using his official position to obtain lucrative clients and millions of dollars in resulting fees.    (Def. Mem. at 3).

That, of course, is not the law.    As much as Silver may wish otherwise, bribes, kickbacks, and extortion are just as illegal in New York as they are in every other state, whether or not they are practiced by a sitting legislator who also happens to be a lawyer, whether or not legislators are permitted to have outside employment, and whether or not the money is passed to Silver as cash in a suitcase or conveniently disguised as a lawyer's referral fee.    The Superseding Indictment alleges that Silver traded official favors in order to obtain lucrative legal business – which is no less a federal crime than a non-lawyer legislator who trades official favors in exchange for health care "consulting" business, *see United States* v. *Rosen*, 716 F.3d 691, 695 (2d Cir. 2013), or a mayor who trades official favors in exchange for a stake in a public relations company, *see United States* v. *Ganim*, 510 F.3d 134, 137 (2d Cir. 2007).    Indeed, Silver's argument that the conduct alleged in the Superseding Indictment involves nothing more than "longstanding features of New York state government that the U.S. Attorney finds distasteful" (Def. Mem. at 2) is not only directly contrary to controlling precedent, but would, in effect, require the Court to find that New York, at least for its lawyer-legislators, has legalized the kind of *quid pro quo* bribery that is at the "core" of federal anti-corruption statutes.    *See Skilling* v. *United States*, 561 U.S. 368, 407 (2010).    The Court should reject Silver's effort to immunize his conduct from the reach of federal law.

Silver's remaining efforts to escape the charges against him similarly fail.    First, the objects of Silver's alleged extortion – including the names and identifying information of

unrepresented parties with mesothelioma (the "Mesothelioma Leads") and accompanying legal claims that Silver obtained from a doctor ("Doctor-1"), and the recurring tax certiorari legal claims that Silver obtained for a real estate law firm (the "Real Estate Law Firm"), as well as the enormous legal fees resulting from the litigation of these claims – plainly were property interests cognizable under the Hobbs Act, as the property was transferable (and in fact was transferred) from one person to another, and also was extremely valuable in the hands of the defendant. *See*, *e.g.*, *Sekhar* v. *United States*, 133 S. Ct. 2720, 2725 (2013).   Second, while Silver claims that the Government has not provided him with adequate notice of the mailings and wires at issue in the honest services fraud counts, the Government in fact already has provided the defendant with precisely the detailed information he contends to be without.   Third, Silver's challenges to Count Seven, which charges him with violating 18 U.S.C. § 1957, should be rejected, as all courts to have considered the issue have squarely held that Section 1957 is not unconstitutionally vague.   Finally, the factual allegations in the Superseding Indictment that the defendant moves to strike, describing how Silver engaged in the transactions that violated Section 1957, are plainly proper and directly relevant to the conduct at issue in the Superseding Indictment and to his state of mind when engaging in that conduct.

For these reasons and those set forth below, the defendant's motion should be denied.

## BACKGROUND

### A.      Procedural Background

The defendant was charged by Complaint, dated January 21, 2015, with honest services fraud and extortion offenses.   (*See* Complaint, Docket No. 1).   On January 22, 2015, the defendant surrendered and was presented in this District.

On February 19, 2015, a grand jury sitting in this District returned a three-count Indictment (the "Indictment") charging the defendant with honest services mail fraud, honest services wire fraud, and extortion under color of official right.   On April 2, 2015, the defendant moved to dismiss the Indictment on various grounds.

On April 23, 2015, a grand jury sitting in this district returned the seven-count Superseding Indictment, which charges those aspects of the scheme involving payments to Silver from the Real Estate Law Firm (the "real estate scheme") separately from those aspects of the scheme involving Doctor-1 and payments made to Silver by Weitz & Luxenberg, P.C. ("Weitz & Luxenberg") related to asbestos legal claims (the "asbestos scheme").   The Superseding Indictment also adds a count charging Silver with engaging in monetary transactions involving crime proceeds.   Specifically, Counts One and Two of the Superseding Indictment charge the defendant with honest services mail and wire fraud, respectively, in connection with the asbestos scheme, in violation of Title 18, United States Code, Sections 1341, 1343, and 1346; Counts Three and Four charge the defendant with honest services mail and wire fraud, respectively, in connection with the real estate scheme, in violation of Title 18, United States Code, Sections 1341, 1343, and 1346; Counts Five and Six charge the defendant with extortion under color of official right in connection with the asbestos scheme and the real estate scheme, respectively, in violation of Title 18, United States Code, Section 1951; and Count Seven charges the defendant with engaging in monetary transactions involving crime proceeds in violation of Title 18, United States Code, Section 1957.

On April 24, 2015, the Court denied the defendant's motion to dismiss the Indictment as moot, in light of the filing of the Superseding Indictment.   On May 28, 2015, the defendant

4

filed the instant motion to dismiss.

### B.  The Superseding Indictment

In addition to setting forth the specific charges against Silver – including statutory language that tracks each of the statutes charged and provides notice of the time, place, and nature of each of the alleged crimes – the Superseding Indictment, as did the Indictment, provides substantial background and detail about the conduct that forms the basis for each of the charges.   The Superseding Indictment alleges that for more than 20 years, from in or about 1994 until in or about February 2015, the defendant served as Speaker of the New York State Assembly (the "Assembly"), having been elected as a member of the Assembly in or about 1977 to represent an Assembly District that comprises much of lower Manhattan.   (Superseding Indictment ¶ 1).   In those roles, Silver "exercised significant power," including over "legislation critical to the real estate industry," and through control of millions of dollars in State funds not subject to public disclosure.   (*Id.* ¶¶ 2-3, 16-17).   The Superseding Indictment further alleges that from at least in or about 2000 through in or about January 2015, the defendant used his power and influence to obtain nearly $4 million in corrupt payments through the Real Estate Law Firm and Weitz & Luxenberg.   (*Id.* ¶ 8).

With respect to Counts One, Two, and Five of the Superseding Indictment, relating to the defendant's receipt of millions of dollars in his share of the fees from lucrative asbestos cases, the Superseding Indictment alleges that beginning in or about late 2003 through at least in or about August 2014, Silver engaged in a corrupt scheme whereby he used his official position to obtain the Mesothelioma Leads, and the valuable legal claims connected thereto, from Doctor-1, resulting in millions of dollars paid to the defendant personally.   (*Id.* ¶¶ 8, 16-25).   In

exchange, the defendant secretly directed $500,000 in State funds, in two tranches, to Doctor-1's research and provided other official benefits to Doctor-1 and his family.   (*Id.* ¶ 23).   In furtherance of the scheme, the United States mail and private and commercial interstate carriers and interstate wires were used and caused to be used, including but not limited to mailings and wires between Weitz & Luxenberg and patients whose legal claims were obtained by the defendant from Doctor-1.   (*Id.* ¶ 25).

With respect to Counts Three, Four, and Six, relating to the defendant's receipt of a share of the fees for lucrative real estate tax certiorari business, the Superseding Indictment alleges that beginning at least in or about 2000, the defendant used the power and influence of his official position to secure for the Real Estate Law Firm recurring tax certiorari legal claims of two real estate developers ("Developer-1" and "Developer-2"), both of which had significant business before the State and owned properties located within the defendant's Assembly District.   (*Id.* ¶¶ 8, 10-15).   In exchange for hundreds of thousands of dollars in illegal payments through the Real Estate Law Firm, the defendant took numerous actions under the color of his official authority as the opportunities arose, including by using his official influence to obtain the continued tax certiorari business of Developer-1 and Developer-2, meeting with representatives of Developer-1 and Developer-2 to discuss matters of importance to their businesses, and supporting legislative proposals favorable to Developer-1 and Developer-2.   (*Id.* ¶ 13).   In furtherance of the scheme, the United States mail and private and commercial interstate carriers and interstate wires were used and caused to be used, including but not limited to mailings and wires between the Real Estate Law Firm, the defendant, Developer-1, and Developer-2.   (*Id.* ¶ 15).

With respect to Count Seven, engaging in financial transactions involving crime proceeds, the Superseding Indictment alleges that from in or about 2006 through January 2015, Silver used his relationship with an investor ("Investor-1"), who had access to private, high-yield investment opportunities, to distribute the proceeds Silver obtained from the offenses charged in Counts One through Six, which Silver commingled in a single bank account, across numerous high-yield investment vehicles not available to the general public, and did so through a series of transactions through financial institutions involving amounts greater than $10,000.   (*Id.* ¶¶ 28-32, 45).   The Superseding Indictment further alleges that Silver took steps to keep the full nature of these transactions from being disclosed, including by not informing Investor-1 about the sources and origin of the funds at issue, and transferring more than $340,000 of one of the investments into the name of a family member, "thereby avoiding future disclosure to the public of the full amount of his investment."   (*Id.* ¶¶ 31-32).

