UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>        v.<br><br>SHELDON SILVER,<br><br>                    Defendant. | No. 15 Cr. 93 (VEC) |

# DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL

Joel Cohen
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York  10038
Telephone:  (212) 806-5644
Facsimile:   (212) 806-6006

Steven F. Molo
Robert K. Kry
Justin V. Shur
MOLO LAMKEN LLP
540 Madison Avenue
New York, New York  10022
Telephone:  (212) 607-8160
Facsimile:   (212) 607-8161

*Attorneys for Defendant*

November 19, 2015

**TABLE OF CONTENTS**

ARGUMENT ............................................................................................................................. 1

I.      The Government Failed To Prove the Mesothelioma Charges ........................................... 1

        A.      The Government Failed To Prove an Agreement To Exchange
                Mesothelioma Referrals for Official Acts .................................................................. 1

        B.      The Government Failed To Prove That Mr. Silver Deprived Anyone of
                Property and Gained Possession of That Property ..................................................... 5

        C.      The Government Failed To Prove a Paradigmatic Bribe or Kickback
                Under *Skilling* ............................................................................................................. 6

II.     The Government Failed To Prove the Real-Estate Charges ................................................ 7

        A.      The Government Has Failed to Prove an Agreement To Exchange Referral
                Fees for Official Acts .................................................................................................. 7

        B.      The Government Failed To Prove That Mr. Silver Deprived Anyone of
                Property and Gained Possession of That Property ..................................................... 9

        C.      The Government Failed To Prove a Paradigmatic Bribe or Kickback
                Under *Skilling* ........................................................................................................... 10

III.    The Government Failed To Prove the Money Laundering Charge .................................. 10

CONCLUSION ........................................................................................................................... 11

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Evans v. United States*, 504 U.S. 255 (1992) ............................................................................... 1, 2

*Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003) ......................................................... 5

*Sekhar v. United States*, 133 S. Ct. 2720 (2013) ...................................................................... 5, 6, 9

*Skilling v. United States*, 561 U.S. 358 (2010) ....................................................................... 1, 6, 10

*United States v. Anderson*, 509 F.2d 312 (D.C. Cir. 1974) .............................................................. 4

*United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011) ............................................................. 1, 2, 3, 7

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) ............................................................. 1, 3, 7

*United States v. Jones*, 393 F.3d 107 (2d Cir. 2004) ....................................................................... 1

*United States v. Loe*, 248 F.3d 449 (5th Cir. 2001) ........................................................................ 11

*United States v. McDonough*, 56 F.3d 381 (2d Cir. 1995) .............................................................. 5

*United States v. Robinson*, 663 F.3d 265 (7th Cir. 2011) ................................................................ 6

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013) ................................................................. 2, 3

*United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997) .............................................................. 11

**Statutes**

18 U.S.C. §1951(b)(2) ....................................................................................................................... 5

18 U.S.C. §1957 ......................................................................................................................... 10, 11

18 U.S.C. §3282 ................................................................................................................................. 4

**Other Authorities**

Fed. R. Crim. Proc. 29(a) .................................................................................................................. 1

Defendant Sheldon Silver respectfully moves for a judgment of acquittal on all counts of the Superseding Indictment under Federal Rule of Criminal Procedure 29(a). Despite over two weeks of testimony and numerous witnesses, the Government has not shown that Mr. Silver committed extortion, honest services fraud, or money laundering.

## ARGUMENT

A motion for judgment of acquittal should be granted if " '[no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004). That standard is met here.[1]

**I.   The Government Failed To Prove the Mesothelioma Charges**

**A.   The Government Failed To Prove an Agreement To Exchange Mesothelioma Referrals for Official Acts**

To prove either honest services fraud or extortion, the Government must prove a quid pro quo – an agreement to exchange referrals for official acts. Under *Skilling v. United States*, 561 U.S. 358 (2010), the honest services statute covers only bribes and kickback schemes, both of which require a quid pro quo. *See United States v. Bruno*, 661 F.3d 733, 743 (2d Cir. 2011) (quid pro quo is an "essential element of a bribery theory of honest services fraud"). Likewise, extortion under the Hobbs Act requires that the "public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans v. United States*, 504 U.S. 255, 268 (1992).

