**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

      v.

SHELDON SILVER,

          Defendant.

No. 15 Cr. 93 (VEC)

## DEFENDANT'S RENEWED MOTION FOR A JUDGMENT OF ACQUITTAL

Joel Cohen
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5644
Facsimile:  (212) 806-6006

Steven F. Molo
Robert K. Kry
Justin V. Shur
MOLO LAMKEN LLP
540 Madison Avenue
New York, New York 10022
Telephone: (212) 607-8160
Facsimile:  (212) 607-8161

*Attorneys for Defendant*

January 21, 2016

## **<u>TABLE OF CONTENTS</u>**

BACKGROUND ............................................................................................................ 1

ARGUMENT .............................................................................................................. 3

I.     The Court Should Enter a Judgment of Acquittal on the Mesothelioma Charges.............. 4

    A.     The Government Failed To Prove an Agreement To Exchange
        Mesothelioma Referrals for Official Acts............................................................ 4

    B.     The Government Failed To Prove That Mr. Silver Deprived Anyone of
        Property or Gained Possession of That Property .................................................... 11

    C.     The Government Failed To Prove a Paradigmatic Bribe or Kickback
        Under *Skilling* ............................................................................................ 12

    D.     The Government Failed To Prove Any Official Act Within the Limitations
        Period ...................................................................................................... 13

II.    The Government Failed To Prove the Real Estate Charges ............................................ 14

    A.     The Government Failed To Prove an Agreement To Exchange Referral
        Fees for Official Acts.................................................................................... 14

    B.     The Government Failed To Prove That Mr. Silver Deprived Anyone of
        Property and Gained Possession of That Property................................................. 19

    C.     The Government Failed To Prove a Paradigmatic Bribe or Kickback
        Under *Skilling* ............................................................................................ 19

    D.     The Government Failed To Prove an Official Act................................................. 20

III.   The Government Failed To Prove the Money Laundering Charge ................................... 20

CONCLUSION.............................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Evans v. United States*, 504 U.S. 255 (1992).........................................................5, 13, 20

*Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003) ......................................11

*Sekhar v. United States*, 133 S. Ct. 2720 (2013)..............................................11, 12, 19

*Skilling v. United States*, 561 U.S. 358 (2010) ...............................................4, 12, 19

*United States v. Anderson*, 509 F.2d 312 (D.C. Cir. 1974) .........................................8

*United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011) ........................................ *passim*

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005) ................................................4

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) ........................................5, 7, 14

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002).....................................................4

*United States v. Loe*, 248 F.3d 449 (5th Cir. 2001) ..................................................21

*United States v. McDonough*, 56 F.3d 381 (2d Cir. 1995) ...........................................8

*United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991)............................................11

*United States v. Robinson*, 663 F.3d 265 (7th Cir. 2011) ..........................................12

*United States v. Rodriguez*, 392 F.3d 539 (2d Cir. 2004) ............................................4

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013)...............................................5, 7

*United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997) ..........................................21

*United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149 (2d Cir. 2008) ...................4

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015).....................................................4

*United States v. Wiley*, 846 F.2d 150 (2d Cir. 1988) ...................................................4

**Statutes, Regulations, and Rules**

18 U.S.C. § 1951(b)(2).................................................................................................11

18 U.S.C. § 1957(a)....................................................................................................20

18 U.S.C. § 3282 ........................................................................................................13

Fed. R. Crim. P. 29(a) ..................................................................................................................3

Fed. R. Crim. P. 29(d)(1) ...........................................................................................................1

Fed. R. Crim. P. 29(c) ................................................................................................................1

## INTRODUCTION

Defendant Sheldon Silver respectfully renews his motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29(c).[1]  No rational trier of fact could have found Mr. Silver guilty of the charges against him.   The Government's case hinged on speculative inferences and circumstantial evidence that fell woefully short of satisfying its burden.   One witness after another denied a *quid pro quo* arrangement, and none of the Government's documents, recordings, or photographs came close to suggesting (much less proving) otherwise. Instead, the Government obtained a conviction based on what Mr. Silver chose ***not*** to say to the press or to his colleagues, notwithstanding what every witness at trial actually ***did*** say – that there was no *quid pro quo*.   No matter how viewed, the evidence failed to prove Mr. Silver's guilt beyond a reasonable doubt.   The Court should enter a judgment of acquittal.

## BACKGROUND

On April 23, 2015, the Government filed a Superseding Indictment charging Mr. Silver with honest services fraud (Counts One through Four), extortion under color of official right (Counts Five and Six), and money laundering (Count Seven).   Dkt. 32.   The charges stemmed from income Mr. Silver earned outside of his role as Speaker for the New York State Assembly, an office in which he served from 1994 through 2015.   *See* 11/4/15 Tr. at 238:1-4; GX 102.   Mr. Silver earned that income as a lawyer for referring clients to the well-regarded law firms Weitz

---

[1] This motion supplements rather than replaces the arguments in Mr. Silver's prior Rule 29 motion.  *See* Dkt. 121; 11/19/15 Tr. at 2638:1-2667:25.  Those arguments are reasserted and incorporated by reference as if fully set forth herein.  Mr. Silver also incorporates by reference his motion to dismiss the Superseding Indictment.  *See* Dkt. 39.  Lastly, Mr. Silver requests that, upon granting the instant motion, the Court also conditionally grant his motion for a new trial pursuant to Rule 33 in the event that the judgment of acquittal is later vacated or reversed.  Fed. R. Crim. P. 29(d)(1).

& Luxenberg, P.C. and Goldberg & Iryami, P.C. – the so-called "Asbestos Payments" and "Real Estate Payments."  Superseding Indictment ¶¶ 33-43.

