USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____5/3/16___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\------------------------------------------------------------ X

UNITED STATES OF AMERICA,                          :

                                                       :

                 -against-                          :

                                                       :

SHELDON SILVER,                                    :

                                  Defendant.          :

\------------------------------------------------------------ X

15-CR-093 (VEC)

MEMORANDUM
OPINION & ORDER

VALERIE CAPRONI, United States District Judge:

        After a twelve-day jury trial, twenty-five witnesses, and three days of jury deliberations, on November 30, 2015, Sheldon Silver, former Speaker of the New York State Assembly, was convicted on two counts of honest services mail fraud, 18 U.S.C. §§ 1341, 1346, two counts of honest services wire fraud, 18 U.S.C. §§ 1343, 1346, two counts of extortion under color of official right, 18 U.S.C. § 1951, and one count of money laundering, 18 U.S.C. § 1957.  Silver renews his motion pursuant to Rule 29 for a judgment of acquittal and moves pursuant to Rule 33 for a new trial.  For the following reasons, Silver's motions are denied.

## BACKGROUND[1]

        Silver orchestrated two criminal schemes that abused his position as the Speaker of the New York State Assembly and as an elected Assemblyman for unlawful personal gain.  The two schemes follow the same basic model: Silver received bribes and kickbacks in the form of referral fees from third party law firms in exchange for official actions.  Silver also engaged in money laundering pursuant to which he invested the proceeds of his unlawful schemes into private, exclusive investment vehicles.

---

[1]      The Court assumes the parties' familiarity with the evidence that was introduced at trial and with the procedural history of the case.  The Court refers to exhibits by the exhibit number they were given at trial and refers to the trial transcript by "Tr."

I.      **The Mesothelioma Scheme**

The first scheme is the "Mesothelioma Scheme."  In the fall of 2002, Silver became "of

counsel" to the personal injury law firm Weitz & Luxenberg.  Tr. 1181.  Silver received a fixed

salary for lending his name to the firm (Silver was not expected to and did not perform any legal

work for the firm's clients) and received a referral fee for any case he brought into the firm; his

referral fee was a set percentage of the fees earned by the firm on any case Silver referred to the

firm.  Tr. 180-81, 184-86, 1010, 1016, 1182.  Mesothelioma cases were particularly lucrative,

generating on average hundreds of thousands of dollars in legal fees per case; the firm did not

donate to mesothelioma medical research.  Tr. 176-77, 262, 273, 1149, 1188, 1206-09.

Dr. Robert Taub, a physician-researcher at Columbia-Presbyterian Hospital, specialized

in mesothelioma, a rare cancer caused by exposure to asbestos.  Tr. 249-51.  Dr. Taub sought

funding for mesothelioma medical research, and, aware of the value of these cases to law firms,

he believed that firms that profit from mesothelioma cases should donate to support

mesothelioma research.  Tr. 262-64.  As of 2003, Dr. Taub knew that Weitz & Luxenberg had

not donated any substantial sums to mesothelioma research.  Tr. 264-65.  For that reason, Dr.

Taub did not refer his patients to the firm for legal representation.  *Id.*  In 2003, Dr. Taub, who

was an acquaintance of Silver, approached Silver at an event to ask him to encourage Weitz &

Luxenberg to donate money to mesothelioma research.  Tr. 265, 267-68.  Silver, without

consulting anyone at the firm, responded that he could not get Weitz & Luxenberg to do so.  Tr.

191, 268.  But, within two weeks, through a mutual friend (Daniel Chill, who had introduced

them), Silver made it known to Dr. Taub that he wanted Dr. Taub to refer mesothelioma cases to

Weitz & Luxenberg through him.  Tr. 269-70, 273.  Responding to that request, Dr. Taub started

referring mesothelioma patients who were not represented to Silver for legal representation; Dr.

2

Taub explained that he wanted to develop a relationship with Silver that would help him receive research funding.  Tr. 273-74, 276.  In addition to referring patients to Silver, Dr. Taub also gave the patients' contact information to Silver.  Tr. 284-87.  Although Dr. Taub did not know the specifics of the financial arrangement between Silver and the firm, he thought Silver would benefit financially.  Tr. 274.  Silver made it known to Dr. Taub that he was pleased with the referrals.  *Id.*  Over approximately ten years, Silver received roughly $3 million in referral fees for cases referred by Dr. Taub.  Tr. 276, 1016; GX 1509.

Several months after Dr. Taub began referring patients to Silver, Silver made it known to Dr. Taub that he should request state funding through Silver.  Tr. 273-74.  In 2005, a few months after Silver received his first referral fee check from Weitz & Luxenberg for $176,048.02, he approved the first of two $250,000 New York State grants to Columbia University to support Dr. Taub's research.  Tr. 275, 661-62, 674-76, 1028-33; GX 115, 284, 514-1.  The grants were funded out of the Health-Care Reform Act ("HCRA") Assembly Pool; Silver alone controlled this pool of tax-payer money.  Tr. 654-59, 663-64, 672, 674, 897-900.  Silver did not publicly disclose the grants.  Tr. 100, 654-59, 899.  Silver never asked Dr. Taub about the progress of his research or about the connection between any predicted upsurge in mesothelioma cases and the discharge of asbestos particles into the air as a result of the collapse of the World Trade Center on September 11, 2001.  Tr. 637.  Dr. Taub presumed that his mesothelioma referrals were a factor in Silver's decision to approve the grants.  Tr. 639.

In 2007, the law changed, requiring Silver to disclose the recipients of HCRA grants and requiring disclosure of conflicts of interest. Tr. 748-52, 754, 762-63.  Although there were sufficient funds available for Silver to continue to support Dr. Taub's research, Tr. 732-33, 752-54, 758-62, after the change in the disclosure requirements, Silver told Dr. Taub, in substance,

that further requests for state grants would not be approved.  Tr. 339-40, 636-37.  Nevertheless,

Dr. Taub continued to send mesothelioma leads to Silver in hopes that by incentivizing him,

Silver would find a way to support his research.  Tr. 340.  Starting in 2010, Dr. Taub started

sending some mesothelioma leads that he would otherwise have given to Silver to the Simmons

Law Firm (another personal injury law firm that handles many mesothelioma cases) because the

Simmons Firm began funding his research.  Tr. 368, 375-76.  As the number of referrals from

Dr. Taub waned, Silver appeared, uninvited, in Dr. Taub's office to complain that he was

receiving fewer referrals; Dr. Taub told Silver that he was sending mesothelioma leads to the

Simmons firm, which was funding his research.  Tr. 376-77.  Dr. Taub understood from this

conversation that Silver wanted more leads, and he continued to provide some leads to Silver in

the continuing hope that Silver would help fund his research as the opportunity arose.  Tr. 378.

Although Silver did not facilitate any additional funding for Dr. Taub's research, he did

take other official actions on behalf of Dr. Taub.  In May 2011, Silver rushed his staff to prepare

a New York Assembly resolution and official proclamation so that Silver could present it to Dr.

Taub at a public event.  Tr. 388-93, 1260-63, 1265-66.  In August 2011, Silver agreed to help Dr.

