UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA

                                 :

    - v -                           S1 15 Cr. 93 (VEC)

                                   :

SHELDON SILVER,

                                   :

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S MOTION FOR BAIL PENDING APPEAL

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

HOWARD S. MASTER
ANDREW D. GOLDSTEIN
JAMES M. McDONALD
Assistant United States Attorneys
     *Of Counsel*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 4

   I.   THE ASBESTOS SCHEME.................................................................................... 5

   II.   THE REAL ESTATE SCHEME............................................................................ 7

   III.   THE LAUNDERING SCHEME ........................................................................... 9

   IV.   THE PARTIES' PROPOSED JURY INSTRUCTIONS AND THE COURT'S JURY
       CHARGE ......................................................................................................... 10

   V.   THE JURY'S VERDICT AND POST-TRIAL PROCEDURAL HISTORY ................. 12

ARGUMENT ...................................................................................................................... 13

   I.   SILVER'S MOTION FOR BAIL PENDING APPEAL SHOULD BE DENIED ........... 13

     A.   Applicable Law ............................................................................................ 13

     B.   The Supreme Court's Decision in *McDonnell* ............................................ 14

     C.   Discussion .................................................................................................... 16

       1. The Defendant Presents No Substantial Question Likely to Result in Reversal
         or New Trial ............................................................................................... 16

         a.   The Jury Instructions Were Not Erroneous ...................................... 16

         b.   Even if There Was Error, Silver Was Not Prejudiced ...................... 21

            i.   Each of the official actions connected to the Asbestos Scheme meets
              the standard set forth in *McDonnell* ............................................. 22

            ii.   Even assuming some actions connected to the Asbestos Scheme were
              not "official" under *McDonnell*, Silver still was not prejudiced ................. 27

            iii.   Each of the official actions connected to the Real Estate Scheme meets
              the standard set forth in *McDonnell* ............................................. 30

            iv.   Even assuming some actions connected to the Real Estate Scheme were
              not "official" under *McDonnell*, Silver still was not prejudiced ................. 32

       2. Silver's Remaining Arguments – Already Rejected Multiple Times Over – Are
         Meritless.................................................................................................... 36

CONCLUSION..................................................................................................................... 37

## TABLE OF AUTHORITIES

### CASES

*Bereano* v. *United States*, 706 F.3d 568 (4th Cir. 2013) ......................................................35

*McDonnell* v. *United States*, No. 15-474 (U.S. 2016) ........................................................ passim

*Neder* v. *United States*, 527 U.S. 1 (1999)..........................................................................22

*Ocasio* v. *United States*, 136 S. Ct. 1423 (2016) ...........................................................19

*United States* v. *Uricuoli*, 513 F.3d 290 (1st Cir. 2008) ...................................................10

*United States* v. *Abuhamra*, 389 F.3d 309 (2d Cir. 2004) ..............................................13

*United States* v. *Andrews*, 681 F.3d 509 (3d Cir. 2012) .................................................21

*United States* v. *Applins*, 637 F.3d 59 (2d Cir. 2011) ....................................................14

*United States* v. *Bestway Disposal Corp.*, 724 F. Supp. 62 (W.D.N.Y. 1988).............................37

*United States* v. *Biaggi*, 909 F.2d 662 (2d Cir. 1990) ...................................................33

*United States* v. *Birdsall*, 233 U.S. 223 (1914) ............................................................17

*United States* v. *Botti*, 711 F.3d 299 (2d Cir. 2013) ......................................................21

*United States* v. *Carson*, 464 F.2d 424 (2d Cir. 1972) ...................................................20

*United States* v. *Dimora*, 750 F.3d 619 (6th Cir. 2014)..................................................26

*United States* v. *Ford*, 435 F.3d 204 (2d Cir. 2006) .......................................................20

*United States* v. *Ganim*, 510 F.3d 134 (2d Cir. 2007) ......................................18, 20, 21

*United States* v. *Giancola*, 754 F.2d 898 (11th Cir. 1985) ..............................................14

*United States* v. *Halloran*, 821 F.3d 321 (2d Cir. 2016) ..........................................4, 35

*United States* v. *Lane*, 474 U.S. 438 (1986) ..................................................................23

*United States* v. *Martoma*, No. 14-3599 (2d. Cir. 2014) ......................................36, 37

*United States* v. *Mazer*, Nos. 14-1397, 14-1299, 14-1401 (2d  Cir. 2014)............................36, 37

*United States* v. *McDonnell*, 792 F.3d 478 (4th Cir. 2015) .............................................20

*United States* v. *Miller*, 753 F.2d 19 (3d Cir. 1985) .................................................13, 14

*United States* v. *Mulder*, 273 F.3d 91 (2d Cir. 2001) .....................................................14

*United States* v. *Nouri*, 711 F.3d 129 (2d Cir. 2013)......................................................35

*United States* v. *Quattrone*, 441 F.3d 153 (2d Cir. 2006)...............................................17

*United States* v. *Rabbitt*, 583 F.2d 1014 (8th Cir. 1978) ...............................................10

*United States* v. *Randell*, 761 F.2d 122 (2d Cir. 1985)....................................................................13

*United States* v. *Rosen*, 716 F.3d 691 (2d Cir. 2013) ...................................................................18

*United States* v. *Rutigliano*, 790 F.3d 389 (2d Cir. 2015) ...........................................................23

*United States* v. *Sabhnani*, 599 F.3d 215 (2d Cir. 2010) .............................................................17

*United States* v. *Skilling*, 638 F.3d 480 (5th Cir. 2011)..........................................................34, 35

*United States* v. *Smith*, 198 F.3d 377 (2d Cir. 1999)..................................................................23

*United States* v. *Sun-Diamond Growers of California*, 526 U.S. 398 (1999) ..............................20

*Valdes* v. *United States*, 475 F.3d 1319 (D.C. Cir. 2007)............................................................10

## STATUTES

18 U.S.C. § 3143(b) ..........................................................................................................................12

## PRELIMINARY STATEMENT

Following his swift and decisive convictions for seven corruption offenses, defendant Sheldon Silver ("Silver" or the "defendant") now seeks bail pending appeal principally on the ground that the Supreme Court's decision in *McDonnell* v. *United States*, No. 15-474 (U.S. 2016), creates a "substantial question" on appeal.  It does not, and the defendant's application for bail pending appeal should be denied.

Over the course of a trial that spanned five weeks, Silver did not deny that he took numerous official actions benefiting individuals and entities that steered him business worth millions of dollars.  Nor could he, given the overwhelming evidence introduced at trial demonstrating that Silver approved funding, authorized legislation, and made other decisions in his official capacity as Speaker of the New York State Assembly, and as an elected State Assemblyman, that benefited those from whom he received millions of dollars in personal payoffs.  Instead, Silver defended the case on the ground that he did not take those official actions *in exchange for* those millions of dollars in personal benefits, *i.e.*, that there was no *quid pro quo*.  In summation, Silver's counsel repeatedly emphasized that "[t]his case is about whether there was a *quid pro quo*."  (Tr. 3030; *see also* Tr. 2932, Tr. 2940).  The jury properly and decisively rejected this defense, convicting him on every count with which he had been charged in Superseding Indictment S1 15 Cr. 93 (VEC) (the "Indictment").  So did this Court, when it denied Silver's post-trial motions.

Now, seizing upon the Supreme Court's decision in *McDonnell*, Silver trots out a new theory of his defense that would have been meritless had it been raised at trial, and that plainly is meritless now that it has been raised for the first time following his convictions.  As Silver's current theory goes, even while he effectively concedes that many of his actions on behalf of his

benefactors were "official actions" under *McDonnell*, at least *some* of the actions he traded for millions in personal payouts were not.

But *McDonnell* will not save Silver on appeal, nor should it entitle him to bail pending appeal. *McDonnell* held that an official act must involve a "formal exercise of governmental power" on which the public official took an action or agreed to take an action, and it explained that the action must be "*something more*" than "*merely* setting up a meeting" or "hosting an event." *McDonnell*, slip op. 19-21 (emphasis added). Support of legislation and approval of state funding plainly count as official actions under *McDonnell*, as does using one's "official position to exert pressure on another official to perform an 'official act.'" *Id.* at 18-21. That is exactly what the record at trial established here: Silver repeatedly took actions that involved the formal exercise of his enormous power as Speaker in exchange for payments to himself personally. In one corrupt scheme (the "Asbestos Scheme"), Silver received valuable leads and millions of dollars in asbestos-related referral fees from Dr. Robert Taub in exchange for various official acts that benefited Dr. Taub – including awarding two State grants of hundreds of thousands of dollars to Dr. Taub; honoring Dr. Taub with an official New York State Assembly resolution (a type of legislation) and proclamation; agreeing to assist Dr. Taub with securing necessary governmental permits for a charity event; and using his official power (including his official Assembly letterhead) to secure jobs for Dr. Taub's children. In a second corrupt scheme (the "Real Estate Scheme"), Silver received valuable business and hundreds of thousands of dollars in real estate-related referral fees from two major New York real estate developers in exchange for performing numerous official acts that benefited the developers – including ensuring the passage of various pieces of legislation critical to the business of the developers and approving more than one billion dollars of tax exempt State financing for one of the developers.

