UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____8/25/16_
```

------------------------------------------------------------ X

UNITED STATES OF AMERICA,                  :

                                           :        15-CR-093 (VEC)

            -against-                      :

                                           :        MEMORANDUM
                                           :        OPINION & ORDER

SHELDON SILVER,                            :
                        Defendant.         :

------------------------------------------------------------ X

VALERIE CAPRONI, United States District Judge:

 On November 30, 2015, Sheldon Silver, former Speaker of the New York State

Assembly, was convicted on two counts of honest services mail fraud, 18 U.S.C. §§ 1341, 1346,

two counts of honest services wire fraud, 18 U.S.C. §§ 1343, 1346, two counts of extortion under

color of official right, 18 U.S.C. § 1951, and one count of money laundering, 18 U.S.C. § 1957.

On May 3, 2016, Silver was sentenced to imprisonment and to pay a financial penalty and

ordered to forfeit the proceeds of the crimes.  Dkt. 297.  Silver moves to continue bail and to stay

the fine and forfeiture orders pending appeal.  For the following reasons, Silver's motion is

granted in part.

## BACKGROUND[1]

 Silver orchestrated two criminal schemes in which he abused his position as the Speaker

of the New York State Assembly and as an elected Assemblyman for unlawful personal gain.

The two schemes follow the same basic model: Silver received bribes and kickbacks in the form

of referral fees from third party law firms in exchange for actual and promised official actions.

---

[1]  The Court assumes the parties' familiarity with the evidence that was introduced at trial and with the
procedural history of the case and only introduces the facts most pertinent to this motion.  The Court refers to
exhibits by the exhibit number they were given at trial and refers to the trial transcript by "Tr."

Silver also engaged in money laundering pursuant to which he invested the proceeds of his

unlawful schemes into private, exclusive investment vehicles.

I.       **The Mesothelioma Scheme**

        The first scheme is the "Mesothelioma Scheme."  Silver was "of counsel" to the personal

injury law firm Weitz & Luxenberg, and he received a referral fee for any case he brought into

the firm.  Tr. 180-81, 184, 1015-17.  Lawsuits for mesothelioma, a rare form of cancer caused by

exposure to asbestos, were particularly lucrative for the firm.  Tr. 176-77, 262, 273, 1149, 1206-

09.

        Dr. Robert Taub, a physician-researcher at Columbia-Presbyterian Hospital who

specialized in mesothelioma, approached Silver in 2003 to ask him to encourage Weitz &

Luxenberg to donate to mesothelioma research.  Tr. 249-51, 265, 267-68.  Silver declined to do

so but within one to two weeks made it known to Dr. Taub through a mutual friend that he

wanted Dr. Taub to refer mesothelioma cases to Weitz & Luxenberg through him.  Tr. 269-70,

273.  In order to develop a relationship with Silver that might help him receive research funding,

Dr. Taub began referring mesothelioma patients to Silver for legal representation, and he also

provided the patients' contact information to Silver.  Tr. 274, 276, 284-87.  Without knowing the

specifics of the financial arrangement between Silver and Weitz & Luxenberg, Dr. Taub

understood that Silver benefited financially, and Silver made it known to him that he was pleased

with the referrals.  Tr. 274.  Over approximately ten years, Silver received roughly $3 million in

referral fees from cases referred by Dr. Taub.  Tr. 276, 1016; GX 1509.

        Several months after Dr. Taub began making the referrals, Silver made it known to Dr.

Taub that he should request state funding for his mesothelioma research through Silver.  Tr. 274-

75.  In response, in early January 2004, Dr. Taub sent a letter to Silver requesting state funding.

Tr. 275, 289-92; GX 302.  Over a year later and just a few months after Silver received his first referral fees from Weitz & Luxenberg for a Taub-referred mesothelioma client, Silver approved—with no public disclosure—the first of two $250,000 New York State grants to Columbia University to support Dr. Taub's research ("Taub Grants").  Tr. 275, 661-62, 674-76, 1028-33; GX 115, 284, 514-1.[2]  Dr. Taub presumed that his mesothelioma referrals were a factor in Silver's decision to approve the grants.  Tr. 639.  After a 2007 change in the law that required disclosure of the recipients of grants from the pool of funds Silver used for the Taub Grants and disclosure of any conflict of interest, Tr. 748-52, 754-55, 762-63, sometime after October 2007, Silver told Dr. Taub, in substance, that further requests for state grants would not be approved, Tr. 339-40, 636-37.  Dr. Taub reduced the number of patients he referred to Silver but continued to send some referrals to Silver in the hope that Silver would resume support of his research. Tr. 340, 368, 376.  After the number of referrals declined, Silver went to Dr. Taub's office to complain that he was receiving fewer referrals.  Tr. 376-77.  Dr. Taub understood Silver to be indicating that he wanted more referrals, prompting Dr. Taub to continue to send referrals in the continued hope that Silver would help fund his research as the opportunity arose.  Tr. 377-78.

Silver never provided additional funding for Dr. Taub's research, but he did take other actions on behalf of Dr. Taub.  In 2007, Silver had his Assembly office staff call Martin Schoenfeld, a Justice on the New York Supreme Court, to ask him to hire Dr. Taub's daughter, who was in law school, as an unpaid intern.  Tr. 1323.  Judy Rapfogel, Silver's chief of staff, emailed Dr. Taub's daughter's resume to the judge, and the judge hired Dr. Taub's daughter for the internship after an interview.  Tr. 277, 1323-26; GX 440.  In May 2008, Silver awarded $25,000 in state grant funding to the Shalom Task Force, on the board of which sat Dr. Taub's

---

[2]     The first grant was made on July 5, 2005.  GX. 115.  The second grant was made on November 30, 2006, but Silver approved that second grant on August 25, 2006.  Tr. 674-76.

