16-1615-cr
*United States v. Silver*

N.Y.S.D. Case #
15-cr-0093(VEC)

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2016

No. 16-1615-cr

UNITED STATES OF AMERICA,
*Appellee,*

v.

SHELDON SILVER,
*Defendant-Appellant.*

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:** _____
**DATE FILED:** July 13, 2017 _____

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: MARCH 16, 2017
DECIDED: JULY 13, 2017

Before: CABRANES, WESLEY, *Circuit Judges*, and SESSIONS, *Judge.*[*]

---

[*] Judge William K. Sessions III, of the United States District Court for the District of Vermont, sitting by designation.

CERTIFIED COPY ISSUED ON 07/13/2017

———————

In 2015, the United States Government indicted Sheldon Silver, the former Speaker of the New York State Assembly, on charges of honest services fraud, Hobbs Act extortion, and money laundering. The Government alleged that Silver abused his public position by engaging in two *quid pro quo* schemes in which he performed official acts in exchange for bribes and kickbacks, and that he laundered the proceeds of his schemes into private investment vehicles. After a jury trial of nearly one month in the United States District Court for the Southern District of New York (Valarie E. Caproni, *Judge*), a jury found him guilty on all counts. He was sentenced to twelve years of imprisonment, to be followed by three years of supervised release.

After Silver had been convicted and sentenced, the Supreme Court issued its decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), which clarified the definition of an "official act" in honest services fraud and extortion charges. The Supreme Court, vacating the conviction of former Governor Robert McDonnell of Virginia, held that "an 'official act' is a decision or action on a 'question, matter, cause, suit, proceeding or controversy'" involving "a formal exercise of governmental power." *Id.* at 2371–72.

Silver now appeals from his judgment of conviction and argues, primarily, that the District Court's jury instructions defining an official act as "any action taken or to be taken under color of official authority" was erroneous under *McDonnell*. He additionally

2

challenges the sufficiency of the evidence on all counts of conviction, arguing, among other things, that his money laundering conviction under 18 U.S.C. § 1957 required the Government to trace "dirty" funds comingled with "clean" funds.

Though we reject Silver's sufficiency challenges, we hold that the District Court's instructions on honest services fraud and extortion do not comport with *McDonnell* and are therefore in error. We further hold that this error was not harmless because it is not clear beyond a reasonable doubt that a rational jury would have reached the same conclusion if properly instructed, as is required by law for the verdict to stand.

Accordingly, we **VACATE** the District Court's judgment of conviction on all counts and **REMAND** the cause to the District Court for such further proceedings as may be appropriate in the circumstances and consistent with this opinion.

———————

STEVEN F. MOLO, MoloLamken LLP (Robert K. Kry, Justin V. Shur, MoloLamken LLP; Joel Cohen, Stroock & Stroock & Lavan LLP, *on the brief*), New York, NY, *for Defendant-Appellant*.

ANDREW D. GOLDSTEIN (Howard S. Master, James McDonald, Karl Metzner, *on the brief*), for Joon H. Kim, Acting United States

Attorney for the Southern District of New
York, New York, NY, *for Appellee*.

———————

JOSÉ A. CABRANES, *Circuit Judge*:

In 2015, the United States Government indicted Sheldon
Silver, the former Speaker of the New York State Assembly, on
charges of honest services fraud, Hobbs Act extortion, and money
laundering. The Government alleged that Silver abused his public
position by engaging in two *quid pro quo* schemes in which he
performed official acts in exchange for bribes and kickbacks, and
that he laundered the proceeds of his schemes into private
investment vehicles. After a jury trial of nearly one month in the
United States District Court for the Southern District of New York
(Valarie E. Caproni, *Judge*), a jury found him guilty on all counts. He
was sentenced to twelve years of imprisonment, to be followed by
three years of supervised release.

After Silver had been convicted and sentenced, the Supreme
Court issued its decision in *McDonnell v. United States*,[1] which
clarified the definition of an "official act" in honest services fraud
and extortion charges. The Supreme Court, vacating the conviction
of former Governor Robert McDonnell of Virginia, held that "an
'official act' is a decision or action on a 'question, matter, cause, suit,

———————

[1] 136 S. Ct. 2355 (2016).

4

proceeding or controversy'" involving "a formal exercise of governmental power."[2]

Silver now appeals from his judgment of conviction and argues, primarily, that the District Court's jury instructions defining an official act as "any action taken or to be taken under color of official authority" was erroneous under *McDonnell*.[3] He additionally challenges the sufficiency of the evidence on all counts of conviction, arguing, among other things, that his money laundering conviction under 18 U.S.C. § 1957 required the Government to trace "dirty" funds comingled with "clean" funds.

Though we reject Silver's sufficiency challenges, we hold that the District Court's instructions on honest services fraud and extortion do not comport with *McDonnell* and are therefore in error. We further hold that this error was not harmless because it is not clear beyond a reasonable doubt that a rational jury would have reached the same conclusion if properly instructed, as is required by law for a verdict to stand.

Accordingly, we **VACATE** the District Court's judgment of conviction on all counts and **REMAND** the cause to the District Court for such further proceedings as may be appropriate in the circumstances and consistent with this opinion.

---

[2] *Id.* at 2371–72.

[3] App'x 629.

## BACKGROUND

### I.   Offense Conduct[4]

Silver was elected to the New York State Assembly (the "Assembly") in 1976, representing an Assembly District comprising much of lower Manhattan. In 1994, he was elected Speaker of the Assembly ("Speaker")—a position he would hold for more than twenty years until his resignation in 2015. As Speaker, Silver was one of the most powerful public officials in the State of New York, exercising significant control over the Assembly and state legislative matters.

The Government's charges against Silver involve his part-time work as a practicing lawyer.[5] The Government sought to prove that Silver orchestrated two criminal schemes that abused his official positions for unlawful personal gain. Each of these alleged schemes had the same premise: in exchange for official actions, Silver received bribes and kickbacks in the form of referral fees from third-party law firms. In one scheme, Silver performed favors for a doctor in exchange for the doctor's referral of mesothelioma patients to

---

[4] The following facts are drawn from the evidence presented at trial and described in the light most favorable to the Government. *See United States v. Litwok*, 678 F.3d 208, 210–11 (2d Cir. 2012) ("Because this is an appeal from a judgment of conviction entered after a jury trial, the . . . facts are drawn from the trial evidence and described in the light most favorable to the Government.").

[5] New York allows state lawmakers to pursue part-time employment. *See* N.Y. Pub. Off. Law § 74(3)(a).

Silver's law firm (the "Mesothelioma Scheme"). In the other, Silver performed favors for two real estate developers who had hired, at Silver's request, a law firm that was paying referral fees to Silver (the "Real Estate Scheme"). Jointly, these alleged schemes produced roughly $4 million in referral fees for Silver. The Government also charged that Silver engaged in money laundering by investing the proceeds of the Mesothelioma and Real Estate Schemes into various private investment vehicles (the "Money Laundering Scheme"). We describe the key aspects of each scheme in turn.

### A.    The Mesothelioma Scheme[6]

In the fall of 2002, Silver became "of counsel" to the law firm Weitz & Luxenberg ("W&L"), which maintained an active personal injury practice. Lawsuits for mesothelioma, a rare form of cancer caused by exposure to asbestos, were particularly lucrative for W&L.

While he was not expected to and did not perform any legal work for W&L's clients, Silver received a fixed salary for lending his name to W&L, as well as referral fees for any case he brought into the firm. Silver's referral fee was a set percentage of the fees earned by W&L on any case that he referred to the firm.

Dr. Robert Taub, an acquaintance of Silver, was a physician and researcher at Columbia-Presbyterian Hospital who specialized in mesothelioma. In the fall of 2003, Dr. Taub encountered Silver at

---

[6] For a timeline of the Mesothelioma Scheme, see Addendum A, *post*.

an event and asked him to encourage W&L to donate money to mesothelioma research.[7] Silver, without consulting anyone at the firm, responded that he could not get W&L to do so.

