**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

      v.

SHELDON SILVER,

          Defendant.

S1 15 Cr. 93 (VEC)

**ORAL ARGUMENT REQUESTED**


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**<u>MOTION TO DISMISS THE SUPERSEDING INDICTMENT</u>**


Michael S. Feldberg
Andrew Rhys Davies
Michael F. Westfal
Rebecca Ann Naeder

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 610-6300
Facsimile:   (212) 610-6399

*Attorneys for Defendant*


Dated:  February 16, 2018
      New York, New York

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................1

I.    The Superseding Indictment Should Be Limited to Mailings, Wires, Payments, and Monetary Transactions During the Limitation Period ..........................................1

    A.    The Honest Services Fraud Counts Should Be Limited to Mailings and Wires Within the Limitation Period .........................................................1

    B.    The Hobbs Act Extortion Counts Should Be Limited to Payments Received During the Limitation Period ..............................................................2

    C.    The Money Laundering Count Should Be Limited to Monetary Transactions During the Limitation Period ..............................................5

II.    The Superseding Indictment Should Be Dismissed Because It Does Not Allege the Quid-Pro-Quo Element of Honest Services Fraud and Hobbs Act Extortion ...............................5

    A.    The Government's "As Opportunities Arise" Quid-Pro-Quo Theory Is Not Viable Under *McDonnell* ..............................................................5

    B.    The Superseding Indictment Does Not Allege the Quid-Pro-Quo Element With Respect to the Asbestos Charges ..........................................7

    C.    The Superseding Indictment Does Not Allege the Quid-Pro-Quo Element With Respect to the Real Estate Charges ..........................................13

III.    The Superseding Indictment's Hobbs Act Counts Should be Dismissed Because There Is No Allegation That Anyone Was Deprived of Property and the Government Alleges Conflicting Theories of Extortion ..............................................23

    A.    The Second Circuit's Statement That Mr. Silver May Have Deprived "Other Law Firms" of Property Demonstrates the Confusion Surrounding the Government's Hobbs Act Theory ..............................................24

    B.    The Government Must Elect a Single Theory of Hobbs Act Extortion Before Trial ..............................................................25

IV.    The Superseding Indictment's Forfeiture Allegations Should Be Dismissed to the Extent They Seek to Forfeit Property That Is Not Traceable to the Alleged Offenses ...................29

CONCLUSION ..........................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cole v. Arkansas,*
    333 U.S. 196 (1948) ................................................................................................28

*Evans v. United States,*
    504 U.S. 255 (1992) ........................................................................................ *passim*

*Ocasio v. United States,*
    136 S. Ct. 1423 (2016) ..........................................................................................15

*People v. Feld,*
    28 N.Y.S.2d 796 (N.Y. App. Div., 2d Dep't 1941) ...............................................27

*Scheidler v. Nat'l Org. for Women, Inc.,*
    537 U.S. 393 (2003) ........................................................................................23, 27

*Sekhar v. United States,*
    133 S. Ct. 2720 (2013) ..........................................................................23, 24, 27, 29

*Toussie v. United States,*
    397 U.S. 112 (1970) ........................................................................................ *passim*

*United States v. Addonizio,*
    451 F.2d 49 (3d Cir. 1971) ....................................................................................27

*United States v. Anderson,*
    509 F.2d 312 (D.C. Cir. 1974) ..............................................................................16

*United States v. Andrews,*
    803 F.3d 823 (6th Cir. 2015) ..................................................................................2

*United States v. Antico,*
    275 F.3d 245 (3d Cir. 2001) ..................................................................................19

*United States v. Barger,*
    178 F.3d 844 (7th Cir. 1999) ..................................................................................1

*United States v. Biaggi,*
    909 F.2d 662 (2d Cir. 1990) ....................................................................9, 10, 20, 21

*United States v. Bonito,*
    57 F.3d 167 (2d Cir. 1995) ....................................................................................12

*United States v. Bruno,*
    661 F.3d 733 (2d Cir. 2011) ..................................................................................16

*United States v. Bucci*,
   839 F.2d 825 (1st Cir. 1988) ................................................................3

*United States v. Bucci*,
   582 F.3d 108 (1st Cir. 2009) ............................................................1, 5

*United States v. Capoccia*,
   503 F.3d 103 (2d Cir. 2007) ................................................................4

*United States v. Coyne*,
   4 F.3d 100 (2d Cir. 1993) ..................................................................18

*United States v. Dean*,
   629 F.3d 257 (D.C. Cir. 2011) ......................................................17, 19

*United States v. Eisen*,
   974 F.2d 246 (2d Cir. 1992) ................................................................2

*United States v. Eppolito*,
   543 F.3d 25 (2d Cir. 2008) ..................................................................1

*United States v. Forszt*,
   655 F.2d 101 (7th Cir. 1981) ...............................................................3

*United States v. Fountain*,
   792 F.3d 310 (3d Cir. 2015) ..............................................................19

*United States v. Ganim*,
   510 F.3d 134 (2d. Cir. 2007) ........................................................12, 13

*United States v. Goldberg*,
   661 F. App'x 33 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1105 (2017) ...................29

*United States v. Isley*,
   No. 1:05-cr-0621, 2007 WL 9672420 (N.D. Ga. May 1, 2007) ............................13

*United States v. Jefferson*,
   No. 1:07-cr-209, 2017 WL 4423258 (E.D. Va. Oct. 4, 2017) ................9, 10, 20, 21

*United States v. Kramer*,
   73 F.3d 1067 (11th Cir. 1996) ..............................................................5

*United States v. Lee*,
   No. 1:15-cr-445, 2016 WL 7336529 (N.D. Ohio Dec. 19, 2016) ................... *passim*

*United States v. Margiotta*,
   646 F.2d 729 (2d Cir. 1981) ...............................................................29

*United States v. Marshall*,
  248 F.3d 525 (6th Cir. 2001) ...................................................................5

*United States v. McDonnell*,
  136 S. Ct. 2355 (2016) ................................................................... *passim*

*United States v. Moloney*,
  287 F.3d 236 (2d Cir. 2002) ...................................................................5

*United States v. Percoco*,
  No. 16-cr-776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ...............................6, 18

*United States v. Provenzano*,
  334 F.2d 678 (3d Cir. 1964) ...................................................................3

*United States v. Reitmeyer*,
  356 F.3d 1313 (10th Cir. 2004) ...............................................................3, 4

*United States v. Reynolds*,
  No. 85-cr-812, 1986 WL 4089 (N.D. Ill. Mar. 19, 1986) ........................................12

*United States v. Ring*,
  706 F.3d 460 (D.C. Cir. 2013) .................................................................16

*United States v. Rivlin*,
  No. 07-cr-524 (SHS), 2007 WL 4276712 (S.D.N.Y. Dec. 5, 2007) .................................3

*United States v. Rosen*,
  716 F.3d 691 (2d Cir. 2013) ............................................................. *passim*

*United States v. Scarano*,
  975 F.2d 580 (9th Cir. 1992) ..................................................................2

*United States v. Silver*,
  864 F.3d 102 (2d Cir. 2017) ............................................................. *passim*

*United States v. Skelos*,
  707 F. App'x 733 (2d Cir. 2017) ..............................................................6

*United States v. Skilling*,
  561 U.S. 358 (2010) .................................................................... *passim*

*United States v. Smith*,
  198 F.3d 377 (2d Cir. 1999) ...................................................................4

*United States v. St. Gelais*,
  952 F.2d 90 (5th Cir. 1992) .................................................................1, 2

*United States v. Stochel*,
No. 2:16-cr-30, 2016 WL 3951741 (N.D. Ind. July 22, 2016) ...............................................13

*United States v. Sun-Diamond Growers of Cal.*,
526 U.S. 398 (1999)........................................................................................................11, 12

*United States v. Sunia*,
643 F. Supp. 2d 51 (D.D.C. 2009) ....................................................................................3, 5

*United States v. Yashar*,
166 F.3d 873 (7th Cir. 1999) ............................................................................................3, 4

**Statutes**

18 U.S.C. § 664 ........................................................................................................................3

18 U.S.C. § 666 ........................................................................................................................3

18 U.S.C. § 981(a)(1)(c) .........................................................................................................29

18 U.S.C. § 1951(b)(1) ............................................................................................................24

18 U.S.C. § 1956 ......................................................................................................................5

18 U.S.C. § 1956(c)(7) ............................................................................................................29

18 U.S.C. § 1957 ......................................................................................................................5

18 U.S.C. § 1961(1) ................................................................................................................29

18 U.S.C. § 2314 ......................................................................................................................4

18 U.S.C. § 3282 ......................................................................................................................1

**Other Authorities**

Fed. R. Crim. P. 12(b)(3) .....................................................................................................1, 29

Fed. R. Crim. P. 32.2(b)(1) ...................................................................................................30

## INTRODUCTION

Mr. Silver respectfully submits this memorandum of law in support of his motion,

pursuant to Federal Rule of Criminal Procedure 12(b)(3), to dismiss the superseding indictment.

