UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -*v.*-                                                    :        S1 15 Cr. 93 (VEC)

SHELDON SILVER,                                      :

                  Defendant.           :

-------------------------------------------------------------x


### MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S MOTIONS *IN LIMINE*


GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
Attorney for the United States of America

Tatiana R. Martins
Daniel C. Richenthal
Damian Williams
Assistant United States Attorneys

- Of Counsel –

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ....................................................................................... 2

I.    EVIDENCE THAT THE DEFENDANT REPEATEDLY FAILED TO DISCLOSE THE TRUTH IS RELEVANT AND ADMISSIBLE REGARDLESS OF WHETHER HE HAD AN AFFIRMATIVE DUTY TO DISCLOSE........................................................ 2

II.   THE DEFENDANT IS NOT ENTITLED COUNTERFACTUALLY TO SEPARATE THE REAL ESTATE DEVELOPERS' TAX CERTIORARI BUSINESS FROM THE FEES THAT HE RECEIVED FROM THAT BUSINESS.............................................. 10

       A. Applicable Law ...................................................................... 11

              1. Constructive Amendment and Prejudicial Variance..............................11

              2. Hobbs Act Extortion and Honest Services Fraud …………………….........11

       B. Discussion............................................................................... 14

III.  THERE IS NO BASIS IN LAW OR LOGIC TO PRECLUDE EVIDENCE AND ARGUMENT ON WHAT THE DEFENDANT TERMS A "TRADITIONAL EXTORTION THEORY"............................................................................. 18

IV.   THE INTENT AND UNDERSTANDING OF GLENWOOD'S AGENTS IS RELEVANT AND ADMISSIBLE.................................................................. 21

V.    THE COURT PREVIOUSLY AND PROPERLY RULED THAT EVIDENCE OF GLENWOOD'S POLITICAL CONTRIBUTIONS IS RELEVANT AND ADMISSIBLE …………………………………………………………………………………………23

VI.   THAT THE DEFENDANT COMMENCED HIS SCHEMES BEFORE THE STATUTE OF LIMITATIONS DOES NOT RENDER EVIDENCE THAT HE DID SO IRRELEVANT OR UNFAIR ........................................................................ 25

VII.  THE DEFENDANT'S VARIOUS RULE 403 ARGUMENTS ARE MERITLESS....... 26

       A. The Nature Of The Defendant's Investments Is Relevant And Admissible …………26

       B. Dr. Taub's Present Employment Status Is Relevant And Admissible ………………28

       C. Evidence Of The Nature Of The Rent Act Of 2011 Is Relevant And Admissible …..29

D. Proof That The Defendant Sought Employment For His Mother-In-Law Is Relevant And Admissible …………………………………………………………………………30

E. The Defendant's Conversation With Michael Whyland About His Father Is Relevant And Admissible …………………………………………………………………………31

F. Jonathan Taub's Initial Job Performance At Ohel Is Relevant And Admissible …….33

VIII. THERE IS NO BASIS TO PRECLUDE THE GOVERNMENT FROM ASKING WITNESSES ABOUT NON-PROSECUTION AGREEMENTS OR IMMUNITY ....... 34

IX. THE DEFENDANT'S ASSERTIONS THAT THE GOVERNMENT "SHOULD BE LIMITED TO ACCURATE STATEMENT OF LAW" AND "ACCURATE STATEMENTS OF EVIDENCE" ARE NOT MOTIONS *IN LIMINE* AND ARE PREMISED ON CHERRY-PICKED SNIPPETS ........................................................... 35

A. Alleged Misstatements Of Law ................................................................. 37

B. Alleged Misstatements Of Fact ................................................................. 42

CONCLUSION ............................................................................................................. 52

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA            :

    *-v.-*                              :      S1 15 Cr. 93 (VEC)

SHELDON SILVER,                 :

                       Defendant.     :

---------------------------------------------------------------x

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO THE DEFENDANT'S MOTIONS *IN LIMINE***

      The Government respectfully submits this memorandum of law in opposition to the defendant's motions *in limine* dated March 9, 2018.

**PRELIMINARY STATEMENT**

      Over the course of a 72-page brief ("Def. Mem."), the defendant asks for myriad rulings. But while styled as motions *in limine*, the first 40 pages of his brief do not contain any such cognizable motions.  Rather, they consist of hyperbolic attacks on the Government.  According to the defendant, during its summations at the first trial, the Government repeatedly and materially misstated both the law and the evidence.  The Government did no such thing, as is apparent when the purported misstatements to which the defendant now points—but to which, with exceedingly few exceptions, he did not object—are placed in context.  Stripped of rhetoric, the defendant's claim appears to be that the Government made arguments grounded in legal doctrines or inferences with which he disagrees.  That is not a claim that the law recognizes.  In any event, the defendant is no more entitled to an advisory ruling with respect to possible jury arguments at the retrial than the Government would be entitled to one.  The Court can and should reject the defendant's first set of motions, to the extent they are motions, on this ground alone.

The next 32 pages of the defendant's brief contain motions *in limine* on numerous subjects, ranging from the purported irrelevance of the defendant's repeated omissions, to arguments concerning the tax certiorari business that the defendant steered to a law firm from which he was receiving referral fees, to evidence of campaign contributions, to the scope of questions concerning non-prosecution agreements.  Multiple of these subjects were litigated and decided before or during the first trial, and the defendant offers no cogent basis for the Court to revisit its decisions.  Other rulings that the defendant seeks, while new in whole or in part, have no basis in law or logic.  None is warranted.  Because this second set of motions can and should be denied under law of the case or on the merits, the Government addresses them first.

## ARGUMENT

**I.  EVIDENCE THAT THE DEFENDANT REPEATEDLY FAILED TO DISCLOSE THE TRUTH IS RELEVANT AND ADMISSIBLE REGARDLESS OF WHETHER HE HAD AN AFFIRMATIVE DUTY TO DISCLOSE**

The defendant moves to preclude any evidence showing that he failed to disclose to the public or to others the payments that he received from Dr. Taub and/or the real estate developers absent a showing that the defendant had an affirmative duty to disclose such information at the time he failed to do so.  (Def. Mem. 42-47.)  In the defendant's view, "an omission cannot constitute an act of concealment or evidence of consciousness of guilt if a defendant had no duty to disclose such information in the first place."  (*Id.* 42.)  Accordingly, the defendant asserts, absent a showing that he owed an affirmative duty to disclose what he describes as mere "potential conflicts of interest" (*id.*), the Government should be precluded from presenting any evidence whatsoever to support the allegations in the Superseding Indictment that he failed to disclose to the public and to others—including his legislative colleagues, staff, other co-workers, and associates—the "true nature of his relationship" with Dr. Taub, the real estate developers, and Goldberg & Iryami (*id.* 43 (citing Superseding Indictment ¶¶ 26(a), (d))).  The defendant

also seeks to preclude any evidence regarding his failure to disclose his referral fees from Goldberg & Iryami for the same reason.  (*Id.* 46.)

The defendant's novel attempt to preclude evidence of concealment and consciousness of guilt in a public honest services fraud and extortion prosecution should be swiftly rejected. Moreover, at least with respect to his disclosure forms (*see id.* 46-47), this Court has already rejected this argument (*see* 10/16/2015 Conf. (Dkt. No. 319) (Oral Argument on Motions *in Limine*)), and the defendant raises no compelling considerations as to why this Court should reconsider its decision.

As an initial matter, the defendant's suggestion that evidence of his omissions is only relevant if the Government can first show that he had an affirmative duty to disclose what he describes as potential conflicts of interest is a red herring.  Regardless of whether the defendant had such a duty, the Government expects the evidence to show (as it did at the first trial) that he did not disclose (a) his relationships with Dr. Taub or the real estate developers or (b) the payments that he received as a result, to anybody, at any point, for decades—while, at the same time, giving a false impression about the bases of his outside income and his legal work.  The question before this Court is not whether the defendant was *required* to disclose what he repeatedly did not (although there is a strong argument, as discussed below, that he was).  The question is whether his failure to do so, despite numerous opportunities, including at the time he took actions to benefit those from whom he was receiving benefits, is *relevant* to the jury's determination of whether he is guilty of the crimes with which he is charged.  The answer is yes.

The Second Circuit has repeatedly recognized that "evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions."  *United States v. Rosen*, 716 F.3d 691,

702 (2d Cir. 2013) (affirming denial of Rule 29 motion in honest services bribery prosecution where circumstantial evidence of *quid pro quo* included timing of payments to legislators, importance of official action to payor, and failure to disclose payments).  Thus, "[i]n cases involving public officials, a trier of fact may 'infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt.'"  *Id.* (quoting *United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011)); *see also United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988) (jury can infer the existence of an illegal *quid pro quo* "from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt").

The defendant does not acknowledge this uncontroversial point or offer a cogent argument as to why the jury could not reasonably view evidence of his repeated concealment and omissions as evidence that he knew he was engaged in wrongdoing, particularly in light of his related public statements.  A rational jury surely could.  As this Court explained in denying the defendant's motion for acquittal or a new trial, "a rational juror could conclude that Silver's financial forms and disclosures to the press . . . were far from forthright and thus were evidence of consciousness of guilt."  *United States v. Silver*, 184 F. Supp. 3d 33, 44-45 (S.D.N.Y. 2016); *see also id.* at 46 ("Although Silver quibbles with evidence introduced as proof of consciousness of guilt, a rational jury could have relied on that evidence to infer that Silver believed his relationships with Witkoff and Glenwood were unlawful." (citation omitted)).  (*See also* Dkt. No. 319, at 37 (Court: "In the context of this case, the failure to disclose that he was receiving money from a law firm involving real estate certainly is substantial circumstantial evidence that [the Government] will use to argue that the relationship with Glenwood was corrupt.").)

The defendant appears to suggest that, as a factual matter, such a conclusion would be wrong.  (Def. Mem. 43-44.)  And to be sure, at trial, the defendant will be free to argue that the jury should not place any weight on evidence of his concealment and omissions because there is, in his view, insufficient evidence that he believed that he had a duty to inform others that he was receiving payments from Weitz & Luxenberg as a result of referrals by Dr. Taub, and payments from Goldberg & Iryami as a result of business from Glenwood and Witkoff.  But that the defendant may make such an argument does not make the evidence that he challenges "irrelevant" (*id.* 44).

It is settled law that the Federal Rules of Evidence have a "very low standard" for relevance.  *United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008).  *See also, e.g.*, *United States v. Quattrone*, 441 F.3d 153, 188 (2d Cir. 2006) ("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry."); *United States v. Ravich*, 421 F.2d 1196, 1204 n.10 (2d Cir. 1970) (Friendly, J.) ("The length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved . . . does not render the evidence irrelevant.").  In short, that the defendant hopes the jury will accept his view of the evidence over the Government's view of the evidence is not a basis to prevent the jury from considering the evidence for itself.  *See, e.g.*, *United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) ("Evidence need not be conclusive in order to be relevant.  Nonconclusive evidence should still be admitted if it makes a proposition more probable than not; factors which make evidence less than conclusive affect only weight, not admissibility." (internal quotation marks and citation omitted)).

Nor is there a basis to preclude the evidence under Federal Rule of Evidence 403. The defendant's sole argument to the contrary is identical to his argument as to why the evidence is purportedly irrelevant, namely, he had no affirmative "duty to disclose." (Def. Mem. 45; *see also id.* 46.) That argument is for the jury. *See, e.g.*, *Schultz*, 333 F.3d at 416; *United States v. Diaz*, 878 F.2d 608, 615 (2d Cir. 1989) ("The logical inferences resulting from proffered evidence do not engender the unfair prejudice against which Rule 403 is directed. Defendants' substantial objection here pertains to the probative value of the challenged government evidence. Rule 403 does not provide an independent basis for defendants' challenge to this evidence." (internal quotation marks and citations omitted)).

