UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA : 

  - *v* - :         S1 15 Cr. 93 (VEC)

SHELDON SILVER, :

       Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S MOTION FOR BAIL PENDING APPEAL AND TO STAY FINANCIAL PENALTIES PENDING APPEAL

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
Attorney for the United States of America

Daniel C. Richenthal
Damian Williams
Assistant United States Attorneys

- Of Counsel -

## Table of Contents

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

    I.       THE ASBESTOS SCHEME ............................................................................ 3

    II.      THE REAL ESTATE SCHEME ...................................................................... 4

    III.     THE INVESTMENT OF ILLICIT PROCEEDS ............................................. 6

    IV.     THE JURY CHARGE ...................................................................................... 6

    V.      THE JURY'S VERDICT AND POST-TRIAL PROCEDURAL HISTORY .......... 8

ARGUMENT ......................................................................................................................... 8

    I.       SILVER IS NOT ENTITLED TO BAIL PENDING APPEAL .............................. 8

        A.   Applicable Law ................................................................................... 8

        B.   Discussion ........................................................................................... 9

            1.   The Court's Bribery Instruction Was Correct .............................. 10

            2.   Assuming *Arguendo* That The Court's Bribery Instruction Was Erroneous, Silver Still Is Not Entitled To Bail Pending Appeal ..................... 14

CONCLUSION .................................................................................................................... 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA           :

   - *v* -                                           :           S1 15 Cr. 93 (VEC)

SHELDON SILVER,                    :

        Defendant.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO THE DEFENDANT'S MOTION FOR BAIL PENDING APPEAL
AND TO STAY FINANCIAL PENALTIES PENDING APPEAL**

The Government respectfully submits this memorandum of law in opposition to the defendant's motion for bail pending appeal and to stay financial penalties pending appeal.

## PRELIMINARY STATEMENT

Twice convicted of all offenses with which he is charged, Sheldon Silver ("Silver" or the "defendant") now seeks bail pending appeal on a single decidedly insubstantial question of law. In his brief filed on August 6, 2018 (Dkt. 456) ("Def. Br."), Silver assets that the Court erred by not instructing the jury that, to be guilty, he had to have entered into a *quid pro quo* "agreement" with those paying him. Silver has repeatedly raised this issue of so-called one-sided intent, and he has repeatedly lost, for good reason. As the Court previously explained with respect to honest services fraud, "The Government must only prove that Silver—not the bribe giver—understood that, as a result of the bribe or kickback, he was expected to exercise official influence or make official decisions for the benefit of the giver." *United States v. Silver*, 184 F. Supp. 3d 33, 45 n.5 (S.D.N.Y. 2016) (citations omitted). Silver's continued disagreement with this Court's holding,

which was grounded in both precedent and principle, and is law of the case, does not make for a "substantial question," as is required for him to be entitled to bail pending appeal.

In any event, even if Silver were correct that the Government must prove a *quid pro quo* agreement in a case where a defendant is not charged with conspiracy, Silver still would not be entitled to bail pending appeal for multiple reasons, including that (a) Dr. Robert Taub testified that he understood that there *was* an agreement, and Silver did not challenge Dr. Taub's credibility, and (b) the one-sided intent instruction was given only with respect to the honest services fraud counts. Having been sentenced to concurrent terms of imprisonment on all counts, Silver thus does qualify for bail pending appeal even if he were correct on the law—and he is not correct.

## STATEMENT OF FACTS

As the Court is well aware, the Government's evidence at trial conclusively demonstrated that Silver orchestrated and carried out two criminal schemes to use his official position as the powerful Speaker of the New York State Assembly to engage in official acts in exchange for millions of dollars in bribes and extortion payments. The evidence further demonstrated that Silver engaged in multiple financial transactions with the proceeds of the schemes.

