USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____9/17/18____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
UNITED STATES OF AMERICA,                       :
                                                :                    15-CR-93 (VEC)
                      -against-                  :
                                                :                    MEMORANDUM
                                                :                    OPINION & ORDER
SHELDON SILVER,                                 :
                              Defendant.         :
------------------------------------------------------------ X

VALERIE CAPRONI, United States District Judge:

On May 11, 2018, a jury found Sheldon Silver, former Speaker of the New York State

Assembly, guilty on two counts of honest services mail fraud, 18 U.S.C. §§ 1341, 1346, two

counts of honest services wire fraud, 18 U.S.C. §§ 1343, 1346, two counts of extortion under

color of official right, 18 U.S.C. § 1951, and one count of money laundering, 18 U.S.C. § 1957.

On July 27, 2018, Silver was sentenced to seven years imprisonment, fined $1.75 million, and

ordered to forfeit the proceeds of the crimes.  *See* Judgment [Dkt. 450].  Silver moves to continue

bail and to stay the fine and forfeiture orders pending appeal.  *See* Notice of Motion [Dkt. 455];

Memorandum of Law in Support of Motion to Continue Bail and to Stay Financial Penalties

Pending Appeal ("Mem.") [Dkt. 456].  For the following reasons, Silver's motion is denied in

part.

## BACKGROUND[1]

The Court assumes the parties' familiarity with the evidence introduced at trial as well as

the procedural history of the case and, therefore, offers only a brief overview of the crimes and

the procedural history of the case.  Silver orchestrated two criminal schemes that allowed him to

---

[1]        The Court refers to exhibits by the exhibit number they were assigned at trial and refers to the trial
transcript as "Tr."

corruptly profit from his position as the Speaker of the New York State Assembly and as an elected Assemblyman.  As part of the criminal schemes, Silver received referral fees from law firms in exchange for official actions that benefitted third parties.  One scheme involved referrals from Dr. Robert Taub, a physician who specialized in treating patients with asbestos-related illnesses.  His patients' valuable legal claims were referred to a law firm with which Silver was affiliated, and Silver profited from lucrative resolutions of those patients' claims.  The other scheme involved steering two real estate developers' tax certiorari business to a second law firm with which Silver had a referral arrangement.  Silver also invested the proceeds of his schemes into private, exclusive investment vehicles in violation of federal anti-money laundering statutes. *See, e.g.*, Opinion and Order, August 26, 2016 ("First Bail Op.") [Dkt. 325] at 1–6.

After a prior conviction was overturned on appeal, *see* Mandate [Dkt. 341], Silver was convicted on all counts and was sentenced to seven years of imprisonment on counts one through seven, all to run concurrently.  *See* Judgment.  The Court also ordered Silver to pay a fine of $1,750,000 ($250,000 on each count) and to forfeit an amount to be determined at a later date, but that would be no less than $3,739,808.53.  *See id.*  The Court ordered Silver to surrender to the Bureau of Prisons on October 5, 2018, and to pay $1,200,000 of the financial penalty no later than September 21, 2018.  *See id.*  The balance of the fine ($550,000) was due in monthly installments of no less than $5,846, starting August 15, 2018.  *See id.*

## DISCUSSION

In support of his motion to continue bail, Silver primarily argues that the jury charge was erroneous because it failed to charge that, as to the existence of a *quid pro quo* for the honest services fraud and color of official right extortion counts, "the government [was required to] prove at least an implicit agreement" between Silver and his counterparts for each scheme.  *See*

Mem. at 1, 5–12.  Silver also moves pursuant to Federal Rules of Criminal Procedure 38(c) and 32.2(d) to stay the financial penalty and forfeiture order pending appeal; he asserts that he has a meritorious appeal and that imposing the penalties now would irreparably harm him and his wife because they would, *inter alia*, need to sell their homes in order to pay the fine.  *Id*. at 2, 15–17. The Court finds that the continuation of bail pending appeal and a stay of the financial penalties are not warranted.  The Court will, however, modify the terms pursuant to which Silver must pay the fine.

## I.    Legal Standard

A convicted defendant who has been sentenced to imprisonment must be detained unless the Court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released [and] that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in . . . reversal [or] an order for a new trial . . . ."  18 U.S.C. § 3143(b)(1)(A)–(B).  It is the defendant's burden to rebut the presumption in favor of detention by clear and convincing evidence.  *See, e.g.*, *United States v. Abuhamra,* 389 F.3d 309, 319 (2d Cir. 2004) (citations omitted).  If a defendant meets this substantial burden, bail pending appeal is mandatory.  *See id*. (quoting 18 U.S.C. § 3143(a) for the post-verdict, pre-sentencing context; the mandatory language in 18 U.S.C. § 3143(b) for the post-sentencing context is identical).

