N.Y.S.D. Case #
15-cr-093(VEC)

**18-2380**
*United States v. Silver*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jan 21 2020

August Term 2018

(Argued: March 13, 2019 | Decided: January 21, 2020)

Docket No. 18-2380

UNITED STATES OF AMERICA,

*Appellee,*

THE NEW YORK TIMES COMPANY, NBCUNIVERSAL MEDIA, LLC,

*Intervenors,*

v.

SHELDON SILVER,

*Defendant-Appellant.*

———————————

Before:
WESLEY, LOHIER, and SULLIVAN, *Circuit Judges*.

A jury convicted Defendant-Appellant Sheldon Silver of two counts each of honest services mail fraud, honest services wire fraud, and Hobbs Act extortion, and one count of money laundering.  Silver argues that the United States District Court for the Southern District of New York (Caproni, *J.*) erred in instructing the jury on the elements of honest services fraud and Hobbs Act extortion.

We agree.  Although Silver is incorrect in asserting that Hobbs Act extortion under color of right and honest services fraud require evidence of a meeting-of-the-minds "agreement," he is correct that each offense demands more than a nonspecific promise to undertake official action on *any* future matter beneficial to

CERTIFIED COPY ISSUED ON 01/21/2020

Case 15-2360, Document 128-1, 01/21/2020, 2756392, Page2 of 84

the payor.  While this instructional error was harmless with respect to three of Silver's seven counts of conviction, the evidence was insufficient to sustain a guilty verdict against Silver on three other counts.

We therefore **REVERSE IN PART**, **VACATE IN PART**, **AFFIRM IN PART**, and **REMAND** for further proceedings consistent with this opinion.

Judge Lohier concurs in a separate opinion.

_____

MEIR FEDER, (Samidh Guha, James Loonam, Conor Reardon, *on the brief*), Jones Day, New York, NY, *for Defendant-Appellant*.

DANIEL C. RICHENTHAL, Assistant United States Attorney (Damian Williams, Thomas A. McKay, Sarah K. Eddy, Assistant United States Attorneys, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY.

_____

WESLEY, *Circuit Judge*:

This appeal marks the second time we have been asked to review the conviction of Sheldon Silver, former Speaker of the New York State Assembly.  In 2016, Silver was convicted of accepting illegal bribes, in violation of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, and the Hobbs Act, 18 U.S.C. § 1951.  He was also convicted of laundering the proceeds of those offenses, in violation of 18 U.S.C. § 1957.  One year later, we found that the United States District Court for the Southern District of New York (Caproni, *J.*) gave a jury instruction that failed to meet the narrowed definition of "official act" set forth in an intervening

2

Supreme Court decision, *McDonnell v. United States*, 136 S. Ct. 2355, 2371–72 (2016).

*United States v. Silver* (*Silver I*), 864 F.3d 102, 119 (2d Cir. 2017), *cert. denied*, 138 S.

Ct. 738 (2018).  The Government tried Silver a second time, and the jury again

convicted him on all seven counts.

Silver raises two principal challenges on appeal, both concerning the district

court's jury instructions.  First, he argues that Hobbs Act extortion under color of

official right and honest services fraud require evidence of an "agreement," *i.e.*, a

meeting of the minds, between the alleged bribe payor and receiver.  Second, he

argues that the "as the opportunities arise" theory of bribery we recognized in

*United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007) does not survive *McDonnell*,

which, he claims, requires identification of the particular act to be performed at

the time the official accepts a payment or makes a promise.

We disagree with Silver's first theory.  Extortion under color of right and

honest services fraud require that the official reasonably believe, at the time the

promise is made, that the payment is made in return for a commitment to perform

some official action.  Neither crime requires that the official and payor share a

common criminal intent or purpose.  We do, however, find limited merit in Silver's

second challenge.  Although neither offense requires, as he argues, advance

3

Case 15-2300 Document 128-1 04/31/2020 2756392 Page 4 of 84

identification of the particular *act* to be undertaken, they do require that the official understand—at the time he accepted the payment—the particular *question or matter* to be influenced.

Because the district court's instructions failed to convey this limitation on the "as the opportunities arise" theory, and because this error was not harmless with respect to his conviction under three counts, we vacate Silver's convictions on Counts 1s, 2s, and 5s. In addition, because we conclude that the evidence as to the same three counts was insufficient as a matter of law to sustain a guilty verdict, we remand with directions for the district court to dismiss the indictment with prejudice as to them. However, because we find this error was harmless with respect to Silver's conviction on Counts 3s, 4s, and 6s, we affirm his conviction on those counts.

Finally, we affirm Silver's conviction under Count 7s for money laundering because that crime does not require the defendant to be convicted of the underlying criminal offenses, nor does it require the underlying offense to take place within the limitations period.

# BACKGROUND

## A. Offense Conduct[1]

Silver was first elected to the New York State Assembly in 1976.  In 1994, he was elected Speaker of the Assembly—a position he held until his resignation in 2015.

During his tenure as Speaker, Silver worked part-time as a practicing lawyer, as permitted by New York law.  *See* N.Y. Pub. Off. Law § 74(3)(a).  The Government alleged that Silver used his law firm work as a vehicle to exploit his elected position for unlawful personal gain.  According to the Government, Silver orchestrated two separate bribery schemes in which he received referral fees from law firms in exchange for taking official actions.  In one scheme, Silver performed official acts beneficial to a medical doctor who referred mesothelioma patients to Silver's law firm (the "Mesothelioma Scheme").  In the other, Silver performed official acts beneficial to two real estate developers who had hired a different law firm that paid referral fees to Silver (the "Real Estate Scheme").  Together, these two alleged schemes generated more than $3.5 million in referral fees for Silver.

---

[1] "Because this is an appeal from a judgment of conviction entered after a jury trial, the . . . facts are drawn from the trial evidence and described in the light most favorable to the Government."  *United States v. Litwok*, 678 F.3d 208, 210–11 (2d Cir. 2012).

The Government also charged that Silver engaged in money laundering by investing the proceeds of the Mesothelioma and Real Estate Schemes into various private investment vehicles (the "Money Laundering Scheme").

### B. Procedural History

On February 19, 2015, the Government indicted Silver on charges of honest services mail and wire fraud, Hobbs Act extortion, and money laundering. It later filed a superseding indictment charging Silver with seven counts:

- Honest Services Mail Fraud: Mesothelioma Scheme, 18 U.S.C. §§ 1341, 1346 (Count 1s);[2]

- Honest Services Wire Fraud: Mesothelioma Scheme, *id.* §§ 1343, 1346 (Count 2s);

- Honest Services Mail Fraud: Real Estate Scheme, *id.* §§ 1341, 1346 (Count 3s);

- Honest Services Wire Fraud: Real Estate Scheme, *id.* §§ 1343, 1346 (Count 4s);

- Hobbs Act Extortion: Mesothelioma Scheme, *id.* § 1951 (Count 5s);

- Hobbs Act Extortion: Real Estate Scheme, *id.* § 1951 (Count 6s);

- Monetary Transactions Involving Crime Proceeds, *id.* § 1957 (Count 7s).

---

[2] Section 1341 is the substantive mail fraud offense; § 1343 is the substantive wire fraud offense. Section 1346 expands the reach of both statutes to include a scheme or artifice to "deprive another of the intangible right of honest services."

After a month-long trial, a jury found Silver guilty on all counts. He was sentenced to twelve years' imprisonment, to be followed by two years of supervised release.

Seven weeks later, the Supreme Court decided *McDonnell*, which clarified the definition of an "official act" in honest services fraud and extortion under color of right charges. 136 S. Ct. at 2371–72. Vacating the conviction of former Virginia Governor Robert McDonnell, the Court held that "an 'official act' is a decision or action on a 'question, matter, cause, suit, proceeding or controversy'" that involves "a formal exercise of governmental power," is "specific and focused," and is either "pending" or "may by law be brought" before a public official. *Id.*

Relying on *McDonnell*, Silver appealed his conviction, arguing that the decision rendered erroneous the district court's jury instructions defining an official act as "any action taken or to be taken under color of official authority." *Silver I*, 864 F.3d at 112 (emphasis and citation omitted). We agreed and remanded for retrial because the error was not harmless. *Id.* at 118, 124.

The Government retried Silver in April and May of 2018. The district court instructed the jury that both honest services fraud and extortion under color of right require that Silver "understood" that, in exchange for the client referrals, he was expected to "take official action" "for the benefit of" the payor "as specific

7

opportunities arose." Special App. 30, 33. A jury again convicted him on all seven counts. The district court sentenced Silver to concurrent terms of seven years of imprisonment and three years of supervised release on each count. The court also ordered Silver to pay a fine of $1,750,000 and to forfeit $3,739,808.53. The district court entered a judgment of conviction on July 30, 2018.

This appeal followed.

## DISCUSSION

Silver advances two principal arguments on appeal, both challenging the district court's jury instructions. According to Silver, (1) the court erroneously omitted from its instructions the required element of an "agreement" between Silver and the alleged bribe payors; and (2) the "as the opportunities arise" theory of bribery is no longer valid in the wake of *McDonnell*, which, Silver argues, requires identification of the particular act to be performed at the time the official accepts a payment or makes a promise.[3] Silver also argues that the evidence is

---

[3] Our references to "bribery" are only intended to address the bribery theories of honest services fraud and Hobbs Act extortion that are the subject of the indictment in this case.

8

insufficient to sustain his conviction with respect to the bribery-based counts, and, as a result, his conviction for money laundering must also be vacated.

"[W]e review a district court's jury charge *de novo*, and will vacate a conviction for an erroneous charge unless the error was harmless." *United States v. Nouri*, 711 F.3d 129, 138 (2d Cir. 2013). A jury charge is erroneous if it "either fails to adequately inform the jury of the law, or misleads the jury as to a correct legal standard." *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006) (quoting *United States v. Doyle*, 130 F.3d 523, 535 (2d Cir. 1997)). For erroneous instructions to be harmless, it must be "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Bah*, 574 F.3d 106, 114 (2d Cir. 2009) (quoting *Quattrone*, 441 F.3d at 177).

## I.     Neither Hobbs Act Extortion Under Color of Right nor Honest Services Fraud Requires a Meeting-of-the-Minds "Agreement."

Silver first argues that the district court erred in rejecting his request to instruct the jury that both extortion under color of right and honest services fraud require "a *quid pro quo agreement* between Mr. Silver and the alleged bribe payors." J.A. 291 (emphasis added). According to Silver, both offenses require that the bribe payor and receiver share a common corrupt intent—*i.e.*, a "meeting of the minds" as to the official acts to be procured by the payment. We disagree.

9

## A. Hobbs Act Extortion Under Color of Right

The Hobbs Act makes it a crime to "obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by robbery or extortion . . . ."  18 U.S.C. § 1951(a).  It defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  *Id.* § 1951(b)(2).

The Supreme Court first articulated a *quid quo pro* requirement for extortion under color of right in *McCormick v. United States*, 500 U.S. 257 (1991).  The Court held that extortion may occur in the special context of political contributions "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act."  *Id.* at 273.  The Court left open the questions of whether the offense further requires "a showing that the public official 'induced' the payor's consent by some affirmative act such as a demand or solicitation," *id.* at 266 n.5, and whether "a *quid pro quo* requirement exists in other contexts, such as when an elected official receives gifts, meals, travel expenses, or other items of value," *id.* at 274 n.10.

One year later, in *Evans v. United States*, the Supreme Court addressed both questions, concluding that extortion under color of right is the "rough equivalent

10

of . . . 'taking a bribe.'" 504 U.S. 255, 260 (1992). First, the Court held that a public official need not affirmatively induce a bribe to be convicted of extortion. *Id.* at 267-68. Instead, extortion under color of right requires only that which was required to prove extortion at common law, namely "a public official [taking] 'by [color] of his office' money that was not due to him for the performance of his official duties. A demand, or request, by the public official was not an element of the offense." *Id.* at 260 (footnotes omitted). Under this reading, "the coercive element is provided by the public office itself," such "that the wrongful acceptance of a bribe establishes all the inducement that the statute requires." *Id.* at 266.

Second, the Court "modified [*McCormick*'s 'explicit promise'] standard in non-campaign contribution cases . . . ." *United States v. Garcia*, 992 F.2d 409, 414 (2d Cir. 1993). Unlike in *McCormick*, the *Evans* defendant-official had never expressly promised to take official action. *Evans*, 504 U.S. at 257. But he had, the Court concluded, "implicit[ly] promise[d]" to do so when, after several meetings and phone calls, he accepted $8,000 from an undercover FBI agent posing as a real estate developer interested in rezoning a specific plot of land. *Id.* The Court treated this "implicit promise" as sufficient to prove extortion, holding that a charge that "allowed the jury to convict [the defendant] on the basis of the 'passive

11

acceptance of a contribution'" "satisfie[d] the *quid pro quo* requirement of [*McCormick*], because the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts." *Id.* at 267–68 (citation omitted); *see also McDonnell*, 136 S. Ct. at 2371 ("[T]he public official [need not] in fact intend to perform the 'official act,' so long as he *agrees* to do so." (emphasis added)).