### C.    The Defendant's Motion To Dismiss

The defendant moves to dismiss the Superseding Indictment based on the following grounds, none of which has any merit: (1) failure to allege extortion of obtainable property under the Hobbs Act; (2) failure to allege honest services fraud, as that crime is defined after *Skilling* v. *United States*, 561 U.S. 368, 409 (2010); (3) lack of identification of specific mailings or wire transmissions; and (4) that Section 1957 is unconstitutionally vague.   Silver further argues that the allegations concerning the investment of his unlawful proceeds should be stricken as "irrelevant" and "prejudicial."   (Def. Mem. at 23-24).   As set forth more fully below, the Superseding Indictment is plainly legally sufficient, as it (a) alleges that the ultimate objects of the defendant's alleged extortion were obtainable property interests that are properly the subject

of Hobbs Act extortion charges; (b) alleges that the defendant engaged in a secret and corrupt

scheme to deprive the citizens of the State of his honest services, by doling out State benefits and

taking other official actions in exchange for bribes and kickbacks in the form of personal

payoffs, which he accomplished in part through material misstatements and omissions; and (c)

does not need to identify specific mailings or wire transmissions (which, in any event, have been

disclosed to the defendant with particularity through discovery).   Moreover, Section 1957 is not

unconstitutionally vague, as multiple Circuit Courts have explicitly held, because the statute sets

forth with precision the conduct it proscribes.   Finally, the allegations in the Superseding

Indictment concerning the defendant's commingling, investment, and concealment of his crime

proceeds are plainly relevant to the defendant's conduct and state of mind and accordingly

should not be stricken.

## **DISCUSSION**

### A.    **Applicable Law Concerning Motions To Dismiss Indictments**

The dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely

limited circumstances implicating fundamental rights."   *United States* v. *De La Pava*, 268 F.3d

157, 165 (2d Cir. 2001) (citation omitted); *United States* v. *Walsh*, 194 F.3d 37, 45 (2d Cir.

1999) (courts should not dismiss an indictment for lack of specificity absent a showing of

prejudice) (citation omitted).   The law is well-settled that "[a]n indictment returned by a legally

constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the

charge on the merits."   *Costello* v. *United States*, 350 U.S. 359, 363 (1956).   A defendant must

wait until after the close of the Government's case-in-chief at trial or after the jury's verdict

before contesting the sufficiency of the evidence.   *See* Fed. R. Crim. P. 29; *see also e.g.*, *United*

*States* v. *Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997).   On a pretrial motion to dismiss

pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, the allegations of the

indictment must be taken as true.   *See Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337,

343 n. 16 (1952); *United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

Rule 7(c) of the Federal Rules of Criminal Procedure, governing the types of information

that must be contained in an indictment, provides that an indictment "must be a plain, concise,

and definite written statement of the essential facts constituting the offense charged."   Fed. R.

Crim. P. 7(c).   In general, to satisfy the pleading requirements, "'an indictment need do little

more than to track the language of the statute charged and state the time and place (in

approximate terms) of the alleged crime.'"   *United States* v. *Stavroulakis*, 952 F.2d 686, 693

(2d Cir. 1992) (quoting *United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)).   "An

indictment is sufficient when it charges a crime with sufficient precision to inform the defendant

of the charges he must meet and with enough detail that he may plead double jeopardy in a future

prosecution based on the same set of events."   *United States* v. *Yannotti*, 541 F.3d 112, 127 (2d

Cir. 2008) (quoting *Stavroulakis*, 952 F.2d at 693) (quotation marks omitted).   When

determining whether or not a count sufficiently alleges a violation, the indictment should be read

"in its entirety."   *United States* v. *Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992).

**B.    The Superseding Indictment Properly Alleges Extortion Under Color of Official Right**

Silver argues that the Hobbs Act charges against him – Counts Five and Six of the

Superseding Indictment – should be dismissed for failure to allege extortion of "obtainable

property."   (Def. Mem. at 9-10).   The Superseding Indictment makes clear, however, that the

objects of the defendant's alleged extortion were obtainable property interests that properly are

the subject of a Hobbs Act extortion charge – namely, (a) the valuable Mesothelioma Leads and

legal claims connected thereto that the defendant obtained from Doctor-1 for Weitz &

Luxenberg, and the fees resulting therefrom, and (b) the valuable tax certiorari legal claims that

the defendant obtained for the Real Estate Law Firm, and the fees resulting therefrom, which

together generated close to $4 million for the defendant.   As set forth in more detail below, the

Mesothelioma Leads and connected legal claims obtained by the defendant from Doctor-1, and

the tax certiorari claims obtained by the defendant for the Real Estate Law Firm, and the fees

resulting from that extortionate conduct, plainly were property interests that were transferable

(and in fact were transferred) from one person to another, and also were extremely valuable in

the hands of the defendant.   As such, the allegations in the Superseding Indictment set forth a

scheme to obtain property, as required by *Scheidler* v. *National Organization for Women, Inc.*,

537 U.S. 393, 404 (2003), *Sekhar* v. *United States*, 133 S. Ct. 2720, 2725 (2013), and case law

establishing the types of property that may be the subject of charges under the Hobbs Act.

### 1.      Applicable Law

The Hobbs Act provides criminal penalties for anyone who "in any way or degree

obstructs, delays, or affects commerce . . . by . . . extortion or attempts or conspires to do so."   18

U.S.C. § 1951(a).   The Act defines extortion, as is applicable here, as "the obtaining of property

from another, with his consent, . . . under color of official right."   *Id.* § 1951(b)(2); *see also Evans*

v. *United States*, 504 U.S. 255, 266, 268 (1992) (inducement not an element of extortion under

color of official right).   To establish extortion under color of official right, the Government is

required to prove only that a "'public official has obtained a payment to which he was not entitled,

10

knowing that the payment was made in return for official acts.'"   *United States* v. *Ganim*, 510 F.3d 134, 145 (2d Cir. 2007) (quoting *Evans*, 504 U.S. at 268).   The Government is not required to prove that any specific official acts are carried out in return for the payment.   *See id.*   Indeed, no official acts need be taken at all; rather, "it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence – *i.e.*, on behalf of the payor – as specific opportunities arise."   *Id.* (quotation marks and citation omitted).

Under the Hobbs Act, "[t]he public officer's misuse of his office supplies the necessary element of coercion, and the wrongful use of official power need not be accompanied by actual or threatened force, violence, or fear."   *United States* v. *Margiotta*, 688 F.2d 108, 130-31 (2d Cir. 1982), *overruled on other grounds by McNally* v. *United States*, 483 U.S. 350 (1987), *as recognized in United States* v. *Bahel*, 662 F.3d 610, 633 (2d Cir. 2011); *see also United States* v. *McDonough*, 56 F.3d 381, 388 (2d Cir. 1995) (citing *Margiotta* as valid Circuit precedent on extortion under color of official right post-*McNally*); *Margiotta*, 688 F.2d at 132 ("The use of public office, with the authority to grant or withhold benefits, takes the place of pressure or threats.").

In *Scheidler* v. *National Organization for Women, Inc.*, 537 U.S. 393 (2003), the Supreme Court held that the "obtaining" property element of the Hobbs Act requires proof that an object of the charged crime is "not only the deprivation but also the acquisition of property."   *Id.* at 404. The "property" that the defendant must seek to obtain, however, is not limited to tangible property or money; *Scheidler* made clear that under the Hobbs Act, obtainable property simply means "something of value" that can be "exercise[d], transfer[red], or s[old]."   *Id.* at 405.   In so holding, the Supreme Court declined to disturb prior precedent holding that "property" covered

11

by the Hobbs Act "is not limited to physical or tangible property or things . . . but includes, in a broad sense, any valuable right considered as a source or element of wealth." *United States* v. *Tropiano*, 418 F.2d 1069, 1075 (2d Cir. 1969) (citations omitted); *see Scheidler*, 537 U.S. at 402 & n.6 (noting that "the dissent is mistaken to suggest that our decision reaches, much less rejects, lower court decisions such as *United States* v. *Tropiano*, 418 F.2d 1069, 1076 (2d Cir. 1969), in which the Second Circuit concluded that the intangible right to solicit refuse collection accounts 'constituted property within the Hobbs Act definition'").