As the Second Circuit has made clear, a quid pro quo requires more than a mere "effort to **buy favor or generalized goodwill** from a public official who either has been, is, or may be at some unknown, unspecified later time, . . . in a position to act favorably on the giver's interests." *United States v. Ganim*, 510 F.3d 134, 149 (2d Cir. 2007) (emphasis added). The parties' intent

---

[1] Mr. Silver incorporates by reference his motion to dismiss the superseding indictment (Dkt. 39).

must be more than merely "to cultivate a relationship with the person or persons who provided [the payments]." *Id.* The Government must prove an ***agreement to exchange payments for official acts***. *See Bruno*, 661 F.3d at 743 ("A quid pro quo is a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the exercise of his official authority."); *United States v. Rosen*, 716 F.3d 691, 699-700 (2d Cir. 2013) (same); *Evans*, 504 U.S. at 268 (extortion requires a "payment in return for [the official's] agreement to perform specific official acts").

The Government failed to make that showing here. There is no evidence that Dr. Taub referred patients to Mr. Silver as part of any ***agreement*** to exchange referrals for official acts. Dr. Taub admitted as much: "Q: You did not have an explicit agreement to exchange patients for grants, did you? A: I did not." Tr. 424:5-7.

If there were any doubt, Dr. Taub's revisions to his non-prosecution agreement erase them. Despite the threat of a felony conviction, ***Dr. Taub refused to sign a draft non-prosecution agreement stating that he gave referrals to Mr. Silver "in exchange for" official acts***. *Compare* DX 25 (draft non-prosecution agreement) *with* DX 27 (final non-prosecution agreement). Dr. Taub agreed to sign the document only after the prosecutor removed all language suggesting the existence of a quid pro quo. No reasonable jury could possibly find Mr. Silver guilty when the Government's own star witness denies an essential element of the offense.

There was no evidence to the contrary. To be sure, Dr. Taub repeatedly testified that he was motivated by a desire to "develop a relationship" with Mr. Silver in order to "incentivize" Mr. Silver to fund mesothelioma research. *See, e.g.*, Tr. 276:13-18 ("Q. What was your purpose in sending all of those cases to Sheldon Silver? A. I wanted to maintain a relationship with him such that he would be ***incentivized*** to be an advocate for mesothelioma research and that he

would feel – he would help us in obtaining funding for mesothelioma research." (emphasis added)); *id.* at 279:1-9 (Dr. Taub wanted to "***develop a relationship*** whereby he would help fund mesothelioma research" (emphasis added)); *id.* at 299:10-16 (Dr. Taub wanted to "***maintain the relationship*** where he would be an advocate and he would be ***incentivized*** to help fund mesothelioma research" (emphasis added)); *id.* at 340:17-25 (similar).

But that is not enough under Second Circuit law. Evidence that Dr. Taub wanted to "incentivize" Mr. Silver to act a certain way or to "develop a relationship" with him does not amount to an ***agreement to exchange referrals for official acts*** – "as opportunities arise" or otherwise. *Bruno*, 661 F.3d at 744; *Rosen*, 716 F.3d at 699-700. At best, it is precisely what the Second Circuit says is ***not*** sufficient: An effort to "buy ***favor or generalized goodwill*** from a public official who either has been, is, or may be at some unknown, unspecified later time, . . . in a position to act favorably on the giver's interests." *Ganim*, 510 F.3d at 149 (emphasis added).