The Court presided over a ten-day jury trial beginning November 3, 2015.  The Government called twenty-five witnesses who testified to, among other things, the multi-step process for securing a state-funded research grant, various pro-tenant real estate laws Mr. Silver sponsored and voted for, and ethics questionnaires Mr. Silver submitted that reported his income and investments.  Other witnesses offered details of Mr. Silver and his wife's personal investments and fees that he earned from Weitz & Luxenberg and Goldberg & Iryami for successfully representing the clients that Mr. Silver referred to them.

Conspicuously absent from the nearly 2,600 pages of testimony was any evidence proving the charged crimes.  On the asbestos charges, the jury learned of Mr. Silver's two-decade-long friendship with Dr. Robert Taub, a board-certified physician who recommended that several of his mesothelioma patients retain Weitz & Luxenberg to represent them in seeking damages for their medical condition.  11/5/15 Tr. at 535:11-537-10 (Taub); 11/10/15 Tr. at 1197:18-23 (Luxenberg).  Dr. Taub suggested his patients contact Mr. Silver – "of counsel" to Weitz & Luxenberg since 2002, *see* 11/3/15 Tr. at 184:12-13 (Weitz) – because Weitz & Luxenberg "had a reputation as being a good firm" and had served patients "well," 11/5/15 at 614:21-224 (Taub).  The jury also learned that patients Dr. Taub recommended to Weitz & Luxenberg remained free to go elsewhere, 11/5/15 Tr. at 634:1-11 (Taub), and that Mr. Silver only earned referral income if Weitz & Luxenberg successfully recovered money for those patients, 11/4/15 Tr. at 210:10-211:2 (Weitz).  Dr. Taub repeatedly and emphatically denied any corrupt agreement with Mr. Silver.  *See id.* at 424:5-7, 460:13-15 (Taub); 11/5/15 Tr. at 548:22-25, 554:2-5, 558:2-4 (Taub).

As for the real estate charges, developers Glenwood Management and the Witkoff Group (the "Developers") confirmed the quality of the tax certiorari work Goldberg did on their behalf. *See* 11/12/15 Tr. at 1408:2-7 (Hoenig); 11/17/15 Tr. at 2048:21-2049:1 (Witkoff).   Neither Developer was promised any official act by Mr. Silver for retaining the firm to represent them or, in the case of Glenwood, its LLCs.   *See* 11/16/15 Tr. at 1845:14-1846:21, 1910:12-25 (Runes); 11/17/15 Tr. at 2051:12-24 (Witkoff).   Nor did the Developers ever ask for – or expect – Mr. Silver to take such action.   To the contrary:   Mr. Silver "uniformly" voted against Glenwood on real estate legislation, 11/16/15 Tr. at 1886:13-17 (Runes), and neither Glenwood nor Witkoff even knew Mr. Silver earned referral fees from Goldberg in connection with their properties until more than a decade into the alleged "scheme."   *Compare* 11/16/15 Tr. at 1850:15-1851:3 (Runes); 11/17/15 Tr. at 2037:2-4 (Witkoff), *with* Superseding Indictment ¶¶ 37, 39, 43.

No witness testified to any sort of agreement with Mr. Silver to receive a benefit in exchange for an official act.   Nor did any witness testify that Mr. Silver used his political office to deprive them of such a benefit.   Mr. Silver did not threaten or promise to take official action against any witness in connection with such a benefit.   And not a single witness, document, or recording demonstrated Mr. Silver's guilty intent to do so.

The jury retired on November 24.   *See* 11/24/15 Tr. at 3135:10-13.   On its third day of deliberations, and after submitting not one but five notes requesting the Court's intervention, the jury returned a guilty verdict on all counts.   11/30/15 Tr. at 3229:16-3230:22.   Mr. Silver now renews his motion for a judgment of acquittal.

## ARGUMENT

Federal Rule of Criminal Procedure 29 requires that the Court "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."   Fed. R. Crim. P. 29(a).   A motion for judgment of acquittal should be granted if "[no] rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004).

"Applying this standard does not . . . mean that a reviewing court must affirm all jury verdicts." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015). A conviction cannot be based on mere speculation or conjecture. *See United States v. Wiley*, 846 F.2d 150, 155 (2d Cir. 1988) (reversing conviction where it was "apparent that in order to reach its verdict the jury must have engaged in false surmise and rank speculation"). Moreover, "[w]here a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible. [The court] must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (quotation marks omitted). "[A]t the end of the day, 'if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'" *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (quoting *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)).

## I.     The Court Should Enter a Judgment of Acquittal on the Mesothelioma Charges

Counts One, Two, and Five concerned the asbestos patient referral allegations. The evidence at trial fell well short of proving any of those charges.

### A.     The Government Failed To Prove an Agreement To Exchange Mesothelioma Referrals for Official Acts

To prove either honest services fraud or extortion, the Government had to prove a *quid pro quo* – an agreement to exchange referrals for official acts. Under *Skilling v. United States*, 561 U.S. 358 (2010), the honest services statute covers only bribes and kickback schemes, both

of which require a *quid pro quo*.  *See United States v. Bruno*, 661 F.3d 733, 743 (2d Cir. 2011) (*quid pro quo* is an "essential element of a bribery theory of honest services fraud").  Likewise, extortion under the Hobbs Act requires that the "public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  *Evans v. United States*, 504 U.S. 255, 268 (1992).