Taub secure the necessary permits for a charity run to benefit mesothelioma research.  Tr. 401-

410; GX 525-21.  Dr. Taub thought at the time that Silver would likely want something—

probably referrals—in return for his help, which Dr. Taub described as a "pattern" when dealing

with Silver.  Tr. 401-02, 407.  Finally, in February 2012, at Dr. Taub's request, Silver helped Dr.

Taub's son get a job with Ohel, a not for profit organization that received substantial

discretionary state funding controlled by Silver (including a $2 million grant and a total of $6

million in funding over a ten-year period).  Tr. 413-416, 718-26, 1295; GX 316.  Silver called

Ohel's CEO twice and sent him a letter on Assembly letterhead relative to the younger Taub.  Tr.

4

1533-35, 1538-39; GX 167-3.  Silver had never previously nor has he subsequently asked Ohel to hire anyone.  Tr. 1534.[2]

Silver concealed his arrangement with Dr. Taub from Weitz & Luxenberg.  Although the attorneys at Weitz & Luxenberg knew that Silver's mesothelioma referrals were coming from Dr. Taub, Silver did not tell the firm that he was allocating state funding to Dr. Taub's research.  Tr. 189, 202-03, 1020, 1154-56, 1183-84, 1186.  Silver also did not disclose the fact that he was receiving referral fees for mesothelioma cases sent by Dr. Taub to his press officer, to fellow Assembly members, or to Department of Health officials responsible for administering the grants Silver provided.  Tr. 100, 933-35, 965, 2188-89, 2193-94, 2206.  Silver asked Dr. Taub not to tell their mutual friend, Mr. Chill, about any further referrals, even though Mr. Chill had facilitated Dr. Taub's introduction to Silver to request research funding.  Tr. 288-89.  Silver did not include on his financial disclosure forms that his compensation as a lawyer included referral fees for mesothelioma cases.  Tr. 2115; GX 913-924, 2009.  Finally, Silver's press statements indicated that his law practice consisted of representing individual claimants in personal injury actions, reviewing medical malpractice cases one half day per week, and referring those cases to trial lawyers at Weitz & Luxenberg.  Tr. 2224-27; GX 1-3.  He said he obtained clients based on his public reputation as a lawyer.  *Id*.  Although Silver mentioned in passing in one statement to the press that he handled asbestos cases, GX 1, he never disclosed that he received referrals from a doctor whose research was funded by HCRA grants controlled by Silver.

---

[2]       In 2007, Silver had his Assembly office staff call Martin Schoenfeld, a New York State Judge, to ask him to hire Dr. Taub's daughter, who was in law school, as an intern.  Judy Rapfogel, Silver's chief of staff, emailed the judge Dr. Taub's daughter's resume.  Tr. 277, 1323-26; GX 440.

II.     **The Real Estate Scheme**

The second scheme is the "Real Estate Scheme."  Glenwood Management and the

Witkoff Group are two major real estate developers in New York.  Both companies depend

heavily on the New York State government for favorable rent regulation, 421-a tax abatement

legislation, and tax-exempt financing that must be approved by the Public Authorities Control

Board ("PACB").[3]  Tr. 1370, 1590-94, 1699-1701, 1705-06, 1707-08, 1730, 1789, 2014-2020.

Both companies hired lobbyists and spent millions in political contributions in an effort to ensure

that they achieved those goals.  Tr. 1353-57, 1362-67, 1595-96, 1708-10, 1714-19, 1725-26,

1745; GX 754.  Silver exercised extraordinary control over legislation covering these issues and

over PACB approvals.  Silver essentially had veto power over all legislation because he could

unilaterally prevent any legislation he opposed from coming to a vote, and he could unilaterally

prevent the PACB from approving financing.  Tr. 78-82, 1595, 1698-1703, 1709-11, 1790, 1902-

03, 1929, 1934, 1961-63.

A former staffer and friend of Silver, Jay Arthur Goldberg, specialized in tax certiorari

work.  Tr. 1597.  Both Glenwood and Witkoff pursued tax certiorari cases to reduce the property

taxes of their buildings.  Tr. 1373-75, 2023-24.  In 1997, at a time when important real estate

legislation was up for renewal, Silver referred Glenwood to Goldberg at the law firm Goldberg &

Iryami for tax certiorari work.  Tr. 1427, 1635, 1747.  In 2005, Silver told Witkoff that his friend

Jay Goldberg at Goldberg & Iryami needed business. Tr. 2021-27.  Both Glenwood and Witkoff

moved some of their tax certiorari work from other law firms to Goldberg & Iryami, and

---

[3]     The PACB is a three member board comprised of a representative from the Governor, the Speaker of the
Assembly, and the Leader of the Senate.  Tr. 1927-28.  It must approve, *inter alia*, all state bond issues, including
those done on behalf of real estate developers.  Tr. 1926.  Approval of all items by PACB requires a unanimous
vote.  Tr. 928, 1701, 1703.  Thus, each member, whether directly or through his voting proxy, has absolute veto
power.

Glenwood did so increasingly over time.  Tr. 1381-84, 1430-38, 2027-35; GX 841.  Witkoff

agreed to refer some tax certiorari work to Goldberg & Iryami both because Witkoff wanted

access to Silver to discuss pending legislation that affected Witkoff's business, including 421-a

legislation, and because he did not want to "alienate" Silver, "one of the most powerful

politicians in state politics."  Tr. 2025-26.  Because Witkoff notified Silver that he had hired

Goldberg & Iryami, Silver knew Witkoff was willing to do "favors" for Silver.  Tr. 2027.  Silver

received a referral fee for all business Glenwood and Witkoff gave to Goldberg & Iryami—

twenty-five and fifteen percent, respectively, of Goldberg & Iryami's fees; over the years, Silver

received approximately $835,000 in such fees.  Tr. 1441, 2523-24.

Silver took a number of official actions that benefited Glenwood and Witkoff.  Silver,

through a proxy, voted as one of three members of the PACB to approve Glenwood's request for

tax-exempt financing for many of its projects. Tr. 1700-05, 1932-43, 1961-63; GX 1522.  Silver

officially opposed the relocation of a methadone clinic that was proposed to be located close to

one of Glenwood's rental buildings in Silver's district.  Tr. 1602-1605, 1749-53, 1783-86.  Silver

personally signed off on rent and 421-a tax abatement legislation.  Tr. 78-82, 1902-03.  Tellingly,

in advance of supporting the Rent Act of 2011 and the 421-a renewal, Silver met privately with

Glenwood and its lobbyist to ensure that Glenwood (which spoke only for itself, not for the

larger real estate industry) was satisfied with the terms of that legislation.  Tr. 1597-1601, 1741-

45.