2

There can be no dispute that these official acts occurred:  They were documented in State government records introduced at trial and corroborated by the testimony of over twenty witnesses who testified at trial.

In arguing for bail, Silver claims that (a) the Court's jury instructions were erroneous in light of *McDonnell*, and (b) there is a risk that the jury could have reached its verdicts based solely on actions that are no longer illegal under *McDonnell*.   Both parts of this argument collapse under scrutiny.

First, this Court's jury instructions were entirely consistent with *McDonnell*'s requirements.  The jury instructions made clear that, in order to find Silver guilty, the jury had to find that Silver "inten[ded] to be *influenced in the performance of his public duties*" (Tr. 3097 (emphasis added)), and that Silver intended to "exercise *official influence or make official decisions* for the benefit of the pay[o]r" (Tr. 3098 (emphasis added)).  (*See also* Tr. 3106 (instructing jury it must find that Silver "*would exercise official influence or decision-making* for the benefit of the extorted party" (emphasis added))).  These instructions, along with the goodwill instruction issued by the Court at Silver's request as "a theory of the defense instruction" (Tr. 2749), plainly communicated the core holding of *McDonnell*:  that official action requires "something more" than setting up a meeting; it requires the exertion of influence on official decision-making, or the making of official decisions, in exchange for payments.  Critically, the jury charge in *McDonnell* that was found to be incomplete by the Supreme Court did not include several instructions that the Court gave here, including (a) that official action must involve the performance of public duties or the making of official decisions; (b) that the public official must actually peform such a public duty or make such an official decision, influence it, or agree to do so; or (c) that official action taken in exchange only for generalized

3

goodwill, and not a personal payoff, is not corruption.  Thus, there can be no real question –
much less a "substantial question" – that the jury charge here captured each of the concepts the
Supreme Court required in *McDonnell*.

Second, even if the jury instructions were erroneous in light of *McDonnell*, the error
clearly would be harmless, as there simply is no possibility, in light of the evidence presented
and the contentions of counsel, that the jury's verdict – on any of the seven counts of conviction,
let alone all of them – could have been based on acts that fall short of the *McDonnell* standard.
For both of the schemes at issue, the proof was overwhelming that in exchange for millions in
personal payouts, Silver took or agreed to take actions that by any definition were "official" –
including securing State funding and favorable State legislation – and Silver never argued
otherwise to the jury.

*McDonnell* thus has nothing to do with Silver's case and cannot serve as the basis for a
successful appeal.  The Second Circuit already rejected another corrupt public official's efforts to
avoid the consequences of his actions by shoehorning his case into the facts of *McDonnell*.  *See
United States* v. *Halloran*, 821 F.3d 321 (2d Cir. 2016).  The Second Circuit will reach the same
conclusion in this case, where the official nature of the actions taken by Silver in furtherance of
both schemes is equally clear.

For these reasons and those set forth below, Silver's motion for bail pending appeal
should be denied.

## STATEMENT OF FACTS

The Government's evidence at trial conclusively demonstrated that Silver orchestrated
two criminal schemes to use his official position as the powerful Speaker of the New York State
Assembly and an elected New York State Assemblyman to engage in official acts in exchange

for millions of dollars in bribes, kickbacks, and extortion payments.  The evidence further demonstrated that Silver engaged in transactions that laundered the proceeds of the two bribery and extortion schemes.

Most of the evidence presented at trial was undisputed, including evidence of the payments made to Silver, on the one hand, and the actions taken by Silver that benefited the sources of those payments, on the other.  As discussed below, the only real dispute at trial was whether the Government had established that the payments were made in exchange for Silver's official actions on the state funding, legislation, and other matters of importance to those who provided him with millions of dollars in financial benefits, *i.e.*, the *pro* component of a *quid pro quo* offense.  As reflected by the jury's convictions on all seven counts, the jury found that the Government proved the *quid pro quo* for both corrupt schemes beyond a reasonable doubt, a conclusion upheld by this Court in its denial of the defendant's Rule 29 motion.

## I.     THE ASBESTOS SCHEME

Silver's criminal schemes followed the same basic model:  Silver received bribes, kickbacks, and extortion payments in the form of referral fees in exchange for official actions.  In the Asbestos Scheme, Silver agreed to take, and did take, numerous official actions on behalf of Dr. Robert Taub in exchange for lucrative leads to unrepresented patients with mesothelioma ("Mesothelioma Leads") sent to Silver at Weitz & Luxenberg, where Silver was "of counsel." (*See* Mem. & Order Denying Deft. Rule 29 & 33 Motions at 1-2 (May 3, 2016) (the "Mem. & Order")).  Over the course of the scheme, in response to specific requests from Silver that were first made in 2003 and that continued through at least 2011 (Tr. 267-74, 377), Dr. Taub sent numerous Mesothelioma Leads to Silver at Weitz & Luxenberg, from which Silver reaped more

than $3 million in personal profits.  (GX 1509).  Silver continued to receive payouts from these profitable Mesothelioma Leads up until his arrest in this case.

The evidence further established that, in exchange for this stream of leads and resulting fees, Silver took a number of official acts that benefited Dr. Taub, including: (1) a $250,000 payment from a taxpayer-funded source – which Silver alone wholly controlled – called the Health Care Reform Act Assembly Pool ("HCRA Assembly Pool"); (2) a second $250,000 payment from the HCRA Assembly Pool; (3) the passage of a New York State Assembly official resolution and proclamation honoring Dr. Taub, which could only have been obtained by a member of the Assembly; (4) Silver's agreement to assist with securing necessary governmental permits for a charity event with which Dr. Taub was associated; and (5) Silver's efforts to secure jobs for Dr. Taub's children with a State judge and a nonprofit organization heavily dependent upon Silver for State funding by making requests on official Assembly letterhead and following those up with personal inquiries by Silver and/or his Chief of Staff.  (*See* Mem. & Order at 2-5).

Silver used secrets and lies, including falsehoods that he repeated for years, to advance the scheme and cover it up.  With respect to the Asbestos Scheme, Silver hid the truth about his *quid pro quo* scheme from attorneys at Weitz & Luxenberg, who were receiving the Mesothelioma Leads, doing all the work on the cases, and paying Silver millions of dollars in referral fees (the *quid*), and his staff, who were carrying out his official actions (the *quo*).  (Tr. 162-63, 751-52, 995, 1182-83, GX 926).  Silver also lied to the public, his press officer (who began working for Silver in 2011), and others about the nature of his practice and the source of his outside income, including the more than $3 million that he obtained as a result of the Mesothelioma Leads sent to him by Dr. Taub.  He falsely told the public that he obtained cases because people in the community came to him based on his lengthy experience as a lawyer, and

that he spent hours each week reviewing potential cases referred to him in this manner, when the reality was that he spent minutes receiving multi-million dollar Mesothelioma Leads associated with people who never met or spoke with him from Dr. Taub, who sent them to him as part of a *quid pro quo*.  (Tr. 2177-78, 2188, 2221-22; GX 276, 2010).

## II.     THE REAL ESTATE SCHEME

In the second of the corrupt schemes – the Real Estate Scheme – Silver took official action on behalf of two real estate developers (Glenwood Management Corp, referred to herein as "Glenwood," and the Witkoff Group, Inc., referred to herein as "Witkoff"),  in exchange for personal financial benefits in the form of attorney referral fees.  More specifically, the evidence at trial showed that, through an arrangement with Jay Arthur Goldberg, a former Assembly staffer and friend who worked in the tax certiorari field, Silver arranged to get a cut of any fees that Goldberg's law firm (the "Goldberg Firm") got from business Silver steered to the firm. (*See, e.g.*, Tr. 1435-41).  Silver then used the power of his office, and the promise and threat of official action, to get Glenwood and Witkoff to send their tax certiorari business to the Goldberg Firm, which netted him hundreds of thousands of dollars in kickbacks paid to Silver by the law firm.  (*See, e.g.*, Tr. 1596-97).  Over the course of the scheme, Silver obtained or accrued more than $835,000 in kickbacks from the Goldberg Firm.  (Tr. 2523-24; GX 732, 1515).