wife.  Tr. 342-346; GX. 389-1, 389-2.  In May 2011, Silver rushed his staff to prepare a New

York Assembly resolution and official proclamation commending Dr. Taub so that Silver could

present it to Dr. Taub at a charity event.  Tr. 388-93, 1260-63, 1265-66; GX 314.  In August

2011, Silver agreed to help Dr. Taub secure the necessary New York City permits for a charity

run to benefit mesothelioma research.  Tr. 401-410; GX 525-21.  Dr. Taub indicated at the time

that Silver would likely want something—probably referrals—in return for his help, which Dr.

Taub described as a "pattern" when dealing with Silver.  Tr. 401-02, 407.  Finally, in February

2012, at Dr. Taub's request, Silver helped Dr. Taub's son get a job with Ohel, a not-for-profit

organization that received substantial discretionary state funding controlled by Silver (including

a $2 million grant approved in March 2012 and a total of $6 million in funding over a ten-year

period).  Tr. 413-416, 718-26, 1295; GX 167-1, 316.  Silver personally called Ohel's CEO twice

and sent him a letter on Assembly letterhead relative to the younger Taub.  Tr. 1533-35, 1538-

39; GX 167-3.  Silver had never previously nor has he subsequently asked Ohel to hire anyone.

Tr. 1534.

Silver concealed his arrangement with Dr. Taub from virtually everyone—from Weitz &

Luxenberg, his press officer, other New York State government officials, the press, the public,

and even the mutual friend who initially acted as the intermediary between Silver and Dr. Taub.

Tr. 100, 189, 202-03, 288-89, 933-35, 965, 1020, 1154-56, 1183-84, 1186, 2115, 2188-89, 2193-

94, 2206, 2224-27; GX 1-3, 913-924, 2009.

## II.     The Real Estate Scheme

The second scheme is the "Real Estate Scheme."  Glenwood Management and the

Witkoff Group are two major residential real estate developers in New York.  Both companies

depend heavily on the New York State government for favorable rent regulation, 421-a tax

4

abatement legislation, and tax-exempt financing that must be approved by the Public Authorities Control Board ("PACB").[3]  Tr. 1370, 1590-94, 1699-1701, 1705-08, 1730, 1789, 2014-2020. Silver essentially had veto power over all legislation covering these issues because he could unilaterally prevent any legislation he opposed from coming to a vote in the Assembly, and he could unilaterally prevent the PACB from approving financing.  Tr. 78-82, 1595, 1698-1703, 1709-11, 1790, 1902-03, 1929, 1934, 1961-63.

At Silver's prompting, both Glenwood and Witkoff—in 1997 and 2005, respectively— began referring some of their tax certiorari work to Silver's friend Jay Arthur Goldberg at the law firm Goldberg & Iryami.  Tr. 1427, 1747, 2021-27.  When Glenwood began sending some of its tax certiorari work to Goldberg & Iryami, important real estate legislation was up for renewal. Tr. 1635.  Witkoff began transferring some of its tax certiorari work to Goldberg & Iryami because it wanted access to Silver, did not want to "alienate" him, wanted to do him a "favor," and sought to generate goodwill.  Tr. 2025-27.[4]   Silver received a referral fee for all business Glenwood and Witkoff gave to Goldberg & Iryami; over the years, Silver received approximately $835,000 in such fees.  Tr. 1441, 2523-24.

Silver took a number of official actions that benefited Glenwood and Witkoff.  Silver, through a proxy, voted as one of three members of the PACB to approve Glenwood's request for billions of dollars in tax-exempt financing. Tr. 1700-05, 1932-43; GX 1522.  Silver officially opposed the relocation of a methadone clinic that was proposed to be located close to one of

---

[3]      The PACB is a three member board comprised of the Governor, the Speaker of the Assembly, and the Majority Leader of the Senate.  Tr. 1927-28.  It must approve, *inter alia*, all state bond issues, including those done on behalf of real estate developers.  Tr. 1926.  Approval of all items by PACB requires a unanimous vote.  Tr. 928, 1701, 1703.  Thus, each member, whether directly or through his voting proxy, has absolute veto power.  Moreover, each member can remove any item from the agenda for a PACB meeting without giving a reason for doing so, further providing each member veto power over the items that will even be considered for approval. Tr. 1929, 1934.

[4]      Silver had asked Witkoff to send tax certiorari business to his friend Jay Arthur Goldberg, representing that Mr. Goldberg needed the business.  Tr. 2021-27.

Glenwood's rental buildings in Silver's district.  Tr. 1602-1605, 1749-53, 1783-86.  Silver

personally signed off on rent regulation and 421-a tax abatement legislation.  Tr. 78-82, 1902-03.

Tellingly, in advance of supporting the Rent Act of 2011 and the 421-a renewal that year, Silver

met privately with Glenwood and its lobbyist to ensure that Glenwood (which spoke only for

itself, not for the larger real estate industry) was satisfied with the terms of that legislation.

Tr. 1597-1601, 1741-45.

       Just as in the Mesothelioma Scheme, Silver concealed his arrangement with Golberg &

Iryami, Glenwood, and Witkoff from virtually everyone; even Glenwood and Witkoff did not

initially know that Silver was receiving referral fees from Golberg & Iryami for their tax

certiorari work.  Tr. 81-82, 1391-1402, 1747, 1788, 1793, 1961-63, 2036-39, 2043, 2115; GX 1-

4, 913-24, 2009.  When Glenwood was informed that Silver was receiving referral fees based on

its business, it and Silver concocted a scheme to limit the number of Glenwood employees who

were aware of the financial arrangements.  Tr. 1392-1402, 1456-61, 1608-09, 1616-17, 1787-93,

1800-07, 1898, 1905, 1914; GX 700.  When Steven Witkoff, who owns eighty-five percent of

the Witkoff Group, discovered that Silver was receiving referral fees, he was furious because he

believed the arrangement could be illegal.  Tr. 2038-40; GX 737, 834.