Within two weeks, however, Silver asked Dr. Taub to refer mesothelioma cases to W&L through him.[8] Responding to that request in November of 2003, Dr. Taub started referring mesothelioma patients to Silver for legal representation. He also provided Silver with names and contact information of unrepresented mesothelioma patients seeking counsel. Dr. Taub sought to develop a relationship with Silver that would help him receive research funding, much of which came from state and federal appropriations. Although unaware of the specifics of the financial arrangement between Silver and W&L, Dr. Taub testified that he believed Silver would benefit personally from the mesothelioma leads. And indeed, Silver conveyed to Dr. Taub that he was "pleased with the referrals that he was getting."[9]

Dr. Taub was soon informed that Silver was considering providing him with state funding for his mesothelioma research. Shortly thereafter, in early January 2004, Dr. Taub sent a letter to

---

[7] Dr. Taub believed that firms that profit from mesothelioma cases should donate to support mesothelioma research. And indeed, other law firms had provided such charitable contributions.

[8] Silver conveyed this request through Daniel Chill, a mutual friend of Dr. Taub and Silver.

[9] Trial Transcript ("Tr.") 274.

Silver requesting state funding. While this grant was under consideration, Dr. Taub continued to send Silver mesothelioma leads. And over a year later, in March of 2005, Silver received his first referral fee check from W&L in the amount of $176,048.02.

Silver soon secured two $250,000 state grants for Columbia University to support Dr. Taub's research. These grants originated from the New York Health-Care Reform Act ("HCRA") Assembly Pool, a pool of discretionary funds that Silver alone controlled as Speaker. Silver approved the first grant in July of 2005, a few months after receiving his first referral check.[10] Silver approved the second grant more than a year later, in August of 2006.[11] Silver did not publicly disclose the grants or his interactions with Dr. Taub, nor did he ever inquire about the progress of Dr. Taub's research. Dr. Taub assumed that his mesothelioma referrals were a factor in Silver's decision to approve the grants, and sought to receive additional grant money on an annual basis.

In 2007, New York law changed to require public disclosure of HCRA grants, and disclosure of any potential conflicts of interest

---

[10] Prior to the first grant approval, Silver invited Dr. Taub to the 2005 State of the State ceremony at the New York State Capitol and put him in touch with a staffer to discuss the status of the grant. Though the Government argued at its summation that these were "official acts" by Silver, it no longer relies on these actions on appeal.

[11] While Silver approved the second grant on August 25, 2006, the grant was actually made on November 30, 2006.

9

between legislators and recipients of legislative grants.[12] Responding to this change, Silver informed Dr. Taub that any further requests for state grants would not be approved.[13] Nevertheless, Dr. Taub continued to send mesothelioma client leads to Silver to maintain their relationship and keep Silver "incentivized."[14]

Silver continued to help Dr. Taub during this time with two other actions:

- In January of 2007, Silver had his office staff call a state trial judge to ask him to hire Dr. Taub's daughter, a student at Fordham University Law School, as an unpaid intern.

- In May of 2008, Silver awarded $25,000 in state grant funding to the Shalom Task Force, a non-profit entity devoted to helping victims of domestic violence, of which Dr. Taub's wife was a board member.

In 2010, Dr. Taub started sending mesothelioma leads to another law firm that had started funding his research. In response, on May 25, 2010, Silver went to Dr. Taub's office to complain that he was receiving fewer referrals. Their conversation prompted Dr. Taub to continue to send referrals to Silver in order to maintain a

---

[12] The record does not establish whether any other ethics obligations applying to public officials in New York State required disclosure of potential conflicts prior to the 2007 enactment.

[13] Dr. Taub had previously sent a letter to Silver on October 11, 2007 requesting a third grant of HCRA funding.

[14] Tr. 340.

relationship with him that would possibly lead to future funding for his mesothelioma research. As he noted in an e-mail to a colleague on the day of his meeting with Silver, "I will keep giving cases to Shelly [Silver] because I may need him in the future—he is the most powerful man in New York State."[15]

In fact, Silver would not approve any more grants for Dr. Taub (and he had not done so since August of 2006). Silver did do three additional favors for Dr. Taub, however.

- In May of 2011, Silver had his staff prepare an Assembly resolution with an official proclamation commending Dr. Taub. Silver sponsored the resolution on the floor of the Assembly and presented it to Dr. Taub at a public event.

- In the fall of 2011, Silver agreed to help Dr. Taub "navigate" the process of securing permits for a proposed New York City charity race in Silver's district to benefit mesothelioma research. Dr. Taub thought at the time that Silver would likely want referrals in return for his help. Ultimately, the law firm working with Dr. Taub to organize the race decided not to pursue the event, and the race never took place.

- In 2012, at the request of Dr. Taub, Silver helped Dr. Taub's son obtain a job with OHEL Children's Home & Family Services ("OHEL"), a non-profit organization devoted primarily to providing social services to Jewish

---

[15] Special App'x 1009.

11

populations,[16] that received millions in discretionary state funding controlled solely by Silver. To help Dr. Taub's son, Silver called OHEL's chief executive officer twice and sent him a letter on Assembly letterhead. Silver had not previously asked, nor did he subsequently ask, OHEL to hire anyone else.

Dr. Taub continued to provide mesothelioma leads to Silver through at least 2013. In total, over the course of ten years, Silver received roughly $3 million in referral fees for cases referred to W&L by Dr. Taub.

### B.    The Real Estate Scheme[17]

Silver's second alleged scheme involved two major New York real estate developers: Glenwood Management ("Glenwood") and the Witkoff Group ("Witkoff") (jointly, the "Developers"). Of course, like other real estate interests, both companies depended heavily on favorable state legislation, including rent regulation and tax abatement legislation. The Developers also depended on tax-exempt financing, which must be approved by the Public Authorities Control Board ("PACB").

Silver held considerable control over legislation covering these issues and over PACB approvals. As Speaker, he had *de facto*

---

[16] While OHEL engages in many social services, the most prominent service discussed at trial was a summer camp for disabled children.

[17] For a timeline of the Real Estate Scheme, see Addendum B, *post*.

veto power over all legislation since he could prevent any legislation that he opposed from coming to a vote. Also, as a voting member on the PACB, Silver had the power to unilaterally prevent the PACB from approving applications for state financing.[18]

As with the Mesothelioma Scheme, Silver allegedly sought to enrich himself through referral fees from a law firm. In this scheme, however, that law firm was Goldberg & Iryami ("G&I"), the firm of Jay Arthur Goldberg, a former staffer and friend of Silver. Goldberg specialized in tax certiorari work, which involves challenges to property owners' real estate tax assessments. The Developers pursued tax certiorari cases to reduce the property taxes of their buildings.

To enrich himself, Silver allegedly induced the Developers to hire Goldberg, who had agreed to pay Silver a percentage of the resulting legal fees. In 1997, at a time when important real estate legislation was due for renewal, Silver referred Glenwood to Goldberg. In 2005, Silver did the same for Witkoff, stating that his friend Goldberg needed business. In response, Glenwood and Witkoff moved some of their tax certiorari work from other law firms to G&I, which they continued to do over time. Of the fees G&I earned from its Glenwood and Witkoff matters, Silver received a referral fee—twenty-five percent of what G&I earned from

---

[18] PACB bond approvals for tax-exempt state financing are typically *pro forma* and votes may be cast by a proxy. One Government witness testified that, in his experience, no PACB applications had been denied.

Glenwood matters and fifteen percent of what G&I earned from Witkoff matters.

The Developers did not know of Silver's financial arrangement with Goldberg at the time. Neither company, however, wanted to alienate Silver, given their need for Silver's approval of favorable legislation. Both testified that they gave tax certiorari work to Goldberg to influence Silver's legislative work concerning real estate. Witkoff also wanted access to Silver to discuss pending legislation that affected its business.

In return for these alleged kickbacks, Silver took a number of actions to benefit the Developers:

- Through a proxy, Silver repeatedly voted as one of three members of the PACB to approve Glenwood's requests for tax-exempt financing for many of its projects. These votes occurred repeatedly over the course of Silver's tenure as Speaker.