## ARGUMENT

I.    **THE SUPERSEDING INDICTMENT SHOULD BE LIMITED TO MAILINGS, WIRES, PAYMENTS, AND MONETARY TRANSACTIONS DURING THE LIMITATION PERIOD**

Each of the offenses charged in the superseding indictment is subject to the five-year

limitation period in 18 U.S.C. § 3282. *See United States v. Silver*, 864 F.3d 102, 119-20 (2d Cir.

2017) (honest services fraud and Hobbs Act extortion subject to § 3282); *United States v. Bucci*,

582 F.3d 108, 115 (1st Cir. 2009) (same for money laundering). The five-year period begins to

run when the relevant crime is "'complete.'" *United States v. Eppolito*, 543 F.3d 25, 46 (2d Cir.

2008) (quoting *Toussie v. United States*, 397 U.S. 112, 115 (1970)). Here, the superseding

indictment charges Mr. Silver with offenses that were complete, as defined by the statutes

charged, as long ago as 2000 (the alleged real estate fraud), 2003 (the alleged asbestos fraud),

and 2006 (the alleged money laundering). *See* ECF No. 32 (Superseding Indictment) ¶¶ 33, 35,

37, 39, 41, 43, 45. To eliminate offenses that are time-barred, the superseding indictment should

be limited to mailings, wires, payments, and monetary transactions during the five-year

limitation period.

### A.    The Honest Services Fraud Counts Should Be Limited to Mailings and Wires Within the Limitation Period

"The time at which a crime is 'complete' depends largely on the nature of the crime."

*Eppolito*, 543 F.3d at 46. It is well established that mail and wire fraud are not continuing

offenses for statute-of-limitation purposes. *See United States v. Barger*, 178 F.3d 844, 847 (7th

Cir. 1999) (mail fraud); *United States v. St. Gelais*, 952 F.2d 90, 96-97 (5th Cir. 1992) (wire

fraud). *See also United States v. Scarano*, 975 F.2d 580, 585 (9th Cir. 1992) ("[M]ail and wire fraud are not continuing offenses."). "It is not the scheme to defraud but the use of the mails or wires that constitutes mail or wire fraud." *St. Gelais*, 952 F.2d at 97. The statute of limitations therefore runs from the date of each alleged mailing and wire. *United States v. Eisen*, 974 F.2d 246, 263-64 (2d Cir. 1992) (mail fraud); *St. Gelais*, 952 F.2d at 97 (wire fraud).[1]

The honest services mail and wire fraud counts against Mr. Silver should therefore be dismissed insofar as the alleged mailings and wires predate February 19, 2010. *See* Superseding Indictment ¶¶ 33, 35 (alleged asbestos fraud based on mailings and wires "[f]rom at least in or about 2003"), 37, 39 (alleged real estate fraud based on mailings and wires "[f]rom at least in or about 2000"). The government should have no objection to this relief, as it has tacitly acknowledged the indictment's overbreadth by disclaiming reliance on any mailing or wire predating February 2010. *See* ECF Nos. 48, 59 (bill of particulars).

**B.     The Hobbs Act Extortion Counts Should Be Limited to Payments Received During the Limitation Period**

The Hobbs Act extortion counts are also time-barred in significant part, because they rely on payments that Mr. Silver allegedly received as long ago as 2000 (in respect of the alleged tax certiorari referral fees) and 2003 (in respect of the alleged mesothelioma referral fees). *See* Superseding Indictment ¶¶ 41, 43. The government recently confirmed that it seeks to convict Mr. Silver for mesothelioma referral fees that he allegedly received as long ago as 2003, and tax certiorari business from as long ago as 2004. *See* Declaration of Michael F. Westfal ("Westfal Decl."), Ex. 1 (letter dated Feb. 9, 2018); Ex. 2 (GX 1509); Ex. 3 (GX 646-1).

---

[1]     In *United States v. Andrews*, 803 F.3d 823 (6th Cir. 2015), the court treated wire fraud as a continuing offense because it erroneously focused its limitation analysis on "the duration of the scheme to defraud," instead of on the defendant's use of the wires. *See id.* at 824-26. It is use of the mails and wires that completes the offenses of mail and wire fraud and that triggers the limitation period. *Eisen,* 974 F.2d at 263-64.

However, the offense of Hobbs Act extortion is "completed" every time an official "receives a payment in return for his agreement to perform specific official acts." *Evans v. United States*, 504 U.S. 255, 268 (1992). Therefore, the limitation period runs from each receipt of improperly obtained property. *See Toussie,* 397 U.S. at 115. Similarly, for offenses prohibiting the acquisition of property through embezzlement, *see, e.g.,* 18 U.S.C. §§ 664, 666, the limitation period runs from each discrete acquisition of embezzled property. *See United States v. Yashar,* 166 F.3d 873, 879-80 (7th Cir. 1999); *United States v. Rivlin*, No. 07-cr-524 (SHS), 2007 WL 4276712, at *1, 3 (S.D.N.Y. Dec. 5, 2007); *see also United States v. Sunia*, 643 F. Supp. 2d 51, 75 (D.D.C. 2009). The Hobbs Act counts are therefore time-barred insofar as they are based on property that Mr. Silver allegedly received earlier than February 19, 2010.

Like mail and wire fraud, Hobbs Act extortion is not a continuing offense for statute-of-limitation purposes. An offense is continuing "only in limited circumstances"—when required by the express language of the substantive criminal statute or when "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Toussie*, 397 U.S. at 115. The Hobbs Act does not explicitly create a continuing offense, and under *Evans*, "the nature of the crime" is a discrete offense committed every time an official receives an extorted payment. *See Evans*, 504 U.S. at 268. Moreover, as the Court held in *United States v. Reitmeyer*, 356 F.3d 1313 (10th Cir. 2004), an offense does not become continuing simply because the government alleges—as here—that the particular defendant committed it in the course of a scheme or pattern of illegal conduct.[2] *See id.* at 1321 ("The term 'continuing

---

[2]     *United States v. Provenzano*, 334 F.2d 678 (3d Cir. 1964), viewed Hobbs Act extortion as a continuing offense—not based on the nature of the crime involved—but rather because the government alleged that, as a factual matter, the defendant engaged in extortion in the course of a scheme of illegal conduct. S*ee id*. at 684-85; *see also, e.g., United States v. Bucci*, 839 F.2d 825, 829-30 (1st Cir. 1988) (treating extortion as a continuing offense, citing *Provenzano*); *United States v. Forszt*, 655 F.2d 101, 103-04 (7th Cir. 1981) (same). That view is no longer good law in light of the Supreme Court's subsequent holdings in *Toussie* and *Evans*, clarifying the nature of the crime of Hobbs Act extortion and the correct analysis of whether an offense is continuing.

offense' is a term of art that does not depend on everyday notions or ordinary meaning. It is not the same as a scheme or pattern of illegal conduct.") (quotation marks omitted).[3] As the Hobbs Act makes no reference to a scheme or pattern of illegal conduct, allowing the government to invoke the continuing offense doctrine simply by alleging schematic conduct would "transform the limitations period from a check on governmental delay in prosecution to a function of prosecutorial discretion." *Yashar*, 166 F.3d at 879.[4]

Finally, *United States v. Smith*, 198 F.3d 377 (2d Cir. 1999), does not hold that Hobbs Act extortion is continuing for statute-of-limitation purposes. *Smith* held that Hobbs Act extortion is a continuing offense *for venue purposes*, so that it may be prosecuted in any district where some part of the offense conduct was committed. *See id*. at 384. That holding is irrelevant here, as a venue analysis is "obviously different" from the analysis that *Toussie* requires for limitation purposes. *See Reitmeyer*, 356 F.3d at 1323; *see also Toussie*, 397 U.S. at 120 n.16 (distinguishing cases that "dealt with venue and did not involve the statute of limitations question presented in this case").

---

[3]     *See also Yashar*, 166 F.3d at 877-79 (an offense is not continuing for statute-of-limitation purposes simply because "the *charged conduct* is continuous in nature") (emphasis in original).