Indeed, not only is there no basis to preclude the evidence that the defendant challenges, but doing so would be unfairly prejudicial to the Government. Without testimony about the defendant's concealment from his own staff and others, the jury would be misled into believing that certain witnesses took steps relevant to this case with full information about the defendant's source of income and actions, and thus implicitly agreed with or signaled to the defendant that his actions were acceptable—when they had no such knowledge, reached no such conclusion, and could have sent no such signal. For example, Victor Franco, the Deputy Budget Director of the Assembly's Ways and Means Committee, testified at the first trial and is expected to testify again that he facilitated paperwork to execute two Heath Care Reform Act ("HCRA") grants to Dr. Taub. Without establishing that Mr. Franco did not know that the defendant was receiving valuable mesothelioma case leads from Dr. Taub at the time of the grants, the jury would be left with the impression that Mr. Franco agreed to process the grants knowing full well, and accepting, the defendant's significant conflict of interest. That impression would be false, and misleadingly so.

The defendant's motion can and should be denied for the foregoing reasons alone.  But even if the defendant were correct that the Government first needed to establish that he had an affirmative duty of honesty and loyalty for the evidence that he challenges to be relevant—and the defendant is not correct—the defendant *did* have such a duty by virtue of his position as a public official that is independent of any duty created or not created under state law.  *See United States v. Margiotta*, 688 F.2d 108, 124 (2d Cir. 1982) ("At the outset, we reject [the] contention that absent a showing of a violation of New York statute or a duty imposed by New York law, a defendant may not be found guilty of using the mails in furtherance of a scheme to defraud on the basis of a breach of a fiduciary duty to the citizenry."), *overruled on other grounds by McNally v. United States*, 483 U.S. 350 (1987); *United States v. Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997) ("Elected officials generally owe a fiduciary duty to the electorate."); *United States v. deVegter*, 198 F.3d 1324, 1328 (11th Cir. 1999) (contrasting the source of the duties owed by private and public sector fiduciaries and noting that "public officials inherently owe a fiduciary duty to the public to make governmental decisions in the public's best interest"). That is because, for purposes of Section 1346, "a public official acts as trustee for the citizens and the State and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty to them."  *United States v. Sawyer*, 239 F.3d 31, 39 (1st Cir. 2001) (internal quotation marks omitted; ellipsis incorporated); *see also Skilling v. United States*, 561 U.S. 358, 407 n.41 (2010) ("The existence of a fiduciary relationship, under any definition of that term, was usually beyond dispute; examples include public official-public[.]") (citation omitted).  The jury instructions given at the first trial (to which the defendant did not object) informed the jury of this foundational concept:

> A public official owes a duty of honest and faithful service to the
> public he serves and to his public employer.

> When a public official obtains a corrupt payment in exchange for
> official action taken or to be taken, the official has breached his duty
> of honest service.

(Tr. 3094-95; *see* also Tr. 3094 (instructing that "false representations" under the honest services

fraud statute include "deceitful statements of half-truths or the concealment of material facts")).)

Accordingly, evidence that the defendant concealed information relevant to the proper exercise

of his duty of honest and faithful service through omissions and half-truths is admissible as direct

evidence. *See United States v. Sawyer*, 85 F.3d 713, 724 (1st Cir. 1996) ("A public official has

an affirmative duty to disclose material information to the public employer.").

The cases cited by the defendant does not compel a different conclusion. Rather than

engage with the fact that this is a public honest services fraud and extortion case—and thus

evidence of concealment and omissions is evidence of the charged crimes, not the actual crimes

themselves—the defendant invokes cases where an omission *is* the alleged crime, and then

asserts that, in such cases, "an omission can only constitute a false representation if the defendant

had a duty to disclose such information." (Def. Mem. 41.) This assertion, even if true, is

irrelevant.

For example, in *United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008) (cited at Def.

Mem. 41), the Second Circuit held that the defendant could not be found guilty of securities

fraud simply because he violated an industry regulation without "some proof of manipulation or

a false statement, breach of a duty to disclose, or deceptive communicative conduct," which the

court explained was required to establish a violation under the pertinent securities statute,

Section 10(b). *Id.* at 148 (internal quotation marks omitted). The court reasoned that, even

though some customers may have expected that the defendant would not engage in a practice

that violated industry rules, "unless their understanding was based on a statement or conduct by [him]," he could not have violated Section 10(b).  *Id.* at 150.

*Finnerty* has nothing to do with this case.  "[T]he concept of deprivation of honest services is not part of the definition of fraud occurring in the securities laws . . .  [and] has no application to securities fraud offenses."  *United States v. Nouri*, 711 F.3d 129, 141 (2d Cir. 2013).  In any event, unlike in *Finnerty* (or in any similar case), the defendant here is not charged with failing to comply with a disclosure rule, where the failure is the alleged crime.  He is charged with corruption schemes in which he exchanged official acts (or failures to act) for personal benefits.  During his commission of those schemes, he lied to and/or hid the truth from, among others, the public (through the press and in his disclosure forms); his staff who helped process HCRA grants; his fellow legislators; and his private employer, who is expected to testify (consistent with the first trial) that his law firm (Weitz & Luxenberg) took affirmative steps to seek to eliminate the types of conflicts inherent in employing the defendant that the defendant himself hid from them (*see* Tr. 187 (testimony of Perry Weitz) (Q: "Why did the firm decide not to handle any more cases involving the State of New York after it hired Sheldon Silver?"  A: "We just didn't want to have any conflict of interest.")).  The relevance of the evidence that the defendant challenges is not that it *is* the crime, but that it shows that the defendant understood himself to be engaged in wrongdoing.  The jury is entitled to weigh that evidence.

The defendant's reliance on *United States v. Weyrauch*, 623 F.3d 707 (9th Cir. 2010), fares no better.  The defendant asserts that *Weyrauch* ruled on "precisely" the issue that a failure to disclose conflicts of interest cannot be evidence of consciousness of guilt absent an affirmative duty to disclose.  (Def. Mem. 42.)  *Weyrauch* said no such thing.  The only issue in *Weyrauch* was whether the government could prove an honest services fraud against two

9

legislators solely by showing that they did not disclose a conflict of interest. Unsurprisingly, on remand from the Supreme Court in light of its decision in *Skilling*, the Ninth Circuit stated that "nondisclosure of a conflict of interest is no longer a basis for prosecution under" Section 1346. The court then cautioned that it "express[ed] no opinion whether the evidence is otherwise admissible, or whether the government has alleged facts sufficient to pursue a § 1346 prosecution consistent with *Skilling*." 623 F.3d at 708.

Here, as the Court is well aware, the Government does not intend to prove the defendant guilty merely by showing that he had undisclosed conflicts of interest. Rather, it intends to prove the defendant guilty by showing that he sought to and did engage in bribery and extortion, as charged. Evidence of the defendant repeatedly hiding his conflicts of interest is not "factually irrelevant" (Def. Mem. 44) simply because the Government must show more to prove him guilty. On the contrary, the evidence easily meets the low standard of relevance and is admissible both to show the defendant's corrupt intent through his concealment of facts and relationships that were material to individuals with whom he interacted during the course of his schemes and to show his consciousness of guilt.

## II.   THE DEFENDANT IS NOT ENTITLED COUNTERFACTUALLY TO SEPARATE THE REAL ESTATE DEVELOPERS' TAX CERTIORARI BUSINESS FROM THE FEES THAT HE RECEIVED FROM THAT BUSINESS

The defendant next seeks to preclude the Government from arguing that the defendant received bribes in the form of the real estate developers' tax certiorari business (as opposed to the referral fees such business generated). (Def. Mem. 47-50.) In support of this motion, the defendant suggests that any argument that the tax certiorari business constituted bribes would constitute a "variance" from the Superseding Indictment. (*Id.* 49.) This suggestion is meritless.

As an initial matter, a variance claim is a procedural vehicle through which a defendant may challenge his conviction, not a basis to preclude evidence before trial. Moreover, it is settled law that there is no variance where a defendant has sufficient notice of the core conduct alleged to have been criminal. The defendant here certainly does—as his motion itself demonstrates. In any event, the artificial and counterfactual distinction that the defendant draws between the tax certiorari business and the fees it generated is just that. The defendant is not entitled to preclude the Government from presenting the full story of how he intended to and did benefit from his corrupt scheme, as charged in the Superseding Indictment, proven at the first trial, and expected to be proven again.

### A.     Applicable Law

#### 1.   Constructive Amendment and Prejudicial Variance

To prevail on a constructive amendment claim, "a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Frank*, 156 F.3d 332, 337 (2d Cir. 1997); *accord, e.g.*, *United States v. Rigas*, 490 F.3d 208, 227 (2d Cir. 2007). The prohibition against constructive amendment rests on two concerns: "first, that [the indictment] contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, that it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Rigas*, 490 F.3d at 228 (internal quotation marks omitted).

"[N]ot all modifications constitute constructive amendments." *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003). Rather, the Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the 'core of criminality' to be proven at trial." *United States v. Patino*, 962 F.2d 263, 266 (2d Cir.

11

1992) (quoting *United States* v. *Heimann*, 705 F.2d 662, 666 (2d Cir. 1983)).  Put differently, in

assessing whether or not a constructive amendment has occurred, "[t]he critical determination is

whether the allegations and the proof 'substantially correspond.'"  *United States v. Danielson*,

199 F.3d 666, 670 (2d Cir. 1999) (quoting *Patino*, 962 F.2d at 266).  The Second Circuit has

explained that not only is no more required, but requiring more would be unworkable.  *See*

*Heimann*, 705 F.2d at 666 ("[P]roof at trial need not, indeed cannot, be a precise replica of the

charges contained in an indictment.").

The Second Circuit has also explained that the "core of criminality" is "the essence of a

crime, in general terms," and not "the particulars of how a defendant effected the crime."  *United*

*States v. D'Amelio*, 683 F.3d 412, 417-18 (2d Cir. 2012).  An indictment has not been

constructively amended where its allegations and the proof at trial both relate to a "single set of

discrete facts," or form "part of a single course of conduct" with the same "ultimate purpose."

*Id.* at 419-21.  In contrast, an indictment may be found to have been constructively amended

where there is a "substantial likelihood" that "the jury convicted based on a complex of facts

distinctly different from that which the grand jury set forth in the indictment."  *Id.* at 416, 419

(internal quotation marks omitted).

In contrast to a constructive amendment, a variance may be found "when the charging

terms of the indictment are left unaltered, but the evidence at trial proves facts materially

different from those alleged in the indictment."  *D'Amelio*, 683 F.3d at 417 (citing *Salmonese*,

352 F.3d at 621).  A "defendant alleging variance must show 'substantial prejudice.'"  *Rigas*,

490 F.3d at 226 (quoting *United States* v. *McDermott*, 918 F.2d 319, 326 (2d Cir. 1990)); *see*

*also, e.g.*, *United States* v. *Dupre*, 462 F.3d 131, 140 (2d Cir. 2006).  A variance is not

prejudicial "where the allegation and proof substantially correspond, where the variance is not of

12

a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *United States* v. *Mucciante*, 21 F.3d 1228, 1236 (2d Cir. 1994) (internal quotation marks omitted).