Much of the evidence presented at trial was undisputed, including evidence of the payments made to Silver, on the one hand, and the actions taken by Silver that benefited the sources of those payments, on the other. As discussed below, the only real dispute at trial was whether Silver solicited and accepted the payments in exchange for official actions on the state funding, legislation, and other matters of importance to those who provided him with the payments, *i.e.*, the *pro* component of a *quid pro quo* offense. As reflected by the jury's convictions on all seven counts, the jury found that the Government proved the *quid pro quo* for

2

both corrupt schemes beyond a reasonable doubt, a finding upheld by this Court in its denial of Silver's post-trial motions.

## I. THE ASBESTOS SCHEME

Silver's criminal schemes followed the same basic model: He solicited and received bribes and extortion payments in the form of referral fees in exchange for agreeing to take and taking official actions. In the Asbestos Scheme, Silver agreed to take, and did take, numerous official actions on behalf of Dr. Taub in exchange for lucrative leads to patients with mesothelioma ("Mesothelioma Leads") sent to Silver at Weitz & Luxenberg, P.C., where Silver was "of counsel." Over the course of the scheme, in response to specific requests from Silver that were first made in 2003 and that continued through at least 2011, Dr. Taub sent numerous Mesothelioma Leads to Silver at Weitz & Luxenberg, from which Silver reaped more than $3 million in personal profits. (GX 1509.) Silver continued to receive payouts from these profitable Mesothelioma Leads up until his arrest in this case.

The evidence further established that, in exchange for this stream of leads and resulting fees, Silver took a number of official acts that benefited Dr. Taub, including: (1) a $250,000 payment from a non-public, taxpayer-funded source—which Silver controlled—called the Health Care Reform Act Assembly Initiatives Pool (the "HCRA Assembly Pool"); (2) a second $250,000 payment from the HCRA Assembly Pool; (3) the passage of a New York State Assembly official resolution and proclamation honoring Dr. Taub, which could only have been obtained by a member of the Assembly; and (4) Silver's agreement to assist with securing necessary governmental permits for a charity event with which Dr. Taub was associated.

Silver's deliberate and repeated concealment of his *quid pro quo* relationship with Dr. Taub was powerful proof of Silver's consciousness of guilt. For instance, the Government

3

established that Silver (1) used an intermediary—Daniel Chill—to set up his relationship with Dr. Taub, thereby distancing himself from an explicit request for referrals (Tr. 249); (2) instructed Dr. Taub to not speak to Chill about the referrals once the corrupt relationship was established (Tr. 293); (3) ceased funding Dr. Taub's research once the disclosure rules changed and the public would have learned about Silver's illicit use of taxpayer money; (4) made repeated false and misleading statements in the press and to his press secretary about the nature of his law practice at Weitz & Luxenberg and the time he spent working on cases, thereby concealing the fact that he was generating substantial outside income because of his relationship with Dr. Taub; and (5) asked Dr. Taub whether he "had told the agents anything" after Dr. Taub told him that he had been interviewed by law enforcement (Tr. 282).

## II. THE REAL ESTATE SCHEME

In the second of the corrupt schemes—the Real Estate Scheme—Silver agreed to and did take official action on behalf of two real estate developers (Glenwood Management Corp., referred to herein as "Glenwood," and The Witkoff Group LLC, referred to herein as "Witkoff"), in exchange for personal financial benefits in the form of attorney referral fees. Specifically, the evidence at trial showed that, through an arrangement with Jay Arthur Goldberg, a former Assembly staffer and friend who worked in the tax certiorari field, Silver arranged to get a cut of any fees that Goldberg's law firm (Jay Arthur Goldberg, P.C., later known as Goldberg & Iryami, P.C., referred to herein as the "Goldberg Firm") got from business Silver steered to the firm. Silver then used the power of his office, and the promise and threat of official action, to get Glenwood and Witkoff to send their tax certiorari business to the Goldberg Firm, which netted him hundreds of thousands of dollars in kickbacks. (GX 732, 1515.)