The latter part of the second requirement—that the appeal raises a substantial question of law or fact likely to result in a reversal or order for a new trial—does not mean that the district court must "predict the probability of reversal."  *United States v. Randell*, 761 F.2d 122, 124 (2d Cir. 1985) (quoting *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)) (internal quotation marks omitted).  Instead, the requirement goes to "the significance of the substantial issue to the

ultimate disposition of the appeal." *Id.* (quoting *Miller*, 753 F.2d at 23) (internal quotation marks omitted). To determine whether this requirement is satisfied, a court must first determine whether the question on appeal is substantial. *Id.* at 125. A substantial question is more than "frivolous" and "is a close question or one that very well could be decided the other way." *Id.* (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)) (internal quotation marks omitted). If the question is substantial, a court "must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'" *Id.* (quoting *Miller,* 753 F.2d at 23). Put differently, the appeal must raise a substantial question that, if decided in a defendant's favor, will likely result in a reversal or order for a new trial as to all counts for which a defendant has been sentenced to prison. *Id.* at 126.

The primary focus of Silver's motion is the jury charge. A jury charge is in error if the "charge either fails to adequately inform the jury of the law, or misleads the jury as to a correct legal standard." *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006) (quoting *United States v. Doyle,* 130 F.3d 523, 535 (2d Cir. 1997)) (internal quotation marks omitted). A court must review the charge as a whole to determine whether a defendant was prejudiced and whether the charge "adequately reflected the law and would have conveyed to a reasonable juror the relevant law." *United States v. Mulder*, 273 F.3d 91, 105 (2d Cir. 2001) (quoting *United States v. Jones*, 30 F.3d 276, 284 (2d Cir. 1994)) (internal quotation marks omitted). "An erroneous instruction, unless harmless, requires a new trial." *United States v. Bah*, 574 F.3d 106, 114 (2d Cir. 2009) (quoting *Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir. 1994)) (internal quotation marks omitted). An error is harmless if it is clear beyond a reasonable doubt that a rational jury would have convicted if it had been properly charged. *Id.* (quoting *Quattrone*, 441 F.3d at 177).

4

As for whether delay is the purpose of an appeal, courts often make such determinations based on the facts and procedural history of the case, and tie this determination to whether the appeal raises a substantial question of law. *See, e.g.*, *United States v. Tischler*, No. S2 11 CR 424 NRB, 2013 WL 4535431, at *9 (S.D.N.Y. Aug. 23, 2013) ("For the foregoing reasons, we find that each of the issues Tischler proposes to raise on appeal . . . fails to raise a substantial question of law or fact likely to result in a reversal or an order for a new trial.  Indeed, we conclude that the purpose of his motion is precisely that which the statute forbids, namely, to delay the commencement of his term of imprisonment.") (citing *Randell*, 761 F.2d at 125); *United States v. Bhindar*, No. 07 CR 711-04 (LAP), 2010 WL 2633858, at *6 (S.D.N.Y. June 30, 2010) ("As set forth above, nearly two years passed between Bhindar's guilty plea and his sentencing.  This delay was mostly due to the fact that Bhindar changed counsel three times.  With this history, the Court is not persuaded by Bhindar's current counsel's claim that the instant motion is not for the purpose of delay.") (internal quotation marks and citation omitted); *United States v. Ciccone*, No. 07 CR. 399 (DLC), 2008 WL 2498242, at *1 (S.D.N.Y. June 19, 2008) ("The defendant has not carried this burden; he has identified no substantial question that is likely to result in a change to his sentence.  This motion is simply brought for purpose of delay.").  *See also United States v. Santiago*, 695 F. Supp. 1490, 1492 (S.D.N.Y. 1988) ("[W]here there exists no particular evidence that the stay is sought only for delay[,] this Court's determination of whether the request for a stay is merely a delay tactic is tied to its determination of whether the issues to be raised on appeal are substantial and whether they would likely result in reversal.").

For all the reasons stated in Silver's motion, and as determined after Silver's first trial, the Court finds by clear and convincing evidence that Silver is unlikely to flee or pose a danger

to the community.  *See* Mem. at 3–4; First Bail Op. at 9.  Thus, the issue to be decided is whether there is a substantial question that the charge was erroneous and, if so, whether there is likely to be a reversal or a new trial ordered.  The Court must also determine whether Silver has proven that the purpose of his motion was not to delay serving his sentence.

## II.     The Jury Charge

The Court conducted a charge conference at which the parties discussed at length objections to the Court's proposed jury instructions.  *See* Tr. at 1551:25–1650:3.  At the charge conference, Silver's counsel argued that, for both the honest services fraud and extortion counts, the jury must be instructed that it must find, at a minimum, an implicit agreement between Silver and another as to each alleged *quid pro quo*.  *See* Tr. at 1567:10–1572:19; 1594:23–1600:10; 1617:5–14; 1621:4–12.  The Court disagreed and stated that, although the Government had to prove a *quid pro quo* for the fraud and extortion counts, no "agreement" was required.  *See id*.

At trial, the Court gave the following instructions as to *quid pro quo*, honest services fraud, and color of official right extortion:

<u>Honest Services Fraud</u>

The third element that the government must prove beyond a reasonable doubt is that Mr. Silver received bribes as part of the scheme to defraud.