In sum, extortion under color of right requires (i) inducement, namely that "a public official has obtained a payment to which he was not entitled," *Evans*, 504 U.S. at 268; and (ii) a *quid pro quo*, namely that the official "promise[d] . . . to perform or not to perform an official act" in return for payment, *McCormick*, 500 U.S. at 273, or accepted a payment "knowing that the payment was made in return for official acts," *Evans*, 504 U.S. at 268.

*Evans* makes clear that the first element, inducement, does not require a meeting of the minds. Because "the [inducement] element is provided by the public office itself," *id.* at 266, it may be proven through evidence that "the victims were motivated to make payments as a result of the defendant's control or influence over public officials and that the defendant was aware of this motivation," *United States v. Middlemiss*, 217 F.3d 112, 117 (2d Cir. 2000) (quoting

12

Case 15-2360, Document 128-1, 01/21/2020, 2756392, Page13 of 84

*United States v. McDonough*, 56 F.3d 381, 388 (2d Cir. 1995)).  In other words, it requires proof as to each party's belief or understanding as to the purpose for which payment is made, but it does not demand that the victim and defendant shared a common criminal intent or purpose.

The second element, *quid pro quo*, similarly requires only that the official "assert[] that his official conduct will be controlled by the terms of the promise or undertaking." *McCormick*, 500 U.S. at 273.  As *Evans* illustrates, the official's actual intent is of no moment.  What matters is the intent the official *conveys* to the payor—*i.e.*, that he will take or refrain from taking certain official action in return for payment.  Significantly, there is no requirement that the official actually intend to *follow through* on his commitment.  What matters is that the official manifested a willingness to take payment for official action or inaction.  And since the official need not follow through or even intend to follow through on his representations, it follows that there cannot logically be a requirement that the official and payor share a common purpose.

In arguing otherwise, Silver points to language in *Evans* explaining that the *quid pro quo* requirement is "satisfie[d]" where "[a] public official receives a payment in return for his *agreement* to perform specific official acts." *Evans*, 504

13

U.S. at 268 (emphasis added).  In doing so, he fails to acknowledge that the term "agreement" is used, in the very same opinion, interchangeably with the term "promise."  *See id.* at 257.  Indeed, we have elsewhere done the same.  *See, e.g.,* *Ganim*, 510 F.3d at 141 (explaining that extortion under color of right "criminalizes . . . a *quid pro quo agreement*—to wit, a government official's receipt of a benefit in exchange for an act he has performed, or *promised* to perform, in the exercise of his official authority" (emphases added)).  He also ignores that the *Evans* Court explained the *quid pro quo* element by reference to *McCormick*, which refers only to a "promise" or "undertaking."  *See McCormick*, 500 U.S. at 266, 273.[4]  Nothing Silver points to suggests that the payor and recipient must share a common purpose.

---

[4] For the same reason, Silver's reliance on the Supreme Court's use of the term "agreement" in *McDonnell* is unpersuasive.  There, the Court summarized the requirements of Hobbs Act extortion as follows:

> Under this Court's precedents, a public official is not required to actually make a decision or take an action on a "question, matter, cause, suit, proceeding or controversy"; it is enough that the official *agree* to do so.  *See Evans*, 504 U.S. at 268.  The *agreement* need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain.  Nor must the public official in fact intend to perform the "official act," so long as he *agrees* to do so.  A jury could, for example, conclude that an *agreement* was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an "official act" in return.

14

To hold otherwise would be to eliminate the distinction between extortion under color of right and conspiracy to commit the same, as recently clarified by the Supreme Court.  In *Ocasio v. United States*, the Court upheld a police officer's conviction for conspiring *with the extorted party*.  136 S. Ct. 1423, 1432 (2016).  The extortionate scheme involved the officer referring motorists involved in automobile accidents to an autobody shop that had agreed to pay kickbacks for each referral.  The Court rejected the argument that a public official cannot conspire with his victim, explaining that the "consent" required for extortion under color of right "simply signifies the taking of property under circumstances falling short of robbery, and such 'consent' is quite different from the *mens rea* necessary for a conspiracy," *id.* at 1435, namely an "*agree*[*ment*]" between the members of the conspiracy "that the underlying crime *be committed*," *id.* at 1432 (first emphasis added); *see also id.* at 1436 (explaining that if a restaurant owner "reluctantly pays [a] bribe in order to keep [her] business open, the owner has 'consented' to [a public official's] demand, but this mere acquiescence in the

---

136 S. Ct. at 2370–71 (emphases added).  Because *McDonnell*'s use of the term agreement is by reference to *Evans*, it is best understood as requiring the same *mens rea* as *Evans*— *i.e.*, a knowing "promise."

demand does not form a conspiracy.").  Because the officer "share[d] a common purpose" with the autobody shop owners—a state of mind above and beyond their mere "acquiescence"—he had simultaneously extorted and conspired with them.  *See id.* at 1432.  Silver's argument that a *quid pro quo* requires a meeting of the minds would directly contradict this distinction drawn in *Ocasio*.[5]

Thus, extortion under color of right does not require a meeting-of-the-minds agreement.  We accordingly find no error in the jury instructions at issue here. They adequately explained that the Government was required to prove that "the extorted party was motivated, at least in part, by the expectation that as a result of the payment, Mr. Silver would exercise official influence or decision-making for the benefit of the extorted party," that Silver was "aware of th[is] motivation," and that Silver "knowingly and intentionally sought or received property . . . in exchange for the promise or performance of official action."  Special App. 32–33.

---

[5] *See also United States v. Repak*, 852 F.3d 230, 251 (3d Cir. 2017) ("[The defendant's] contention that the Government failed to demonstrate an 'agreement' is unpersuasive. . . . [T]he Government need not show an agreement [to prove Hobbs Act extortion under color of right], [though] it does need to demonstrate [the defendant's] acceptance of [payments] knowing that they were given in exchange for his influencing the award of [government] contracts.").

16

## B.  Honest Services Fraud

Silver makes the same "agreement" argument with respect to the district court's instructions on honest services fraud.  He further argues that this error was compounded by an instruction that, unlike in extortion under color of right, the payor's intent is irrelevant to proving honest services fraud.  We again find no error in the instructions in this regard.

The mail and wire fraud statutes criminalize use of their respective communication channels for the purpose of executing a "scheme or artifice to defraud."  18 U.S.C. §§ 1341, 1343.  Where, as here, the fraud is prosecuted as a scheme or artifice "to deprive another of the intangible right of honest services," *id.* § 1346, it is known as "honest services" fraud.  *See Ganim*, 510 F.3d at 148.  Public sector honest services fraud "is premised upon an underlying theory that a public official acts as trustee for the citizens and the State and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty to them."  *United States v. Silvano*, 812 F.2d 754, 759 (1st Cir. 1987) (internal quotation marks, citations, and alteration omitted).  Although once thought to cover a broad range of corruption, honest services fraud now "criminalizes *only* . . . bribe[s] and[] kickback[s]."  *Skilling v. United States*, 561 U.S. 358, 409 (2010).  This limitation was deemed

17

necessary to avoid the "due process concerns underlying the vagueness doctrine," *id.* at 408, that might otherwise result from an open-ended application of the term, *see id.* at 405.

It remains an open question whether vagueness concerns further require that honest services fraud be defined, in all cases, by reference to one of the various federal bribery statutes. *See Silver I*, 864 F.3d at 116 n.67; *cf. Skilling*, 561 U.S. at 412 (explaining that there is "no significant risk that the honest-services statute . . . will be stretched out of shape" because it "draws content . . . from federal statutes proscribing—and defining—similar crimes" (citing 18 U.S.C. §§ 201(b), 666(a)(2); 41 U.S.C. § 52(2))). However, the parties here agreed to define bribery by reference to 18 U.S.C. § 201(b)(2)(A), and we follow their lead. Section 201(b)(2)(A) makes it a crime for "a public official . . . , directly or indirectly, [to] corruptly demand[], seek[], receive[], accept[], or agree[] to receive or accept anything of value . . . in return for . . . being influenced in the performance of any official act."

In *United States v. Rybicki*, we held that the *mens rea* required for honest services fraud is proof that the defendant "inten[ded] to deprive another of the intangible right of honest services." 354 F.3d 124, 145 (2d Cir. 2003) (en banc) (citation omitted). Where, as here, the prosecution relies on a bribery theory, the

18

Government must additionally prove a *quid pro quo*, which we have variously defined as "knowledge" of the payor's expectations, *Ganim*, 510 F.3d at 149, an "underst[anding] that the . . . payments were made in return for official action," *United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011), or a "promise[] to perform" an official act in exchange for payment, *id.* at 743.  As with extortion under color of right, the *quid pro quo* may be express or implied, and it is not necessary that the public official in fact intend to perform the contemplated "official act."  *McDonnell*, 136 S. Ct. at 2370–71 (citing *Evans*, 504 U.S. at 268).

Neither *Rybicki*'s specific intent element nor *Ganim*'s *quid pro quo* element supports Silver's argument that there must be a meeting of the minds between the payor and the official as to the corrupt purpose of the payments.  *Rybicki* is concerned only with the defendant's state of mind—whether she purposefully sought to breach her duties of honesty and loyalty.  For the same reasons discussed in the context of extortion, "knowledge" and "promise" imply a unilateral awareness of, or commitment to do or not do, something; neither demands a meeting of the minds.  Finally, although "understanding" could be interpreted as requiring a collusive agreement, such a reading is incompatible with the synonymous use of "promise" in *Ganim*.  *See, e.g.*, *Ganim*, 510 F.3d at 144–45.

Any remaining doubt is dispelled by our interpretation of § 201(b)(2)(A) in
*United States v. Myers*, where we rejected the defendant-official's theory that
bribery requires proof of an intent to follow through on a promised action. 692
F.2d 823, 841–42 (2d Cir. 1982). We clarified that the phrase "being influenced," as
used in § 201(b)(2)(A), "does not describe the [public official's] true intent, it
describes the intention he *conveys* to the briber in exchange for the bribe." *Id.* at
841 (emphasis added).[6] Therefore, even "[i]f [the defendant] was 'playacting' and
giving false promises of assistance to people he believed were offering him money
to influence his official actions, he violated the bribery statute." *Id.* at 842. In other
words, bribery criminalizes "corrupt promise[s]"—as evidenced by the official's
state of mind—not collusive agreements. *See id.* at 850.

Silver is therefore incorrect in arguing that honest services fraud requires
evidence of a meeting of the minds. We accordingly find no error in the jury
instructions he challenges. They adequately conveyed that,

---

[6] *See also United States v. Ford*, 435 F.3d 204, 212, 213 & n.6 (2d Cir. 2006) (explaining that,
whereas the federal funds bribery statute, 18 U.S.C. § 666(a)(1)(B), requires proof that a
defendant "accepted [payment] 'intending to be influenced' in her official duties," section
201(b)(2) "[lacks] an 'intent to be influenced' element, requiring instead that the 'overall
act be committed corruptly'" and thus requires only an "awareness" of the payment's
purpose).

> because the intent of the party giving the thing of value may be
> different from the intent of the party receiving the thing of value[,] . . .
> the government only has to prove that *Mr. Silver*—not the bribe
> giver—*understood that, as a result of the bribe, he was expected to exercise
> official influence or take official action* for the benefit of the payor and, at
> the time the bribe was accepted, intended to do so.

Special App. 30 (emphasis added). If anything, the district court raised the

Government's burden to Silver's benefit by requiring that Silver "inten[ded] to be

influenced." *Id.* As both *McDonnell* and *Myers* make clear, it is the official's

*conveyed* intent—not her actual intent—that is determinative in an honest services

fraud conviction. To the extent Silver argues that it was error to instruct that the

payor's intent is irrelevant, he mistakenly attempts to import an element of

extortion into honest services fraud. It was extortion's unique inducement

element—not its *quid pro quo* element—that required evidence as to the payor's

purpose. *See Evans*, 504 U.S. at 266. As *Myers* makes clear, honest services fraud

is concerned only with the official's subjective *belief* as to the payor's purpose.

## II. The "As The Opportunities Arise" Theory Remains Valid Post-*McDonnell*, but the Instructions Erroneously Failed to Convey Its Requirements.