In *Sekhar* v. *United States*, 133 S. Ct. 2720, 2724 (2013), the Supreme Court applied *Scheidler* to a Hobbs Act conviction involving a scheme to coerce the General Counsel of the State Comptroller's Office into making a non-binding internal recommendation to approve the State's investment in a particular investment fund.   While the jury in *Sekhar* was presented with several property interests that the Government alleged were the objects of the extortion scheme of the defendant in that case, the jury found that the defendant attempted to extort only a single type of alleged property: "the General Counsel's recommendation to approve the Commitment [to invest in the defendant's fund]." *Id.* (quotation marks omitted).   The Supreme Court granted certiorari to consider whether the General Counsel's internal recommendation, standing alone, could be considered obtainable property for a Hobbs Act extortion charge, and held that it could not. *Id.*   The Court reached this conclusion based on a straightforward application of *Scheidler*, noting that "*Scheidler* rested its decision, as we do, on the term 'obtaining.'   The principle announced there – that a defendant must pursue something of value from the victim that can be exercised, transferred, or sold – applies with equal force here." *Id.* at 2726 (citation omitted).   Because the alleged "property" at issue, which the jury had identified as the General

Counsel's right to make a non-binding internal recommendation, was not "*transferable* – that is, capable of passing from one person to another," *id*. at 2725, the Court held that the Government had not established Hobbs Act extortion in that case.   *See id.* at 2726.

In reaffirming *Scheidler*'s holding that the property alleged to be the object of a Hobbs Act extortion scheme must be obtainable by a defendant, the Supreme Court in *Sekhar* expressly declined to upend the large body of well-established law concerning the types of obtainable property that could be the object of a Hobbs Act extortion scheme, or the manner in which the property may be obtained by a defendant.   *See id.* at 2725 n.2 (noting that its holding did not purport to restrict the Government's ability to "charge a person who obtains money by threatening a third party, who obtains funds belonging to a corporate or governmental entity by threatening the entity's agent, or who obtains 'goodwill and customer revenues' by threatening a market competitor" (citations omitted)).   Cases decided after *Sekhar* have confirmed this reading of the decision, and, in particular, have confirmed that the defendant need not obtain the property interest directly from the victim of the extortion.   *See*, *e.g.*, *Re* v. *United States*, 736 F.3d 1121, 1123 (7th Cir. 2013) (holding that appellant "is not right to attribute to either *Scheidler* or *Sekhar* a holding that 'obtaining' property requires getting it directly from the person threatened.   Section 1951(b)(2) speaks of obtaining property 'from another'; it does not say that the 'another' must be the threat's recipient." (internal citation omitted)); *United States* v. *Larson*, 07 Cr. 304, 2013 WL 5573046, at *2 (W.D.N.Y. Oct. 9, 2013) ("The Supreme Court's holding in *Sekhar* is not new.").

13

### 2.     The Superseding Indictment Properly Alleges Extortion of Obtainable Property

The allegations in the Superseding Indictment, like those in the original Indictment, plainly satisfy the Hobbs Act and are readily distinguishable from those deemed to be insufficient in *Sekhar*.   The Government does not allege that the property the defendant sought to obtain as a result of the scheme was merely "an employee's yet-to-be-issued recommendation."   *Sekhar*, 133 S. Ct. at 2727.   Rather, the object of the extortion of Doctor-1 was to obtain valuable Mesothelioma Leads, valuable legal claims connected thereto, and fees derived therefrom (Superseding Indictment ¶ 41), and the object of the extortion of Developer-1 and Developer-2 was the defendant's receipt of recurring tax certiorari legal claims of the developers, and fees derived therefrom (*id.* ¶ 43).

With respect to the extortion of Doctor-1, the Mesothelioma Leads and connected legal claims of Doctor-1's patients that the defendant obtained through his extortion of Doctor-1 were self-evidently transferable and obtainable (and in fact obtained) by the defendant.   As alleged in the Superseding Indictment, and as the Government expects to prove at trial in further detail, law firms specializing in asbestos cases, including Weitz & Luxenberg, spend substantial resources attempting to obtain leads to unrepresented potential clients suffering from mesothelioma because mesothelioma cases are extremely valuable to firms.   (*See* Superseding Indictment ¶ 19).   Law firms that handle asbestos cases pay large sums of money to generate such leads even though not every lead will result in the firm obtaining a new client with valuable legal claims. In fact, there are companies that are in the business of generating leads for law firms.[1]

---

[1]     *See, e.g.*, "What Can Lead Generation Do For Your Law Firm," *available at* http://www.lawyermarketing.com/articles/what-can-lead-generation-do-for-your-law-firm.

Moreover, the legal claims of a personal injury victim are a well-established property interest.   Personal injury victims with potentially valuable claims allow law firms to seek to convert those claims into a cash payout based on an agreement through which the law firm will receive a share of any recovery received by the client – and as such, the law firm has a stake in the legal claims it pursues.   In fact, legal claims represent a contingency law firm's principal source of revenue – and if those claims are sent or transferred to different firms, that revenue goes with them.   There are also established markets for legal claims, through which, for example, a victim can sell a legal claim to a third party in return for an up-front payment. Likewise, a law firm pursuing a client's legal claim can borrow funds secured by such claims; one of the businesses Silver is accused of investing crime proceeds in was precisely such a company.[2]

Here, the Government expects that the evidence will establish, among other things, that many of Doctor-1's patients had highly valuable legal claims by virtue of being victims of asbestos exposure and having contracted mesothelioma or another asbestos-related disease; that Doctor-1 obtained the Mesothelioma Leads by speaking with and getting information from his patients, including information about their potential legal claims; that Doctor-1 transferred the Mesothelioma Leads and the legal claims connected thereto to Silver as a result of Silver's use of his official influence; that Silver then transferred the leads to Weitz & Luxenberg (in exchange for a stake in any payouts resulting from the leads); and Weitz & Luxenberg then used the

---

[2]      Indeed, there are hedge funds whose entire business model is based on investing in and purchasing legal claims.   *See, e.g.*, "Hedge Fund Betting on Lawsuits is Spreading," Bloomberg Business, Mar. 18, 2015, *available at* http://www.bloomberg.com/news/articles/2015-03-18/hedge-fund-betting-on-lawsuits-is-spreading.

Mesothelioma Leads to obtain clients and legal claims with the capacity to generate millions of dollars in fees.   The evidence will further show that when the defendant for a time ceased providing official benefits to Doctor-1, Doctor-1 began providing many of the Mesothelioma Leads to a different law firm that began supporting his research – further establishing the transferability of the Mesothelioma Leads and the legal claims connected thereto.   For all of these reasons, the Mesothelioma Leads and the legal claims connected thereto plainly constitute transferable property interests under *Scheidler* and *Sekhar*.

For these same reasons, the property that was the object of Silver's extortion in the real estate scheme – the tax certiorari legal claims of Developer-1 and Developer-2 – was similarly transferable and highly valuable.   Like Weitz & Luxenberg, the Real Estate Law Firm was paid on contingency – and its revenue was dependent on obtaining legal claims that it could pursue and, if successful, share in resulting payouts.   The Government expects the evidence at trial to show, among other things, that (a) Developer-1 and Developer-2 had potentially valuable and recurring legal claims based on the annual tax assessments of their properties; (b) Developer-1 and Developer-2 were using firms other than the Real Estate Law Firm to pursue their tax certiorari legal claims prior to Silver's extortion; (c) as a result of Silver's extortion, Developer-1 and Developer-2 transferred a portion of their tax certiorari legal claims from those other firms to the Real Estate Law Firm; and (d) the legal claims of Developer-1 and Developer-2 that were transferred to the Real Estate Law Firm proved to be highly valuable for both Silver and the Real Estate Law Firm.   Thus, the legal claims obtained by Silver for the Real Estate Law Firm constitute property interests that were transferable, and were in fact transferred, and accordingly can form the basis for Hobbs Act extortion under *Scheidler* and *Sekhar*.

16

Moreover, while the *exact* economic value of the leads and claims obtained as a result of the scheme may not have been known at the time the defendant obtained them for Weitz & Luxenberg and the Real Estate Law Firm, the leads and claims obtained as a result of the defendant's extortion in this case were indisputably "valuable in the hands of the defendant." *United States* v. *Cain*, 671 F.3d 271, 282 (2d Cir. 2012).   Indeed, as noted above, law firms and businesses of all kinds buy and sell leads without knowing whether a particular lead can be converted to sale, and the precise ultimate value of a legal claim can never be known with certainty until the litigation is resolved through settlement or adjudication.   But the inderminate ultimate monetary value of these interests in no way inhibits marketplace participants from transferring interests in such property.