That is not the only problem with the Government's theory. Dr. Taub testified that, when he began sending referrals to Mr. Silver, he was hoping Mr. Silver would convince ***Weitz and Luxenberg*** – not the state – to fund mesothelioma research. *See, e.g.*, Tr. 267:5-268:6 ("I explained to Mr. Silver . . . that we would like his help, if possible, to influence Weitz & Luxenberg to donate funds to MARF . . . [b]ecause I felt that he was a senior member of the firm. He would have influence in order to be able to discuss this and would allow us access."). Even as late as 2010, Dr. Taub continued to hope that the referrals would result in ***Weitz & Luxenberg's*** funding of research. *See* GX 595-1 ("I sent a case to Shelly Silver today . . . [and] point[ed] out to him that Perry Weitz, in contrast to other law firms, has not given a dime for research . . . ."); Tr. 620:20-621:1-12 (similar). Even if efforts to "incentivize" someone to fund

3

research could amount to a quid pro quo – and they cannot – those efforts are irrelevant in this case, which charges only an agreement to exchange referrals for *official acts*.

That absence of any agreement to exchange referrals for official acts was a running theme throughout Dr. Taub's testimony. For example, Dr. Taub *explicitly denied* sending referrals to Mr. Silver in exchange for his assistance getting his son a job. *See* Tr. 554:2-5 ("Q: You did not exchange referrals of patients to Weitz & Luxenberg for your son getting a job – your Ivy-league son getting a job at OHEL? A: No."). He denied sending referrals to Mr. Silver in exchange for his assistance getting his daughter a job. *See id.* at 558:2-4 ("Q: And you did not refer patients to Weitz & Luxenberg in exchange for an unpaid internship for your daughter, did you? A: No."). He denied sending referrals to Mr. Silver in exchange for directing a grant to Shalom Task Force. *See id.* at 548:22-25 ("Q: Dr. Taub, you didn't refer patients to Weitz & Luxenberg in exchange for any kind of state grant to Shalom Task Force, did you? A: No."). And he never claimed he sent referrals to Mr. Silver in exchange for his legislative resolution and proclamation. *See* Tr. 460:13-15 ("Q: And I take it you would not send patients to Weitz & Luxenberg in exchange for receiving a resolution? A: It was nice to get the plaque."). Viewing that record as a whole, no reasonable jury could infer that there was *any* sort of agreement between Dr. Taub and Mr. Silver to exchange referrals for official acts – particularly given that many of the official acts on which the Government relies are outside the statute of limitations. 18 U.S.C. § 3282.

Even if Dr. Taub *had* believed he was agreeing to exchange referrals for official acts, there is no evidence that *Mr. Silver* shared Dr. Taub's belief or was even aware of it. What matters is Mr. Silver's intent, not Dr. Taub's. "The payment and the receipt of a bribe are not interdependent offenses, for obviously the donor's intent may differ completely from the donee's." *United States v. Anderson*, 509 F.2d 312, 332 (D.C. Cir. 1974). And for extortion,

4

"the government must prove beyond a reasonable doubt that the victims were motivated to make payments as a result of the defendant's control or influence over public officials *and that the defendant was aware of this motivation*." *United States v. McDonough*, 56 F.3d 381, 388 (2d Cir. 1995) (emphasis added). Even if there were evidence that Dr. Taub had corrupt intent – and there is not – there still would be no basis for imputing that intent to Mr. Silver.

By contrast, there is evidence that Dr. Taub sent Mr. Silver referrals for legitimate reasons, not least of which was that Weitz & Luxenberg was a top asbestos firm. *See, e.g.*, Tr. 284:11-19, 398:21-399:4, 403:13-23, 535:11-537:10, 543:1-10, 611:25-612:7, 643:21-644:20. The evidence also made clear that Mr. Silver awarded Dr. Taub the research grants for reasons wholly unrelated to the referrals. Grants for purposes of medical research were common, and the amounts of the grants were not unusual. *See* DX 35-1, 35-3, 34-1. Moreover, Dr. Taub proposed to conduct research relating to mesothelioma arising out of the 9/11 terrorist attacks, which occurred in Mr. Silver's district. *See, e.g.*, GX 367-1, 368-1, Tr. 487:2-23, 917:24-918:8. No reasonable juror could find any exchange of referrals for official acts.