As the Second Circuit has made clear, a *quid pro quo* requires more than a mere "effort to **buy favor or generalized goodwill** from a public official who either has been, is, or may be at some unknown, unspecified later time, . . . in a position to act favorably on the giver's interests." *United States v. Ganim*, 510 F.3d 134, 149 (2d Cir. 2007) (emphasis added).  The parties' intent must be more than merely "to cultivate a relationship with the person or persons who provided [the payments]."  *Id.*  The Government must prove an **agreement to exchange payments for official acts**.  *See Bruno*, 661 F.3d at 743 ("A quid pro quo is a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the course of the exercise of his official authority."); *United States v. Rosen*, 716 F.3d 691, 699-700 (2d Cir. 2013) (same); *Evans*, 504 U.S. at 268 (extortion requires a "payment in return for [the official's] agreement to perform specific official acts").

The Government failed to prove such an agreement here.  Dr. Taub admitted that no such agreement existed:  "Q.  You did not have an explicit agreement to exchange patients for grants, did you?  A.  I did not."  11/4/15 Tr. at 424:5-7.  If there were any doubt, Dr. Taub's revisions to his non-prosecution agreement erase them.  Despite the threat of a felony conviction, **Dr. Taub refused to sign a draft non-prosecution agreement stating that he gave referrals to Mr. Silver "in exchange for" official acts**.  *Compare* DX 25 (draft non-prosecution agreement), *with* DX 27 (final non-prosecution agreement).  Dr. Taub agreed to sign the document only after the

prosecutor removed all language suggesting the existence of a *quid pro quo*.  No rational juror could find Mr. Silver guilty when the Government's own star witness denies an essential element of the offense.

The absence of any agreement to exchange referrals for official acts was a running theme throughout Dr. Taub's testimony.  For example, Dr. Taub **explicitly denied** sending referrals to Mr. Silver in exchange for his assistance in getting his son a job.  *See* 11/5/15 Tr. at 554:2-5 ("Q.  You did not exchange referrals of patients to Weitz & Luxenberg for your son getting a job – your Ivy-league son getting a job at OHEL?  A.  No.").  He denied sending referrals to Mr. Silver in exchange for his assistance in getting his daughter a job.  *See id.* at 558:2-4 ("Q.  And you did not refer patients to Weitz & Luxenberg in exchange for an unpaid internship for your daughter, did you?  A.  No.").  He denied sending referrals to Mr. Silver in exchange for directing a grant to Shalom Task Force.  *See id.* at 548:22-25 ("Q.  Dr. Taub, you didn't refer patients to Weitz & Luxenberg in exchange for any kind of state grant to Shalom Task Force, did you?  A.  No.").  And he never claimed he sent referrals to Mr. Silver in exchange for his legislative resolution and proclamation.  *See* 11/4/15 Tr. at 460:13-15 ("Q.  And I take it you would not send patients to Weitz & Luxenberg in exchange for receiving a resolution?  A.  It was nice to get the plaque.").  Viewing that record as a whole, no rational jury could infer *any* sort of agreement between Dr. Taub and Mr. Silver to exchange referrals for official acts.

To be sure, Dr. Taub repeatedly testified that he was motivated by a desire to "develop a relationship" with Mr. Silver in order to "incentivize" Mr. Silver to fund mesothelioma research. *See, e.g.*, 11/4/15 Tr. at 276:13-18; *id.* at 279:1-9; *id.* at 299:10-16; *id.* at 340:17-25.  But that is not enough under Second Circuit law.  Evidence that Dr. Taub wanted to "incentivize" Mr. Silver to act a certain way or to "develop a relationship" with him does not amount to an

6

**agreement to exchange referrals for official acts** – "as the opportunities arise" or otherwise. *Bruno*, 661 F.3d at 744; *Rosen*, 716 F.3d at 699-700.   At best, it is precisely what the Second Circuit says is **not** sufficient:   An effort to "buy **favor or generalized goodwill** from a public official who either has been, is, or may be at some unknown, unspecified later time, . . . in a position to act favorably on the giver's interests."  *Ganim*, 510 F.3d at 149 (emphasis added).

The evidence showed that Dr. Taub sent Mr. Silver referrals for legitimate reasons, not least of which was that Weitz & Luxenberg was a top asbestos firm.  *See, e.g.*, 11/4/15 Tr. at 284:11-19, 398:21-399:4, 403:13-23; 11/5/15 Tr. at 535:11-537:10, 543:1-10, 611:25-612:7, 643:21-644:20.  The evidence also made clear that Mr. Silver awarded Dr. Taub the research grants for reasons wholly unrelated to the referrals.  Grants for purposes of medical research were common, and the amounts of the grants were not unusual.  *See, e.g.*, DX 35-1, 35-3, 34-1. Moreover, Dr. Taub proposed to conduct research relating to mesothelioma arising out of the 9/11 terrorist attacks that occurred in Mr. Silver's district.  *See, e.g.*, GX 367-1, 368-1, 11/5/15 Tr. at 487:2-23; 11/9/15 Tr. at 917:24-918:8.

Indeed, Dr. Taub testified that, when he began sending referrals to Mr. Silver, he was hoping Mr. Silver would convince **Weitz & Luxenberg** – not the State – to fund mesothelioma research.  *See, e.g.*, 11/4/15 Tr. at 267:5-268:6 ("I explained to Mr. Silver . . . that we would like his help, if possible, to influence Weitz & Luxenberg to donate funds to MARF . . . [b]ecause I felt that he was a senior member of the firm.  He would have influence in order to be able to discuss this and would allow us access.").  Even as late as 2010, Dr. Taub continued to hope that the referrals would result in **Weitz & Luxenberg's** funding of research.  *See* GX 595-1 ("I sent a case to Shelly Silver today . . . [and] point[ed] out to him that Perry Weitz, in contrast to other law firms, has not given a dime for research . . . ."); 11/5/15 Tr. at 620:20-621:12 (similar).  Even

7

if efforts to "incentivize" someone to fund research could amount to a *quid pro quo* – and they cannot – those efforts are irrelevant in this case, which charges only an agreement to exchange referrals for **official acts**.