Just as in the Mesothelioma Scheme, Silver also concealed his arrangement with

Glenwood and Witkoff.  Silver did not disclose to other New York legislators or PACB members

that he was receiving payments from Glenwood and Witkoff via Goldberg & Iryami.  Tr. 81-82,

1961-63.  Silver did not state on his financial disclosure forms that his compensation as a lawyer

included referral fees from Goldberg & Iryami for taxi certiorari work; indeed, he never mentioned Goldberg & Iryami or the real estate industry as a source of income on his disclosure forms.  Tr. 2115; GX 913-24, 2009.  Silver did not inform his press officer that he received any income from the real estate industry.  Tr. 2308.  Silver affirmatively misrepresented the situation to the press, telling them that in his work as a lawyer he did not represent big companies or anyone who had business before the State.  GX 1, 2, 3, 4.  Silver concealed the fee-sharing arrangements while hypocritically telling the press that "disclosure [was] the key" to avoiding corruption because it "prevents activities that may be in conflict" with an official's public obligations.  GX 4.

Finally, Silver even hid from Glenwood and Witkoff that he was receiving referral fees from Goldberg & Iryami.  Tr. 1391-1402, 1747, 1788, 1793, 2036-39, 2043.  The fee sharing arrangement was not disclosed to Glenwood until 2011, when Goldberg & Iryami decided to comply with state bar rules requiring written consent from the client for all fee-sharing arrangements.  Tr. 1442, 1445, 1451-56.  Silver informed a Glenwood lobbyist of the fee-sharing by phone and asserted that the arrangement was not problematic because the fees came from Glenwood's LLCs rather than from Glenwood directly.  Tr. 1605-09, 1615-16.[4]  Although seriously alarmed by Silver's arrangement given the obvious conflict of interest, Glenwood, recognizing its dependence on Silver for favorable legislative action, executed a secret side letter with Goldberg & Iryami—separate from the firm's retainer agreement —consenting to the fee arrangement; this letter was kept secret from the public and was even concealed from Glenwood's own financial officer.  Tr. 1392-1402, 1456-61, 1608-09, 1616-17, 1787-93, 1800-

---

[4]      Glenwood structured its holdings so that each Glenwood building was owned by a specific limited liability company ("LLC").  Tr. 1348, 1351.  All of the LLC's were, in turn, wholly owned by Glenwood, a privately held company owned by the Litwin family.  Tr. 1348, 1373, 1700.

07, 1898, 1905, 1914; GX 700.  In a meeting with Richard Runes, an attorney who supervises Glenwood's lobbying program, Silver agreed to the side letter arrangement and indicated that he wanted the fee sharing arrangement to continue.  Tr. 1804.  Witkoff was not informed of the fee-sharing arrangement until Jay Goldberg received a grand jury subpoena in connection with this investigation.  Tr. 1461-64, 2036-38.  When Steven Witkoff, who owns eighty-five percent of the Witkoff Group, learned that its fees to Goldberg & Iryami were being shared with Silver, he was furious because he believed the arrangement could be illegal.  Tr. 2038-40; GX 737, 834.

## III.    The Money Laundering Scheme

Silver was also convicted of money laundering.  The evidence showed that he invested the proceeds of the Mesothelioma and Real Estate Schemes into high-yield, private, and exclusive investment vehicles through the help of Jordan Levy, a private investor who was friends with many politicians.  Tr. 2465-66, 2524-38; GX S-5, 1511-13.  Silver did not disclose to Levy the source of the funds he sought to invest, and he instructed Levy to divide one of the investments in half, placing one half in his wife's name so that he would not be required to publically disclose the full amount of his investment.  Tr. 2429-30.

## DISCUSSION

## I.    Silver's Motion for a Judgment of Acquittal Is Denied

Silver challenges the sufficiency of the evidence in support of his conviction and moves for a judgment of acquittal on all counts.  As to the honest services fraud and extortion counts, Silver contends that, for both schemes, the Government failed to prove an agreement to exchange payments for official acts.  Def. Rule 29 Mem. 4-11, 14-19 (Dkt. 179).  Silver also argues that he should be acquitted on the extortion charge because the Government failed to prove that transferable property was extorted and on the honest services fraud charge because the

Government failed to prove a bribe or kickback under *Skilling v. United States*, 561 U.S. 358, 409 (2010). *Id.* at 11-13, 19-20.  Regarding the Mesothelioma Scheme, Silver maintains that the Government failed to prove any official acts within the limitations period for both the honest services and extortion counts.  *Id.* at 13-14.  As to the Real Estate Scheme, Silver asserts that the Government failed to prove any official act at all in support of the honest services and extortion counts.  *Id.* at 20.  Finally, Silver requests a judgment of acquittal on the money laundering charge because the Government failed to prove that the transferred funds were criminally derived, inasmuch as that they had been commingled with untainted funds before the alleged money laundering transactions.  *Id.* at 20-22.

### A.  Legal Standard

"'A defendant challenging the sufficiency of the evidence that led to his conviction at trial bears a heavy burden,' . . . because [courts] must uphold the judgment of conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Vilar*, 729 F.3d 62, 91 (2d. Cir. 2013) (quoting *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) and *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (alteration omitted, emphasis in *Jackson*).  "A court examines each piece of evidence and considers its probative value before determining whether it is unreasonable to find 'the evidence in its totality, not in isolation,' sufficient to support guilt beyond a reasonable doubt."  *United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013) (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)).  Courts "'resolve all inferences from the evidence and issues of credibility in favor of the verdict.'"  *United States v. Zayac*, 765 F.3d 112, 117 (2d Cir. 2014) (quoting *United States v. Howard*, 214 F.3d 361, 363 (2d Cir. 2000)).  "'The jury's verdict may be based entirely on circumstantial evidence.'"  *Goffer*, 721 F.3d at 124 (quoting *United States v.*

*Santos*, 541 F.3d 63, 70 (2d Cir. 2008)) (alteration omitted).  "'A judgment of acquittal' is warranted 'only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (quoting *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)) (alteration omitted).

> ### B. The Government Presented Sufficient Evidence of a Quid Pro Quo for a Rational Jury to Convict Silver of Honest Services Fraud and Extortion Under Color of Official Right

Silver argues that, with respect to both schemes, the Government has failed to prove an agreement to exchange payments for official acts, i.e., a *quid pro quo*, as required for honest services fraud and extortion under color official right.  Def. Rule 29 Mem. 4-11, 14-19.  The Government maintains that it presented sufficient circumstantial evidence that a rational jury could have found a *quid pro quo* with respect to both schemes.  Gov't Opp. 20-24, 26-29 (Dkt. 213).

"[P]roof of a quid pro quo" is "an essential element of a bribery theory of honest services fraud."  *United States v. Bruno*, 661 F.3d 733, 743 (2d Cir. 2011) (citing *United States v. Ganim*, 510 F.3d 134, 148–49 (2d Cir. 2007)).  "A quid pro quo is a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the course of the exercise of his official authority."  *Id.* (citing *Ganim,* 510 F.3d at 141).  The Government must prove that the Defendant intended to receive something of value in exchange for an official act. *Id.*  Similarly, extortion under color of official right requires that the "public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  *Evans v. United States*, 504 U.S. 255, 268 (1992).