The evidence also showed that Silver took a number of official acts that benefited Glenwood and Witkoff.  Among other things: (1) Silver voted (through a proxy) as one of three voting members of a State entity called the Public Authorities Control Board ("PACB") to approve Glenwood's request for more than one billion dollars in tax-exempt State financing for its projects, approval that was necessary for the State financing to be issued (Tr. 1700-05, 1932-43, 1961-63; GX 1522); (2) Silver personally signed off on rent and tax abatement legislation

favorable to Witkoff and Glenwood (Tr. 78-82, 1902-03), having met privately with Glenwood and its lobbyist to confirm Glenwood's interests and needs (Tr. 1597-1601, 1741-45); and (3) Silver used his official position to oppose State approvals that were necessary for relocation of a methadone clinic that was proposed to be located close to one of Glenwood's rental buildings in Silver's district (Tr. 1602-05, 1749-53, 1783-86).  (*See* Mem. & Order at 7).

As with the Asbestos Scheme, Silver covered up the corrupt Real Estate Scheme through secrets and lies that continued until weeks before his arrest.  For example, Silver hid from his fellow legislators the fact that he was receiving hundreds of thousands of dollars in personal financial benefits from Glenwood at the same time he was passing legislation favorable to it, and he hid from the PACB the fact that he was benefitting personally from Glenwood's largesse at the same time he was approving over $1 billion in State financing for Glenwood.  (Tr. 81-82, 1961-63; GX 1522).  Moreover, in communications through his press officer and direct communications with the press and public, continuing until shortly before his arrest, Silver lied repeatedly about the source of his income, never disclosing that he obtained income from the real estate industry, much less from one of the State's largest developers and its most active participant in the political process.  To the contrary, Silver falsely stated that his clients were "little people" and that he did not represent "corporations" or "entities that are, uh, um, you know, involved in the legislative process" or "had an impact on anything we do legislatively." (GX 1A, 2, 4, 5).  Moreover, Silver's annual financial disclosures, continuing through those filed by Silver in 2014, never revealed that the Goldberg firm served as a source of outside income, despite forms that required Silver to list "EACH SOURCE" of outside income, and Silver never revealed in those disclosures that he derived any outside income connected to the real estate industry at all.  (Tr. 2115; GX 2009 (summarizing disclosure forms)).

Numerous mailings and interstate phone calls occurred in furtherance of both schemes within the limitations period.  (Tr. 1605-09, 2486-91 and GX 1308-1-A (interstate phone calls in furtherance of Real Estate Scheme within limitations period); Tr. 1062-66 and GX 512, 1520 (wires and mailings in furtherance of Asbestos Scheme within limitations period); GX 646-10 to 646-34, 650-6 to 650-13 (mailings in furtherance of Real Estate Scheme within limitations period)).

### III.    THE LAUNDERING SCHEME

The jury also heard testimony about Silver's efforts to maximize the value of his ill-gotten gains by laundering it through investment vehicles not available to the general public. Jordan Levy, a private investor who was friends with many politicians, testified that Silver, alone among all of his politician friends, asked Levy to permit Silver to invest his funds in private high-yield investment vehicles.  (Tr. 2465-66).  Testimony and exhibits introduced at trial reflected that Silver funded these investments by taking money that he made from the Asbestos and Real Estate Schemes, including money in increments of greater than $10,000, depositing the money into a federally-insured bank account, and sending the money to the vehicles as directed by Levy.   (Tr. 2535-38; GX S-5, 1511-13).

The laundering scheme included further evidence of Silver's efforts to conceal the source and extent of his ill-gotten gains within the limitations period.  As Levy testified, Silver disclosed to him only that he was looking for lucrative private investments because he had come into some "extra money," without ever disclosing his receipt of asbestos- or real estate-related fees to Levy.  Moreover, in 2011, Silver asked that one of the investment vehicles be split in half, with half placed in his wife's name, so that the public would not see the amount of his investment, and thus the wealth he had amassed from the schemes.  (Tr. 2421-30; GX 978-99).

## IV.     THE PARTIES PROPOSED JURY INSTRUCTIONS AND THE COURT'S JURY CHARGE

At the conclusion of the Government's case-in-chief, the Court held a conference with the parties regarding the charge to be provided to the jury.  In advance of the conference, the parties had submitted requests to charge to the Court.  In the Government's submission, it requested, among other things, that the Court instruct the jury that "[t]he term 'official action' as I have just used it includes any act taken under color of official authority."  (Dkt. 68, at 11).  In Silver's submission, he requested that the Court instruct the jury that "[a]n 'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity."  (Dkt. 66, at 30).

During the charge conference, an attorney for Silver handed the Court a one-page additional proposed instruction further defining "official action" – which had not been included in Silver's filed requests to charge, was not submitted in advance of the charge conference even after the parties had received the Court's draft charge, and was never filed on ECF.  Silver's proposed further instruction stated:

Official Acts

> To prove an "official act," the government must prove the exercise of actual governmental power, the threat to exercise such power, or pressure imposed on others to exercise actual governmental power.
>
> Source:  *United States* v. *Uricuoli*, 513 F.3d 290 (1st Cir. 2008) ("official action" includes the "invo[cation] of . . . authority" or the "threat[] to use official powers"); *Valdes* v. *United States*, 475 F.3d 1319, 1324 (D.C. Cir. 2007) (en banc) ("official action" includes only actions involving "questions, matters, causes, suits, proceedings, and controversies that are decided by the government"); *United States* v. *Rabbitt*, 583 F.2d 1014 (8th Cir. 1978).

(Dkt. 298, Ex. A; Tr. 2784-85).

In response to Silver's proposed instruction, the Court reviewed the other portions of its jury charge that defined "official action" and concluded that Silver's proposed further instruction was "more words that just say the same thing" as the existing instructions.  (Tr. 2786).  The Court accordingly declined to include Silver's proposed further instruction on official action.  (Tr. 2786).

The Court's final jury instructions related to the definition of official action stated that "[o]fficial action includes any action taken or to be taken under color of official authority," and also required the jury to find that Silver "inten[ded] to be *influenced in the performance of his public duties*" in exchange for payments he was receiving, that Silver intended to "exercise *official influence or make official decisions* for the benefit of the pay[o]r," and that Silver "*would exercise official influence or decision-making for the benefit of the extorted party*."  (Tr. 3097, 3098, 3106 (emphases added)).

Also during the charge conference, an attorney for Silver proposed an additional statute-of-limitations instruction.  Silver's proposed statute-of-limitations instruction stated:

> The statute of limitations for the charges here is five years.  That means that if you find that Mr. Silver committed any of the alleged acts constituting honest services fraud, extortion, or money laundering before February 19th, 2010, you may not find Mr. Silver guilty on the basis of those acts.

(Tr. 2781).  The Government explained that Silver's proposed instruction was "a misleading description of what a statute of limitations is," because it stated that if Silver "committed any [act as part of the scheme] before February 19th, 2010 you may not find him guilty.  So, therefore, if a grant was given in 2005 you must find him not guilty.  That doesn't make any sense."  (Tr. 2782).  The Court agreed, explaining that the instruction "would have to be that no part of the scheme continued beyond February 19th, 2010."  (Tr. 2782).  The Court then explained that Silver's proposed instruction "is incorrect because you have got the words in the wrong way."

11

(Tr. 2784).  Counsel for Silver agreed, and stated that "[w]e will correct it."  (Tr. 2784).  After this discussion, Silver and the Government submitted to the Court proposed instructions regarding the statute of limitations defense.

The Court then, during its jury charge, gave the following jury instruction on the statute of limitations, without objection by either the Government or Silver.

> The statute of limitations for each of the charged crimes is five years.  If you find that Mr. Silver engaged in the scheme to commit honest services fraud, extortion, or money laundering but no aspect of the particular scheme occurred after February 19th, 2010, then you must acquit on that charge because it is barred by the statute of limitations.
> If, on the other hand, you find that any aspect of the crime you are considering continued on or after February 19, 2010, then the statute of limitations as to that charge has been complied with.

(Tr. 3117).

## V.      THE JURY'S VERDICT AND POST-TRIAL PROCEDURAL HISTORY

On November 30, 2015, following a lengthy jury trial that included presentation of twenty-five witnesses and hundreds of exhibits, Silver was convicted of all of seven counts with which he had been charged in the Indictment.  After the conclusion of trial, Silver filed a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  On May 3, 2016, the Court denied both motions.