## III.   The Money Laundering Scheme

       Silver was also convicted of money laundering.  The evidence showed that he invested

the proceeds of the Mesothelioma and Real Estate Schemes into high-yield, private, and

exclusive investment vehicles.  Tr. 2465-66, 2524-38; GX S-5, 1511-13.  At one point, Silver

placed half of an investment in his wife's name so that he would not be required to publically

disclose the full amount of his investment.  Tr. 2429-30.

**IV.      Procedural History**

Silver was convicted on all counts on November 30, 2015.  On May 3, 2016, he was sentenced to twelve years of imprisonment on counts one through six (the honest services and extortion counts) and to ten years of imprisonment on count seven (the money laundering count), all to run concurrently.  The Court also ordered Silver to pay a fine of $1,750,000 and to forfeit $5,393,976.63.  The Court ordered Silver to self-surrender to the Bureau of Prisons on July 1, 2016, and to pay $1,500,00 of the financial penalty no later than June 14, 2016, the balance ($250,000) due in monthly installments of no less than $5,846, starting July 14, 2016.  On May 13, 2016, Silver moved to continue bail and to stay the financial penalties pending appeal, relying largely on *McDonnell v. United States*, No. 15-474, which was then pending before the Supreme Court.  Dkt. 299.  On May 18, 2016, the Court adjourned: Silver's deadline to begin to pay the fine and forfeiture to August 15, 2016; Silver's self-surrender date to August 31, 2016; and briefing on Silver's motion to continue bail to after the Supreme Court decided *McDonnell*. Dkt. 304.  On June 27, 2016, the Supreme Court decided *McDonnell*, and on July 11, 2016, Silver made an amended motion to continue bail and to stay financial penalties, Dkt. 312, which the Government opposed, Dkt. 313.[5]

## DISCUSSION

In support of his motion to continue bail, Silver primarily argues that the scope of "official action" in a quid pro quo—an element of both honest services fraud and extortion under color of official right—has changed dramatically due to the Supreme Court's decision in *McDonnell*.   Def. Mem. 1 (Dkt. 312).  According to Silver, the jury charge defining official action was deficient under *McDonnell*, and many of the alleged official acts introduced at trial do

---

[5]      While Silver's amended motion was pending, Silver requested that the Court adjourn his deadline to pay the fine and forfeiture to August 31, 2016, and the Court did so.  Dkt. 316.

not rise to the level of official action after *McDonnell. Id.* at 5-15.  Thus, there was an error in

the jury charge, and the error was not harmless because the jury may have improperly convicted

Silver based on conduct that is not illegal under *McDonnell*, which would require reversal of the

conviction or a new trial as to all counts.  *Id.* at 15-18.[6]  Silver contends that there is therefore a

substantial question of law and fact likely to result in reversal or an order for a new trial, thereby

requiring that Silver's bail be continued pending his appeal.  *Id.* at 1.  Silver also moves pursuant

to Federal Rules of Criminal Procedure 38(c) and 32.2(d) to stay the financial penalty and

forfeiture order pending appeal.  He asserts that he has a meritorious appeal and that imposing

the penalties now would irreparably harm him and his wife because they would need to sell their

homes in order to pay the fine.  *Id.* at 2.  The Court agrees that, in light of *McDonnell*, the

continuation of bail pending appeal and a stay of certain of the financial penalties are warranted.[7]

## I.    Legal Standard

A convicted defendant who has been sentenced to imprisonment must be detained unless

the Court finds "by clear and convincing evidence that the person is not likely to flee or pose a

danger to the safety of any other person or the community if released" and "that the appeal is not

for the purpose of delay and raises a substantial question of law or fact likely to result in . . .

reversal [or] . . . an order for a new trial."  18 U.S.C. § 3143(b)(1)-(2).  It is the defendant's

burden to rebut the presumption in favor of detention by clear and convincing evidence.  *See*

---

[6]       Silver correctly points out that a reversal or order for a new trial on the extortion and honest services fraud counts would also require a reversal or order for a new trial on the money laundering count because the specified unlawful activity that supported the money laundering conviction was the extortion and honest services fraud.  Def. Mem. 18 n.4 (citing *United States v. Kamdar*, No.04-CR-156A, 2010 WL 883685, at *9 (W.D.N.Y. Mar. 8, 2010)). Thus, the money laundering conviction cannot stand if the extortion and honest services fraud convictions are both reversed on appeal.

[7]       In addition to the *McDonnell* argument, Silver claims that a number of other issues that he intends to raise on appeal present substantial questions that justify bail pending appeal. Def. Mem. 18-20.  Because the Court finds that *McDonnell* raises a substantial question for the purpose of bail pending appeal as to all counts, the Court does not address whether Silver's other arguments present substantial questions.  Suffice it to say, however, that Silver raised these arguments before trial, during trial, and after trial, and the Court rejected them on each occasion.

*United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004) (in the post-verdict, pre-sentencing

context). If a defendant meets this substantial burden, bail pending appeal is mandatory. *See id.*

(quoting 18 U.S.C. § 3143(a) for the post-verdict, pre-sentencing context, but the mandatory

language in 18 U.S.C. § 3143(b) for the post-sentencing context is identical). For all the reasons

stated in Silver's motion, the Court finds by clear and convincing evidence that Silver is unlikely

to flee or pose a danger to the community. Def. Mem. 2-3. The Court also finds that delay is not

the purpose of the appeal. Accordingly, only the second requirement for bail pending appeal is

at issue.