- Silver regularly approved and voted for rent and tax abatement legislation sought by Glenwood. In particular, in June of 2011, Silver met with Glenwood lobbyists in advance of negotiating pending real estate legislation to ensure that Glenwood was satisfied with the terms of the legislation. He then supported and voted in favor of the Rent Act of 2011 and tax abatement renewal legislation later that month, both of which benefited Glenwood.

- Later in 2011, Silver publicly opposed the relocation of a methadone clinic that was to be located near one of Glenwood's rental buildings in Silver's district.

14

In a late 2011 phone call, Silver informed a Glenwood lobbyist of his fee-sharing arrangement with Goldberg. This disclosure was prompted by G&I's decision to send new retainer agreements to Glenwood that referenced Silver. Silver told the Glenwood lobbyist that he wanted his fee-sharing arrangement with Goldberg to continue, and that the arrangement was not problematic since the fees came from a Glenwood limited liability company. Glenwood, despite its reservations, executed a confidential "side letter" agreement with G&I—separate from the firm's retainer agreement—consenting to the fee arrangement. This letter was kept secret from the public and from Glenwood's own chief financial officer.[19] Witkoff learned of the fee-sharing arrangement in June of 2014 on a call with Goldberg, who had received a grand jury subpoena in connection with the Government's investigation of Silver.

In total, over a period of about 18 years, Silver received approximately $835,000 in fees from G&I for his referral of the Developers.

## C.    The Money Laundering Scheme

Silver allegedly laundered the proceeds of the Mesothelioma and Real Estate Schemes by investing them in high-yield, private investment vehicles with the help of Jordan Levy, a private

---

[19] The record does not establish whether Silver was under any legal obligation, as a public official or private lawyer, to disclose publicly this secret side letter with G&I.

investor.[20] At one point, Silver instructed Levy to place one half of an investment in his wife's name to avoid publicly disclosing the full amount of the investment.

## II.    Procedural History

### A.    Indictment

In February of 2015, Silver was indicted for engaging in schemes "to deprive the citizens of [New York State] of his honest services as an elected legislator and as Speaker of the Assembly by using the power and influence of his official position to obtain for himself millions of dollars in bribes and kickbacks . . . ."[21] The charges against him consisted of four counts of honest service fraud, two counts of Hobbs Act extortion, and one count of money laundering.[22]

The Government's theory underlying its honest services fraud and Hobbs Act extortion charges was that Silver had accepted bribes

---

[20] Levy was unaware of the source of Silver's funds.

[21] App'x 97.

[22] *See* 18 U.S.C. §§ 1341, 1343, 1346 (honest services fraud); *id.* § 1951 (Hobbs Act extortion); *id.* § 1957 (money laundering). Specifically, Counts One and Two charged Silver with honest services mail fraud and wire fraud, respectively, in connection with the Mesothelioma Scheme. Counts Three and Four did the same as to the Real Estate Scheme. Counts Five and Six charged Silver with Hobbs Act extortion in connection with the Mesothelioma Scheme and Real Estate Scheme, respectively. And Count Seven charged Silver with money laundering.

and kickbacks in exchange for official acts.[23] To succeed on a bribery theory of honest services fraud and Hobbs Act extortion, the Government had to prove, beyond a reasonable doubt, the existence of a *quid pro quo* agreement—that the defendant received, or intended to receive, something of value in exchange for an official act.[24]

## B.    Trial and Jury Instructions

Before trial, Silver and the Government presented proposed jury instructions to the District Court on how to define an "official act." Silver's initial proposed instructions sought to define "official act" by quoting 18 U.S.C. § 201(a)(3), the federal bribery statute: "[a]n 'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any

---

[23] *See Skilling v. United States*, 561 U.S. 358, 404 (2010) (construing honest services fraud to forbid "fraudulent schemes to deprive another of honest services through bribes or kickbacks"); *Evans v. United States*, 504 U.S. 225, 260 (1992) (construing Hobbs Act extortion to include "taking a bribe").

[24] *See United States v. Bruno*, 661 F.3d 733, 743–44 (2d Cir. 2011) (in a prosecution of honest services fraud under a bribery theory, "[t]he key inquiry is whether, in light of all the evidence, an intent to give or receive something of value in exchange for an official act has been proved beyond a reasonable doubt"); *United States v. Ganim*, 510 F.3d 134, 143 (2d Cir. 2007) ("[T]he offense [of Hobbs Act extortion] is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts . . . ." (quoting *Evans*, 504 U.S. at 268)); *see also id.* at 141 (honest services fraud and Hobbs Act extortion "criminalize[], in some respect, a *quid pro quo* agreement—to wit, a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the exercise of his official authority").

time be pending, or which may by law be brought before any public official, in such official's official capacity."[25] The Government's proposed instruction, in contrast, sought to define an official act more broadly as "any act taken under color of official authority."[26]

Silver's trial began on November 2, 2015, and lasted nearly a month. At the charge conference on November 19, 2015, the parties once again addressed the definition of an "official act" in the jury instructions. This time, Silver proposed a new "official act" instruction: "To prove an 'official act,' the government must prove the exercise of actual governmental power, the threat to exercise such power, or pressure imposed on others to exercise actual government power."[27] The Government urged a broader instruction—that "[o]fficial action includes *any action* taken or to be taken under color of official authority."[28]

The District Court declined to include Silver's proposed instructions and ultimately adopted the Government's official act language in its final jury charge.[29] The District Court instructed the jury that to prove honest services fraud, the Government must "prove, beyond a reasonable doubt, . . . that Silver received bribes or

---

[25] App'x 188 (tracking verbatim the language of 18 U.S.C. § 201(a)(3)).

[26] *Id.* at 190.

[27] *Id.* at 591.

[28] Tr. 2785–86 (emphasis added).

[29] *Id.* at 2786.

kickbacks as part of a scheme to defraud."[30] The District Court explained:

> To satisfy this element, the Government must prove that there was a *quid pro quo*. *Quid pro quo* is Latin, and it means "this for that" or "these for those." The Government must prove that a bribe or kickback was sought or received by Mr. Silver, directly or indirectly, in exchange for the promise or performance of official action. Official action includes *any action taken or to be taken under color of official authority*.[31]

In its Hobbs Act extortion instructions, the District Court also instructed that the Government must prove a *quid pro quo*— specifically, that "property was sought or received by Mr. Silver, directly or indirectly, in exchange for the promise or performance of official action."[32] The District Court did not redefine official action in its extortion charge, but did explicitly reference the earlier honest services fraud charge when setting forth the *quid pro quo* requirement as an element of extortion.[33]

---

[30] App'x 629.

[31] *Id.* (emphasis added).

[32] *Id.* at 635.

[33] *Id.*

The District Court also provided the following charge regarding the five-year statute of limitations for honest services fraud and Hobbs Act extortion:[34]

> The statute of limitations for each of the charged crimes is five years. If you find that Mr. Silver engaged in a scheme to commit honest services fraud, extortion or money laundering, but no aspect of the particular scheme occurred after February 19, 2010, then you must acquit on that charge because it is barred by the statute of limitations. If, on the other hand, you find that any aspect of the crime you are considering continued on or after February 19, 2010, then the statute of limitations as to that charge has been complied with.[35]

After three days of deliberation, on November 30, 2015, the jury found Silver guilty on all seven counts. Silver timely moved for a judgment of acquittal or, in the alternative, a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal procedure.[36] The

---

[34] 18 U.S.C. § 3282.

[35] App'x 644.

[36] Under Rule 29, after the Government closes its case, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Rule 33 states, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Here, Silver moved for a judgment of acquittal at the close of the Government's case, and the District Court reserved decision until after the jury verdict. Silver renewed his Rule 29 motion after the verdict, and moved for a new trial, pursuant to Rule 33, based on various evidentiary rulings made by the

District Court denied those motions in a written opinion on May 3, 2016.[37]

## C.    Sentencing and Post-Sentencing Motions

On May 4, 2016, the District Court sentenced Silver to twelve years of imprisonment, to be followed by three years of supervised release. It also imposed $5.4 million in forfeiture, and a $1.75 million fine. The court entered its final judgment on May 10, 2016.