[4]     In *United States v. Capoccia*, 503 F.3d 103 (2d Cir. 2007), the Second Circuit denied a similar attempt by the government to rely on an alleged "scheme" to avoid the statute of limitations where the statute criminalized only discrete acts. *Id.* at 111-12. 18 U.S.C. § 2314, the statute at issue in *Capoccia*, prohibits the "transport[ation], transmi[ssion], or transfer[ ]" of stolen property in interstate commerce. *Id.* at 112. In response to a forfeiture challenge as to uncharged conduct pre-May 2000, the government argued that the indictment "effectively charge[d] an over-arching scheme, commencing around 1997 and continuing until 2002." *Id.* at 111. The Court rejected this argument, and noted that § 2314 "does not refer to, nor does it set forth as an element, a scheme to transport, transmit, or transfer" stolen property. *Id.* at 112. As a result, the Court held that while the indictment's reference to a "scheme" "provides background for the specific allegations contained in the count, [such reference] does not allege a substantive violation of § 2314 encompassing the pre-May 2000 conduct." *Id.* at 113. The Court emphasized that its holding was "compelled by the language of the charged paragraph of § 2314." *Id.* at 115. That holding applies equally to the government's attempt here to use an alleged "scheme" to broaden the Hobbs Act extortion charges in this case beyond the discrete acts of obtaining property proscribed by that statute.

### C.     The Money Laundering Count Should Be Limited to Monetary Transactions During the Limitation Period

The money laundering count rests on an allegation that Mr. Silver engaged in prohibited monetary transactions as early as 2006. *See* Superseding Indictment ¶ 45. But the offense of money laundering pursuant to 18 U.S.C. § 1957 is completed when the defendant engages in the prohibited monetary transaction. *See Bucci*, 582 F.3d at 115-16. Nothing in § 1957 suggests that Congress intended to create a continuing offense. *See Toussie*, 397 U.S. at 115. And although no court appears to have addressed whether § 1957 is a continuing offense, it is well established that money laundering under 18 U.S.C. § 1956, which similarly criminalizes each discrete prohibited transaction, is not. *See United States v. Marshall*, 248 F.3d 525, 540 (6th Cir. 2001); *United States v. Kramer*, 73 F.3d 1067, 1072 (11th Cir. 1996).[5] Again, the government tacitly acknowledges the overbreadth of the money laundering count by limiting the monetary transactions specifically enumerated in the superseding indictment to those during the limitation period. *See* Superseding Indictment ¶ 45(a)-(h).

## II.   THE SUPERSEDING INDICTMENT SHOULD BE DISMISSED BECAUSE IT DOES NOT ALLEGE THE QUID-PRO-QUO ELEMENT OF HONEST SERVICES FRAUD AND HOBBS ACT EXTORTION

### A.     The Government's "As Opportunities Arise" Quid-Pro-Quo Theory Is Not Viable Under *McDonnell*

For honest services fraud and Hobbs Act extortion, the government must prove the element of quid pro quo—that the defendant had the "specific intent" to take something of value "*in exchange* for an official act." *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) (emphasis in original) (honest-services fraud); *see also Evans*, 504 U.S. at 268 (extortion

---

[5]       *United States v. Moloney*, 287 F.3d 236 (2d Cir. 2002), is not to the contrary. In *Moloney*, the court held that a single count could encompass multiple acts of money laundering committed as part of a common scheme. *See id.* at 240-41. But the issue addressed in *Moloney*—whether a single count is impermissibly duplicitous—is a different question, governed by different considerations and different standards, from whether an offense is continuing for statute of limitation purposes. *See, e.g., Sunia*, 643 F. Supp. 2d at 70-71.

requires proof that an official "receive[d] a payment in return for his agreement to perform specific official acts"). Here, however, the government relies on the "as-opportunities-arise" theory of bribery, *see, e.g.,* Tr. at 2854-55, 3051; *see also* ECF No. 135 (Jury Instructions), at 18:11-4, 24:5-8; ECF No. 294 (Mem. Order & Op. dated May 2, 2016), at 12, and as a result, it has recently asserted that it has no obligation to prove that Mr. Silver took any official actions in exchange for a thing of value. *See* Westfal Decl., Ex. 1.

This "as-opportunities-arise" theory was supported by Second Circuit law before *McDonnell*, *see, e.g., Rosen*, 716 F.3d at 700,[6] but it is not consistent with the Supreme Court's ruling in *McDonnell* that an official act must be "specific and focused"—in other words, an act sufficiently "circumscribed" and "concrete" that it can be (a) "placed on an agenda, tracked for progress, and then checked off as complete," and (b) classified as falling within the "specific duties" of the bribed official (or of another official on whom the bribed official will exert pressure). *United States v. McDonnell*, 136 S. Ct. 2355, 2369-70, 2372 (2016).

The government's continued reliance on the "as-opportunities-arise" theory also demonstrates the nearly impossible task of properly instructing a jury on the charges in this case following *McDonnell*. Consistent with *McDonnell*, Mr. Silver cannot be convicted based only on evidence of benefits conferred merely to "maintain a relationship" with him, *Silver*, 864 F.3d at 108, or in contemplation of his performance of unspecified acts that are not "official" under the standard set forth in *McDonnell*, *see id.* at 118-19. Rather, the government must prove beyond a

---

[6]     Although this Court ruled that the as-opportunities-arise theory survives *McDonnell* in the context of *United States v. Percoco,* No. 16-cr-776 (VEC), 2017 WL 6314146, at *4-5 (S.D.N.Y. Dec. 11, 2017), the Court of Appeals has not addressed the issue in a precedential opinion. *Cf. United States v. Skelos*, 707 F. App'x 733, 738-39 (2d Cir. 2017) (summary order).

reasonable doubt that it was specifically *official* acts that Mr. Silver agreed to exchange for things of value.[7]

*McDonnell* requires that the government be held strictly to this burden. Otherwise, there is the risk that Mr. Silver could be wrongfully convicted based on an alleged quid pro quo agreement as early as 2000, solely because he later received client referrals from Dr. Taub or the real estate developers which were neither connected to the alleged quid pro quo, nor in exchange for official acts within the limitation period; in other words, referrals that were entirely lawful.

### B.   The Superseding Indictment Does Not Allege the Quid-Pro-Quo Element With Respect to the Asbestos Charges

The government's original theory was based largely on state grants for medical research to Columbia University in 2005 and 2006: the government charged that Dr. Taub and Mr. Silver agreed some time before the first grant to "exchange" grants for client referrals. *See* Brief for the United States of America ("Govt. Brief") at 16-17, 23, 32-34, *United States v. Silver*, No. 16-1615 (2d Cir. Nov. 30, 2016) (describing the state grants to Dr. Taub as "the core" of the alleged asbestos scheme). But it is undisputed that those grants stopped by 2007—Mr. Silver unequivocally told Dr. Taub there would be no more grants, and there were none.[8] Based on a proper application of the statute of limitations, *see supra* Section I, the government must prove that mailings, wires, and payments made after February 19, 2010 somehow furthered the alleged

---

[7]       Indeed, the fact that the jury in *McDonnell* was instructed on an "as-opportunities-arise" theory makes clear that, at the very least, the Supreme Court's ruling in that case established an outer boundary to an otherwise boundless theory of bribery. *See United States v. McDonnell*, Case 3:14-cr-12-JRS, ECF No. 487 at 18:12-22, 19:16-20, 42:20-43:1 (Jury Charge) (E.D. Va. Sept. 2, 2014). As a result, the government must prove that any actions that Mr. Silver allegedly agreed to take in exchange for things of value constituted "official acts" under *McDonnell*.

[8]       When the Second Circuit ruled that the government must prove that some aspect of the alleged quid pro quo continued into the limitation period, it also noted Mr. Silver's 2007 communication to Dr. Taub. *Silver*, 864 F.3d at 122. The Court observed that a "rational jury could also find that this *quid pro quo* arrangement ended when Silver told Dr. Taub that he would no longer provide him with HCRA grants, which occurred well before the statute of limitations period began to run in 2010." *Id.*

agreement from at least five years earlier—an agreement that all the evidence demonstrates was terminated.

In a letter responding to Mr. Silver's request for a bill of particulars, the government has identified seven acts that it contends were official acts committed in connection with the alleged asbestos scheme: (1) the July 2005 state grant to Columbia University; (2) the August 2006 state grant to Columbia University; (3) Mr. Silver's alleged recommendation of Dr. Taub's daughter to Judge Schoenfeld in January 2007; (4) the May 2008 state grant to Shalom Task Force; (5) the May 2011 Assembly resolution and proclamation honoring Dr. Taub; (6) the Fall 2011 offer to assist Dr. Taub with the "Miles for Meso" charity race; and (7) Mr. Silver's recommendation of Dr. Taub's son to OHEL in 2012. *See* Westfal Decl. Ex. 1. Those acts cannot support a finding of quid pro quo because (1) the three acts within the limitation period are not "official" as a matter of law under *McDonnell*, and (2) there is no allegation or evidence connecting the four earlier acts—even if some of them may be "official"—to the mailings, wires, and payments that occurred during the limitation period.

### 1.     The three alleged acts within the limitation period are not "official" as a matter of law under *McDonnell*

The combined guidance of *McDonnell* and the Second Circuit's opinion in this case makes clear that the alleged official acts that did occur within the limitation period are not sufficient to prove a quid pro quo in violation of the honest services fraud or Hobbs Act extortion statutes.