In evaluating prejudice, courts take into account, among other things, pretrial disclosures made that put the defendant on notice of the conduct at issue. *See Dupre*, 462 F.3d at 141 (the government's pretrial disclosures placed defendant on notice of conduct at issue at trial, even if that conduct lay outside terms of the indictment); *United States v. Choullam*, No. 05 Cr. 523 (LTS), 2008 WL 3861356, at *3 (S.D.N.Y. Aug. 19, 2008) (declining to find variance, and noting that "even if the Government's proof of the subset conspiracy could be construed to constitute a variance from the broader conspiracy described in the indictment, the Court concludes that no substantial prejudice resulted" because, among other things, the defendant received the Government's 3500 material nearly two weeks before trial), *aff'd,* 346 F. App'x 619 (2d Cir. 2009); *see also, e.g.*, *United States v. Ratliff-White*, 493 F.3d 812, 823 (7th Cir. 2007) (no prejudice to defendant given Rule 16 disclosures) (citing *Dupre*, 462 F.3d at 141).

### 2.  Hobbs Act Extortion and Honest Services Fraud

A Hobbs Act prosecution may lie where the extorted payments are transferred to third parties rather than the public official directly. *See Margiotta*, 688 F.2d at 133; *see also United States v. Green*, 350 U.S. 415, 420 (1956) (extortion, as defined in Hobbs Act, "in no way depends upon having a direct benefit conferred on the person who obtains the property"); *Town of W. Hartford v. Operation Rescue*, 915 F.2d 92, 101 (2d Cir. 1990) ("There is no requirement that the perpetrator of an extortion receive the benefit of his act."); *United States v. Clemente*, 640 F.2d 1069, 1079-80 (2d Cir. 1981) ("[W]hether a Hobbs Act defendant personally receives any benefit from his alleged extortion is largely irrelevant for the purpose of determining guilt

under that Act."); *United States v. Haimowitz*, 725 F.2d 1561, 1577 (11th Cir. 1984) ("[A] Hobbs Act prosecution is not defeated simply because the extorter transmitted the extorted monies to a third party."); *United States v. Jacobs,* 451 F.2d 530, 535 (5th Cir. 1971) ("Under § 1951 . . . it is not necessary to show that a person charged with extortion or attempted extortion actually received any benefit.");

Similarly, in affirming a recent honest services fraud conviction, the Second Circuit rejected the argument that a fiduciary must himself receive the payoff, and noted that "payoff schemes have been viewed as involving kickbacks when the defendant has directed that the contracting party's profit be shared with family, friends, or others loyal to the defendant." *See United States v. DeMizio*, 741 F.3d 373, 382 (2d Cir. 2014) (collecting cases).

### B.      Discussion

There is simply no plausible way to read the Superseding Indictment or case law as supporting the proposition that the Government should be precluded from arguing at trial that the tax certiorari business that the defendant directed to Goldberg & Iryami was part of the charged bribery and extortion schemes, but rather may argue only that the fees that the defendant personally received were.  Without the business, there are no fees.  The story is one and the same.  It plainly is part of the "same elaborate scheme to defraud" the public and to extort benefits from businesses that depended on the defendant for official action that is described—in great detail—in the Superseding Indictment.  *See generally United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012) (evidence is "direct evidence" when "it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial" (internal quotation marks omitted)).

Indeed, as the defendant acknowledges but seeks to downplay (*see* Def. Mem. 50), the Superseding Indictment describes both the referral fees and the tax certiorari business as part of the same scheme. *See, e.g.*, Superseding Indictment ¶ 8(b) (describing the payments received by the defendant "through" Goldberg & Iryami "in exchange for using his official position to obtain recurring tax certiorari legal claims" of the real estate developers); ¶ 12 (the defendant "used the power and influence of his official position to obtain Tax Certiorari Business of two real estate developers" with significant business before the State "*for* the Real Estate Law firm [Goldberg & Iryami])," and in exchange for "his receipt of illegal payments *through* the Real Estate Law Firm," the defendant took official actions to benefit the real estate developers (emphases added)); ¶ 13(a) (the defendant "*obtained* Tax Certioriari Business of Deverloper-1 and Developer-2 . . . *for* the Real Estate Law Firm" (emphasis added)). The Court was correct in recently noting that to the extent that the defendant suggests otherwise, he "is slicing the allegations against him too thinly." *United States v. Silver*, No. 15 Cr. 93 (VEC), 2018 WL 1406617, at *6 n.7 (S.D.N.Y. Mar. 20, 2018). In any event, however he may slice the literal allegations in the Superseding Indictment, the defendant does not contest that he has long been on notice of the core conduct—indeed, of far more than just the core conduct—with which he is charged. There accordingly would be no variance, much less a prejudicial one, from presentation of this conduct at trial. *See, e.g.*, *Dupre*, 462 F.3d at 141. Nor does the defendant contest that the evidence of the tax certiorari business is not separable from evidence that he received fees from that business.

The defendant argues that the Government nevertheless should be precluded from arguing that the tax certiorari business constituted bribes because the "to wit" clauses of certain counts refer only to referral fees. (Def. Mem. 49 (citing Superseding Indictment ¶¶ 37, 39).) This argument is meritless. The defendant is not at risk of suffering from a prejudicial variance

because the to wit clauses—which are only a small piece of the Superseding Indictment, and are not intended to, nor could, describe all details of the schemes—focus on referral fees, when the Superseding Indictment otherwise describes the schemes in detail (including in paragraphs expressly incorporated by reference in the pertinent counts (*see* Superseding Indictment ¶¶ 38, 40)), and the defendant is well aware of the evidence that he seeks to preclude.  Indeed, he makes no claim of prejudice.  And that is unsurprising, because there would be no basis for any colorable claim of prejudice given the elaborate scheme described in the Superseding Indictment.  *Cf. Dupre*, 462 F.3d at 141 (declining to find prejudice when "the evidence at trial concerned the same elaborate scheme to defraud investors as was described in the indictment").  What is more, the defendant has been privy not only to 3500 material, exhibits and other materials *years* in advance of the forthcoming retrial, but also has sat through a five-week trial in which the Government presented the very evidence and arguments that he now seeks to preclude.[1]

Nor would the defendant suffer from a constructive amendment (and he does not contend otherwise).  *See D'Amelio*, 683 F.3d at 422 ("[T]he *specific means* used by a defendant to effect his or her crime does constitute an 'essential element' of the offense and, therefore, proof of specific means apart from those charged in the indictment does not constructively amend the indictment." (emphasis in original)); *United States v. Agrawal*, 726 F.3d 235, 259-61 (2d Cir. 2013) (no constructive amendment or prejudicial variance where defendant's conviction rested on facts outside the "to wit" clause's recitation of the particular means of theft).

---

[1]     Moreover, the defendant previously litigated the pertinent underlying legal theory.  *See Silver*, 184 F. Supp. 3d at 47 ("this Court reads the Supreme Court's language in *Sekhar* merely to underscore the requirement that the victim must transfer the extorted property to the perpetrator (*or to a third party as directed by the perpetrator*)" (citations omitted) (emphasis added).  He cannot claim that he has insufficient notice that the Government will seek to argue it at trial.

*D'Amelio* in particular is instructive.  There, the defendant was convicted of enticing a minor based on his use of the internet and the telephone, but the "to wit" clause of the indictment had indicated only use of the internet as a means of enticement.  *D'Amelio*, 683 F.3d at 416.  In rejecting the defendant's constructive amendment argument, the Second Circuit held that the "core of criminality" alleged in the indictment and proven at trial was a "course of conduct [with] a single, ultimate purpose," *i.e.*, the enticement of the minor.  *Id.* at 421.  In other words, "[t]he 'core of criminality' of an offense involves the essence of a crime, in general terms."  *Id.* at 418.  "[T]he particulars of how [the] defendant effected the crime," *id.*, the court explained, "whether e-mails or telephone calls, took place as part of a single course of conduct," and thus did not alter the essence of the crime, *id.* at 421-22 (internal quotation marks omitted).

Here, as in *D'Amelio*, to the extent that one were to assume that the particular means and methods by which the defendant received the benefits he sought may not be fully laid out in the Superseding Indictment (although it is), the introduction of such evidence at trial, and the presentation of arguments based on it, does not remotely change the "core of criminality" or the "essence of the crime."  On the contrary, it is clear from the face of Superseding Indictment (and accords with both the evidence presented at the first trial and common sense) that the tax certiorari business and the resulting referral fees were part of a single course of conduct, the ultimate purpose of which was one and the same.  *See Dupre*, 462 F.3d at 140-41; *D'Amelio*, 683 F.3d at 416.  Put differently, the "essential element" of the crimes charged is that the defendant directed payments to an entity of his choosing in exchange for official acts.  The particular means through which he benefited from those payments (*i.e.*, whether they were sent directly to

him or to a third party, who then sent the defendant a cut) does not and cannot alter that essential element.

## III.    THERE IS NO BASIS IN LAW OR LOGIC TO PRECLUDE EVIDENCE AND ARGUMENT ON WHAT THE DEFENDANT TERMS A "TRADITIONAL EXTORTION THEORY"

In his most recent attempt to avoid a jury weighing his conduct, the defendant asserted that extortion under the Hobbs Act encompasses two "mutually exclusive crimes"—what the defendant termed the "traditional theory of extortion," and what he termed "bribery extortion"—and claimed that the extortion charges accordingly must be dismissed, or, in the alternative, the Government must "elect" a single theory.  (Dkt. No. 353, at 25-26.)  The Government noted in response that it is entirely proper for the Government to allege and argue different theories of guilt, including theories that may be in tension or inconsistent with each other, and that the only issue this raises is one of jury instructions.  (Dkt. No. 356, at 21.)  The Government also stated that, in any event, what the defendant appeared to distinguish from his case is "'extortion accomplished by fraud,'" a theory that is irrelevant here.  (*Id.* at 22 (quoting *Evans v. United States*, 504 U.S. 255, 269 (1992)).)  Rather, the Government explained:

> [W[hat is alleged in the Superseding Indictment; what was argued at trial; what the jury was told it needed to find (as the defendant appears to acknowledge (Def. Mem. 28)); what the Court explained the evidence showed the defendant did, *see Silver* Rule 29 Opinion, at 43 (describing evidence under the heading, "The Government Presented Sufficient Evidence of a Quid Pro Quo for a Rational Jury to Convict Silver of Honest Services Fraud and Extortion Under Color of  Official Right"); and what the Second Circuit affirmed as sufficient was precisely the bribery conduct that *Evans* held the Hobbs Act criminalizes: "that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts," 504 U.S. at 267.

(*Id.* at 21-22.)

18

The defendant now claims that because the Government "helpfully clarified" that it is not pursuing so-called "traditional extortion," it should be precluded "from arguing or suggesting" that the defendant participated in anything other than an entirely voluntary and mutually-agreeable decision between private parties and himself (Def. Mem. 54), and should specifically be precluded from introducing evidence or making an argument that the defendant intended to and did obtain money by seeking payment from those who were fearful of "alienating" him in his official capacity (*id.* 55).  This claim is baseless.

As the Government explained in its opposition to the defendant's motion to dismiss, and the defendant ignores, what the defendant accurately described as a form of extortion that does not involve anything akin to bribery—what he calls the "traditional theory of extortion"—is what *Evans*, which did not use that phrase, explained was a "taking[] under a false pretense of official right," that is, "extortion accomplished by fraud."  504 U.S. at 269.  *That* is what the Government explained is irrelevant here.  It is not irrelevant that *Evans*, and numerous other cases, *see, e.g.*, *United States v. Ganim*, 510 F.3d 134, 141 (2d Cir. 2007), have held that it is illegal for a public official to ask for or obtain payment in return for taking or omitting to take official action.  And that is what the defendant is charged with doing.  The clear divide that the defendant suggests exists in the law, between an official asking for or obtaining a payment under color of official right, which is purportedly a standalone "traditional" theory, and an official "agree[ing]" with the person paying him to accept a freely-offered payment, which is purportedly an entirely separate and mutually-exclusive "bribery" theory (Def. Mem. 54, 55), does not exist.