4

The evidence also showed that Silver took a number of contemporaneous official acts that benefited Glenwood and Witkoff. Among other things: (1) Silver voted (through a proxy) as one of three voting members of a State entity called the Public Authorities Control Board ("PACB") to approve Glenwood's request for more than one billion dollars in tax-exempt State financing for its projects, approval that was necessary for the State financing to be issued (GX 1522); and (2) Silver personally signed off on rent and tax abatement legislation that left Glenwood "satisfied" (Tr. 1220), having met privately with Glenwood and its chief lobbyist to confirm Glenwood's interests and needs.

As with the Asbestos Scheme, Silver covered up the corrupt Real Estate Scheme through secrets and lies that continued until soon before his arrest. For example, Silver hid from his fellow legislators the fact that he was receiving hundreds of thousands of dollars in personal financial benefits from Glenwood at the same time he was passing legislation favorable to it, and he hid from the PACB the fact that he was benefitting personally from Glenwood's largesse at the same time he was approving over $1 billion in State financing for Glenwood. Moreover, in communications through his press secretary and direct communications with the press and public, continuing until shortly before his arrest, Silver lied repeatedly about the source of his income, never disclosing that he obtained income from the real estate industry, much less from one of the State's largest developers and its most active corporate participant in the political process. To the contrary, Silver falsely stated that his clients were "little people" and that he did not represent "corporations" or "entities that are, uh, um, you know, involved in the legislative process" or "had an impact on anything we do legislatively." (GX 1A, 2, 4, 5.) In addition, Silver's annual financial disclosures never revealed that the Goldberg Firm (or any firm other than Weitz & Luxenberg) served as a source of outside income, despite Silver being instructed to

list "EACH SOURCE" of outside income, and Silver never revealed in those disclosures that he derived any outside income connected to the real estate industry at all. (GX 2009 (summarizing disclosure forms).)

### III. THE INVESTMENT OF ILLICIT PROCEEDS

The jury also heard testimony and saw documents about Silver's efforts to maximize the value of his ill-gotten gains by moving them through investment vehicles not available to the general public. Jordan Levy, a private investor, testified that Silver, alone among all of his friends and acquaintances working in the public sector, asked Levy to permit Silver to invest his funds in private high-yield investment vehicles. Testimony and exhibits introduced at trial reflected that Silver funded these investments by taking money that he made from the Asbestos and Real Estate Schemes, including money in increments of greater than $10,000, depositing the money into a federally-insured bank account, and sending the money to the vehicles as directed by Levy. (GX S-5, 1511-13.)

The laundering scheme included further evidence of Silver's efforts to conceal the source and extent of his ill-gotten gains. As Levy testified, Silver never disclosed his receipt of asbestos- or real estate-related fees to Levy. Moreover, in 2011, Silver asked that one of the investment vehicles be split in half, with half placed in his wife's name, so that the public would not see the amount of his investment, and thus the wealth he had amassed from the schemes. (GX 922-23, 978-99; Tr. 1453-54, 1663-66.)

### IV. THE JURY CHARGE

At the conclusion of the Government's case-in-chief, the Court held a conference with the parties regarding the jury charge. Consistent with his proposed jury instructions, Silver asserted during the charge conference that, to be found guilty, "there has to be an agreement to

exchange official acts for bribes." (Tr. 1567-68; *see* Dkt. 373-4 at 21-24.) The Government disagreed, and the Court ultimately decided, consistent with its prior rulings, that, with respect to the honest services fraud counts, no "agreement" to exchange bribes for official acts was required. (Tr. 1570.) Accordingly, the Court instructed the jury as follows with regard to those counts:

> The payment and the receipt of a bribe are not interdependent offenses because the intent of the party giving the thing of value may be different from the intent of the party receiving the thing of value. Therefore, the Government only has to prove that Mr. Silver—not the bribe giver—understood that, as a result of the bribe, he was expected to exercise official influence or take official action for the benefit of the payor and, at the time the bribe was accepted, intended to do so as specific opportunities arose.