A bribe occurs when a public official corruptly seeks or accepts, directly or indirectly, something of value from another person with the intent to be influenced in the performance of his public duties.

To satisfy this element, the government must prove that there was a quid pro quo. Quid pro quo is Latin, and it means "this for that" or "these for those."  The government must prove that a bribe was sought or received by Mr. Silver, directly or indirectly, in exchange for the promise or performance of official action.  The government does not have to prove that there was an express or explicit agreement that official actions would be taken or that any particular action would be taken in exchange for the bribe. . . .

The payment and receipt of a bribe are not interdependent offenses because the intent of the party giving the thing of value may be different from the intent of the party receiving the thing of value.  Therefore, the government only has to prove that Mr. Silver -- not the bribe giver -- understood that, as a result of the bribe, he was expected to exercise official influence or take official action for the benefit of the payor and, at the time the bribe was accepted, intended to do so as specific opportunities arose.

Tr. at 2043:13–2044:20.

Color of Official Right Extortion

The third element that the government must prove beyond a reasonable doubt is that Mr. Silver used the authority of his public office to obtain the extorted property for himself or for a third party and that the extorted property was given, at least in part, because of Mr. Silver's official position.  In addition, as was the case when I charged you on honest services fraud, the extortion counts require the government to prove beyond a reasonable doubt the existence of a quid pro quo. As I explained to you earlier, quid pro quo is Latin, and it means "this for that" or "these for those."  To prove a quid pro quo, the government must prove that Mr. Silver knowingly and intentionally sought or received property, directly or indirectly, in exchange for the promise or performance of official action.  An act is done "knowingly and intentionally" if it is done deliberately and purposefully; that is, the defendant's actions were his conscious objective rather than the product of mistake or accident, mere negligence or some other innocent reason. . . .

To satisfy this element, the government must prove beyond a reasonable doubt that Mr. Silver obtained property to which he was not entitled by his public office, knowing that it was given in return for official acts as the opportunity arose, rather than being given voluntarily and unrelated to Mr. Silver's public office. The government must also prove beyond a reasonable doubt that the extorted party was motivated, at least in part, by the expectation that as a result of the payment, Mr. Silver would exercise official influence or decision-making for the benefit of the extorted party, or would refrain from taking action to the detriment of the extorted party, and that Mr. Silver was aware of their motivation. . . .

Again, as I charged you earlier, it is not necessary that Mr. Silver or the person giving the property state the quid pro quo in express or explicit terms. A quid pro quo can be implied from words and actions, so long as you find that Mr. Silver intended there to be a quid pro quo.

Tr. at 2053:1–2054:25.

III.    **Silver Has Not Raised a Substantial Question That Will Likely Result in Reversal or an Order for a New Trial If His Position Prevails on Appeal, and the Purpose of His Appeal is Delay**

  **a.  The Parties' Arguments**

Silver argues that the Second Circuit will decide the meaning of "quid pro quo" in his favor.  *See* Mem. at 8–12.  First, he looks to the Second Circuit's opinion in the appeal of his first trial, *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017) ("*Silver I*"), and the Supreme Court's opinion in *Skilling v. United States*, 561 U.S. 358 (2010).  *Id*. at 9.  Silver points out that those opinions use the terms "agreement," "colluding," and "conspired;" Silver claims these cases demonstrate that an agreement is what conceptually differentiates a bribe from the mere failure to disclose a conflict of interest.  *Id*.  Next, he looks to the Second Circuit's opinion in *United States v. Alfisi*, 308 F.3d 144 (2d Cir. 2002), to argue that bribery cannot be proven merely by showing that a defendant was influenced by a payment; an agreement is necessary because "the intent to influence, or to be influenced in, an official act, does not establish a bribe."  Mem. at 9–10.  Third, Silver argues that "[b]eing influenced by a payment cannot be sufficient to turn the payment into a bribe because, as this Court has previously recognized, it is not a defense to bribery that a public official would have taken the same official acts in the absence of a bribe."  *Id*. at 10 (citations omitted).  He contends that language in *United States v. Ganim*, 510 F.3d 134, 143 (2d Cir. 2007), which states that a *quid pro quo* can be evidenced by an implied agreement, suggests that some sort of agreement is necessary.  *Id*. at 10–11.  And lastly, citing *Skilling*, he contends that a bribery theory that does not require an agreement is inconsistent with his Due Process rights.  *Id*. at 11–12.  He argues that he was a part-time legislator "convicted for receiving industry-standard fees for undertaking permitted outside employment, simply on the basis that he was influenced, even just a little bit, by those fees," and suggests that the statutes

pursuant to which he was convicted are unconstitutionally vague. *Id*. Silver goes on to argue that a favorable decision from the Circuit would warrant a new trial, and that the errors resulting from the Court's failure to require an agreement are not harmless. *Id*. at 12–15. *See also* Reply Memorandum of Law in Further Support of Motion to Continue Bail and to Stay Financial Penalties Pending Appeal ("Reply") [Dkt. 464] at 3–6.