Silver's second challenge is to the district court's instruction that an official

may be found guilty of extortion under color of right and honest services fraud so

long as he promised "to take official action in exchange for . . . payments *as the*

*opportunity arose.*"  Special App. 33 (emphasis added).  Silver argues that *McDonnell* eliminated this so-called "as the opportunities arise" theory of bribery, under which an official need not have promised to perform any specific official acts at the time of payment.  Although we disagree that *McDonnell* requires identification of a particular *act* of influence, we do agree that it requires identification of a particular *question or matter* to be influenced.  In other words, a public official must do more than promise to take some or any official action beneficial to the payor as the opportunity to do so arises; she must promise to take official action *on a particular question or matter* as the opportunity to influence that same question or matter arises.  *See Ganim*, 510 F.3d at 145.

### A. Bribery Does Not Require Identification of the Particular *Act* to Be Performed.

To begin, Silver is incorrect in asserting that bribery requires a promise to perform a particular official act.  *McDonnell* explained that both extortion under color of right and honest services fraud require that an official promise to "make a decision or take an action on a question, matter, cause, suit, proceeding or controversy."   136 S. Ct. at 2371 (internal quotation marks omitted).  Neither offense, however, requires that the official "specify the *means* that he will use to perform his end of the bargain."  *Id.* (emphasis added); *see also Ganim*, 510 F.3d at

147 ("[S]o long as the jury finds that an official accepted gifts in exchange for a

promise to perform official acts for the giver, it need not find that the *specific act* to

be performed was *identified at the time of the promise* . . . ." (emphases added)).

There is no error in the portion of the district court's instructions explaining that

"[t]he government does not have to prove that there was an . . . agreement . . . that

any particular action would be taken in exchange for the bribe."  Special App. 30.

### B.  *McDonnell* **Requires that the Official Understand the Particular** *Question* **or** *Matter* **to Be Influenced at the Time of the Promise.**

Even though the particular *act* of influence need not be identified at the time

of the official's promise, the particular *question* or *matter* to be influenced must be.

The "as the opportunities arise" theory of bribery, which we approved in *Ganim*,

requires a promise to "exercise *particular kinds of influence* . . . as specific

opportunities ar[i]se."   510 F.3d at 144 (emphasis added) (citation omitted).

Although *Ganim* rejected the proposition "that a specific act [must] be identified

and directly linked to a benefit at the time the benefit is received," *id.* at 145,

*McDonnell* clarifies that, to be convicted of bribery under the "as the opportunities

arise" theory, the public official must, at minimum, promise to influence a

23

"focused and concrete" "question or matter" that "involv[es] a formal exercise of governmental power." *See McDonnell*, 136 S. Ct. at 2369–70.[7]

### 1. The "As The Opportunities Arise" Theory of Bribery

In *Ganim* we reviewed the extortion under color of right and honest services fraud convictions of former Bridgeport, Connecticut mayor Joseph Ganim. Several companies and individuals had paid bribes to Ganim's aides in exchange for Ganim undertaking official acts on pending issues. The aides then provided Ganim with money and other benefits over a period of four years. Because many of the bribery schemes overlapped, and because Ganim received the payments from his aides rather than directly from the bribe payors, the individual benefits that Ganim received were not always tied directly to a specific official act. This lack of linkage, Ganim argued, defeated the Government's case.

---

[7] The terms "as the opportunities arise," "stream of benefits," and "retainer" have been used interchangeably by other courts. *See, e.g.*, *United States v. Percoco*, No. 16-CR-776 (VEC), 2019 WL 493962, at *6 (S.D.N.Y. Feb. 8, 2019); *United States v. Mangano*, No. 16-CR-540 (JMA), 2018 WL 851860, at *2 (E.D.N.Y. Feb. 9, 2018). Our holding is limited to the "as the opportunities arise" theory as set forth in *Ganim*—*i.e.*, a promise to "exercise particular kinds of influence . . . as specific opportunities ar[i]se," 510 F.3d at 144–45. We express no opinion and need not reach the issue of whether the acceptance of a bribe with a promise to perform an official act in the future upon designation of the official act by the bribe payor at that later date (in essence a retainer) would run afoul of the honest services fraud statutes or the Hobbs Act. That case is simply not before us.

We disagreed and instead endorsed jury instructions requiring that Ganim accepted payments knowing that they were "made in exchange for a *specific* exercise of [his] official powers" and that "he was expected as a result of the payment[s] to exercise particular kinds of influence, that is, on behalf of the payor, as specific opportunities arose." *Ganim*, 510 F.3d at 144 (emphasis added). We explicitly rejected Ganim's argument that bribery prosecutions are governed by the same "nexus" requirement set forth in *United States v. Sun–Diamond Growers of California*, in which the Supreme Court held that the illegal-gratuities statute, 18 U.S.C. § 201(c)(1)(A), requires proof of "a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." 526 U.S. 398, 414 (1999).

Such a link is "not needed in the extortion or bribery contexts," we explained, because "it is the requirement of an intent to perform an act in exchange for a benefit—*i.e.*, the quid pro quo agreement [or promise]—that distinguishes those crimes from both legal and illegal gratuities." *Ganim*, 510 F.3d at 146–47. In other words, bribery's *quid pro quo* requirement serves the same function as does the nexus requirement for illegal gratuities: avoiding the "peculiar result[]" that, without requiring a *quid pro quo*, federal law might unconstitutionally criminalize

"*any* effort to buy favor or generalized goodwill from an official who either has

been, is, or may at some unknown, unspecified later time, be *in a position to act*

favorably to the giver's interests."  *Sun–Diamond*, 526 U.S. at 405–06 (first emphasis

added).  The only difference is that, whereas the § 201(c)(1)(A) nexus requires "a

link between a thing of value . . . and a specific 'official act,'" *id.* at 414—*i.e.,* this

for that—the extortion and bribery *quid pro quo* does not require a "link [between]

each specific benefit [and] a *single* official act," *Ganim*, 510 F.3d at 147 (emphasis

added).  It may, alternatively, be proven through evidence of "a scheme involving

payments at regular intervals in exchange for specific official[] acts as the

opportunities to commit those acts arise"—*i.e.,* "this for these or these for these,

not just this for that."  *Id.* at 147–48 (internal quotation marks omitted).[8]

---

[8] *See also United States v. Kemp*, 500 F.3d 257, 267–70, 281 (3d Cir. 2007) (approving of charge in honest services fraud prosecution explaining that, where multiple benefits are given by a person to a public official, "it need not be shown that any specific benefit was given in exchange for a specific official act," so long as payments were made "in *implicit exchange for one or more official acts*" (emphasis added)); *United States v. Jennings,* 160 F.3d 1006, 1014 (4th Cir. 1998) ("Bribery requires the intent to effect an exchange of money (or gifts) for *specific official action* (or inaction), but each payment need not be correlated with a specific official act.  Rather, it is sufficient to show that the payor intended for each payment to induce the official to adopt a *specific course of action*. . . .  Thus, all that must be shown is that payments were made with the intent of securing a specific *type* of official action or favor in return." (emphases added and citation omitted)).

*Ganim* was thus concerned with whether bribery is limited to one-for-one exchanges. Although we held that it can also "be accomplished through an ongoing course of conduct," *id.* at 149, we were clear that in such cases the public official must still understand the exchange to be one of payment for "*specific* official[] acts as the opportunities to commit *those* acts arise," *id.* at 147 (emphases added).

### 2. *McDonnell v. United States*

In *McDonnell*, the Supreme Court reviewed a challenge to jury instructions on extortion under color of right and honest services fraud. At issue was "whether arranging a meeting, contacting another official, or hosting an event—without more—can be a[n official act]." 136 S. Ct. at 2368. Like the parties here—but unlike in *Ganim*, 510 F.3d at 142 n.4—the parties in *McDonnell* agreed to define "official act" by reference to the federal bribery statute, 18 U.S.C § 201(a)(3) ("[T]he term 'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."). *See McDonnell*, 136 S. Ct. at 2365. The district court defined "official act" accordingly, but further instructed the jury that

27

official acts "encompassed acts that a public official customarily performs, including acts in furtherance of longer-term goals or in a series of steps to exercise influence or achieve an end." *Id.* at 2366 (internal quotation marks omitted).

The Supreme Court, citing concerns that the "standardless sweep" of this definition could "subject [public officials] to prosecution, without fair notice, for the most prosaic interactions," found these instructions to be inadequate. *Id.* at 2373 (citation omitted). It explained that, in order to "avoid[] this 'vagueness shoal,'" *id.* (quoting *Skilling*, 561 U.S. at 368), a narrower definition of "official act" was necessary.

First, the Court observed that a "'cause,' 'suit,' 'proceeding,' [or] 'controversy' . . . connote[s] a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination." *Id.* at 2368, 2374 (quoting 18 U.S.C. § 201(a)(3)). Second, because "a word is known by the company it keeps," *id.* (citation omitted), the Court held that a jury must find that the "question" or "matter" before the official was "something specific and focused that is 'pending' or 'may by law be brought before [him],'" *id.* at 2374 (quoting 18 U.S.C. § 201(a)(3)). Third, the Court interpreted the terms "'[p]ending' and 'may by law be brought' [to] suggest something that is relatively circumscribed—the kind of thing that can

28

be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 2369 (quoting 18 U.S.C. § 201(a)(3)). Finally, the Court noted that a jury must find that the official "made a decision or took an action—or agreed do so—*on* the identified 'question, matter, cause, suit, proceeding or controversy.'" *Id.* at 2374.

Contrary to the Government's assertions, the Court's vacatur of McDonnell's conviction was not limited to concerns that the jury may have believed a meeting, on its own, qualifies as a "decision or action." *Id.* at 2375. The Court was also concerned that the jury may have convicted the defendant "without finding that he agreed [(or promised)] to make a decision or take an action on a *properly defined 'question, matter, cause, suit, proceeding or controversy.'" Id.* at 2375 (emphasis added). In fact, the Court discussed specific examples of both properly—and improperly—defined "focused and concrete . . . formal exercise[s] of governmental power." *Id.* at 2370. The examples were limited to "questions or matters" because, as here, there was no allegation that McDonnell promised to influence a "cause, suit, proceeding or controversy"—like "a lawsuit, hearing, or administrative determination." *See id.* at 2368–70.

The Court agreed with the Fourth Circuit that the following questions or matters were sufficiently "focused and concrete":

> (1) whether researchers at any of Virginia's state universities would initiate a study of Anatabloc; (2) whether the state-created Tobacco Indemnification and Community Revitalization Commission would allocate grant money for the study of anatabine; and (3) whether the health insurance plan for state employees in Virginia would include Anatabloc as a covered drug.

*Id.* at 2370 (internal quotation marks and citation omitted). In contrast, general concerns about "'Virginia business and economic development,' or—as it was often put to the jury—'Bob's for Jobs,'" fell below that standard. *Id.* at 2369 (citation omitted)). Indeed, the Court noted that "[a]t trial, several of Governor McDonnell's subordinates testified that he asked them to attend a meeting, not that he expected them to do anything other than that." *Id.* at 2374. The Court explained that "[i]f that testimony reflects what Governor McDonnell agreed [(or promised)] to do *at the time he accepted the loans and gifts*," then he did not, as required, "agree [(or promise)] to make a decision or take an action *on any of the three questions or matters* described [above]." *Id.* (emphases added); *see also id.* at 2374–75 (requiring that the jury find the defendant "agreed [(promised)] to exert pressure . . . to initiate the research studies or add Anatabloc to the state health plan").

### 3. *McDonnell* Reiterates that Bribery Requires the Official to Promise to Act on a Specific, Concrete, or Focused Question, Matter, Cause, Suit, Proceeding or Controversy.

Two observations drawn from *McDonnell*'s language inform our analysis. First, *McDonnell* re-emphasizes that the relevant point in time in a *quid pro quo* bribery scheme is the *moment at which the public official accepts the payment*.  *See id*. at 2374; *see also Evans*, 504 U.S. at 268 ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts . . . .").  The question that arises here, however, is: what must the official promise at the time the bribery offense is committed?

That leads to our second observation.  *McDonnell* suggests that, at the time the bribe is made, the promised official act must relate to a "properly defined" "question, matter, cause, suit, proceeding or controversy."  *See McDonnell*, 136 S. Ct. at 2374.  This follows from the fact that there are two requirements for an official act: "First, the Government must identify a 'question, matter, cause, suit, proceeding or controversy,'" and "[s]econd, the Government must prove that the public official made a decision or took an action '*on*' *that* question, matter, cause, suit, proceeding, or controversy, or agreed to do so."  *Id.* at 2368 (emphasis added). Thus, for an official to promise to perform an official act—and thereby engage in

31

the prohibited *quid pro quo*—the official must promise to act *on* an identified "question, matter, cause, suit proceeding, or controversy" at the time of the promise. *See id.*

This point is illustrated in the context of this case by considering the following example: An official accepts a bribe, stating to the payor that she will "take official acts as the opportunities arise." In other words, the official has promised to take—as the opportunities arise—"*any* decision or action on any question, matter, cause, suit, proceeding or controversy [that] may at any time be pending," 18 U.S.C. § 201(a)(3) (emphasis added), a promise so vague as to be meaningless. The official has not agreed to take official action on a properly defined—*i.e.*, focused, concrete and specific—question or matter. The official has failed to offer a *quo*. Absent any additional specificity, criminal liability could attach to any later action the official takes so long as the official is exercising some ability granted to him or her by law, regardless of the fact that the official essentially promised nothing in return for the payment.