And in this case, it is clear that the Mesothelioma Leads and the legal claims of Doctor-1's patients that were obtained by Silver, as well as the tax certiorari legal claims of Developer-1 and Developer-2 obtained by Silver, had real financial value – with Weitz & Luxenberg, the Real Estate Law Firm, and Silver profiting handsomely as anticipated.   In particular, the Government expects that the evidence will show that cases obtained by Weitz & Luxenberg as a result of the defendant's extortion of Doctor-1 thus far have generated more than $27 million, resulting in payment of more than $9 million in fees to Weitz & Luxenberg and more than $3 million in fees to the defendant; and the tax certiorari business of Developer-1 and Developer-2 that the defendant obtained for the Real Estate Law firm has generated approximately $10 million in awards or tax reductions, resulting in payment of approximately $2.5 million in fees to the Real Estate Law Firm and close to $700,000 in fees to the defendant. *See, e.g.*, *Tropiano*, 418 F.2d at 1076 (proof that intangible right to solicit business constituted

"property" under Hobbs Act included evidence that the extortion victim's "agreement not to solicit . . . customers was valued at an additional $15,000" when accounts were later sold). Certainly, the close to $4 million in fees directly tied to the economic value of the leads and associated legal claims that the defendant obtained as a result of the extortion alleged in the Superseding Indictment reflects both that the leads and claims had economic value, and that the defendant's motivation in engaging in the conduct was to obtain property within the meaning of the Hobbs Act.  *See United States* v. *Gotti*, 459 F.3d 296, 324-25 (2d Cir. 2006) ("[a] motive ultimately to profit by cashing out the value of the property right will generally serve as powerful evidence that the defendant's goal was to obtain the [property] right for himself, rather than merely to deprive the victim of that right").

The defendant argues that the Mesothelioma Leads sent by Doctor-1 to the defendant and the valuable legal claims connected thereto could not be "obtain[ed]" by the defendant because they were "nothing more than [Doctor-1's] recommendations that his patients take their business to Weitz & Luxenberg."   (Def. Mem. at 11).   That, however, is not an accurate characterization of the allegations in the Superseding Indictment, nor does it encompass what the Government expects to prove at trial.   As set forth above, the Superseding Indictment alleges that the defendant extorted more than mere internal "recommendations" from Doctor-1.   It alleges that the defendant obtained actual Mesothelioma Leads and the legal claims connected thereto directly from Doctor-1 that could have been (and in fact were, when Silver failed to reward Doctor-1 sufficiently) transferred to others, and that the defendant ultimately received millions of dollars as a result of the scheme.   (Superseding Indictment ¶ 8).   Indeed, the fact that the defendant was paid millions of dollars in fees by Weitz & Luxenberg for the

18

Mesothelioma Leads and the clients with valuable legal claims that Doctor-1 sent to the defendant as a result of the extortion shows that the Mesothelioma Leads, the clients' claims, and the resulting payments were valuable property "capable of passing from one person to another." *Sekhar*, 133 S. Ct. at 2725.[3]

Silver also argues that the legal claims of Doctor-1's patients cannot be the object of his extortion because "the claims belonged to Doctor-1's *patients*, not Doctor-1."   (Def. Mem. at 12).   That is inaccurate both factually and legally.   As an initial matter, the Government expects to establish that the Mesothelioma Leads were in fact possessed by, and valuable to, Doctor-1 – such that when Silver used his official influence to obtain the Mesothelioma Leads from Doctor-1, Doctor-1 was deprived of being able to use and capitalize on those leads in another manner, including by providing them to a different law firm willing to provide money to support Doctor-1's research, which Doctor-1 did when the State funding from Silver ceased.

Moreover, the fact that an ultimate object of a defendant's extortion is owned by a third party is irrelevant as a legal matter.   First, the Supreme Court in *Sekhar* explicitly stated that its holding did not purport to restrict the Government's ability to prosecute for Hobbs Act extortion "a person who obtains money by threatening a third party."   133 S. Ct. at 2725 n. 2 (quotation

---

[3]     As the Government properly alleges that property was the object of the defendant's extortion, the defendant's argument that the Government alleges only coercion, and not extortion (Def. Mem. at 11), has no merit.   As the Supreme Court stated in *Scheidler*, "extortion necessarily involves the use of coercive conduct to obtain property."   537 U.S. at 407-08. Thus, evidence that Doctor-1, Developer-1, and Developer-2 were "coerced" by the defendant's misuse of his official position represents affirmative proof of the existence of the charged scheme.   *See Margiotta*, 688 F.2d at 130-31 (under the Hobbs Act, "[t]he public officer's misuse of his office supplies the necessary element of coercion").   That, along with evidence that the object of the defendant's "misuse of his office," *id.*, was "to obtain property," *Scheidler*, 537 U.S. at 407-08, and an effect on interstate commerce, establishes Hobbs Act extortion.

marks omitted).    Second, governing precedent does not require that the extorted party

personally own the property that is extorted.    *See*, *e.g.*, *Evans*, 504 U.S. at 268 (requiring proof

only that a "public official has obtained a payment to which he was not entitled, knowing that the

payment was made in return for official acts" (emphasis omitted)).    Third, the plain language of

the Hobbs Act does not require the extortionate conduct to be addressed to the legal owner of the

property.    *See, e.g.*, *Re* v. *United States*, 736 F.3d 1121, 1123 (7th Cir. 2013) ("Section

1951(b)(2) speaks of obtaining property 'from another'; it does not say that the 'another' must be

the threat's recipient.").

      Consistent with these principles, numerous decisions, including decisions by the Second,

Seventh, and First Circuits, recognize that the extortion "victim" does not have to own personally

the property that is extorted, and that extortion payments can pass through (or even remain with)

third parties.    *See United States* v. *Guang*, 511 F.3d 110 (2d Cir. 2007); *Re* v. *United States*, 736

F.3d 1121; *United States* v. *McDonough*, 727 F.3d 143 (1st Cir. 2013).    In *Guang*, 511 F.3d 110

(2d Cir. 2007), the defendants were charged with extortion designed to generate business for a

gift shop owned by one of the defendants, which catered to Chinese tourists.    *Id.* at 114.    The

victims of the extortion scheme included, *inter alia*, "tour guides who were coerced by force and

threats of force to steer business to [the defendant's] shop."    *Id.*    As with the client legal claims

that were among the property extorted from Doctor-1, the extorted tour guides were not the legal

owners of the property that the defendant in *Guang* sought to extort.    Rather, the property was

owned by the extorted tour guides' customers, whose money would be spent at the defendant's

shop after the customers were steered there as a result of the extortion, thereby enriching the

defendant.   *Id.* at 115-17.   The Second Circuit affirmed denial of a new trial over various challenges, characterizing the evidence of extortion as "overwhelming."   *Id.* at 120.[4]

In *Re*, the Seventh Circuit considered whether a defendant who extorted a rival warehouse owner to obtain a tenant of the extortion victim, and the resulting rental payments, for his own warehouse could be convicted of Hobbs Act extortion after *Scheidler* and *Sekhar*.   It had little difficulty answering the question in the affirmative.   As the Court held, the defendant "is not right to attribute to either *Scheidler* or *Sekhar* a holding that 'obtaining' property requires getting it directly from the person threatened."   *Re,* 736 F.3d at 1123 (internal citation omitted). In that case, because "[a] jury could find that [the defendant]'s goal was to obtain [the current tenant of the extortion victim] as a tenant," and "[t]enancy yields rental payments, a form of property," the defendant's conviction was unaffected by *Scheidler* or *Sekhar*.   *Id.*

In *McDonough*, which was decided months after *Sekhar*, the First Circuit upheld extortion and honest services fraud convictions against the Speaker of the Massachusetts House of Representatives (an individual named DiMasi), arising out of a scheme in which DiMasi extorted lobbyists for a company seeking state government business to obtain property not belonging to the

---

[4]        Indeed, a contrary finding would mean that classic organized crime extortion schemes, prosecuted routinely around the country, where victim businesses (*e.g.*, meat or produce suppliers) are directed to send their business or customers to other victim businesses (*e.g.*, restaurants) that in turn pay organized crime a cut of their profits would no longer be prosecutable as Hobbs Act extortion.   *See, e.g.*, *Chang* v. *United States*, 305 F. Supp. 2d 198, 201 (E.D.N.Y. 2004) (indictment sufficiently alleged Hobbs Act scheme to obtain property where "[t]he indictment specifically charged petitioner with engaging in extortive acts in order to require certain business owners to purchase liquor from petitioner and to refer customers to a car service he controlled.   Such purchases and referrals were the mechanisms by which he sought to obtain property."); *cf. United States* v. *Lee*, 25 Fed. App'x 20, 22 (2d Cir. 2001) (affirming denial of acceptance of responsibility credit for defendant in *Chang* where the defendant "denied responsibility for a key element of the crime – namely, that he was attempting to gain business through his threats").   That is not and cannot be the law, and no case post-*Sekhar* has so held.

lobbyists personally, but instead belonging to the company.   727 F.3d at 147.   Moreover, DiMasi received payments not directly from the company or the lobbyists, but instead, indirectly in the form of referral fees paid through DiMasi's law partner, who shared a portion of those legal fees with DiMasi even though DiMasi performed no work on behalf of the company.   *Id.* at 148-49.   The law partner, like Weitz & Luxenberg in the instant case, was not aware of the scheme, and thus was not criminally charged, *see id.* at 147-49.   The First Circuit had little trouble concluding that "[t]hese actions fit comfortably into what the Supreme Court has described as a 'classic kickback scheme,'" *id.* at 153 (quoting *Skilling* v. *United States*, 561 U.S. 368, 410 (2010)), and constituted a scheme to commit extortion under color of official right under the Hobbs Act, *id.* at 155-56.   *See also Margiotta*, 688 F.2d at 130-32 (Hobbs Act extortion under color of official right established where extorted funds originated with governmental body whose leaders were unaware of the scheme, passed through corporation controlled by extorted individuals, and were routed through to yet other third parties as a result of the scheme).