### B. The Government Failed To Prove That Mr. Silver Deprived Anyone of Property and Gained Possession of That Property

The Government's proof on the extortion count also fails for a separate reason. To prove Hobbs Act extortion, the Government must show that Mr. Silver obtained property from someone "under color of official right." 18 U.S.C. § 1951(b)(2). There must be "'not only the *deprivation* but also the *acquisition* of property.'" *Sekhar v. United States*, 133 S. Ct. 2720, 2725 (2013) (quoting *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 404 (2003)) (emphasis added); *see also id.* (victim must "'part with' his property, . . . and the extortionist 'gain possession' of it"). "The property extorted must therefore be *transferable* – that is, capable of passing from one person to another." *Sekhar*, 133 S. Ct. at 2725.

5

As Mr. Silver explained in his motion to dismiss the Superseding Indictment, the conduct charged in this case – and the evidence presented in support of those charges – did not amount to extortion.  Dkt. 39 at 9-14.  The so-called "mesothelioma leads" were nothing but recommendations to patients to contact Weitz & Luxenberg.  They were not obtainable property within the meaning of the statute.  This Court recognized in its opinion denying the motion to dismiss that, if the evidence at trial showed merely that Dr. Taub "recommended that his patients contact Weitz & Luxenberg," Mr. Silver "would not be guilty of Hobbs Act extortion under *Sekhar*."  Dkt. 46 at 9-10.  But that is all the evidence showed.

Dr. Taub acknowledged that a patient was free to reject his recommendations, and sometimes did.  Tr. 634:1-11.  In fact, Dr. Taub did not even know whether the majority of his patients ended up using Weitz & Luxenberg.  *Id.* at 634:8-11.

There was simply no evidence that mesothelioma leads were a transferable property right.  Nor was there any evidence of the deprivation and acquisition of any other property right.  The Government has not proved that Mr. Silver obtained "property" within the meaning of *Sekhar*.

### C. The Government Failed To Prove a Paradigmatic Bribe or Kickback Under *Skilling*

Finally, the evidence failed to establish honest services fraud.  *Skilling* limits the honest services statute to "paradigmatic cases of bribes and kickbacks," not mere conflicts of interest.  561 U.S. at 409-11.  Mr. Silver's routine financial relationship with Weitz & Luxenberg is not the sort of "side payment[] from a third party" that *Skilling* requires for an illegal bribe or kickback.  *Id.* at 413; *cf. United States v. Robinson*, 663 F.3d 265, 272 (7th Cir. 2011) (under federal bribery statute, "compensation paid in the ordinary course shall not be construed as a bribe").  Without any such paradigmatic bribe or kickback scheme, the government's charge cannot survive.

6

## II. The Government Failed To Prove the Real-Estate Charges

### A. The Government Has Failed to Prove an Agreement To Exchange Referral Fees for Official Acts

To convict Mr. Silver of honest services fraud or extortion on the real estate allegations, the Government must prove beyond a reasonable doubt that he entered into a quid pro quo agreement with Glenwood or Witkoff. That requires an ***agreement to exchange payments for official acts***. *See Bruno*, 661 F.3d at 743. A rational jury may not convict if "the benefit is intended to be, and accepted as simply an effort to buy favor or generalized goodwill." *Ganim*, 510 F.3d at 149.