Even if Dr. Taub intended to exchange referrals for official acts, there is no evidence that **Mr. Silver** shared that understanding or was even aware of it.  What matters is Mr. Silver's intent, not Dr. Taub's.  "The payment and the receipt of a bribe are not interdependent offenses, for obviously the donor's intent may differ completely from the donee's."  *United States v. Anderson*, 509 F.2d 312, 332 (D.C. Cir. 1974).  And for extortion, "the government must prove beyond a reasonable doubt that the victims were motivated to make payments as a result of the defendant's control or influence over public officials **and that the defendant was aware of this motivation**."  *United States v. McDonough*, 56 F.3d 381, 388 (2d Cir. 1995) (emphasis added).  No rational juror could find that Mr. Silver intended to engage in a corrupt *quid pro quo*, regardless of Dr. Taub's intent.

For one thing, Mr. Silver had perfectly legitimate reasons to direct research funds to Dr. Taub.  The 9/11 attacks occurred in Mr. Silver's district and caused serious air quality concerns due to the release of asbestos into the air.  Dr. Taub's letters to Mr. Silver specifically highlighted those concerns.  *See, e.g.*, 11/4/15 Tr. at 295:25-296:15, 447:1-17.

State officials testified that the grants for Dr. Taub's research underwent the same multi-step procedure required for all grants.  *See* 11/9/15 Tr. at 914:11-915:3 (August); *id.* at 996:8-997:7 (Rodgers).  There was no evidence that any of those officials concealed Mr. Silver's role.  *See, e.g.*, 11/9/15 Tr. at 882:5-21 (Franco); *id.* at 998:22-999:7 (Rodgers).  Nor did Mr. Silver instruct them to do so.  *See, e.g.*, 11/9/15 Tr. at 920:23-921:4 (August).

8

Mr. Silver's own actions in the grant process refute any *quid pro quo*. When Dr. Taub submitted his request for a second grant in March 2006, *see* DX 20, Mr. Silver approved the grant internally by August 2006, *see* GX 117. If there were a *quid pro quo* arrangement, Mr. Silver surely would have notified Dr. Taub immediately. But he did not – leading Dr. Taub to send a follow-up request in October 2006. *See* GX 120. Dr. Taub found out about the grant only when he received a letter from the Department of Health in January 2007 – almost ***six months*** after Mr. Silver approved it. DX 12.

After the state funding became unavailable, moreover, Mr. Silver never asked ***Weitz & Luxenberg*** to donate money to Dr. Taub's research – even though he would have had every reason to do so if there were a corrupt agreement over referral fees. Mr. Weitz and Mr. Luxenberg both testified that the firm had donated money for medical research in the past, including money for mesothelioma research. *See* 11/4/15 Tr. at 226:9-227:2 (Weitz); 11/10/15 Tr. at 1202:8-1203:15 (Luxenberg). Asking Weitz & Luxenberg to fund Dr. Taub's research would have been an easy way to continue a corrupt *quid pro quo* arrangement if one existed.

Finally, Dr. Taub's conduct after the grants ended belies any suggestion of an unlawful *quid pro quo*. Dr. Taub received his last state grant in January 2007, *see* DX 12; 11/4/15 Tr. at 339:3-16 (Taub), and submitted his last request in October 2007, GX 129. Yet Dr. Taub continued to refer patients to Mr. Silver for years after that. *See* GX 1508 (demonstrative showing referral of two patients in 2008, seven in 2009, and thirteen from 2010 through 2013). Dr. Taub's continued referral of patients even after the grants dried up gave Mr. Silver no reason to believe there was any agreement to exchange referrals for grants.

Unable to muster any actual evidence of a *quid pro quo*, the Government pointed to Mr. Silver's annual disclosure forms in an effort to show consciousness of guilt. But those forms

showed no such thing.  Mr. Silver filed those forms with the appropriate state ethics body every year as the law required.  *See* GX 913-24.  And every year, Mr. Silver gave a "general description of the principal subject areas of matters undertaken" by him as "of counsel" to Weitz & Luxenberg – just as the disclosure forms directed.  *See* 11/17/15 Tr. at 2125:14-2127:5 (Reid). There was no evidence that Mr. Silver under-reported the amount of income he earned from Weitz & Luxenberg, or that the Legislative Ethics Commission ever asked him to provide additional detail – despite multiple levels of review.  *See* 11/17/15 Tr. at 2167:12-2169:24, 2170:7-2172:24 (Reid).

The Government claimed the responses were misleading because Mr. Silver described his work as "personal injury."  But the forms asked Mr. Silver to "give a general description of the principal subject areas of matters undertaken ***by [him]***."  *See, e.g.*, GX 924 at SS_054079 (emphasis added).  Mr. Silver was a ***personal injury*** lawyer.  *See* 11/10/15 Tr. at 1081:8-11 (Klein) ("Q.  So, is it fair to say that after Mr. Silver joined Weitz & Luxenberg his principal subject area continued to be personal injury?  A. Yes, it would be.").  His responses were thus a perfectly accurate description of his ***own*** specialty.  When Dr. Taub recommended mesothelioma patients to Mr. Silver, Mr. Silver directed them to ***other*** Weitz & Luxenberg attorneys who specialized in that field.  *See* 11/4/15 Tr. at 217:5-218:18 (Weitz).  In any event, the firm's founder testified that "personal injury" work ***includes*** asbestos claims.  *Id.* at 222:21-224:10 (Weitz); DX 2; GX 913 at SS_054062.