The Government does not have to prove that there was an express or explicit agreement that official actions would be taken or that any particular action would be taken in exchange for the bribe or kickback.  *United States v. Coyne*, 4 F.3d 100, 114 (2d Cir. 1993); *see also Ganim*, 510 F.3d at 147 ("[T]he specific transactions comprising the illegal scheme need not match up this for that.").  "Rather, it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence—i.e., on behalf of the payor—as specific opportunities arise."  *Coyne*, 4 F.3d at 114.  Specific "[a]cts constituting the agreement need not be agreed to in advance."  *Bruno*, 661 F.3d at 743.  Circumstantial evidence, such as the timing of private benefits and favorable official action, *id.* at 745; *United States v. Biaggi*, 909 F.2d 662, 684 (2d Cir. 1990), and failure to disclose payments, *United States v. Rosen*, 716 F.3d 691, 703 (2d Cir. 2013), can suffice to prove the existence of a *quid pro quo* relationship.  Moreover, a *quid pro quo* is illegal even if the public official would have taken the same official action without the bribe or even if the public official did not take an official act, so long as the public official intended to do so.  *See Evans*, 504 U.S. at 268; *United States v. Alfisi*, 308 F.3d 144, 151 (2d Cir. 2002); *United States v. McDonough*, 56 F.3d 381, 390 (2d Cir. 1995); *Coyne*, 4 F.3d at 114.

### 1. The Mesothelioma Scheme

Silver argues that the Government has failed to prove a *quid pro quo* relationship between Silver and Dr. Taub because: (1) Dr. Taub denied that a *quid pro quo* agreement existed and testified that he only sought to incentivize Silver to fund mesothelioma, Def. Rule 29 Mem. 5-7; (2) Dr. Taub sent referrals to Weitz & Luxenberg for legitimate reasons, and Silver gave state grants for legitimate reasons, Def. Rule 29 Mem. 7; (3) no evidence shows that Silver intended to engage in a *quid pro quo*, Def. Rule 29 Mem. 8-9; (4) Dr. Taub continued to refer

patients to Silver after he stopped receiving funding from the State, Def. Rule 29 Mem. 9; and (5) Silver's disclosure forms and statements to the press do not show Silver's consciousness of guilt, Def. Rule 29 Mem. 9-11.  Silver was free to, and did, encourage the jury to adopt this view of the evidence, but a rational juror could reject this interpretation after considering the totality of the evidence.

Although Dr. Taub denied that there was any explicit agreement to exchange mesothelioma leads for state grants and other official acts, Tr. 424, 554, 548, 558, 560, there was sufficient circumstantial evidence for a rational juror to conclude that there was an implicit agreement to do so.  The timing between Dr. Taub's request for Silver's support for mesothelioma research funding and Silver's initial request for referrals (less than two weeks) and between Dr. Taub's first referral and Silver's instruction to Dr. Taub to apply for state funding (several months) could lead a rational jury to conclude that this was more than a goodwill relationship—it was a *quid pro quo* agreement, and Silver understood as much.  Further, it was only after Silver received his first referral payment that he approved the first state grant to Columbia University.  Even though Dr. Taub testified that there was no explicit agreement to exchange specific benefits with Silver, he also testified that he understood that there was a pattern in which Silver wanted a personal benefit, specifically mesothelioma leads, in return for taking an official action on Dr. Taub's behalf.  That testimony alone could support a reasonable jury concluding that Silver intended and had a *quid pro quo* arrangement with Taub.

Evidence that Dr. Taub referred his patients to a prominent asbestos litigation firm and that the state grants went to worthy medical research does not negate a *quid pro quo* arrangement; virtuous and nefarious motivations can coexist.  Evidence that Dr. Taub was otherwise adamantly opposed to referring patients to Weitz & Luxenberg—because the firm did

not financially support mesothelioma research—and evidence that Silver directed Dr. Taub not

to tell their mutual friend Mr. Chill about the referrals, never inquired about Dr. Taub's research,

ceased funding the research when his involvement with it would have become public, and did not

approve the first grant until he had begun to be compensated for Taub-generated leads also

support a reasonable jury concluding that Silver intended a *quid pro quo*.  The fact that Dr. Taub

continued to refer cases to Silver even after the state grants stopped does not undermine the

reasonableness of the jury's determination that there was a *quid pro quo*, both because Dr. Taub

did not know why Silver had stopped funneling state grants to him and thus could hope Silver

would reinitiate them, and because Dr. Taub continued to receive favorable official action from

Silver (an honorary resolution and proclamation, an agreement to secure permits for a

fundraising event, and employment for his children).  Moreover, the fact that Dr. Taub reduced

the number of referrals after Silver terminated the state grants is circumstantial evidence that a

rational jury could have relied on to conclude that Silver intended there to be and there was a

*quid pro quo* link between referrals and official actions.  Finally, a rational juror could conclude

that Silver's financial forms and disclosures to the press—that he represented individuals in

medical malpractice cases, that he was a personal injury lawyer, and a passing comment during a

press interview that some of his clients had asbestos claims—were far from forthright and thus

were evidence of consciousness of guilt.

### 2.  The Real Estate Scheme

Silver argues that the Government has failed to prove a *quid pro quo* relationship

between Silver and Glenwood and Witkoff on the following grounds: (1) Witkoff and Glenwood

denied that there was a *quid pro quo* agreement and said that they provided business to Goldberg

& Iryami only to foster generalized goodwill, Def. Rule 29 Mem. 14-15; (2) Silver did not act on

behalf of Witkoff or Glenwood, whether with respect to the Rent Act of 2011, the PACB, or the proposed methadone clinic, Def. Rule 29 Mem. 15-16; and (3) Silver's disclosure forms, Silver's statements to the press, the Goldberg & Iryami side letter retainer, and Glenwood's and Witkoff's surprise and concern about Silver's referral fees are not evidence of Silver's corrupt intent, Def. Rule 29 Mem. 16-19.  Once again, Silver was free to, and did, encourage the jury to adopt this view of the evidence, but a rational juror could reject Silver's arguments given the totality of the evidence.

Just as in the Mesothelioma Scheme, although Glenwood and Witkoff representatives denied that there was any express agreement to exchange tax certiorari business for favorable legislation and PACB financing, Tr. 1686, 1823, 1830-31, 2051, there was sufficient circumstantial evidence for a rational juror to conclude that there was an implicit agreement to do so.[5]  The Government introduced sufficient circumstantial evidence on which a jury could have relied reasonably to conclude that Silver intended there to be and Glenwood and Witkoff understood there to be a *quid pro quo*: (1) Silver solicited Glenwood's tax certiorari business when important real estate legislation was up for renewal, Tr. 1427, 1635; (2) Glenwood rewarded Goldberg & Iryami with additional tax certiorari business each year after Silver approved real estate legislation that was satisfactory to Glenwood, Tr. 1376-1384, 1601, 1635-39, 1731, 1744; GX. 750; (3) Silver agreed with Glenwood's decision to re-execute the retainer agreements without mentioning that Silver was splitting the fees and to execute a side letter to

---

[5]     Moreover, at least for honest services fraud, the intent of the bribe giver may be different from the intent of the bribe receiver.  The Government must only prove that Silver—not the bribe giver—understood that, as a result of the bribe or kickback, he was expected to exercise official influence or make official decisions for the benefit of the giver.  *See Rosen*, 716 F.3d at 700 (omitting any requirement regarding the bribe payer's intent in definition of "*quid pro quo*"); *Bruno*, 661 F.3d at 743-44 (same); *United States v. Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013) ("[T]hough the offerer of a bribe is guilty of honest-services fraud, his attempted target may be entirely innocent." (citing *United States v. Anderson*, 509 F.2d 312, 332 (D.C. Cir. 1974))).

that effect;[6] (4) Silver intervened to prevent the relocation of a methadone clinic to a location

near one of Glenwood's residential rental buildings; and (5) PACB, on which Silver was one of

three voting members, approved hundreds of millions in tax exempt bond financing for

Glenwood.  Perhaps the most compelling evidence on which a rational jury could have relied to

conclude that Silver understood and intended there to be a *quid pro quo* was his decision to meet

with Glenwood immediately prior to approving the 2011 Rent Act to ensure that the legislation

that would ultimately pass would satisfy Glenwood.