Also on May 3, 2016, the Court sentenced Silver to twelve years' imprisonment on Counts One through Six, and ten years' imprisonment on Count Seven, all to run concurrently. In addition to a mandatory special assessment, the Court imposed a $1,750,000 fine, with $1,500,000 due not later than June 14, 2016 and the balance ($250,000) to be paid in monthly installments of not less than $5,846, with the first payment on July 14, 2016.  The court also

ordered Silver to forfeit property and other assets in the amount of $5,393,976.63 in accordance with the Preliminary Order of Forfeiture issued by the Court on May 3, 2016.

On July 11, 2016, Silver filed a motion seeking bail pending appeal based principally on the Supreme Court's decision in *McDonnell*.

## ARGUMENT

## I.   SILVER'S MOTION FOR BAIL PENDING APPEAL SHOULD BE DENIED

### A.  Applicable Law

Title 18, United States Code, Section 3143(b), provides that a court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment" be detained pending appeal unless the judicial officer finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released," and "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in . . . reversal [or] an order for a new trial."  18 U.S.C. § 3143(b)(1)-(2).

That provision gives effect to Congress's view that "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances."  *United States* v. *Miller*, 753 F.2d 19, 22 (3d Cir. 1985) (quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970)).  Following a guilty verdict and sentencing, there is a "presumption in favor of detention."  *United States* v. *Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).  It is the defendant's burden to "rebut this presumption with clear and convincing evidence."  *Id.*

A "substantial question" is "a 'close' question or one that very well could be decided the other way."  *United States* v. *Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (quoting *United States* v.

*Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)).  "If a court does find that a question raised on appeal is 'substantial,' it must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'"  *Id.* (quoting *United States* v. *Miller*, 753 F.2d at 23).  With respect to all of these issues, "the burden of persuasion rests on the defendant." *Id.* at 125-26

A defendant challenging a jury instruction must demonstrate that (1) he requested a charge that "accurately represented the law in every respect" and (2) the charge delivered was erroneous and prejudicial.  *United States* v. *Applins*, 637 F.3d 59, 72 (2d Cir. 2011) (quotation marks omitted).  As a general matter, no particular wording is required for an instruction to be legally sufficient, but, rather, the Court must "look to the charge as a whole to determine whether it adequately reflected the law and would have conveyed to a reasonable juror the relevant law." *United States* v. *Mulder*, 273 F.3d 91, 105 (2d Cir. 2001) (quotation marks omitted).

### B.  The Supreme Court's Decision in *McDonnell*

The principal basis cited by the defendant for bail pending appeal is the Supreme Court's decision in *McDonnell*, which was issued on June 27, 2016.  In that case, Robert McDonnell, the former Governor of Virginia, was charged with, among other things, honest services fraud and extortion under color of official right, stemming from his relationship with Jonnie Wiliams, the chief executive of Star Scientific, a Virginia-based company that had developed a nutritional supplement made from anatabine, a compound found in tobacco.  *McDonnell*, slip op. 1.  The Government there argued that, in exchange for personal benefits, then-Governor McDonnell had taken official action on Williams's behalf, including "arranging meetings for Williams with other Virginia officials to discuss Star Scientific's product, hosting events for Star Scientific at the

14

Governor's Mansion, and contacting other government officials concerning studies of anatabine."  *Id.* at 2 (quotations omitted).

The Government also "argued more broadly that these activities constituted 'official action' because they related to Virginia business development, a priority of Governor McDonnell's administration."  *Id.*  In his defense, McDonnell presented evidence at trial (including his own testimony) that he did not pressure or influence any state official to take action on Williams's anatabine product, and that the State of Virginia never issued grant money for studies of anatabine or arranged for anatabine to be covered under State health plans – the favorable decisions Williams was seeking from the State.  McDonnell  argued both before the District Court and on appeal that "merely setting up a meeting, hosting an event, or contacting an official – without more – does not count as an 'official act.'"  *Id.*  The jury convicted McDonnell of the honest-services-fraud and extortion offenses, and the Fourth Circuit affirmed.

The Supreme Court granted certiorari and vacated the Fourth Circuit's judgment affirming McDonnell's conviction.  In reaching that conclusion, the Supreme Court explained that the jury instructions given by the District Court "lacked important qualifications," without which the jury was permitted to convict McDonnell for receiving personal benefits in exchange merely for "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)."  *McDonnell*, slip op. 21-22, 25.  The Supreme Court held that an "official action" under the honest services fraud and extortion statutes must involve a "formal exercise of governmental power" that is "more specific and focused than a broad policy objective."  *Id.* at 25-26; *see also id.* at 17 (stating that official action in this context "conveys something within the specific duties of an official position – the function conferred by the authority of his office").  While merely setting up a meeting, "without more," does not constitute official action under this

definition, *McDonnell* reaffirmed that a public official takes official action by agreeing to perform an official act, "exert[ing] pressure on another official to perform an official act," or "advis[ing] another official, knowing or intending to such advice will form the basis for an official act by another official." *Id.* at 21.

### C. Discussion

#### 1. The Defendant Presents No Substantial Question Likely to Result in Reversal or New Trial

Silver argues that the Supreme Court's decision in *McDonnell* presents the "substantial question" in this case required to warrant bail pending appeal. According to Silver, (a) the Court's jury charge in this case did not adequately instruct the jury on the definition of official action in light of *McDonnell*, and (b) he was prejudiced by the instructional error. (Br. 5).

Silver is wrong on both counts. First, the Court's jury charge in this case – which relied on decades of precedent from the Supreme Court and the Second Circuit undisturbed by *McDonnell* – instructed the jury on each of the key concepts identified by *McDonnell*. Second, even if there was error (and there was not), any error was harmless beyond a reasonable doubt, given the overwhelming and essentially uncontested evidence the Government presented at trial that Silver's schemes centered around acts that are "official" under any conceivable definition – such as awarding hundreds of thousands of dollars in State grants, approving more than one billion dollars of tax exempt financing, and ensuring the passage of various pieces of legislation. Silver thus has failed to present a substantial question likely to result in reversal or a new trial.

#### a. The Jury Instructions Were Not Erroneous

Silver takes issue with a single portion of the jury charge in which the Court instructed the jury that "[o]fficial action includes any action taken or to be taken under color of official authority," and contends that this portion of the instruction did not adequately capture the

definition of "official action" in light of *McDonnell*.  (Br. 5).  But in advancing that argument, Silver ignores that, when reviewing a jury charge, courts "view[] the charge as a whole."  *United States* v. *Sabhnani*, 599 F.3d 215, 237 (2d Cir. 2010) (quoting *United States* v. *Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006)).  That is, the Court of Appeals "emphatically do[es] not review a jury charge on the basis of excerpts taken out of context, but in its entirety, to determine whether considered as a whole, the instructions adequately communicated the essential ideas to the jury."  *Id.* (internal quotations omitted).  When viewed as a whole, as it must be, the jury charge here properly instructed the jury on each of the legal concepts identified in *McDonnell*.

 As set forth above, *McDonnell* explains that the jury should be instructed that the official action at issue must involve a "formal exercise of governmental power" that is "more specific and focused than a broad policy objective."  *McDonnell*, slip op. 25-26; *see also id.* at 17 (stating that official action in this context "conveys something within the specific duties of an official position – the function conferred by the authority of his office").  *McDonnell* also reaffirms that the public official must "make a decision or take an action *on* that" formal exercise of governmental power, "or agree to do so."  *Id.* at 19.  A public official is not required to make the decision or take the action in question; rather, it is sufficient, for example, if the public official pressures or influences another official to do so.  *Id.* (citing *United States* v. *Birdsall*, 233 U.S. 223, 234 (1914)).

 The Court adequately communicated each of these concepts to the jury here.  *First*, in its charge to the jury – just a few lines before the "official action" definition Silver challenges – the Court made clear that, to convict Silver of honest-services fraud and extortion, the jury must have found that Silver intended to be influenced in the carrying out of his public duties.  The Court explained that "[a] bribe occurs when a public official corruptly seeks or accepts, directly

or indirectly, something of value from another person *with the intent to be influenced in the performance of his public duties*." (Tr. 3097 (emphasis added)). The Court then defined a kickback along similar lines: "A kickback occurs when a public official corruptly seeks or accepts, directly or indirectly, something of value from another person *with the intent to be influenced in the performance of his public duties*, and the influenced public act itself provides the source of the funds to be kicked back." (Tr. 3097 (emphasis added)).