     The second requirement—that the appeal raises a substantial question of law or fact

likely to result in a reversal or order for a new trial—does not mean that the district court must

"'predict the probability of reversal.'" *United States v. Randell*, 761 F.2d 122, 124 (2d Cir.

1985) (quoting *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)). Instead, the requirement

goes to "'the significance of the substantial issue to the ultimate disposition of the appeal.'" *Id.*

(quoting *Miller*, 753 F.2d at 23). To determine whether this requirement is satisfied, a court

must first determine whether the question on appeal is substantial. *Id.* at 125. A substantial

question is more than "frivolous" and "'is a close question or one that very well could be decided

the other way.'" *Id.* (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985))

(internal quotation marks omitted). If the question is substantial, a court "must then consider

whether that question is 'so integral to the merits of the conviction on which defendant is to be

imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a

new trial.'" *Id.* (quoting *Miller,* 753 F.2d at 23). Put differently, the appeal must raise a

substantial question that, if decided in defendant's favor, will likely result in a reversal or order

for a new trial as to all counts for which a defendant has been sentenced to prison. *Id.* at 126.

Silver argues that there is a substantial question whether, in light of *McDonnell*, the jury charge was erroneous, and if the Court of Appeals finds that it was, Silver asserts that the conviction will likely be reversed and a new trial ordered.  A charge is in error if the "charge either fails to adequately inform the jury of the law, or misleads the jury as to a correct legal standard."  *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006) (internal quotation marks and citation omitted).  A court must look to the charge as a whole to determine whether a defendant was prejudiced and "to determine whether it adequately reflected the law and would have conveyed to a reasonable juror the relevant law."  *United States v. Mulder*, 273 F.3d 91, 105 (2d Cir. 2001) (internal quotation marks and citation omitted).  "An erroneous instruction, unless harmless, requires a new trial."  *United States v. Bah*, 574 F.3d 106, 114 (2d Cir. 2009) (internal quotation marks and citation omitted).  An error is harmless if it is clear beyond a reasonable doubt that a rational jury would have convicted if it had been properly charged.  *Id.* Thus, Silver must demonstrate both that there is a substantial question whether the charge was erroneous and, if so, that there is a substantial question whether the error was harmless.

## II.     *McDonnell v. United States*

Honest services fraud and extortion under color of official right require a quid pro quo— an exchange of official action for something of value or property not due to the public official by his public office.  The Supreme Court in *McDonnell* addressed what qualifies as an "official act." In that case, Robert McDonnell, the former Governor of Virginia, was charged, *inter alia*, with honest services fraud and extortion under color of official right.  While McDonnell was in office, he and his wife accepted $175,000 in loans, gifts, and other benefits from businessman Jonnie Williams, who was the chief executive officer of Star Scientific, a Virginia-based company that developed a nutritional supplement made from antabine, a compound found in tobacco.

10

*McDonnell v. United States*, 136 S. Ct. 2355, 2361 (2016).  Williams wanted Virginia's public universities to conduct research studies on the nutritional supplement and sought McDonnell's help in obtaining the studies.  *Id.*  The Government alleged in the indictment and argued at trial and on appeal that McDonnell committed the following official acts to assist Williams in exchange for the loans and gifts: (1) arranging meetings for Williams with subordinate officials to discuss Star Scientific's product; (2) hosting events for Star Scientific at the Governor's Mansion; (3) contacting other government officials to encourage the antabine studies; (4) promoting Star Scientific's products by allowing Williams to invite individuals important to the business to exclusive events at the Governor's mansion; and (5) recommending that officials meet with Star Scientific to discuss ways the company's products could lower healthcare costs. *Id.* at 2365.  "The Government also argued more broadly that these activities constituted 'official action' because they related to Virginia business development, a priority of Governor McDonnell's administration."  *Id.* at 2361.

The parties had agreed that the  jury charge should define the official action element of Hobbs Act extortion and honest services fraud by quoting the federal bribery statute, 18 U.S.C § 201(a)(3), and the district court defined official action accordingly.  *Id.* at 2365, 2366.  The district court also instructed that official acts "encompassed 'acts that a public official customarily performs,' including acts 'in furtherance of longer-term goals' or 'in a series of steps to exercise influence or achieve an end.'"  *Id.* at 2366 (citation omitted).  The district court, however, refused to instruct the jury, as requested by McDonnell, that "merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone, 'official acts,' even if they are settled practices of the official, because they are not decisions on matters pending before the government."  *Id.* (internal quotation marks and citation omitted).

The district court also rejected McDonnell's requested instruction that "an 'official act' must intend to or 'in fact influence a specific official decision the government actually makes—such as awarding a contract, hiring a government employee, issuing a license, passing a law, or implementing a regulation.'" *Id.* (citation omitted).  The jury convicted McDonnell of honest services fraud and extortion, and the Fourth Circuit affirmed.  *Id.* at 2366, 2367.