On May 13, 2016, Silver moved to continue bail and stay the financial penalties pending appeal. Silver relied largely on arguments raised in *McDonnell*, which was then pending before the Supreme Court and would address the definition of an "official act" for honest services fraud and Hobbs Act extortion violations.[38] On June 27, 2016, the Supreme Court decided *McDonnell*. Soon thereafter, on August 25, 2016, the District Court granted Silver's motion for bail pending appeal.[39] In a thoughtful opinion, the District Court concluded that while Silver's case is "factually almost

---

District Court. *See United States v. Silver*, 184 F. Supp. 3d 33, 37, 52 (S.D.N.Y. 2016).

[37] *Silver*, 184 F. Supp. 3d at 54.

[38] The District Court initially adjourned Silver's deadline to begin paying the fine and forfeiture to August 15, 2016, adjourned Silver's surrender date to August 31, 2016, and moved briefing on Silver's bail motion to after the Supreme Court decided *McDonnell*.

[39] *United States v. Silver*, 203 F. Supp. 3d 370 (S.D.N.Y. 2016).

nothing like *McDonnell*[,] . . . there is a substantial question whether, in light of *McDonnell*, the [jury] charge was in error and, if so, whether the error was harmless."[40]

## DISCUSSION

On appeal, in addition to various arguments challenging the sufficiency of the evidence against him, Silver primarily argues that the District Court's jury instructions on the definition of an "official act" in its honest service fraud and extortion charges were erroneous under *McDonnell*.[41] He thus contends that we should vacate and remand the honest services fraud and extortion counts against him for a new trial. Silver also argues that if we vacate those counts, we necessarily must vacate the money laundering count against him.[42]

## I. Sufficiency of the Evidence

"We review *de novo* challenges to the sufficiency of evidence, but must uphold the conviction if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

---

[40] *Id.* at 380.

[41] Silver also claims that the District Court improperly admitted certain evidence. Because we vacate and remand Silver's judgment of conviction on all counts due to erroneous jury instructions, we do not reach this additional argument.

[42] Def. Br. at 45 n.2; *see also Silver*, 203 F. Supp. 3d at 376 n.6.

doubt."[43] To conduct this review, "we view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."[44] Silver raises three challenges to the sufficiency of the evidence against him, none of which have merit.

### A.  Hobbs Act Extortion

First, Silver claims that the Government failed to prove Hobbs Act extortion because there was no evidence that that he deprived anyone of property. This argument is belied by the record.

The Hobbs Act defines extortion, as applicable here, as "obtaining . . . property from another, with his consent, induced . . . under color of official right."[45] The "property" at issue in a Hobbs Act extortion violation must be "something of value from the victim that can be exercised, transferred, or sold."[46] Here, the evidence supports a deprivation of property as to both schemes.[47] Specifically,

---

[43] *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016) (internal quotation marks omitted).

[44] *United States v. Babilonia*, 854 F.3d 163, 174 (2d Cir. 2017) (internal quotation marks omitted).

[45] 18 U.S.C. § 1951(b)(2).

[46] *Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013)

[47] The Government further contends that a deprivation of property is not an essential element of a Hobbs Act extortion violation. Because a deprivation of property occurred on the record before us, we do not reach that question here.

both the mesothelioma leads and the tax certiorari business from which Silver profited were valuable and transferable property (albeit intangible property). By engaging in the alleged schemes, Silver is said to have deprived Dr. Taub, the Developers, and other law firms of property.

### B. Honest Services Fraud

Second, Silver argues that he engaged in mere "undisclosed self-dealing," and that, accordingly, the Government failed to prove a "paradigmatic bribe or kickback" for its honest services fraud charges, as required by *Skilling v. United States*.[48] This argument is likewise contradicted by the record.

In *Skilling*, the Supreme Court in 2010 clarified that honest services fraud "does not encompass conduct more wide-ranging than the paradigmatic cases of bribes and kickbacks," and includes instances where a defendant "solicited or accepted side payments from a third party."[49] Here, both the mesothelioma leads and tax certiorari business indisputably came from Dr. Taub and the Developers, which resulted in payments to Silver from other third parties, W&L and G&I. These payments, solicited by Silver, were

---

[48] 561 U.S. 358, 409–11 (2010).

[49] *Id.* at 411, 413.

24

thus bribes or kickbacks within the meaning of *Skilling*, not mere "undisclosed self-dealing by a public official" as Silver argues.[50]

### C.   Money Laundering

Lastly, Silver argues that the Government failed to prove its money laundering count because the proceeds of his two schemes had been commingled into an account with untainted funds. To convict Silver of money laundering under 18 U.S.C. § 1957, the Government was required to prove that Silver "knowingly engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property of a value greater than $10,000," and that the property was "derived from specified unlawful activity."[51] Silver thus argues that because he deposited the proceeds of his schemes into an account with legitimate funds, the Government could not prove that the funds at issue were criminally derived.

We have not yet addressed whether the Government must trace "dirty" funds comingled with "clean" funds in order to prove money laundering under Section 1957. Silver relies on the view of the Fifth and Ninth Circuits, which both require the Government to

---

[50] *Id.* at 410. "In . . . self-dealing cases, the defendant typically causes his or her employer to do business with a corporation or other enterprise in which the defendant has a secret interest, undisclosed to the employer." *United States v. Rybicki*, 354 F.3d 124, 140 (2d Cir. 2003) (en banc). The evidence at trial demonstrated that Silver's proven conduct, in colluding with Dr. Taub and the Developers, went far beyond undisclosed self-dealing.

[51] 18 U.S.C. § 1957(a)

trace criminally derived proceeds when they have been commingled with funds from legitimate sources to prove money laundering under Section 1957.[52] This view, however, is a minority one.[53]

We, on the other hand, adopt the majority view of our sister Circuits—that the Government is not required to trace criminal funds that are comingled with legitimate funds to prove a violation of Section 1957. Because money is fungible, once funds obtained from illegal activity are combined with funds from lawful activity in a single account, the "dirty" and "clean" funds cannot be distinguished from each other.[54] As such, "[a] requirement that the government trace each dollar of the transaction to the criminal, as opposed to the non-criminal activity, would allow individuals effectively to defeat prosecution for money laundering by simply

---

[52] *See United States v. Loe*, 248 F.3d 449, 467 (5th Cir. 2001) ("[W]here an account contains clean funds sufficient to cover a withdrawal, the Government can not prove beyond a reasonable doubt that the withdrawal contained dirty money."); *United States v. Rutgard*, 116 F.3d 1270, 1292–93 (9th Cir. 1997) (Section 1957 "does not create a presumption that any transfer of cash in an account tainted by the presence of a small amount of fraudulent proceeds must be a transfer of these proceeds").

[53] *See United States v. Braxtonbrown–Smith*, 278 F.3d 1348, 1354 (D.C. Cir. 2002) (*Rutgard*'s "holding that tracing is required under § 1957 is a minority view" (citing *United States v. Sokolow*, 91 F.3d 396, 409 (3d Cir. 1996); *United States v. Moore*, 27 F.3d 969, 976 (4th Cir. 1994); *United States v. Johnson*, 971 F.2d 562, 570 (10th Cir. 1992))); *see also United States v. Haddad*, 462 F.3d 783, 792 (7th Cir. 2006); *United States v. Pizano*, 421 F.3d 707, 723 (8th Cir. 2005); *United States v. Richard*, 234 F.3d 763, 768 (1st Cir. 2000).

[54] *Moore*, 27 F.3d at 976–77.

commingling legitimate funds with criminal proceeds."[55] Accordingly, we reject Silver's sufficiency challenge to his money laundering conviction.

## II.    *McDonnell v. United States*

Having determined that the evidence was sufficient to prove the counts of conviction against Silver, we now turn to Silver's challenge to the District Court's jury instructions under *McDonnell.*

The Supreme Court in *McDonnell* addressed what qualifies as an "official act" in an honest services fraud or Hobbs Act extortion *quid pro quo*. Robert McDonnell, the former Governor of Virginia, was charged with, among other things, honest services fraud and Hobbs Act extortion.[56] While McDonnell was in office, he and his wife accepted $175,000 in loans, gifts, and other benefits from businessman Jonnie Williams, who was the chief executive officer of Star Scientific, a Virginia-based company that developed a nutritional supplement made from antabine, a compound found in tobacco.[57] Williams sought to have Virginia's public universities conduct research on the nutritional supplement, and sought McDonnell's help to make these studies happen.[58] At trial and on

---

[55] *Id.* at 977.