First, the government seeks to convict Mr. Silver on the basis of his offer to assist Dr. Taub with a mesothelioma charity race that never took place. In its Order granting Mr. Silver's bail motion pending appeal, this Court appeared to suggest that a jury could convict Mr. Silver solely because such assistance "might have entailed exerting pressure on another official." ECF

No. 325 (Mem. Op. & Order dated Aug. 25, 2016) at 18-19. But as the Second Circuit observed, a jury would have to find that Mr. Silver actually *sought* to use his official position to exert pressure on another official to perform an official act, in this case issuing permits for the charity race. *Silver*, 864 F.3d at 120. In other words, Mr. Silver must have had the specific intent to exert such pressure. *Rosen*, 716 F.3d at 700; *McDonnell*, 136 S. Ct. at 2371 ("And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal."). This alleged official act should be dismissed because the government does not allege (nor can it) that Mr. Silver intended to exert pressure on another public official when he offered to help Dr. Taub. *See United States v. Lee*, No. 1:15-cr-445, 2016 WL 7336529, at *4 (N.D. Ohio Dec. 19, 2016) (To satisfy *McDonnell*, "the Government must allege in the Indictment that Defendant either exerted pressure on another official or advised another public official, knowing or intending that the advice would form the basis of an official act."). Instead, all the government can do is speculate that Mr. Silver's office's assistance might have entailed such pressure. *See United States v. Biaggi*, 909 F.2d 662, 681 (2d Cir. 1990) ("But knowledge, though inferable from circumstances, must be based on evidence, not speculation."); *United States v. Jefferson*, No. 1:07-cr-209, 2017 WL 4423258, at *16-17 (E.D. Va. Oct. 4, 2017) (vacating bribery conviction based in part on letter on congressional letterhead and phone call in support of visa application because there was "no indication that [the defendant] exerted pressure as required to make his actions official").

Second, the government seeks to convict Mr. Silver based on an allegation that he "facilitated employment for a family member of [Dr. Taub] at a not-for-profit organization to which [Mr. Silver] had directed millions of dollars in State funding." Superseding Indictment ¶ 23(e). As an initial matter, no official act is alleged here. Moreover, Mr. Silver did not

"facilitate" anything—he referred Dr. Taub's son to OHEL, which found him to be well-qualified and offered him a position. Indeed, the Second Circuit noted that despite the government's contention that Mr. Silver "used his official position to 'exert pressure' on the chief executive officer of OHEL, there is no evidence in the record that Silver or anyone else threatened to withhold OHEL funding." 865 F.3d at 120. This allegation suffers from the same defect as the charity race. The government does not allege (nor can it) that Mr. Silver exerted pressure on or threatened the CEO of OHEL[9] or anyone else associated with that non-profit. *See Lee*, 2016 WL 7336529, at \*4. This alleged official act should be dismissed because speculation that an act "could have" or "might have" involved exerting pressure or threatening someone does not satisfy *McDonnell*. *See Biaggi*, 909 F.2d at 681; *Jefferson*, 2017 WL 4423258, at \*16-17.

Third, the government alleges that Mr. Silver sponsored and obtained an Assembly resolution and proclamation honoring Dr. Taub in May 2011. Superseding Indictment ¶ 23(d). This is an "official act" in name only. This Court has acknowledged the "pro forma, rubber stamp nature" of such resolutions, and the Second Circuit likewise described them as "routine, *pro forma* exercises rubber stamped by Assembly members." ECF No. 325 at 18; *Silver*, 864 F.3d at 121. To allow such a case to proceed would result in the very same "absurdities" described by the Supreme Court in *McDonnell*, of convicting a public official of corruption based on conduct such as the President hosting a championship sports team at the White House

---

[9]     To address this Court's question of whether pressuring a non-governmental entity or person violates the Hobbs Act under *McDonnell* (ECF No. 325 at 13 n.9, 19), the police officer who accepts bribes to "encourage" store owners to use a particular carting company probably commits an "official act" when he or she implicitly threatens law enforcement action, or withholding law enforcement protection, since that is the formal governmental power that a police officer holds. Here, on other hand, Mr. Silver's mere recommendation of Dr. Taub's son to OHEL does not satisfy *McDonnell* because it is not a formal exercise of his governmental power and there is no allegation or evidence that he threatened to withhold OHEL's funding. Such a threat is the only type of pressure on a non-governmental person that could possibly satisfy *McDonnell* under these circumstances—and the government has no basis to allege that it happened.

or the Secretary of Education visiting a local high school. 136 S. Ct. at 2370 (citing *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999)).

Since each of the alleged "official acts" within the limitation period fails under *McDonnell*, this Court should dismiss each of the asbestos counts (1, 2, and 5) for failure to allege a quid pro quo.

> **2.**   **Even if "official," there is no allegation and no evidence connecting the four acts prior to the limitation period to the wires, mailings, and payments allegedly obtained during the limitation period**

The government alleges that Mr. Silver committed four other "official acts" prior to the limitation period when he directed HCRA grants to Dr. Taub in July 2005 and November 2006, when he recommended Dr. Taub's daughter to Judge Schoenfeld for an unpaid internship in January 2007, and when he "helped direct" $25,000 in state funding to the Shalom Task Force. Superseding Indictment ¶¶ 23(a)-(c). Mr. Silver challenges the last act under *McDonnell* since it is unclear what the government means when it vaguely alleges that he "helped direct" funding to the non-profit organization, an allegation which suggests the very same commonplace, routine acts that government officials undertake every day and that *McDonnell* made clear are insufficient.

Regardless of whether these alleged pre-limitation period actions are "official" under *McDonnell*,[10] a proper application of the statute of limitations makes clear that the asbestos counts should be dismissed as to such conduct. Beginning with the Hobbs Act, the government must prove that Mr. Silver received property during the limitation period, "knowing that the payment was made in return for official acts." *Evans*, 504 U.S. at 268. But since Mr. Silver's

---

[10]     Mr. Silver's recommendation of Dr. Taub's daughter to Judge Schoenfeld fails under *McDonnell* for the same reasons as the mesothelioma charity race and his recommendation of Dr. Taub's son to OHEL. First, there is no official act alleged. Moreover, there is no allegation, or basis to allege, that Mr. Silver *sought* to exert pressure on Judge Schoenfeld. *Silver*, 864 F.3d at 120. And while Mr. Silver may have recommended Dr. Taub's daughter, there is no allegation and no evidence that he sought to "advise" Judge Schoenfeld about anything. *McDonnell*, 136 S. Ct. at 2371-72; *Lee*, 2016 WL 7336529, at *4.

actions during the limitation period are not "official" under *McDonnell*, and the government cannot rely on any payments obtained by Mr. Silver prior to February 19, 2010, *see supra* at Section I.B, the government must therefore prove that Mr. Silver received patient referrals post-February 2010, and that he knew such referrals were made by Dr. Taub in return for his alleged official acts from before the limitation period. *Evans*, 504 U.S. at 268.

But there is no allegation and no evidence tying any property that Mr. Silver received after February 2010 to the HCRA grants from July 2005 and November 2006, or the Shalom Task Force grant from 2008, let alone an allegation that such payments were made in return for such grants. And in any event, the Second Circuit has made clear that payments made for past acts are only chargeable as illegal gratuities which plainly are not illegal under either statute at issue here. *United States v. Ganim*, 510 F.3d 134, 150 (2d. Cir. 2007) (distinguishing between bribes and illegal gratuities and noting that "a payment made to 'influence' connotes bribery, whereas a payment made to 'reward' connotes an illegal gratuity") (citing *United States v. Bonito*, 57 F.3d 167, 171 (2d Cir. 1995); *Sun-Diamond*, 526 U.S. at 404-05)). The Court should therefore dismiss the Hobbs Act asbestos allegations in their entirety.

Similarly, a proper application of the statute of limitations limits the alleged honest services fraud offenses to mailings and wires post-February 19, 2010. *See supra* at Section I.A. But like the Hobbs Act charges, there is no allegation and no evidence that connects the non-time-barred mailings and wires to the state grants, which were made years earlier. Indeed, several courts have acknowledged this requirement of connecting the mailings and wires from within the limitation period to alleged conduct that would otherwise be time-barred. *See United States v. Reynolds*, No. 85-cr-812, 1986 WL 4089, at *7-8 (N.D. Ill. Mar. 19, 1986) (addressing defendant's "troubling" argument that a mailing from five years after the alleged bribe cannot be

"in furtherance" of the charged scheme); *United States v. Stochel*, No. 2:16-cr-30, 2016 WL 3951741, at *4 (N.D. Ind. July 22, 2016) ("If this case proceeds to trial, the Government will be put to the task of proving that the scheme alleged in the indictment existed . . . and that the mailing in question was sent for the purpose of carrying out the scheme or attempting to do so.").