On the contrary, the proposition that, in addition to fraud by extortion, the Hobbs Act also criminalizes two other distinct and mutually-exclusive crimes (*i.e.*, criminalizes three entirely separate crimes), is refuted by *Evans* itself.  *Compare* 504 U.S. at 268 ("We hold today that the

Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."), *with id.* at 283 (Thomas, J., dissenting) (the majority "errs" in holding that non-fraudulent "extortion is the rough equivalent of what we would now describe as taking a bribe" (internal quotation marks omitted)).  The defendant may wish that the Supreme Court had held otherwise.  It did not.

Nor does the defendant's proposition have a basis in the self-evident purpose behind the criminal prohibition on public officials abusing their office in this way.  *See id.* at 274 (Kennedy, J., concurring in part and concurring in judgment) ("[A] public official violates § 1951 if he intends the payor to believe that absent payment the official is likely to abuse his office and his trust to the detriment and injury of the prospective payor or to give the prospective payor less favorable treatment if the *quid pro quo* is not satisfied. . . . The criminal law in the usual course concerns itself with motives and consequences, not formalities.").  As this Court recently explained in rejecting the defendant's motion to dismiss:

> The Court disagrees with Silver's premise that there is a bright line between traditional bribery and traditional "color of right" extortion.  What begins as a bribe scheme can easily morph into a traditional extortion scheme if the payor becomes afraid of retribution if he quits paying.  Indeed, it takes no imagination to posit that at any given time, the payor may both be willing to pay for the benefits he is obtaining (traditional bribery) and be afraid to quit paying for fear of retribution (traditional extortion).

*Silver*, 2018 WL 1406617, at *7 n.9.

In short, the proposition that the defendant asks this Court to accept has no basis in law or logic.  It does not entitle the defendant to prevent the jury from learning the entirety of what he did and how he did it, which included that he abused his power by seeking payment from individuals over whom he exercised power.  It was and remains wholly appropriate that the Government introduce evidence and advance the argument that those paying the defendant did

so, at least in part, because they feared alienating him.  That evidence, as the Court previously

recognized, is evidence of the charged crimes, *see Silver*, 184 F. Supp. 3d at 40, not some

entirely different, factually and legally distinct, and "mutually exclusive[]" crime (Def. Mem.

50).  It is plainly admissible.

## IV.     THE INTENT AND UNDERSTANDING OF GLENWOOD'S AGENTS IS RELEVANT AND ADMISSIBLE

The defendant next asks this Court to preclude the Government from proving

Glenwood's state of mind by offering evidence of its agents' state of mind.  (Def. Mem. 55-57.)

This motion is also baseless.  The defendant's argument hinges on the idea that Glenwood,

despite being a corporation that employed employees and agents to act on its behalf, had no

discernible state of mind other than that of Leonard Litwin (who, as the defendant knows, is

deceased). The law is firmly to the contrary.  Indeed, the Court need look no further than *United

States v. McDonough*, 56 F.3d 391 (2d Cir. 1995), a case that the defendant cites (Def. Mem.

56), to conclude that in extortion cases—like this one, where the pertinent victim is a

corporation—the states of mind of the corporation's agents are relevant.  In *McDonough*, the

defendant was accused of using his position as chairman of a county Democratic committee to

obtain kickbacks on insurance commissions paid by various public entities.  He was ultimately

charged with, among other things, extortion.  The indictment alleged that the extortion victims

were two insurance agencies that were run by two of his longtime friends.  At trial and again on

appeal, and just like the defendant in this case, the defendant in *McDonough* claimed that the

only states of mind that were relevant belonged to his two friends, the presidents of the insurance

agencies.  The district court disagreed, and so did the Second Circuit.  On appeal, the Second

Circuit explained:

> The presidents of the insurance agencies are not the only individuals
> whose motivation matters.  Both the indictment and the jury charge

> as a whole clearly identified the [insurance agencies] as the extortion
> victims.  As the district court charged, a corporation can 'only act
> through natural persons as its agents or employees.'  Therefore, the
> jury was entitled to consider the states of mind, not only of [the two
> presidents], but also of other corporate agents in determining the
> victims' motivation, and the jury charge was not improper.

56 F.3d at 388.

In this case, the Superseding Indictment charges the defendant with extorting, among

others, Glenwood, which is a corporate entity.  The fact that Litwin may have acted as

Glenwood's primary decision maker does not mean that the states of mind of Glenwood's other

agents and employees, such as Brian Meara and Richard Runes, who communicated with the

defendant during the scheme, are "irrelevant" (Def. Mem. 56).  Despite claiming support from

"numerous courts" for this proposition (*id.*), the defendant cites only one case, *Metcalf v. Yale

University*, No. 15 Civ. 1696 (VAB), 2017 WL 6614255 (D. Conn. Dec. 17. 2017), which dealt

with the scope of civil discovery in an employment discrimination litigation and which bears no

resemblance whatsoever to this case.  In *Metcalf*, the district court concluded that a plaintiff

could not depose and obtain mental health records from three non-party individuals who played

no role in the events leading to his employment termination and whose testimony would have

been relevant only to litigate an ancillary issue.  *Id.* at *3.  It is a stretch, to say the least, to read

*Metcalf* as the defendant does and conclude that the district court concluded that Yale

University's state of mind could only be proven by testimony from one person (much less a

deceased person).  Instead, the court merely and unsurprisingly concluded that the testimony of

three people who did not participate in the chain of events leading to the termination was not

relevant.  Here, by contrast, multiple Glenwood actors beyond Litwin, including Meara and

Runes, were involved in the decision to continue to retain Goldberg & Iryami once Glenwood

learned that the defendant was being compensated for Glenwood's tax certiorari business.

Consistent with *McDonough*, their states of mind are highly probative of not only Glenwood's state of mind but also of the defendant's state of mind, given that the defendant primarily interacted with Meara and Runes during the extortion scheme.

In any event, at bottom, the defendant's quarrel is really with the weight the jury should give this state of mind evidence. (*See* Def. Mem. 57.) The Government expects to argue that it is probative, and the defendant is free to argue the contrary, presumably by suggesting that Litwin was the only actor who mattered. But there is no legitimate basis to preclude the Government from offering evidence that the law plainly and rightly permits.

## V.   THE COURT PREVIOUSLY AND PROPERLY RULED THAT EVIDENCE OF GLENWOOD'S POLITICAL CONTRIBUTIONS IS RELEVANT AND ADMISSIBLE

Prior to trial, the defendant moved *in limine* to preclude evidence of Glenwood's political contributions. (Dkt No. 53.) The Court denied that motion in a written decision. (Dkt. No. 88.) The defendant, "with the benefit of hindsight," asks for reconsideration. (Def. Mem. 57.) His request should be denied.

As the Court recognized in rejecting the defendant's motion to dismiss, "Under the law of the case doctrine, 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise.'" *Silver*, 2018 WL 1406617, at *2 (quoting *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009)) (internal quotation marks omitted). The defendant does not acknowledge this standard, and he cannot meet it. Instead, he offers the same arguments, in practically the same language, that he offered prior to trial (that Glenwood's campaign contributions are purportedly irrelevant, and that, even if relevant, the evidence should be precluded under Rule 403), and asks this Court now to accept what it previously did not.

The sole gesture that the defendant even attempts to make towards meeting the "cogent and compelling reasons" standard is to state that, in summation at the first trial, the Government argued that Glenwood's campaign contributions and related conduct were evidence of its dependence on the defendant and showed that Glenwood could not rationally say no—and that the defendant knew that—when the defendant asked it to spend money in another form.  (Def. Mem. 58-59.)  The defendant suggests that this argument was improper.  (*See id.*)  He omits that he did not object to the first statement to which he points, and that his objection to the second statement was overruled.  (Tr. 2894-97.)  And rightly so, because the Government's argument was on all fours with the Court's decision rejecting the defendant's prior motion *in limine*.

Contrary to the defendant's conclusory assertion, the Government did not "impl[y]" that campaign contributions were "inherently unlawful" (Def. Mem. 59).  Rather, the Government argued that the campaign contributions were evidence of the defendant's knowledge and state of mind when he engaged in the charged conduct.  The Government explained—in a line that the defendant omits, while citing passages both before and after the line—that the evidence of campaign contributions (along with other evidence), showed that "Sheldon Silver knew exactly what the developers wanted from him, exactly how much they depended on him."  (Tr. 2895.)  That was precisely a point made by the Court in rejecting the defendant's prior motion *in limine*. As the Court explained:

> In this case, Glenwood's campaign contributions are relevant to Glenwood's motive to enter into an alleged *quid pro quo* relationship with Silver, even if the contributions themselves were not part of the *quid pro quo* exchange.  The fact that Glenwood's contributions to New York State politicians and political action committees were purportedly the largest of any company or individual during the relevant time period is circumstantial evidence that Glenwood believed at the time that favorable action by New York State was critical to Glenwood's business success. From that fact, a jury could conclude that Glenwood was

> motivated to curry favor with Silver.  In addition, because Silver
> was himself a substantial beneficiary of Glenwood's lawful
> largesse, evidence of the contributions tends to prove that Silver
> knew of the importance Glenwood placed on favorable New York
> State action.  That knowledge, in turn, is relevant to whether Silver
> entered into an unlawful *quid pro quo* relationship with Glenwood

(Dkt. No. 88, at 2 (citations omitted).)

The Court's decision was—and remains—manifestly correct.  The defendant does not

come close to meeting the standard required to warrant reconsideration.

## VI.    THAT THE DEFENDANT COMMENCED HIS SCHEMES BEFORE THE STATUTE OF LIMITATIONS DOES NOT RENDER EVIDENCE THAT HE DID SO IRRELEVANT OR UNFAIR

The defendant also requests an order precluding the Government from offering evidence

that pre-dates February 19, 2010, the beginning of the five-year statute of limitations period.

This argument, which echoes the same points made in his now-rejected motion to dismiss, fails.

The defendant's claim rests on the incorrect premise that the Government's charges must

be subdivided into discrete mailings, wires, payments, and monetary transactions.  (Def. Mem.

62-63.)  On the contrary, as the Court held in denying the defendant's recent motion to dismiss,

"the offenses," which span more than a decade and both pre-date and post-date the statute of

limitations period, "were appropriately charged as single schemes."  *Silver*, 2018 WL 1406617,

at *3.  That form of pleading is consistent with the Second Circuit's longstanding rule that "acts

that could be charged as separate counts of an indictment may instead be charged in a single

count if those acts could be characterized as part of a single continuing scheme."  *United States*

*v. Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006) (internal quotation marks omitted).