(Tr. 2044.)

The Court's extortion instruction was different. The Court previously had held that, "[u]nlike honest services fraud, extortion under color of official right does require the Government to prove that the bribe giver was 'motivated to make payments as a result of the defendant's control or influence over public officials and that the defendant was aware of this motivation.'" *Silver*, 184 F. Supp. 3d at 46 n.7 (quoting *United States v. McDonough*, 56 F.3d 381, 388 (2d Cir. 1995)).[1] The Court therefore instructed the jury that, for extortion, the Government had to prove:

> that Mr. Silver obtained property to which he was not entitled by his public office, knowing that it was given in return for official acts as the opportunity arose, rather than being given voluntarily and unrelated to Mr. Silver's public office. The Government must also prove, beyond a reasonable doubt, that the extorted party was motivated, at least in part, by the expectation that as a result of the

---

[1] The Government does not necessarily agree that extortion under color of official right requires proof that those paying a defendant in fact paid him with such a motivation, and that the defendant knew that, rather than proof that the defendant, at the time he acted, *intended* to so motivate the person from whom he sought payment.

7

> payment, Mr. Silver would exercise official influence or decision
> making for the benefit of the extorted party (or would refrain from
> taking action to the detriment of the extorted party), and that Mr.
> Silver was aware of their motivation.

(Tr. 2054.) Silver's proposed extortion instruction largely tracked the Court's instruction in this respect. (*See* Dkt. 373-4 at 35.)

### V. THE JURY'S VERDICT AND POST-TRIAL PROCEDURAL HISTORY

On May 11, 2018, Silver was convicted of all of seven counts with which he had been charged. After the conclusion of trial, Silver filed a motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. On July 27, 2018, the Court denied both motions and sentenced Silver to seven years' imprisonment on each of Counts One through Seven, to run concurrently. In addition to a mandatory special assessment, the Court imposed a $1,750,000 fine. The Court also ordered Silver to forfeit the referral fees and any investment gains traceable to those fees, with the latter sum to be determined later, with the consent of both parties.

## ARGUMENT

### I. SILVER IS NOT ENTITLED TO BAIL PENDING APPEAL

#### A. Applicable Law

Title 18, United States Code, Section 3143(b), provides that a court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment" be detained pending appeal unless the judicial officer finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released," and "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in . . . reversal [or] an order for a new trial." 18 U.S.C. § 3143(b)(1)-(2).

That provision gives effect to Congress's view that "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances." *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985) (quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970)). Following a guilty verdict and sentencing, there is a "presumption in favor of detention." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004). It is the defendant's burden to "rebut this presumption with clear and convincing evidence." *Id.*

A "substantial question" is "a 'close' question or one that very well could be decided the other way." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (quoting *United States* v. *Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)). "If a court does find that a question raised on appeal is 'substantial,' it must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'" *Id.* (quoting *Miller*, 753 F.2d at 23). As this Court has explained, "the appeal must raise a substantial question that, if decided in defendant's favor, will likely result in a reversal or order for a new trial as to *all counts* for which a defendant has been sentenced to prison." *United States v. Silver*, 203 F. Supp. 3d 370, 377 (S.D.N.Y. 2016) (emphasis added). With respect to all of these issues, "the burden of persuasion rests on the defendant." *Randell*, 761 F.2d at 125-26.

**B. Discussion**

Apart from a conclusory footnote (Def. Br. 2 n.1), which does not suffice to discharge his burden, Silver's sole contention in support of his motion is that he warrants bail pending appeal because the Government purportedly must prove an "agreement" (*id.* 1)—a meeting of the minds between Silver and those paying him—to establish the existence of a *quid pro quo*, even in a

case where the defendant, as here, is not charged with conspiracy. Silver is wrong. But he would not be entitled to bail pending appeal even were he right.