In opposition, the Government argues that the jury instructions were correct. *See* Memorandum of Law in Opposition to Defendant's Motion for Bail Pending Appeal and to Stay Financial Penalties Pending Appeal ("Opp.") [Dkt. 459] at 10. As to Silver's first argument, the Government contends that Silver omitted language from *Silver I* that emphasizes the defendant's state of mind—and not that of the counterparty—and asserts that the Circuit's use of the term "agreement" was not legally significant. *Id*. at 10–11. The Government further argues that Silver's quotation from *Skilling* was taken out of context, as he quoted a section that described the facts of a different case rather than a point of law. *Id*. at 11–12. As to his second and third arguments, the Government asserts that the charge did not permit the jury to convict based solely on proof that the Defendant was influenced by a payment: "Silver cannot demonstrate that this Court committed instructional error by positing that the Court gave a different instruction from what it gave." *Id*. at 12–13. And as to Defendant's Due Process argument, the Government notes that this argument lacks supporting citations and is essentially frivolous. *Id*. at 13.

The Government goes on to argue that, even if Silver's version of the law were correct, he would still not be entitled to bail pending appeal. In particular, the Government argues that any error was harmless because the evidence at trial demonstrated that Silver and Dr. Taub had an "implicit understanding" that would satisfy the heightened agreement requirement that Silver asserts exists. Opp. at 14–16. Second, the Government argues that Silver's motion is legally

insufficient because it would not result in the vacatur of the extortion counts (and thus not *all* counts on which Silver was convicted) because the Court's instruction on extortion, which referenced the extorted party's motivation and Silver's awareness thereof, "required the jury to find the very kind of a meeting of the minds with respect to extortion that Silver asserts was required for all counts." *Id*. at 16–18.

Silver challenges these two arguments, asserting that the evidence at trial did not demonstrate that he had entered into agreements, implicit or otherwise, with the counterparties in either of the two schemes. *See* Reply at 8–10. He challenges the Government's argument that the extortion instruction aligned with the "agreement" instruction he requested, noting that the Court explicitly rejected his request when discussing the extortion instruction. *See id*. at 6–8 (citing, *inter alia*, Tr. at 1621).

### b. Silver's Arguments Lack Merit and Are Not Supported by Law

The Court begins by noting that Silver has presented this issue numerous times, and the Court has rejected it each time. In its opinion on Silver's post-trial motions after the first trial, the Court underscored that these charges focus on *Silver*'s intent, not the intent of the bribe giver. *See* Post-Trial Opinion ("Post-Trial Op.") [Dkt. 294] at 15 n.5 (citing *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013); *United States v. Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013); *United States v. Bruno*, 661 F.3d 733, 743–44 (2d Cir. 2011)). The Court also rejected Defendant's "agreement" argument in crafting the jury instructions for the second trial. *See* Tr. at 1567:10–1572:19; 1594:23–1600:10; 1617:5–14; 1621:4–12.

Next, the Court looks to *Silver I*, which Defendant contends supports his position. That opinion, however, does not suggest that the Government must prove the existence of an agreement or prove that there was a meeting of the minds in order to prove the existence of a

*quid pro quo*.  The primary issue on appeal in *Silver I* was the propriety of this Court's charge

regarding the definition of "official action" in light of the Supreme Court's intervening decision

in *McDonnell v. United States*, 136 S. Ct. 2355 (2016).   *See Silver I*, 864 F.3d at 115–25.  While

the Circuit did, on one occasion in passing, use the phrase "*quid pro quo* agreement," *see id*. at

111, and twice used the phrase "*quid pro quo* arrangement," *see id*. at 122, 123, it far more

frequently used the phrase "*quid pro quo* scheme" or the term "*quid pro quo*" without any

additional noun.  *See id*. at 105 ("schemes"); 112 (no noun); 115 (no noun); 119 (no noun); 122

("scheme" and no noun); 123 ("scheme" and no noun).  Accordingly, inasmuch as the Circuit's

language varied, and inasmuch as there is no indication it intended (with no discussion that it

was doing so) to introduce a new required essential element into these crimes, this Court finds no

tea leaves to read in the Circuit's opinion as to the issue at hand.  The Circuit certainly did not

explore in any meaningful way whether the *quid pro quo* element of honest services fraud and

extortion requires an agreement or meeting of the minds (which is understandable because the

Circuit was focused on *McDonnell*'s newly-articulated definition of "official action").[2]  And, as

noted by the Government, *see* Opp. at 10, the Circuit's sole use of the phrase "*quid pro quo*

agreement" was in the context of discussing the required mental state of the *defendant*: "To

succeed on a bribery theory of honest services fraud and Hobbs Act extortion, the Government

had to prove, beyond a reasonable doubt, the existence of a *quid pro quo* agreement—that the

defendant received, or intended to receive, something of value in exchange for an official act."

*Silver I*, 864 F.3d at 111 (citations omitted).

---

[2]  The Court does not read the Circuit's quotations from previous cases in footnote 24, which include the term "agreement," as signaling any investigation of this issue.  *See Silver I*, 864 F.3d at 111 n.24.