*McDonnell* thus stands for the proposition that bribery requires that an official accept a payment, knowing that he is expected to use his office to influence a "focused," "concrete," and "specific" question or matter that "may be

32

understood to refer to a formal exercise of governmental power." *Id.* at 2369–70, 2372. The question or matter need only be "focused," "concrete," or "specific" enough to satisfy the *quid pro quo* requirement—the official need only promise to do *something* about a question or matter that "may be understood to refer to a formal exercise of governmental power." *Id.* at 2369. For example, questions or matters such as whether state universities will research a particular drug, or whether the state will provide funding to research a particular disease are sufficiently concrete and focused to satisfy *McDonnell*. *See id.* at 2369–70. Conversely, for example, a promise to perform *some* act to create jobs or lower taxes, or to "benefit the payor," without more, cannot be understood to refer to a "formal exercise of governmental power that is similar in nature to a 'cause, suit, proceeding or controversy.'" *Id.* at 2369. More pointedly, such a promise is so lacking in definition or specificity that it amounts to no promise at all. And, absent a promise, there is no *quid pro quo.*

This observation does not signal a change in the law. Nor do we suspect it will affect the prosecution of bribery in most cases because neither the facts of *McDonnell*, nor the Court's opinion, suggest that either the payor or the official must precisely define the relevant matter or question upon which the official is

33

expected to exercise his official power.[9]  Circumstantial evidence demonstrating

an understanding between the payor and the official will often be sufficient for the

Government to identify a properly focused and concrete question or matter.[10]  The

crux of our inquiry is whether the offered *quo* has enough definition and focus to

be properly understood as promising, in return for some *quid*, the formal exercise

of governmental power.

---

[9] For example, the Supreme Court identified three properly focused and concrete questions or matters without any explicit agreement between Virginia businessman Jonnie Williams, the alleged bribe payor, and Governor McDonnell.  *See McDonnell*, 136 S. Ct. at 2370; *see, e.g.*, *id*. at 2362 ("Williams told Governor McDonnell that he 'needed his help' moving forward on the research studies at Virginia's public universities . . . ."); *see also*, *e.g.*, *id*. (noting that after Williams took Mrs. McDonnell on a "shopping trip," "[t]he McDonnells later had Williams over for dinner at the Governor's Mansion, where they discussed research studies on Anatabloc"); *id.* at 2363 ("Three days after the meeting between Williams and Mrs. McDonnell, Governor McDonnell directed his assistant to forward the article on Star Scientific to [Virginia's Secretary of Health and Human Resources].").  It was clear, based on a pattern of conversations and gift-giving that Williams sought McDonnell's influence on three distinct questions that properly involved the formal exercise of governmental power.

[10] Indeed, bribery is rarely conducted in explicit terms; instead, the language of bribery is one of implication and innuendo.  Past experience shows that the Government will be able to introduce, in the appropriate circumstances, circumstantial and other evidence that the payor and official understood the *quid pro quo* to center on an exchange of a thing of value for official acts related to some sufficiently defined and concrete question or matter involving the formal exercise of governmental power.  For example, in some circumstances, a wink and a nod, an exchange of monies, and a subsequent vote on a bill likely will be sufficient.  *See, e.g.*, *Bruno*, 661 F.3d at 744 ("[A] jury can in such cases infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt.").

Furthermore, *McDonnell*'s interpretation of the "official act" requirement fits comfortably with—and provides a narrowing gloss on—*Ganim*'s "as the opportunities arise" theory, which similarly requires an anticipated exchange of payment for "*particular* kinds of influence," *Ganim*, 510 F.3d at 144 (emphasis added) (citation omitted).  We therefore disagree with Silver that the "as the opportunities arise" theory of bribery does not survive *McDonnell*.  But we agree that, if the district court's jury instructions failed to convey that, as relevant here, a particular *question* or *matter* must be identified at the time the official makes a promise or accepts a payment, they were in error.

Otherwise, we risk "subject[ing] [public officials] to prosecution, without fair notice, for the most prosaic interactions."  *McDonnell*, 136 S. Ct. at 2373.  Indeed, without a requirement that an official must promise to influence a particular question or matter, any official who accepts a thing of value and then later acts to the benefit of the donor, in any manner, could be vulnerable to criminal prosecution.  *See Bruno*, 661 F.3d at 744 (explaining that a jury may "infer guilt from evidence of benefits received and subsequent favorable treatment" (quoting *United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988))); *see also McDonnell*, 136 S. Ct. at 2372 ("Officials might wonder whether they could respond to even the

35

most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse.").[11]  As the Supreme Court has warned, "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter."  *Sun–Diamond*, 526 U.S. at 412.

### C.  The Jury Instructions in Context

Having determined that the "as the opportunities arise" theory of bribery survives *McDonnell*, but that the *quid pro quo* requirement demands more than a mere promise to perform some or any official action to "benefit the payor," we turn to the jury instructions provided in this case.

The district court provided the following instruction to the jury on honest services fraud:

---

[11] *Accord United States v. Kincaid-Chauncey*, 556 F.3d 923, 942–43 (9th Cir. 2009) ("The political system functions because lobbyists and others are able to persuade elected officials of the wisdom or error of policy proposals. . . . [S]uch endeavors are protected by the right to petition the Government for a redress of grievances guaranteed by the First Amendment of the United States Constitution.  Attempts to persuade or mere favoritism, evidenced by a public official's willingness to take a lobbyist's telephone call or give a lobbyist greater access to his appointment schedule, are not sufficient to demonstrate either the lobbyist's or the public official's intent to deprive the public of honest services." (original alterations, citation, and internal quotation marks omitted) (quoting *United States v. Sawyer*, 85 F.3d 713, 731 n.15 (1st Cir. 1996))).

The government must prove that a bribe was sought or received by Mr. Silver, directly or indirectly, in exchange for the promise or performance of official action. The government does not have to prove that there was an . . . agreement . . . that any particular action would be taken in exchange for the bribe. . . .

[It does have to] prove that Mr. Silver . . . understood that, as a result of the bribe, he was expected to exercise official influence or take official action *for the benefit of the payor* and, at the time the bribe was accepted, intended to do so as specific opportunities arose. . . .

An "official act" or "official action" is a decision or action on a specific matter that may be pending or may by law be brought before a public official. . . . The decision or action must *be made on* a question or matter that involves a formal exercise of governmental power. That means that the question or matter must be *specific*, *focused*, and *concrete*—for example, the kind of thing that could be put on an agenda and then checked off as complete. It must be something that may by law be brought before a public official, or may at some time be pending before a public official.

Special App. 30–31 (emphases added). The court instructed the jury on extortion under color of right as follows:

To satisfy [the *quid pro quo*] element, the government must prove . . . that Mr. Silver obtained property to which he was not entitled by his public office, knowing that it was given *in return for official acts* as the opportunity arose . . . . If you find that Mr. Silver understood that the property at issue was given solely to cultivate goodwill or to nurture a relationship with the person or entity who gave the property and not as an exchange for *any* official action, then this element has not been proven . . . . On the other hand, if you find that Mr. Silver accepted the property intending, at least in part, to take official action in exchange for those payments as the opportunity arose, then [the *quid quo pro*] element has been satisfied.

Special App. 32–33 (emphases added).

The instructions required that, at the time Silver entered into the *quid pro quo*, he believed that the payor expected him to exchange payment for "official action [to] the benefit of the payor . . . as specific opportunities arose," *id.* at 30, or "official acts as the opportunity arose," *id.* at 33. Although the district court further instructed the jury that it must find that Silver "*made* [a decision] on a question or matter that . . . [was] specific, focused, and concrete," *id.* at 31 (emphasis added), it did not require that the specific matter—*e.g.*, the receipt of grant funding (Mesothelioma Scheme) or extending specific tax programs (Real Estate Scheme)—be identified, or even understood by Silver, at the time he accepted the bribe.

Analyzing the district court's instructions in the context of the Real Estate and Mesothelioma Schemes demonstrates both that Silver overreads *McDonnell* and that the Government relies on an open-ended interpretation of *Ganim*. In our view, the district court's instructions were erroneous. They only required the jury to find that Silver understood, at the time that he accepted any *quid*, that he was expected to exercise official influence or take official action *for the benefit of the payor*. As we explain below, an illegal *quid pro quo* under the "as the opportunities

38

arise" theory of bribery requires more than what the Government presented in this case: an open-ended promise to perform official actions "for the benefit of the payor."

### 1. Mesothelioma Scheme (Counts 1s, 2s, and 5s)

The Government argues that Silver took "at least five official actions" in connection with the Mesothelioma Scheme, which allegedly involved the exchange of client referrals for acts benefitting a Manhattan physician, Dr. Robert Taub.  Special App. 44.  The acts included securing two grants to fund Taub's research; directing funding to a nonprofit for which Taub's wife served as a board member; securing an Assembly resolution honoring Taub; and offering to secure permits needed for a charity race in Silver's Lower Manhattan Assembly district.[12]

### a. Background

In the fall of 2002, while he was Speaker of the Assembly, Silver became "of counsel" to the law firm Weitz & Luxenberg ("W&L"), which maintained an active personal injury practice.  Lawsuits for mesothelioma, a rare form of cancer caused

---

[12] The Government also presented evidence that Silver helped Taub's children secure employment.  However, the Government did not argue that any of this assistance included official acts, only that it provided evidence of "the corrupt relationship between Sheldon Silver and Dr. Taub" and of Silver's "corrupt intent."  Special App. at 50.

by exposure to asbestos, were particularly lucrative for W&L. Silver received referral fees—a set percentage of the fees earned by W&L—for any case he brought into the firm.

Taub, an acquaintance of Silver, worked as a physician and researcher at Columbia-Presbyterian Hospital where he specialized in mesothelioma. In the fall of 2003, Taub met Silver at an event and "specifically" asked him to encourage W&L to donate money to mesothelioma research. J.A. 445. Silver declined.

However, "[a] few days" later, a mutual friend—Daniel Chill—relayed to Taub that "Shelly [Silver] want[ed] cases." *Id.* at 446. Taub then began referring patients to Silver for legal representation. As Taub put it, he understood that "if [he] referred patients to [W&L] . . ., [Silver] would be incentivized to be an advocate for mesothelioma research and to help mesothelioma patients." *Id.* at 489.

Within "seven or eight months" of when Taub began sending referrals, Silver—again through Chill—directed Taub to write Silver a letter seeking state funding for his mesothelioma research. *Id.* at 447. Chill assisted Taub in drafting the letter, which requested $250,000. In March 2005, Silver received from W&L his first check for fees from Taub's referrals, totaling more than $175,000.

40

In July 2005, Taub received a $250,000 grant from the New York State Department of Health under the 2002 Health Care Reform Act ("HCRA"). The HCRA Assembly Pool was a discretionary fund containing millions of dollars in public money that Silver, as Speaker, could designate to grants for health care purposes. Silver "was the ultimate decision-maker" regarding HCRA disbursements, which were not subject to public disclosure from 2000 to 2006. *Id.* at 528.

Taub continued to refer patients to W&L after he received the first grant. In October 2006, Taub sent Silver a letter requesting a second $250,000 HCRA grant. He received that funding in November 2006.

In 2007, state law changed to require public disclosure of future HCRA grants, as well as disclosure to the State Attorney General of any potential conflicts of interest between legislators and recipients of legislative grants. That same year, Silver informed Taub in person that he could not fund his third HCRA grant request.

Taub nevertheless continued sending mesothelioma client leads to W&L until 2010, at which time he began sending fewer leads to W&L because he had started sending leads to another law firm. In response, on May 25, 2010, Silver

41

visited Taub in person to complain that he was receiving fewer referrals.  Taub subsequently renewed his practice of referring cases to W&L.[13]  As he explained in a contemporaneous email, "I will keep giving cases to Shelly because I may need him in the future—he is the most powerful man in New York State."  *Id.* at 1775.

Silver did, in fact, continue to help Taub in other ways.  First, in 2008 he directed a $25,000 state grant to the Shalom Task Force, a domestic violence non-profit for which Taub's wife served as a board member.  Second, in May 2011, Silver sponsored an Assembly resolution commending Taub.  He presented the resolution to Taub at a public event.  And, third, in the fall of 2011, Silver promised Taub that his office could help "navigate" the process of securing permits needed to organize a proposed "Miles for Meso" charity race in Silver's Assembly district.  *Id.* at 1774.  The promise never came to fruition, as the event was abandoned shortly thereafter.