Thus, under *Guang*, *Re*, and *McDonough*, and consistent with the language of the Hobbs Act, Silver is properly charged with extorting Doctor-1 in order to obtain property of a third party – Doctor-1's patients.   Just as the jury in *Re* could properly "find that [the defendant]'s goal was to obtain [the current tenant of the extortion victim] as a tenant," and "[t]enancy yields rental payments, a form of property," 736 F.3d at 1123, here the jury can properly find that one of Silver's goals was to obtain the legal claims of Doctor-1's patients, which would yield payments to him and to Weitz & Luxenberg when the claims were pursued.

Finally, Silver's argument that the legal claims he obtained through Doctor-1 and from Developer-1 and Developer-2 cannot constitute extortion because he allegedly did not

22

"deprive[]" them of the funds that he received (Def. Mem. at 12-14) finds no basis in the law and should be rejected by the Court.   Economic harm or loss are not elements of Hobbs Act extortion under color of official right, and nothing in the language of the Hobbs Act itself or the governing legal standards supports such a conclusion.   To the contrary, a Hobbs Act extortion can consist of a "classic kickback scheme" in which both the public official and the individual being extorted hope to benefit from a corrupt financial relationship.   *McDonough*, 727 F.3d at 153-56.   Here, the Government properly alleges that the defendant acquired valuable and transferable legal claims through the use of his official position, and that the defendant received a portion of that property in the form of fees, thus squarely meeting the requirements set forth in *Sekhar*, *Evans*, and other governing cases.   Moreover, even assuming that proof of some sort of deprivation of property is required, the Government expects its evidence to show that absent the defendant's coercive use of his official position, the developers would not have retained the Real Estate Law Firm and thus would not have paid any fees to the Real Estate Law Firm or to the defendant via the Real Estate Law Firm.   Thus, the developers were in fact deprived of their property.   They could have chosen to pursue their tax certiorari claims themselves, or to have another firm pursue them.   Just as it was immaterial in *Guang* that, absent the extortion, the tourists would have spent their money at another gift shop, *Guang*, 511 F.3d at 114, it is immaterial whether the developers might have paid the same amount in fees to another firm for the same work.   Likewise, Doctor-1 was deprived of the valuable Mesothelioma Leads after he provided them to Silver, and Doctor-1's patients were deprived of property when Silver obtained their legal claims through his extortion of Doctor-1.   Absent the extortion, the patients may

have chosen to pursue their legal claims in another way – that did not result in 33 percent of their recovery being paid to Weitz & Luxenberg and Silver.

For all of these reasons, Counts Five and Six of the Superseding Indictment properly allege that Silver committed extortion under the Hobbs Act, and accordingly should not be dismissed.

### C.   The Honest Services Fraud Counts Are Properly Pled

#### 1.   Applicable Law

For purposes of the mail and wire fraud statutes, 18 U.S.C. § 1346 provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."   In 1988, Congress enacted Section 1346 to overturn *McNally* v. *United States*, 483 U.S. 350, 360 (1987), which had held that only tangible property rights, not intangible rights, were protected from schemes to defraud.   In *Skilling* v. *United States*, 561 U.S. 358, 409 (2010), the Supreme Court interpreted Section 1346 to criminalize "*only* the bribe-and-kickback core of the pre-*McNally* case law."   What distinguishes bribes and kickbacks from non-criminal activity, such as mere undisclosed conflicts of interest, is a *quid pro quo*.   Put differently, to establish honest services fraud under either a bribery or kickback theory, the Government must "prove that the defendant had a specific intent to give [or receive] something of value *in exchange* for an official act," *United States* v. *Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) (quotation marks omitted), which "includes any act taken 'under color of official authority,'" *id.* (quoting *United States* v. *Ganim*, 510 F.3d 134, 142 (2d Cir. 2007)).

### 2.    The Superseding Indictment Sufficiently Alleges Honest Services Fraud

The Superseding Indictment more than adequately alleges – and the Government expects to prove at trial – that the defendant engaged in a secret and corrupt scheme to deprive the citizens of the State of New York of his honest services, by doling out State benefits and taking other official acts in exchange for bribes and kickbacks in the form of personal payoffs, which he accomplished in part through material misstatements and omissions.    In his effort to avoid the plain implications of his actions, the defendant attempts to portray these bribes and kickbacks as nothing more than "the sort of undisclosed conflicts of interest that *Skilling* held insufficient." (Def. Mem. at 15).    But the allegations in the Superseding Indictment are not so limited: rather, they make it clear that Silver took official action *in exchange for* the benefits he received.    (*See* Superseding Indictment ¶¶ 8, 13, 23).    Thus, the honest services fraud counts in the Superseding Indictment fall squarely within the mandates of *Skilling* and accordingly should not be dismissed.

### a.    The Asbestos Scheme

With respect to the millions of dollars in fees the defendant received as a result of his relationship with Doctor-1, the defendant contends that, because he received the payments from a law firm with which he was associated (Weitz & Luxenberg) pursuant to a referral fee arrangement, his failure to disclose those payments, at most, constitutes self-dealing or a conflict of interest.    (Def. Mem. at 16-17).    But the distinguishing feature between self-dealing or conflicts of interest, on the one hand, and bribery or kickbacks on the other, is the *quid pro quo* – that is, self-dealing or conflicts of interest become bribes and kickbacks when a public official receives something of value in exchange for the exercise of his official influence.    *See Rosen*,

716 F.3d at 700.    As alleged, the defendant obtained the Mesothelioma Leads and valuable legal claims connected thereto in exchange for the use of his official position, in particular, his direction of State funds to Doctor-1's research and other official acts that benefited Doctor-1 and his family.    (Superseding Indictment ¶ 23).    Accordingly, the Superseding Indictment properly alleges the requisite *quid pro quo*, and should not be dismissed.    *See* Fed. R. Crim. P. 7(c); *United States* v. *Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).

It is of course true that, in the course of receiving bribes and kickbacks, the defendant *also* engaged in self-dealing and possessed concealed conflicts of interest, but that fact simply serves as evidence of and underscores his consciousness of his own guilt – it does not somehow negate the criminal nature of those bribes and kickbacks.    *See, e.g.*, *Rosen*, 716 F.3d at 703 (noting that bribor's "fail[ure] fully to disclose the payments to [the public official] on the required disclosure forms" constituted circumstantial evidence of guilt); *United States* v. *Bruno*, 661 F.3d 733, 745 (2d Cir. 2011) (public official's "failure to disclose the transaction" in question constituted circumstantial evidence of a *quid pro quo*).    Indeed, as the Third Circuit has explained, "while the evidence of nondisclosure by itself may not constitute honest services fraud based on a conflict-of-interest theory" after *Skilling*, "where there is also evidence of bribery or kickbacks, . . . then the [undisclosed conflict] evidence may be relevant to proof of a scheme to defraud under a bribery-and-kickback theory of honest services fraud."    *United States* v. *Ciavarella*, 716 F.3d 705, 729 (3d Cir. 2013).

Contrary to the defendant's contention (Def. Mem. at 16), the fact that the bribes and kickbacks were funneled through Weitz & Luxenberg as part of a fee arrangement does not alter this conclusion.    *See United States* v. *Biaggi*, 909 F.2d 662, 683 (2d Cir. 1990) (affirming

extortion and bribery convictions and rejecting argument that payments were lawful because they were made pursuant to formalized, "of counsel," relationship with law firm).    Indeed, the defendant's enlistment of Weitz & Luxenberg in his scheme fits the "classic" pattern of "kickback scheme[s]" recognized by the Supreme Court in *Skilling*: that is, where a state official, in exchange for awarding state funds to a "middleman," "arrange[s] for that [middleman] to share the [funds] with entities in which the official has an interest."    *Skilling*, 561 U.S. at 410; *see also United States* v. *DeMizio*, 741 F.3d 373, 382-83 (2d Cir. 2014) (citing cases); *McDonough*, 727 F.3d at 153 (scheme described *supra*, involving corrupt payments via law firm that was not a knowing participant in the scheme to Speaker of the Massachusetts House of Representatives, is "classic kickback scheme").    That "classic kickback scheme" is precisely what the Superseding Indictment alleges, and what the evidence at trial will prove beyond a reasonable doubt.