The Government has not come close to meeting that standard. As with Dr. Taub, ***both Glenwood and Witkoff deny any agreement with Mr. Silver to trade benefits for official acts***. *See* Tr. 1823:25-1824:10 (Runes) ("Q: And Mr. Silver never came to you and said, I want something in exchange for helping Glenwood with these laws? A. No."); *id.* at 1831:11-21 ("Q: And you certainly never offered Mr. Silver anything of value in exchange for his agreement to go along with a proposal that you were making on rent regulation; correct? . . . A: No. . . . Q: And Mr. Silver never demand[ed] anything of value from you in exchange for him taking some official action to go along with what you were proposing in rent regulations? A: No."); *id.* at 2051:15-24 (Witkoff) ("Q: And at the time Mr. Silver did not tell you he wanted you to send Goldberg business in exchange for him doing something for you, did he? A: No. Q: In fact, you did not give Mr. Goldberg business in exchange for Mr. Silver's specific exercise of his official authority in some ways; is that right? . . . A: No."); *see also id.* at 1830:24-1831:2 (Runes) (similar); *id.* at 1686:5-9 (Meara) (similar).

Indeed, Glenwood and Witkoff were ***not even aware that Mr. Silver was receiving referral fees*** from Goldberg & Iryami until late December 2011 and June 2014 respectively,

7

*after* the key official acts at issue. Glenwood learned about Mr. Silver's referral fees only in December 2011, "long, long after" the government's principal alleged official act – the Rent Act of 2011 – was passed in June 2011. Tr. 1850:15-1851:3 (Runes). Likewise, Steven Witkoff testified that he did not learn about the referral fees until June 2014, *three years after* the Rent Act was passed. Tr. 2037:2-4.

The evidence showed at most that the Developers were attempting to foster generalized goodwill. Mr. Witkoff testified that he gave Goldberg business because "it was an easy favor" and he wanted to "create goodwill." Tr. 2025:3-7; *see also id.* at 2027:14-16, 2052:3-4; 2058:10-25. And no testimony shows that Mr. Litwin of Glenwood – who did not testify – either originally hired Goldberg & Iryami in the 1990s or continued to retain the firm in 2012 in exchange for an official act.

No rational juror could infer a quid pro quo from the circumstances here. There is no evidence that Mr. Silver agreed to influence laws on rent regulation, 421-a, 421-g, or anything else in Glenwood's or Witkoff's favor. The uncontradicted evidence shows that Mr. Silver's position with respect to the Rent Act of 2011 was as pro-tenant as it had always been. *See* Tr. 1635:16-1636:12, 1663:10-23 (Meara); 1824:12-14, 1886:13-17 (Runes). In fact, the Rent Act of 2011 was the first legislation in New York to strengthen protections for rent-regulated tenants in over two decades. *Id.* at 1674:7-13 (Meara). To the extent that Mr. Silver compromised on certain pro-tenant positions, he did so as a result of the necessary give-and-take of legislation. *See id.* at 1639:19-1640:1 (Meara), 1864:9-1865:13 (Runes).

Nor could any juror find beyond a reasonable doubt that Mr. Silver had any agreement to trade referral fees for favorable treatment by the Public Authorities Control Board. Mr. Runes *denied* such an agreement. *Id.* at 1824:6-10, 1826:10-22. And there is no evidence that

8

Glenwood and Mr. Silver reached such an agreement to influence how Mr. Silver would vote. *Id.* at 1816:11-22 (Runes).

The Government's final theory – that Mr. Silver took action in 2008 and 2011 to stop a methadone clinic to help Glenwood, before Glenwood learned of the Goldberg & Iryami referral fees – fares no better. There is no evidence that Glenwood exchanged referral fees for official acts regarding the clinic. Glenwood, of course, could not have done so in 2008 or 2011 because ***it did not yet know that Mr. Silver was receiving them.*** Tr. 1787:1-1788:1, 1792:11-1793:4. When Brian Meara called Mr. Silver's office about the clinic, moreover, Judy Rapfogel, Mr. Silver's chief of staff, was "***already well aware*** of the program and informed [Meara] that they were opposing it," that they had "already made a decision. It doesn't matter. We're opposing it." *Id*. at 1602:3-1603:1 (emphasis added), 1645:2-14. No juror could possibly infer that Mr. Silver entered into a corrupt agreement to exchange referral fees for his opposition to the clinic.