The Government fares no better with its arguments over statements to the press.  There was nothing remarkable about the absence of a press release announcing the grants to Dr. Taub. Government witnesses confirmed that press releases were not issued as a matter of course for all – or even most – state grants.  *See* 11/3/15 Tr. at 163:17-19 (Paulin) ("Q.  Do you always issue a

press release when you make these grants?  A.  Not always.  I sometimes do and I sometimes don't."); 11/17/15 Tr. at 2236:20-2237:24 (Whyland).  Mr. Silver never instructed his press secretary to conceal the grants.  *See* 11/17/15 Tr. at 2238:15-18, 2239:14-2240:11 (Whyland). And he told a reporter *during a recorded interview* that some of his clients at Weitz & Luxenberg had *"asbestos" claims*.  GX 1-A.

Rule 29 requires more than tenuous inferences "no more valid than others equally supported by reason and experience."  *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991) (quotation marks omitted).  The Government failed to meet that threshold here.  The Court should enter a judgment of acquittal.

### B. The Government Failed To Prove That Mr. Silver Deprived Anyone of Property or Gained Possession of That Property

The Government's extortion charge also fails for a separate reason.  To prove Hobbs Act extortion, the Government must show that Mr. Silver obtained property from someone "under color of official right."  18 U.S.C. § 1951(b)(2).  There must be " 'not only the *deprivation* but also the *acquisition* of property.' "  *Sekhar v. United States*, 133 S. Ct. 2720, 2725 (2013) (quoting *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 404 (2003)) (emphasis added); *see also id.* (victim must " 'part with' his property, . . . [and] the extortionist 'gain possession' of it").  "The property extorted must therefore be *transferable* – that is, capable of passing from one person to another."  *Id.*

As Mr. Silver explained in his motion to dismiss the Superseding Indictment, the conduct charged in this case – and the evidence presented in support of those charges – did not amount to extortion.  Dkt. 39 at 9-14.  The so-called "mesothelioma leads" were nothing but recommendations to patients to contact Weitz & Luxenberg – not obtainable property within the meaning of the statute.  Mr. Silver, moreover, did not "deprive" anyone of that so-called property

merely because Dr. Taub recommended Weitz & Luxenberg to his patients.  This Court recognized in its opinion denying the motion to dismiss that, if the evidence at trial showed merely that Dr. Taub "recommended that his patients contact Weitz & Luxenberg," Mr. Silver "would not be guilty of Hobbs Act extortion under *Sekhar*."  Dkt. 46 at 9-10.  But that is all the evidence showed.

Multiple witnesses, including Dr. Taub himself, acknowledged that a patient was free to reject his recommendations, and sometimes did.  *See* 11/4/15 Tr. at 634:1-11 (Taub); 11/10/15 Tr. at 1197:18-23 (Luxenberg).  In fact, Dr. Taub did not even *know* whether the majority of his patients ended up using Weitz & Luxenberg.  11/4/15 Tr. at 634:8-11 (Taub).  In all events, it remained the patient's decision whether to follow Dr. Taub's recommendation and retain Weitz & Luxenberg.  11/10/15 Tr. at 1197:18-23 (Luxenberg).

There was simply no evidence that mesothelioma leads were a transferable property right or that Mr. Silver deprived anyone of that property or obtained it for himself.  Nor was there any evidence of the deprivation and acquisition of any other property right.  The Government has not proved a transfer of property within the meaning of *Sekhar*.

## C.    The Government Failed To Prove a Paradigmatic Bribe or Kickback Under *Skilling*

The evidence also failed to establish honest services fraud.  *Skilling* limits the honest services statute to "paradigmatic cases of bribes and kickbacks," not mere conflicts of interest. 561 U.S. at 409-11.  Mr. Silver's routine financial relationship with Weitz & Luxenberg is not the sort of "side payment[] from a third party" that *Skilling* requires for an illegal bribe or kickback.  *Id.* at 413; *cf. United States v. Robinson*, 663 F.3d 265, 272 (7th Cir. 2011) (under federal bribery statute, "compensation paid in the ordinary course shall not be construed as a

bribe").  Without any such paradigmatic bribe or kickback, the Government's evidence is insufficient to support a conviction.

### D.      The Government Failed To Prove Any Official Act Within the Limitations Period

Finally, the Government failed to prove any official act within the limitations period. Both the honest services statute and the Hobbs Act require an "official act" by the defendant. *See Bruno*, 661 F.3d at 744; *Evans*, 504 U.S. at 268.  The Government did not prove that here.

Most of the "acts" the Government alleged were not "official" in any conceivable sense. Those include: (i) Mr. Silver's recommendation that Judge Martin Schoenfeld hire Aimee Bandler as an unpaid intern, *see* 11/12/15 Tr. at 1323:19-21 (Schoenfeld, J.); (ii) Mr. Silver's role (if any) in helping Dr. Taub secure a proclamation and resolution and presenting the document at an American Cancer Society event, *see* GX 315, 380-83; 11/4/15 Tr. at 460:13-15 (Taub); and (iii) Mr. Silver's request to OHEL that it extend a job interview to Jonathan Taub, *see* 11/12/15 Tr. at 1556:14-1557:5 (Mandel).  Those sorts of routine personal courtesies cannot support a conviction for honest services fraud or extortion.