       That Glenwood and Witkoff did not initially know that Silver was receiving referral fees

(as opposed to knowing only that their business was benefiting a long-time friend of Silver) does

not mean that Silver did not intend there to be a *quid pro quo* arrangement or that Glenwood and

Witkoff were not giving tax certiorari business in return for official acts.[7]  There is no legal

requirement that the payor understand the precise nature of the benefit that is flowing to the

public official, and there is no question Glenwood and Witkoff understood that they were

transferring their tax certiorari business at Silver's request and for the benefit, at a minimum, of

Silver's friend.  Glenwood in particular understood that the arrangement was ultimately for

Silver's benefit in some, albeit unspecified, way because they were concerned about upsetting

and alienating Silver if they took their business away from Goldberg & Iryami.  Furthermore,

evidence that Glenwood and Witkoff sought to please Silver because they depended on

---

[6]      Glenwood reduced the fee arrangement to a side letter that was held separately from Glenwood's books and records (and was not shared with even the financial department of Glenwood) because Glenwood thought that the retainer agreement, in which Goldberg & Iryami had initially disclosed that it was splitting its fees with Silver, might have to be filed publicly. Tr. 1400-01, 1800-01, 1804-06.  Glenwood conferred with Silver about preparing a side letter separate from the retainer agreements and received his approval to do so; Silver executed the side letter. Tr. 1804; GX 700.

[7]      Unlike honest services fraud, extortion under color of official right does require the Government to prove that the bribe giver was "motivated to make payments as a result of the defendant's control or influence over public officials and that the defendant was aware of this motivation."  *McDonough*, 56 F.3d at 388 (citation omitted).

legislation which he predominantly controlled shows that Glenwood and Witkoff were motivated to transfer their business to Goldberg & Iryami for favorable—or, at least, less unfavorable—official action by Silver.

Although Silver argues that the jury's verdict cannot be upheld because there is no evidence that Silver would have acted differently than he did with respect to the Rent Act of 2011, the PACB funding, or the methadone clinic, the law allows a jury to find that there is a *quid pro quo* relationship even if the public official would have taken the same official action without the bribe, so long as the public official was motivated, at least in part, by the bribe. *Biaggi*, 909 F.2d at 683; *Coyne*, 4 F.3d at 113.  Furthermore, while the Rent Act of 2011 may have on the whole been pro-tenant, the jury could have found significant that Silver met with Glenwood to ensure that the legislation was satisfactory to that developer before signing off on it.

Although Silver quibbles with evidence introduced as proof of consciousness of guilt, Def. Rule 29 Mem. 16-19, a rational jury could have relied on that evidence to infer that Silver believed his relationships with Witkoff and Glenwood were unlawful.  For example, although the state financial disclosure forms clearly required Silver to state "each source" of income, nowhere on the form did Silver list Goldberg & Iryami as a source of income.  A jury could have found that Silver's minor revision to his disclosure in 2010 to state that his law practice income "included" fees from Weitz & Luxenberg, GX 920, was no more forthcoming than his previous disclosures and that the failure to disclose receipt of income from Goldberg & Iryami was calculated to keep his relationship with real estate developers secret.  Given that Silver received hundreds of thousands of dollars in referral fees for business that derived from large real estate developers with substantial interests in matters pending before the legislature, a jury could also

have reasonably viewed his false statements to the press that he did not represent "corporations" or entities that had any interest in matters pending before the Assembly to be further evidence of consciousness of guilt.  Considering all the circumstantial evidence as a whole, a rational juror could conclude that Silver was knowingly engaged in an unlawful *quid pro quo* with Glenwood and Witkoff.

### C. The Government Presented Sufficient Evidence to Support the Jury's Conclusion that Each Scheme Involved a Transfer of Property Necessary to Prove a Hobbs Act Violation

Silver contends that the Government's extortion charges also fail because the mesothelioma leads and the tax certiorari business are not transferable property—"'that is, capable of passing from one person to another.'"  Def. Rule 29 Mem. 11 (quoting *Sekhar v. United States*, 570 U.S. ---, 133 S. Ct. 2720, 2725 (2013)), 19.  Silver raised this argument not only during trial but also in his motion to dismiss the Superseding Indictment.  Dkt. 39.

The Hobbs Act defines extortion as "obtaining [] property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  To qualify as property under the Hobbs Act, the property must be "valuable" and "transferable," *Sekhar*, 133 S. Ct. at 2726 n.5, but can be either tangible or intangible, *see, e.g.*, *id.* at n.2 (noting that obtaining good will by threatening a market competitor may be Hobbs Act extortion (citing *United States v. Zemek*, 634 F.2d 1159, 1173 (9th Cir. 1980))); *United States v. Atcheson*, 94 F.3d 1237, 1243 (9th Cir. 1996) (affirming Hobbs Act convictions where defendants, *inter alia*, "extorted from [the victims] information about how much money the[y] had in their accounts").

Silver argues that the Hobbs Act requires both the "deprivation" and "acquisition" of property.  Def. Rule 29 Mem. 11 (quoting *Sekhar*, 133 S. Ct. at 2725).  As explained in the

Court's prior opinion, however, the Court does not read the *dicta* in *Sekhar* describing "deprivation" to add an element to Hobbs Act extortion; instead, this Court reads the Supreme Court's language in *Sekhar* merely to underscore the requirement that the victim must transfer the extorted property to the perpetrator (or to a third party as directed by the perpetrator).  Dkt. 46 at 7 n.8; *see Sekhar*, 133 S.Ct. at 2726 (noting that it rests its decision on the term "obtaining" and announcing the principle "that a defendant must pursue something of value from the victim that can be exercised, transferred, or sold").  In addition, intangible property, such as information, can often be "retained" in some sense even after it has been transferred to another. *Cf. Atcheson*, 94 F.3d at 1243.