These instructions plainly capture *McDonnell*'s teaching that official action is limited to "something within the specific duties of an official position – the function conferred by the authority of his office." Slip op. 17. Indeed, the pre-*McDonnell* Second Circuit precedent – on which the jury instruction was based – has long recognized the same point. *See United States* v. *Ganim*, 510 F.3d 134, 141 (2d Cir. 2007) (Sotomayor, J.) (explaining that honest services fraud and extortion under color of official right "criminalize[] . . . a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the exercise of his official authority"); *United States* v. *Rosen*, 716 F.3d 691, 699-700 (2d Cir. 2013) (same).

*Second*, just a few sentences after the challenged "official act" definition, the Court further instructed the jury that it could not convict Silver of honest services fraud unless it found that he "understood that as a result of the bribe or kickback, he was expected *to exercise official influence or make official decisions for the benefit of the pay[o]r*." (Tr. 3098 (emphasis added)). In instructing the jury on the extortion count, the Court similarly explained that "[t]he Government must also prove beyond a reasonable doubt that the extorted party was motivated, at least in part, by the expectation that as a result of the payment, *Mr. Silver would exercise official influence or decision-making for the benefit of the extorted party* and that Mr. Silver was aware of their motivation." (Tr. 3106 (emphasis added)).

Once again, these instructions are in line with *McDonnell*.  The Supreme Court there faulted the district court for rejecting McDonnell's request that the court instruct the jury that "an 'official act' must intend to or 'in fact influence a specific official decision the government actually makes.'"  Slip op. 12; *see also Ocasio* v. *United States*, 136 S. Ct. 1423, 1434 (2016) (affirming conviction on indictment alleging that "[i]t was a purpose of the conspiracy for [the defendants] to enrich over 50 [Baltimore Police Department] Officers . . . in exchange for the . . . Officers' exercise of their official positions and influence to cause vehicles to be towed or otherwise delivered to Majestic").  Here, by contrast, the Court included an instruction nearly identical to the one the district court in *McDonnell* rejected.

Indeed, the Court's instruction here that official action required Silver to "exercise official influence or make official decisions" or "exercise official influence or decision-making" (Tr. 3098, 3106) is substantially identical to the additional instruction proposed by Silver, which would have instructed the jury that official action requires "the exercise of actual governmental power" (Tr. 2784-85).  The Court thus was plainly correct in explaining that the defendant's proposed instruction was merely "more words that just say the same thing" as the existing instructions.  (Tr. 2786).

*Third*, as these instructions make clear, the jury was properly charged under *McDonnell* that, to convict, it was not enough merely that an official decision be at issue, but it also had to find that Silver influenced (or was influenced in) an official decision, or that he so agreed.  (*See, e.g.*, Tr. 3097 (explaining that "[a] bribe occurs when a public official corruptly seeks or accepts, directly or indirectly, something of value from another person *with the intent to be influenced in the performance of his public duties*" (emphasis added)), *id.* (same for kickbacks)).  This concept has long been recognized in prior Supreme Court decisions.  *See, e.g.*, *United States* v. *Sun-*

*Diamond Growers of California*, 526 U.S. 398, 404 (1999) (explaining that "[b]ribery requires intent to influence an official act or to be influenced in an official act" (quotations omitted)). Second Circuit precedent, relying on the governing Supreme Court caselaw, has consistently recognized the same principle. *See, e.g.*, *United States* v. *Ford*, 435 F.3d 204, 210 (2d Cir. 2006) (same, quoting *Sun-Diamond*); *see also Ganim*, 510 F.3d at 151 (affirming jury charge that included instruction that "a public official acts corruptly if he solicits, accepts or agrees to accept a personal benefit, at least in part, *with the intent to be improperly influenced or rewarded* in connection with the performance of an official act" (emphasis in original)); *United States* v. *Carson*, 464 F.2d 424, 435 (2d Cir. 1972) (explaining that "[i]t is corruption of official positions through misuse of influence in governmental decision-making which the bribery statutes make criminal").

*Fourth*, the Court instructed the jury on all of these points in the context of a jury charge that specifically instructed the jury – at the defendant's urging – that it could not convict Silver if the jurors found that he understood the payments to have been made only to cultivate generalized goodwill or nurture a relationship, rather than in exchange for specific official acts. Specifically, the Court instructed the jury that "[i]f you find that [the defendant] understood that the benefits were provided solely to cultivate goodwill or to nurture a relationship with the person or entity who provided the benefit, and not in exchange for any official action, then this element will not have been proven." (Tr. 3098). The district court in *McDonnell*, in contrast to the Court here, declined to provide such a "generalized goodwill" instruction over McDonnell's objection. *See United States* v. *McDonnell*, 792 F.3d 478, 514-515 (4th Cir. 2015).

At bottom, Silver's effort to find error in this Court's jury charge amounts to nothing more than wordplay. Indeed, the Court here recognized as much when declining to include

Silver's last-minute proposed jury instruction that further defined "official action" in a way that used "more words that just say the same thing."  (Tr. 2786).[1]

Because the jury in this case was properly instructed on each of the legal principles set forth in *McDonnell*, Silver has failed to identify a substantial question of law that is likely to result in reversal or a new trial sufficient to warrant bail pending appeal.  Silver's application for bail pending appeal accordingly should be denied.

### b.  Even if There Was Error, Silver Was Not Prejudiced

Even if the Court's jury charge here was erroneous (it was not), Silver still would not be entitled to bail pending appeal because he did not suffer prejudice.  As the Second Circuit has explained, "it does not follow that reversal is necessary in every case in which the District Court erred by failing to give [a particular jury] instruction."  *United States* v. *Botti*, 711 F.3d 299, 311 (2d Cir. 2013).  Rather, "the determination as to whether an instructional error was harmless depends significantly on the context in which the instruction was provided and the other evidence presented at trial."  *United States* v. *Andrews*, 681 F.3d 509, 522 (3d Cir. 2012).  For that reason, the Court must undertake a "thorough examination of the record."  *Neder* v. *United States*, 527 U.S. 1, 19 (1999).

---

[1] The jury instructions given in this case did not use the language of Title 18, United States Code, Section 201, which the parties in *McDonnell* had agreed to use as a source for the definition of "official act," *McDonnell*, slip. op. 9.  The law does not require that the precise language of Section 201 be used in public corruption cases.  As the Second Circuit has explained, Section 201 is the definition applicable to the federal bribery statute, and does not necessarily apply to other public corruption statutes, such as those with which Silver was charged.  *See United States* v. *Ganim*, 510 F.3d 134, 142 n.4 (2d Cir. 2007) (Sotomayor, J.).  Nowhere in *McDonnell* (in an opinion joined by now-Justice Sotomayor) did the Supreme Court purport to overrule *Ganim* or hold that the Section 201 definition, rather than the definition used for more than a decade in this Circuit and applied here, must apply in all federal corruption prosecutions.  Nevertheless, as set forth above, the legal principles set forth in *McDonnell* were fully contained within the instructions given in this case.

A thorough examination of this record reveals that, even if there were instructional error, it plainly was harmless.  That is because, as to both the Asbestos Scheme and the Real Estate Scheme, Silver's performance of core governmental actions in exchange for payment – including awarding hundreds of thousands of dollars of State grants, approving more than one billion dollars of tax exempt financing, and ensuring the passage of various pieces of legislation – constitutes official action under any conceivable definition of the term.

### i.   Each of the official actions connected to the Asbestos Scheme meets the standard set forth in *McDonnell*

Taking the Asbestos Scheme first, there can be no question that Silver repeatedly performed official acts on behalf of Dr. Taub, as that phrase is defined in *McDonnell*.  In fact, Silver does not seriously contest that the acts at the center of the Asbestos Scheme – the two $250,000 State grants to Dr. Taub – constitute official acts.  (Br. 16).  That is for good reason, as *McDonnell* itself expressly stated that "allocat[ing] grant money" is an official action under the governing standard.  Slip op. 18 (quotations omitted)).  Silver also effectively concedes that the $25,000 State grant to the Shalom Task Force also counts as an official act, as does his successful efforts to pass a New York State Assembly official resolution (a form of legislation that required a vote on the floor of the Assembly) and obtain a proclamation honoring Dr. Taub. (Br. 16-17; *see also* DX 90; Tr. 1266-68).