The Supreme Court vacated the Court of Appeals' judgment and remanded the case because the jury was incorrectly instructed on the meaning of official act and may have convicted McDonnell for conduct that was not unlawful.  *Id.* at 2375.  To reach that conclusion, the Supreme Court relied on section 201(a)(3) of the federal bribery statute, which defines official act as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." *Id.* at 2367 (quoting 18 U.S.C. § 201(a)(3)).[8]  Interpreting section 201(a)(3), the Supreme Court held:

---

[8]        The Supreme Court did not hold that section 201(a)(3) of the federal bribery statute necessarily had to be the source for the definition of official action for the purpose of defining the "quo" in the quid pro quo requirement of honest services fraud and extortion under color of official right.  In beginning its analysis, the Court incorporated the federal bribery statute's definition of official act into the bribery requirement for honest services fraud and extortion without explaining why it was doing so.  *See McDonnell*, 136 S. Ct. at 2367.  Instead, in describing the background of the case, the Supreme Court merely noted that the parties had agreed to use the definition of official act from the federal bribery statute to define the "official action" element of Hobbs Act extortion and honest services fraud.  In accordance with the parties' agreement, the district court had quoted that definition in its charge to the jury.  *Id.* at 2365, 2366.  Thus, it is not clear whether the definition of official action must—or even should—come from the federal bribery statute in every honest services fraud or extortion case.  The Supreme Court, however, emphasized that an "expansive interpretation of 'official act' would raise significant constitutional concerns."  *Id.* at 2372.  Those concerns include (1) criminalizing virtually all official actions taken on behalf of constituents, even though it is an inherent part of our representative democracy that officials act on behalf of constituents, (2) subjecting public officials to prosecution without fair notice, and (3) setting standards of good government for local and state officials, in contravention of our federalism principles.  *Id.* at 2372-73.  The Supreme Court was clearly seeking to cabin the "quo" in the quid pro quo element of honest services fraud and extortion in order to avoid these constitutional concerns.  Although the Supreme Court found that the federal bribery statute's official action definition as interpreted by the Court alleviated those concerns, the Court did not address whether a different definition (e.g., one derived from state or local law that governed the official's conduct) could likewise allay the Court's constitutional concerns.

> [A]n "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of "official act."

*Id.* at 2371-72.[9] The Supreme Court further held that the district court's instructions to the jury were deficient because they failed to include that: (1) the jury "must identify a 'question, matter, cause, suit, proceeding or controversy' involving the formal exercise of governmental power;" (2) "the pertinent 'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought before any public official;'"[10] and (3) the jury "had to find that [McDonnell] made a decision or took an action—or agreed to do so—*on* the identified 'question, matter, cause, suit, proceeding or controversy,'" which excluded "merely arranging a meeting or hosting an event to discuss a matter." *Id.* at 2374-75 (emphasis in original).

---

[9]    *McDonell* dealt only with actions in which the Governor was alleged to be exerting pressure on other public officials to take action to assist Mr. Williams. It seems unlikely that the Supreme Court intended the above-quoted language to eliminate from the scope of honest services fraud and extortion scenarios in which a public official pressures a private citizen to take action as part of an extortion or kickback scheme. For example, suppose a police officer is receiving kickbacks from a carting company in exchange for the police officer "encouraging" store owners on his beat to use that carting company. In the words of *McDonnell*, the police officer is using his official power (the implicit threat of law enforcement action or withholding law enforcement protection) to exert pressure on a private party (not another public official) to take certain action. While further cases will have to flesh out the meaning of *McDonnell*, the Court believes Congress would be surprised to learn that the hypothetical police officer would not be running afoul of the Hobbs Act.

[10]    The Supreme Court interpreted "pending" and "may by law be brought" as "something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *McDonnell*, 136 S. Ct. at 2359. In addition, the Supreme Court understood "may by law be brought" to connote "something within the specific duties of an official's position." *Id.*

Silver's case is factually almost nothing like *McDonnell*; there is no question that Silver took a number of official acts—most obviously, passing legislation and approving state grants and tax-exempt financing—as part of a quid pro quo in the Mesothelioma and Real Estate Schemes.  Nevertheless, there is a substantial question whether, in light of *McDonnell*, the charge was in error and, if so, whether the error was harmless.

III.     **The Jury Charge**

Both the Government and Silver submitted proposed jury instructions in advance of the trial.  The Government's proposed instruction defined official action as "any act taken under color of official authority."  Dkt. 68, at 11.  Silver's proposed instruction defining "official act" was an exact quote of section 201(a)(3) from the federal bribery statute.  Dkt. 66, at 30.  During the charge conference, Silver submitted another proposed instruction for official action, stating that "the government must prove the exercise of actual governmental power, the threat to exercise such power, or pressure imposed on others to exercise actual governmental power."  Dkt. 298, Ex. A; Tr. 2784-85.  The Court declined to include Silver's additional instruction on the basis that it essentially repeated what the Court's proposed instructions already said.  Tr. 2786.

This Court provided the same definition of official action in both the honest services fraud and extortion under color of official right jury instructions.  The Court told the jury that to prove honest services fraud, among other things, the Government had to prove that Silver received bribes or kickbacks as part of a scheme to defraud.  Jury Charge 17 (Dkt. 135).  The Court explained  that to satisfy this element, the Government must prove there was a quid pro quo, i.e., "that a bribe or kickback was sought or received by Mr. Silver, directly or indirectly, in exchange for the promise or performance of official action."  *Id.*  The Court continued, "[o]fficial

14

action includes any action taken or to be taken under color of official authority." *Id.* In its extortion charge, the Court also instructed that the Government must prove a quid pro quo, i.e., that "property was sought or received by Mr. Silver, directly or indirectly, in exchange for the promise or performance of official action." *Id.* at 23. The Court did not redefine official action in its extortion charge but did explicitly reference the honest services fraud charge when setting forth the quid pro quo requirement as an element of extortion. *Id.*

Other provisions in the charge provided some—albeit limited—additional context as to the scope of official action. In defining a bribe for honest services fraud, the Court instructed that the Government had to prove that in exchange for payments Silver "intend[ed] to be influenced in the performance of his public duties" and understood that he was "expected to exercise official influence or make official decisions for the benefit of the payor." *Id.* at 17, 18. In defining a quid pro quo for extortion, the Court added that Silver must have been aware that the extorted party "was motivated, at least in part, by the expectation that as a result of the payment, Mr. Silver would exercise official influence or decision making for the benefit of the extorted party." *Id.* at 23-24. In addition, the Court charged the following regarding the statute of limitations:

> The statute of limitations for each of the charged crimes is five years. If you find that Mr. Silver engaged in a scheme to commit honest services fraud, extortion or money laundering, but no aspect of the particular scheme occurred after February 19, 2010, then you must acquit on that charge because it is barred by the statute of limitations. If, on the other hand, you find that any aspect of the crime you are considering continued on or after February 19, 2010, then the statute of limitations as to that charge has been complied with.