[56] *McDonnell*, 136 S. Ct. at 2361.

[57] *Id.*

[58] *Id.*

appeal, the Government argued that McDonnell performed certain official acts to help Williams in exchange for William's loans and gifts.[59] These official acts included arranging meetings with state government officials to discuss the supplement, hosting and attending events at the Governor's Mansion for Star Scientific, and contacting other government officials to encourage antibine studies at Virginia state universities.[60]

The parties in *McDonnell* agreed that the jury charge should define an "official act" by quoting the federal bribery statute, 18 U.S.C § 201(a)(3), which defines an official act as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."[61] The *McDonnell* district court defined "official act" accordingly for the jury,[62] and further instructed it that official acts "encompassed acts that a public official customarily performs, including acts in furtherance of longer-term goals or in a series of steps to exercise influence or achieve an end."[63] The jury convicted McDonnell of

---

[59] *Id.* at 2365.

[60] *Id.*

[61] This is the same statute quoted by Silver in his proposed "official act" jury instructions. App'x 188; *see also* text accompanying note 25, *ante*.

[62] *McDonnell*, 136 S. Ct. at 2365–66.

[63] *Id.* at 2366 (internal quotation marks omitted).

honest services fraud and extortion, and the U.S. Court of Appeals for the Fourth Circuit affirmed.[64]

The Supreme Court, however, unanimously vacated the Fourth Circuit's judgment and remanded the case.[65] The Court ruled that the jury was incorrectly instructed on the meaning of an "official act," and that this error was not harmless because it may have convicted McDonnell for conduct that is not unlawful.[66]

Relying on the federal bribery statute's definition of "official act," the Court held that "an 'official act' is a decision or action on a 'question, matter, cause, suit, proceeding or controversy.'"[67] The Court set forth a two-part test to meet this definition.

---

[64] *Id.* at 2366–67.

[65] *Id.* at 2375.

[66] *Id.*

[67] *Id.* at 2371. With its holding, the Supreme Court did not hold that § 201(a)(3) of the federal bribery statute must *necessarily* be the exclusive source for the definition of an official action in every honest services fraud and Hobbs Act extortion case. Since "the parties agreed that they would define honest services fraud with reference to the federal bribery statute," the Court incorporated § 201(a)(3)'s definition of an official act into the bribery requirement for honest services fraud and extortion without explanation. *See McDonnell*, 136 S. Ct. at 2365–67. In this case, however, while the parties did not agree to apply § 201(a)(3)'s definition of "official act" at trial, they each apply the "official act" definition from *McDonnell* in support of their arguments on appeal. Neither party argues for an alternative definition that would allay the constitutional concerns expressed in *McDonnell*. Accordingly, we apply the *McDonnell*'s definition of an "official act," as derived from § 201(a)(3).

29

First, "[t]he 'question, matter, cause, suit, proceeding or controversy' must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee."[68] The Court further clarified that this question, matter, cause, suit, proceeding or controversy "must also be something specific and focused that is 'pending' or 'may by law be brought' before a public official."[69]

Second, "to qualify as an 'official act,' the public official must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so."[70] Such an action or decision "may include using [an] official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official."[71] Without more,

---

[68] *Id.* at 2372.

[69] *Id.* The Supreme Court interpreted "pending" and "may by law be brought" as "something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 2359. In addition, the Supreme Court understood "may by law be brought" to connote "something within the specific duties of an official's position." *Id.*

[70] *Id.* at 2372.

[71] *Id.*

"setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)," are not official acts.[72]

The Supreme Court emphasized that the Government's "expansive interpretation of 'official act' would raise significant constitutional concerns."[73] Those concerns included the criminalization of virtually all actions taken on behalf of constituents, subjecting public officials to prosecution without fair notice due to the vagueness of the Government's definition, and setting standards of good government for local and state official in contravention of federalism principles.[74]

Applying these principles to McDonnell's case, the Supreme Court found that the district court's jury charge did not include three instructions that should have been given. Specifically, the Court held that the district court should have instructed the jury:

- that it "must identify a 'question, matter, cause, suit, proceeding or controversy' involving the formal exercise of governmental power"[75];

- that "the pertinent 'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is

---

[72] *Id.*

[73] *Id.*

[74] *Id.* at 2372–73.

[75] *Id.* at 2374.

'pending' or 'may by law be brought before any public official'"[76]; and,

- that "merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter."[77]

## III. Honest Services Fraud and Hobbs Act Extortion Counts under *McDonnell*

Based on *McDonnell*, Silver now challenges the District Court's jury instructions on the definition of "official act" in its honest services fraud and Hobbs Act extortion charges. Where a defendant has timely objected, as Silver did below, "we review a district court's jury charge *de novo*, and will vacate a conviction for an erroneous charge unless the error was harmless."[78] It is well settled that "[a]n erroneous instruction, unless harmless, requires a new trial."[79]

We first consider whether the instructions were indeed in error, before turning to whether the Government met its burden of proving beyond a reasonable doubt that any such error was harmless.

---

[76] *Id.*

[77] *Id.* at 2375.

[78] *United States v. Nouri*, 711 F.3d 129, 138 (2d Cir. 2013).

[79] *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006) (internal quotation marks omitted).

### A. The Jury Instruction under *McDonnell*

We consider a jury instruction erroneous "if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."[80] When conducting this review, "we examine the charges as a whole to see if the entire charge delivered a correct interpretation of the law."[81]

Upon review of the jury charge in this case, we conclude that the District Court's jury instruction defining an official action in its honest services fraud and Hobbs Act extortion charges was erroneous under *McDonnell*. The District Court's charge, encompassing "*any action* taken or to be taken under color of official authority,"[82] was overbroad. Like the improper instruction in *McDonnell*, the plain language of the instruction at Silver's trial captured lawful conduct, such as arranging meetings or hosting events with constituents. Further, the District Court's charge did not contain any of the three instructions specified in *McDonnell*.

It bears recalling that the purpose of a proper charge is to give the jury guideposts as to what would qualify as criminal wrongdoing under the law. Here, the instructions did not convey to the jury that an official action must be a decision or action on a

---

[80] *United States v. Finazzo*, 850 F.3d 94, 105 (2d Cir. 2017) (internal quotation marks omitted).

[81] *Quattrone*, 441 F.3d at 177 (internal quotation marks omitted).

[82] App'x 629 (emphasis added).

matter involving the formal exercise of government power akin to a lawsuit, hearing, or agency determination. Nor did the instructions prevent the jury from concluding that meetings or events with a public official to discuss a given matter were official acts by that public official. The Government's own summation confirms that the jury instructions conveyed an erroneous understanding of the law as clarified by *McDonnell.* The Government expressly urged the jury to convict because an official act "*is not limited* to voting on a bill, making a speech, passing legislation, *it is not limited to that*," but rather, includes "*any action* taken or to be taken under color of official authority."[83] The Government thus directly argued that the District Court's instruction defining an official act was broader than the formal exercise of government power described in *McDonnell.* Accordingly, the jury could not have received a correct interpretation of the law.[84]

---

[83] Tr. 2857 (emphasis added).

[84] In *United States v. Boyland*, we recently rejected overbroad jury instructions that did not comport with *McDonnell.* No. 15-3118, --- F.3d ----, 2017 WL 2918840 (2d Cir. July 10, 2017). Specifically, we rejected an honest services fraud instruction defining an official act as "decisions o[r] actions generally expected of a public official, including but not limited to contacting or lobbying other governmental agencies, and advocating for his constituents," and a Hobbs Act extortion instruction stating that the jury needed to find that the defendant "knew that any money he accepted was offered in exchange for a specific exercise of [the defendant's] official powers." *Id.* at *6, *8–*9. We similarly reject the official act instructions given at Silver's trial because of the "constitutional concerns stemming from the breadth of the interpretation advanced by the government." *Id.* at *9.