Even assuming an "agreement" between Dr. Taub and Mr. Silver existed at all, it was terminated by 2007. *See United States v. Isley*, No. 1:05-cr-0621, 2007 WL 9672420, at *6 (N.D. Ga. May 1, 2007) ("However, if the underlying scheme has reached fruition, subsequent mailings will not violate the statute."). The Court should therefore dismiss the honest services fraud asbestos allegations since the government has not alleged that any post-February 2010 mailings or wires furthered an alleged quid pro quo agreement dating back to 2003.

### C.    The Superseding Indictment Does Not Allege the Quid-Pro-Quo Element With Respect to the Real Estate Charges

In its letter responding to Mr. Silver's request for a bill of particulars, the government has identified four acts that it contends were official acts committed in connection with the alleged real estate scheme: (1) the June 2011 vote for the Rent Act of 2011 ("Rent Act") and tax abatement renewal legislation; (2) Mr. Silver's actions relating to a proposed methadone clinic near a Glenwood building; (3) the Public Authorities Control Board's approval of Glenwood's requests for tax-exempt financing; and (4) Mr. Silver's repeated votes for and approval of rent and tax abatement legislation sought by, among others, Glenwood.[11] *See* Westfal Decl. Ex. 1.

---

[11]    The government has correctly abandoned its theory from the first trial that Mr. Silver's meetings with constituents such as Glenwood and Witkoff constitute official acts under *McDonnell*. *See* Westfal Decl. Ex. 1. To the extent the government seeks to rely on any pre-February 2010 acts by Mr. Silver, the argument as to the asbestos allegations in Section II.B above applies equally to any pre-limitation period conduct with respect to the tax certiorari referral payments. Although the first trial focused on allegedly official acts within the limitation period only, the government's letter suggests that it may seek a conviction based on conduct by Mr. Silver well before February 19, 2010. For example, the government may try to argue a Hobbs Act or honest services fraud offense based on pre-2010 rent and tax abatement legislation or PACB financing requests from Glenwood. *See* Westfal Decl., Ex. 1 (references to Mr. Silver's "repeated votes" on PACB requests and rent and tax abatement legislation). Like the alleged asbestos scheme, such allegations fail as a matter of law since a payment received by Mr. Silver

Those acts cannot support a finding of quid pro quo because (1) insofar as Mr. Silver did those things, in particular his vote on the Rent Act, at a time when it is undisputed that the developers were unaware of the referral fees that he was being paid, those fees cannot possibly be characterized as bribes, (2) the remaining alleged official acts other than the Rent Act vote are insufficient as a matter of law under *McDonnell*, and (3) the superseding indictment's sparse allegations with respect to Witkoff fail to state any offense.

> **1.    The allegations with respect to Mr. Silver's 2011 Rent Act vote do not describe a bribe within the meaning of *Skilling* or *Evans***

During the first trial, the government emphasized Mr. Silver's duty "to be honest" and "not to deceive the public" (Tr. at 3050), reminded the jury of testimony from Richard Runes about "holding a tiger by the tail" and noted that "you don't want to get eaten by the tiger" (Tr. at 3061-62), and even analogized this case to "when the school yard bully takes everyone's lunch money." (Tr. at 3063). But Mr. Silver is not charged with lies, bullying, or conflicts of interest, and this is not a case about alleged extortion or taking someone's lunch money with the threat of force. Mr. Silver is charged with bribery.

Bribery is the only viable theory of honest services fraud post-*Skilling*, in which the Supreme Court limited the statute to cases involving "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *United States v. Skilling*, 561 U.S. 358, 404 (2010). And in a Hobbs Act case based on bribery, the government must "show that a public official has obtained a payment to which he

---

post-February 2010 could not have been made to "*influence*" him for past acts going back to 2000. *Ganim*, 510 F.3d at 150. Such allegations should be dismissed on this basis.

was not entitled, knowing that the payment was made in return for official acts." *Evans*, 504 U.S. at 260, 268.[12]

As a result, despite the government's repeated references during the first trial to tigers and school yard bullies, the only allegation that states an offense under the statutes at issue is an allegation of bribery. The Supreme Court made that clear in *McDonnell*, explaining that "[t]he theory underlying both the honest services fraud and Hobbs Act extortion charges was that Governor McDonnell had accepted bribes from [a third party]." 136 S. Ct at 2365 (citing *Skilling*, 561 U.S. at 404, and *Evans*, 504 U.S. at 260, 269). The Court found that "[t]o convict the McDonnells of bribery, the Government was required to show that Governor McDonnell committed (or agreed to commit) an 'official act' in exchange for the loans and gifts" provided by the bribe payer. *Id.* at 2361.

To begin with what the government calls its "core" allegation against Mr. Silver, the superseding indictment alleges that Mr. Silver "supported legislative proposals favorable to Glenwood." Govt. Brief at 16-17, 22-23; Superseding Indictment ¶ 13(d). The government has rightly narrowed this allegation to Mr. Silver's vote on the Rent Act, rather than his public support of a particular position or his meetings with constituents such as Glenwood or Witkoff. *See* Westfal Decl. Ex. 1. This allegation nevertheless fails to state a bribery offense since the government alleges that Mr. Silver voted on the Rent Act "[i]n exchange for his receipt of *illegal payments* through the Real Estate Law Firm." Superseding Indictment ¶ 13 (emphasis added). That is, the only alleged *quid* in exchange for Mr. Silver's alleged *quo* was the "hundreds of

---

[12]    Although this Court is bound by *Evans*, Mr. Silver preserves for appeal the argument that Hobbs Act extortion cannot be used to prosecute alleged bribery. Indeed, several Supreme Court justices have questioned whether *Evans* was correctly decided. *See Evans*, 504 U.S. at 283 (Thomas, J., Rehnquist, J., and Scalia, J., dissenting); *see also Ocasio v. United States*, 136 S. Ct. 1423, 1437 (2016) (Breyer, J., concurring); *id.* at 1444-45 n. 3 (Sotomayor, J. and Roberts, J., dissenting); *id.* at 1437-38 (Thomas, J., dissenting).

thousands of dollars in illegal payments through [Goldberg & Iryami] that were disguised as attorney referral fees." Superseding Indictment ¶¶ 12-13.

But it is undisputed that when Mr. Silver voted on the Rent Act in June 2011, neither Glenwood nor Witkoff had any idea that Mr. Silver was receiving referral fees from Goldberg & Iryami. *Silver*, 864 F.3d at 109. Indeed, Glenwood did not learn about the referral fees until approximately January 2012, or six months after Mr. Silver's vote, and Witkoff did not learn about the referral fees until three years later in June 2014. *Silver*, 864 F.3d at 110; ECF No. 1 (Complaint dated Jan. 21, 2015), at ¶ 32(a) (as to Glenwood) and ¶ 33(c) (as to Witkoff).

The only plausible reading of the government's bribery theory with respect to the Rent Act is therefore that Glenwood and Witkoff were unwittingly "bribing" Mr. Silver by paying unknown referral fees in exchange for his vote. Despite the government's repeated pleas to the jury during closing arguments that only Mr. Silver is on trial and so it only has to prove his intent (Tr. at 2852-53, 3046),[13] this novel theory that someone can pay a bribe without knowing it is not only counterintuitive, more importantly it fails to state an offense under the statutes at issue. *Cf.*

---

[13]    Mr. Silver acknowledges the Court's prior ruling that the intent of a bribe payer may be different than the intent of a bribe recipient. ECF No. 294 (Mem. Op. & Order dated May 3, 2016) at 15 n. 5. It is one thing, however, to conclude that the government need only prove Mr. Silver's intent at trial, and it is quite another to conclude that evidence of an alleged bribe payer's knowledge and intent is completely irrelevant to a jury's determination of an alleged bribe recipient's intent. It is simply a bridge too far to conclude that a public official can be convicted of accepting *bribes* that the supposed bribe payers did not even know they were paying. Judge Wesley perhaps put it best when he asked during oral argument before the Second Circuit, "what kind of scheme is that?" Indeed, Mr. Silver is not aware of any other case that has proceeded on such a bribery theory.

       Moreover, *Skilling* and *Evans* hold to the contrary, *see infra* at 17-19, and with respect to the cases cited by the Court: *Rosen* and *Bruno* actually support the opposite conclusion—that the government must prove the intent of both parties in an alleged bribery scheme. It would be an odd reading of *Rosen's* quid pro quo definition to omit any requirement regarding a bribe payer's intent when the only appellant in that case was the bribe payer. 716 F.3d 691. While *United States v. Bruno* cited to the same definition as *Rosen* in a case against a public official, the Court's reading of that decision fails to explain why the Second Circuit would have any reason to conclude that "a rational jury could find that [*the bribe payer's*] purpose in hiring Bruno as a consultant was for Bruno to use his office to further the interests" of the bribe payer. 661 F.3d 733, 744-45 (2d Cir. 2011) (emphasis added). As to *United States v. Ring*, that decision was expressly based on the language of the federal bribery statute, which punishes "offers" of bribes, and not accepted offers. 706 F.3d 460, 467 (D.C. Cir. 2013). And the language from *United States v. Anderson* cited by the Court addressed only a bribe payer's argument that his guilty verdict was inconsistent with the bribe recipient's conviction of a lesser charge. 509 F.2d 312, 331-32 (D.C. Cir. 1974).