Because the charges are properly pled as unitary schemes, the defendant cannot plausibly

argue that the Government is not permitted to introduce evidence spanning the length of the

schemes.  Indeed, he concedes that there is no legal bar to the introduction of relevant evidence

that predates the limitation period.  (Def. Mem. 62 (citing *United States v. De Fiore*, 720 F.2d 757, 764 (2d Cir. 1983)); *see also Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001) ("[A] statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period." (citations omitted)).  The defendant's only real contention is that pre-limitations evidence should be excluded under Rule 403 because it may permit the jury to convict him for conduct that is time-barred.  (Def. Mem. 63.)  This is entirely unpersuasive.  The jury is expected to be instructed, consistent with the Second Circuit's guidance in this case, that the Government "need only prove that some aspect of the particular *quid pro quo* scheme continued into the statute of limitations period."  *United States v. Silver*, 864 F.3d 102, 122 (2d Cir. 2017) (citations omitted).  There is no plausible risk that the jury will disregard this clear and uncomplicated instruction. *See, e.g.*, *Parker v. Randolph*, 442 U.S. 62, 75 n.7 (1979) ("The 'rule'– indeed, the premise upon which the system of jury trials functions under the American judicial system – is that juries can be trusted to follow the trial court's instructions.").

## VII.   THE DEFENDANT'S VARIOUS RULE 403 ARGUMENTS ARE MERITLESS

The defendant improperly invokes Rule 403 to seek to preclude the admission of highly relevant evidence that, at bottom, he simply does not like.  Because the defendant has failed to make the requisite showing that the evidence's probative value is "substantially outweighed" by its alleged unfair prejudice, his motions fail.

### A.  The Nature Of The Defendant's Investments Is Relevant And Admissible

The defendant first seeks to preclude the Government from offering any evidence of the nature of the private investments that he used to launder his crime proceeds.  (Def. Mem. 64-65.)  As the Court no doubt recalls, at the first trial, the Government proved that the defendant moved at least certain of his crime proceeds from commercial bank accounts to investments in or

through Counsel Financial, which was controlled by his "close friend" Jordan Levy.  (Tr. 2404.)

The investments consisted largely of promissory notes, which provided the defendant "with an

interest rate return" that could reach as high as twelve percent.  (Tr. 2317, 2392.)

The relevance of this evidence was, and remains, obvious.  As the Government explained

when this issue was first litigated, "we have to prove that Sheldon Silver knew they were crime

proceeds. . . . [W]hat he put them in helps us prove that he knew they were crime proceeds."  (Tr.

2282.)  Then, as now, the defendant argued the opposite and tried to cabin the Government's

proof to evidence that the defendant merely "money moved from A to B."  (Tr. 2281).  The

Court rejected that blatant attempt to dictate how the Government proved its case.  (Tr. 2285-86

(Court: "So this is classic.  The defendant wants to tell the government how to prove their case.

You don't get to do that.  They're entitled to put in the evidence they're entitled to put in.").)

The Court went on to rule that the nature of the investments is "circumstantial evidence that he

knew he was transacting in illicit funds if he moved the money from a commercial bank account,

which I think is where it came from, into funds that had far less transparency in terms of

regulated entities and the like."  (Tr. 2286.)

The Court's ruling is law of the case.  And, even though the defendant acknowledges the

ruling in passing (Def. Mem. 65), he offers no cogent or compelling justification that should lead

the Court to depart from its earlier ruling.  Instead, he relies on the spurious claim that the

Government used the money laundering evidence "to encourage an impermissible element of

class bias" (*id.*).  Not so.  The Government's argument in rebuttal that the defendant invested his

crime proceeds "in exclusive accounts with guaranteed returns and he split the note to hide some

of his ill-gotten gains from the public" was an accurate depiction of the record evidence (Tr.

3073), not some kind of attempt to stir up "class prejudice" (Def. Mem. 65 (internal quotation

marks omitted)).  Indeed, the exclusivity and stability of these investments, which yielded profits up to twelve percent, were undisputed.[2]  The defendant's motion is a clear attempt to find yet another angle to seek to dictate the Government's proof.  It should be denied.

### B.  Dr. Taub's Present Employment Status Is Relevant And Admissible

The defendant also seeks to preclude the Government from offering evidence of Dr. Taub's employment status at Columbia University, which was recently resolved against Dr. Taub through litigation he brought against the university.  (Def. Mem. 66.)  This motion should be denied as moot and in any event meritless.  As the defendant knows—because the Government told him so prior to his motions *in limine*—the Government does *not* intend to elicit any testimony about Dr. Taub's litigation with Columbia.  Instead, the Government intends to ask Dr. Taub the same question that it asked at the first trial, which prompted no objection: Q. "After the charges in this case became public, what happened to your job at Columbia?"  A. "I was terminated from Columbia."  (Tr. 281-82.)  There is nothing objectionable about this expected testimony.  Dr. Taub's employment status is relevant background, as it explains why he is no longer treating mesothelioma patients after a long career dedicated to fighting the disease.  Without Dr. Taub's simple statement that he was ultimately terminated, the jury would be left with the false impression (one which the defendant no doubt would prefer the jury to draw) that Dr. Taub, who is in his early 80s, voluntarily retired at the end of a long career, and that Columbia was entirely untroubled by his actions in this case.

---

[2]      The defendant also argues, in circular fashion, that "[n]o *evidence* supports the government's argument that this *evidence* shows that Mr. Silver knew the money he invested in these investments constituted crime proceeds."  (Def. Mem. 65 (emphasis added).)  It is hard to know what to make of this contention.  Evidence does not need evidence in order to support an argument, much less an argument that takes into account all of the evidence at a trial.

Dr. Taub's testimony that he was terminated will also complete the picture of the events leading up to his cooperation with the Government.  The Government expects Dr. Taub to testify that he initially lied to federal investigators in part because he feared losing his job at Columbia. It will be odd for the jury to be left to speculate whether or not that fear had any basis or came to pass and unfair to the Government for the defendant to suggest implicitly that the fear was not reasonable.

There is no ground to preclude this relevant evidence under Rule 403, as the defendant suggests.  A "mini-trial on a collateral issue" (Def. Mem. 66) is impossible, given the Government's decision to not raise the Columbia litigation at all.  Nor is there any risk that the jury will conclude that Columbia terminated Dr. Taub after a finding that he committed crimes. (*See id.*)  To the extent that there is any such theoretical risk, it is easily addressed with a simple limiting instruction.  *See, e.g.*, *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006) ("[T]o the extent there was any risk of unfair prejudice, the district court satisfactorily reduced that possibility with a thorough and carefully worded limiting instruction."); *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) (noting the presumption that "juries understand and abide by a district court's limiting instructions")  The defendant fails to explain why this is not sufficient to ameliorate his professed concern.

## C.  Evidence Of The Nature Of The Rent Act Of 2011 Is Relevant And Admissible

The defendant also argues that the Government should be precluded from offering evidence on whether the Rent Act of 2011 was good or bad for tenants.  In the defendant's telling, this proof is "completely irrelevant to whether Mr. Silver engaged in a quid pro quo agreement with Dr. Taub or the real estate developers."  (Def. Mem. 67.)  This argument can be easily rejected.  Evidence that the defendant took official actions (including his vote on the Rent

Act of 2011) that *benefited* Glenwood and other developers is highly relevant to prove that the

defendant was engaged in a scheme to defraud the public of its right of honest services.  The

defendant's only argument to the contrary is a red herring.  He insists that the Government will

misconstrue the evidence to tell the jury that the defendant had a "legal obligation to support

tenant's rights" as a legislator, and that his failure to be "Mr. Tenant" is sufficient to convict.

(*Id.* (emphasis omitted).)  That contention is a stretch, at best, and it provides no justification to

preclude the admission of highly relevant evidence under Rule 403.  The Government made no

such argument at the first trial and will not do so at the second.  The jury, furthermore, will be

instructed on each of the elements that the Government must establish beyond a reasonable

doubt.  There is no risk whatsoever that the jury will ignore all of the Court's instructions and

conclude that not acting in the best interest of tenants (and benefiting developers) by itself is

enough for a conviction.

### D. Proof That The Defendant Sought Employment For His Mother-In-Law Is Relevant And Admissible

The defendant next seeks an order precluding the Government from offering proof that he

once requested that Judge Schoenfeld hire his mother-in-law.  The evidence is plainly relevant,

as it underscores Dr. Taub's importance to the defendant.  Its admission is also law of the case;

the defendant fails to acknowledge that he objected to this precise testimony during Judge

Schoenfeld's testimony and that the Court overruled his objection.  (Tr. 1328.)

The defendant's current objections fare no better than the one he offered at trial.  His

primary argument against admission is an obvious straw man.  He claims that because the

Government does not allege that he was in a *quid pro quo* relationship with Judge Schoenfeld,

evidence that he asked Judge Schoenfeld to employ his mother-in-law is irrelevant.  (Def. Mem.

68.)  The defendant's secondary basis for preclusion is equally flimsy.  He claims that the

evidence will confuse the jury, leaving jurors to question whether there may be a host of additional, undisclosed *quid pro quo* schemes at play.  (*See id.*)  The jury, however, will be well aware that the only schemes at issue are between the defendant and Dr. Taub and the defendant and the real estate developers.  The potential for juror "confusion" is thus illusory, much less is there a risk of such substantial confusion as to warrant preclusion of relevant evidence.  Because the defendant fails to offer any compelling basis for the Court to reconsider its decision and preclude this relevant evidence, his motion should be denied.[3]

### E.  The Defendant's Conversation With Michael Whyland About His Father Is Relevant And Admissible

The defendant also seeks to preclude the Government from asking Michael Whyland, the defendant's Assembly press secretary, about a conversation he had with the defendant regarding Mr. Whyland's father, who suffered from an asbestos-related illness, calling it "irrelevant and prejudicial."  (Def. Mem. 69.)  Again, the defendant seeks to limit the Government's proof because he does not like the inferences that the Government asked the jury to draw from that proof.  As the Government argued to the jury, and may reasonably again, the defendant's response to the news that Mr. Whyland's father suffered from an asbestos-related illness by inquiring *only* into whether his father had legal representation is probative of the defendant's intent and state of mind, and the nature of his true relationship with Dr. Taub—that is, rather than

---

[3]      The defendant also argues that, in the alternative, he should be permitted to offer evidence of "hundreds of other resumes that Mr. Silver forwarded on to others, not just Judge Schoenfeld, as part of the constituent services he performed."  (Def. Mem. 69.)  While the defendant is free to seek to rebut the Government's proof by presenting admissible evidence, if any exists, that he asked *Judge Schoenfeld* to help others (beyond his mother-in-law and Dr. Taub), the Government would object to any attempt by the defendant to present the jury with hundreds of resumes, sent to unidentified people at unidentified times for unidentified purposes, untethered from any evidence of who the resumes belonged to or what the defendant's relationship was with those people.  Nor may the defendant otherwise "seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990).

recommend a nationally-renowned asbestos doctor who the defendant suggested at trial was a close friend (and thus purportedly not the subject of a *quid pro quo* relationship), the defendant only asked whether Mr. Whyland's father had a lawyer, presumably so the defendant could refer him to Weitz & Luxenberg.  The defendant is free to argue to the jury a different inference, as he does in his brief—*i.e.*, that he was doing nothing more than "point[ing] out a potential inconsistency in his press secretary's opinions" regarding asbestos litigation.  (Def. Mem. 70.) The existence of such a counterargument does not render the evidence "completely irrelevant" (*id.* 69).  *See, e.g.*, *Schultz*, 333 F.3d at 416 ("Evidence need not be conclusive in order to be relevant.").