1. **The Court's Bribery Instruction Was Correct**

While "proof of a quid pro quo" is "an essential element of a bribery theory of honest services fraud," *United States v. Bruno*, 661 F.3d 733, 743 (2d Cir. 2011) (citing *United States v. Ganim*, 510 F.3d 134, 148-49 (2d Cir. 2007)), the law does not require, at least with regard to honest services fraud (or any similar bribery charge), that there be a *quid pro quo* "agreement." This Court previously held thusly, explaining:

> [T]he intent of the bribe giver may be different from the intent of the bribe receiver. The Government must only prove that Silver—not the bribe giver—understood that, as a result of the bribe or kickback, he was expected to exercise official influence or make official decisions for the benefit of the giver.

*Silver*, 184 F. Supp. 3d at 45 n.5 (citing *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013); *Bruno*, 661 F.3d at 743-44; *United States v. Ring*, 706 F.3d 460, 468 (D.C. Cir. 2013)). That ruling, which is law of the case, was manifestly correct.

Silver does not engage with this Court's reasoning or the decisions that this Court relied upon. Indeed, Silver does not even cite those decisions. Instead, he presses four arguments. Each is baseless.

*First*, he states that, in ruling on his prior appeal, the Second Circuit used the phrase "*quid pro quo* agreement" to describe what the Government must show to prove him guilty. (Def. Br. 9 (quoting *United States v. Silver*, 864 F.3d 102, 111 (2d Cir. 2017)).) But Silver omits what preceded this phrase, that the requirement is simply that the Government show "that the defendant received, or intended to receive, something of value in exchange for an official act." *Silver*, 864 F.3d at 111. In short, it is *the defendant's* state of mind that matters—not that of the

person paying him. That the Second Circuit used the word "agreement" as short-hand for that state of mind does not change this foundational point, as demonstrated not simply by the Second Circuit's explanation of the state of mind, but also by the cases upon which it relied. *See id.* at 864 n.24 (citing, *inter alia*, *Bruno*, 661 F.3d at 743-44, which Silver omits from his brief).

Silver argues to the contrary by asserting that, in resolving his prior appeal, the Second Circuit also purportedly made "clear that 'collu[sion]' between the payor and the recipient is what distinguishes a bribe from mere undisclosed self-dealing." (Def. Br. 9 (quoting *Silver*, 864 F.3d at 114 n.50).) This assertion is disingenuous, at best. What the Second Circuit said was: "The evidence at trial demonstrated that Silver's proven conduct, in colluding with Dr. Taub and the Developers, went far beyond undisclosed self-dealing." *Silver*, 864 F.3d at 114 n.50. This statement—made in the course of rejecting Silver's sufficiency argument, in a section of the opinion that was about the facts, not the law—plainly did not "mak[e] clear" that the *mens rea* for a substantive bribery offense, as charged in this case, is the same as that for a "*conspiracy*" (Def. Br. 9 n.4 (emphasis in original)). It cannot be and is not. *See, e.g.*, *Pinkerton v. United States*, 328 U.S. 640, 643 (1946) ("It has been long and consistently recognized . . . that the commission of [a] substantive offense and a conspiracy to commit it are separate and distinct offenses.").

Nor did the Supreme Court hold to the contrary in *Skilling v. United States*, 561 U.S. 358, 410 (2010), as Silver misleadingly suggests (Def. Br. 9). The section of the Supreme Court's decision that Silver excerpts was describing the particular facts of a different case, *McNally v. United States*, 483 U.S. 350 (1987), not holding that, in the bribery context (but in no other context), there is no distinction between conspiring to commit the offense and committing it. Were the Supreme Court so holding, one would expect it to have wrestled with the fact that, in

11

*United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 405-06 (1999), it had defined "*quid pro quo*" as the "specific intent" on the part of the defendant "to give or receive something of value in exchange for an official act." That definition, which Silver omits from his brief, is irreconcilable with his theory. *See also, e.g.*, *United States v. Brewster*, 408 U.S. 501, 526 (1972) ("acceptance of the bribe is the violation").