Regardless, upon its own *de novo* review, this Court finds, again, that an agreement is not required in order to prove the existence of a *quid pro quo* in honest services fraud or color of official right extortion.  Although courts may use loose language and at times refer to an "agreement" when discussing these crimes,[3] the Court is aware of no case that has held that an "agreement" is an additional element of either of them.[4]

For honest services fraud, although there may be an "agreement" on the facts of any given case, the third party's state of mind is legally irrelevant because the focus of the crime is on the defendant's state of mind: "To establish the corrupt intent necessary to a bribery conviction, the Government must prove that the defendant had a specific intent to give something of value *in exchange* for an official act . . . ."  *Rosen*, 716 F.3d at 700 (quoting *Alfisi,* 308 F.3d at 149) (internal quotation marks and alterations omitted) (emphasis in original).  *See also Bruno*, 661 F.3d at 744 ("The key inquiry is whether, in light of all the evidence, an intent to give or receive something of value in exchange for an official act has been proved beyond a reasonable doubt.").  In the seminal case *United States v. Sun-Diamond Growers of California*, the Supreme Court made no mention of the third party's state of mind or any required agreement when discussing the required *mens rea* for bribery: "Bribery requires intent . . . 'to be influenced' in an official act . . . .  In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act."  526 U.S. 398, 404–05 (1999) (emphasis in original).  *See also Ganim*, 510 F.3d at 148 ("We found the jury charge sufficient because it required the jury to find a corrupt intent on the part of the payor

---

[3]     *See, e.g.*, *Rosen*, 716 F.3d at 699–700; *Bruno*, 661 F.3d at 744.

[4]     If the substantive offenses of honest services mail fraud and color of official right extortion were to require proof of an agreement, it would be impossible to differentiate conspiracy to commit these crimes from the substantive crimes themselves.

to influence the performance of official acts.") (discussing *United States v. Bonito*, 57 F.3d 167, 171 (2d Cir. 1995)); *United States v. Alfisi*, 308 F.3d at 149 ("The 'corrupt' intent necessary to a bribery conviction is in the nature of a *quid pro quo* requirement; that is, there must be a specific intent to give something of value *in exchange* for an official act.") (quoting *Sun-Diamond*, 526 U.S. at 404–05) (internal quotation marks and alteration omitted).  Honest services fraud effected by bribery "does not require the [third party] to agree to . . . a corrupt exchange . . . .  [A] defendant may be guilty of honest-services bribery where he offers [his counterparty] something of value with a specific intent to effect a quid pro quo even if [the counterparty] emphatically refuses to accept.  In other words, though the [defendant] is guilty of honest-services fraud, his attempted target may be entirely innocent."  *Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013) (citations omitted).  In short, the focus of bribery-based honest services fraud is the defendant's state of mind and his understanding that there is a *quid pro quo* exchange—no actual agreement with the counterparty, implicit or explicit, is required.  This Court has been unable to locate any case that holds to the contrary.

Similarly, although the counterparty's intent *is* relevant in color of official right extortion, there is no requirement that there be any agreement or meeting of the minds.  To prove extortion under color of official right, "the government must prove beyond a reasonable doubt that the victims were motivated to make payments as a result of the defendant's control or influence over public officials and that the defendant was aware of this motivation."  *United States v. Middlemiss*, 217 F.3d 112, 117 (2d Cir. 2000) (quoting *United States v. McDonough,* 56 F.3d 381, 388 (2d Cir. 1995)) (internal quotation marks omitted).  "[I]it is enough that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  *Ganim*, 510 F.3d at 145 (quoting *Evans v. United States*, 504 U.S. 255,

268 (1992)) (internal quotation marks omitted).  *See also Ocasio v. United States*, 136 S. Ct.

1423, 1428 (2016) (quoting same).  In other words, the *quid pro quo* for extortion requires that a

public official know the counterparty's motivation, but it does not require a meeting of the

minds.  *See United States v. Desnoyers*, 637 F.3d 105, 111 (2d Cir. 2011) ("[T]he relevant

extortion statute required the Government to prove a quid pro quo: that a public official has

obtained a payment to which he was not entitled, knowing that the payment was made in return

for official acts.") (quoting *United States v. Garcia*, 992 F.2d 409, 414 (2d Cir. 1993)) (internal

quotation marks omitted).  Accordingly, there is simply no support for Silver's argument that the

jury should have been instructed that extortion requires an agreement.

The Court now turns to the specific arguments Defendant makes in his motion.  First, as

discussed above, the Court disagrees that *Silver I*, specifically its infrequent and inconsistent use

of the phrase "*quid pro quo* agreement," supports his argument.  The Circuit's reference to

Silver's "colluding with Dr. Taub and the Developers," which is buried in a footnote, refers to

the facts of Silver's case and is not a statement of law.  *See* 864 F.3d at 114 n.50; Opp. at 11.