---

[13] There is some ambiguity in the record as to whether, after the 2010 conversation between Taub and Silver, Taub continued to send Silver referrals at the same volume, or whether Taub increased the volume of referrals to Silver.

Taub provided mesothelioma leads to W&L through at least 2013.  Over the course of ten years, Silver received roughly $3 million in fees for cases that Taub referred to W&L.

### b.  HCRA Grants

The HCRA grants are the most clearly-defined aspect of the Mesothelioma Scheme.  As detailed above, the facts adduced at trial provide overwhelming evidence that Silver knowingly accepted referrals in exchange for action on a "focused and concrete" question or matter: whether the Assembly would allocate grant money to Taub for the study of mesothelioma.  From the moment Taub approached Silver about research funding, Silver knew that he had power over something of great value to Taub.  He then chose to abuse that power for personal gain.  The HCRA component of the Mesothelioma Scheme is thus a quintessential example of a public official extorting a constituent under color of right and committing honest services fraud, and the district court's charge adequately informed the jury of this aspect of the scheme.  While not naming the specific matter in the charge, there could be but one conclusion: that the focus of the promise was on the particular subject matter of state funding for mesothelioma research.

However, for the reasons discussed below in Part IV.A, the HCRA grant scheme occurred outside of the statute of limitations, so we must determine whether the jury could have properly considered evidence other than the HCRA grants.

### c. Non-Profit Funding, Charity Race Permits, and the Assembly Resolution

The Government argues that, even without the HCRA grants, it presented evidence beyond a reasonable doubt that Silver knowingly exchanged referrals for influence on a particular question or matter. Silver's corrupt promise, in the Government's view, is particularized by *any official act that benefitted Taub*. The Government points to the hodgepodge of other allegedly official acts Silver undertook, including securing funding for Taub's wife's charity, formally recognizing Taub in an Assembly resolution, and offering to assist in securing permits for Taub's charity race. The district court's charge is in accord with that view. However, as we explain below, like the HCRA grants, Silver's securing of funding for Taub's wife's charity is also outside of the limitations period. Thus, Silver's conviction rests upon whether *Ganim*, as modified by *McDonnell*, requires only that the official understood he was expected to take official action "for the benefit of the payor," as the opportunities arose.

44

## 2. Real Estate Scheme (Counts 3s, 4s, and 6s)

The Real Estate Scheme presents a significantly different factual scenario that more closely resembles classic bribery-based crimes. The Government argues that Silver committed at least two official acts in connection with the Real Estate Scheme, which involved two major New York real estate developers: Glenwood Management and the Witkoff Group (collectively, the "Developers"). First, the Government argues that Silver helped pass legislation beneficial to the Developers, specifically provisions of the Rent Act of 2011 concerning certain tax abatement and rent stabilization programs. Second, the Government asserts that Silver helped Glenwood secure certain tax-exempt financing from the Public Authority Control Board ("PACB"), of which he was a voting member.[14]

---

[14] Silver's argument that the PACB approvals were "perfunctory" or "rubber-stamp[s]" and that his vote on the Rent Act of 2011 was "inevitable" are unavailing. Appellant Br. 51–52. It is no defense that an official would have taken certain actions regardless of any alleged bribe. *See, e.g.*, *United States v. Rosen*, 716 F.3d 691, 701–02 (2d Cir. 2013) ("Payments to State legislators may constitute bribes even if the legislator's resulting actions are otherwise 'routine'—such as voting in a certain manner . . . . Moreover, the corrupt intent that is central to an illegal quid pro quo exchange persists even though the State legislator's acts also benefit constituents other than the defendant."); *see also United States v. Alfisi*, 308 F.3d 144, 151 (2d Cir. 2002) ("[T]here is no lack of sound legislative purpose in defining bribery to include payments in exchange for an act to which the payor is legally entitled.").

Similar to the Mesothelioma Scheme, the Government again alleges that Silver enriched himself through referral fees from a law firm. In the Real Estate Scheme, however, the firm was Goldberg & Iryami ("G&I"), headed by Jay Goldberg, a former staffer and friend of Silver. Goldberg specialized in tax certiorari work, which involves challenges to property valuations used in tax assessments. According to the Government, Silver accepted tax certiorari referrals in exchange for influencing two matters important to the Developers: (i) legislation relating to certain tax abatement and rent stabilization programs, and (ii) PACB financing approvals.

The Glenwood referrals began in 2002, when Goldberg asked a Glenwood lobbyist to send him some of Glenwood's tax certiorari work. Although the lobbyist testified that both he and the leadership of Glenwood were unaware until December 2011 that Silver received referral fees from G&I, he also testified that he "thought [the fact that Silver and Goldberg were friends] would be important to [Glenwood] to know" when considering whether to retain G&I. J.A. 728.

The Witkoff referrals began in 2004 when Silver "told [Witkoff] that he had a friend whose name was Jay Goldberg who was in the tax certiorari legal business. He was struggling and was wondering if [Witkoff] might consider giving some of

46

[his] tax certiorari legal work to Mr. Goldberg's law firm." *Id.* at 798. Although Silver did not mention that he received referral fees from G&I, Witkoff testified that he subsequently sent work to G&I because he "didn't want to do anything that could possibly alienate Mr. Silver. . . . [Silver] was a powerful man . . . with regard to [Witkoff's] industry, [his] business and how [he] exist[s] in [his] business in the city." *Id.* As Witkoff explained, he "might have occasion to" discuss matters with Silver in the future, though he "didn't have [occasion to do so] at that moment." *Id.*

Silver's first alleged *quid pro quo* with the Developers involved an exchange of referrals from Glenwood for influence on provisions of the Rent Act of 2011. As Speaker, Silver had substantial control over which legislation went to the Assembly floor for a vote. Glenwood's lobbyist testified that provisions of the Rent Act of 2011 related to tax abatement and rent stabilization were "[v]ery" important to Glenwood, and that "without continuation of [the tax abatement program, Glenwood] couldn't build any more buildings." *Id.* at 725; *see also id.* at 796 (Witkoff testifying that "[i]f [Witkoff] didn't have [the tax abatement], it would have been a tougher exercise to finance [certain prior] project[s]"). Glenwood's lobbyist also testified that passage of both provisions was "[e]xtremely"

47

controversial, *id.* at 725, though a third-party lobbyist testified that there was "[n]ot much" controversy as to "the continuation of [the programs]," *id.* at 764.

In June 2011, Silver met with Glenwood's lobbyists in his Assembly office. The lobbyists proposed that certain rent stabilization provisions in the Rent Act of 2011 be made more tenant-friendly to ensure passage of the larger "full bill" that included renewal of the specific tax abatement program important to Glenwood. *See id.* at 726–27. Several weeks later, the bill passed to the "satisf[action]" of Glenwood. *Id.* at 727.

The second alleged *quid pro quo* involved an exchange of referrals from Glenwood for Silver's influence as a voting member of the PACB. Because PACB financing applications require unanimous approval, Silver had the power to unilaterally deny them. Silver voted in favor of all eight of the Glenwood PACB requests received between 2000 and 2012. Four of these approvals—November 2010, October 2011, October 2012, and August 2014—occurred within the limitations period.

In proving the Real Estate Scheme, the Government highlighted a "side letter" retainer agreement signed by Goldberg, Glenwood, and Silver in December 2011. *See id.* at 898. In late 2011, G&I prepared new retainer agreements "notifying

48

[Glenwood] formally that Mr. Silver was participating," *i.e.*, receiving referral fees. *Id.* at 897.  Although Glenwood was unhappy that Silver received referral fees, it was also concerned about how Silver would "[r]eact towards Glenwood" if the fees stopped because Silver was "extremely influential and powerful, not somebody you would want to make not like you."  *Id.* at 823.  Subsequently, a Glenwood executive called G&I's office and "said they decided that they would rather have a standard retainer without the mention of Mr. Silver's name and that there would be a side agreement wherein Mr. Silver, Mr. Goldberg, [and the Glenwood executive] would sign, everyone acknowledging that Mr. Silver was getting a portion of the fee."  *Id.* at 897.  In January 2012, Silver signed this "side letter."

Days after Silver and Glenwood inked the side letter, Glenwood sent six new buildings to Goldberg for tax certiorari representation—benefitting Silver. Silver also voted to approve hundreds of millions of dollars in PACB financing benefitting Glenwood two months before and ten months after signing the letter. Additionally, had Silver still been in the Assembly in 2015, he would have again had the opportunity to vote on the same valuable tax abatement and rent stabilization programs, which must be renewed every four years.  Although Silver

49

resigned from the Assembly following his indictment in February 2015, Glenwood

testified that, had Silver still been Speaker, it would have lobbied him on those

programs.  Witkoff did not learn that Silver received referral fees until June 2014.

Despite misgivings about Silver's involvement, Witkoff continued using G&I.

    In total, over a period of about 18 years, Silver received approximately

$835,000 in fees from G&I for referring the Developers' tax certiorari work to the

firm.

> **3. Silver's Conviction Depends on the Proper Understanding of *Ganim's* Requirement that the Official Agree to Exercise "*Particular Kinds of Influence*."**

    As discussed, the Mesothelioma Scheme changed after 2007.  After Taub

stopped directing referrals to W&L through Silver, and after Silver visited Taub's

office seeking additional referrals, the Government argued that the character of

the *quid pro quo* changed.  The jury instructions as written encompass what the

Government believed the character of the *quid pro quo* had become—that after

Silver sought additional referrals, he promised to, or understood that he was

expected to, perform official acts, *for Taub's benefit*, as the opportunities to do so

arose.

At trial, and before this Court, the Government argued that Silver sought "other ways to keep Dr. Taub happy"—such as navigating the race permitting process or passing the Assembly resolution—to continue receiving referrals. *See* Special App. 41. However, after *McDonnell*, navigating a permitting process is not an official act, *see McDonnell*, 136 S. Ct. at 2370, and Silver's provision of funding to Taub's wife's charity took place outside of the limitations period. Thus, because the HCRA grants are time-barred, the only official action within the limitations period is the Assembly resolution honoring Taub.

In contrast, the *quid pro quo* that allegedly forms the basis of the Real Estate Scheme is more focused. The Government presented evidence tracking Silver's signing of the "side letter" retainer agreement with PACB approvals, and Glenwood and Witkoff's retention of G&I with Silver's actions related to the Rent Act of 2011. The Government also presented evidence suggesting the relationship between Silver and the Developers continued due to the Developers' fear that Silver would act adversely to their interests. Furthermore, there is evidence suggesting that Silver's relationship with Glenwood and its lobbyists centered around Silver's approval of specific favorable provisions contained in real estate legislation. And circumstantial evidence of the timing of (in particular)

51

Glenwood's retention of, and provision of business to, G&I tracks neatly with Silver's approval of real estate legislation.

While the Government presented no evidence that Taub sought, or Silver promised to provide, the Assembly resolution as part of the Mesothelioma Scheme, with respect to the Real Estate Scheme, the Government presented evidence that links Silver's official actions with business provided by the Developers to G&I. The Government's "for the benefit of" theory occasioned by the factual differences in the two schemes compels us to confront what is required under *Ganim*, in light of *McDonnell*, when an official promises to exercise "particular kinds of influence" "as the opportunities arise." *See Ganim*, 510 F.3d at 145.

### D. The "As the Opportunities Arise" Theory of Bribery Requires More Than a Promise to Perform Any Official Act for the Benefit of the Payor.

As discussed above, the jury instructions only required the jury to determine whether Mr. Silver promised to, or understood that he was expected to, perform official acts "for the benefit of the payor" as the opportunities to do so arose. Special App. 30–31. The instruction on extortion under color of right was even less definite, asking the jury to determine only whether Silver "accepted the

property intending, at least in part, to take official action in exchange for those payments as the opportunity arose." Special App. 33. Having contrasted the two schemes, we think it evident that Silver's conviction under Counts 1s, 2s, and 5s depends on *what* precisely is required to demonstrate a promise to exercise "particular kinds of influence" after *McDonnell*. *See Ganim*, 510 F.3d at 144.

Under the instructions provided by the district court, and according to the Government's argument, it is enough that the official promised to perform some or any official acts, *for the benefit of the payor*, as the opportunities arose. *See, e.g.*, Appellee Br. at 39, 41–42. However, the facts of *Ganim* demonstrate that the "as the opportunities arise" theory has always required more than a mere promise to perform official acts "for the benefit of the payor."

Specifically, Ganim used two aides, both of whom held side jobs as consultants, to facilitate various bribery schemes. In each instance, Ganim knew that the bribe payor sought to influence an identified issue pending before the City—including specific wastewater treatment contracts, an open municipal pension brokerage position, condemnation of a specific property, and two identified property development contracts—by paying consulting fees to the aides. *Ganim*, 510 F.3d at 137–40. The aides kept Ganim's fee shares "to avoid

detection" but provided him with money and other benefits "upon his request."