### b.    The Real Estate Scheme

Incorporating many of the same arguments, the defendant contends that the real estate-related allegations also do not constitute honest services fraud.    (Def. Mem. at 17-18). Specifically, the defendant contends that his failure to comply with attorney ethics rules amounts only to "a mere conflict of interest."    (Def. Mem. at 18).    But the fact that the defendant violated the relevant ethics rules while carrying out the real estate referral scheme does not somehow render lawful the bribes and kickbacks paid to the defendant as part of the scheme. Quite the contrary, those ethics violations serve as further evidence of the defendant's consciousness of his own guilt.    *See, e.g.*, *United States* v. *Middlemiss*, 217 F.3d 112, 119 (2d Cir. 2000) (The defendants "contend that the ethical violations they committed by not disclosing

27

their interest . . . do not rise to the level of criminal culpability[,] [but] the jury rationally could

infer criminal intent from the nondisclosure.").

The only additional argument put forward by the defendant is that the Government fails

to allege that the legal services provided to the Developers "were unsatisfactory" or that the

Developers "paid for services they would not otherwise have obtained."   (Def. Mem. at 17).

The law, however, does not require the Government to show that a bribe or kickback resulted in

subpar services, or services that were more expensive than they should have been.   To the

contrary, classic kickback schemes often result in business being steered to one vendor over

another, regardless of any proof that the beneficiary of the kickback scheme provided lesser

service than the vendor who lost the business.   *See, e.g.*, *United States* v. *Hausmann*, 345 F.3d

952, 957 (7th Cir. 2003) (rejecting defendant's argument that "no harm resulted to [the

defendant's] clients, who were deprived of nothing to which they were entitled," and explaining

that "[i]t is of no consequence that . . . [the relevant] fees . . . were competitive, or that the clients

received the same net benefit as they would have absent the kickback scheme"); *Ranke* v. *United

States*, 873 F.2d 1033, 1040 (7th Cir. 1989).   Thus, the defendant's suggestion that the work

performed by the Real Estate Law Firm was satisfactory, and that one should infer therefore that

the service providers were chosen without regard to monies paid to Silver or official actions

taken, is nothing more than a factual argument (and a weak one at that) that does not provide a

valid basis to challenge the Superseding Indictment at this stage of the proceedings.   *See

DeMizio*, 741 F.3d at 386 ("At bottom, the jury was presented with two factual theories:   [the

defendant's] argument that the payments . . . were for legitimate work and the government's

argument that the payments were, instead, kickbacks made to improperly obtain Morgan

28

Stanley's business;" "[t]he fact that [the jury] returned a guilty verdict reflects that it agreed with the government beyond a reasonable doubt that the payments were kickbacks" (quotation marks omitted)).

It bears noting, moreover, that even if the defendant could establish at trial that the kickbacks he received arose out of legal fees paid for legitimate services actually rendered, that still would not support dismissal of this charge.    That is because "[a] valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability."    *Biaggi*, 909 F.2d at 683; *see also United States* v. *Bryant*, 655 F.3d 232, 242 (3d Cir. 2011) (affirming honest services fraud and bribery convictions because there was sufficient evidence of a *quid pro quo*, and rejecting the defendant's argument that his actions were not criminal because they had a valid purpose, holding "[t]hat [the defendant's] actions may also have benefited his constituents is irrelevant").[5]

For all of these reasons, the honest services fraud counts are alleged sufficiently and should not be dismissed.

### 3.    The Superseding Indictment Sufficiently Alleges the Use of Mail and Wire Transmissions

The defendant further argues that the honest services mail and wire fraud counts should be dismissed for failure to allege specific mailings and wire transmissions, respectively.    (Def.

---

[5]    *See also, e.g.*, *United States* v. *Shyres*, 898 F.2d 647, 653 (8th Cir. 1990) (affirming pre-*Skilling* honest-services-fraud conviction on kickback theory, explaining that "even if *all* the invoices represented services actually performed, the jury could have found on the evidence that [the defendant] deprived Anheuser-Busch of the right to pay for services alone, not for services plus kickbacks"); *Ranke* v. *United States*, 873 F.2d 1033, 1040 (7th Cir. 1989) (affirming pre-*Skilling* honest services fraud conviction on kickback theory, explaining that "regardless of whether Century's price appeared to be reasonable and competitive, we cannot assume that Building Systems bargained to also pay money [through a kickback] to [the defendant]").

Mem. at 18-21).    As set forth above, however, the Second Circuit repeatedly has held that to satisfy the notice requirements and provisions of Rule 7(c) of the Federal Rules of Criminal Procedure, "an indictment need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, . . . state the time and place in approximate terms."    *United States* v. *Flaharty*, 295 F.3d 182, 198 (2d Cir. 2002) (quotation marks and citation omitted) (holding that the indictment at issue sufficiently charged an offense because it closely tracked the relevant statutory language).[6]

The defendant does not dispute, as he cannot, that the Superseding Indictment tracks the statutory language and apprises him of the general nature, including time and place in approximate terms, of the charged offenses.    (*See* Superseding Indictment ¶¶ 33-39).    Indeed, the Superseding Indictment, and the prior charging instruments filed in this case, set forth in great detail the nature and circumstances of the offenses charged.    Rather, the defendant argues that the Superseding Indictment must be dismissed because it fails to provide additional information, specifically, the identity of each "letter, package, telephone call, postcard, e-mail, or tweet" that the Government alleges is at issue.    (Def. Mem. at 19).

It is well settled, however, that lack of specificity regarding the mailings or wire

---

[6]     *See also United States* v. *Frias*, 521 F.3d 229, 235 (2d Cir. 2008) (quoting *Flaharty*); *United States* v. *Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (noting that "[i]t is well settled that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense" and further reiterating that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime") (quotation marks and citations omitted); *United States* v. *Citron*, 783 F.2d 307, 314 (2d Cir. 1986) ("[w]here . . . an indictment tracks the statutory language and specifies the nature of the criminal activity . . . it is sufficiently specific to withstand a motion to dismiss") (quotation marks and citation omitted).

transactions in a mail or wire fraud indictment does not warrant dismissal of the indictment.

*See United States* v. *Zandstra*, No. 00 Cr. 209 (RWS), 2000 WL 1368050, at *4 (S.D.N.Y. Sept.

20, 2000) (mail fraud indictment does not need to identify exact mailing dates); *United States* v.

*Reale*, No. S4 96 Cr. 1069 (DAB), 1997 WL 580778, at *13-*14 (S.D.N.Y. Sept. 17, 1997)

(dismissal of indictment for mail and wire fraud inappropriate even though indictment did not

identify specific mailings or wire transfers);[7] *United States* v. *Upton*, 856 F. Supp. 727, 739

(E.D.N.Y. 1994) (wire fraud indictment does not need to list particular electronic transactions or

telephone calls to be sufficient under Rule 7(c)).

      Dismissal is particularly inappropriate here because there is no mystery as to the mailings

and wires at issue in this case.   As alleged in the Superseding Indictment, and as further

particularized by prior charging instruments, Weitz & Luxenberg used the mail and wire

transmissions to communicate with the mesothelioma clients who were the subject of the

Mesothelioma Leads and whom Doctor-1 sent to the defendant, as well as to receive payments

and provide payments to clients and the defendant.   Likewise, the Real Estate Law Firm used

the mail and wire transmissions in connection with its representation of Developer-1 and

Developer-2, as well as to receive payments and provide payments to those clients and the

defendant, and Developer-1 and Developer-2 engaged in wire communications connected to the

representation.

      In addition, the Government has provided the defendant with extensive discovery (and an

---

[7]      The defendant incorrectly cites *Reale* in support of his argument for dismissal, as it
stands for precisely the opposite of what defendant claims it does.   (Def. Mem. at 19).   The
Court in *Reale* refused to dismiss the indictment and held that "the lack of specificity does not
warrant dismissing these counts at this time since the Government can provide Defendants with a
Bill of Particulars detailing the individual mailings and wire transfers."   *Id.* at *14.

index to such discovery), including evidence of such mail and wire transmissions.    Further, in a

letter to the defendant dated April 27, 2015 ("the Government's April 27 Letter"), the

Government provided the defendant with specific information on the use of mail and wire

transmissions by listing 39 mailings, telephone calls, and e-mails that were used in furtherance of

the scheme.    To the extent the Government in the course of its continued investigation and/or

receipt of subpoena responses discovers additional mail or wire transmissions it intends to prove

at trial, it will supplement the Government's April 27 Letter.    Accordingly, the defendant is

more than able to determine which wires or mailings are at issue and prepare his defense, and the

motion should be denied on that basis.    *See United States* v. *Wolf*, No. 12 Cr. 968 (JFK), 2013

WL 2359107 (S.D.N.Y. May 30, 2013) (denying motion to dismiss and in the alternative for a

bill of particulars in part because the information at issue was provided in discovery) (citing

*United States* v. *Cephas*, 937 F.2d 816, 823 (2d Cir. 1991) and *United States* v. *Barnes*, 158 F.3d

662, 665-66 (2d Cir. 1998)).[8]

### D.    The Section 1957 Charge is Not Unconstitutionally Vague

Silver argues that Count Seven of the Superseding Indictment should be dismissed

because Section 1957 is "unconstitutionally vague."    (Def. Mem. at 22-23).    There is no merit

---

[8]    While never specifically requested by the defense, a bill of particulars is not required here
because the Government already has provided the defendant, through its discovery productions
and the Government's April 27 Letter, with the exact information he claims to need.    *See, e.g.*,
*United States* v. *Chen*, 378 F.3d 151, 163 (2d Cir. 2004) ("[A] bill of particulars is not necessary
where the government has made sufficient disclosures concerning its evidence and witnesses by
other means.") (quoting *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)); *United States v.
Facciolo*, 753 F. Supp. 449, 450-51 (S.D.N.Y. 1990) (rejecting the defendants' request for a bill
of particulars because the Government had produced of a list of telephone calls likely to be used
at trial (along with materials related to the telephone calls), which was "sufficient for the
defendants to glean the essential elements needed to be informed of the charges against them")
(citing *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990)).

to this argument.