Meara's, Runes', Witkoff's, and Dorego's expressions of surprise and concern about Mr. Silver's referral payments do not make up for that missing evidence. There is no evidence of any quid pro quo with the developers. The Court should grant a judgment of acquittal.

### B. The Government Failed To Prove That Mr. Silver Deprived Anyone of Property and Gained Possession of That Property

As explained in Mr. Silver's motion to dismiss, the real estate allegations do not amount to extortion. There is no evidence that Mr. Silver deprived anyone of a transferable property right, and obtained it for himself, in connection with the tax certiorari work that Goldberg & Iryami performed. Absent such evidence, the Government has failed to prove extortion under *Sekhar*.

### C. The Government Failed To Prove a Paradigmatic Bribe or Kickback Under *Skilling*

Similarly, as explained in the motion to dismiss, there is no paradigmatic bribe or kickback as required under *Skilling* to prove honest services fraud. Mr. Silver's routine financial relationship with Goldberg & Iryami is not the sort of "side payment[ ] from a third party" that *Skilling* requires for an illegal bribe or kickback, and a mere conflict of interest is not enough. 561 U.S. at 413.

### III. The Government Failed To Prove the Money Laundering Charge

Count 7 accuses Mr. Silver of money laundering – "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity." 18 U.S.C. § 1957(a). The Government has failed to prove that charge as well.

For one thing, absent a violation of the Hobbs Act or the honest services statute, there is no evidence that any of the funds at issue were "criminally derived property" or proceeds "derived from specified unlawful activity." Thus, if the Court grants this motion with respect to those other counts, it necessarily must also grant a judgment of acquittal on this count.

Even if there were sufficient evidence on those other counts, the Court should still enter a judgment of acquittal on this count. The Government failed to establish that a rational trier of fact could prove beyond a reasonable doubt that the proceeds Mr. Silver invested in the private investment vehicle were proceeds of the other charged offenses. The evidence showed that Mr. Silver originally deposited his referral fees into an account in which they were commingled with a large amount of other funds not challenged in this case – including, for example, his annual salary from Weitz & Luxenberg. There is no evidence that, when Mr. Silver withdrew funds from that commingled account to invest in the private investment vehicle, the withdrawal

consisted of "tainted" rather than "untainted" funds.  The commingled nature of the account precludes the Government proving that fact.

The Fifth Circuit has ordered a judgment of acquittal on similar facts.  It explained: "[W]here an account contains clean funds sufficient to cover a withdrawal, the Government cannot prove beyond a reasonable doubt that the withdrawal contained dirty money."  *United States v. Loe*, 248 F.3d 449, 467 (5th Cir. 2001).  The Ninth Circuit agrees.  *See United States v. Rutgard*, 116 F.3d 1270, 1292-93 (9th Cir. 1997) (holding that where the amount of money left in an account after a transfer charged under § 1957 exceeds the amount of criminally derived proceeds in the account, the government cannot prove that any illegally derived proceeds were transferred).  The Court should adopt that well-reasoned approach.  Because the Government cannot prove beyond a reasonable doubt that the funds withdrawn from Mr. Silver's commingled account and placed into the investment vehicle were the challenged referral fees rather than any other unchallenged receipts, Mr. Silver is entitled to a judgment of acquittal on this count too.

## CONCLUSION

The Court should enter a judgment of acquittal for Mr. Silver on all counts.


Dated:   November 19, 2015                             Respectfully submitted,
         New York, New York

 /s/ Joel Cohen                                         /s/ Steven F. Molo
Joel Cohen                                             Steven F. Molo
STROOCK & STROOCK & LAVAN LLP                          Robert K. Kry
180 Maiden Lane                                        Justin V. Shur
New York, New York  10038                              MOLO LAMKEN LLP
Telephone:  (212) 806-5644                             540 Madison Avenue
Facsimile:   (212) 806-6006                            New York, New York  10022
                                                       Telephone:  (212) 607-8160
                                                       Facsimile:   (212) 607-8161

*Attorneys for Defendant*