Nor can the two research grants support the conviction:  They were outside the limitations period.  Under 18 U.S.C. § 3282, the Government had to prove that Mr. Silver committed the charged offenses within five years of the indictment.  Mr. Silver approved the first grant on July 5, 2005, GX 367-1, and approved the second on November 30, 2006, GX 284.  The Government did not indict Mr. Silver until February 19, 2015 – almost ***nine years later***.  Dkt. 9. The Court should accordingly grant a judgment of acquittal.

## II.   **The Government Failed To Prove the Real Estate Charges**

Counts Three, Four, and Six concern referral fees Mr. Silver earned from Goldberg & Iryami in connection with its real estate work.  The evidence was similarly insufficient to support a conviction on those charges.

### A.   **The Government Failed To Prove an Agreement To Exchange Referral Fees for Official Acts**

As with the mesothelioma charges, the Government had to prove a *quid pro quo* – an ***agreement to exchange payments for official acts***.  *See Bruno*, 661 F.3d at 743.  A jury cannot convict if "the benefit is intended to be, and accepted as simply an effort to buy favor or generalized goodwill."  *Ganim*, 510 F.3d at 149.  The Government did not come close to meeting that standard.

As with Dr. Taub, ***both Glenwood and Witkoff denied any agreement with Mr. Silver to trade benefits for official acts***.  *See* 11/16/15 Tr. at 1823:25-1824:10 (Runes) ("Q.  And Mr. Silver never came to you and said, I want something in exchange for helping Glenwood with these laws?  A.  No."); *id.* at 1831:11-21 ("Q.  And you certainly never offered Mr. Silver anything of value in exchange for his agreement to go along with a proposal that you were making on rent regulation; correct?  A.  No. . . .  Q.  And Mr. Silver never demand[ed] anything of value from you in exchange for him taking some official action to go along with what you were proposing in rent regulations?  A.  No."); 11/17/15 Tr. at 2051:15-24 (Witkoff) ("Q.  And at the time Mr. Silver did not tell you he wanted you to send Goldberg business in exchange for him doing something for you, did he?  A.  No.  Q.  In fact, you did not give Mr. Goldberg business in exchange for Mr. Silver's specific exercise of his official authority in some ways; is that right? . . .  A.  No."); *see also* 11/16/15 Tr. at 1830:24-1831:2 (Runes) (similar); 11/13/15 Tr. at 1686:5-9 (Meara) (similar).

Indeed, Glenwood and Witkoff were ***not even aware that Mr. Silver was receiving referral fees*** from Goldberg & Iryami until late December 2011 and June 2014 respectively – ***after*** the key official acts at issue.  Glenwood learned about Mr. Silver's referral fees only in December 2011, "long, long after" the Rent Act of 2011 was passed in June 2011.  11/16/15 Tr. at 1850:15-1851:3 (Runes).  Likewise, Steven Witkoff testified that he did not learn about the fees until June 2014, ***three years after*** the Rent Act was passed.  11/17/15 Tr. at 2037:2-4.

At most, the evidence showed that the Developers were attempting to foster generalized goodwill.  Mr. Witkoff testified that he gave Goldberg business because "it was an easy favor" and he wanted to "create goodwill."  11/17/15 Tr. at 2025:3-7; *see also id.* at 2027:14-16, 2052:3-4, 2058:10-25.  And there was no indication that Mr. Litwin of Glenwood – whom the Government declined to call as a witness – hired Goldberg & Iryami in the 1990s or continued to retain the firm in 2012 in exchange for an official act.

There was no evidence that Mr. Silver agreed to influence laws on rent regulation, 421-a, or 421-g; or that he took other official action in Glenwood or Witkoff's favor.  The uncontradicted evidence showed that Mr. Silver's position on the Rent Act of 2011 was as pro-tenant as it had always been.  *See* 11/13/15 Tr. at 1635:16-1636:12, 1663:10-23 (Meara); 11/16/15 Tr. at 1824:12-14, 1886:13-17 (Runes).  In fact, the Rent Act of 2011 was the first legislation in New York to strengthen protections for rent-regulated tenants in over two decades.  11/13/15 Tr. at 1674:7-13 (Meara).  It is thus no surprise that witnesses repeatedly denied that Mr. Silver had peddled his influence over rent legislation.  *See, e.g.*, 11/16/15 Tr. 1823:25-1824:10 (Runes) ("Q.  And Mr. Silver never came to you and said, I want something in exchange for helping Glenwood with these laws?  A.  No."); *id.* at 1831:11-21 ("Q.  And Mr. Silver never demand[ed] anything of value from you in exchange for him taking some official action to go

15

along with what you were proposing in rent regulations?  A.  No."); 11/17/15 Tr. at 2051:15-24 (Witkoff) ("Q.  And at the time Mr. Silver did not tell you he wanted you to send Goldberg business in exchange for him doing something for you, did he?  A.  No."); 11/13/15 Tr. at 1686:5-9 (Meara) ("Q.  Mr. Silver did not demand from you something of value in exchange for taking legislative action, did he? . . . .  A.  No.").

Nor could any juror find beyond a reasonable doubt that Mr. Silver had any agreement to trade referral fees for favorable treatment by the Public Authorities Control Board.  Mr. Runes explicitly *denied* such an agreement.  11/16/15 Tr. at 1824:6-10, 1816:10-22.  And there is no evidence that Glenwood and Mr. Silver reached any agreement to influence how Mr. Silver would vote.  *Id.* at 1816:11-22 (Runes).