> 1. **The Mesothelioma Scheme**

Silver argues that because the leads for mesothelioma cases were only recommendations to patients to contact Weitz & Luxenberg, they did not qualify as transferable property.  Def. Rule 29 Mem. 11-12.  As this Court stated when it denied Silver's motion to dismiss the Superseding Indictment, "[i]f Silver's conduct led only to Doctor-1's recommending Weitz & Luxenberg to his patients, such a scenario would not constitute extortion, as Doctor-1's recommendation is not 'transferrable' as defined by *Sekhar*."  Dkt. 46 at 6.  The evidence, however, showed that Dr. Taub did more than just recommend patients to Weitz & Luxenberg. Dr. Taub provided information regarding mesothelioma patients who needed legal representation directly to Silver, which this Court previously held could satisfy the requirement for transferable property under *Sekhar*, Dkt. 46 at 6-7.  The key distinction drawn by the Supreme Court is that restricting someone's freedom of action by force or threat of force is coercion, while forcing someone to transfer something of value is extortion.  *See Sekhar*, 133 S.Ct. at 2727; *Scheidler v. Naitonal Organization for Women, Inc.*, 537 U.S. 393, 405-07, 409.  If Dr. Taub had merely

recommended his patients to Weitz & Luxenberg, that might have been the former, but under color of official right, Dr. Taub transferred to Silver valuable contact information for potential mesothelioma clients, which is the latter—extortion.

At trial, the Government presented sufficient evidence from which a rational juror could conclude that the mesothelioma leads were valuable and transferable as required to constitute a violation of the Hobbs Act.  Testimony showed mesothelioma cases, resulting on average in $400,000 in legal fees per case for the law firm that represents the mesothelioma patient, are the most lucrative of all asbestos cases, and personal injury law firms spend millions in marketing to procure mesothelioma leads, i.e., potential clients.  Tr. 1206-1209.  The evidence also showed that Silver received approximately $3 million in referral fees for the cases referred from Dr. Taub, indicating the value of those leads.  GX 1509.

A rational juror could also have concluded that Dr. Taub transferred the information about the mesothelioma leads to Silver because he "asked" for them under color of official right. In 2003, one to two weeks after Dr. Taub requested Silver's help in encouraging Weitz & Luxenberg to donate to mesothelioma research—a request Silver rejected out of hand—Silver made known to Dr. Taub that he wanted Dr. Taub to send mesothelioma referrals to Silver at Weitz & Luxenberg.  Tr. 273.  In response, Dr. Taub started recommending Silver as counsel at Weitz & Luxenberg to his patients *and* providing the names and contact information for those patients to Silver.  Tr. 284-87.  That is precisely the type of information that law firms spend millions in marketing expenses to obtain.  Thus, Dr. Taub transferred valuable, albeit intangible, property to Silver in the form of information.  The fact that some patients declined to have Dr. Taub share their contact information with Silver because they wished to obtain different legal representation does not mean that the leads Dr. Taub did provide were not transferable property,

as that term is used in the Hobbs Act.  Dr. Taub's testimony that he started referring patients and sharing their contact information with the Simmons Firm instead of Silver demonstrates that the information is transferable—Dr. Taub could pass the valuable information to the Simmons Firm or to Silver or to some other law firm.  Tr. 368-69, 373-76.  Moreover, the fact that Silver sought out Dr. Taub to complain that Dr. Taub was passing fewer leads to him and that he wanted to obtain more leads further confirmed the conclusion the jury reached—Dr. Taub was extorted under color of official right to transfer valuable mesothelioma leads to Silver.  Tr. 376-78.

### 2.  The Real Estate Scheme

Silver incorporates by reference his argument from his motion to dismiss the Superseding indictment that, just like the mesothelioma leads, tax certiorari business does not qualify as transferable property under the Hobbs Act.  Def. Rule 29 Mem. 19.  As the Court explained previously, "[o]btaining business (even if, to be paid, the defendant had to perform additional work) meets the Hobbs Act's requirement that the defendant obtain transferable property with the victim's consent."  Dkt. 46 at 10 (citing *United States v. Cain*, 671 F.3d 271, 282-83 (2d Cir. 2012)); *see also United States v. Gotti*, 459 F.3d 296, 326 (2d Cir. 2006).

The Government presented sufficient evidence at trial from which a rational juror could have concluded that the tax certiorari business from Witkoff and Glenwood was valuable and transferable property as required to constitute a violation of the Hobbs Act.  Testimony that Goldberg & Iryami was paid higher fees for Glenwood's and Witkoff's tax certiorari work than for  most of its other clients, Tr. 1429, 1438-40, and that Silver received approximately $835,000 in referral fees, Tr. 2523-24, was evidence the jury could rely on to conclude that the tax certiorari business was valuable.  A rational juror could also have concluded that the tax certiorari business was transferable based on Dara Iryami's and Steven Witkoff's testimony that

Glenwood and Witkoff transferred some of their tax certiorari work from other law firms to Goldberg & Iryami.  Tr. 1430, 1431-34, 1436-38.

### D.  The Government Presented Sufficient Evidence for a Jury Reasonably to Conclude that Each Scheme Involved a Bribe or Kickback as Required for Honest Services Fraud

Silver argues that the Government failed to prove a paradigmatic bribe or kickback, as required to prove honest services fraud under *Skilling v. United States*, 561 U.S. at 409, and instead proved only a "routine financial relationship."  Def. Rule 29 Mem. 12, 19.

Based on the evidence presented at trial, a rational juror could find that the referral fees paid to Silver were bribes or kickbacks and not "routine" referral fees paid to a lawyer.  Silver did not receive referral fees for referring mesothelioma and tax certiorari clients that he legitimately obtained.  As explained above, he was able to refer these clients because of pressure he brought to bear using his official position.  He got Dr. Taub to give him mesothelioma leads by holding out the hope (and actually delivering) state grants and other officially conferred benefits; he got Witkoff and Glenwood to retain Goldberg & Iryami by manipulating their need for favorable (or less unfavorable) real estate legislation and PACB approval.

The evidence supports the jury's finding that Silver engaged in more than self-dealing. "In the self-dealing cases, the defendant typically causes his or her employer to do business with a corporation or other enterprise in which the defendant has a secret interest, undisclosed to the employer."  *United States v. Rybicki*, 354 F.3d 124, 140 (2d Cir. 2003) (*en banc*); *see Skilling*, 561 U.S. at 409-10.  While Silver may have also engaged in self-dealing with respect to Witkoff and Glenwood (for years they did not know Silver was receiving referral fees for their business), Silver simultaneously did more than just self-deal.  A rational jury could have concluded that Silver accepted bribes and kickbacks as part of both schemes, as those terms were used in

*Skilling,* because he took official action in exchange for the payments, including sending state grants to Dr. Taub, officially recommending Dr. Taub's son for a job, causing the Assembly to pass a resolution in honor of Dr. Taub, securing permits for a fundraiser event in which Dr. Taub had an interest, acting favorably (or less unfavorably) to Witkoff and Glenwood with respect to rent regulation and tax abatement legislation, and approving tax-exempt financing for Glenwood. The fact that the payments Silver received as bribes were funneled through entities in which, unbeknownst to Glenwood or Witkoff, he had an undisclosed interest does not transform the bribery or kickback schemes into mere undisclosed conflict-of-interest schemes. *Cf. United States v. DeMizio*, 741 F.3d 373, 381-82 (2d Cir. 2014).