These appropriate concessions are fatal to Silver's effort to obtain bail pending appeal. His only response as to the grants that constituted the core official acts in the Asbestos Scheme is to assert that, because the grants were issued outside the applicable statute of limitations, the jury could not have relied upon them in convicting Silver.  But as the Court properly instructed the jury – with no objection from Silver – the jury was not required to find that Silver committed an "official act" after February 19, 2010, but only that "*any* aspect of the crime" it was considering

occurred after that date, which could include wires and mailings in furtherance of the scheme, demands for additional financial benefits, and lies told in furtherance of the scheme. *See United States* v. *Rutigliano*, 790 F.3d 389, 400-01 (2d Cir. 2015) (rejecting statute of limitations challenge to, *inter alia*, substantive mail and wire fraud convictions based on "measures of concealment" and "other corrupt intervention" in furtherance of the scheme within limitations period, along with evidence of a charged "mailing or wire within the applicable limitations period"); *see also United States* v. *Lane*, 474 U.S. 438, 451-52 (1986) (acts of concealment in furtherance of scheme that occur within limitations period satisfy statute of limitations); *United States* v. *Smith*, 198 F.3d 377, 384 (2d Cir. 1999) (Hobbs Act extortion is "a continuing offense," only requiring some aspect of the charged conduct to continue into the limitations period).

The Government presented undisputed (and indisputable) evidence that proved not only that the state grants were issued, but that the Asbestos Scheme continued well beyond February 19, 2010, the commencement of the limitations period. For example, Silver visited Dr. Taub at Columbia University to request more Mesothelioma Leads in May 2010, and Dr. Taub agreed to continue providing such leads, explaining to a colleague that he might "need [Silver] in the future – he is the most powerful man in New York State." (Tr. 377, GX 595-1 (May 25, 2010 e-mail)). Dr. Taub in fact continued to send Mesothelioma Leads well after February 19, 2010 (GX 1509), and Silver continued to receive millions of dollars in payouts from the Mesothelioma Leads well beyond February 19, 2010 (*id.*). Moreover, Silver continued to take indisputably official actions on behalf of Dr. Taub after February 19, 2010, for example by obtaining the official resolution and proclamation honoring Dr. Taub (Tr. 390-92, 1260-65; GX 314, 315, 382), and Silver continued to further conceal the scheme by telling lie after lie well after February 19, 2010 – in interviews with the press (GX 5) and on his disclosure forms (GX 920-

924) – to keep the public from learning the truth about his corruption.  In addition, wires and mailings in furtherance of the charged honest services fraud schemes were sent after the commencement of the limitations period.  (GX 1520).  Thus, even if Silver were correct (and he is not) that only the official actions Silver took on behalf of Dr. Taub were the awards of State funds and the official proclamation and resolution, that would not undermine the jury's verdict.[2]

Moreover, the official actions Silver contests in fact meet the standard set forth in *McDonnell*.  The only actions Silver contends were not sufficiently "official" under *McDonnell* are: (a) Silver's agreement to assist Dr. Taub with obtaining governmental approvals for the Miles for Meso charity event; and (b) Silver's efforts, using his Assembly letterhead and official position, to obtain jobs for Dr. Taub's children.  Each of these actions, however, is an official action under *McDonnell*.

As for the Miles for Meso event, Silver claims that "merely meeting with Dr. Taub [in connection with the event] was not an 'official act.'"  (Br. 12).  But the Government presented evidence at trial demonstrating that Silver did not merely meet with Dr. Taub to discuss the event.  To the contrary, Silver agreed to assist Dr. Taub with securing the necessary governmental permits, and he documented this agreement through the issuance of an official memorandum.  (Tr. 409-10; GX 525-21 (memorandum from Silver on official Assembly letterhead stating that "[t]echnically, the City has a moratorium on new events here in Lower Manhattan," but stating that Silver would "help [Dr. Taub] navigate this process if needed")).  The issuance of the permits needed for the event plainly were "formal exercises of governmental

---

[2] Silver contends that the jury could not have relied on the official resolution and proclamation because there was no evidence of a *quid pro quo*.  (Br. 16).  But of course—as explained below—Silver argued that theory to the Court (in securing a generalized goodwill instruction) and to the jury at length during summation.  Both this Court and the jury rejected that argument.

power," and Silver's agreement to assist amounts to just the sort of effort to influence the exercise of governmental power *McDonnell* requires.  *See McDonnell*, slip op. 18-19.  Silver also relies on the fact that the Miles for Meso event "never took place" to support his contention that Silver's efforts of assistance were not official acts.  (Br. 12).  But that is irrelevant.  As the Supreme Court explained in *McDonnell*, "a public official is not required actually to [take the official] action [in question]; it is enough that the official agrees to do so."  Slip op. 19.  The fact that Silver's agreement to assist Dr. Taub with obtaining necessary government permits was preceded by a meeting does not affect the analysis, much less make Silver's illegal *quid pro quo* scheme legal; the *McDonnell* decision does not immunize from prosecution any scheme that involved meetings as part of the scheme.  In fact, the Supreme Court specifically held, "[i]f an official sets up a meeting, . . . on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act."  *McDonnell*, slip op. 20.

Turning to Silver's efforts on behalf of Dr. Taub's children, Silver contends that his efforts to secure a position for Dr. Taub's daughter with a State court judge cannot be considered "official" because there was no evidence that Judge Schoenfeld relied on Silver's recommendation.  (Br. 11-12).  But once again, that is not the test.  Rather, under *McDonnell*, a public official engages in official action when he "uses his official position to provide advice to another official, *knowing or intending* that such advice will form the basis of an official act."  Slip op. 19 (emphasis added).  The Government presented ample evidence at trial that Silver intended that his efforts, which included a submission to the judge, whose appointment Silver had supported, on official Assembly letterhead and a call from Silver's Chief of Staff, would influence Judge Schoenfeld's decision to hire Dr. Taub's daughter.  (*See* Tr. 1323; Tr. 105-06

(testimony of Assemblywoman Amy Paulin that the use of official Assembly letterhead reflected that a legislator was seeking assistance in his or her official capacity, rather than in her personal capacity)); *see also United States* v. *Dimora*, 750 F.3d 619,627 (6th Cir. 2014) (holding that effort to influence the hiring of governmental employees constitutes official action).[3]

Finally, with respect to Silver's efforts to secure a position for Dr. Taub's son with OHEL, a nonprofit that was heavily dependent on Silver for funding, Silver simply misses the point. Silver's efforts included a submission on Assembly letterhead, and multiple calls by Silver and his Chief of Staff, to the CEO of the organization – actions that Silver had never taken before on behalf of any applicant to OHEL. Silver took those actions soon after he had approved large State capital grants to OHEL, which named its summer camp after Silver's brother to acknowledge Silver's efforts to secure State funding for the organization. (*Compare* Tr. 722 (OHEL securing $2 million in State funding from Silver in March 2012) and Tr. 1527 (Silver, through State, was largest funder of OHEL), *with* GX 167-3 (Silver seeking position for Dr. Taub's son with OHEL in May 2012 and asking OHEL's CEO to "let me know how things progress"); *see also* Tr. 1531 (OHEL named camp after Silver's brother to acknowledge Silver's support for OHEL through State), 1533-34 (Silver never called or otherwise requested assistance with hiring anyone other than Dr. Taub's son)). Silver's actions on behalf of Dr. Taub's son thus included not only his and his State staff's direct efforts, through use of Assembly letterhead and numerous calls, to influence OHEL's hiring decision, but also the implicit "threat to exercise [his official] power" that accompanied it – *i.e.* the implicit threat to cut off the spigot of State funds

---

[3] Silver also asserts that it is not an official act for a state court judge to hire an unpaid intern. But hiring governmental employees is plainly a "formal exercise of governmental power," and nothing in *McDonnell* purports to exclude from its definition hiring decisions regarding unpaid governmental employees.

that Silver was sending to OHEL in the future if the organization did not hire Dr. Taub's son as

requested.  *See* Tr. 2784-85 (Silver advancing position that "an 'official act'" includes "the threat

to exercise [official] power"); Dkt. 298 Ex. A (defense proposed instruction).

### ii.   Even assuming some actions connected to the Asbestos Scheme were not "official" under *McDonnell*, Silver still was not prejudiced

Even assuming that the three actions Silver now challenges (Silver's assistance with the

Miles for Meso event and Silver's efforts to secure jobs for Dr. Taub's children) fall outside

*McDonnell*'s definition of "official act" (and they do not), Silver *still* would not be entitled to the

relief he seeks.  The evidence the Government presented at trial on the Asbestos Scheme

overwhelmingly demonstrated that the actions Silver effectively concedes were official –

including the two $250,000 State grants to Dr. Taub and the resolution and proclamation – in fact

occurred, and were central to his corrupt scheme.  Moreover, the evidence presented at trial

leaves no realistic possibility that the jury convicted Silver solely based on a finding that Silver

merely engaged in the actions he now claims were not "official" in exchange for millions of

dollars in private financial benefits.

To begin with, unlike Governor McDonnell, Silver never disputed whether his actions

were sufficiently "official."  At trial, the Government presented a parade of witnesses whose

testimony established the official acts, the private benefits that Silver obtained, and the *quid pro

quo*.  Silver cross-examined each one – at length – regarding, not whether the acts occurred or

were official, but whether the official acts were taken in exchange for the private benefits.