*Id.* at 32.

**IV.     Silver Has Raised a Substantial Question That Will Likely Result in Reversal or an Order for a New Trial If His Position Prevails on Appeal**

The charge given to the jury did not contradict *McDonnell.*  The Court did not charge the jury that merely arranging a meeting, attending an event, hosting a reception, or making a speech are, standing alone, official acts.  Nevertheless, the jury charge did not include key language from *McDonnell's* definition of official action.  The charge did not include the three instructions that the Supreme Court in *McDonnell* held should have been given to the jury in that case. Specifically, this Court did not instruct the jury that (1) it "must identify a 'question, matter, cause, suit, proceeding or controversy' involving the formal exercise of governmental power;" (2) "the pertinent 'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought before any public official;'" and (3) that it "had to find that [Silver] made a decision or took an action—or agreed to do so—*on* the identified 'question, matter, cause, suit, proceeding or controversy,'" which excludes "merely arranging a meeting or hosting an event to discuss a matter."  *McDonnell*, 136 S. Ct. at 2374-75 (emphasis in original). [11]  In other words, the Court did not explicitly tell the jury that there had to be a formal exercise of governmental power on an identified question, matter, cause, suit, proceeding or controversy, which had to be specific and pending or might by law be brought before the public official, "similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee."  *Id.* at 2370.  These concepts were likely not fully captured in the definition provided to the jury, namely that official action is "any action taken or to be taken under color of official authority," Jury Charge 17.  Although the Government argues

---

[11]     It is unclear how narrowly the Supreme Court intends this language to be construed.  For example, if a state legislator told a constituent, "If you pay me $10,000 per month, I will make sure that any legislation that affects your business is to your liking," would that be sufficiently "specific and focused" to satisfy *McDonnell* even though there was no specific item of legislation identified?

that the charge as a whole adequately conveyed *McDonnell's* requirements, the Court finds that this is a close question that could be decided the other way.  The additional language in the charge mentioning "performance of his public duties," the "expect[ation] to exercise official influence or make official decisions," the "exercise [of] official influence or decision making for the benefit of the extorted party," etc., is not "stray language," as Silver contends, Def. Reply 2 (Dkt. 314), but there is nevertheless a close question whether the charge, in light of *McDonnell,* was erroneous.

It is also a close question whether the potentially erroneous charge was harmless, i.e., it is a close question whether it is clear beyond a reasonable doubt that a rational jury would have found Silver guilty absent the error.  As stated previously, this case differs from *McDonnell* because most of the official acts presented to the jury—the provision of state grants, approval of tax-exempt state financing, and voting on legislation—are undoubtedly official acts under *McDonnell*.  Thus, the harmless error analysis in this case presents a much closer call than in *McDonnell.*  The Government, however, also introduced evidence of actions taken by Silver in exchange for money that may not qualify as official acts under *McDonnell* but were argued to the jury—consistent with pre-*McDonnell* law—as official acts.

A.      **Mesothelioma Scheme**

In the Mesothelioma Scheme, three of the acts proven by the Government—the provision of the Taub Grants, a call to get an internship for Dr. Taub's daughter, and the provision of the grant to the Shalom Task Force—occurred outside the statute of limitations.  While it is clear beyond a reasonable doubt that the provision of the Taub Grants and the Shalom Task Force grant were exercises of official power, an effort to get Dr. Taub's daughter an internship is less

obviously an official act.[12]  Some of the acts that occurred within the statute of limitations

arguably do not constitute official acts under *McDonnell*, and there is a possibility that the jury

might have convicted Silver by relying on those later acts, which they would not have done had

the charge more fully described what was necessary to find an "official act."  The acts falling

within the statute of limitations period that the Government argued at trial were official include:

(1) obtaining a resolution and proclamation in honor of Dr. Taub, (2) agreeing to assist Dr. Taub

in procuring New York City permits for a charity event, and (3) helping Dr. Taub's son get a job

at a non-profit that received significant state funding.

 Because resolutions and proclamations are passed by the Assembly, Tr. 1259, the

resolution and proclamation brought to the Assembly floor by Silver was a formal exercise of

governmental power on a specific matter brought by law, in accordance with *McDonnell*.  But,

given the evidence of the pro forma, rubber stamp nature of these honorary resolutions and

proclamations, *see* Tr. 1278-79, 1282-85, 1287, 1289-90; DX 90, there is a substantial question

whether a rational jury would have found Silver guilty, absent the error in the charge, based

solely on the resolution and proclamation.

 As to the permits, a rational jury could have interpreted Silver's offer to help as an offer

to advise Dr. Taub as to the steps Dr. Taub would need to take to secure the permits, which

would not be official action under *McDonnell*.  This Court believes the evidence shows that

---

[12] It is a close question whether asking Justice Schoenfeld to select Dr. Taub's daughter as an unpaid summer intern and passing along her resume was advice provided to another official "knowing or intending that [such] advice [would] form the basis for an 'official act'" [the hiring decision] by the official.  *McDonnell*, 136 S. Ct. at 2359.  While hiring an unpaid intern might satisfy *McDonnell*, a rational jury could have viewed that call as more akin to the sort of calls people (both public officials and non-public officials) make all the time to assist friends' and colleagues' children get jobs.  In the absence of any evidence that Justice Schoenfeld was particularly involved with the Court's budget, so that he might logically interpret the call as an implicit threat to cut the court's funding if he did not comply, a rational jury could have found that the call on behalf of Dr. Taub's daughter was not an "official act" as that term was defined in *McDonnell*.

Silver agreed to help Dr. Taub by having his own office assist in securing the permits, which might have entailed exerting pressure on another official to perform an official act under *McDonnell*, but the Court believes that a rational fact finder could reasonably decide this issue the other way.