The Government argues that the District Court's charge, taken as a whole, was consistent with Silver's proposed additional instructions and with *McDonnell.* To salvage the District Court's instructions, the Government points to language requiring that Silver "intend[ed] to be influenced in the performance of his public duties"; "was expected to exercise official influence or make official decisions" as a result of bribes or kickbacks; and "intended to do so as specific opportunities arose."[85] We are not persuaded that the terms "public duties," "official influence," and "official decisions" convey the requisite specificity that, to qualify as an "official act," the given "question, matter, cause, suit, proceeding or controversy" must involve the *formal exercise* of governmental power; nor do these terms specify that the "question, matter, cause, suit, proceeding or controversy" must be specific and focused like a hearing or lawsuit.[86] Moreover, whatever limiting effect this language may have had was undone by the District Court's broad instruction that an official action included "*any action* taken under color of official authority."[87]

Though we conclude that the jury instructions at Silver's trial were erroneous, we do not ascribe fault to the District Court or to the Government. The instructions at the trial, given prior to the Supreme Court's decision in *McDonnell*, were consistent with our

---

[85] App'x 629–30.

[86] *See McDonnell*, 136 S. Ct. at 2371–72.

[87] App'x 629 (emphasis added).

35

precedent at the time.[88] Indeed, we commend the District Court's forthrightness in acknowledging, after *McDonnell* was decided, that its instructions might have been in error.[89]

### B.    Harmlessness

The Government contends that even if the jury instructions were in error under *McDonnell*, the error was harmless. We will find an erroneous jury instruction harmless "only if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'"[90] The Government bears the burden of establishing harmlessness.[91]

As explained below, we cannot conclude, beyond a reasonable doubt, that a rational jury would have found Silver guilty if it had been properly instructed on the definition of an official act. While the Government presented evidence of acts that remain "official" under *McDonnell*, the jury may have convicted Silver for conduct

---

[88] *See, e.g., United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013); *see also* App'x 599 (documenting that Silver conceded that his proposed instruction was supported only by "out-of-circuit authority").

[89] *Silver*, 203 F. Supp. 3d at 381.

[90] *United States v. Sheehan*, 838 F.3d 109, 121 (2d Cir. 2016) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).

[91] *Quattrone*, 441 F.3d at 181.

that is not unlawful, and a properly instructed jury might have reached a different conclusion.[92]

### 1.    Mesothelioma Scheme

With a *McDonnell* instruction, it is possible that a rational jury would not find that Silver engaged in a *quid pro quo* to exchange official acts for Dr. Taub's referrals.

In this case, the statute of limitations is critical to our analysis. As previously noted, both honest services fraud and Hobbs Act extortion charges have a five-year statute of limitations.[93] Here it only captures conduct occurring after February 19, 2010, five years before the indictment against Silver.[94] Only three acts proven by the Government fall within the statute of limitations: obtaining an

---

[92] In *Boyland*, we affirmed the defendant's conviction despite finding that the jury instructions were erroneous under *McDonnell*. We note, however, that in addition to the clear factual differences of that case, *Boyland* did not apply a harmless error standard of review because the defendant in that case did not object to the jury instructions. *Boyland*, 2017 WL 2918840, at *6–*7, *9–*10.

[93] 18 U.S.C. § 3282.

[94] The other acts proven by the Government—approving the HCRA grants, helping Dr. Taub's daughter obtain an unpaid internship with a state court judge, and approving the grant to the Shalom Task Force—all occurred well outside of the statute of limitations and by themselves cannot support Silver's conviction. Silver does not dispute that the HCRA grants and the Shalom Task Force grant are "official acts" as defined by the Supreme Court in *McDonnell.* Silver's intervention on behalf of Dr. Taub's daughter to secure an unpaid internship, however, is not as clearly "official." We need not reach that question since this intervention occurred outside the statute of limitations period.

Assembly resolution honoring Dr. Taub, agreeing to assist Dr. Taub with acquiring permits for a charity race, and helping Dr. Taub's son secure a job with a non-profit receiving state funding.[95] Of those acts, only the Assembly resolution clearly remains an "official act" under *McDonnell*. As such, the jury may have convicted Silver by relying on acts within the statute of limitations period that are no longer "official" under *McDonnell*. And a rational jury might not have convicted had the charge more fully described an "official act."

First, a rational jury might have concluded that Silver did not engage in an official act when he agreed to help Dr. Taub with permits for his charity race. The Government's evidence showed that Dr. Taub, along with others, met with Silver at Silver's New York City office regarding the race. Silver then sent Dr. Taub a letter on Assembly letterhead offering to "help navigate the process if needed."[96] To conclude that this act was "official" under the teachings of *McDonnell*, the jury would have to find that Silver sought to "us[e] his official position to exert pressure on another official to perform an 'official act'"—in this case, to issue permits to Dr. Taub.[97] We cannot conclude the jury would have done so. Indeed, a rational jury with a proper jury instruction could have found that Silver's letter offering general assistance with an event occurring in his district—absent any actual "exert[ion] [of] pressure"

---

[95] *See* Addendum A.

[96] App'x 706.

[97] *McDonnell*, 136 S. Ct. at 2372.

38

on other officials regarding a particular matter under their consideration—did not satisfy the standards for an official act as defined by *McDonnell*.[98]

Similarly, a rational jury with a proper *McDonnell* instruction might find that Silver's letter to OHEL on behalf of Dr. Taub's son did not rise to the level of an "official act." In its summation, the Government emphasized that Silver recommended Dr. Taub's son "on official Assembly letterhead."[99] But using government letterhead is not, by itself, a formal exercise of government power on a matter similar to a hearing or lawsuit. Moreover, even assuming, as the Government contends, that Silver used his official position to "exert pressure" on the chief executive officer of OHEL, there is no evidence in the record that Silver or anyone else threatened to withhold OHEL funding.[100] To be sure, a rational juror might well believe hiring should be based solely on "the merits" rather than on

---

[98] *Id.* at 2369. In *Boyland*, we affirmed in part because, in exchange for money, "Boyland agreed to ensure that favorable governmental decisions would be made, whether for licensing, work contracts, zoning, or funding." *Boyland*, 2017 WL 2918840, at *10. That agreement, however, was far more explicit than the offer made by Silver here to help Dr. Taub "navigate" the permit process.

[99] Tr. 2859.

[100] *McDonnell*, 136 S. Ct. at 2369. The District Court, addressing the OHEL issue, stated that using an official position to pressure a non-governmental entity or person could constitute an official act. *Silver*, 203 F. Supp. 3d at 379 n.9, 383–84. We need not address this question here since we merely conclude that, with a proper instruction and on this record, a rational jury could have concluded that Silver's actions with OHEL were not "official" actions.

the recommendations of successful, powerful, or informed figures, and thus view negatively recommendation letters of the sort here. But viewing something negatively is not the same as finding that the elements of a crime have been met. We cannot conclude, beyond a reasonable doubt, that the jury would have found that Silver's actions with OHEL met the definition of "official act" as defined in *McDonnell*.

The only proven act remaining within the statute of limitations is thus the resolution and proclamation honoring Dr. Taub. The Government argues, and Silver concedes, that the resolution is an "official act" under *McDonnell*.[101] We agree, but it is not clear beyond a reasonable doubt that a rational jury would have found Silver guilty based on the resolution alone. The resolution honoring Dr. Taub was a clear formal exercise of government power on a specific matter: it was brought to the floor of the Assembly by Silver and subsequently passed by the Assembly. The evidence at trial, however, established that these honorary resolutions and proclamations were routine, *pro forma* exercises rubber stamped by Assembly members.[102] Indeed, in the past year alone, the Assembly has passed hundreds of honorary resolutions that, among other things, congratulated newly designated Eagle Scouts,[103] celebrated

---

[101] Gov't Br. at 30, 36; Oral Argument Transcript at 6, 8.

[102] *See* Tr. 1278–79, 1282–85, 1287, 1289–90.