*United States v. Dean*, 629 F.3d 257, 259-61 (D.C. Cir. 2011) (reversing bribery and extortion conviction because, while "the evidence established that [the defendant] intended to keep the $1275 . . . the fact remains that *the agreement* was for [the defendant] to accept the $1275 on behalf of the [government agency]. There is no evidence of an agreement between [the defendant] and the undercover agent that the money was to go to [the defendant] personally.") (emphasis added).

With respect to the honest services fraud statute, the Supreme Court in *Skilling* limited that offense only to those cases involving "bribes or kickbacks supplied by a third party *who had not been deceived*." 561 U.S. at 404 (emphasis added). It is this qualifier—that the bribe must be paid by a third party "who had not been deceived"—which makes clear that the government's bribery theory in this case fails to allege honest services fraud. *Skilling* differentiated between fraud cases, "in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other," and honest services theory cases that "targeted corruption that lacked similar symmetry. While the offender profited, the betrayed party suffered no deprivation of money or property; instead, a third party, *who had not been deceived*, provided the enrichment." *Id.* at 400 (emphasis added) (internal citation omitted). The Supreme Court then narrowed the honest services statute to only the latter category of cases, a category that plainly does not capture the government's allegation in this case that the third party who <u>was</u> deceived somehow also paid the alleged bribes, just without knowing it.

During closing arguments in the first trial, the government argued precisely this nonsensical theory to the jury:

> The fact that these other people around Sheldon Silver did not know or think that they were committing a crime is not surprising or odd at all. It makes sense. These were the people who Sheldon Silver used and took advantage of. They're people who Sheldon Silver kept in the dark . . . And of course Sheldon Silver did not

> want these people involved in his schemes to know or think about the whole
> picture, to know that he was abusing his power and taking advantage of them. So,
> the fact that they did not fully understand how they were being used by Sheldon
> Silver is not a defense, it is the opposite. It is powerful evidence of Sheldon
> Silver's guilt.

Tr. 2853-54, 3059. To the contrary, under the Supreme Court's clear guidance in *Skilling*, the

alleged receipt of a payment from a third party who was deceived plainly does not constitute

bribery, and it therefore cannot constitute honest services fraud. Accordingly, the superseding

indictment's allegation that Mr. Silver committed honest services fraud by receiving payments

from Glenwood and Witkoff in exchange for his vote on the Rent Act should be dismissed

because the real estate developers undisputedly had no knowledge of such payments until well

after the vote.

 With respect to the Hobbs Act, in order to prove extortion "under the color of official

right" using a bribery theory, the Supreme Court in *Evans* held that the government must prove

"that a public official has obtained a payment to which he was not entitled, *knowing that the*

*payment was made in return for official acts*." 504 U.S. at 268 (emphasis added). Mr. Silver

could not possibly have *known* that Glenwood and Witkoff were paying tax certiorari referral

fees *in return* for his vote on the Rent Act when neither real estate developer knew about such

payments at that time.

 In *Percoco*, this Court, citing the above language in *Evans*, noted that "'[t]he government

does not have to prove an explicit promise to perform a particular act made at the time of

payment, [as it is] sufficient if the public official understands that he or she is expected as a

result of the payment to exercise particular kinds of influence—i.e., on behalf of the payer—as

specific opportunities arise.'" 2017 WL 6314146, at *9 (quoting *United States v. Coyne*, 4 F.3d

100, 114 (2d Cir. 1993)) (internal citation omitted) (alterations in original). There is no way that

Mr. Silver could have understood that, *as a result of the tax certiorari referral fees*, he was

*expected* to vote a particular way on the Rent Act. Expected by whom? Neither Glenwood nor Witkoff could have possibly expected Mr. Silver to do anything as a result of the referral fees when they did not even know they were paying them. Such circumstances make clear that the superseding indictment fails to allege Hobbs Act extortion by Mr. Silver, and as a result, the government's allegations with respect to the Rent Act should be dismissed. *See United States v. Fountain*, 792 F.3d 310, 316 (3d Cir. 2015) (Hobbs Act extortion focuses on "(1) the motivation of the payor, that is, whether a payment '*was made* in return for official acts,' and (2) whether the defendant knew the payor's motivation.") (citing *United States v. Antico*, 275 F.3d 245, 257 (3d Cir. 2001)) (emphasis in original).

Finally, Mr. Silver notes that it is this very theory that led to the government's repeated argument during the first trial that "if you find that money played any part, then he is guilty. And, you know? There are 4 million reasons why you know the money played a part." Tr. at 2925. While such a salacious sound-bite may sound appealing to a jury, it is a gross misstatement of the law. It is not enough that Mr. Silver "did it for the money." Tr. at 3052. Instead, the government must allege (and prove) that the money that he "did it for" was a bribe—that is, that it was given to him "in exchange for" an official act and that Mr. Silver knew it. *See Fountain*, 792 F.3d at 316; *Rosen*, 716 F.3d at 700; *Dean,* 629 F.3d at 259-61; *Skilling*, 561 U.S. at 404; *Evans*, 504 U.S. at 268. This the government cannot prove when the supposed bribe payers had absolutely no knowledge of the only bribes alleged in the superseding indictment.

### 2.    The remaining alleged "official acts" fail under *McDonnell*

The rest of the actions alleged by the government in its February 9, 2018 letter fail to state an offense under *McDonnell*.[14] The government first alleges that, through his appointment

---

[14]    Although not addressed in the government's letter, the superseding indictment also alleges that, even though Mr. Silver had no tax certiorari experience, he obtained tax certiorari business from Glenwood and Witkoff,

to the PACB, Mr. Silver "had oversight and approval power over certain tax subsidized loans that were sought by and granted to [Glenwood]." Superseding Indictment ¶ 13(f). Critically, the government does not allege that Mr. Silver ever exercised that "oversight and approval power" over Glenwood's financing requests (because he never did). Without an allegation that Mr. Silver either (i) exercised his approval power by voting in favor of Glenwood's financing requests, (ii) exerted pressure on some other public official to vote in favor of the requests, or (iii) provided advice to another public official, knowing that such advice would form the basis of a vote in favor of Glenwood's requests, the superseding indictment fails to state an offense against Mr. Silver. Setting aside the fact that we know from the first trial that there is no evidence that any of these things actually happened, the failure even to allege them in the superseding indictment is fatal under *McDonnell*. 136 S. Ct. at 2371; *see also Biaggi*, 909 F.2d at 681; *Jefferson*, 2017 WL 4423258, at *16-17; *Lee*, 2016 WL 7336529, at *4.

Although not alleged in the superseding indictment, the government's February 9, 2018 letter notified Mr. Silver that it plans to argue that Mr. Silver's opposition to the opening of a methadone clinic constituted an official act. *See* Westfal Decl. Ex. 1; *see also* Tr. 2893-94; *Silver*, 864 F.3d at 122-23. The government argued to the Second Circuit that the evidence during the first trial "showed that, with the help of his office and staff, *Silver pressured other government agencies* to prevent the clinic from relocating, then took credit for keeping the clinic away from the Glenwood building." Govt. Brief at 43, n. 6 (emphasis added). The government

---

whose businesses depended in part on obtaining favorable official action from Mr. Silver. Superseding Indictment ¶ 13(a). This allegation plainly fails to state an offense under *McDonnell* as Mr. Silver allegedly asking two private companies to send their tax certiorari business to a law firm cannot possibly constitute a formal exercise of governmental power. To the extent the government is alleging traditional extortion under the Hobbs Act here, such an allegation is impermissible for the reasons set forth in Section III. The government also alleges that based on Mr. Silver's past favorable actions concerning Glenwood, in late 2011 through early 2012, Glenwood "continued to retain the Real Estate Law Firm by executing a side agreement with SILVER and the Real Estate Law Firm." Superseding Indictment ¶ 13(e). This does not allege any action whatsoever by Mr. Silver, let alone official action constituting the formal exercise of governmental power.

cited to pages 1602-05, 1752-53, and 1783-86 of the trial transcript to support this proposition. *Id*. Plainly, none of the trial testimony cited by the government supports its argument, but notably, as to pages 1602-05, Glenwood lobbyist Brian Meara testified that when he called Judy Rapfogel to tell her about the proposed methadone clinic, she "was already well aware of the program and informed me that they were opposing it." Tr. at 1602. That is, Mr. Silver's office was already opposing the methadone clinic before any request came from Glenwood or its lobbyists. And of course, when Mr. Meara was asked what, if anything, he knew "about any financial relationship that Sheldon Silver had with Glenwood"—that is, the bribes alleged in the superseding indictment—he testified, "Nothing." Tr. at 1605.