Nor, contrary to the defendant's undeveloped suggestion (*see* Def. Mem. 69), is there any justification for precluding the admission of this evidence under Rule 403.  The defendant is on trial for a decades-long corruption scheme involving the *quid pro quo* exchange of personal benefits for official action.  A handful of questions about a conversation he had with his press secretary in which the defendant appeared to demonstrate a self-interested, financial motive to direct his press secretary's father to a law firm from which he received referral fees is no different in kind, and is far less inflammatory than, the crimes for which he is standing trial.  *See United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (evidence not unfairly prejudicial because it "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged").  More fundamentally, evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence."  *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).  "Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*."  *Costantino v.*

*Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) (emphasis in original).  There is nothing unfair in the admission of the conversation that the defendant challenges to the extent that it helps to prove the defendant's intent and state of mind and the nature of his true relationship with Dr. Taub, particularly given that Mr. Whyland will be subject to cross examination and the defendant is free to argue that the inference with which he disagrees is incorrect.  *See, e.g.*, *Diaz*, 878 F.2d at 615 ("The logical inferences resulting from proffered evidence do not engender the unfair prejudice against which Rule 403 is directed." (internal quotation marks omitted)).

### F.  Jonathan Taub's Initial Job Performance At Ohel Is Relevant And Admissible

The defendant argues that the Government should be prevented from offering evidence showing that Jonathan Taub, Dr. Taub's son, initially performed poorly at Ohel—the non-profit organization that hired Jonathan at the defendant's request.  (Def. Mem. 70-71.)  The defendant insists that the evidence is "wholly irrelevant" because, in the defendant's view, it has no bearing on whether the defendant's recommendation to hire Jonathan in the first place was part of the asbestos scheme with Dr. Taub.  (Def. Mem. 70.)  This argument misses the point.  At the first trial, David Mandel testified that one of the reasons Ohel did not *terminate* Jonathan was because of the defendant's role as Speaker.  (Tr. 1546.)  That testimony supports the Government's argument that one of the reasons why the defendant chose to recommend Jonathan to Ohel was because, in light of the defendant's direction of substantial sums of state funds to Ohel, he believed that Ohel would find it hard to say no.  Jonathan's performance, and Ohel's response (or lack thereof), is therefore plainly relevant.  The defendant's only remaining basis for precluding the testimony is that it purportedly will prompt a "mini-trial" on Jonathan's fitness for his Ohel job.  (Def. Mem. 71.)  There is no such risk.  At the first trial, the Government itself elicited the fact that Jonathan's job performance improved after his initial difficulties.  (Tr. 1546.)  The

defendant may decide, for strategic reasons, to seek to offer additional details about that improvement (although the relevance of such details is unclear, and the Government reserves the right to object).  But that choice is not a reason to preclude the admission of relevant proof.

## VIII.   THERE IS NO BASIS TO PRECLUDE THE GOVERNMENT FROM ASKING WITNESSES ABOUT NON-PROSECUTION AGREEMENTS OR IMMUNITY

The defendant also seeks to preclude the Government from asking its witnesses if they are testifying pursuant to a non-cooperation agreement or immunity order.  He alternatively moves to preclude the Government from introducing the so-called truth-telling provision of a witness's non-prosecution agreement absent an attack on the witness's credibility.  As the Government informed the defendant when he raised this issue with the Government, the Government agrees that it would be premature to introduce any non-prosecution agreement into evidence, or to ask its witnesses on direct examination about the truth-telling provisions of their agreements, absent questions or arguments (through opening statement or cross examination) by the defendant that "open the door."  *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 86 (2d Cir. 2014) (internal quotation marks omitted).

However, as set forth in the same case, which the defendant himself cites (Def. Mem. 72), "although the Government may not introduce the bolstering aspects of an agreement until after the witness's credibility has been attacked, this restriction does not apply to an agreement's impeaching aspects, which the Government is free to introduce even on the witness's direct examination."  753 F.3d at 86.  That is, "'even in the absence of a prior attack on credibility, the elicitation of the fact of the agreement and the witness's understanding of it, as a motivation for the witness to testify for the Government, should be permitted on direct examination in order to anticipate cross-examination by the defendant which might give the jury the unjustified impression that the Government was concealing this relevant fact.'"  *Id.* (quoting *United States v.*

*Cosentino*, 844 F.2d 30 (2d Cir. 1988)) (internal quotation marks omitted; alterations

incorporated). The defendant presents no cogent reason why the settled law on the introduction

by the Government on direct examination of the existence of a non-prosecution agreement (or

immunity order) and the witness's understanding of it should be ignored in this case. It should

not.[4]

## IX.   THE DEFENDANT'S ASSERTIONS THAT THE GOVERNMENT "SHOULD BE LIMITED TO ACCURATE STATEMENT OF LAW" AND "ACCURATE STATEMENTS OF EVIDENCE" ARE NOT MOTIONS *IN LIMINE* AND ARE PREMISED ON CHERRY-PICKED SNIPPETS

As noted above, the first 40 pages of the defendant's brief, while styled as motions *in*

*limine*, contain no such cognizable motions. Rather, it consists of varied attacks on the conduct

of the Government at the first trial, which, according to the defendant, repeatedly misstated both

the law and the evidence during its summations. Even if the prior Government team had done so

---

[4]    To the extent that the defendant may be suggesting that he does not intend to cross examine witnesses on the existence of a non-prosecution agreement or immunity order, and therefore the Government has no basis to ask about the same because the sole reason to do so is to "anticipate cross-examination" (*id.*), he is wrong. Without explaining to the jury that a witness has been granted protection from prosecution, the jury may conclude that the witness is shading the truth to protect himself or herself, when, for example, he or she denies knowledge of a certain fact. Or the jury may speculate as to how the witness can testify freely about his or her participation in the same scheme for which the defendant is standing trial. For example, without eliciting that Dr. Taub has entered into a non-prosecution agreement, the jury may be confused about how he can testify about his lies when he was first approached by law enforcement, and his providing mesothelioma leads to the defendant while benefiting from official acts by the defendant. Put differently, the existence of an agreement or order may affect how the jury— which is charged with assessing the credibility of witnesses—judges the witness's motivation or credibility in various ways, even without a specific attack on the witness's credibility. *See generally United States v. Borello*, 766 F.2d 46, 57 (2d Cir. 1985) ("the Government may bring out on direct examination the circumstances surrounding a witness's motivation for cooperating with the Government or other matters damaging to the witness's credibility" (internal quotation marks omitted)). To the extent that the defendant is concerned that the mere fact of a non-prosecution agreement or immunity order may reflect badly on him, such a concern is not unique to this case, and the appropriate remedy is a limiting instruction, not preclusion.

(and it did not), the defendant is no more entitled to an advisory ruling with respect to jury addresses than the Government would be entitled to one.

If the defendant has a good faith basis to believe that the Government may misstate the law or the evidence at this trial, he may raise such a concern with the Government, and then, if need be, the Court, after the close of evidence and the charge conference—when there is a factual and legal record against which his concern may be weighed.  If the defendant thereafter has a good faith basis to believe, during summations themselves, that the Government has misstated the law or the evidence, he may object—when the alleged misstatement may be viewed in the context and against the backdrop of prior rulings, including the now-pending motions *in limine*.  That is the way to resolve the defendant's proffered concern, not a blunderbuss attack on prior summations (much less ones that took place before *United States v. McDonnell*, 136 S. Ct. 2355 (2016)).  The Court can and should deny the defendant's first set of the defendant's motions, to the extent they may be deemed motions, on this basis alone.  In any event, the defendant's claims that the Government misstated the law and the evidence at the first trial do not withstand even cursory examination.

Rather, time and again in this section of his brief, the defendant takes the same approach: First, he asserts that the Government "ignored" or materially "misstated" the law or the evidence.  Next, as purported proof of this, he quotes a few sentences from one of the Government's summations, devoid of context and without regard to the Court's rulings or jury charge.  Finally, he concludes that because these sentences did not fully and accurately capture his view of the law or the evidence, the Government engaged in prejudicial misconduct, and the Court should order the Government to refrain from making such statements again.  This is nonsense.

### A.        Alleged Misstatements Of Law

The defendant first asserts that the Government "[i]gnored" (Def. Mem. 1 (emphasis

omitted)), "completely disregarded" (*id.* 2), and "misstate[d]" (*id.* 3) the applicable statute of

limitations in its principal summation.  As purported proof of this, the defendant cites a few

sentences from the Government's 22-page summation.  (*Id.* 2.)  As an initial matter, the

defendant's suggestion that these few sentences—to which the defendant did not object—are

best understood as an invitation for the jury to "disregard[]" the statute of limitation is strained,

to put it mildly.  With the use of an ellipsis, the defendant omits that in the very lines that he

invokes, the Government referred to conduct post-dating the statute of limitations.  Below is

what the Government said just before the, "So, even if . . . ," sentence that the defendant

precedes with an ellipsis and italicizes as purported proof of an improper argument (*see id.*):

> Just look at the e-mails that Dr. Taub sent to his trusted friend and
> colleague back in 2010 way before Dr. Taub ever thought he
> would be a witness at this case.  He put it right there in black and
> white: I will keep giving cases to Shelly because I may need him in
> the future—he is the most powerful man in New York State.
> That's Government Exhibit 595-1.  That's the reason he gave the
> cases to Sheldon Silver and Sheldon Silver knew exactly why he
> was getting those cases from Dr. Taub.  And Sheldon Silver, in
> turn, used his office again and again to keep those valuable leads
> coming.

(Tr. 2844.)  It is apparent that the Government was not inviting the jury to convict the defendant

based solely on actions that took place before the statute of limitations, but on testimony

regarding a scheme that began before the statute of limitations and continued *into* it.

But even if the Government had said only what the defendant misleadingly suggests the

Government said—but did not in fact say—the defendant's claim of misconduct would remain

utterly meritless.  The Government is unaware of any authority, and the defendant cites none, in

support of the proposition that every few sentences of a jury address, standing alone, must

capture all aspects of relevant law, a standard that, if imposed, would turn jury addresses into stilted incantations, rather than arguments, and displace the jury charge. The law requires no such things. On the contrary, "[t]he law has long recognized that summations—and particularly rebuttal summations—are not detached expositions, with every word carefully constructed before the event." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (internal quotation marks and citations omitted; alteration and ellipsis incorporated). Moreover, although not legally required, the Government told the jury, "You will hear an instruction about the statute of limitations, whether or not these crimes, these schemes continued past the beginning of 2010. They all did. The asbestos scheme, the real estate scheme, these things were all happening, were all past 2010." (Tr. 2921.) The defendant relegates this fact to a footnote. (Def. Mem. 3 n.1.)

Similarly, the defendant asserts that the Government "misstated and misrepresented federal bribery law" (*id.* 3) in its principal summation by arguing that no "agreement" was needed. This is so, according to the defendant, when the Government stated:

> [T]here does not need to be an explicit agreement between Sheldon Silver and Dr. Taub, or between Sheldon Silver and the developers or Jay Goldberg for the defendant to be guilty. In fact, there does not need to be an agreement at all. As we just talked about, it is the defendant and only the defendant who is on trial here. The government has to prove that Sheldon Silver—and Sheldon Silver alone—acted with criminal intent.

(Def. Mem. 3 (quoting Tr. 2454-55).) But again, even assuming *arguendo* that the Government were required to capture all aspects of law every time it explains in a few sentences why a defendant is guilty (and there is no such requirement), these sentences, to which the defendant also did not object, are accurate.