Other courts are in accord. Canvasing case law, and rejecting the argument that Silver makes here—that the word "agreement" in certain prior decisions means that there must be meeting of the minds, even in a case not charging conspiracy—the Tenth Circuit explained:

> The key question in this case, then, is not whether both [the official] *and* [the private party] had a corrupt intent but *whether [the official] had a corrupt intent*—whether he had the intent to receive the retainer fees [at issue] in exchange for his legislative influence."

*United States v. Morgan*, 635 F. App'x 423, 431 (10th Cir. 2015) (emphases in original); *see also Ring*, 706 F.3d at 468 (in the context of federal bribery law, the word "'agreement' is used as a synonym for specific intent. When . . . a public official is charged with *soliciting* a bribe, the evidence must show that the official conveyed an intent to perform official acts in exchange for personal benefit." (emphasis in original)).

*Second*, Silver asserts that "the Second Circuit already rejected the government's position—that bribery can be proven by showing that the defendant was influenced by a payment." (Def. Br. 9.) But it is not the Government's position, and it certainly was not this Court's instruction to the jury, that the jury needed to find that Silver was "influenced" in some undefined way. As discussed above, the Court instructed the jury that it needed to find that Silver "understood that, as a result of the bribe, he was expected to exercise official influence or take official action for the benefit of the payor and, at the time the bribe was accepted, intended

12

to do so as specific opportunities arose." (Tr. 2044.) Indeed, this instruction tracked that in the very case that Silver cites, *United States v. Alfisi*, 308 F.3d 144 (2d Cir. 2002), for the proposition that this Court's instruction was somehow erroneous. *See id.* at 150 (approving instruction, with respect to a bribe-payor, that the jury must find that the defendant acted with "a corrupt intention specifically to influence the outcome of the official act"; explaining that "[t]his instruction clearly set out the *quid pro quo* requirement").

*Third*, Silver asserts that "[b]eing influenced by a payment cannot be sufficient to turn the payment into a bribe because, as this Court has previously recognized, it is not a defense to bribery that a public official would have taken the same official acts in the absence of a bribe." (Def. Br. 10.) But again, the Court did not instruct the jury that it needed to find that Silver was "influenced" in some undefined way. Silver cannot demonstrate that this Court committed instructional error by positing that the Court gave a different instruction from what it gave.

*Finally*, Silver contends that this Court's instruction violated Due Process. (Def. Br. 11.) This argument—in support of which Silver cites nothing, except a case that rejects the argument—may reasonably be characterized as frivolous. As the Court has already explained, and as discussed above, its instruction was well-grounded in precedent. Indeed, as demonstrated by the great lengths to which Silver went to lie about and conceal what he was doing, and by the question that he asked Dr. Taub after Dr. Taub was visited by law enforcement, it is apparent that Silver knew that he was engaged in criminal wrongdoing.[2]

---

[2] In pressing this final argument, Silver also repeats his claim that this Court erred in failing to instruct the jury, with respect to extortion, that it had to find that Silver "created or instilled fear, or used or exploited existing fear." (Def. Br. 11.) It is unclear in what way Silver believes that this claim bolsters his argument of instructional error with respect to the *quid pro quo* requirement. In any event, Silver was charged with extortion under color of official right. The requisite mental state is not intending to create or use "fear," but to obtain a payment in return for official action. The Supreme Court held thusly *Evans v. United States*, 504 U.S. 255

13

## 2. Assuming *Arguendo* That The Court's Bribery Instruction Was Erroneous, Silver Still Is Not Entitled To Bail Pending Appeal

For the reasons previously articulated by the Court, and discussed above, Silver's theory of bribery law is wrong. That theory does not become "substantial" merely because Silver repeats it yet again. But Silver would not be entitled to bail pending appeal even were his theory the law, for two independent reasons.