Defendant's argument based on *Skilling* fares no better.  *See* Mem. at 9.  The language that

Silver emphasizes—"conspired with a third party," *see id.* (quoting *Skilling*, 561 U.S. at 410)—

describes the underlying facts of *McNally v. United States*, 483 U.S. 350 (1987).  *McNally*

involved a scheme in which the parties conspired to pay kickbacks, and the Court contrasted that

kickback scheme to pre-*McNally* cases that involved prosecutions for undisclosed conflicts of

interest.  *See Skilling*, 561 U.S. at 410 (discussing *McNally*, 483 U.S. at 352–53).  Nowhere in

discussing *McNally* did the Court suggest that, for conduct to go beyond non-disclosure of a

conflict of interest and become an illicit bribe, there *must* be some sort of conspiracy or

agreement.  *See id.*

14

Next, Defendant contends that *Alfisi*, in which the Second Circuit described the difference between a bribe and an unlawful gratuity, *see* 308 F.3d at 149–52, "reject[s] the government's position—that bribery can be proven by showing that the defendant was influenced by a payment."  Mem. at 9–10.  But the premise of Silver's argument is wrong; the Court did not charge the jury that bribery can be proven simply by demonstrating that the defendant was influenced by receiving a payment.  Moreover, failing to require proof of a "meeting of the minds" as part of the definition of *quid pro quo* does not make bribery the same as an unlawful gratuity.  What distinguishes the two, as the majority in *Alfisi* made clear, is the defendant's understanding that the payment was made in order to corruptly influence official action.  *See* 308 F.3d at 149.  *See also Sun-Diamond*, 526 U.S. at 404–05 ("In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act.  An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.") (emphasis in original).  Where Silver's argument falls short is that the focus has to be on a *defendant's* state of mind and *his* understanding of the circumstances of the payment, not those of the counterparty.  Thus, a *quid pro quo* may be proven without proving the existence of an agreement between the bribe taker and the bribe giver.

Silver's third argument is that "[b]eing influenced by a payment cannot be sufficient to turn the payment into a bribe because, as this Court has previously recognized, it is not a defense to bribery that a public official would have taken the same official acts in the absence of a bribe."  Mem. at 10.  Silver's argument is a non-sequitur.  Silver seems to be suggesting that a defendant does not need to be influenced by a payment for there to be bribery.  But that argument ignores

critical portions of the charge.  As to honest services fraud, the jury was charged that it must find

that Silver received bribes as part of the scheme to defraud.  "A bribe occurs when a public

official *corruptly* seeks or accepts . . . something of value from another person *with the intent to*

*be influenced* in the performance of his public duties."  Tr. at 2043:16–19 (emphasis added).  As

to extortion, the jury was charged that it must find that Silver "obtained property to which he was

not entitled . . . *knowing* that it was given in return for official acts . . . rather than being given

voluntarily and unrelated to Mr. Silver's public office."  Tr. at 2053:24–2054:3 (emphasis

added).  The reason that "I-would-have-done-it-anyway" fails as a defense is because these

statutes criminalize public officials' corruptly accepting payments in return for public acts,

regardless of whether good policy reasons might support any given official act.  Put differently, a

public official who solicits a bribe to do something good that he intends to do anyway is just as

guilty of bribery as a public official who solicits a bribe to do an evil act that he would not do but

for the bribe.

      Silver raises an additional contention based on *Ganim*, in which the Circuit noted that

"winks and nods" could frustrate the law's effect if proof of a *quid pro quo* required an express

agreement.  *See* Mem. at 10–11 (citing *Ganim*, 510 F.3d at 143).  But *Ganim* does not hold that

an agreement is required for a case like Silver's; the Second Circuit was simply discussing its

earlier decision in *Garcia* and contrasting campaign contribution cases with non-campaign

contribution cases, the former of which require proof of an *explicit* agreement to perform or not

to perform official acts.  *See Ganim*, 510 F.3d at 143.  Although *Ganim* uses the term

"agreement" in discussing *Garcia*, *Garcia* itself does not, suggesting that *Ganim*'s use of the

term "agreement" was not intended to introduce a new required element into these crimes.  *See*

*id.* (quoting *Garcia*, 992 F.2d at 414); *Garcia*, 992 F.2d at 414 ("The official and the payor need

not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.") (quoting *Evans*, 504 U.S. at 274) (Kennedy, J., concurring) (internal quotation marks omitted).

Finally, Silver argues, with minimal citation to law, that the Government's theory of prosecution violates his Due Process rights.  *See* Mem. at 11–12.  Silver invokes *Skilling*, *see id.* at 11, in which the Supreme Court rejected the defendant's argument that the honest services fraud statute is unconstitutionally vague, *see* 561 U.S. at 412–13, and noted that "it has always been as plain as a pikestaff that bribes and kickbacks constitute honest-services fraud . . . ."  *Id.* at 412 (quoting *Williams v. United States,* 341 U.S. 97, 101 (1951)) (internal quotation marks omitted).  Silver seems to be attempting to contrast the bribes and kickbacks that *Skilling* held were obviously illegal with the referral fees he accepted here.  But Silver makes absolutely no effort to lay out the legal standard for his constitutional challenge, let alone meet it.  *See* Mem. at 11–12.  He simply laments that, as a part-time legislator, who was permitted to earn outside income including industry-standard legal referral fees, he had no notice that if he were influenced, even slightly, by those fees, he was committing a crime.[5]  *See id.*  As before, this argument ignores the various aspects of the charge that made it clear to the jury that Silver must have taken the money corruptly—not, as Silver's lament suggests, innocently.  Notwithstanding Silver's gross oversimplification of the facts of the case and his misrepresentation of what the jury found, he makes no effort to seriously argue that the statutes charged are unconstitutional, and therefore this argument must be rejected.