*Id.* at 139.

Thus, it was clear from the beginning what "particular kinds of influence"
Ganim was expected to exercise, namely official action affecting each of these
identified areas.[15]  *Id.* at 149.  This exchange of payments "for a *specific* exercise of
[Ganim's] official powers" was enough to sustain Ganim's conviction, even
though the separate questions of *how* Ganim would influence those issues (which

---

[15] In *United States v. Coyne*, the primary Second Circuit case on which *Ganim* relies to
support the "as the opportunities arise" theory, we approved of an instruction requiring
that the defendant "know the payment is offered in exchange for a *specific requested*
exercise of his official power . . . ."  4 F.3d 100, 113–14 (2d Cir. 1993) (emphasis added).  In
doing so, we rejected the defendant's argument that the *quid pro quo* requirement
demands an "explicit promise," explaining that it is instead "sufficient if the public
official understands that he or she is expected as a result of the payment to exercise
particular kinds of influence—i.e., on behalf of the payor—as specific opportunities
arise."  *Id.* at 114.  To the extent that "particular kinds of influence—i.e., on behalf of the
payor" might, in isolation, be read to require only that the official promise to take some
action beneficial to the payor, the precise instructions in *Coyne* make clear that such a
reading is too broad.  Rather, the promise must concern a "specific requested exercise
of . . . official power"—in *Coyne*, a specific municipal contract.  *Id.* at 113–14.  *Ganim* does
not loosen this requirement in demanding a "specific exercise of the defendant's official
powers."  510 F.3d at 144.  Indeed, *Ganim* says as much.  *See id.* at 145 ("To the extent
Ganim objects to the 'particular kinds of influence' phraseology in . . . the jury charge, we
find no error.  Because the preceding paragraph in the charge clearly articulated the
'payment . . . in return for official acts' quid pro quo, the phrase 'kinds of influence,' which
might otherwise be ambiguous, would only be understood to refer to undertaking the
official acts that made up Ganim's part of the bargain." (second alteration in original)).

specific actions he would take), as well as the form the kickbacks would ultimately take (cash, meals, etc.), remained unspecified.[16]  *See id.* at 144 (emphasis added). In *Ganim*, the fact that a specific official act did not need to be linked to a gratuity (this for that) did not eliminate the necessity of some degree of specificity to the public official's promise.  The "opportunities" had definition—they were not open-ended and subject to whatever the public official thought might please (or benefit) the bribe payor.

To the extent our sister circuits have used language suggesting the open-ended liability advanced by the Government, a close review of the facts in each case makes clear that they, like *Ganim*, do not support such a sweeping view of bribery.  For example, in *United States v. Kincaid-Chauncey*, the Ninth Circuit upheld instructions regarding extortion and honest services fraud similar to those in *Ganim*—that the public official must have "underst[ood] that he or she [was] expected as a result of the payment to exercise particular kinds of influence as specific opportunities ar[o]se."  556 F.3d at 945.  There, the Government's evidence

---

[16] *See also United States v. Whitfield*, 590 F.3d 325, 350 (5th Cir. 2009) ("[A] particular, specified act need not be identified at the time of payment to satisfy the *quid pro quo* requirement, so long as the payor and payee agreed upon a specific *type* of action to be taken in the future.").

showed that a county commissioner had accepted four separate payments from a strip club owner who needed certain ordinances, permits, and licenses to operate two new establishments. On one occasion, the commissioner had lunch with the owner, received a cash payment later that same day, and a month later voted in the owner's business interests. *Id.* at 928. On another occasion, the commissioner contacted the owner to request a sum of cash, which she later received along with subsequent instructions regarding how to vote on a specific piece of legislation. *Id.* at 928.

The Ninth Circuit's observation that "[i]t is sufficient . . . if the evidence establishes that the government official . . . has received payments or other items of value with the understanding that when the payor comes calling, the government official will do whatever is asked" was set in the context of identified concerns followed by official acts. *Id.* at 927–28, 943 n.15. As in *Ganim*, the commissioner knew she was expected to assist in securing various government approvals for the owner's business in exchange for the payments. What she, like Ganim, did not know was what form that assistance would ultimately take. The phrase "when the payor comes calling" was thus another way of conveying that the specific act need not be identified at the time of payment, but may instead be

56

later identified, by the payor, when a specific opportunity arises. The phrase does not, in light of its factual context, suggest that an official may be held criminally liable for accepting a payment with the understanding that she will take some action on *any* conceivable topic.[17] Indeed, such a reading would effectively eliminate the distinction between lobbying (lawful attempts to "buy favor," *see Sun–Diamond*, 526 U.S. at 405–406) and bribery (unlawful attempts to buy particular kinds of influence).

But contrary to the Government's assertions, *Ganim* neither held, nor do its facts suggest, that a bribery scheme involving payments made in return for a promise to "take [some or any] official action" beneficial in any way to the payor

---

[17] *See also Kemp*, 500 F.3d at 267–70 (affirming honest services fraud convictions where defendants made multiple payments to a former Philadelphia treasurer in return for official assistance in securing and/or renewing certain municipal contracts); *Jennings,* 160 F.3d at 1010–12 (affirming bribery conviction where defendant met with the administrator of a federal agency to discuss two specific housing rehabilitation programs that did not require competitive bidding, made ongoing multiple payments to the administrator, and simultaneously submitted a series of successful requests for contracts under those same two programs); *cf. Sawyer*, 85 F.3d at 730 (explaining that "a person with continuing and long-term interests before an official . . . engag[ing] in a pattern of repeated, intentional gratuity offenses in order to coax ongoing favorable official action in derogation of the public's right to impartial official services" would be "akin to" two honest services fraud cases involving undisclosed self-dealing—a theory that is distinct from the bribery theory at issue here and that was subsequently deemed unconstitutional in *Skilling*, 561 U.S. at 409).

satisfies either offense's *quid pro quo* requirement.  Nor have we articulated this view elsewhere.[18]  At most, *Ganim* left open the narrow question of what qualifies as "particular kinds of influence."   But *Ganim* made clear that the promised influence, at a minimum, must be of a "particular kind[]."   The jury instructions here, however, required only that Silver promise "to take [some or any] official action" "for the benefit of the payor."   In light of *Ganim* and our other precedents, and especially after *McDonnell*'s narrowing of the definition of official acts, such an instruction is insufficient to accurately inform the jury of what is required to find a *quid pro quo*.

---

[18] *See Rosen*, 716 F.3d at 700 ("[T]he federal bribery and honest services fraud statutes . . . criminalize schemes involving payments at regular intervals *in exchange for specific official acts* as the opportunities to commit *those* acts arise, even if the opportunity to undertake the requested act has not arisen, and even if the payment is not exchanged for a particular act but given with the expectation that the official will exercise *particular kinds of influence*." (emphases added) (original alterations, internal quotation marks, and citations omitted)); *Bruno*, 661 F.3d at 744 ("The government's evidence of the timing of the payments in relation to the actions taken by [the former New York State Senate Majority Leader] could also be accepted by a rational jury in support of the conclusion that [the defendant] understood that the consulting payments were made in return for official action [on a specific and pending government grant]."); *United States v. Bahel*, 662 F.3d 610, 634 (2d Cir. 2011) (approving of jury instruction requiring that the defendant-official have "accepted financial benefits . . . in return for [three enumerated] forms of assistance" (emphasis omitted)); *Coyne*, 4 F.3d at 113–14 (approving of jury instruction requiring that defendant-official have known the payment was made "in return for official acts," *i.e.*, "in exchange for a *specific requested* exercise of his official power" (emphasis added)).

Moreover, failure to define the conduct prohibited by extortion under color of right and honest services fraud would "raise[] significant federalism concerns" akin to those identified in McDonnell.  *Id.* at 2373.  "A State defines itself as a sovereign through 'the structure of its government[] and the character of those who exercise government authority.'  That includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents." *Id.* (citation omitted) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).  New York State allows elected officials to maintain part-time employment, including practicing law.  N.Y. Pub. Off. Law § 74(3)(a).  Without the particularity requirement, federal corruption statutes could reach a wide range of activity not prohibited by New York law.

In short, "[s]erving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator."  *McCormick*, 500 U.S. at 272.  The federal criminal statutes cannot be read in a manner that "reaches any effort to buy favor or generalized goodwill from an official who either has been, is, or may at some unknown, unspecified later time, be *in a position to act* favorably to the giver's interests," *Sun–Diamond*, 526 U.S. at 405, or that "'involves the Federal Government in setting standards' of

59

'good government for local and state officials,'" *McDonnell*, 136 S. Ct. at 2373

(quoting *McNally v. United States,* 483 U.S. 350, 360 (1987)).

For the foregoing reasons, *Ganim*'s rule that the jury "need not find that the

specific act to be performed was identified at the time of the promise, nor need it

link each specific benefit to a single official act," 510 F.3d at 147, remains good law.

Furthermore, *McDonnell* makes clear that the official need not communicate that

he will, or otherwise believe that he is expected to, affect the relevant "question,

matter, cause, suit, proceeding or controversy" by any particular "*means*."

*McDonnell*, 136 S. Ct. at 2371 (emphasis added).  That is, the official need not

promise to perform any precise act upon the relevant question or matter.  But to

the extent that the Government reads *McDonnell* to allow an open-ended promise

limited only by those acts that benefit the payor and not to require that a particular

*question* or *matter* be identified at the time the official enters into a *quid pro quo*

arrangement, we disagree.

With respect to honest services fraud, the jury was instructed that it needed

only to find that Silver was "expected to exercise official influence or take official

action *for the benefit of the* payor."  Special App. 30–31 (emphasis added).  Instead,

the jury should have been instructed that, to convict on honest services fraud, the

Government must prove that, at the time the bribe was accepted, Silver promised to take official action on a *specific and focused question or matter* as the opportunities to take such action arose.

As to Hobbs Act extortion, the jury was instructed that they could find Silver guilty if they found that he "obtained property to which he was not entitled by his public office, knowing that *it was given in return for official acts as the opportunity arose*," "that the extorted party was motivated, at least in part, by the expectation that as a result of the payment, Mr. Silver would exercise official influence or decision-making *for the benefit of the extorted party*, . . . that Mr. Silver was aware of that motivation," and that the property was given "as an exchange for *any* official action." *Id.* at 32–33 (emphases added). Instead, the jury should have been told that the *quid pro quo* element was satisfied if, at the time Silver accepted the extorted property, he understood that he was expected, in exchange for those payments, to take official action *on a specific and focused question or matter* as the opportunity to do so arose.[19] *See, e.g., Ganim*, 510 F.3d at 144–45 (finding no error

---

[19] We note too that prior instructions requiring the jury to find that the official understood that he or she was expected to exercise *particular kinds of influence* would not be in error after *McDonnell*. *See, e.g., Ganim*, 510 F.3d at 144–45. The phrase "particular kinds of influence" connotes that the official action must relate to a sufficiently particular, focused,

in instruction that the jury must find the official understood he was "expected as a result of the payment to exercise *particular kinds of influence* . . . on behalf of the payor, as specific opportunities arose" (emphasis added)).

Instructing a jury that an official need only understand her official action to *benefit the payor* creates a situation where an official could accept a payment—lawful or otherwise—and later incur criminal liability by voting on *any* legislation or performing *any* official act on *any topic* that benefits the payor.  While some may find political contributions a corrupting influence in American politics, those moral judgments do not define criminal liability.

In summary, the jury instructions were erroneous because the required *quid pro quo* contained therein was too open-ended.  The instructions failed to convey that Silver could not be convicted of honest services fraud unless the Government proved that, at the time the bribe was accepted, Silver promised to take official action on a *specific and focused question or matter* as the opportunities to take such action arose.   And, with respect to Hobbs Act Extortion, the instructions erroneously failed to convey that the Government was required to prove that, at

---

or concrete question or matter.  Furthermore, an exchange for a *particular kind* of influence is sufficiently definite to satisfy the *quid pro quo* requirement.

the time Silver accepted the extorted property, he understood that he was expected, in exchange for those payments, to take official action on a *specific and focused question or matter* as the opportunity to do so arose.

## III.    Harmlessness

Because the instructions are burdened with this error, we must determine whether the error was harmless as to Silver's convictions.  For the erroneous instructions to have been harmless, it must be "clear beyond a reasonable doubt that a rational jury would have found [Silver] guilty absent the error."  *Bah*, 574 F.3d at 114 (quoting *Quattrone*, 441 F.3d at 177).  That is to say, we must be convinced that a rational jury would have found that Silver entered into the alleged *quid pro quos* understanding that he was expected to influence "specific," "focused, and concrete" questions or matters.[20]  The Government bears the burden of establishing that any error is harmless.  *See Quattrone*, 441 F.3d at 181.