### 1.   Applicable Law

As relevant here, Section 1957(a) makes it a crime for a person to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."   A "monetary transaction," under the statute, means "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument."   18 U.S.C. § 1957(f)(1).   "[C]riminally derived property" means "any property constituting, or derived from, proceeds obtained from a criminal offense."   *Id.* § 1957(f)(2).   "Specified unlawful activity" includes mail and wire fraud and extortion.   *Id.* §§ 1957(f)(3), 1956(c)(7)(A), 1961(1)(B).

The Due Process Clause "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."   *Kolender* v. *Lawson*, 461 U.S. 352, 357 (1983).   It is settled law that "a challenger who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."   *United States* v. *Amer*, 110 F.3d 873, 878 (2d Cir. 1997) (alterations omitted)); *see also Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 23 (2010) (same); *United States* v. *Blarek*, Nos. 98-1291, 98-1292, 1998 WL 907429, at *3, 166 F.3d 1202 (2d Cir. Dec. 23, 1998) (summary order included in table) (same).   Thus, "even if there might be theoretical doubts regarding" the scope of a statute, a "defendant's vagueness challenge fail[s]" where "his case present[s] no such problem."   *Humanitarian Law Project*, 561 U.S. at 23.

The defendant cites no cases finding that Section 1957 is unconstitutionally vague, either

facially or as applied, and the Government has not located any such cases.    To the contrary,

every court to have considered the issue, including the Second Circuit in an unpublished decision

and other Circuits in published decisions, have rejected materially identical vagueness challenges

to Section 1957.    In *United States* v. *Blarek*, the Second Circuit rejected a challenge to Section

1957 as unconstitutionally vague, explaining that "there is no doubt that [the defendants] were

aware that the cash they received from [their co-conspirator] was 'criminally derived property'

from drug dealing."    1998 WL 907429, at *3.    "It is also clear," the Court continued, "that the

term 'criminally derived property' covers money earned from drug trafficking and then directly

provided to a defendant by a drug trafficker."    *Id.*    Thus, "even if a phrase in a statute might be

vague as applied to extreme situation, that fact does not make the statute void for vagueness"

where, as in the case before it, "a defendant's conduct falls within the core of the statute."    *Id.*

"As a result," the Court concluded, "the Appellants cannot argue that § 1957(a) failed to provide

adequate notice to them," and "[t]heir void-for-vagueness challenge to § 1957(a) is, therefore,

without merit."    *Id.*

        In *United States* v. *Bazazpour*, 690 F.3d 796, 801 (6th Cir. 2012), the Sixth Circuit

addressed the argument that Section 1957 is unconstitutionally vague because it "criminalize[s] a

simple deposit of funds" derived from certain criminal activity.    In rejecting the argument, the

Sixth Circuit recognized that "[i]t is no doubt accurate to assert that simply depositing a check

into one's own account is a relatively common action that carries with it no indicia of

criminality."    *Id.*    But the court explained that, contrary to the defendant's assertion there (and

Silver's here), "the federal money laundering statute does not . . . criminalize simply depositing a

check into an account."    *Id.*    Instead, "[a]s made explicit by 18 U.S.C. § 1957(a), criminal

liability attaches to such an otherwise innocent act when, and only when, the government proves beyond a reasonable doubt that the defendant *knowingly* engaged in such a transaction involving 'criminally derived property of a value greater than $10,000" that 'is derived from specified unlawful activity.'"   *Id.* (quoting 18 U.S.C. § 1957(a)).   "By attaching such a knowledge requirement to the 'monetary transaction,'" the court continued, "the statute defines 'the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Id.* (quoting *Kolender*, 461 U.S. at 357).   The court thus concluded that "there is no merit to [the defendant's] constitutional challenge to [§ 1957]."   *Id.*; *see also United States* v. *Baker*, 19 F.3d 605, 614 (11th Cir. 1994) (rejecting vagueness challenge to 1957, holding that statute "clearly proscribed" the defendant's conduct of "deposit[ing] into their bank accounts funds that they had derived from their own criminal fraud activities").

### 2.    Silver's Vagueness Challenge to Section 1957 Is Meritless

The Court should reject Silver's vagueness challenge to Section 1957, just as the courts did in *Blarek*, *Bazazpour*, and *Baker* when faced with similar challenges.   As in those cases, here there can be no doubt that the defendant's conduct fits comfortably within the core of Section 1957's proscriptions.

Section 1957 specifically defines each of its key phrases: "monetary transaction," "criminally derived property," and "specified unlawful activity."   *See Humanitarian Law Project*, 561 U.S. at 21 (rejecting vagueness challenge where "Congress . . . took care to add narrowing definitions to the [relevant] statute").   Taking these definitions together, Section 1957(a) criminalizes knowingly engaging in monetary transactions involving funds

constituting or derived from proceeds of a criminal offense, where the criminal offense at issue is one of those referenced by the statute – including honest services mail and wire fraud and Hobbs Act extortion.[9]   There is nothing indeterminate about a statue that criminalizes this conduct, and the defendant's alleged conduct here unquestionably falls within it.   The defendant himself recognizes that extortion and honest services fraud are offenses covered by Section 1957 (*see* Def. Mem. at 21 (stating that "'specified unlawful activity' includes various offenses such as mail fraud, wire fraud, and extortion")), and the transfers at issue here – hundreds of thousands of dollars sent to high-yield investment vehicles from a bank account into which the defendant deposited and commingled proceeds of the crimes charged in Counts One through Six – plainly constitute "monetary transactions" under Section 1957, defined to include the "transfer . . . of funds . . . by, through or to a financial institution."   The defendant does not – and cannot – argue otherwise.

Finally, Section 1957's knowledge requirement "destroy[s] any force in the argument that application of the [statute] would be so unfair that it must be held invalid."   *Boyce Motor Lines* v. *United States*, 342 U.S. 337, 342 (1952); *see also Humanitarian Law Project*, 561 U.S. at 21 (explaining that "the knowledge requirement of the statute further reduces any potential for vagueness").   As the Sixth Circuit has explained with respect to Section 1957, "[b]y attaching such a knowledge requirement to the 'monetary transaction,' the statute defines 'the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited" by the statute and avoids its "arbitrary and discriminatory enforcement." *Bazazpour*, 690 F.3d at 801 (quoting *Kolender*, 461 U.S. at 357).   Furthermore, just as in

---

[9]      The transactions also must exceed $10,000 and affect interstate or foreign commerce, two requirements that the defendant does not allege are unconstitutionally vague.

*Blarek*, here "there is no doubt that [Silver was] aware that the cash [he] received [as a result of his extortion and honest services fraud] was 'criminally derived property.'"   1998 WL 907429, at *3.   Indeed, the funds the defendant transferred to the investment vehicles were derived directly from his own corrupt actions, of which the defendant unquestionably had direct knowledge.   *See also Baker*, 19 F.3d at 614 (Section 1957 "clearly proscribed" the defendants' conduct of "deposit[ing] into their bank accounts funds that they had derived from their own criminal fraud activities").

Thus, the Superseding Indictment plainly alleges that Silver "engage[d] in some conduct that is clearly proscribed" by Section 1957, and accordingly he "cannot complain of the vagueness of the law."   *Amer*, 110 F.3d at 878.   The vagueness challenge thus should be rejected.

In resisting this conclusion, the defendant mischaracterizes the scope of Section 1957 and the facts and circumstances supporting the charge, and entirely disregards the relevant authority interpreting the statute.   As for the scope of Section 1957, the defendant contends that "[t]he statute has staggering breadth, sweeping within its scope *any* transaction in excess of $10,000 involving the proceeds of myriad offenses – including a defendant's mere receipt and deposit of funds into a bank account bearing his name."   (Def. Mem. at 22).   But that is not so: as set forth above, the statute makes it a crime only for a person "knowingly to engage in a monetary transaction in criminally derived property," thus ensuring the statute only extends to those individuals who act with the requisite criminal intent in circumstances specified by the statute. *See Bazazpour*, 690 F.3d at 801.