The Government's final theory – that Mr. Silver took action in 2008 and 2011 to stop a methadone clinic – fares no better.  There is no evidence that Glenwood exchanged referral fees for official acts regarding the clinic.  Glenwood could not have done so in 2008 or 2011 because *it did not yet know that Mr. Silver was receiving them.*  11/16/15 Tr. at 1787:2-1788:1, 1792:11-1793:4 (Runes).  When Brian Meara called Mr. Silver's office about the clinic, moreover, Judy Rapfogel, Mr. Silver's chief of staff, was "*already well aware* of the program and informed [Meara] that they were opposing it," that they had "already made a decision. It doesn't matter. We're opposing it." 11/13/15 Tr. at 1602:3-1603:1 (Meara) (emphasis added); *id.* at 1645:2-14.  No rational juror could infer that Mr. Silver entered into a corrupt agreement to exchange referral fees for his *preexisting* opposition to the clinic.

No one from Goldberg & Iryami testified that Mr. Silver tried to conceal his referral fees from the firm.  Ms. Iryami testified just the opposite.  *See* 11/12/15 Tr. at 1505:6-11 (Iryami) ("Q.  Did you consciously decide that you were not going to disclose that Mr. Silver was

referring matters to your firm?  A.  No.  **Q.  And Mr. Silver didn't come up to you and say, Ms. Iryami, please don't disclose that I'm referring cases to you?  A.  No.**" (emphasis added)). Goldberg & Iryami fully and accurately reported to the federal government the referral income it paid to Mr. Silver.  *Id.* at 1510:10-17, 1511:21-23.  And it waited until 2012 to issue retainer agreements to its clients only because of Ms. Iryami's busy schedule.  *See id.* at 1504:23-24 ("Q. You were sort of overtaken by the press of events?  A.  Yes.  Busy with work, personal matters.").  Lastly, there was no evidence Mr. Silver had ***anything*** to do with preparing the one-page letter regarding the division of fees for Goldberg & Iryami's representation of Glenwood's LLCs – the linchpin of the Government's case.  GX 700; *see* 11/12/15 Tr. at 1523:13-17 (Iryami) ("Q.  I just want to be absolutely clear.  There is nothing to suggest to you that Mr. Silver had anything to do with preparing this document, is that right? . . . .  A.  Correct.").

Nor did anything in Mr. Silver's disclosure forms show consciousness of guilt.  The forms did not ask for a description of matters on which the legislator did no work or matters the legislator referred to other attorneys.  11/17/15 Tr. at 2127:4-2128:17 (Reid).  Mr. Silver did not perform legal work on behalf of the Developers ***or*** their LLCs, and he was not a partner or shareholder in Goldberg & Iryami.  *See* 11/12/15 Tr. at 1482:11-16, 1494:20-1495:18 (Iryami). Nothing required Mr. Silver to list the Developers' identities on his disclosure forms in any event.  *See* 11/17/15 Tr. at 2162:18-2163:9 (Reid) (agreeing that legislators need not disclose client identities in response to Question 8 "other than in very specific circumstances," and that for Question 13, they "did not need to disclose the identity of their clients" at all).

Mr. Silver's description of his "source" of income was equally unremarkable.  *See, e.g.*, GX 922.  There was no evidence that Mr. Silver misstated the ***amount*** of income he earned from his outside law practice.  And the Government's own witness confirmed that it was appropriate

to list "law practice" as the "source" of a legislator's outside income where the income was deposited into a specific bank account – just as Mr. Silver had done from 2009 through 2013. *Compare* 11/17/15 Tr. at 2163:23-2164:10 (Reid), *with* GX 920-24 (disclosure forms for 2009 through 2013). Mr. Silver was "of counsel" to Weitz & Luxenberg, **not** Goldberg & Iryami, and in that role he was permitted to earn referral income from other law firms and deposit that income into his law practice account. *See* 11/10/15 Tr. at 1088:9-15 (Klein); *id.* at 1190:3-6 (Luxenberg). When Mr. Silver **voluntarily revised** his disclosures to clarify that his law practice income "includ[ed]" fees from Weitz & Luxenberg, *see, e.g.*, GX 920 at SS_054142, Mr. Silver received no indication from anyone involved in the review process that his forms had been incomplete or misleading, *see* 11/17/15 Tr. at 2170:17-2173:16 (Reid).

Mr. Silver's statements to the press do not fill that gap. While the Government faults Mr. Silver for stating that his clients had no "business before the state," *see, e.g.*, GX 274, there was no evidence those statements were false: The Developers were **not** Mr. Silver's clients; and the work **Goldberg & Iryami** did for Glenwood's **LLCs** had nothing to do with the State. *See* 11/12/15 Tr. at 1494:20-1495:18 (Iryami) ("Q. And Mr. Silver didn't do any of that work with Goldberg & Iryami, did he? A. No."); *id.* at 1492:6-9 ("Q. So when you're representing your clients before the [New York City Finance] commission, you're not doing business before the state; correct? A. Correct.").

Finally, the Developers' purported "surprise and concern" about Mr. Silver's referral fees does not prove corrupt intent. *See, e.g.*, 11/13/15 Tr. at 1609:4-5 (Meara). The witnesses testified that the basis for any "concern" was public perception and political "optics" – not fears about a corrupt *quid pro quo* arrangement. *See* 11/16/15 Tr. at 1836:12-14 (Runes) ("Q. And you believed that perhaps that payment of referral fees was bad optics? A. I believe I have used

that expression."). Neither Mr. Meara nor Mr. Runes took any steps to conceal their lawful lobbying of Mr. Silver, or gave any indication that Mr. Silver had asked them to do so. *See* 11/13/15 Tr. at 1623:11-16 (Meara) ("Q. Mr. Meara, you did not, in any way, conceal that you lobbied Mr. Silver on behalf of Glenwood concerning real estate legislation, did you? A. Concealed to who? Q. Anyone. A. No."). And Mr. Runes confirmed that, after Goldberg & Iryami issued new engagement letters in January 2012, *see* GX 700, 701, Mr. Silver did not "say anything to suggest . . . that if the [Glenwood] LLCs stopped working with Goldberg & Iryami[,] he would take official action harmful to Glenwood." 11/16/15 Tr. at 1845:22-1846:3.