### E. The Government Presented Sufficient Evidence for a Rational Jury to Find that Silver Engaged in Official Acts in Exchange for Bribes and Kickbacks

Silver asserts that the Government did not prove an official act required for honest services fraud and Hobbs Act extortion. Def. Rule 29 Mem. 13, 20 (citing *Bruno*, 661 F.3d at 744 and *Evans*, 504 U.S. at 268). Specifically, as to the Mesothelioma Scheme, Silver argues that the Government did not prove an official act within the five year statute of limitations proscribed by 18 U.S.C. § 3282 because the state grants provided on Dr. Taub's behalf were approved by him on July 5, 2005 and November 30, 2005, GX 367-1, 284, but Silver was not indicted until February 19, 2015, almost ten years later. Def. Rule 29 Mem. 13. While that chronology is accurate, the jury was charged that it had to find an official act taken by Silver on behalf of Dr. Taub during the five year statute of limitations period. Tr. 3127. The jury could have reasonably relied on the following evidence to find that element satisfied: Silver procured an official Assembly resolution and proclamation honoring Dr. Taub in May 2011; in 2011, Silver offered to use his Assembly position and staff to assist a mesothelioma fundraiser with which Dr. Taub was involved to obtain necessary City permits; and in 2012, Silver

23

recommended Dr. Taub's son (using his official Assembly letterhead) to a prospective employer that depended heavily on Silver for state funding.  Although Silver contends that these were merely "routine personal courtesies," a jury could reasonably have concluded the contrary.  Even if these official acts are minor compared to $500,000 in state grants, a jury could nonetheless reasonably determine that they were official acts.

Regarding the Real Estate Scheme, Silver argues that the Government failed to prove an official act because: Silver was not involved in Glenwood's applications for tax-exempt financing submitted to the PACB; Silver did not take an official act to oppose the methadone clinic as requested by Glenwood; and Silver took no official act with respect to the Rent Act of 2011.  Def. Rule 29 Mem. 20.  The jury could reasonably have found that as a member of the PACB, Silver acted in his official capacity to benefit Glenwood by keeping Glenwood's requests for tax-exempt financing on the agenda and by voting in favor of financing Glenwood's projects, even if a proxy voted on Silver's behalf.  A jury could also find that Silver took official action to oppose the relocation of the methadone clinic near one of Glenwood's buildings in Silver's district based on the evidence that showed that Glenwood, at the request of Silver's Assembly Office, prepared a letter for its tenants highlighting Silver's role in successfully blocking the relocation of the clinic.  Tr. 1602-04, 1752-53, 1783-86; GX 788.  Finally, a jury could find that Silver took official action with respect to rent regulation and the 421-a tax abatement program because he had to sign off on any such legislation in order for the legislation to come to a vote.  Moreover, in advance of supporting the Rent Act of 2011 and the 421-a renewal, Silver met privately with Glenwood and its lobbyist to confirm that Glenwood was satisfied with the terms of the legislation.  A jury could have relied on that evidence to conclude that Silver, in his

official capacity, made sure that the legislation was satisfactory to a large real estate developer that was paying him bribes.[8]

### F. The Government Presented Sufficient Evidence for a Rational Jury to Find that Silver Engaged in Unlawful Money Laundering

To convict Silver of money laundering under 18 U.S.C. § 1957, the Government was required to prove that Silver "knowingly engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property of a value greater than $10,000," and that the property was "derived from specified unlawful activity."  18 U.S.C. § 1957(a); *see United States v. Ness*, 565 F.3d 73, 78 (2d Cir. 2009).  "[T]he term 'criminally derived property' means any property constituting, or derived from, proceeds obtained from a criminal offense."  18 U.S.C. § 1957(f)(2).  The only issue Silver raises post-trial is whether the Government adequately proved that the monetary transactions involved criminally derived property.  Silver argues for a judgment of acquittal on the money laundering count on the ground that the Government did not prove that the funds at issue were criminally derived because the proceeds of his Mesothelioma and Real Estate Schemes had been commingled in an account with untainted funds.  Def. Rule 29 Mem. 21-22 (citing *United States v. Loe*, 248 F.3d 449, 467 (5th Cir. 2001); *United States v. Rutgard*, 116 F.3d 1270, 1292-93 (9th Cir. 1997)).  The Government contends that the Fifth and Ninth Circuit cases on which Silver relies to make this argument represent the minority view, not adopted in this Circuit, and that the Government is not legally required to trace criminally derived funds through a commingled account.  Gov't Opp. 33-35.

---

[8]    The majority of the Government's evidence to prove the Real Estate Scheme concerned Glenwood; the Government only introduced one witness to testify about Witkoff's role.  In contrast with the evidence regarding the methadone clinic, PACB financing, and the private meeting prior to the 2011 Rent Act, the Government did not introduce comparable evidence showing official actions taken by Silver specifically in favor of Witkoff.  Nevertheless, a rational jury could conclude that Silver took official action on behalf of Witkoff because Witkoff, as a peer developer to Glenwood, would have also benefited from real estate legislation that was satisfactory to Glenwood, such as the 2011 Rent Act.

The Second Circuit has not addressed whether the Government must trace "dirty" funds commingled with "clean" funds to prove money laundering under Section 1957, and "other Circuit Courts of Appeals have reached contradictory conclusions." *United States v. Weisberg*, No. 08-CR-347 (NGG) (RML), 2011 WL 4345100, at *2, *3-4 (E.D.N.Y. Sept. 15, 2011) (citing cases). The requirement that the Government must trace the criminally derived proceeds when they have been commingled with funds from legitimate sources is a minority view. *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1354 (D.C. Cir. 2002) (*Rutgard's* "holding that tracing is required under § 1957 is a minority view." (citing *United States v. Sokolow*, 91 F.3d 396, 409 (3d Cir.), *cert. denied*, 519 U.S. 1116 (1997); *United States v. Moore*, 27 F.3d 969, 976 (4th Cir.), *cert. denied*, 513 U.S. 979 (1994); *United States v. Johnson*, 971 F.2d 562, 570 (10th Cir. 1992))).[9]

The Court finds the logic underlying the majority view far more convincing. Because money is fungible, once funds obtained from illegal activity are combined with funds from lawful activity in a single account, the "dirty" and "clean" funds cannot be distinguished from each other. *Moore*, 27 F.3d at 976-77. "A requirement that the government trace each dollar of the transaction to the criminal, as opposed to the non-criminal activity, would allow individuals effectively to defeat prosecution for money laundering by simply commingling legitimate funds with criminal proceeds." *Id.* at 977 (citing *Johnson*, 971 F.2d at 570 and *United States v. Jackson*, 935 F.2d 832, 840 (7th Cir. 1991)). Thus, the Government was not required to prove that funds transferred from Silver's bank account to the investment vehicles offered through Jordan Levy were the actual dollars derived from Silver's illegal schemes given that that money

---

[9]       *See also United States v. Haddad*, 462 F.3d 783, 792 (7th Cir. 2006) (explicitly rejecting the Ninth Circuit's tracing requirement under Section 1957 as "untenable"); *United States v. Pizano*, 421 F.3d 707, 723 (8th Cir. 2005) ("[T]he Government is not required to trace funds to prove a violation of § 1957.").

was commingled with legitimately derived funds in Silver's bank account; in other words, the Government did not have to "show that funds withdrawn from the [D]efendant's account could not possibly have come from any source other than the unlawful activity," *Johnson*, 971 F.2d at 570.  The Government traced payments from the Mesothelioma and Real Estate Schemes to Silver's bank account and proved transfers from Silver's bank account to investment vehicles made available to Silver by Jordan Levy.  Tr. 2526-35; GX 1511-1513.  That suffices to prove a monetary transaction in criminally derived property; based on that evidence, a rational trier of fact could have found that this element of money laundering under Section 1957 was satisfied.