Likewise, Silver's summation focused exclusively on whether there was a *quid pro quo* – not on

whether any of his actions occurred or were "official" in nature.  (*See, e.g.*, Tr. 2930 ("Good

afternoon.  Sheldon Silver did not sell his office.  *There was no quid pro quo*." (emphasis

added)), Tr. 2932 ("The question is did he commit a *quid pro quo*.  Did he engage in a *quid pro quo*, this for that. The answer is no."), Tr. 2940 ("While there are seven counts, as we saw earlier, in the charges against Mr. Silver, they really boil down, all of them to this question of was there an illegal *quid pro quo*.  The answer is no."), Tr. 2968 ("Just as the real estate allegations were devoid of any evidence of a *quid pro quo*, there's no illegal *quid pro quo* between Mr. Silver and Dr. Taub."), Tr. 3030 ("There was no *quid pro quo* on the real estate side of this case, there was no *quid pro quo* on the Dr. Taub side of this case.  There was no *quid pro quo*.")).  By contrast, Silver did not contest at all whether he had engaged in "official acts" on behalf of Dr. Taub or the real estate developers.

Further reinforcing the nature of Silver's defense at trial, in connection with his argument that there was no *quid pro quo*, Silver requested the Court provide the jury with a "generalized goodwill" instruction, which defense counsel described as "essentially . . . a theory of the defense instruction."  (Tr. 2749).  The Court ultimately provided a "goodwill" instruction as Silver requested.  (Tr. 3098).  Silver repeatedly argued in closing that Silver viewed the financial benefits that he obtained – not as part of an illegal *quid pro quo* – but as an effort to generate goodwill with him.  (*See, e.g.*, Tr. 3003 ("[T]here's no question that Dr. Taub wanted to create goodwill with Mr. Silver, and that's not corruption."), Tr. 3030 ("This case is about whether there was a *quid pro quo*.  And notwithstanding what you heard this morning, you are going to hear tomorrow from the instructions from Judge Caproni that generalized goodwill, desire to have a relationship with somebody is not enough to create an illegal *quid pro quo*.")).

The jury rejected Silver's actual theory of the defense.  So did this Court in denying his post-trial motions.  Mem. & Order 13.  That is because the overwhelming evidence demonstrated that Silver had engaged in an illegal *quid pro quo* – that is, he performed official acts on behalf

of Dr. Taub in exchange for the Mesothelioma Leads and resulting referral fees.  (*See* Govt. Opp. to Silver Rule 29 Mot., Dkt. 212 at 20-26).

All of this stands in stark contrast to *McDonnell*, where the question whether Mr. McDonnell's actions were "official" was the central disputed issue at trial, in view of the lack of clear proof that any ultimate decision had been made to award grants or provide other State financial benefits to Williams or his company, and McDonnell's own testimony that he never made any decisions or took any actions that benefited Williams.  There is a good reason why Silver did not pursue that defense here:  The official actions at the core of the Government's evidence and argument on the Asbestos Scheme, including matters such as issuance of state grants that are plainly "official" under any definition of the term, indisputably occurred, and the proof overwhelmingly established that they occurred as part of a *quid pro quo* relationship with Dr. Taub.

In light of this record, to conclude that the jury may have convicted on an improper theory, the Second Circuit would have to find a reasonable possibility that the jury ignored the undisputed evidence demonstrating that Silver awarded two separate $250,000 State grants to Dr. Taub, *and* an official resolution and proclamation for Dr. Taub, *and* a formal memorandum documenting Silver's agreement to help obtain governmental approvals for the Miles for Meso event.  The Second Circuit also would have to conclude that Silver's efforts to obtain jobs for Dr. Taub's children did not constitute official acts *and* that those acts and the Miles for Meso meeting were the *only* actions Silver took in exchange for the millions of dollars in leads provided by Dr. Taub.  That is, to have convicted Silver on the theory he now advances, the jury would have had to ignore the overwhelming and undisputed proof that Silver awarded State grants to Dr. Taub, and engaged in other indisputably official acts on behalf of Dr. Taub, and

instead concluded that Silver obtained millions of dollars' worth of Mesothelioma Leads in exchange only for a recommendation of Dr. Taub's daughter for an unpaid internship, a recommendation for Dr. Taub's son at a non-profit organization, and a meeting (but not an agreement to assist, despite the formal memo from Silver on official Assembly letterhead to the contrary) concerning a charity event. That is implausible on its face and impossible when viewed in light of the entire evidentiary record.

### iii.   Each of the official actions connected to the Real Estate Scheme meets the standard set forth in *McDonnell*

As with the Asbestos Scheme, the actions Silver took on behalf of Glenwood and Witkoff as part of the Real Estate Scheme easily satisfy the "official act" definition set forth in *McDonnell*. For starters, the Rent Act of 2011 is a core "official action" contemplated by *McDonnell*, as is the more than one billion dollars of tax exempt financing the PACB provided to Glenwood. *See McDonnell*, slip op. 16-17. Silver's efforts, with the assistance of his office and staff, to help shut down the methadone clinic that was proposed near a Glenwood building also plainly constitute official action. *Id.*

In resisting this conclusion, Silver effectively concedes, as he must, that the Rent Act of 2011 counts as official action, but he claims that a meeting Silver held with Glenwood and its lobbyists leading up to the passage of that law are not official actions after *McDonnell*. (Br. 17). The Government admitted evidence at trial that showed Silver held a private, confidential meeting with Glenwood and its lobbyists in his Assembly office so that Glenwood could spell out its confidential position on the Rent Act of 2011 – which differed from the public position Glenwood had taken within the real estate industry. (Tr. 1742-43; GX 103-8). Silver then oversaw the passage of the Rent Act of 2011, which was, in all relevant respects, identical to Glenwood's private request as stated in the confidential meeting. (GX 1521; *see also* Tr. 78-81

(Assemblywoman Paulin explaining Silver's control over flow of legislation and personal

involvement in real estate legislation), 1592-96 (Brian Meara explaining Silver's role in real

estate legislation), 1705-11 (Richard Runes explaining process surrounding passage of Rent Act

of 2011), 1902-03 (Richard Runes explaining that no major rent regulation legislation ever

passed over Silver's objection)).  As was the case with the Asbestos Scheme, the fact that a

meeting preceded the Rent Act of 2011 did not make Silver's illegal *quid pro quo* Real Estate

Scheme legal; as explained above, *McDonnell* does not immunize from prosecution any scheme

that involved meetings as part of the scheme.  *See McDonnell*, slip op. 20.

 Moreover, unlike in *McDonnell*, in which Williams's objectives of state grant funding

and health plan coverage never were achieved, here, there is no dispute that the Rent Act of 2011

was passed, nor that it corresponded closely with Runes's requests in the meeting with Silver.

As to the PACB financing, Silver again effectively concedes that the financing decisions

constituted official action, but he protests that he did not, in fact, take any action or make any

decision on that financing.  (Br. 14).  But as the evidence at trial showed, as a voting member of

the PACB, Silver authorized the financing decisions of the board through a proxy, who had no

power to deviate from Silver's own views concerning whether to approve the financing.  (Tr.

1929).  Moreover, Silver – as one of the three members of the PACB – had complete, personal

veto power over any PACB financing, including the more than one billion dollars of financing

given to Glenwood, and could remove items from the PACB's agenda.  (Tr. 928, 1701, 1703,

1926-28).  Silver, however, declined to use that veto power to halt the PACB's financing of

Glenwood; had he instead vetoed the financing, or simply removed it from the agenda,

Glenwood would have lost this billion-dollar, tax-exempt state financing.  *See McDonnell*, slip

op. 19 (explaining that decisions or actions that constitute a "qualifying step" towards an ultimate decision are "official actions").

> **iv. Even assuming some actions connected to the Real Estate Scheme were not "official" under *McDonnell*, Silver still was not prejudiced**

Silver next contends that any instructional error was not harmless because the jury could have found that that the Rent Act of 2011 – which indisputably became law and which Silver effectively concedes involved official action – was not part of an illegal *quid pro quo*. But this merely attempts to reargue his Rule 29 motion, which the Court already rejected prior to imposing sentence. As the Government argued below and as this Court already has found, the jury was presented with overwhelming evidence that Silver took official actions relating to the Rent Act of 2011, and official actions that impacted Glenwood and Witkoff more generally, as part of a *quid pro quo*.