Of the three acts within the statute of limitations, Silver's pressure on Ohel to hire Dr. Taub's son presents the most interesting post-*McDonnell* issue.  As observed in note 9, it is not clear whether the Court in *McDonnell* intended to exclude from the realm of "official acts" the use of official power to pressure a non-governmental entity or person to take action.  *McDonnell* holds that exerting pressure on or advising another official to act is official action, but it is silent regarding whether using official power to pressure a non-public actor is official action.  *See* 136 S. Ct. at 2371.  The Court agrees with the Government that advising or pressuring a non-governmental entity, particularly one that receives much of its financing from the government—thanks to the official doing the advising or pressuring—should be official action for the purposes of honest services fraud and extortion, but there is a substantial question whether such conduct qualifies after *McDonnell*.  If doing so is official action, then it is clear beyond a reasonable doubt that a rational jury would have convicted Silver if it had been properly charged.  Nevertheless, given the language in *McDonnell*, there is a substantial question whether such conduct constitutes official action.

The Government argues that any error in the charge was harmless because no rational jury could find that the Taub Grants were not official action and that the Mesothelioma scheme did not continue into the statute of limitation period.  Gov't Opp. 22-23 (Dkt. 313).  The Court instructed the jury that the crime fell within the statute of limitations if "any aspect of the crime you are considering continued on or after February 19, 2010."  Jury Charge 32.  The Government

undoubtedly presented evidence that Silver continued to receive referrals from Dr. Taub and payments from the referrals and that there were wires and mailings in furtherance of the scheme after February 2010.  GX 1509, 1520.  Although the Court tends to agree with the Government that any error was harmless, because the Court did not instruct the jury what "any aspect of the crime" included—whether receipt of a single payment or a single mailing within the statute of limitations sufficed—it is conceivable that a rational jury would not have convicted if it had received complete instructions on both what constitutes an official act and what specifically it must have found to have occurred within the statute of limitations.[13]  In short, there is a substantial question that will likely result in reversal or a new trial as to the Mesothelioma Scheme convictions if the Court of Appeals concurs with Silver's arguments.

### B.     The Real Estate Scheme

Any error in the charge as it relates to the Real Estate Scheme is almost certain to be harmless error.  Silver argues that the Government improperly urged the jury to convict Silver because in exchange for tax certiorari referrals he took a private meeting with Glenwood and its lobbyist in advance of the Assembly vote on the Rent Act of 2011, which is not official action under *McDonnell*.  Def. Mem. 13-14.  The Government did argue to the jury that the meeting itself was an official act given in exchange for tax certiorari referrals.  Tr. 2892 ("That meeting, ladies and gentlemen, that is official action.").  But, the Government also argued that the significance of the meeting, which took place on the eve of the Rent Act vote and during which

---

[13]        Silver initially proposed a different statute of limitations instruction than the one the Court gave, *see* Dkt. 122, at 16, but Silver's proposed instruction was legally erroneous, *see* Tr. 2782-84.  The Court then submitted to the parties for their review an updated draft jury charge that included a statute of limitations instruction that was virtually identical to the one the Court ultimately gave to the jury.  Dkts. 135-3, 135-4.  Silver did not object or request a more specific charge, so any error associated with the statute of limitations charge would be evaluated under the plain error standard.  *See United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013) ("If the defendant did not object to an erroneous jury instruction before the jury retired to consider its verdict, a plain error standard of review applies.").

Silver confirmed that Glenwood was satisfied with the various compromises made in the bill, was that it tended to demonstrate the quid pro quo nature of Silver's vote. *See* Tr. 2893. In exchange for bribes in the form of tax certiorari business, Silver made sure the legislation accomplished what Glenwood wanted it to accomplish (renewal of the 421-a program) and did not unduly harm Glenwood's interests as to those aspects of the bill that were counter to Glenwood's interest (renewal of rent regulation). Tr. 1597-1601, 1741-45. Thus, this Court believes that any error was harmless because a rational jury would have found, absent the error, that Silver's official act was exercising his power as Speaker of the Assembly to permit the Rent Act of 2011 to come to the floor of the Assembly and voting in favor of the bill. Nevertheless, because the charge did not specifically instruct the jury that a meeting on its own is not official action and because the Government argued the meeting was official action in and of itself as well as being evidence of Silver trading his vote for tax certiorari referrals, there is some possibility that the Court of Appeals will find that a properly charged jury would have concluded that the meeting was just that—a meeting with a well-heeled, financially-generous constituent who had special access but nothing more. Accordingly, there is a substantial question likely to result in reversal or a new trial if the Court of Appeals concurs with Silver's argument as to the Real Estate Scheme.[14]

---

[14]     Silver argues that the PACB funding was not an official act because there was no evidence Silver himself took any action or decision on the PACB funding; according to Silver, his proxy acted without any input from him. Def. Reply 14. Silver's proxy, however, was his representative who placed his vote for him at the PACB meeting. Tr. 1929. Moreover, of the three PACB members (which included the Governor and the Senate Majority Leader), Silver was the only one to keep his voting position on the PACB instead of appointing another official, suggesting that Silver was keen on maintaining his voice—and control—in PACB matters. Tr. 1927-28, 1961. The Court does not find it to be a close question that approval of PACB financing was an official act by Silver, albeit via a proxy.