[103] *See, e.g.*, N.Y. Assemb. Res. 86 (2017) ("Congratulating Bailey Hohwald upon the occasion of receiving the distinguished rank of Eagle Scout . . . ."); N.Y. Assemb. Res. 85 (2017) ("Congratulating Hector Rios, Jr. upon the occasion of

high school sports teams,[104] commended retirees,[105] and commemorated the "retirement" of a jersey worn by a Stony Brook University athlete.[106] A rational jury could thus conclude that, though certainly "official," the prolific and perfunctory nature of these resolutions make them *de minimis quo*s unworthy of a *quid*.

The Government, citing the District Court's statute of limitations instruction, primarily argues that it need not prove that Silver committed an official act within the statute of limitations period, only that some aspect of the *quid pro quo* scheme extended

---

receiving the distinguished rank of Eagle Scout . . . ."); N.Y. Assemb. Res. 11 (2017) ("Congratulating Daniel A. Molloy upon the occasion of receiving the distinguished rank of Eagle Scout . . . .").

[104] *See, e.g.*, N.Y. Assemb. Res. 318 (2017) ("Honoring the 2007 Thomas R. Proctor High School Baseball Team upon the occasion of its induction into the Greater Utica Sports Hall of Fame"); N.Y. Assemb. Res. 244 (2017) ("Congratulating the Baldwin High School Girls Basketball Team . . . upon the occasion of capturing the New York State Public High School Athletic Association Class AA Championship . . . .").

[105] *See, e.g.*, N.Y. Assemb. Res. 326 (2017) ("Commending Fire Chief Gerald J. VanDeWalle upon the occasion of his retirement after 40 years of dedicated service to the Newark Volunteer Fire Department"); N.Y. Assemb. Res. 305 (2017) ("Congratulating The Reverend Gary W. Bonebrake, D. Min., upon the occasion of his retirement after 22 years of distinguished service to Main Street Baptist Church in Oneonta, New York").

[106] *See, e.g.*, N.Y. State Assemb. Res. 46 ("Commemorating the retirement of the No. 20 jersey worn by Stony Brook's Jameel Warney, a three-time America East Player of the Year and the most decorated player in Seawolves basketball history.").

into the statute of limitations period.[107] The Government accordingly contends that Silver took action in furtherance of the scheme within the statute of limitations period, including demanding additional referrals from Dr. Taub on May 25, 2010, continuing to receive mesothelioma leads from Dr. Taub, and engaging in various phone calls and mailings in furtherance of the scheme.[108] The Government concludes that, even if the only official actions Silver ever took were the award of the HCRA grants and the Assembly resolution, it is clear beyond a reasonable doubt that the scheme continued into the limitations period.[109]

We agree that the Government need not prove that an official act occurred within the statute of limitations period. The Government need only prove that some aspect of the particular *quid pro quo* scheme continued into the statute of limitations period.[110] Here, however, most of the acts relied upon by the Government may no longer be "official." Thus, it is entirely conceivable that a

---

[107] Gov't Br. at 35–36.

[108] *Id.* at 36; *see also* Special App'x 1425.

[109] Gov't Br. at 36.

[110] *See United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) ("Once the quid pro quo has been established, . . . the specific transactions comprising the illegal scheme need not match up this for that." (internal quotation marks omitted)); *United States v. Smith*, 198 F.3d 377, 384 (2d Cir. 1999) (Hobbs Act extortion is "a continuing offense" in the context of venue); *cf. United States v. Rutigliano*, 790 F.3d 389, 400–01 (2d Cir. 2015) (receipt of a payment within the statute of limitations period was an overt act in furtherance of an ongoing conspiracy to commit mail, wire, and health care fraud).

properly instructed rational jury would have viewed the *quid pro quo* scheme as limited to the exchange of referrals *for HCRA grant money*. Assuming that is the case, it is possible that a rational jury could also find that this *quid pro quo* arrangement ended when Silver told Dr. Taub that he would no longer provide him with HCRA grants, which occurred well before the statute of limitations period began to run in 2010. Given this possibility, we cannot say, beyond a reasonable doubt, that a rational jury would have convicted Silver if properly instructed.

### 2. Real Estate Scheme

For the Real Estate Scheme, the Government at trial contended that the following acts by Silver were "official": his PACB proxy votes for bond approvals; his meeting with Glenwood lobbyists prior to the passage of the Rent Act of 2011; his approval of real estate legislation benefiting the Developers, including the Rent Act of 2011; and his opposition to a methadone clinic near a Glenwood property. It is not clear, beyond a reasonable doubt, that a properly instructed rational jury would have found an official act *quid pro quo* based on these acts.

Assuming the jury was properly instructed, it is possible that it would not have considered Silver's opposition to the methadone clinic an official act. The only action Silver took regarding the clinic was to draft a letter to be distributed publicly that expressed his strong opposition to the clinic. Taking a public position on an issue, by itself, is not a formal exercise of governmental power, and is

therefore not an "official act" under *McDonnell*. The record does not establish that Silver formally used his power as Speaker of the Assembly to oppose the clinic and, accordingly, a rational jury might not have found his opposition to be an "official act."[111]

Similarly, because the District Court's charge did not specifically instruct the jury that a meeting on its own is not official action, it is possible that the jury improperly concluded that the meeting between Silver and Glenwood lobbyists was an official act. This possibility is certainly "reasonable," if not *probable*, in light of the Government's argument during its summation that this meeting, by itself, was an official action.[112] Simply meeting to discuss the terms of the Rent Act of 2011, without more, does not qualify as a "decision" or "action" under *McDonnell*.

The remaining acts proved by the Government—Silver's PACB proxy votes—may not have been enough for a rational, properly instructed jury to conclude that there was a *quid pro quo*. Assuming, *arguendo*, that Silver's PACB and housing legislation

---

[111] The Government and the District Court both state that there was evidence in the record to suggest that Silver sought to take credit for causing the clinic to be relocated, implying that he did or intended to take some action to oppose the clinic. *See Silver*, 203 F. Supp. 3d at 384 n.14 (citing Tr. 1602–05, 1752–53); Gov't Br. at 43 n.6. While that may be, a rational jury might reach a different conclusion given that there was no evidence presented that Silver took any action to relocate the clinic other than publicly stating his opposition.

[112] Tr. 2892–93.

votes qualify as "official acts" under *McDonnell*,[113] a rational jury might not view these acts as part of a *quo* exchanged for the Developers' tax certiorari business.

First, a properly instructed rational jury might not have concluded that Silver's legislative votes were part of a *quid pro quo* scheme. There is little else linking Silver's passage of real estate legislation to the Developers' referral fees other than the 2011 meeting between Glenwood lobbyists and Silver. As the District Court rightly noted, the Glenwood meeting was "the most compelling evidence on which a rational jury could have relied to conclude that Silver understood and intended there to be a *quid pro quo*."[114] But even if the jury viewed the Glenwood meeting as circumstantial evidence of a *quid pro quo*, we cannot say beyond a reasonable doubt that a properly instructed jury would have *found* a *quid pro quo* for legislative votes.

Further, a juror could reasonably conclude that the PACB approvals were too perfunctory to be regarded as a *quo*—that is, not part of any fraudulent scheme. There was no evidence adduced that any of the PACB financing approvals were particularly

---

[113] Silver questions whether votes by a proxy could be official acts performed by him. We need not reach this question of who possessed authority over the acts here.

[114] *Silver*, 184 F. Supp. 3d at 46. Indeed, the jury could have concluded, easily, but mistakenly, that the meeting itself sufficed to show an official act, and gone no further.

controversial, and one Government witness even stated that, in his experience, the PACB approved *every* financing request.[115]

Accordingly, a rational jury with proper instructions could conclude that Silver's PACB and real estate legislation votes were not part of any *quid pro quo* "scheme." The Government characterizes this conclusion—that a rational jury could have concluded that the official acts proven were not part of a *quid pro quo* arrangement—as one necessarily based on sufficiency of the evidence. We disagree. The issue of whether the Government adduced sufficient evidence to support the convictions is distinct from whether it is clear beyond a reasonable doubt that a properly instructed jury would have convicted. We conclude only that, in the matter of the Real Estate Scheme counts against Silver, it is not clear beyond a reasonable doubt that a rational jury would have convicted Silver if given proper instructions under *McDonnell*.