It is no surprise then, that the Second Circuit found that "[t]he only action Silver took regarding the clinic was to draft a letter to be distributed publicly that expressed his strong opposition to the clinic. Taking a public position on an issue, by itself, is not a formal exercise of governmental power, and is therefore not an 'official act' under *McDonnell*." *Silver*, 864 F.3d at 122. This allegation therefore fails to state an offense for multiple reasons. First, it is not alleged in the superseding indictment. Second, even if it had been alleged, there is no suggestion that Mr. Silver did anything other than publicly oppose the clinic, which, as the Second Circuit found, does not entail the formal exercise of governmental power. Nor is there any suggestion (beyond a "could have" or "might have") that Mr. Silver exerted pressure on any other public official or that he provided advice to another public official, knowing that such advice would form the basis of an official act. *See McDonnell*, 136 S. Ct. at 2371; *see also Biaggi*, 909 F.2d at 681; *Jefferson*, 2017 WL 4423258, at *16-17; *Lee*, 2016 WL 7336529, at *4. Finally, like the Rent Act allegations, the government's bribery theory as to the methadone clinic fails under *Skilling* and

*Evans* because, at the time of Mr. Silver's alleged opposition to the proposed clinic, Glenwood and Witkoff had no knowledge they were paying the alleged bribes. *See supra* Section II.C.1.

With no viable allegation that Mr. Silver performed, or agreed to perform, any official act in exchange for the only bribes alleged in the superseding indictment, the Real Estate Counts (3, 4, and 6) fail to state an offense and should be dismissed in their entirety.

> **3.    The superseding indictment's allegations with respect to Witkoff should be dismissed**

The Court acknowledged the shortcomings of the allegations with respect to Witkoff in its Order denying Mr. Silver's Rule 29 motion for acquittal and Rule 33 motion for a new trial:

> The majority of the Government's evidence to prove the Real Estate Scheme concerned Glenwood; the Government only introduced one witness to testify about Witkoff's role. In contrast with the evidence regarding the methadone clinic, PACB financing, and the private meeting prior to the 2011 Rent Act, the Government did not introduce comparable evidence showing official actions taken by Silver specifically in favor of Witkoff. Nevertheless, a rational jury could conclude that Silver took official action on behalf of Witkoff because Witkoff, as a peer developer to Glenwood, would have also benefited from real estate legislation that was satisfactory to Glenwood, such as the 2011 Rent Act.

ECF No. 294 at 25 n. 8. In light of *McDonnell* and the Second Circuit's decision, it is now clear that the allegations in the superseding indictment are insufficient and fail to state an offense.

The superseding indictment alleges the following with respect to Witkoff: in exchange for his receipt of illegal payments from Witkoff disguised as attorney referral fees, Mr. Silver supported legislative proposals favorable to Witkoff, including with respect to the Rent Act. Superseding Indictment ¶¶ 12, 13(d). This allegation fails for the same reasons discussed above in Section II.C.I—there is no plausible way that Witkoff could have bought Mr. Silver's legislative vote on the Rent Act with payments disguised as attorney referrals when it did not have knowledge of such payments until three years later. ECF No. 1 (Complaint), at ¶ 33(c).

With no possibility of a quid pro quo between Mr. Silver and Witkoff under such circumstances, the Real Estate Counts with respect to Witkoff should be dismissed.

For the foregoing reasons, the Real Estate Counts should be dismissed in their entirety.

### III.   THE SUPERSEDING INDICTMENT'S HOBBS ACT COUNTS SHOULD BE DISMISSED BECAUSE THERE IS NO ALLEGATION THAT ANYONE WAS DEPRIVED OF PROPERTY AND THE GOVERNMENT ALLEGES CONFLICTING THEORIES OF EXTORTION

While Mr. Silver acknowledges the Court's prior rulings with respect to his argument that the government must prove both the "deprivation" and "acquisition" of property in order to establish Hobbs Act extortion, ECF No. 46 (Mem. Op. & Order dated July 24, 2015) at 4-10; ECF No. 294 at 18-22, he renews his argument in this motion to preserve it for appeal.[15] As Mr. Silver has argued previously, the Supreme Court's ruling in *Sekhar v. United States* makes clear that Hobbs Act extortion requires "'not only the deprivation but also the acquisition of property.'" 133 S. Ct. 2720, 2725 (2013) (quoting *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 404 (2003) (internal citation omitted)). Indeed, extortion "requires that the victim 'part with' his property . . . and that the extortionist 'gain possession' of it." *Id.*

However, since the superseding indictment's factual allegations limit the alleged *quid* to the "Mesothelioma Leads, and the valuable legal claims connected thereto" for the asbestos charges, and the "illegal payments . . . disguised as attorney referral fees" for the real estate charges, the government has not alleged that anyone was deprived of property in this case. Superseding Indictment ¶¶ 13, 23. Dr. Taub may have sent mesothelioma leads to Weitz & Luxenberg, but he was not deprived of them. And his patients may have agreed to hire Weitz & Luxenberg for a contingency fee, but they were not deprived of their legal claims when they did

---

[15]     The Second Circuit declined to decide whether a deprivation of property is an essential element of Hobbs Act extortion. *Silver*, 864 F.3d at 114 n. 47.

so.[16] And the real estate developers may have sent tax certiorari business to Goldberg & Iryami, but they were not deprived of their tax certiorari claims, and in any event, the superseding indictment's allegations are limited to the attorney referral fees paid to Mr. Silver. As a result, the Hobbs Act counts (5 and 6) should be dismissed for failure to state an offense since no one was deprived of property according to the government's allegations. *Sekhar*, 133 S. Ct. at 2725.

Mr. Silver also renews his argument on this issue to point out the utter confusion around the Hobbs Act extortion charges in this case. First, the Second Circuit's observation that Mr. Silver may have deprived "other law firms" of property, *see Silver*, 864 F.3d at 114, reflects that confusion. And to the extent the government is also pursuing a "traditional" extortion theory under the Hobbs Act, such theory is inherently conflicting with the government's Hobbs Act bribery theory. The government therefore must at a minimum choose a single, coherent theory in advance of trial.

A.  **The Second Circuit's Statement That Mr. Silver May Have Deprived "Other Law Firms" of Property Demonstrates the Confusion Surrounding the Government's Hobbs Act Theory**

In denying Mr. Silver's initial motion to dismiss on this point, this Court noted the Hobbs Act's requirement that a defendant obtain property "with the victim's consent." ECF No. 46, at 10. Indeed, it is the Hobbs Act's requirement that a defendant obtain property from another, "with his consent," that differentiates extortion from the crime of robbery, which requires the unlawful taking of personal property from another, "against his will." 18 U.S.C. § 1951(b)(1). Even under a third-party extortion theory, such as the Court's proposition that Mr. Silver could have obtained property from Dr. Taub's patients by extorting Dr. Taub, the party that transfers his or her property—here, the patient—does so with consent, as explicitly required by the statute.

---

[16]     Notably, the Second Circuit did not include Dr. Taub's patients in its list of persons who may have been deprived of property by Mr. Silver's alleged schemes. *Silver*, 864 F.3d at 114.

However, despite the benefit of a full trial record and briefing and oral argument from skilled counsel on both sides, the Second Circuit understood that, "[b]y engaging in the alleged schemes, Silver is said to have deprived Dr. Taub, the Developers, *and other law firms* of property." *Silver*, 864 F.3d at 114 (emphasis added). This observation as to "other law firms" is impossible to understand in light of the Hobbs Act's requirement that property be obtained with the victim's consent. Given the facts as alleged in the superseding indictment, under no circumstances could "other law firms" have consented to anything. Such law firms may not have obtained tax certiorari business from the real estate developers or mesothelioma leads from Dr. Taub, but they did not consent to anything. For the Second Circuit to suggest that other law firms may have been extorted of property demonstrates the incoherence of the Hobbs Act charges against Mr. Silver.

### B.    The Government Must Elect a Single Theory of Hobbs Act Extortion Before Trial

After the first trial, the Court denied Mr. Silver's Rule 29 and Rule 33 motions and upheld the Hobbs Act asbestos convictions, finding that:

> [U]nder color of official right, Dr. Taub transferred to Silver valuable contact information for potential mesothelioma clients, which is the latter—extortion . . . . A rational juror could also have concluded that Dr. Taub transferred the information about the mesothelioma leads to Silver because he "asked" for them under color of official right . . . . Silver made known to Dr. Taub that he wanted Dr. Taub to send mesothelioma referrals to Silver at Weitz & Luxenberg . . . . Moreover, the fact that Silver sought out Dr. Taub to complain that Dr. Taub was passing fewer leads to him and that he wanted to obtain more leads further confirmed the conclusion the jury reached—Dr. Taub was extorted under color of official right to transfer valuable mesothelioma leads to Silver.

ECF No. 294 at 20-21 (internal citations omitted). The Court also upheld the Hobbs Act real estate convictions, finding sufficient evidence for a jury to conclude that the developers' tax certiorari business was both valuable and transferable. *Id.* at 21-22.

The Supreme Court made clear in *Evans* that there are two independent ways for the government to prove Hobbs Act extortion "under the color of official right." First, the defendant's conviction in *Evans* was based on a bribery theory—that the defendant, a county official, had accepted $8,000 in bribes in exchange for his vote in favor of certain rezoning sought by the bribe payer—a quid pro quo. 504 U.S. at 257. The Court affirmed the conviction and held that Hobbs Act extortion "under the color official right" included "the rough equivalent of what we would now describe as 'taking a bribe.'" *Id.* at 260. The Court acknowledged that common law extortion also covered the more commonly understood theory of extortion "under the color of official right," where a public official wrongfully obtains property from his or her victim under a false pretense of official right. *Id.* at 269-70. However, the Court rejected the dissent's view that common law extortion, and hence the Hobbs Act, was limited to this traditional theory of extortion only, and not the bribery theory that formed the basis of the defendant's conviction in that case. *Id.*

While the Hobbs Act covers both traditional extortion and bribery extortion "under the color of official right" after *Evans*, the two charges are inherently conflicting and mutually exclusive. That is, a defendant cannot be convicted of both extorting a victim in the traditional sense and accepting a bribe from that person based on a single set of facts. *See Evans*, 504 U.S. at 283 (Thomas, J., dissenting) ("Where extortion is at issue, the public official is the sole wrongdoer; because he acts 'under color of office,' the law regards the payor as an innocent victim and not an accomplice . . . . With bribery, in contrast, the payor *knows* the recipient official is not entitled to the payment; he, as well as the official, may be punished for the offense.") (internal citations omitted). The Supreme Court made clear in *Sekhar* and *Scheidler* that the Hobbs Act, enacted in 1946, was modeled after the New York State extortion statute.

26

*Sekhar*, 133 S. Ct. at 2725; *Scheidler*, 537 U.S. at 403. At that time, New York law considered bribery and extortion to be "mutually exclusive" crimes, and where a defendant accused of extortion raised a defense that the supposed victim had paid him a bribe, the defendant "was entitled to have the jury instructed that if the [victim] were guilty of bribery, the [defendant] could not be guilty of extortion." *People v. Feld*, 28 N.Y.S.2d 796, 797-98 (N.Y. App. Div., 2d Dep't 1941). While the "mutual exclusivity" of the New York law bribery and extortion offenses was later eliminated by statute, that did not happen until 1965, approximately 20 years after the enactment of the Hobbs Act. *See United States v. Addonizio*, 451 F.2d 49, 77 n. 35 (3d Cir. 1971).

As a result, under the statutes at issue here, a single set of facts can only constitute both honest services fraud and Hobbs Act extortion if the government proceeds on a bribery theory alone as to the latter. However, the superseding indictment alleges *both* a bribery theory of Hobbs Act extortion and the traditional theory of extortion as to the real estate developers. Paragraphs 13(b) to 13(f) describe the bribery theory, since Mr. Silver is alleged to have exchanged official acts for the tax certiorari referral fees. On the other hand, the government also pursues the traditional theory when it alleges that, even though Mr. Silver had no tax certiorari experience, he obtained tax certiorari business from Glenwood and Witkoff, whose businesses depended in part on obtaining favorable official action from Mr. Silver. Superseding Indictment ¶ 13(a).

The asbestos scheme allegations only describe a bribery theory of Mr. Silver exchanging the mesothelioma leads for official acts in favor of Dr. Taub. Superseding Indictment ¶¶ 22-23. To confuse the matter further, during the first trial, while the government seemed primarily to argue a bribery theory as to the alleged asbestos scheme, it also argued that "Sheldon Silver got

those leads from Dr. Taub and passed them on to Weitz & Luxenberg and he did that using his official power," suggesting a traditional extortion theory that is not alleged in the superseding indictment. Tr. at 2921. On the real estate side, the government certainly argued the traditional theory of extortion, repeatedly describing the "tiger by the tail" analogy, adding in a school yard bully analogy, and even describing Mr. Silver's referral of the developers' tax certiorari business to Goldberg & Iryami as follows: "he used that state leverage, that official leverage to hit them up and get them to move their business so that he could make hundreds of thousands of dollars off of them." Tr. at 2895.

It appears from the Court's Rule 29 Order quoted above that the Court found that the government proved a traditional theory of Hobbs Act extortion as to Dr. Taub. ECF No. 294 at 20-21. Setting aside that the superseding indictment did not allege traditional Hobbs Act extortion as to Dr. Taub, the glaring defect with this blurring of the lines between traditional extortion and bribery is that undeniably, the jury was only instructed on a bribery theory: "In addition, as was the case when I charged you on honest services fraud, the extortion counts require the Government to prove, beyond a reasonable doubt, the existence of a quid pro quo." ECF No. 135 at 23:12-14.

It is one thing for the government to argue a theory that was not alleged in the superseding indictment. It is far more problematic to base a criminal conviction on a theory not alleged in the indictment. But it is impossible for a criminal conviction to be based on a crime that was not even charged to the jury. *Cole v. Arkansas*, 333 U.S. 196, 201 (1948) ("It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made.") (internal citation omitted).

All of this is to say that the Hobbs Act extortion allegations against Mr. Silver are utterly confusing, and the government's conflicting theories are simply irreconcilable with the language of the Hobbs Act and the jury instructions from the first trial. Mr. Silver renews his argument that no one in the alleged schemes was deprived of any property, as required by *Sekhar*, 133 S. Ct. at 2725, and so the Hobbs Act counts should be dismissed for failure to state an offense. Further, given the utter confusion caused by the conflicting theories of Hobbs Act extortion[17] alleged by the government in the same counts of the superseding indictment, at the very least this Court should order the government to elect a single theory in advance of trial to avoid the chaos and potential variance issues caused by inherently conflicting and impossibly confusing charges going to the jury. Fed. R. Crim. P. 12(b)(3)(B)(i); *see United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981) (recognizing the policy considerations underlying the doctrine of duplicity "include avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, [and] assuring the defendant adequate notice . . . .").

## IV.  THE SUPERSEDING INDICTMENT'S FORFEITURE ALLEGATIONS SHOULD BE DISMISSED TO THE EXTENT THEY SEEK TO FORFEIT PROPERTY THAT IS NOT TRACEABLE TO THE ALLEGED OFFENSES

A "district court may impose forfeiture of '[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . 'specified unlawful activity,'' including wire fraud[,]" mail fraud, Hobbs Act extortion, and Section 1957 money laundering. *United States v. Goldberg*, 661 F. App'x 33, 37 (2d Cir. 2016) (summary order), *cert. denied*, 137 S. Ct. 1105 (2017) (quoting 18 U.S.C. § 981(a)(1)(c) and citing 18 U.S.C. §§ 1956(c)(7), 1961(1)).

---

[17]     The traditional theory of Hobbs Act extortion likewise inherently conflicts with honest services fraud bribery charges based on the same facts.

Property is traceable to an unlawful activity where the government can "establish a nexus between the forfeitable property or proceeds and the illegal activity by a preponderance of the evidence." *Id.* (internal citations omitted); *see* Fed. R. Crim. P. 32.2(b)(1)(A). Here, however, despite the superseding indictment's allegation that Mr. Silver "received nearly $4 million in illegal payments through two law firms," Superseding Indictment ¶ 8, and the government's argument at trial that Mr. Silver received a total of $3.9 million in illegal payments, *see* Westfal Aff. Ex. 4 (GX 1515), Mr. Silver was ordered to forfeit $5,393,976.63 following the first trial. *See* ECF No. 297 (Amended Judgment in a Criminal Case dated May 10, 2016). The government's forfeiture allegations should be dismissed to the extent they seek forfeiture of any amount above the alleged $3.9 million as such assets are not traceable to the alleged offenses.

## CONCLUSION

For the foregoing reasons, the superseding indictment should be dismissed, or at a minimum substantially narrowed as set forth herein.

Dated: February 16, 2018                    Respectfully submitted,
     New York, New York


                                      /s/ Michael S. Feldberg
                                 Michael S. Feldberg
                                 Andrew Rhys Davies
                                 Michael F. Westfal
                                 Rebecca Ann Naeder

                                 ALLEN & OVERY LLP
                                 1221 Avenue of the Americas
                                 New York, NY 10020
                                 Telephone: (212) 610-6300
                                 Facsimile: (212) 610-6399

                                 *Attorneys for Defendant*