As discussed at the charge conference, and as then-counsel to the defendant did not contest, the defendant is not charged with conspiracy and there is no requirement of a meeting of

the minds.  (*See* Tr. 2706 (Court: "There are cases that say expressly that you can have a

disconnect with an innocent bribe giver and a guilty bribe taker."  Defense Counsel:

"Absolutely.  That's [*United States v.* ]*Anderson*[, 509 F.2d 312, 332 (D.C. Cir. 1974)].").)  And

indeed, the Court instructed the jury on just that point:

> The payment and the receipt of a bribe are not interdependent
> offenses because the intent of the party giving the thing of value
> may be different from the intent of the party receiving the thing of
> value.
>
> Therefore, the government only has to prove that Mr. Silver, not
> the bribe giver, understood that as a result of the bribe or kickback,
> he was expected to exercise official influence or make official
> decisions for the benefit of the payer and, at the time the bribe or
> kickback was accepted.

(Tr. 3098; *see also* Tr. 743 (noting that evidence that may show that "Dr. Taub didn't

intentionally bribe doesn't mean that Silver didn't have the correct state of mind to be guilty of

extortion or mail fraud").)  Irrespective of whether the defendant may now, belatedly object to

this instruction (*see* Def. Mem. 9 n.4), the Government cannot have "misstated and

misrepresented federal bribery law" (*id.* 3), much less done so intentionally, by arguing in accord

with the Court's instructions.

Moreover, those instructions were and remain entirely proper.  Indeed, it would be

particularly inappropriate in the context of an honest services fraud charge to instruct the jury

that the pertinent private party must have agreed to pay a bribe.  The self-evident purpose of the

statute (indeed, all bribery statutes) is to prohibit a public official's violation of his or her duty to

serve the public honestly and faithfully, not to criminalize only those times when a private party

agrees that an official should not do so.  As the Court previously explained, "the intent of the

bribe giver may be different from the intent of the bribe receiver.  The Government must only

prove that Silver—not the bribe giver—understood that, as a result of the bribe or kickback, he

was expected to exercise official influence or make official decisions for the benefit of the giver." *Silver*, 184 F. Supp. 3d at 45 n.5 (citing *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013); *United States v. Bruno*, 661 F.3d 733, 743-44 (2d Cir. 2011); *United States v. Ring*, 706 F.3d 460, 468 (D.C. Cir. 2013)). *See also Ring*, 706 F.3d at 468 (in the context of federal bribery law, the word "'agreement' is used as a synonym for specific intent. When . . . a public official is charged with *soliciting* a bribe, the evidence must show that the official conveyed an intent to perform official acts in exchange for personal benefit." (emphasis in original)); *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 405-06 (1999) (defining "*quid pro quo*" as the "specific intent" on the part of the defendant "to give or receive something of value in exchange for an official act"); *cf. United States v. Morgan*, 635 F. App'x 423, 431 (10th Cir. 2015) ("The key question in this case, then, is not whether both [the official] *and* [the private party] had a corrupt intent but *whether [the official] had a corrupt intent*—whether he had the intent to receive the retainer fees [at issue] in exchange for his legislative influence." (emphases in original)).

For the same reasons, the defendant list of various, additional sentences in the Government's principal and rebuttal summations (Def. Mem. 5-6)—to which, again, the defendant did not object—does not support a claim. It is no surprise that what the defendant calls "sound-bites," standing alone, may not "state the elements of the bribery offenses charged in this case" (*id.* 6). The Government was no more required to ensure that every few sentences did so than the defendant was required to ensure the same. And again, the defendant cherry-picks the sentences that he invokes. To choose just one example, the defendant suggests that it was improper for the Government to argue that to "convict the defendant, the money only needs

to be a partial motivation," because being motivated by money is not a crime.  (*Id.* 5 (quoting Tr.

2886).)  The defendant omits that, after immediately after this sentence, the Government said:

> So that's nine reasons that you know that Sheldon Silver is guilty
> of the asbestos scheme.  Each one of them alone would be
> sufficient to convict the defendant.  Each one.
>
> Every one of these shows how this was a *quid pro quo*, how
> Sheldon Silver was dispensing official benefits in order to get
> valuable leads, in order to get those millions of dollars for himself.
> That's what you learned through the evidence on the asbestos
> scheme.

(Tr. 2886.)  The jury cannot reasonably have thought that the Government was asking it to

convict the defendant merely because he was "motivated by money" or merely because he had

an "undisclosed conflict of interest" (Def. Mem. 6 (internal quotation marks omitted)).  Nor

could the jury reasonably have concluded that the Government was asking it to convict on the

ground that what the defendant did, though non-criminal, was "salacious" (*id.* 10).  No fewer

than at least fifteen times in its principal summation alone, the Government talked about the

"quid," the "quo," or the "quid pro quo."  (Tr. 2844, 2852, 2857, 2859, 2863, 2864, 2865, 2882,

2886, 2890, 2903, 2924.)  The Government did the same in its rebuttal summation.  (Tr. 3040,

3047, 3057, 3063.)  The defendant's assertion that the Government somehow "left o[ut]" this

"essential element" (Def. Mem. 11) defies reality.

Nor, contrary to the defendant's suggestion (*id.*) does the foregoing mean that the

Government was (or is) of the view that the intent of Dr. Taub or others is "irrelevant."  It is

unclear why the defendant suggests that the Government had or has this view.  It did not and

does not.  There is nothing inconsistent, as the Court recognized at trial (Tr. 743), with evidence

of the state of mind of Dr. Taub or others being probative of the state of mind of the defendant,

notwithstanding that only the defendant is on trial and the jury must find the state of mind of the defendant.

Finally, the defendant asserts that the "Government cannot create legal duties that do not exist," and suggests that somehow the Government engaged in misconduct when it referred to the defendant's duty of honest services and referred the jury to the "elements" to be described by the Court.  (Def. Mem. 11.)  The Government does understand this argument. The duty not to engage in honest services fraud is imposed by law, not the Government.  *See, e.g.*, *Rosen*, 716 F.3d at 700 ("it has always been as plain as a pikestaff that bribes and kickbacks are prohibited"). The defendant's disagreement that he violated his duty is not a basis to preclude the Government from arguing to the contrary, much less to preclude the Government from directing the jury's attention to the Court's instructions about what that duty is.

### B.    Alleged Misstatements Of Fact

The defendant's first claim as to purported misstatements of fact in the Government's summations is that the Government allegedly relied "on pure speculation to make non-official acts 'official' under *McDonnell*."  (Def. Mem. 12.)  As an initial matter, this claim, to the extent it rests on *McDonnell*, is premature.  The Government is well aware of *McDonnell*, which came down after the first trial, and it does not intend make arguments at the second trial in a manner inconsistent with the decision.

In any event, the defendant's claim is legally and factually baseless.  At bottom, what he deems a lack of an alleged lack of any "evidentiary support" (*id.*) is a disagreement with inferences that the Government asked the jury to draw with which the defendant disagrees.  It is no more appropriate for the defendant to ask the Court to preclude the Government from arguing in favor of such inferences, much less to do so before any evidence is presented, than it would be for the Government to ask for the reverse.  *See, e.g.*, *United States v. Edwards*, 342 F.3d 168,

181 (2d Cir. 2003) (The Government "has broad latitude in the inferences it may reasonably suggest to the jury during summation."); *United States v. Bonventre*, 646 F. App'x 73, 88 (2d Cir. 2016) ("Defendants were entitled to—and, in fact, did—argue for opposing inferences on the basis of the same evidence. That defendants disagree with the strength of the government's inferences does not establish prosecutorial misconduct." (citation omitted)); *United States v. Salameh*, 152 F.3d 88, 138 (2d Cir. 1998) (government did not misrepresent evidence by arguing for inference that, while not based on direct evidence, such as "testimony" establishing the point, did not exceed its "broad latitude to suggest reasonable inferences"); *United States v. Wilner*, 523 F.2d 68, 74 (2d Cir. 1975) ("A prosecuting attorney is not an automaton whose role on summation is limited to parroting fact already before the jury."); *see generally United States v. Arboleda*, 20 F.3d 58, 61 (2d Cir. 1994) ("A summation is not evidence. It is simply an attorney's argument to the jury on the circumstances of the case. Its purpose is to explain to the jury how that party views the evidence the jury has seen and heard and to suggest to that body what significance or inference it should attach to or draw from the evidence under the relevant law charged by the trial court.").

Moreover, as the Court explained in denying the defendant's most recent motion to dismiss, "the determination whether a specific action constitutes an official act is a jury question." *Silver*, 2018 WL 1406617, at *7. The Second Circuit had held the same on appeal. *Silver*, 864 F.3d at 119 (a "properly instructed jury might have reached a different conclusion" as to whether certain acts are "official" under *McDonnell*). The defendant's assertion that he expects that the Government will fail to prove that certain existing or future acts were official is not a basis to preclude the Government from seeking to do so.

Furthermore, as the Government explained in its opposition to the defendant's recent

motion to dismiss, even if the Government elects not to argue that a certain set of actions

constitute an official act—a determination the Government need not make at this juncture—the

evidence to which the defendant objects is plainly relevant to tell the story of the background to

and mutually-beneficial relationship between the defendant and Dr. Taub and the defendant and

Glenwood.  Federal Rules of Evidence 401 and 402 do not require that every piece of

evidence—in and of itself—be an element, as the defendant appears to contend in asking for

preclusion on the ground that the acts to which he points are not, in his view, official acts.

Rather, it is sufficient if evidence constitutes "a step on one evidentiary route to the ultimate

fact."  *Old Chief v. United States*, 519 U.S. 172, 179 (1997).  As the Second Circuit has

explained: "Evidence need not be conclusive in order to be relevant"; rather "[a]n incremental

effect . . . is sufficient."  *Certified Envtl. Servs.*, 753 F.3d at 90 (internal quotation marks

omitted); *see also, e.g.*, *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) (evidence of

a crime is not limited to "that which directly establishes an element of the crime").[5]

The defendant's claim that the Government baselessly asked the jury "just to assume that

all roads led to [him]" (Def. Mem. 16) fails for similar reasons.  The defendant's assertion that

his actions as a member of the Public Authorities Control Board (the "PACB") cannot constitute

official actions is wrong (*id.*), but even if it were right, it does not render evidence of those

actions, and of Glenwood's reliance on the PACB, somehow irrelevant.  Nor, again, is the fact

that the defendant disagrees with inferences that the Government asked the jury to draw (and

---

[5]     As to the methadone clinic (*see* Def. Mem. 14-15), moreover, the defendant sought to
preclude this evidence before the first trial, a request that the Court rejected.  (10/16/2015 Court
Conf. (Dkt No. 319, at 73).)  The defendant does not acknowledge this prior ruling, and he does
not meet the standard to warrant reconsideration of it.

may ask the jury to draw again, depending on the evidence) a basis to preclude the Government

from arguing such inferences, much less to do so before any evidence is presented.

And indeed, it is apparent that the inferences that the Government asked the jury to draw

were not just supported by the evidence, but were more persuasive than the counter-inferences

that the defendant asked the jury to draw.  The defendant was convicted of all counts, this Court

ruled that there was sufficient evidence to support the jury's verdict on all counts, and the

Second Circuit vacated the conviction only because, in the interim, *McDonnell* was decided.

Many of the factual arguments that the defendant presents in his brief in the guise of asking the

Court to preclude arguments that he deems "misstatements" are materially indistinguishable

from those that he presented to and were rejected by the jury; then presented, at least in part, to

and were rejected by the Court; and then, in certain cases, presented yet again on appeal and

were rejected yet again.  *Compare, e.g.*, Def. Mem. 19 ("[T]here is absolutely no evidence to

support the government's suggestion that Mr. Silver somehow pressured Glenwood to hire Mr.

Goldberg with the threat of official action."), *with*, *Silver*, 184 F. Supp. 3d at 46 (The evidence

showed that "Glenwood in particular understood that the arrangement was ultimately for Silver's

benefit in some, albeit unspecified, way because they were concerned about upsetting and

alienating Silver if they took their business away from Goldberg & Iryami.  Furthermore,

evidence that Glenwood and Witkoff sought to please Silver because they depended on

legislation which he predominantly controlled shows that Glenwood and Witkoff were motivated

to transfer their business to Goldberg & Iryami for favorable—or, at least, less unfavorable—

official action by Silver.").  The defendant is not entitled to seek to re-litigate the same factual

arguments in the guise of a motion *in limine*.  His factual arguments concerning what inferences

and conclusions one could or should draw about, among other things, the PACB (Def. Mem. 16-

17), referrals to Goldberg & Iriyami (*id.* 17-19), Glenwood's decision to continue paying

Goldberg & Iriyami (*id.* 19-21), the side letter (*id.* 21-23), a statement by Jay Arthur Goldberg to

Steve Witkoff (*id.* 23), HCRA grants (*id.* 24-27), the Moreland Commission (*id.* 29-33), the

Shalom Task Force (*id.* 33-34), and why the defendant made decisions to invest money in his

wife's name (*id.* 35-37), are moot to the extent they rest on evidence at the first trial, premature

to the extent they rest on speculation as to evidence to be presented at the retrial, and, in any

event, are based on self-interested assertions about his view—which is by no means the only

view—of what the evidence did and is expected to show.  In short, they are for the jury at the

retrial (or this Court after the close of evidence, should the defendant elect to move for a

judgment of acquittal).  They are not a basis for preclusion.

Nor, as the defendant appears to suggest in the alternative, is he entitled to a pretrial

ruling as to what adjectives the Government may use in advancing its arguments, such as the

word "secret" (*id.* 23, 24, 25, 26, 27).  There was nothing remotely improper about this word (to

which, again, the defendant did not object), which plainly meant non-public or only known to

certain people.  The defendant is no more entitled to an order requiring the Government to use

his preferred verbal formulations, or to avoid using "sound-bites" with which he disagrees (*see*

*id.* 35), than the Government would be entitled to the reverse.  That is not how trials—

particularly jury addresses, and especially summations—work.  *See, e.g.*, *United States v. Rivera*,

971 F.2d 876, 884 (2d Cir. 1992) ("A prosecutor is not precluded from vigorous advocacy, or the

use of colorful adjectives, in summation."); *United States v. Wexler*, 79 F.2d 526, 530 (2d Cir.

1935) (L. Hand, J.) (A summation is not a "detached exposition as would be appropriate in a

lecture.").

Only three of the defendant's statements or claims may warrant further discussion, because they appear to be based on a foundational mischaracterization of a Government legal theory or are more akin to a motion *in limine* that may be resolved by the Court before trial.

*First*, the defendant states, without elaboration: "For approximately 15 years after Glenwood's initial retention of Jay Goldberg, Glenwood was unaware that [the defendant] was receiving referral fees from that law firm.  The government has no plausible bribery theory during this time period." (Def. Mem. 19.)  That is wrong.  As the Government explained in its opposition to the defendant's most recent motion to dismiss, the evidence previously showed and is expected again to show that, even before Glenwood learned of payments to the defendant directly, Glenwood knew it was directing lucrative tax certiorari business to Goldberg & Iryami at the defendant's request and because it wanted the defendant to take official action on its behalf (or refrain from taking official action that might hurt its business), even if it did not know precisely how the defendant was benefiting.  *See Silver*, 184 F. Supp. 3d at 40 (citing testimony regarding Glenwood and Witkoff's decision to send business to Goldberg & Iryami in order to obtain access to, and in order not to alienate, the defendant); *id.* at 46 ("There is no legal requirement that the payor understand the precise nature of the benefit that is flowing to the public official, and there is no question Glenwood and Witkoff understood that they were transferring their tax certiorari business at Silver's request and for the benefit, at a minimum, of Silver's friend.").  *See also supra* pp. 39-40 (citing cases explaining that Hobbs Act extortion does not require a defendant to receive directly the extorted benefits); *Ring*, 706 F.3d at 468 (the word "agreement" in federal bribery prosecutions "is used as a synonym for specific intent.  When . . . a public official is charged with *soliciting* a bribe, the evidence must show that the official conveyed an intent to perform official acts in exchange for personal benefit." (emphasis

in original)). And the fact that this is what was happening—that is, that the developers were sending their business to Goldberg & Iryami because of and to please (and/or not to alienate) the defendant, and that the defendant knew that—is reinforced by, among other things, the continuation of those payments after Glenwood discovered that the defendant was receiving a percentage of the fees.

*Second*, the defendant asserts that a statement of Daniel Chill to Dr. Taub concerning the defendant wanting mesothelioma cases is inadmissible. (Def. Mem. 27-29.) It is not. The Government expects Dr. Taub will testify that, in 2003, Chill introduced him to the defendant. During the conversation, Dr. Taub asked the defendant to influence Weitz & Luxenberg to donate funds to the Mesothelioma Applied Research Foundation (or "MARF"). Dr. Taub is expected to testify that the defendant declined his request and that he reported the defendant's negative response to Chill. Days later, Chill approached Dr. Taub with a message—"Shelly wants cases." That statement, which the Government did not offer at the first trial because of an agreement between the parties, is admissible.

As an initial matter, the statement can be viewed as an instruction from Chill that Dr. Taub should send cases to the defendant in order to receive state funding. Such directives are not hearsay. *See, e.g.*, *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."). But even if viewed as something other than an instruction from Chill to Dr. Taub, the statement is still admissible either as an authorized statement by the defendant or as a statement bearing on Dr. Taub's state of mind that explains his subsequent decision to send cases to the defendant.

Under Federal Rule of Evidence 801(d)(2)(C), a statement is not hearsay if it is "offered against an opposing party" and it "was made by a person whom the party authorized to make a statement on the subject."  The rule provides that "[t]he statement must be considered but does not by itself establish the declarant's authority" to speak.  *Id.*  The circumstances preceding and following the statement that the defendant challenges here make clear that it was authorized, explicitly or implicitly, by the defendant.  *See United States v. Iaconetti*, 540 F.2d 574, 577 (2d Cir. 1976) (in case involving solicitation and receipt of a bribe, the defendant's request for payment was later communicated to others and held to be "impliedly authorized" under Rule 801(d)(2)(C) because "by requesting a bribe from [the bribe payer], appellant impliedly authorized [the bribe payer] to confer with his associates in order to get their permission to pay the bribe"); *Leser v. U.S. Bank Nat. Ass'n*, No. 09 Civ. 2362 (KAM) (MDG), 2012 WL 6738402, at *3 (E.D.N.Y. Dec. 29, 2012) ("Under 801(d)(2)(C), a party may bestow speaking authority upon an individual either 'expressly or implicitly.'" (citing *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 260 (S.D.N.Y. 2003))).

There are at least three reasons why the Court can and should conclude that Chill's statement falls within Rule 801(d)(2)(C).  First, it is clear that the defendant spoke to Chill and told him he wanted cases from Dr. Taub.  As noted above, Chill's statement, "Shelly wants cases," came on the heels of Dr. Taub's request for funding and the defendant's immediate refusal.  Chill was aware that the defendant refused because Dr. Taub told him so.  Chill was only able to return to Dr. Taub with the message that the defendant wanted cases from Dr. Taub because the defendant spoke to Chill about that fact.  There is no other plausible explanation for the statement, and, in fact, defense counsel conceded as much in the first trial.  (*See* Tr. 271.) Indeed, Dr. Taub decided to send cases to the defendant precisely because Dr. Taub himself

concluded, based on the timing and substance of the statement, that Chill was carrying a message from the defendant.  Second, the record is expected to show that the defendant used Chill more than once to act on his behalf when setting up his relationship with Dr. Taub.  Following the defendant's request for cases, the defendant again used Chill to send Dr. Taub a different message—that he (the defendant) wanted Dr. Taub to write a letter seeking state funding for mesothelioma research.  It was only later, once the defendant had established a relationship with Dr. Taub, that he requested that Dr. Taub cut Chill out of their communications.  This pattern of behavior provides ample support for the conclusion that the defendant authorized Chill to tell Dr. Taub that he wanted cases.  Third, the defendant expressed no surprise at all when Dr. Taub began referring cases to him.  In a world in which the defendant had not authorized Chill to speak to Dr. Taub about his desire for cases, the sudden appearance of highly lucrative referrals from a near stranger, whom he had only met in passing twice over two decades, would make no sense.  By contrast, the defendant's no-questions-asked acceptance of the referrals was the natural response because he was receiving the exact thing he had previously requested.

In addition to being an authorized statement, the statement "Shelly wants cases" is undoubtedly admissible to explain *why* Dr. Taub decided to send the defendant cases.  In fact, at the first trial, then-defense counsel conceded that the Chill-Taub conversation was admissible for that purpose.  (Tr. 2831-33.)  Dr. Taub's state of mind remains highly probative, and the statement is necessary background to his decision to begin the stream of referrals.  Without it, the jury will be left with the demonstrably incorrect belief that Dr. Taub began referring cases to the defendant for no reason at all and without any expectation that the defendant wanted them. Under these circumstances, the statement is not offered for its truth and therefore is not hearsay. *See, e.g.*, *United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir. 1984) ("When statements by an

out-of-court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed."). Indeed, the truth of the matter—*whether* the defendant in fact wanted cases from Dr. Taub—was not contested at the first trial and the Government does not expect it to be contested at the second. After all, the record, which will include the direct conversations between Dr. Taub and the defendant about referrals over the course of a decade, will make clear that the defendant both wanted cases and complained when he felt he was not getting enough of them. The issue that is hotly contested is whether the defendant sought case *in exchange for* state action, not whether he sought cases at all.

It is important to recognize, moreover, that the defendant's present motion is focused less on the admissibility of the Chill statement and more on seeking an order precluding the Government from arguing that the defendant sought referrals. (*See* Def. Mem. 29 (seeking to preclude the Government from "arguing to the jury without an evidentiary basis that it was Mr. Silver who first requested referrals from Dr. Taub").) It is entirely proper for the Government to argue, and the jury to ultimately infer, that Chill's statement (which, as noted above, is admissible under multiple bases) flowed from an earlier conversation with the defendant. *See Edwards*, 342 F.3d at 181 (The Government "has broad latitude in the inferences it may reasonably suggest to the jury during summation."). The sequence of events leading up to and following Chill's statement is strong circumstantial evidence of that conclusion. No other inference makes sense.

*Finally*, the defendant claims that the Government offered into evidence emails for the state of mind of Dr. Taub that should not have been admitted because they allegedly have no

relevant purpose except to support improper "propensity' arguments.  (Def. Mem. 38-41.)  As

the defendant acknowledges in a lengthy footnote (*id.* 39 n.7), this issue was litigated at the first

trial, and the Court ruled against the defendant after hearing considerable argument from the

parties.  (*See* Tr. 348-62.)   The defendant's most recent motion simply resurrects the same

arguments that the Court previously and properly rejected.  Because he has offered no cogent or

compelling reasons to revisit the Court's ruling, the defendant's attempt to re-litigate the issue

should be denied.

## CONCLUSION

For the foregoing reasons, the defendant's motions should be denied.

Dated: New York, New York
       March 26, 2018

                                    Respectfully submitted,

                                    GEOFFREY S. BERMAN
                                    United States Attorney


                        By:     s/_____
                                    Tatiana R. Martins
                                    Daniel C. Richenthal
                                    Damian Williams
                                    Assistant United States Attorneys
                                    (212) 637-2215/2109/2298