*First*, as described in the Government's opposition to Silver's post-trial motions (Dkt. 30), there was overwhelming evidence of Silver's guilt. To receive *vacatur*, there must be both instructional error *and* prejudice. *See, e.g.*, *United States v. Carr*, 424 F.3d 213, 218 (2d Cir. 2005). Even assuming *arguendo* that Silver could demonstrate the former, he cannot demonstrate the latter. This is particularly true with respect to the Asbestos Scheme. As described in greater detail in the Government's opposition, Dr. Taub's testimony, which Silver endorsed as true (Tr. 2005), described the contours of their corrupt relationship, including that he and Silver had an "implicit understanding" that he would exchange mesothelioma referrals for official action from Silver. (Tr. 273-74.) On direct examination, Dr. Taub explained:

> As a legislator, he could help mesothelioma patients in a variety of ways. For example, he could help regulate laws relating to asbestos production or asbestos use, and particularly asbestos inspections within the state, which were weak at the time. He could influence legislation to help support research in cancer in general and mesothelioma in particular. He could also help, for example,

---

(1992). The holding is irreconcilable with his claim: "We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.* at 268. Nor is Silver correct that the Court's instruction somehow permitted conviction for extortion based on a "unilateral" belief of Silver's "clients." (Def. Br. 11.) As discussed above, the Court instructed that the Government must prove "that the extorted party was motivated, at least in part, by the expectation that as a result of the payment, Mr. Silver would exercise official influence or decision making for the benefit of the extorted party (or would refrain from taking action to the detriment of the extorted party), *and that Mr. Silver was aware of their motivation*." (Tr. 2054 (emphasis added).)

14

> regulate insurance companies in the state so that they would not balk at supporting clinical trials, which they would like to consider as experimental but actually were very helpful in treating patients.

(Tr. 271-72.) Dr. Taub went on to explain that while he did not know *when* Silver would use his power as Speaker of the Assembly, he "thought that, however, the *occasions might arise* where a legislation would be important, and if he could impact, that would be a help." (Tr. 272 (emphasis added).) Silver, who had previously expressed no interest in mesothelioma research, became an advocate, just as Dr. Taub expected, because of the referrals. Among other things, in exchange for the referrals, Silver steered two $250,000 state grants, from the HCRA Assembly Pool, to Dr. Taub's research center.

On cross-examination, Dr. Taub expanded on the understanding he had with Silver. Asked whether he "had an arrangement with Shelly," Dr. Taub replied, "The understanding was that I felt that he wanted the cases . . . in order to incentivize him to be an advocate for mesothelioma patients and to help raise funds for mesothelioma research." (Tr. 379-80.) Asked "when do you think that understanding" was reached, Dr. Taub staetd "that understanding came about when he first said he could do nothing [about raising funds through Weitz & Luxenberg]. And then, when Mr. Chill said Shelly wants cases, I thought, my understanding, I thought that he felt that that would incentivize him, yes." (Tr. 380.)

But the Government's proof extended well beyond Dr. Taub's description of his corrupt relationship with Silver. The evidence established that Silver requested referrals from Dr. Taub "a few days" after Dr. Taub initially requested mesothelioma funding from Silver. (Tr. 249.) Silver then directed Dr. Taub write him a letter seeking state funding within months of when Dr. Taub began sending referrals to Silver. (Tr. 254-55.) Silver then steered the first $250,000 state

15

grant to Dr. Taub's mesothelioma center only *after* he received a $176,048.02 check generated by Dr. Taub's referrals. (GX 320, 514-1, 1509.)

On this record, even assuming *arguendo* that the Court erred in not instructing the jury that the Government needed to demonstrate an "agreement" to exchange bribes for official actions, particularly with respect to the Asbestos Scheme, any failure to so instruct was harmless.

*Second*, and in any event, even if Silver's challenge resulted in the *vacatur* of all of the honest services fraud counts, it would not result in the *vacatur* of the extortion counts (or the money laundering count). This dooms Silver's motion, because he received concurrent sentences on all counts. *See Randell*, 761 F.2d at 126 (denying bail pending appeal where defendant could not show that "the appeal raises a substantial question of law or fact likely to result in reversal or an order for a new trial on *all* of the counts for which he received prison terms (emphasis added)); *Silver*, 203 F. Supp. 3d at 377 (noting the defendant's burden to prove entitlement to relief on all counts of conviction).

As discussed above, with respect to extortion, the Court instructed the jury that it needed to find that "the extorted party was motivated, at least in part, by the expectation that as a result of the payment, [Silver] would exercise official influence or decision making for the benefit of the extorted party (or would refrain from taking action to the detriment of the extorted party), and that [Silver] was aware of their motivation." (Tr. 2054.)

In his brief, Silver attempts to avoid what flows from this instruction—that his claim, even if correct, would not result in a new trial on all counts, and therefore that he is not entitled to bail pending appeal—by asserting, in a footnote, that because the Government told the jury in summation that "the core of all these offenses is the same," he would be entitled to relief on all counts were he to achieve *vacatur* of any count. (Def. Br. 6 n.2 ("The meaning of 'quid pro

16

quo', if decided by the Second Circuit in Mr. Silver's favor, satisfies the 'all counts for which a defendant has been sentenced to prison' standard since the government argued as to the honest services fraud and Hobbs Act extortion counts that '[w]hat you should keep in mind as you deliberate is that the core of all these offenses is the same.'") (quoting Tr. 1952).)

This is nonsense. It was the Court, not the Government, that instructed the jury on the law (as the jury was well aware), and it is Silver's burden to establish that those instructions were both incorrect and entitle him to relief on all counts. Moreover, the Government's statement in summation, to which Silver did not object, and which Silver truncates in his brief, began by encouraging the jury to follow those instructions:

> Judge Caproni is going to give you a very detailed instruction on how each of these charges works and what you need to find, but let me say a few words very briefly about them right now. The charges for the asbestos scheme and the real estate scheme are honest services mail fraud, honest services wire fraud, and extortion under color of official right. *What you should keep in mind as you deliberate is that the core of all these offenses is the same.* That's what we have been discussing this morning.

(Tr. 1951-52 (emphasis added).) Nothing in this statement invited the jury to ignore the Court's instructions. Just the opposite. (*See also* Tr. 50 (We ask you to "follow Judge Caproni's instructions on the law."); Tr. 1957 ("It will soon be your turn to evaluate the evidence for yourselves. In doing so, we ask you now, as Mr. Williams asked you at the beginning of the case, to listen carefully to Judge Caproni's instructions on the law and to follow them.").)

The Government is unaware of any authority in support of the proposition that every sentence of a jury address must capture all aspects of the relevant law, or that the Government must avoid referring to the "core" or "heart" of the facts of a case, as Silver appears to suggest (Def. Br. 8 n.3). The law requires no such things. *See, e.g.*, *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (summations "are not detached expositions" (internal quotation marks

17

and citations omitted)); *United States v. Wilner*, 523 F.2d 68, 74 (2d Cir. 1975) ("A prosecuting attorney is not an automaton . . . ."); *United States v. Arboleda*, 20 F.3d 58, 61 (2d Cir. 1994) (The purpose of a summation "is to explain to the jury how that party views the evidence the jury has seen and heard and to suggest to that body what significance or inference it should attach to or draw from the evidence under the relevant law charged by the trial court."). Nor did Silver object to the other portions of the Government's summation that he now invokes (Def. Br. 7) in an attempt to suggest that the jury should be presumed not to have followed the Court's instructions—instructions that required the jury to find the very kind of a meeting of the minds with respect to extortion that Silver asserts was required for all counts.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion should be denied.

Dated: New York, New York
       August 16, 2018

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:   s/_____
      Daniel C. Richenthal
      Damian Williams
      Assistant United States Attorneys
      (212) 637-2109/2298