---

[5]     Silver also references the Court's rejection of an instruction he requested regarding the Government's theory of extortion, *see* Mem. at 11 (citing Tr. at 1657), but it is not clear how this is at all relevant to Defendant's Hail Mary constitutional claim.

In short, the law is clear that the Government need not prove an agreement or meeting of the minds between the briber taker and the bribe giver to prove the existence of the *quid pro quo* element of either honest services fraud or color of official right extortion. Therefore, the Court's jury instructions were correct. Silver has not presented a close legal question, and his appeal, therefore, does not raise a substantial question likely to result in a reversal or a new trial. The Court further concludes that, because the substance of Silver's appeal lacks merit, because his appeal follows a second trial at which he was again convicted on all counts, and because of his age, the true purpose of Silver's appeal is simply to postpone his day of reckoning. Accordingly, Silver's motion for bail pending appeal is denied.[6]

---

[6]   Because the Court finds that Silver's appeal does not present a substantial question of law or fact, the Court need not reach the Government's alternative argument that any error in the jury instructions was harmless. If, however, the instructions were erroneous, the Court agrees that the error was harmless, but for only one of the two reasons the Government suggests.

The Court disagrees that the extortion instructions "required the jury to find the very kind of a meeting of the minds with respect to extortion that Silver asserts was required for all counts." Opp. at 18. As discussed above, extortion focuses on a defendant's state of mind (which includes an awareness of the target's motivation) but does not require any agreement or meeting of the minds between the defendant and the third party. Moreover, the Court explicitly rejected Plaintiff's request that the jury be charged it must find the existence of an agreement. *See* Tr. at 1617:5–14; 1621:4–12. If Defendant's appeal were meritorious, it would certainly require recalibration of the Court's extortion instruction, in addition to the other instructions, and might warrant a new trial.

The Court agrees, however, with the Government that a rational jury would have convicted Silver on the mesothelioma counts even if it had been charged that an implicit agreement was necessary. *See* Opp. at 14–16. The Court has reviewed the evidence in the record, and concludes that it is clear beyond a reasonable doubt that Silver and Taub had an implicit meeting of the minds as to the mesothelioma scheme. *See, e.g.*, Tr. at 247:13–252:19; 254:15–255:13; 270:16–278:8; 279:11–282:11; 283:24–284:11; 316:9–317:5; 334:16–338:13; 349:2–351:13; 379:22–382:5; 411:11–412:25. *See also* GX 525-16; GX 525-17; GX 595-1.

For example, Dr. Taub testified that his purpose for sending cases to Silver was to incentivize him to be an advocate for mesothelioma patients and to help raise money for mesothelioma research. *See* Tr. at 272:9–273:3. Taub testified that he referred cases to Silver as part of an implicit understanding that, in return for referrals, Silver would use his official position to help fight mesothelioma: "[m]y understanding was that I believed at the time that Mr. Silver felt that if he received, and I acted on that feeling, I felt that Mr. Silver felt that if I referred patients to Weitz & Luxenberg through him rather than the patient contacting Weitz & Luxenberg directly, he would be incentivized to be an advocate for mesothelioma research and to help mesothelioma patients." *Id.* at 273:11–274:6. Corroborating Taub's understanding, when referrals to Silver waned, Silver visited Taub and sought an explanation. *See id.* at 334:16–336:25.

There was also documentary evidence and related testimony regarding the existence of an agreement between Taub and Silver. In a 2010 email to Mary Hesdorffer, who worked at the Mesothelioma Applied Research Foundation ("MARF"), Taub wrote "Of course [asbestos lawyers] will all be nice to you for the cases, and hate you

## IV.      Fine and Forfeiture

Silver moves to stay the fine and forfeiture order pursuant to Federal Rules of Criminal Procedure 32.2(d) and 38(c).  Silver represents that, to pay the fine, he and his wife would be forced to sell their two residences, depriving Mrs. Silver of the homes she has lived in for decades, and Silver would have to liquidate his retirement account, incurring substantial tax liability.  Mem. at 15–17.  The Government did not oppose this portion of Silver's motion.  *See* Opp.

When a defendant appeals his conviction, a district court "may stay a sentence to pay a fine or a fine and costs."  Fed. R. Crim. P. 38.  It is within a court's broad discretion to stay a fine pending appeal.  *See United States v. Bestway Disposal Corp.*, 724 F. Supp. 62, 70 (W.D.N.Y. 1988); *United States v. Weichert*, No. 84-CR-139, 1985 WL 8059, at *1 (N.D.N.Y. Oct. 10, 1985).  *Cf. United States v. Yalincak*, No. 05CR153 (JBA), 2015 WL 6456537, at *2 (D. Conn. Oct. 26, 2015) (discussing court's discretion to stay sentence of restitution on any terms considered appropriate).  "If a sentence imposing a fine is stayed, the court shall, absent exceptional circumstances (as determined by the court)—(1) require the defendant to deposit, in the registry of the district court, any amount of the fine that is due; (2) require the defendant to

---

if they don't get them.  I will keep giving cases to Shelly because I may need him in the future—he is the most powerful man in New York State."  GX 595-1.  *See also* Tr. at 337:1–338:13 (discussing this email).  In testifying about an email chain between Taub and another asbestos law firm—with whom he was trying to organize a charity race—in which Taub noted that Silver's assistance would "cost" them, *see* GX 525-16, Taub gave perhaps the clearest testimony of an agreement: "Mr. Silver just did not articulate or express clearly what his needs were, but somehow we got the idea.  For example, Mr. Chill asked me for Mr. Silver to get cases for him, without expressing it in great detail.  When he felt he should get more cases, he just mentioned casually that the referrals were not as great as they were before.  So we were led to infer these things.  We got the idea, although it was not clearly expressed."  Tr. at 351:2–13.

In all, the record shows that it was clear beyond a reasonable doubt that Silver and Taub had an implicit agreement to exchange referrals for official action, and a jury instructed that an agreement was necessary would have so found.  Accordingly, any error in the jury instructions was harmless at least as to the mesothelioma scheme, rendering bail pending appeal inappropriate.

provide a bond or other security to ensure payment of the fine; or (3) restrain the defendant from transferring or dissipating assets."  18 U.S.C. § 3572(g).

Similarly, "[i]f a defendant appeals from a conviction or an order of forfeiture, the court may stay the order of forfeiture on terms appropriate to ensure that the property remains available pending appellate review."  Fed. R. Crim. P. 32.2(d).  According to the Advisory Committee Notes, the purpose of Rule 32.2(d) "is to ensure that the property remains intact and unencumbered so that it may be returned to the defendant in the event the appeal is successful." *Id.* advisory committee's notes to the 2000 amendments. "[T]he law governing when a district court should exercise its discretion to stay a forfeiture order has not been extensively developed." *United States v. Davis*, No. CRIM.A. 07-CR-11 (JCH), 2009 WL 2475340, at *2 (D. Conn. June 15, 2009).  District courts in this Circuit typically consider four factors when considering a motion to stay a forfeiture order: 1) the likelihood of success on appeal; 2) whether the forfeited asset is likely to depreciate over time; 3) the forfeited asset's intrinsic value to defendant (i.e., the availability of substitutes); and 4) the expense of maintaining the forfeited property.  *See, e.g.*, *United States v. Young*, No. 12-CR-210, 2014 WL 1671507, at *2 (W.D.N.Y. Apr. 24, 2014) (quoting *United States v. Peters*, 784 F. Supp. 2d 234, 235 (W.D.N.Y. 2011)); *Davis*, 2009 WL 2475340, at *2 (citing *United States v. Riedl,* 214 F. Supp. 2d 1079, 1082 (D. Haw. 2001)).

The Court is not unsympathetic to Silver's position, but, upon consideration of the factors and circumstances, it denies his request to stay his fine and forfeiture pending appeal.  The Court is swayed most by the lack of merit in Silver's appeal, as discussed extensively above.  Silver's appeal is unlikely to prevail, and this outweighs his asserted hardship of having to liquidate assets and incur tax liability.  Although the Court did stay Silver's fine and forfeiture pending his

first appeal, *see* First Bail Op. at 22–24, that appeal appeared to have merit while this one does not.

Still, the Court does appreciate the potential hardship that Silver and his family would face if required to liquidate sufficient assets to pay the $1.2 million portion of his fine that is due on September 21, 2018.  Accordingly, the Court will reduce the amount of his fine that is due on September 21, 2018, to $750,000, an amount the Court finds, based on the financial information contained in the Presentence Report, Silver can pay without hardship.  Silver must then make monthly installment payments on the first business day of each month, starting November 1, 2018, of not less than $10,000 until 30 days after his appeal is resolved.  If his conviction is affirmed, the remaining balance is then immediately due and payable within 30 days.

## CONCLUSION

For the foregoing reasons, Silver's motion to continue bail pending appeal and to stay the fine and forfeiture orders pending appeal is DENIED in part.  The amount of his fine that Silver must pay by September 21, 2018 is reduced to $750,000, with the remaining $1 million to be paid in monthly installments, due the first business day of each month beginning November 1, 2018, of not less than $10,000, with the balance due within 30 days after the Circuit's affirmance of his conviction.  The Clerk of Court is respectfully requested to terminate Docket Entry 455.

**SO ORDERED.**

**Date:   September 17, 2018**
**New York, New York**

_____
**VALERIE CAPRONI**
**United States District Judge**