---

[20] As in *McDonnell*, there is no allegation that Silver accepted payments knowing they were given with the expectation of influencing a "cause, suit, proceeding or controversy." We therefore focus only on whether Silver knew the payments were given with the expectation of influencing a "question or matter."

63

### A. The Instructions Could Have Misled the Jury to Convict Silver Despite a Lack of any *Quid Pro Quo* Related to the Mesothelioma Scheme After 2007.

As we noted in our earlier discussion, Silver's convictions under Counts 1s, 2s, and 5s are dependent upon whether liability could attach to a promise to perform official acts "for the benefit of the payor."   In light of our analysis of *McDonnell* and *Ganim*, we cannot conclude, beyond a reasonable doubt, that a rational jury would have found Silver guilty of counts related to the Mesothelioma Scheme had it been properly instructed on the requirements of a *quid pro quo* under an "as the opportunities arise" theory of bribery.

Because, as we discuss in more detail below, the statute of limitations precludes consideration of the HCRA grants and the procurement of funding for Taub's wife's charity, we limit our review to the other evidence remaining in the record.  This review reveals that the Government presented no evidence that Silver made any promises to Taub, after 2007, regarding any action on any identified, or even *identifiable*, question or matter—much less a focused or concrete question or matter involving the exercise of governmental power.   While the Government argues that the character of Silver and Taub's *quid pro quo* merely changed after 2007, we find no evidence in the record from which a rational jury could conclude

that any *quid pro quo* between Silver and Taub related to *official acts* existed after 2007. Instead, the only promise that could be inferred from the evidence presented at trial is that Silver promised to keep Taub happy as the opportunities to do so arose. Such a promise falls short of what *Ganim* required, even before the Supreme Court narrowed the definition of an official act in *McDonnell*. Keeping someone happy, without more, is not a promise to exercise particular kinds of influence, and it is especially not a promise to perform official acts on an identified, focused, and concrete matter or question that involves the exercise of governmental power. *See McDonnell*, 136 S. Ct. at 2370.

The last remaining argument that any error was harmless, then, is that a rational jury would have found that Silver promised to honor Taub through an Assembly resolution in exchange for referrals. While the Assembly resolution is indisputably an official act, we find no evidence on the record from which a jury could conclude Silver ever promised to pass the resolution or understood Taub's referrals were in exchange for his doing so. Instead, the evidence demonstrates that the assembly resolution was "last minute," and "rush[ed]." *See* Special App. 49. A rational jury could only have found that Silver engaged in a corrupt *quid pro quo* exchanging referrals for the Assembly resolution by relying upon the very

65

instruction we find erroneous: that they need only find Silver promised to perform

official acts, *for the benefit of the payor*, as the opportunities arose.  Consequently,

with respect to the Mesothelioma Scheme, the jury could have erroneously

convicted Silver based on a finding that he believed he was expected to take official

action to "benefit the payor," in any way, in the future.[21]

 With respect to Counts 1s, 2s, and 5s, the error is not harmless.

> ### B. It is Clear Beyond a Reasonable Doubt that a Rational Jury Would Have Found that the Real Estate Scheme Concerned Sufficiently "Focused and Concrete" "Questions or Matters" "Involving a Formal Exercise of Governmental Power."

 With respect to the Real Estate Scheme, the question is whether it is clear

beyond a reasonable doubt that a rational jury would have found that Silver

---

[21] Compare, for example, *Jennings,* where the Fourth Circuit found jury instructions plainly erroneous because they failed to convey that "the jury [was required] to find a relatively *specific quid pro quo*"—*i.e.,* "that [the defendant] intended to trade specific payments for *specific* favors." 160 F.3d. at 1022 (emphases added).  The jury instructions were erroneous because "the court repeatedly charged that it was sufficient if [the defendant] paid [the public official] to influence [the official] 'in connection with' or 'in reference to' [the official's agency's] business."  *Id.*  These allusions to agency business "were too general because they did not describe any official acts that [the defendant] intended to induce with his payments to [the official].  These explanations could have described a situation in which [the defendant] paid [the official] with a vague expectation of some future benefit."  *Id.* (original alterations and internal quotation marks omitted). Nevertheless, the Fourth Circuit found this error was harmless because the "pattern of behavior confirmed the existence of a quid pro quo."  *Id.* at 1023.

accepted referral fees with the belief that he was expected to influence a *particular matter*, namely the relevant tax abatement and rent stabilization programs, absent the error.[22]  Based on the evidence presented at trial, including circumstantial evidence of the timing of PACB financing approvals and Silver's "side letter" retainer agreement, we conclude that it is clear, beyond a reasonable doubt, that a properly instructed, rational jury would have reached the same conclusion.

Neither party argues, nor does the record reflect, that Silver and the Developers themselves focused on a particular question or matter forming the subject of the *quid pro quo* in advance.  However, the "side letter" provides strong evidence of a *quid pro quo* between Silver and the Developers on a focused and concrete question or matter.  Not only does it reasonably constitute "behavior indicating consciousness of guilt," *Bruno*, 661 F.3d at 744 (quoting *Friedman*, 854

---

[22] The Government suggests "shaping and supporting real estate legislation" as a properly defined question or matter.  Appellee Br. at 56.  We again disagree that this broad formulation qualifies as "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete."  *See McDonnell*, 136 S. Ct. at 2369.  A narrower definition that focuses on particular programs—*e.g.*, tax abatement and rent stabilization programs—is therefore required.  However, the question or matter need not specify *how* the public official would support/oppose those programs—*e.g.*, sponsoring a bill, lobbying colleagues to gather votes for that bill, or funding a study on the program's efficacy.  Despite the Government's suggestion, we believe the facts as presented at trial suggest that such a narrowly defined question was implicitly identified.

F.2d at 554), it also supports a finding that Silver knew Glenwood sought to exchange referrals for official action. Indeed, Glenwood's lobbyist testified that Glenwood's owner signed the agreement because Silver was "extremely influential and powerful, not somebody you would want to make not like you," and that not signing the letter could lead to "repercussions legislatively." J.A. 823, 825.

Based on the fact that the Developers knew (i) Silver's vote alone could prevent them from obtaining PACB funding, and (ii) that Silver had an extraordinary amount of power to influence the Rent Act (which required regular renewal), it is clear beyond a reasonable doubt that a rational, properly instructed jury would conclude that the Developers signed the "side letter" and thus provided business to G&I in exchange for official actions related to those two questions or matters. This is especially true in light of the circumstantial evidence presented by the Government, which demonstrated a pattern between Silver's PACB approvals, actions with respect to the Rent Act of 2011, and the Developers' provision of business to G&I. We believe it is clear beyond a reasonable doubt that a rational jury would have concluded, absent the error, that Silver understood he

was expected to support specific, identified provisions of the Rent Act of 2011 in exchange for the Developers' provision of business to G&I.

Furthermore, we find that the circumstantial timing of Silver's PACB funding approvals and Glenwood's signing of the "side letter" demonstrate that one of the identified, focused, and concrete matters at the heart of Silver's *quid pro quo* with the Developers was whether the State would finance the Developers' projects through PACB funding in exchange for the Developers' provision of business to G&I.

On this evidence, we find that the district court's failure to instruct the jury that Silver must have believed the Developers sought his influence on "focused and concrete" matters was harmless. That is, we are convinced, beyond a reasonable doubt, that a rational, properly instructed jury would have found Silver possessed the required *mens rea* at the time he accepted the payment. This is especially true because the district court instructed the jury that, should they find "Mr. Silver understood that the benefits were provided solely to cultivate goodwill or to nurture a relationship with the person or entity who provided the benefit," then no *quid pro quo* was proven. Special App. 30.

We therefore affirm Silver 's convictions for the Real Estate Scheme under

Counts 3s, 4s, and 6s.

### IV. Because There is Insufficient Evidence to Prove the Mesothelioma Scheme Beyond a Reasonable Doubt, We Remand with Instructions to Vacate Those Counts.

Having determined that the erroneous jury instructions were not harmless

with respect to the Mesothelioma Scheme, we must assess whether those counts

should be remanded for a retrial or dismissed outright. Ordinarily, "[a]n

erroneous jury instruction mandates a new trial unless the error is harmless." *Cobb*

*v. Pozzi*, 363 F.3d 89, 112 (2d Cir. 2004). However, on rare occasions, we have

remanded with instructions to dismiss charges without a trial where it is

undisputed that the evidence would be insufficient to prove the elements of the

charges beyond a reasonable doubt to a properly instructed jury. *See, e.g.*, *United*

*States v. Newman*, 773 F.3d 438, 451, 455 (2d Cir. 2014), *abrogated on other grounds by*

*Salman v. United States,* 137 S. Ct. 420 (2016).

Here, we must consider whether the jury could have found the relevant

elements of each of the Mesothelioma Scheme counts beyond a reasonable doubt.

As noted earlier, for Hobbs Act extortion, the Government needed to prove that

Silver "obtain[ed] . . . property from another, with his consent, induced . . . under

70

color of official right."  18 U.S.C. § 1951(b)(2); *see also Silver I*, 864 F.3d at 113–14.

Additionally, and most relevant to the resolution of this case, the Government

must prove a *quid pro quo*, namely that the official "promise[d] . . . to perform or

not to perform an official act" in return for payment, *McCormick*, 500 U.S. at 273,

or accepted a payment, "knowing that the payment was made in return for official

acts," *Evans*, 504 U.S. at 268.

Similarly, with respect to honest services wire and mail fraud, the

Government needed to prove that Silver used the mails and interstate wire

communications to participate in a "scheme or artifice" to "deprive another of the

intangible right of honest services."  *See* 18 U.S.C. §§ 1341, 1343, 1346; *Ganim*, 510

F.3d at 147–48.  As discussed above, section 1346 criminalizes only bribery and

kickbacks, and the parties agreed to define bribery by reference to 18 U.S.C. § 201,

which criminalizes "corruptly" demanding, seeking, receiving, accepting, or

agreeing to receive or accept "anything of value personally or for any other person

or entity, in return for . . . being influenced in the performance of any official act."

*See* 18 U.S.C. § 201(b)(2)(A); *McDonnell*, 136 S. Ct. at 2365.

Here, Silver was not indicted until February 2015.  The five-year statute of

limitations thus excludes conduct that occurred before February 2010.  *See* 18

71

U.S.C. § 3282(a).  Because Silver refused to award additional HCRA grants to Taub after 2007—prior to the limitations period—the Government "need[ed] . . . [to] prove that some aspect of the particular *quid pro quo* scheme continued into the statute of limitations period."  *Silver I*, 864 F.3d at 122.  It did not.

Although Taub's referrals continued into the limitations period, until at least 2013, the Government does not contend that those referrals constituted "back pay" for the 2005, 2006, or 2007 grants.[23]  Indeed, by 2007 Silver had told Taub that the HCRA grants would cease, and Taub himself testified that the post-2010 referrals were, instead, intended to curry generalized goodwill.  *See, e.g.*, J.A. 500 (Taub testifying that he continued sending cases to Silver because he "was a very powerful man and there were *other ways* in which he could assist in helping mesothelioma patients" (emphasis added)); *id.* at 1775 (2010 email from Taub stating that he would "keep giving cases to [Silver] because [Taub] may need him *in the future*—he is the most powerful man in New York State" (emphasis added));

---

[23] *See, e.g., Jennings*, 160 F.3d at 1014 ("Because the distinguishing factor between a bribe and an illegal gratuity is the intent behind the payment, the timing of the payment in relation to the official act for which it is made is (in theory) irrelevant.  Bribes often are paid before the fact, but 'it is only logical that in certain situations the bribe will not actually be conveyed until the act is done.'" (citation omitted) (quoting *United States v. Campbell*, 684 F.2d 141, 148 (D.C. Cir. 1982))).

*id.* at 505 (Taub testifying that he continued referring cases because he hoped that "if cases were referred to [Silver], he would continue to be incentivized to be an advocate for mesothelioma research *if* the occasion arose" (emphasis added)).

Moreover, the fact that W&L continued to pay Silver after 2010 for legal fees generated on the pre-2007 referrals does not automatically extend the scheme for statute of limitations purposes. Rather, those payments must be made "in furtherance of" an ongoing scheme, not merely as "the *result* of a completed" one. *See United States v. Grimm*, 738 F.3d 498, 503 (2d Cir. 2013).[24]

The five-year statute of limitations under 18 U.S.C. § 3282(a) is not extended "where the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place." *Id.* at 502 (alterations omitted) (quoting *United States v. Salmonese,* 352 F.3d 608, 616 (2d Cir. 2003)); *see also United States v. Rutigliano*, 790 F.3d 389, 400–01 (2d

---

[24] *See also* Special App. 35 (district court instructing jury that, "as to each count of wire or mail fraud you must find that a wire communication or mailing respectively was made after February 19, 2010, in furtherance of that crime. As to each extortion count, you must find that Mr. Silver or, at the direction of Mr. Silver, a third party obtained property or money from the scheme after February 19").

73

Cir. 2015) (reviewing conspiracy to commit mail and wire fraud under *Grimm*'s standard).[25]  In *Grimm*, for example, we determined that regular interest payments on a guaranteed investment contract did not trigger a new limitations period because they were "serial payments that . . . [were] lengthy, indefinite, ordinary, typically noncriminal and unilateral," and made by wire over a "prolonged time." 738 F.3d at 503; *cf. Rutigliano*, 790 F.3d at 400–01 (finding limitations period extended where coconspirators "engaged, within the limitations period, in 'measures of concealment' and 'other corrupt intervention'" (quoting *Grimm*, 738 F.3d at 503)).

Based on this reasoning, we disagree with the Government that the post-2010 payments provide evidence of an ongoing scheme.  There is no evidence of any "corrupt intervention" here—and certainly nothing like the conduct in *Rutigliano*, where the defendants, within the limitations period, mailed false disability recertification forms to secure continued payments.  *See* 790 F.3d at 400–01.  Instead, the compensation that Silver received after 2010 for referrals Taub

---

[25] Although *Grimm* and *Rutigliano* concerned conspiracy prosecutions, their reasoning is grounded in conspiracy's acts-in-furtherance requirement and is therefore equally applicable to the ongoing bribery scheme alleged here.

74

made before 2007—one third of any fee ultimately earned by W&L—much more closely resembles the indefinite and prolonged interest payments in *Grimm*. *See* Appellee 28(j) Letter, Mar. 14, 2019 (detailing 19 payments between August 2010 and September 2014, ranging from $0.86 to $26,568.26, made to Silver over the course of four years for the referral of one client in February 2004).

The thing of value (or the *quid*) that Silver received from Taub in exchange for his promise to deliver the HCRA grants was the referrals themselves—not the subsequent payouts from W&L on the referrals that generated fees for the firm. If Silver had been paid in oil leases or diamonds or savings bonds, the result would be the same, regardless of when those properties were subsequently monetized. Here, Taub paid his bribe in referrals made between 2005 and 2007—well before the February 2010 limitations cut off. The fact that W&L later earned fees and cut checks to Silver does not alter the fact that the HCRA scheme was completed by 2007. Thus, because the within-limitations payments to Silver from W&L were "the *result* of a *completed* [scheme], and . . . not in furtherance of one that [was] ongoing," the HCRA scheme was not renewed with each payment. *See Grimm*, 738 F.3d at 503 (second emphasis added).

Because the HCRA grants are time-barred, we turn to the remaining three alleged official acts to determine whether they provide evidence supporting the Mesothelioma Scheme convictions.

To begin, Silver allocated state funding for Taub's wife's charity in 2008, prior to the limitations period. As with the HCRA grants, there is no evidence that post-2010 referrals—*i.e.*, referrals within the relevant limitations period—were made in return for this prior grant. The charity grant is likewise time-barred and cannot sustain Silver's conviction.

As to the charity race, *McDonnell* makes clear that Silver's offer to assist in securing permits for Taub's planned "Miles for Meso" event did not constitute an official act. At trial, the Government showed that Silver met with Taub in 2011 to discuss a charity run in Lower Manhattan, which had a moratorium on such events. Silver subsequently sent a letter to Taub, on official letterhead, explaining the permit procedure and promising to "help . . . navigate th[e] process if needed." J.A. 1774. Because "using government letterhead is not, by itself, a formal exercise of government power on a matter similar to a hearing or lawsuit," *Silver I*, 864 F.3d at 120, no reasonable jury could find that Silver's promise to "help . . . navigate th[e] process," J.A. 1774, constituted a promise to *use his office* to Taub's benefit.

76

The lone alleged official act remaining is the Assembly resolution.  Although Silver concedes that the resolution constitutes an official act, the Government did not present any evidence to suggest that Silver understood, at the time he accepted any patient referrals, that Assembly recognition of Taub was one of the "specific," "focused, and concrete" matters or questions that he was expected to influence.[26] Instead, during trial the Government described the effort to secure the commendation as one that proceeded "on a rush[ed] basis" and "at the last minute."  Special App. 49.

Thus, Silver's conviction on the Mesothelioma Scheme turns on whether a rational jury could find that Silver either promised or understood he was expected to exchange the Assembly resolution for referrals.

Without the HCRA grants, we are compelled to conclude that "no rational trier of fact could have found [Silver] guilty beyond a reasonable doubt" with respect to Counts 1s, 2s, and 5s.  *See United States v. Cassese*, 428 F.3d 92, 98 (2d Cir.

---

[26] The Government suggests "helping mesothelioma patients" as a properly defined question or matter.  Appellee Br. at 11.  We disagree that this broad formulation qualifies as "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete."  *See McDonnell*, 136 S. Ct. at 2369.

2005) (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)); *see also Newman*, 773 F.3d at 455 (identifying instructional error and ordering dismissal of the indictment under Rule 29 because even a properly instructed jury would not have had sufficient evidence to convict).[27]

For the same reasons that we found the erroneous jury instructions were not harmless with respect to Counts 1s, 2,s, and 5s, we find that there is no evidence that Silver engaged in a *quid pro quo* within the limitations period, much less understood he was expected to influence a "focused and concrete" question or matter in exchange for mesothelioma client referrals.

At best, the Government's evidence suggests Silver understood he was expected to influence some or any matter beneficial to Taub, should an opportunity to do so arise. In essence, the Government argues that after the HCRA scheme ended, without even a "wink[]" or a "nod[]" from Taub indicating what he wanted in exchange for future referrals, *see Evans*, 504 U.S. at 274 (Kennedy, *J.*, concurring in part and concurring in the judgment), Silver was found criminally liable for engaging in outside work (an otherwise lawful endeavor) and then

---

[27] Silver timely made a Rule 29 motion before the district court. It was denied.

helping a constituent (also an otherwise lawful endeavor).  For the reasons outlined above, this falls short of the *mens rea* required for bribery.  And if there were any doubt, the Government fails to argue in its brief that the exchange of referrals for the Assembly resolution provides sufficient evidence to support conviction on the counts in question.  *See* Appellee Br. at 55–56 (pointing to "assistance in securing permits for a charity race" as the only identified official act falling within the limitations period).

Accordingly, we reverse the judgment of the district court on Counts 1s, 2s and 5s and remand with directions for the district court to enter a judgment of acquittal on these counts.

## V.    Money Laundering

Finally, the Government alleged that Silver laundered the proceeds of the Mesothelioma and Real Estate Schemes by investing them in high-yield, private investment vehicles with the help of Jordan Levy, a private investor.[28]  In May 2011, Silver instructed Levy to transfer one half of an investment to his wife to avoid publicly disclosing the full amount of the investment.  There is no dispute

---

[28] Levy was unaware of the source of Silver's funds.

79

that the underlying investment, an account at Counsel Financial, was comprised in part of proceeds from the 2006–2007 HCRA scheme.

Silver argues that vacatur of his extortion and honest services fraud counts compels vacatur of his money laundering count as well. We disagree. Not only are the remaining counts of conviction sufficient to sustain his money laundering conviction, but because Silver knowingly transferred proceeds of the HCRA scheme within the limitations period, vacatur of all of his counts of conviction would not compel a different result.

The money laundering statute, 18 U.S.C. § 1957, prohibits "knowingly engag[ing] . . . in a monetary transaction in criminally derived property . . . ."[29] *Id.* § 1957(a). "[M]onetary transaction" is defined as "the deposit, withdrawal, transfer, or exchange . . . of funds or a monetary instrument . . . by, through, or to a financial institution." *Id.* § 1957(f)(1). "[C]riminally derived property" is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." *Id.* § 1957(f)(2).

---

[29] The statute also requires that the property be derived from "specified unlawful activity." 18 U.S.C. § 1957(a). Mail fraud, wire fraud, and Hobbs Act extortion categorically qualify as such. *See id.* § 1956(c)(7)(A) (citing *id.* § 1961(1)).

Significantly, an individual need not have been *convicted* of the underlying

criminal offense in order to be convicted of laundering the proceeds thereof.  *See*

*United States v. Pierce*, 224 F.3d 158, 162–63, 165–67 (2d Cir. 2000).  Rather, the

Government need only prove, beyond a reasonable doubt, that an individual

committed all elements of the underlying offense and that the defendant knew

that the proceeds were derived from such unlawful activity.  *See id.*  Nor must the

underlying offense take place within the limitations period.  For example, in *United*

*States v. Monaco*, we rejected the defendant's argument that her prosecution for

money laundering violated the Ex Post Facto Clause.  194 F.3d 381, 385, 387 (2d

Cir. 1999).  Although the illegal proceeds were generated prior to enactment of the

money laundering statute, the laundering activity continued post-enactment.

Only the latter fact was material because "[t]he statute . . . makes no distinction

based on when the illegal activity took place or when the proceeds were received."

*Id.* at 385; *see also United States v. Gabel*, 85 F.3d 1217, 1224 (7th Cir. 1996) ("[Money

laundering] focuses on the conversion of the fruits of the earlier crimes into other,

presumably less detectable, forms. . . .  Only when the effort to conduct the

financial transaction described by the statute begins does the relevant conduct

commence for money laundering itself.").[30]  The relevant act for purposes of the statute of limitations, in other words, is the knowing "deposit, withdrawal, transfer, or exchange" of "proceeds obtained from a criminal offense."  18 U.S.C. § 1957(f)(1)-(2).

We are convinced, beyond a reasonable doubt, that a rational jury would have found that Silver laundered the proceeds of a criminal offense within the limitations period.  *See Bah*, 574 F.3d at 114.  As to the underlying criminal offense, it is clear that, but for the statute of limitations, even a properly charged jury would have convicted Silver of extortion and honest services fraud in relation to the HCRA scheme.  Put differently, it is clear that Silver committed all elements of the criminal offense underlying his money laundering conviction, albeit outside the

---

[30] Indeed, it is often the case that the proceeds of the criminal offense were derived long before the money laundering transaction.  Imagine a scenario where an individual sold drugs in 2005 and hid the cash proceeds in her basement for ten years.  Imagine further that she then decided to sell the house in 2015 and deposited the cash from the basement into a bank account disguised as proceeds from the sale of the house.  Although she could not be prosecuted for the narcotics trafficking, as the statute of limitations would have run, the government could still prosecute her for the money laundering.  *See generally United States v. Szur*, 289 F.3d 200, 214 (2d Cir. 2002) ("[M]oney laundering does not focus on the specifics of the predicate offense, [and] it does not matter when all the acts constituting the predicate offense take place." (quoting *United States v. Mankarious*, 151 F.3d 694, 706 (7th Cir. 1998))).

82

five-year statute of limitations.[31]   As to the limitations period, the relevant

unlawful act for the money laundering count is not the HCRA scheme itself, but

instead the knowing transfer of the proceeds thereof.  That act occurred in 2011

and was, therefore, well within the limitations period.

Thus, we affirm Silver's conviction under Count 7s for money laundering.

* * *

So long as "curry[ing] favor" and "build[ing] a reservoir of goodwill" with

politicians is legal, *see Ganim*, 510 F.3d at 146; *Sun–Diamond*, 526 U.S. at 405, the

Government's burden in bribery prosecutions remains high.  This case provides a

useful illustration of that which is bribery and that which is not.  With respect to

the HCRA grants, Silver received a thing of value in return for exerting official

influence on a particular matter.  This is a classic example of bribery, and, but for

the statute of limitations, Silver's conviction for the Mesothelioma Scheme would

stand, regardless of the jury instructions.

---

[31] *Cf. Silver I*, 864 F.3d at 124 (vacating money laundering conviction following vacatur of
the underlying extortion and honest services fraud convictions because a properly
instructed jury may not have found all elements of the predicate offenses satisfied).

On the other end of the spectrum sit the Assembly commendation and charity race permits. An official who merely accepts a thing of value in an otherwise-legal manner (*e.g.*, client referrals, as permitted under New York law) has not committed a crime. If that official later acts to the benefit of the payor, she still has not committed a crime. It is only upon a showing that, at the time the official accepted the payment, she understood it to be a payment in exchange for official influence on some specific, focused, and concrete matter involving the formal exercise of governmental power that the Government has met its burden.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment and **VACATE** the conviction on Counts 1s, 2s, and 5s, and **AFFIRM** the conviction on Counts 3s, 4s, 6s, and 7s. We **REMAND** to the district court to dismiss the indictment with prejudice as it pertains to the reversed counts, for resentencing, and for such further proceedings as may be appropriate and consistent with this opinion with respect to the remaining counts.

A True Copy
Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

84