Instead of addressing case law directly contrary to his position, the defendant grasps at

guidance provided from the U.S. Attorney's Manual providing that mere "receipt and deposit" transactions "should not be charged" as money laundering "unless there are extenuating circumstances."   U.S. Attorney's Manual § 9-105.330(5).   But this guidance does not help him.   An an initial matter, the U.S. Attorney's Manual "provide[s] no substantive rights to criminal defendants," *United States* v. *Piervinanzi*, 23 F.3d 670, 682 (2d Cir. 1994), and notwithstanding this guidance, courts have rejected constitutional challenges to money-laundering prosecutions for "receipt and deposit" transactions.   *See Bazazpour*, 690 F.3d at 801; *Baker*, 19 F.3d at 614.

Second, the charges against the defendant here are not based on mere "receipt and deposit" transactions.   Rather, they are based on allegations that *after* the defendant received and deposited nearly $4 million in proceeds from the criminal conduct charged in Counts One through Six into a single commingled account, he transferred a portion of those funds into high-yield investment vehicles not available to the general public.   (Superseding Indictment ¶¶ 28-32).   Moreover, the defendant engaged in actions that concealed the circumstances in which the investments were made and the extent of the proceeds he had generated from his criminal conduct, generating nearly $1 million in additional revenue from these transactions.   (*Id.*). The Superseding Indictment further alleges that the defendant engaged in these transactions knowingly and for the purpose of maximizing the amount of money generated by his criminal conduct, by further exploiting his powerful position to gain access to private investment vehicles. *See id.*   This sort of money laundering activity is not a mere "receipt and deposit" transaction and fits easily within the core of Section 1957.[10]

---

[10]     The defendant also claims that Count Seven should be dismissed because it alleges that

**E.      None Of The Challenged Allegations In The Superseding Indictment
          Should Be Stricken**

The defendant also is wrong to ask the Court to strike certain allegations in the

Superseding Indictment as surplusage.    Silver's characterization of the allegations is inaccurate,

and his motion reflects an effort to avoid introduction of evidence that is not unfairly prejudicial

and is in fact squarely relevant to each of the crimes set forth in the Superseding Indictment,

including but not limited to the Section 1957 charge.

### 1.      Applicable Law

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike

surplusage from an indictment, it has long been the policy of courts within the Southern District

to refrain from tampering with indictments."    *United States* v. *Bin Laden*, 91 F. Supp. 2d 600,

621 (S.D.N.Y. 2000) (internal quotation marks, alterations, and citations omitted).    "Motions to

strike surplusage from an indictment will be granted only where the challenged allegations are

not relevant to the crime charged and are inflammatory or prejudicial."    *United States* v.

*Scarpa*, 913 F.3d 993, 1013 (2d Cir. 1990).    "[I]f evidence of the allegation is admissible and

relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken."

*Id.* (internal quotation marks omitted); s*ee also United States* v. *Mulder*, 273 F.3d 91, 99 (2d Cir.

---

the criminally-derived property at issue is "the proceeds of the offenses charged in Counts One
through Six," and each of Counts One through Six fails to state an offense.    (Def. Mem. at
21-22).    For the reasons stated above, each of Counts One through Six does in fact state an
offense and thus the defendant's claim that the Superseding Indictment fails to allege the
existence of criminally-derived property is wholly without merit.    The defendant also alleges,
without support, that the count was "gratuitous" and was based on facts "surely known long
ago."    (Def. Mem. at 23).    Both accusations are false.    The charge relates to intentionally
wrongful conduct that Congress has seen fit to criminalize, as such conduct undermines the
integrity of the financial system, and, as the defendant is aware from his continued receipt of
newly-obtained discovery from the Government, Count Seven was the product of the
Government's ongoing investigation into the defendant's criminal conduct.

2001) (quoting *Scarpa*).   "Given this exacting standard, such motions [to strike] are rarely

granted."   *United States* v. *Coffey*, 361 F. Supp. 2d 102, 123 (E.D.N.Y. 2005).

In setting forth allegations in an indictment, the Government is not limited to an

enumeration of the bare elements of a crime; instead, an indictment may be used to provide

background to the charged criminal conduct, to describe the circumstances, means, and methods,

of an offense, and to describe evidence that is otherwise admissible at trial.   "Statements

providing background are relevant and need not be struck."   *United States* v. *Mostafa*, 965 F.

Supp. 2d 451, 466 (S.D.N.Y. 2013) (citing *Mulder*, 273 F.3d at 99).   Allegations also will not

be stricken where they elucidate the circumstances, means, and methods of a charged scheme or

would be admissible, in the alternative, under Rule 404(b) of the Federal Rules of Evidence.

*See United States* v. *Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996); *United States* v. *Markoll*,

No. 300 Cr. 133 (EBB), 2001 WL 173763, at *2-*3 (D. Conn. Jan. 24, 2001).   Where there is

any doubt about the connection between the allegations and the evidence that will be admitted at

trial, "[c]ourts in this district routinely await presentation of the Government's evidence at trial

before ruling on a motion to strike."   *Mostafa*, 965 F. Supp. 2d at 467 (citing, *inter alia*, *Scarpa*,

913 F.2d at 1012); *see also United States* v. *Ahmed*, No. 10 Cr. 131 (PKC), 2011 WL 5041456,

at *3 (S.D.N.Y. Oct. 21, 2011).

## 2.   The Challenged Allegations Are Proper

As an initial matter, the defendant mischaracterizes the nature of the allegations that he

seeks to strike.   Silver claims that the allegations at issue relate only to the "money laundering

allegations" of the Superseding Indictment (Def. Mem. at 23), when in fact, they explicitly relate

to and are incorporated into each of the charges in the Superseding Indictment.   (*See*

40

Superseding Indictment ¶¶ 33, 34, 36, 38, 40, 42, 44 (incorporating paragraphs 1-32 of

Superseding Indictment into each of the charges in the Superseding Indictment)).

The challenged allegations are in fact relevant to each of the crimes charged in the

Superseding Indictment and are not inflammatory or prejudicial, and thus should not be stricken.

First, the Government expects the evidence to show that the defendant took advantage of his

relationship with the individual described in the Indictment as Investor-1 to gain access to private

investment vehicles with some of the millions of dollars in ill-gotten gains he had obtained

through the schemes described in Counts One through Six of the Superseding Indictment, and to

engage in prohibited financial transactions concerning those crime proceeds while avoiding

scrutiny into the illegal sources of his money.    This is direct evidence that will help to establish

the defendant's knowledge not only that the funds were "criminally derived property" under

Section 1957, but also the defendant's consciousness of his own guilt as to honest services fraud,

extortion, and the Section 1957 count, including by intentionally placing at least a portion of the

funds that are the subject of the Section 1957 charge into his wife's name in order to avoid

disclosure to the public of the full amount of his ill-gotten gains on financial disclosure forms

required by state law.    *See, e.g.*, *Rosen*, 716 F.3d at 703 (noting that failure to disclose payments

tends to establish consciousness of guilt of honest services fraud).    Second, the challenged

allegations describe the background, nature, and circumstances of the financial transactions

charged in Count Seven and therefore may be the subject of admissible testimony at trial.    *See*

*Hernandez*, 85 F.3d at 1030.    The Government expects the evidence to show that the defendant

gained access to the investment vehicles without paying any commission or fee, which typically

would be associated with such investment opportunities.    Instead, the evidence will show, the

41

defendant took official actions as requested by Investor-1, who controlled the investment vehicles.   These facts serve as direct evidence that will help explain to the jury how the defendant committed the crime charged in Count Seven.   *See Old Chief* v. *United States*, 519 U.S. 172, 187 (1997) ("[T]he evidentiary account of what a defendant has thought and done can accomplish what no set of abstract statements ever could, not just to prove a fact but to establish its human significance").   Allegations concerning the background, nature, and circumstances of the offense charged in Count Seven are fully admissible and are neither "inflammatory" nor "prejudicial."   *See United States* v. *Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) ("Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence.").[11]

For all of these reasons, the challenged statements should not be stricken from the Superseding Indictment.

---

[11]   By including these allegations, the Superseding Indictment provides the defendant with notice that the Government will seek to introduce this evidence against him at trial, one of the purposes of an indictment contemplated by Rule 7.   To the extent Silver seeks to challenge the admissibility of evidence relating to these allegations, the proper forum to do so is through an *in limine* motion or an objection at trial, at a time when there is a more substantial evidentiary record before the Court.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court deny

the defendant's motion in its entirety.

Dated:   June 12, 2015
         New York, New York

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney


                           By:  _____/s/_____
                                Carrie H. Cohen/Howard S. Master/
                                Andrew D. Goldstein/James M. McDonald
                                Assistant United States Attorneys