In sum, there was no evidence of any *quid pro quo* agreement with the Developers. The Court should grant a judgment of acquittal.

### B.    The Government Failed To Prove That Mr. Silver Deprived Anyone of Property and Gained Possession of That Property

As explained in Mr. Silver's motion to dismiss, the Real Estate Charges do not amount to extortion. There was no evidence that Mr. Silver deprived anyone of a transferable property right or obtained it for himself in connection with the tax certiorari work that Goldberg & Iryami performed. Absent such evidence, the Government failed to prove extortion under *Sekhar*.

### C.    The Government Failed To Prove a Paradigmatic Bribe or Kickback Under *Skilling*

Similarly, as explained in the motion to dismiss, there was no paradigmatic bribe or kickback as required under *Skilling* to prove honest services fraud. Mr. Silver's routine financial relationship with Goldberg & Iryami was not the sort of "side payment[ ] from a third party" that *Skilling* requires for an illegal bribe or kickback, and a mere conflict of interest is not enough. 561 U.S. at 413.

### D.      The Government Failed To Prove an Official Act

Finally, the Government failed to prove that any action Mr. Silver took in connection with the real estate charges was an "official act" – a required element for both honest services fraud and extortion.  *Bruno*, 661 F.3d at 744; *Evans*, 504 U.S. at 268.

For example, there was no evidence that Mr. Silver took any official act in connection with the applications that Glenwood's LLCs submitted to the PACB.  Ms. Putnam testified that Mr. Silver was not present at ***any*** of the relevant PACB meetings.  *See* 11/16/15 Tr. at 1945:19-22 ("Q. . . . Mr. Silver wasn't present at any of those PACB meetings where those matters were discussed, correct?  A.  Not to my knowledge.").  And Mr. Runes denied that Mr. Silver was involved at all.  *See id.* at 1816:10-22.

The Government similarly failed to prove any official act in connection with the methadone clinic.  A letter referred vaguely to Mr. Silver's "opposition" to that proposal.  11/13/15 Tr. at 1603:15-1605:5; GX 788.  But there was no evidence that the "opposition" took the form of an official act.  Finally, as explained above, there was no evidence that Mr. Silver took any relevant official act with respect to the Rent Act of 2011 – legislation that was undeniably pro-tenant.

### III.     The Government Failed To Prove the Money Laundering Charge

Count Seven accuses Mr. Silver of money laundering: "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity."   18 U.S.C. § 1957(a).   The Government failed to prove that charge as well.

For one thing, absent a violation of the Hobbs Act or the honest services statute, there is no evidence that any of the funds at issue were "criminally derived property" or proceeds "derived from specified unlawful activity."   Thus, if the Court grants a judgment of acquittal

with respect to those Counts, it necessarily must also grant a judgment of acquittal on Count Seven as well.

Even if there were sufficient evidence on those other counts, the Court should still enter a judgment of acquittal on this count. The Government failed to prove beyond a reasonable doubt that the proceeds Mr. Silver invested in the private investment vehicle were proceeds of the other charged offenses. The evidence showed that Mr. Silver originally deposited his referral fees into an account in which they were commingled with a large amount of other funds not challenged in this case – including, for example, his annual salary from Weitz & Luxenberg. *See* GX 1229 (account history for "Sheldon Silver: Counselor at Law" account). There is no evidence that, when Mr. Silver withdrew funds from that commingled account to invest in the private investment vehicle, the withdrawal consisted of "tainted" rather than "untainted" funds. The commingled nature of the account precludes the Government from proving that fact.

The Fifth Circuit has ordered a judgment of acquittal on similar facts. It explained: "[W]here an account contains clean funds sufficient to cover a withdrawal, the Government cannot prove beyond a reasonable doubt that the withdrawal contained dirty money." *United States v. Loe*, 248 F.3d 449, 467 (5th Cir. 2001). The Ninth Circuit agrees. *See United States v. Rutgard*, 116 F.3d 1270, 1292-93 (9th Cir. 1997) (holding that where the amount of money left in an account after a transfer charged under § 1957 exceeds the amount of criminally derived proceeds in the account, the government cannot prove that any illegally derived proceeds were transferred). The Court should adopt that well-reasoned approach.

Because the Government cannot prove beyond a reasonable doubt that the funds withdrawn from Mr. Silver's commingled account and placed into the investment vehicle were

the challenged referral fees rather than other unchallenged receipts, Mr. Silver is entitled to a judgment of acquittal on this count too.

## <u>CONCLUSION</u>

The Court should enter a judgment of acquittal for Mr. Silver on all counts.

Dated:   January 21, 2016                      Respectfully submitted,
             New York, New York

  /s/ Joel Cohen                                        /s/ Steven F. Molo
Joel Cohen                                     Steven F. Molo
STROOCK & STROOCK & LAVAN LLP                  Robert K. Kry
180 Maiden Lane                                Justin V. Shur
New York, New York  10038                      MOLO LAMKEN LLP
Telephone: (212) 806-5644                      540 Madison Avenue
Facsimile:  (212) 806-6006                     New York, New York  10022
                                               Telephone: (212) 607-8160
                                               Facsimile:  (212) 607-8161

*Attorneys for Defendant*