## II.    Silver's Motion for a New Trial Is Denied

"Federal Rule of Criminal Procedure 33(a) provides that 'upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.'" *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013) (quoting Fed. R. Crim. P. 33(a)) (alteration omitted).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  "To grant the motion, 'there must be a real concern that an innocent person may have been convicted.'"  *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *Ferguson*, 246 F.3d at 134) (alteration omitted).  Particularly "[w]here an evidentiary ruling is the basis of a defendant's Rule 33 motion, the question is not whether there was error in the evidentiary ruling, but whether there is 'manifest injustice' and a real concern that an innocent person may have been convicted."  *United States v. Soto*, No. 12 CR 556 (RPP), 2014 WL 1694880, at *5 (S.D.N.Y. Apr. 28, 2014), *aff'd sub nom.*, *United States v. Ramos*, 622 F. App'x 29 (2d Cir. 2015).

Silver moves, pursuant to Rule 33, for a new trial, challenging a number of the Court's evidentiary rulings.  Specifically, Silver argues that the Government introduced irrelevant and unfairly prejudicial evidence regarding the following issues: the state grant process, Dr. Taub's relationship with the Simmons Foundation, Glenwood's political contributions, Silver's financial disclosure forms, and Silver's investments and relationship with Jordan Levy.  *See* Def. Rule 33 Mem. 1-8, 10-12 (Dkt. 180).  Silver also argues that evidence regarding Silver's purported effort to make more fulsome financial disclosures and additional statements from Silver's recorded conversations with reporters were wrongfully excluded.  *See* Def. Rule 33 Mem. 8-10, 12-14. Silver contends that the evidentiary rulings about which he complains poisoned the trial and denied him a full defense.  Def. Reply 9 (Dkt. 224).  Every one of these evidentiary issues was thoroughly litigated before and during trial, and the Court issued rulings at the time the issues were initially raised.  Silver does not offer any new arguments for the Court to consider regarding these issues and instead rehashes old arguments that were appropriately rejected at the time.  Accordingly, the Court does not disturb its prior evidentiary rulings.[10]

---

[10]   Silver raises two points that were not specifically addressed at trial, and thus the Court considers them here.

First, in support of his argument that his financial disclosure forms should not have been admitted because they were unfairly prejudicial, Silver points to a November 30, 2015 New York Times article stating that one juror reported to have "changed her mind" and agreed to convict Silver based on the disclosure forms.  Def. Rule 33 Mem. 7-8.  Silver argues that the article shows that the jury convicted based on a "collateral dispute," i.e., "the details of how Mr. Silver filled out his state ethics forms."  *Id.* at 8.  How Silver filled out his financial disclosure forms was not, however, a "collateral dispute" nor mere "details."  As discussed during trial on several occasions, the forms were relevant as circumstantial evidence of Silver's consciousness of guilt.  Moreover, apart from three narrow exceptions that do not apply here, the Court may not consider evidence of a juror's statement about the effect of anything on a juror's vote or the juror's mental processes concerning the verdict.  Fed. R. Evid. 606(b)(1); *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 107 (2d Cir. 2004).  Even if the Court were to consider the juror's statements as reported in the media, the article reported that, according to the interviewed jurors, "the 12 took their time re-examining the evidence" and that the juror who "changed her mind" did so because the disclosure forms— specifically the lack of any mention of Goldberg & Iryami—were evidence of Silver "being deceitful" and of "scheming or manipulation."  Def. Rule 33 Mem., Ex. 1 at 2-3 (Dkt. 180-1).  Thus, the juror found the disclosure forms persuasive evidence of Silver's state of mind, which she was entitled to do.

Second, Silver argues that the Court's ruling regarding certain testimony from Lisa Reid, a state ethics officer, was improper.  After much argument from both sides, the Court ruled that, pursuant to the state of mind exception to the hearsay rule, Fed. R. Evid. 803(3), Defense counsel could introduce Reid's testimony that Silver

Moreover, the jury's verdict was not against the weight of the evidence.  As discussed above, there was sufficient evidence to sustain each of the convictions.  The Court is not "'convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"  *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988)).

## CONCLUSION

For the foregoing reasons, Silver's Motions are DENIED.  The Clerk of Court is respectfully requested to terminate the open motions at docket entries 179 and 180.

**SO ORDERED.**

Dated: May 3, 2016
        New York, NY

VALERIE CAPRONI
United States District Judge

---

told her in early 2010 during a brief exchange that he was revising an answer on his financial disclosure forms regarding Weitz & Luxenberg fees to make his response "more accurate."  But, the Court also ruled that if Silver introduced that out of court statement, it would open the door to evidence that the Government wished to introduce, namely that the change to Silver's disclosure forms followed the sentencing of New York State Assemblyman Anthony Seminerio for federal crimes related to the failure to disclose accurately the nature of his outside income. Tr. 2087.  Silver objected and ultimately decided not to introduce the conversation between Reid and Silver.

Silver now contends that the ruling improperly opened the door to inadmissible evidence.  According to Silver, the door may only be opened to inadmissible evidence if (a) the opposing party has introduced inadmissible evidence on the same issue, or (b) the evidence is needed to rebut a false impression that may have resulted from the opposing party's evidence.  Silver asserts that neither exception applied.  Def. Rule 33 Mem. 9-10 (citing *United States v. Forrester*, 60 F.3d 52, 60-61 (2d Cir. 1995)).  The Government responds that Silver wrongly relies on the "curative admissibility" doctrine instead of the "standard opening the door doctrine" because the curative admissibility doctrine only applies when admitting inadmissible evidence in rebuttal to other inadmissible evidence, and the Lisa Reid conversation was not inadmissible.  Gov't Opp. 49-50 (citing *United States v. Al-Moayad*, 545 F.3d 139, 169 n.25 (2d Cir. 2008)).  Regardless of the doctrine's name, otherwise inadmissible evidence is admissible to rebut a false impression created by the opposing party's evidence, whether the opposing party's evidence was properly admissible or not.  *See United States v. Vasquez*, 267 F.3d 79, 85 (2d Cir. 2001); *United States v. Gambino*, 59 F.3d 353, 368 (2d Cir. 1995); *United States v. Bilzerian*, 926 F.2d 1285, 1296 (2d Cir. 1991). Here, the otherwise unfairly prejudicial evidence regarding Seminerio's conviction was admissible in order to correct the false impression that may have been created that Silver was motivated to revise his financial disclosures out of a desire to be fully transparent versus being motivated by the fear of getting caught for inadequate financial disclosure.