The evidence showed, among other things, that Silver exercised outsized control over real estate legislation and State financing for real estate development that was essential to Glenwood and Witkoff. Silver was well aware that Glenwood and Witkoff were dependent on state action he controlled, and took advantage of that fact by directly and personally soliciting both Glenwood and Witkoff to shift fungible yet valuable tax certiorari business from other service providers to Goldberg in exchange for a lucrative cut of Goldberg's fees (the *quid*). The evidence also demonstrated that Silver reciprocated by engaging in official action (the *quo*, described above) that benefited the developers in exchange for their willingness to send their lucrative business to the Goldberg firm. By keeping the developers satisfied with Silver's official acts on real estate-related matters and growing their business with the Goldberg firm,

Silver was making Goldberg and himself rich by getting Goldberg his biggest and most lucrative clients.

Moreover, the private payments to Silver and Silver's official acts were specifically linked in a *quid pro quo*. Both Witkoff and Glenwood's representatives testified that they sent the business to Goldberg at Silver's request because they were concerned that refusal to do so would alienate Silver and thereby risk losing the specific favorable official action on which they had relied. (Tr. 2025 (Witkoff testifying that one of the reasons for hiring the Goldberg Firm was to "not alienate" Silver, who had specifically asked him to hire the firm), Tr. 1904 (Glenwood agreed to financial arrangement with Silver because it "did not want to alienate the [S]peaker")).

In addition, the timing of the private benefits given by the developers and by Goldberg, and the official action taken by Silver, provides compelling support for the existence of the illegal *quid pro quo*. *See United States* v. *Biaggi*, 909 F.2d 662, 684 (2d Cir. 1990) (noting that timing of private benefits *vis-à-vis* official action can support proof of *quid pro quo*). In particular, Silver: (a) solicited Glenwood for business in 1997 at the very time critical real estate legislation was up for renewal; (b) received additional business from Glenwood each year Silver approved real estate legislation that was satisfactory to Glenwood (2003, 2007, and 2011); (c) in late December 2011, Silver asked Glenwood to sign off on ongoing payments within months of 2011 real estate legislation that left Glenwood satisfied, within days of Silver's favorable official action concerning a planned methadone clinic in the vicinity of Glenwood's buildings (GX 788 (letter of praise for Silver concerning official action benefiting Glenwood on methadone clinic circulated in early December 2011), and *the same day* he deposited a check approaching the amount of his annual State salary, which he understood represented Glenwood fees, into his bank

account; (d) received additional buildings from Glenwood within days of his signature of the secret side letter; and (e) approved hundreds of millions of dollars in PACB financing two months before and ten months after his signature of the secret side letter (GX 1522).

Moreover, the jury heard that Silver carried out the scheme and covered it up by keeping secrets and telling lies – in order to prevent the public from learning about the illegal *quid pro quo* he was engaged in.  (*See*, *e.g.*, GX 1A, 2, 4 (Silver falsely stating that his clients were "little people," that he did not represent "corporations" or "entities that are, uh, um, you know, involved in the legislative process," or "had an impact on anything we do legislatively.").

Thus, the evidence overwhelmingly supported a finding of an illegal *quid pro quo* on the Real Estate Scheme, as this Court already found in denying Silver's Rule 29 motion.  For the same reasons, any instructional error plainly was harmless, as Silver's only argument to the contrary is the purported lack of proof of a *quid pro quo*.  Thus, on this scheme, as on the Asbestos Scheme, Silver has failed to present a substantial question likely to result in reversal or a new trial.

*        *        *

Accordingly, as to both the Asbestos Scheme and the Real Estate Scheme, even if there were instructional error (and there is none), it was plainly harmless.  If, as Silver suggests, this Court finds instructional error and looks to post-*Skilling* caselaw for guidance in assessing harmlessneess (Br. 9-10), it need look no further than *Skilling* itself.  On remand from the Supreme Court, the Fifth Circuit found that the instructional error was harmless beyond a reasonable doubt because the evidence of the defendant's guilt on a valid theory was overwhelming and because the Government had focused primarily on the valid theory.  *United States* v. *Skilling*, 638 F.3d 480, 483-84 (5th Cir. 2011); *see also United States* v. *Nouri*, 711

F.3d 129, 140 (2d Cir. 2013) (affirming conviction post-*Skilling* where, in light of overwhelming evidence, court found no reasonable likelihood that properly instructed jury would have reached a different verdict); *Bereano* v. *United States*, 706 F.3d 568, 578-79 (4th Cir. 2013) (denying relief where "the core of the Government's case" was a valid theory post-*Skilling*).

More to the point, however, in a recent factually analogous case, the Second Circuit found that *McDonnell* was irrelevant where, as here, the defendant public official engaged in acts that were indisputably "official" under *McDonnell*.  In *United States* v. *Halloran*, 821 F.3d 321, 325 (2d Cir. 2016), the defendant – a former member of the New York City Council – was convicted of participating in two bribery schemes.  In the first, the defendant accepted bribes in exchange for promising to funnel City funds to the bribe payors, and in the second, the defendant was paid to help his co-defendant, Malcolm A. Smith (a Democrat), bribe Republican Party officials to issue what is known as a "Wilson-Pakula," which would have permitted Smith to run for mayor of New York City as a Republican.  *Id.* at 325.

Halloran argued that the Second Circuit should hold his appeal in abeyance for the Supreme Court's decision in *McDonnell*.  *Id.* at 340 n.13.  The Second Circuit declined to do so, even though some of the actions taken by Halloran involved meetings, explaining that: "[b]ecause there can be no dispute that disbursing public funds and issuing a Wilson-Pakula are official acts, *McDonnell* has no apparent relevance to the issues in this appeal."  *Id.*

Any court that examines the record in this case will reach the same conclusion – that *McDonnell* has no relevance to the issues in Silver's appeal because there can be no dispute that Silver engaged in numerous official acts in furtherance of both the Asbestos Scheme and the Real Estate Scheme.  Silver's contentions therefore do not amount to a substantial question warranting bail pending appeal.

### 2.   Silver's Remaining Arguments – Already Rejected Multiple Times Over – Are Meritless

In a last-ditch effort to advance his cause, Silver raises a host of other issues which, he says, would present substantial questions likely to result in reversal or a new trial.  (Br. 18-19). This Court has already (and repeatedly) rejected each of the points Silver now seeks to resurrect, and Silver's legal arguments on these points are no better now than when the Court previously rejected them.  The Second Circuit is likely to reject those same arguments for the same reasons. Thus, these arguments also fail to present a substantial question likely to result in reversal or a new trial.

It does not change matters that Silver has identified a handful of other cases in which bail pending appeal has been granted.  (Br. 20-22).  That bail pending appeal may have been granted in other cases – on different facts and different legal arguments – cannot aid Silver in identifying a "substantial question" necessary to justify bail pending appeal in his case.  And for the reasons explained above, Silver has fallen well short of the mark.  In any event, Silver substantially overstates the extent to which bail pending appeal is granted in cases like this one.  Contrary to Silver's characterization, bail pending appeal in public corruption and other white collar cases is the exception, and is rarely granted.  For example, in *United States* v. *Martoma*, No. 14-3599 (2d Cir. 2014), the defendant – who had been convicted of insider trading offenses – moved for bail pending appeal in light of the pending appeal in *United States* v. *Newman*, No. 13-1837.  *See Martoma*, No. 14-3599, Dkt. 27, at 26.  The district court denied Martoma's motion, and the Second Circuit affirmed.  *See id.*, Dkt. 51 (per curiam).  Similarly, in *United States* v. *Mazer*, No. 14-1397 (2d Cir. 2014), the defendants – who had been convicted of, among other things, honest services fraud and money laundering offenses – moved for bail pending appeal.  The district court denied the motions, and the Second Circuit affirmed.  *See Mazer*, Nos. 14-1397, Dkt. 69.

For all the reasons explained above, this Court should deny Silver's request for bail pending

appeal, just as the courts did in *Martoma* and *Mazer*.[4]

## CONCLUSION

      For the foregoing reasons, the defendant's motion should be denied.

Dated: New York, New York
      July 25, 2016

                          Respectfully submitted,

                          PREET BHARARA
                          United States Attorney

            By:          /s/
                          Howard S. Master
                          Andrew D. Goldstein
                          James M. McDonald
                          Assistant United States Attorneys
                          (212) 637-/2248/1559/2405

---

[4] Silver's request to stay the financial penalties pending appeal should also be denied.  For the same reasons his argument does not present a "substantial question" warranting bail pending appeal, Silver's low likelihood of success on appeal counsels against granting a stay of the financial penalties imposed by the Court.  *See United States* v. *Bestway Disposal Corp.*, 724 F. Supp. 62, 70 (W.D.N.Y. 1988).