Silver also maintains that his conduct with respect to the methadone clinic was not official action because he did not make a decision or act on the methadone clinic but merely expressed opposition without intending to pressure another official or to provide advice that would form the basis for an official act. Def. Reply 15. The Court disagrees; there was evidence in the record that Silver sought to take credit for causing the clinic to be relocated, implying that he did take some action to oppose the location of the clinic. Tr. 1602-05, 1752-53. These facts are not like *McDonnell*, where the Governor expressed support for the research study at a meeting; in contrast, the evidence

**V.      Fine and Forfeiture**

Silver moves to stay the fine and forfeiture order pending appeal pursuant to Federal Rule of Criminal Procedure 38(c).  Silver represents that to pay the fine, he and his wife would be forced to sell their two residences, depriving Mrs. Silver of the homes she has occupied for decades, and to liquidate retirement accounts, incurring substantial tax liability.  Def. Mem. 24. A district court "may stay a sentence to pay a fine or a fine and costs."  Fed. R. Crim. P. 38.  It is within a court's discretion to stay a fine pending appeal.  *See United States v. Bestway Disposal Corp.*, 724 F. Supp. 62, 70 (W.D.N.Y. 1988).  "If a sentence imposing a fine is stayed, the court shall, absent exceptional circumstances (as determined by the court)—(1) require the defendant to deposit, in the registry of the district court, any amount of the fine that is due; (2) require the defendant to provide a bond or other security to ensure payment of the fine; or (3) restrain the defendant from transferring or dissipating assets."  18 U.S.C.A. § 3572(g).

Similarly, "[i]f a defendant appeals from a conviction or an order of forfeiture, the court may stay the order of forfeiture on terms appropriate to ensure that the property remains available pending appellate review."  Fed. R. Crim. P. 32.2(d).  According to the Advisory Committee Notes, the purpose of Rule 32.2(d) "is to ensure that the property remains intact and

---

showed that Silver's intended goal was to use his official power to influence the decision-makers to relocate the clinic.  Moreover, Silver merely had to agree to perform an official act—and not actually perform the act—in order for there to have been a quid pro quo.  *See McDonnell*, 136 S. Ct. at 2371.

Although the relocation of the methadone clinic and the PACB votes were unquestionably official acts, there is nevertheless a substantial issue for appeal whether, had a rational jury been correctly charged that a meeting alone is not official action and based on that charge it rejected the meeting on the Rent Act as an "official act," it would have convicted based on the remaining official acts: the PACB votes and the relocation of the methadone clinic.  As to the PACB votes, there was no evidence adduced that any of the bond issues was particularly controversial, which could have led the jury to conclude that those votes were not a quo exchanged for Glenwood's tax certiorari business.  Although the methadone clinic was controversial, the evidence demonstrated that Silver was already opposing the location of the clinic before anyone from Glenwood spoke to him about it.

unencumbered so that it may be returned to the defendant in the event the appeal is successful."
*Id.* "[T]he law governing when a district court should exercise its discretion to stay a forfeiture order has not been extensively developed." *United States v. Davis*, No. CRIM.A. 07-CR-11 (JCH), 2009 WL 2475340, at *2 (D. Conn. June 15, 2009). District courts in this Circuit typically consider four factors when considering a motion to stay a forfeiture order: "1) the likelihood of success on appeal; 2) whether the forfeited asset is likely to depreciate over time; 3) the forfeited asset's intrinsic value to defendant (i.e., the availability of substitutes); and 4) the expense of maintaining the forfeited property." *See, e.g.*, *United States v. Young*, No. 12-CR-210, 2014 WL 1671507, at *2 (W.D.N.Y. Apr. 24, 2014); *United States v. Quinones*, No. 06-CR-845(S-2)(FB), 2009 WL 4249588, at *2 (E.D.N.Y. Nov. 25, 2009); *Davis*, 2009 WL 2475340, at *2.

As to the financial penalty, as discussed, Silver has articulated a possibly meritorious legal basis for his appeal, and he has also shown that he would suffer irreparable harm should the stay be denied because to pay the fine he would be forced to sell his two residences and to incur substantial tax liability associated with liquidating his retirement account.[15] *Cf. Bestway Disposal Corp.*, 724 F. Supp. at 70 (refusing to stay payment of a financial penalty because the defendant had not indicated a legal basis for its appeal nor an irreparable harm should the stay be denied); *see also United States v. Coluccio*, No. CR-87-077, 1993 WL 217133, at *1 (E.D.N.Y. June 15, 1993) (same), *aff'd*, 9 F.3d 1536 (2d Cir. 1993). As to the forfeiture order, the only

---

[15] Based on the information provided to the Court in the Presentence Investigation Report in advance of Silver's sentencing, the Court believes that Silver may be able to make the $1.5 million initial payment of his fine without selling both residences and liquidating his retirement account but by instead pursuing some combination of selling the second home, liquidating the retirement account, and perhaps obtaining a mortgage on his primary residence. But, without more concrete information regarding the worth of Silver's residences, the tax liability for liquidating the retirement account, and the possibility of getting a mortgage, the Court cannot confidently calculate that Silver has sufficient available assets to pay the $1.5 million absent selling both residences and liquidating his retirement account.

factor in favor of a stay is the likelihood of Silver's success on appeal.  The remaining factors do

not weigh in favor of a stay because the assets to be forfeited are all cash or securities.  Dkt. 295

at 3-4.  Nevertheless, it is within the Court's discretion to grant the stay, and the assets

designated for forfeiture remain frozen, Dkt. 30.  Thus, maintaining the status quo keeps the

assets equally available and unencumbered whether for forfeiture or for return to Silver pending

the outcome of his appeal.

      Accordingly, the fine and forfeiture orders are stayed in part pending Silver's appeal:

Silver must promptly begin making monthly payments on the fine equal to $5,846 per month (the

first payment is due September 1, 2016).  Silver also may not transfer or encumber his assets

(such as by taking out loans) and must refrain from dissipating his assets.

## CONCLUSION

      For the foregoing reasons, Silver's motion to continue bail pending appeal and to stay the

fine and forfeiture orders pending appeal is GRANTED in part and DENIED in part.  The Clerk

of Court is respectfully requested to terminate the open motions at docket entries 299 and 312.

**SO ORDERED.**

Dated: August 25, 2016
      New York, NY

                               VALERIE CAPRONI
                              United States District Judge