## IV. Money Laundering Count

Silver also argues that, were we to vacate his honest services fraud and extortion counts for a new trial, we would necessarily need to vacate his money laundering count as well. As noted above, 18 U.S.C. § 1957 prohibits engaging in monetary transactions in property "derived from specified unlawful activity."[116] Here, the specified unlawful activity charged in the indictment and proven at

---

[115] Tr. 1957; *see also* note 18, *ante.*

[116] 18 U.S.C. § 1957.

trial is the honest services fraud and extortion verdict that we now vacate. We therefore must also vacate the conviction of Silver on the money laundering count.

## CONCLUSION

We recognize that many would view the facts adduced at Silver's trial with distaste. The question presented to us, however, is not how a jury would *likely* view the evidence presented by the Government. Rather, it is whether it is clear, beyond a reasonable doubt, that a rational jury, properly instructed, would have found Silver guilty. Given the teachings of the Supreme Court in *McDonnell*, and the particular circumstances of this case, we simply cannot reach that conclusion. Accordingly, we are required to vacate the honest services fraud and extortion counts against Silver, as well as the money laundering count.

To summarize, we hold as follows:

(1) the evidence presented by the Government was sufficient to prove the Hobbs Act extortion and honest services fraud counts of conviction against Silver;

(2) the evidence presented by the Government was sufficient to prove the money laundering count of conviction against Silver because the Government was not required to trace criminal funds that were commingled with legitimate funds under 18 U.S.C. § 1957;

(3) the District Court's jury instruction on its honest services fraud and Hobbs Act extortion charge, defining an official act as "any action taken or to be taken under color of official authority," was erroneous under *McDonnell*;

(4) a properly instructed rational jury may not have convicted Silver, and accordingly the District Court's error was not harmless beyond a reasonable doubt; and

(5) the verdict on the money laundering count against Silver was predicated on the verdicts rendered on Silver's honest services fraud and extortion counts and must fall with those verdicts.

Accordingly, we **VACATE** the District Court's judgment of conviction on all counts and **REMAND** the cause to the District Court for such further proceedings as may be appropriate in the circumstances and consistent with this opinion.

### ADDENDUM A: Mesothelioma Scheme Timeline[1]

| Date | Event | Official Act or Not, as Argued by the Government[2] |
|---|---|---|
| Fall 2002 | Silver, Speaker of the New York Assembly since 1994, becomes "of counsel" at W&L. | Not Official |
| Fall 2003 | Dr. Taub, at an event, asks Silver to encourage W&L to donate money to mesothelioma research. Silver responds that he could not get them to do so. Within two weeks, Silver asks Dr. Taub to refer mesothelioma cases to W&L through him. | Not Official |
| Nov. 2003 | Dr. Taub starts providing referrals to W&L through Silver. | Not Official |
| Jan. 2004 | Dr. Taub sends a letter to Silver requesting state funding for his research after learning that Silver wanted him to apply. | Not Official |

---

[1] This timeline summarizes the events supporting Count One (honest services mail fraud), Count Two (honest services wire fraud), and Count Five (Hobbs Act extortion) of the indictment.

[2] This column describes whether the Government argued on appeal that the given event was an "official act." All "official acts" argued by the Government are denoted as "official" and bolded.

| | | |
|---|---|---|
| Jan. 2005 | Silver invites Dr. Taub to attend the State of the State ceremony at the New York State Capitol. He then puts Dr. Taub in touch with one of his staffers to discuss the status of Dr. Taub's grant request. | Not Official |
| Mar. 2005 | Silver receives first referral fee check from W&L for $176,048.02. | Not Official |
| July 2005 | **Silver approves a $250,000 state grant to Columbia University to support Dr. Taub's research, funded out of the HRCA Assembly Pool.** | **Official** |
| Aug. 2006 | **Silver approves a second $250,000 state grant to Columbia for Dr. Taub's research out of the HCRA pool.** | **Official** |
| Jan. 2007 | **Silver has his Assembly staff call a state trial judge to ask him to hire Dr. Taub's daughter as an unpaid intern.** | **Official** |
| Oct. 2007 | Dr. Taub sends Silver a letter requesting a third HRCA grant. Responding to a state law change requiring disclosure of HRCA grants and disclosures of any conflicts of interest, Silver tells Dr. Taub that he cannot approve any more state grants. Dr. Taub nonetheless continues referring patients to Silver. | Not Official |
| May 2008 | **Silver awards $25,000 in state grant funding to the Shalom Task Force, a non-profit of which Dr. Taub's wife was a board member.** | **Official** |
| Feb. 19, 2010 | Statute of limitations date (5 years from indictment) | |

| | | |
|---|---|---|
| May 25, 2010 | Silver appears in Dr. Taub's office to complain he had been receiving fewer referrals. Following this conversation, Dr. Taub continues to provide leads to Silver to maintain the relationship. | Not Official |
| May 2011 | **Silver has staff prepare an Assembly resolution and official proclamation honoring Dr. Taub, which he later presents to Dr. Taub at a public event.** | **Official** |
| Fall 2011 | **Silver meets with Dr. Taub and others to discuss a "Miles for Meso" charity race that Dr. Taub was trying to organize in Silver's district. Silver then sends Dr. Taub a letter offering to help him navigate the permitting process. The race ultimately does not occur.** | **Official** |
| Winter 2012 | **Silver makes two calls and sends a letter to help Dr. Taub's son get a job with OHEL, a non-profit organization receiving millions in state funding controlled by Silver.** | **Official** |
| Feb. 19, 2015 | Indictment | |

51

### ADDENDUM B: Real Estate Scheme Timeline[1]

| Date | Event | Official Act or Not, as Argued by the Government[2] |
|------|-------|------|
| 1994 | Silver is elected Speaker of the Assembly and in that capacity, he becomes one of three voting members of the PACB. | Not Official |
| 1997 | Silver refers real estate developer Glenwood to his friend Jay Arthur Goldberg for tax certiorari work. Glenwood hires Goldberg's firm, G&I. | Not Official |
| 2005 | Silver tells real estate developer Witkoff that his friend Goldberg needed business. Both Glenwood and Witkoff start to move their tax certiorari work to G&I over time. | Not Official |
| Feb. 19, 2010 | Statute of limitations date (5 years before indictment) | |

---

[1] This timeline summarizes the events supporting Count Three (honest services mail fraud), Count Four (honest services wire fraud), and Count Six (Hobbs Act extortion) of the indictment.

[2] This column describes whether the Government argued on appeal that the given event was an "official act." All "official acts" argued by the Government are denoted as "official" and bolded.

| | | |
|---|---|---|
| June 2011 | **Silver meets with Glenwood lobbyists to discuss pending real estate legislation to ensure that Glenwood is satisfied with the legislation. Later that month, Silver votes for the Rent Act of 2011 and tax abatement renewal legislation, both benefiting Glenwood.** | **Official** |
| Dec. 2011 | **Silver publicly opposes relocation of a methadone clinic proposed to be located near a Glenwood building in Silver's district.** | **Official** |
| Dec. 2011 | Silver informs a Glenwood lobbyist of his fee-sharing arrangement with Goldberg since proposed retainer agreements referencing Silver were sent to Glenwood. | Not Official |
| Jan. 2012 | Glenwood executes secret fee-sharing side letter with Silver. | Not Official |
| June 2014 | Witkoff learns about Silver's fee-sharing during a call with Goldberg, who had received a grand jury subpoena in connection with the Government's investigation of Silver. | Not Official |
| Feb. 19, 2015 | Indictment | |

Two Real Estate Scheme events occurred repeatedly both before and during the period of time captured by the statute of limitations period. The Government argues both are "official acts."

- **Silver repeatedly votes, through a proxy, as one of three veto-wielding members of the PACB, to approve Glenwood's requests for tax-exempt financing.**

- **Silver regularly approves and votes for rent and tax abatement legislation sought by, among others, Glenwood.**

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit