UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

        v.

SHELDON SILVER,

        Defendant.

Case No. 15 Cr. 93 (S-1) (VEC)

## Defendant Sheldon Silver's Sentencing Memorandum

Defendant Sheldon Silver respectfully submits this sentencing memorandum in advance of his sentencing, which is scheduled for July 20, 2020.[1]

### Introduction

Mr. Silver is now 76 years old, and this case has visibly aged him beyond those years. He is not the same man who stood before this Court more than five years ago, or even two years ago. The stress and anxiety of living every day with the uncertainty of this case hanging over him have taken a toll. Mr. Silver feels like he has aged "15 or 20 years" during the course of this case. Ex. A, Sheldon Silver Letter at 2. Mr. Silver's wife Rosa, a retired public elementary school teacher, has watched him grow "frailer and frailer." Ex. B, Rosa Silver Letter at 3. But the time also has given Mr. Silver an opportunity to reflect further on his conduct. As he made clear in his letter to the Court, Mr. Silver knows he has no one to blame for his predicament but himself. Ex. A, Sheldon Silver Letter at 1. He takes responsibility for developing a sense of entitlement and using his position as an elected official for personal financial gain. *Id.* at 1. He

---

[1] By letter motion dated June 1, 2020, the defendant consented to be sentenced via video teleconference to address concerns raised by the COVID-19 pandemic.  ECF No. 500.

takes responsibility for further eroding the public's trust in its elected officials and institutions. *Id.* at 2.  As he has written to the Court, Mr. Silver is ashamed of his conduct and saddened by its consequences.  *Id.* at 1.

Mr. Silver has been convicted of serious offenses involving public corruption, which the Court has correctly identified as categorically among the most serious white-collar offenses.  At the same time, it is also important to acknowledge that there are few among us who, over the course of their lifetimes, have helped more people than Sheldon Silver has during his career.[2]

Sheldon Silver is the hardware store owner's son that never left the Lower East Side. PSR ¶¶ 70, 83.[3]  Together with his wife Rosa of over 53 years, he lives in the same apartment complex where he grew up.  PSR ¶¶ 75, 85.  Rosa, who knows him best, put it simply: "he is a good man."  Ex. B, Rosa Silver Letter.  People could depend on Mr. Silver to help them with real problems affecting their lives.  As the Court previously recognized:

> I was again struck by the breadth of support that Mr. Silver has, from people from all walks of life.  Some were constituents.  Some were not.  Some were from people Silver has placed on boards, attesting that he never attempted to manipulate their vote.  The letters as a whole clearly and persuasively paint a picture of a gifted politician who went above and beyond the call of duty many

---

[2] Letters attesting to Mr. Silver's good works are attached hereto.  These letters were submitted to the Court in connection with Mr. Silver's prior sentencing proceedings.  Some of the excerpts quoted in this memorandum were included in the Sentencing Memoranda of Sheldon Silver dated April 20, 2016 and July 20, 2018.

In accordance with the Court's Individual Practices in Criminal Cases, all letters are attached as exhibits to this Submission and grouped as follows: a letter from Mr. Silver, dated June 17, 2020 (Exhibit A); a letter from Mr. Silver's wife, Rosa Silver, dated June 17, 2020 (Exhibit B); letters from Mr. Silver's children (Exhibit C); a letter from Mr. Silver's rabbi, Rabbi Siff (Exhibit D); updated reports from Mr. Silver's physicians (Exhibit E); letters from Mr. Silver's supporters that were independently filed on ECF since Mr. Silver's July 27, 2018 sentencing (Exhibit F); letters from Mr. Silver's supporters that were independently filed on ECF since Mr. Silver's retrial but after Mr. Silver's July 27, 2018 sentencing (Exhibit G); letters that were filed in support of Mr. Silver's April 20, 2016 sentencing submission (Exhibit H); other letters from Mr. Silver's supporters that were filed on ECF in 2016 (Exhibit I); medical records that were filed in support of Mr. Silver's July 20, 2018 sentencing submission (Exhibit J); and a letter from Mr. Silver that was filed in support of Mr. Silver's July 20, 2018 sentencing submission (Exhibit K).  Letters that were received in handwritten form are immediately followed by a typewritten transcription.

[3] Citations to "PSR" refer to the revised Presentence Report filed on August 1, 2018, ECF No. 453.  On June 6, 2020, the Probation Department filed a four page Supplemental PSR docketed as the "Final Presentence Investigation Report."  ECF No. 506 ("Supplemental PSR").

> times, for friends, for friends of friends, and constituents.
> Constituent service is part of the job of any politician.  But the
> reality is that some do it better than others.  It's clear that Sheldon
> Silver did it quite well.  And I have to consider his many good
> works in considering the history and characteristics of the
> defendant.

Sentencing Tr. 36:15-37:3 (July 27, 2018), ECF No. 460.

The Court is correct.  In addition, we submit, these accounts provide a window into who Mr. Silver is beyond his gifts as a politician.  When describing Mr. Silver, people use phrases such as "a man of compassion,"[4] "generous, humble and respectful of others,"[5] "his deep capacity for empathy and kindness,"[6] "kindness, concern and compassion,"[7] "his compassion to care for others,"[8] "helpfulness and generosity,"[9] and "unfailingly considerate, kind and polite."[10] These accounts describe a decent man who genuinely cares for people, treats them with respect, and wants to help them.  This is what forms the core of Mr. Silver's person to this day—people still call on him for help—which makes this case particularly tragic, even though the tragedy is of his own making.

Mr. Silver recognizes that while he may have been motivated to do good and help people, he was corrupted by his own sense of entitlement and lack of perspective.  He stands convicted of serious offenses as a result.  We acknowledge that, under ordinary circumstances, these serious counts of conviction would warrant some term of incarceration to punish Mr. Silver and to promote general deterrence.  But these are not ordinary circumstances, and "the punishment

---

[4] Briende Lehan.

[5] Alan Gerson.

[6] Harvey Weisenberg.

[7] Dovid & Chevy Libman; Bernard Silverstein.

[8] Kenneth Ngai.

[9] Edie Goldman.

[10] Frederick Jacobs.

should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 48 (2011) (citation omitted).

We submit that a just sentence should not expose Mr. Silver, a non-violent, first-time offender who poses no risk of recidivism, to an undue risk of dying in prison due to COVID-19. As an obese, 76-year-old man with a history of cancer, chronic kidney disease, and other health ailments, Mr. Silver is among those most at risk of dying from COVID-19. It does not appear this risk will abate any time soon. A vaccine is likely more than a year away, and perhaps much longer. A term of incarceration would substantially increase Mr. Silver's risk of infection. To meet the goals of sentencing during these extraordinary times, we propose that the Court sentence Mr. Silver to a substantial term of home confinement, combined with a rigorous community service requirement approved by Probation, plus fines and forfeitures.[11] Given the risk to Mr. Silver's life posed by COVID-19, we respectfully submit that such a sentence would be sufficient, but not greater than necessary, to meet the goals of sentencing.

<u>Mr. Silver's History and Characteristics</u>

A.   <u>Mr. Silver's Good Works Weigh Heavily in Favor of Leniency</u>

Mr. Silver devoted his life to public service. He has an admirable record of helping others in matters that might have been considered small or unimportant to another person who held his power. But these "small" matters were important to Sheldon Silver. He also has an equally-admirable record of fighting tough battles for legislation that unquestionably improved the lives of people in this State. We respectfully submit that Mr. Silver's long record of good works weighs heavily in favor of leniency.

---

[11] As set forth in the government's letter of June 12, 2020, the government and Mr. Silver have reached agreement on the issue of forfeiture. ECF No. 507.

1.      Mr. Silver's Record of Helping Others

Mr. Silver routinely helped others, doing far beyond what most legislators do in the name of constituent service: "I do not remember a single instance when Mr. Silver did not respond to the need of an individual, institution or cause."[12]

A 23-year-old who was picked on during his adolescence due to speech difficulties describes Mr. Silver this way:

> Sheldon Silver taught me to always challenge myself and gave me valuable advice for the future. To me, he is a mentor who has always encouraged me to work hard no matter how simple or difficult the task and to strive for the best.
>
> I am aware that Sheldon Silver has been convicted of serious offenses but please consider how important his presence has been to the youth members of the lower east side community. He was always willing to listen and to provide kind words of advice, which have guided me throughout my life. I am grateful for his compassion to care for others.[13]

Mr. Silver took many seemingly-small acts that made a real difference to individuals. His "commitment to his community and constituents was well known."[14]  That commitment took many forms, as a former Assembly colleague describes:

> From helping to ensure my local firefighters and classroom teachers have the tools they need to do their jobs, to helping me establish a summer respite camp on Long Island for children with cancer, and three residences for medically fragile children that no one else in New York could treat, Shelly never turned his back on people in need.[15]

To provide just some examples, Mr. Silver:

---

[12] Malcolm Hoenlein.

[13] Kenneth Ngai, assistant manager of a miniature golf course.

[14] Edie Goldman.

[15] Harvey Wiesenberg, former Assemblyman.

- Stepped in when insurance refused to pay a $150,000 medical bill for a graduate student with limited financial means;[16]

- Secured death benefits to a family in need;[17]

- Provided mobile hearing-test units to his constituents;[18]

- Mobilized a search party when six 14-year olds were lost overnight in Bear Mountain State Park;[19]

- Helped the family of a quadriplegic get weekend assistance when their in-home care was suddenly and unexpectedly discontinued;[20]

- Visited people in the hospital; [21] and

- Kept teenagers off the street, counseled struggling families, and went out of his way to make sure every person knew that they, individually, could make a difference.[22]

*Mrs. Esther Langer,* now 79 years old, describes Mr. Silver's office as the "helpline"—the "go to" place—whenever the community was in need.  "[B]efore the 311 number,'' she recalls, "Assemblyman Silver's constituents would call his office for help with all kinds of problems, and his staff was always very knowledgeable, helpful and polite."[23]  *Wallace Dimson,* President of Southbridge Towers, described his dealings with Mr. Silver as follows: "From the very beginning, he listened to our situation and eased our minds and fears . . . . [H]e felt an

---

[16] Rabbi Menachem Genack, Congregation Shomrei Emunah.

[17] Chaim Rand; Jacob Rand; Tamar Rand.

[18] Paul Hovitz, retired special education teacher.

[19] Joseph Geliebter, friend. Mr. Geliebter recalls that when his daughter and her friends were lost, "I did not hesitate to call Shelly in the middle of the night to mobilize a search party. He immediately got involved and made things happen."

[20] Miriam Katz, constituent.

[21] Morris Tuchman, former president of The Hamptons Synagogue.  Mr. Tuchman also recalls an instance when Mr. Silver looked in on Mr. Tuchman's wife at Beekman Downtown Hospital: "You could tell that Mr. Silver was revered at the institution and had done much for its funding and survival."

[22] Rabbi Mayer Friedman, community activist.

[23] Esther Langer; Former City Council Member Alan J. Gerson ("On an individual level, I observed countless individuals approach Shelly Silver during meetings and district inspections we attended and undertook together. Speaker Silver took his time and demonstrated sincere concern and compassion for each individual. I never heard one complaint that his office did not follow up.").

immense need to help.  He believed in our case very strongly, and was even kind enough to take it on *pro bono*.  Most importantly, the respect and concern he gave my 95 year old grandmother will forever be appreciated."[24]

As *Malcolm Hoenlein,* CEO of the Conference of Presidents of Major American Jewish Organizations, wrote:

> In the four decades of our association, Mr. Silver volunteered his assistance, participation and support for many important civil and human rights, for advancing intergroup relations, and aiding charitable and communal undertakings. He did so without seeking public recognition. . . .  His involvement was selfless, and he showed up in the rain and snow, and helped enlist others to these and other important causes.[25]

Mr. Silver has encouraged community involvement in government and the political process.  As a group of constituents states:

> It would not be an exaggeration to say that Mr. Silver, personally and through his staff, encouraged our community involvement and, by his example, showed how thoughtful engagement in public processes can improve a community's life. . . . [We] have been inspired by his example of how an elected politician can have a positive effect on his constituents' lives.[26]

We submit that these consistent sentiments reflect Mr. Silver's genuine concern for people, and his desire to make their lives better if he could.

    2.    <u>Mr. Silver's Work Fighting Gender Discrimination</u>

As *M. Tracey Brooks,* a leading women's health advocate, states, Mr. Silver has been "an outstandingly tireless champion and advocate for the women of New York.  Whether it was health care, educational opportunities, safety and integrity of women, economic opportunities to

---

[24] Susan Yomtov.

[25] Malcolm Hoenlein.

[26] Rent Stabilized Tenants of 125 Cedar Street.

level the playing field, housing, the ability to borrow money without added barriers, and the list goes on, the body of policy that Mr. Silver made a reality in his tenure is unprecedented."[27]

Mr. Silver vigorously pursued legislation on a range of important issues relating to gender discrimination.  For example, he championed the Women's Equality Act "aimed to prevent discrimination in employment and housing, while assuring adequate access to meaningful health care."[28]

He also sponsored legislation requiring all divorcing spouses, as a condition to a divorce, to agree to "remove any barriers to remarriage."[29]  This legislation, known as the "get law," was necessary because in Orthodox Judaism, only the husband can provide a "get," or a religious divorce, and many refused to do so at the time of civil divorces.  As a result, many women were held hostage in marriages they could not terminate.  Mr. Silver took on this injustice.

> [These women] are literally held ransom for exorbitant sums or at the husband's malicious whim, as they cannot get remarried in terms of Jewish religious law and are thus "chained" to these husbands.  Shelly Silver set out to do something about it . . . [The "get law"] has brought relief to so many of these unfortunate ladies.[30]

To achieve this legislation, Mr. Silver had to take on parts of his own Orthodox Jewish community.[31]  "Shelley, over the course of a number of years, was able to navigate among the leaders of these organizations to get them all on board supporting a bill that he proposed."[32]

---

[27] M. Tracey Brooks, former President and CEO of one of the largest women's reproductive health care advocacy organizations in New York.

[28] Hon. James A. Yates (ret.).

[29] *See* N.Y. Dom. Rel. Law § 253.

[30] Moshe H. Wieder; Dennis Rapps, Executive Director of the National Jewish Commission on Law and Public Affairs.

[31] Moshe H. Wieder.

[32] Jerald Berger, friend and former constituent.

The cornerstone of Mr. Silver's 2001 legislative agenda was the "Women's Health and Wellness Act," a comprehensive set of laws that encouraged early detection and prevention of medical conditions such as breast cancer, cervical cancer, and osteoporosis. As a result of Mr. Silver's efforts, women enjoy significantly improved access to and coverage for mammograms and other cancer-preventative testing, and insurance companies can no longer limit women's access to preventative gynecological care.[33]

Mr. Silver also fought to assure coverage for affordable fertility treatments for couples who were facing difficulties with natural conception.  Through his efforts, there is now legislation mandating coverage of fertility treatments for all New Yorkers.[34]

3.     Mr. Silver's Work to Promote and Improve Public Education

Mr. Silver has been "a tireless advocate for downtown public school families."[35]   He "had a special interest in serving . . . vulnerable senior and youth populations, and "fought for and won increased funding for schools throughout New York State."[36]   As *Billy Easton,* the Executive Director for the Alliance for Quality Education states, Mr. Silver has been the "one who we could count on to stand up for the educational needs of students."[37]

As *Randi Weingarten,* the President of the American Federation of Teachers, AFL CIO and former President of the United Federation of Teachers recalls, Mr. Silver "proposed, fought for and essentially single-handedly created the first universal pre-K for all 4-year-olds in New

---

[33] *See* Press Release, Assembly Speaker Sheldon Silver, Assembly Passes Revised Women's Health Bill (Apr. 8, 2002).

[34] Moshe H. Wieder; *see also* Marcel Weisman, neighbor and constituent ("He took special interest in the plight of infertile couples desperately trying to have children.").

[35] Wendy Chapman, former PTA President, P.S. 150.

[36] Yvonne Morrow, Mr. Silver's Director of Constituent Services (1992-2003).

[37] Billy Easton.

York."  Mr. Silver "continued to fight for these pre-K programs with every new gubernatorial administration."  That program, known as "LADDER," is the precursor to our State's adoption of universal Pre-K education in 1997.[38]  This single accomplishment would be a record to be proud of, but Mr. Silver's contributions to education went further.

He "championed the Tuition Assistance Program that provides financial assistance . . . for students to obtain a higher education degree,'' and helped launch a "statewide program to assist private colleges and universities" in obtaining critical funding for new construction projects.[39] Mr. Silver also provided affordable higher education through enhanced funding for two-year community colleges to provide a "path to a better life" for many New Yorkers.[40]

Mr. Silver established and chaired the Overcrowding Task Force, "a monthly forum to address the need for new schools in Lower Manhattan neighborhoods that have been experiencing significant population growth since September 11."  The Overcrowding Task Force brought together "parents, local elected officials and senior DOE representatives to build a case for new schools," and "served to open three additional public schools with a fourth to be opened in the coming years."[41]  Mr. Silver helped create over 2,000 seats, as well as "much needed temporary space to start schools while the new schools were built."[42]  When officials planned a school relocation that would have harmed the parents and children who attended the school, Mr. Silver's efforts stood out:

I will never forget Sheldon Silver at the last Overcrowding Task

---

[38] Stephen August. former Deputy Director Budget Studies for Ways & Means Committee.

[39] Ronald Canestrari, former Assemblyman and former Chair, Committee on Higher Education.

[40] *See* News Release, Assembly Speaker Sheldon Silver, Assembly Budget Proposal Increases Community College Funding (Mar. 8, 2013).

[41] Matt Schneider, resident of lower Manhattan and constituent.

[42] Professor Eric Greenleaf, member of the Overcrowding Task Force and Professor of Marketing, Stern School of Business, New York University.

> Force Meeting of the school year. With senior DOE staff members
> in attendance, Sheldon Silver proclaimed that downtown children
> should not be bused up to Chelsea.  He made it clear that
> downtown overcrowding was the real problem. [DOE relented
> and] Sheldon Silver's support and very public comments were
> invaluable in our fight.[43]

Mr. Silver was "highly effective in facilitating the construction of new schools in Lower

Manhattan,"[44] and worked tirelessly to ensure the City's schools remained as uncrowded as

possible.[45]  He provided support "for school infrastructure, construction and reconstruction

projects to ensure that school facilities were safe for children and educators alike."[46]

Mr. Silver's commitment to education has included improving the lives of children with

special needs.  That has been demonstrated not only through broad policy initiatives but also

through personal involvement with those facing challenges.  For example, when the legal

guardian of a special-needs teenager needed stability, it was Mr. Silver who provided it:

> I was getting nowhere and my cousin was getting worse
> psychologically and emotionally. . . . [Shelly Silver] and his staff
> got involved and managed to have my cousin transferred to the
> Lower East Side facility.  *Shelley Silver saved this young man's
> life.*[47]

Others have described the very real, personal results of Mr. Silver's efforts:

- "As a result of [Mr. Silver's] compassion, I can safely state that, my daughter is residing
  in a community residence geared to care for and meet every physical and emotional
  need."[48]

- "I see the care that [children with Down's Syndrome] receive and the dignity with which
  they live [in a newly established assisted-living center]. This was possible and happened
  under Shelly's watch, caring and outreach. Simply, there are many, many parents who are

---

[43] Wendy Chapman.

[44] Wallace Dimson, President, Board of Directors, Southbridge Towers, Inc.

[45] Emily Armstrong.

[46] Randi Weingarten.

[47] Edie Goldman, neighbor and teacher (emphasis added).

[48] Briendel R. Lehan, former special education teacher.

grateful that their children have a chance to live as normally as possible, especially as they grow older, and that gratitude is due to Shelly."[49]

- "[Our son] is now 19 years old and I cannot begin to tell you the obstacles we had to overcome. Especially, trying to get him into proper schools. Every which way we turned the door was literally slammed in our face . . . [Mr. Silver] listened to our predicament and saw our desperation. He displayed kindness, concern and compassion, and helped us overcome our situation."[50]

- "On many occasions, Shelly accompanied me in visiting programs that serve our special children. I can attest from experience that people who visit these programs will look, but not always really see these children; they will listen, but perhaps not truly hear their voices and their needs. Shelly Silver genuinely saw, heard and acted on their behalf. I have seen the amazing results of his deep capacity for empathy and kindness and I respectfully ask that you take these actions and qualities into account as you undertake the task of determining his sentence."[51]

Mr. Silver did these things with no fanfare.  As one grandparent remembers, "When I went over to thank him, he simply said, somewhat proudly I believe, 'that's what we're here for.'"[52]

Perhaps *Randi Weingarten,* the President of the American Federation of Teachers, summarizes Mr. Silver's commitment to public education best:

> I cannot say that Shelly Silver and I agreed on every issue. However, I always knew that his ultimate goal was the same as mine. He was a tireless advocate for public education and worked continually to ensure that parents and students had the resources they needed so all children could have access to a high-quality education.

Mr. Silver worked to keep daycare and after-school programs freely available.  One daycare center official "remember[s] distinctly" his efforts to protect "afterschool and daycare

---

[49] Moshe H. Wieder.

[50] David & Chevy Libman; Bernard  W. Silverstein.

[51] Harvey Weisenberg, former  Assemblyman and father of child with multiple disabilities.

[52] Pamela and Nussin Fogel, friends.

programs for low income families," stating, "Without his support, the programs may have been discontinued and the children would be without any educational and recreational help."[53]

And *W. Ann Reynolds*, who served as chancellor of the City University of New York from 1990–1997, writes that she was not asked to prepare a letter: "I reached out to Mr. Silver's legal staff in the fall to see if his outstanding record in helping the underserved could be brought up in his consideration."  She then points out how Mr. Silver mobilized support for a bill to limit the work requirement for welfare recipients, over 20,000 of whom were enrolled in CUNY, to 20 hours per week, to be performed in borough of residence or community college so that they could stay in school, further noting that Mr. Silver "probably set a record in making it a law thus enabling our welfare recipients to keep moving upward."[54]

    4. <u>Mr. Silver's Work to Improve the Lives of Seniors</u>

Mr. Silver also worked to improve the lives of New York City's senior citizens living without family support.  He spearheaded legislation to develop and establish services for "Naturally Occurring Retirement Communities" ("NORC").  He helped found a NORC agency that offers no-cost nursing, social work, and group services to seniors.  With Mr. Silver's help, the agency allows the aged to "remain in their own homes, maintain their independence, and have needed services provided in their homes rather than force them to leave the community so dear to them and be transplanted to a nursing home, a likely alternative."[55]

Mr. Silver's support for seniors has taken on many forms.  He supported a new State law

---

[53] Pauline Chen, Retired Director of Confucius Plaza Daycare Center.

[54] W. Ann Reynolds.

[55] Rita M. Siff, Coordinator of Group Services and Volunteers, Co-op Village NORC; *see also* Wallace Dimson, President of the Board of Directors of Southbridge Towers, Inc.; Donald H. West, President of Seventh Precinct Community Council and former Board member of Seward Park Cooperative, who explains that with Mr. Silver's help, "our NORC soon became the template for the rest of the nation."

ensuring that the City's "SCRIE" program—"Senior Citizen Rent Increase Exemption"—remained in place.  The positive effect of this legislation on the lives of seniors in need has been drastic.  As Jian Fu Li and Pie Qiong Li explain:

> Because of SCRIE, our quality of life has improved and we are appreciative of the former Assembly Speaker's initiative in passing this law. As you can imagine thousands and thousands of fellow New Yorkers who are elderly and low income are benefactors of Mr. Silver's leadership in passing laws that alleviate our ever increasing shelter costs and health maintenance costs.[56]

Concerned that seniors not become discouraged over their financial plight, Mr. Silver has worked to ensure that senior centers could adequately meet the needs of local seniors.  Today, for example, the Open Door Senior Citizens Center offers a variety of critical services to more than 800 members. At one point, when the center was housed in a basement space, without access to daylight or fresh air, it was Mr. Silver who stepped in. "Because of his help," the center's director explains, "our seniors can enjoy their time in a comfortable space which has enough room for educational and recreational activities."[57]  And Mr. Silver did not just ensure the centers worked—he made certain that seniors who wanted to work to give back to their community, could.  "Through networking with his office, I was able to place my well-trained program participants in various home agencies in spite of their age, immigration status and ethnic[] background. Many of them had become contributing members of our society as they achieved economic self-sufficiency, thanks to ex Assemblyman Silver . . . ."[58]

For nearly four decades, "seniors always felt they could count on Shelly."[59]

---

[56] Jian Fu Li and Pie Qiong Li, residents of the Lower East Side of Manhattan and constituents.

[57] Po Ling Ng, Director of the CPC Open Door Senior Citizens Center.

[58] Man Nam Ma, Open Door Senior Center Social Worker.

[59] Rita M. Siff.

5.      <u>Mr. Silver's Work to Improve Access to Healthcare</u>

Ensuring New Yorkers' access to quality health care has been important to Mr. Silver. When Maimonides Medical Center in Brooklyn contacted Mr. Silver to explain that the borough had no dedicated cancer center for its roughly 2.5 million citizens, Mr. Silver "made the cause of these patients his own."  As a Trustee for Maimonides Medical Center explained, "I believe that he made the Cancer Center happen, and today it is a Brooklyn world-class resource for so many in need of help in their battle against this dreaded disease."[60]

Of Mr. Silver's many contributions to New York's health care, Mr. Silver's support for the Gouverneur Health Medical Center stands out.  Gouverneur is the largest provider of health care on the Lower East Side.  It serves more than 50,000 patients every year, many of whom are uninsured or underinsured.  Those services are essential: "[The] Lower East Side is an area in which TB, Hepatitis and other infectious disease can spread if sick people are not taken care of. These diseases are still rampant in the Lower East Side."[61]  Mr. Silver assembled a coalition of governmental agencies to secure financing for a major modernization of Gouverneur, which had previously been considered by patients as "a provider of last resort."[62]  The results speak for themselves:  "Today, Gouverneur is recognized as a leader in its field and operates a five-star state-of-the art facility, offering high quality comprehensive services to patients on the Lower East Side and beyond[,] regardless of their ability to pay."[63]  "His funding to organizations such as Gouverneur Health and others has helped many, especially low-income people."[64]

---

[60] Moshe  Wieder, a Trustee for Maimonides Medical  Center.  Mr. Wieder is also founder of a post-secondary vocational institution and former board member of Ohel Children's Home and Family Services.

[61] Herbert L. Kee, M.D., family practitioner who served at Gouverneur.

[62] Mendel Hagler, former Executive Director of Gouverneur.

[63] *Id.*

[64] Fei Chen, employee of Gouverneur.

And as with so many other issues, Mr. Silver has not been content to merely oversee legislation from afar.  He encouraged Gouverneur "to co-sponsor health fairs, . . . to promote awareness of good health practices, and to educate the public about  early  access  to preventative care that would have an immense benefit for community residents."  Mr. Silver personally appeared at the health fairs "to show the importance" of flu immunizations, which he received "proudly and publically" to "encourage others to do so as well."[65]

### 6.   Mr. Silver's Work to Provide Affordable Housing

Mr. Silver has been a devoted advocate for tenants.  He worked hard to maintain access to public and affordable housing.  For example, Gateway Plaza is the largest residential complex in Lower Manhattan and home to 4,000 tenants.  When its landlord sought to raise rents, Mr. Silver "single-handedly led negotiations with the Battery Park City Authority and the owners of Gateway to achieve the renewal of our stabilization agreements."  It was "Mr. Silver's herculean efforts [that] resulted in keeping [Gateway Plaza] one of the few remaining pockets of affordability in Battery Park City."[66]

Another example of his support of tenants is his advocacy for the "Loft Law," enacted in 1982 to assist tenants living in lofts in former non-residential buildings.  "Because the Loft Law was originally adopted with a sunset date, it became a bargaining chip for many years in the period from 1992 to 2010 when it was finally made permanent."  Even though Mr. Silver's Assembly district contained a relatively small number of loft tenants, Mr. Silver continuously fought for renewal of the Loft Law because it "was the right thing to do."[67]

---

[65] Mendel Hagler.

[66] Glenn Plaskin, President of the Gateway Plaza Tenants Association.

[67] Chuck DeLaney, founder of Lower Manhattan Loft Tenants. Frederick J. Jacobs also recalls a series of 24-hour extender laws "so that the law would remain in effect while negotiations" continued for a law Mr. Silver "championed."

Mr. Silver has also been an advocate for settlement houses, which provide social services and youth development programs for more than 500,000 people each year.  He worked with the Henry Street Settlement to secure funding for renovations, programs, and its youth gym and arts center.  Mr. Silver has long been "a champion of the community work of all of the Settlement Houses on the Lower East Side."[68]  A representative of another settlement admits, "I don't think there is any question that the one senior leader we could rely on to represent most of our collective interest was Sheldon Silver."[69]

Mr. Silver also helped renegotiate the ground rent between the Battery Park City Authority and local condominium owners; it was his "involvement [that] helped correct a serious injustice which would have made Battery Park City unaffordable to the middle class."[70]

7.    <u>Mr. Silver's Singular Focus on Legislating for the Benefit of New Yorkers</u>

The *Honorable James A. Yates* describes Mr. Silver's legislative efforts.  "I left the bench to work as Counsel to the Speaker because I wanted to work with him on an array of progressive legislative proposals he supported or sponsored; the many hundreds . . . ranging from criminal justice reform, provisions of meaningful health care, worker protection, domestic violence prevention, and more . . . I could list, without exaggeration, a thousand bills that were the object of our many discussions . . . ."[71]

In describing Mr. Silver's focus and approach, *Justice Yates,* the point person on many of his legislative initiatives, states:

> I can state unequivocally that the direction he gave me in my
> negotiations during those years was principled, thoughtful and

---

[68] Daniel Kronenfeld, former Executive Director of the Henry Street Settlement.

[69] Michael Zisser, Chief Executive Officer, University Settlement.

[70] Patrick M. Smith, journalist, public affairs officer, and public relations practitioner.

[71] Hon. James A. Yates (ret.), former New York State Supreme Court Justice and Counsel to the Speaker from 2011 until Justice Yates's retirement in 2015.

> reflective of the Assembly conference's common desire to help to improve the lot of all New Yorkers.
>
> . . . .
>
> I am not writing to contest or re-litigate the issues of the trial, but I can only say that each and every one of the bills and legislative proposals upon which we worked together were uniformly aimed at betterment of the public weal, free of any other consideration.

Mr. Silver's colleagues in the Assembly echo those thoughts.  As former *Assemblywoman*

*Ann-Margaret Carrozza* writes:

> I can attest to the passion and tenacity with which Shelly would advocate on behalf of our state's most vulnerable citizens.  From Universal Pre-K to Marriage equality, Sheldon Silver has been a champion for those who needed help.

*Frederick J. Jacobs*, who worked as Mr. Silver's legislative counsel, writes:

> I can state without hesitation or reservation that during the period when I worked closely with him from 1988 through 1998, he acted with the highest degree of integrity, commitment to the public good, and compassion in every legislative matter with which he and I were involved.

After citing examples, *Mr. Jacobs* states:

> In all of these legislative endeavors, I can state unequivocally that I never witnessed Mr. Silver act for personal gain, and never saw his judgment swayed or distracted by personal interest.  I am not writing to dispute or contest the facts and issues adjudicated at Mr. Silver's recent criminal trial, but to simply state that in the almost 11 years that I had the privilege to serve as his counsel, he always acted in what he and his colleagues perceived to be the best interest of the public they were elected to serve.

After noting Mr. Silver's "unfailingly considerate, kind and polite" interactions with

employees and colleagues, *Mr. Jacobs* concludes:

> I truly hope that all of the good I saw Mr. Silver do as a public servant, and the kindness and compassion I both witnessed and took comfort in, will weigh favorably in his receiving as lenient a sentence as possible from your Honor.[72]

---

[72] Frederick J. Jacobs, former legislative counsel to the Speaker.

And *Stephen August*, who testified as a prosecution witness in both of Mr. Silver's trials, writes:

> I have known Mr. Silver for several years. Our contact was largely focused on the development and negotiation of the state's annual budget. I have had the opportunity to watch him interact with state leaders, his colleagues from the Assembly Democratic Conference, advocates of various interest groups, and industry representatives. In all these interactions, I believe Mr. Silver acted with integrity and exhibited a deep, consistent commitment to issues he felt best served the public interest. He accomplished many things in his tenure as Speaker that I believe have improved the lives of New Yorkers in areas such as access to housing, education, health care services, programs for the elderly and mental health services. I believe he acted out of a conviction that government is a positive force in society and was mindful of how his actions, and those of the Assembly, affected New Yorkers.[73]

### 8. Mr. Silver's Response to Superstorm Sandy

Mr. Silver's response to Superstorm Sandy, the natural disaster that struck New York and surrounding areas on October 29, 2012, exemplifies his approach of using both legislation and direct community involvement to bring help where it is needed. Mr. Silver immediately sponsored relief legislation and, when that legislation met with resistance in the Senate, pushed and prodded until a relief package was approved.[74]

But Mr. Silver's efforts went well beyond legislation. "In the aftermath of Hurricane Sandy, Mr. Silver personally delivered food supplies to Southbridge [Towers, an apartment building complex in Lower Manhattan] during the time before power was restored." He cut through "bureaucratic red tape with Con Edison to facilitate the restoration of power to the

---

[73] Stephen August, former Deputy Director Budget Studies for Ways & Means Committee.

[74] *See* News Release, Assembly Speaker Sheldon Silver, Speaker Silver Urges House to Take Action on Sandy Relief Package (Jan. 2, 2013); News Release, Assembly Speaker Sheldon Silver, Speaker Silver Statement on Senate Vote to Finally Provide Relief for Sandy Survivors (Jan. 28, 2013).

development."[75]  He "came to visit [residents] and brought us food and water."[76]  He provided

"resources quickly and expeditiously to [wherever] the need was," and his "direct follow-up was

exceptional and clearly demonstrated care and concern."  He played "an important role in getting

our community, and all of Lower Manhattan, back to a sense of normalcy."[77]  And as one

constituent and community board member recalls, he "was the first to send food, water and

electricity into his District to respond to the emergency need of Superstorm Sandy."[78]

And Mr. Silver's aid has not been limited to New York City.  As the Mayor of Lawrence,

New York, a town on Long Island devastated by Superstorm Sandy, explains:

> During Superstorm Sandy, Sheldon Silver sought to close the gap
> between State and Local government. He ensured that our residents
> received genuine, practical assistance ranging from lights to
> emergency equipment and services, always making certain that
> government's resources reached the people government is created
> to serve. In doing so, he facilitated our Village's survival and
> recovery.[79]

In short, when disaster struck and duty called, Mr. Silver answered and came to the aid of

the people of this State.

9. <u>Mr. Silver's Response to 9/11</u>

Mr. Silver's response in the aftermath of 9/11 is similarly admirable.  In describing Mr.

Silver's response to 9/11, *Yvonne Morrow* writes:

> [Mr. Silver] rented a large van, turned it into a "traveling district office."
> The staff provided any help needed and distributed water, cell phones,
> food, etc. to trapped residents throughout the district. Assemblyman Silver
> created  a committee comprised of tenants, elected officials and
> representatives of all pertinent city agencies to develop a clean-up

---

[75] Wallace Dimson.

[76] Shiu Ling Ng Lam, constituent.

[77] Rev. Dr. Marcos Rivera, Senior Pastor, Primitive Christian Church.

[78] Robert J Schneck, Jr., resident of Battery Park City and Community Board 1 member.

[79] Martin Oliner, Mayor, Incorporated Village of Lawrence, NY.

program to expeditiously remove asbestos and other toxic materials from living spaces so people could move back in to their homes.[80]

*Bob Townley,* Founder and Executive Director of Manhattan Youth, recalls that Mr. Silver "immediately" took action "to help seniors get back to their homes and to get their medicine.[81]  *Reverend Dr. Marcos Rivera* also remembers Mr. Silver's efforts to ensure that suffering families could obtain vital resources:

> The families of my congregation suffered greatly. Many lived within eyesight of the fallen towers and were witnesses of the horrendous loss, including the loss of family members. Mr. Silver was directly in contact with me and mobilized his office and other public resources to make sure that assistance was given expediently. I am certain that he was pulled from the many layers of government and the financial and business sector, but we never felt that he was unavailable.

As the then-City Council member who represented the area for eight years following 9/11 explains: "I worked very closely with then Speaker Silver, during the first year following 9/11, almost on a daily basis.  I witnessed his concern, compassion and commitment to all District 1 residents. It was unending and unselfish."[82]

Mr. Silver coordinated the work of more than a dozen agencies.  That coordination resulted in clean homes and accessible streets for affected Manhattan residents.  For example, as nineteen rent-stabilized tenants of 125 Cedar Street, the closest residential building to the World Trade Center, recount:

> State Assembly member and Speaker Sheldon Silver came to our aid immediately and powerfully, spearheading the effort of returning us to our homes. He was instrumental in paring back the plans so that our existing affordable housing, and that of our neighbors, was spared from the wrecking ball.  He then concerned himself with the cleanup and steps to return us to our homes, a task

---

[80] Yvonne Morrow.

[81] Bob Townley, Founder and Executive Director of Manhattan Youth.

[82] Alan J. Gerson.

> for which no city, state or federal agency was taking responsibility.
> * * * * *
> We understand that Mr. Silver has been convicted of serious
> corruption-related offenses, and do not seek to excuse or condone
> them.  But we ask that you take into consideration the whole
> person and consider leniency in your sentencing based on his many
> long years of representing his constituents and engaging in larger
> public policy in a dedicated and thoughtful way.  At a time when
> we had few champions he worked personally to assure we had a
> place to move home to.[83]

By October 2001, Mr. Silver had already announced a $200 million victim assistance and

economic recovery package that: provided financial assistance for families of victims;

established a memorial commission; and secured a Lower Manhattan Resurgence Authority to

coordinate and finance efforts to rebuild lower Manhattan.[84]  He also:

- Secured funding for proper air-monitoring equipment and ventilation systems in
  public schools;

- Sponsored legislation requiring use of low-sulfur fuel in ground zero clean-up efforts;

- Coordinated air testing in residential areas;

- Increased the number of victims eligible for critical grants under the Lower
  Manhattan Development Corporation assistance plan;

- Sponsored the September 11th Victims and Families Relief Act, signed into law on
  May 21, 2002, to allay concerns of victims and their families over delays in receiving
  coverage from their insurance carriers;

- Instituted "tax-free days" to support small businesses in lower Manhattan;

- Included in the 2002-2003 State budget more than $1 billion to revitalize the City's
  schools and businesses;

- Championed the Lower Manhattan  "Marshall Plan," signed into law in August 2005,
  to ensure City and State rebuilding efforts and promote further development; and

- Sponsored the "Zadroga Bill," signed into law in August 2006, ensuring that death
  benefits would be available to those exposed to toxic substances in the aftermath of

---

[83] Rent Stabilized Tenants of 125 Cedar Street.

[84] *See* Press Release, Assembly Speaker Sheldon Silver, Speaker Silver Unveils World Trade Center Victim
Assistance and Lower Manhattan Economic Recovery Package (Oct. 30, 2011).

9/11.

The words in the letters submitted in support of Mr. Silver speak for themselves: "Shelly Silver was an unsung hero after September 11th."[85]  "Lower Manhattan would not have made it through 9/11 as well as we did without Shelly Silver."[86]

Sheldon Silver helped shepherd the City through its darkest hour.

* * * *

Mr. Silver went above and beyond the call of duty so many times, over decades of public service.  Mr. Silver has demonstrated over and over again, a genuine interest in helping people. We submit that Mr. Silver's lifetime of good works should be considered by the Court as an important and substantial mitigating factor at sentencing.

B.     Mr. Silver's Advanced Age And Pre-Existing Health Conditions Weigh in Favor of a Non-Custodial Sentence

Peter Green, MD, from Columbia University Medical Center, has written the Court regarding Mr. Silver's health:

> This 76 year old male has been my patient for 10 years. . . . He has multiple chronic medical problems that include a malabsorption syndrome with resultant edema, chronic kidney disease, anemia and thrombocytopenia, treated prostate cancer and obesity.  *These conditions and his age put him at great risk for a poor outcome should he contract the Covid-19 virus.*

Ex. E, Dr. Green Letter (emphasis added).

As the Court is aware, COVID-19 is a serious respiratory illness that is spread through droplets when an infected person coughs, sneezes, or talks.  It is spread person-to-person or by

---

[85] Bob Townley, Founder & Executive Director, Manhattan Youth.

[86] Alan J Gerson.

touching a surface or object that has the virus on it.[87]  Seemingly healthy people can spread the

virus during the virus' incubation period, which lasts up to two weeks.[88]  There are also reports

of asymptomatic people spreading the virus.[89]

On March 11, 2020, the World Health Organization (WHO) classified COVID-19 as a

pandemic.[90]  On March 13, 2020, the President declared the COVID-19 outbreak a national

emergency.[91]  COVID-19 has infected more than 2 million people in the United States and at

least 116,958 deaths have resulted.[92]

Dr. Green's concern for Mr. Silver's health is well supported by the growing body of

medical evidence.  Age is the most significant factor in COVID-19 mortality rates.  As Judge

Wood observed in the case against New York State Senate Majority Leader, Dean Skelos:

> *Defendant's age [72] makes him highly vulnerable*.  In a February
> 29, 2020 WHO-China Joint Mission Report, preliminary mortality
> rate analyses showed that individuals 70-79 years old had an 8%
> mortality rate. Individuals aged 60-69 had a 3.6% mortality rate;
> those aged 40-49 had a .4% mortality rate; those 40 years and
> younger had a mortality rate as low as 0.2%.  Defendant, at 72
> years old, is very vulnerable to infection by COVID-19.

*United States v. Skelos*, No. 15-cr-317 (KMW), 2020 WL 1847558, at *2 (S.D.N.Y. Apr. 12,

2020) (emphasis added).  Statistics for COVID-19 deaths in New York City show that a patient

---

[87] *What You Should Know About COVID-19 to Protect Yourself and Others*, CDC (June 1, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

[88] *Clinical Questions About COVID-19: Questions and Answers*, CDC (last updated June 4, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Transmission.

[89] *Id.*

[90] *WHO Director-General's Opening Remarks*, World Health Organization (March 11, 2020),
https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-
19---11-march-2020.
[91] President Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel
Coronavirus Disease (COVID-19) Outbreak,* The White House (Mar. 13, 2020),
https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-
coronavirus-disease-covid-19-outbreak/.
[92] *Coronavirus Map: Tracking the Spread of the Outbreak*, N.Y. Times,
https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (last visited June 16, 2020).

75 years or older is *more than eight times* more likely to die from virus complications than a

patient in the 45-64 year old age group.[93]   At 76 years old, Mr. Silver is among those with the

highest risk for serious complications from COVID-19, including death.

Mr. Silver's risk of death is further aggravated by pre-existing health conditions.   Mr.

Silver has been diagnosed as obese.   Ex. E, Dr. Green Letter, Record of June 1, 2020 Visit with

Dr. Green at 1, 4.   Researchers have found that patients with obesity are significantly more likely

to require hospitalization and to develop severe complications from COVID-19 versus those with

normal weight.[94]   One study quantified this risk as a three-fold increase compounding the risk

associated with age.[95]   Courts have recognized that "obesity of patients was the single biggest

[chronic] factor, after age, in whether those with COVID-19 had to be admitted to a hospital."

*United States v. Delgado*, No. 3:18-cr-17, 2020 WL 2464685 (D. Conn. Apr. 30, 2020);[96] *see*

*also* Endorsement, *United States v. Cooper*, 7:08-cr-00356 (KMK) (S.D.N.Y. Apr. 28, 2020),

---

[93] *Death Rates for COVID-19 in New York City*, Statista (last updated June 14, 2020),
https://www.statista.com/statistics/1109867/coronavirus-death-rates-by-age-new-york-city/.

[94] *See* Safiya Richardson et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area*, JAMA (Apr. 22, 2020), available at https://jamanetwork.com/journals/jama/fullarticle/2765184; Simonnet et al., *High Prevalence of Obesity in Severe Acute Respiratory Syndrome Coronavirus-2 (SARS-CoV-2) Requiring Invasive Mechanical Ventilation*, Obesity (Apr. 9, 2020), available at https://bit.ly/2KrVQ1v.   Both of these studies defined obesity as a BMI above 30.   Mr. Silver's BMI was most recently calculated as 33.48. Ex. E, Record of June 1, 2020 Visit with Dr. Green at 4.

[95] *Obesity Triples Odds of More Severe Symptoms with COVID-19*, Healio (May 20, 2020), https://www.healio.com/news/endocrinology/20200520/obesity-triples-odds-of-more-severe-symptoms-with-covid19 (describing two studies).   "In two cohorts of Chinese adults with COVID-19, those with obesity were at least three times more likely to have a severe case of the disease than those with normal weight, according to two studies. . . .   In addition, increasing obesity was associated with increasing odds of severe COVID-19, and the association between obesity and symptom severity was stronger for men than for women."   These studies defined obesity as BMI above 25.

[96] Quoting Tiernan Ray, *NYU Scientists—Largest US Study of COVID-19 Finds Obesity the Single Biggest 'Chronic' Factor in New York City's Hospitalizations*, ZDNet (Apr. 12, 2020), https://www.zdnet.com/article/nyu-scientists-largest-u-s-study-of-covid-19-finds-obesity-the-single-biggest-factor-in-new-york-critical-cases.   This risk is greatest for those diagnosed as severely obese.   *See also* Groups at Higher Risk for Severe Illness, Coronavirus Disease 2019 (COVID-19), CDC (last visited June 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#severe-obesity.

ECF No. 181 (granting motion for compassionate release where BMI of 32.1 "place[d] [defendant] in a higher risk category").

In addition to his age and obesity, Mr. Silver's cancer diagnoses and treatment approximately five years ago *may* also increase his risk for severe complications from COVID-19.[97] Dr. Gary Lyman, an oncologist and health policy expert, has explained that the risk posed to cancer patients by COVID-19 "extends beyond the period of active treatment. . . .  The after-effects of treatment don't end when people finish their last course of therapy or leave the hospital after surgery.  The after-effects of cancer and the immunosuppressive effects of treatment can be long term."[98]

Courts have found that active or recent prostate cancer puts individuals at a greater risk for complications from COVID-19.  *See, e.g.*, *United States v. Gonzalez*, No. 3:17-cr-00062, 2020 WL 2511427, at *1 (D. Conn. May 15, 2020) (granting compassionate release to a cancer survivor who "had a tumor of his salivary glands, radiation treatment, and the insertion of a feeding tube for approximately one year until shortly before the sentencing"); *United States v. Lee*, No. 2:17-cr-0030, 2020 WL 2084812, at *3 (E.D. Cal. Apr. 30, 2020) ("The court accepts that defendant's cancer likely puts him at higher risk for complications from COVID-19, and gives this circumstance the serious weight warranted."); *United States v. Joling*, No. 6:11-cr-60131, 2020 WL 1903280, at *4 (D. Or. Apr. 17, 2020) (granting defendant's COVID-19-based motion for compassionate release where defendant was diagnosed with prostate cancer in 2018, received radiation treatment in 2019, continued to undergo cancer-related hormone therapy, and introduced expert testimony at sentencing that "35-45% persons with a history of cancer

---

[97] It is unclear how long the increased risks from cancer treatment could last.

[98] Diane Mapes, *Coronavirus: What Cancer Patients Need to Know* (Mar. 6, 2020), https://www.fredhutch.org/en/news/center-news/2020/03/coronavirus-what-cancer-patients-need-to-know.html.

treatment had a more severe clinical course with COVID-19 infection, with severity defined by ICU admission, invasive ventilation, and death").[99]

COVID-19 presents a substantial risk to Mr. Silver's life.  That risk would increase many fold if the Court were to sentence him to a term of incarceration.  Prisons and jails have "long been known to be associated with high transmission probabilities of infectious diseases."[100] Incarcerated individuals "are at special risk of infection" and "infection control is challenging."[101]  This is because prisons and jails "contain high concentrations of people in close proximity and are breeding grounds for uncontrolled transmission [of infection]."[102]  Prisons are ill-suited to contain the virus once it is introduced into the facility.[103]  Unsurprisingly, the rate of infection in the Bureau of Prisons is far greater, 6.71 times higher, than the rate of infection in the United States.[104]  Sadly, as of June 16, 2020, at least 85 inmates have died of COVID-19

---

[99] *See generally Valenzuela Arias v. Decker*, No. 20-cv-2802, 2020 WL 1847986, at *4 (S.D.N.Y. Apr. 10, 2020) ("Based on what know now, those at high-risk for severe illness from COVID-19 are . . . '[p]eople who are immunocompromised' by 'cancer treatment' . . . .") (quoting Groups at Higher Risk for Severe Illness, CDC (Apr. 2, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html); *Graham v. Decker*, No. 20-cv-2423, 2020 WL 1847568, at *4 n.3 (S.D.N.Y. Apr. 13, 2020) ("The Mayo Clinic states that immunity may be compromised by cancer treatments, smoking, bone marrow or organ transplants, HIV/AIDS and prolonged use of prednisone or similar drugs.").

[100] Letter from Patricia Davidson, Dean, Johns Hopkins School of Nursing, et al., to Hon. Larry Hogan, Governor of Maryland (Mar. 25, 2020), https://bioethics.jhu.edu/wp- content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf (co-signed by over 200 faculty members of Johns Hopkins Bloomberg School of Public Heath, School of Nursing, and School of Medicine).

[101] Open Letter from Gregg S. Gonsalves, Assistant Professor, Department of Epidemiology of Microbial Diseases, Yale School of Public Health, et al. to Vice President Mike Pence and Other Federal, State and Local Leaders 4 (Mar. 2, 2020), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf (co-signed by 814 experts in public health, law and human rights); see also Joseph A. Bick, Infection Control in Jails and Prisons, 45 Clinical Infectious Diseases 1047-155 (2007), https://doi.org/10.1086/521910.

[102] Letter from Dr. Sandro Galea, Dean, Boston University School of Public Health, et al., to President Trump 1 (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public- Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions)

[103] *Outbreaks in Jails and Prison Prove Hard to Contain*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?referringSource=articleShare  (last visited June 8, 2020).

[104] See Fed. Defenders of New York Southern & Eastern Districts, *BOP COVID-19 Charts and Graphs* (June 16, 2014) https://federaldefendersny.org/assets/uploads/BOP_COVID-19_Charts_and_Graphs.6.14.pdf.

complications in the custody of the BOP.[105]  According to the BOP, as of June 16, 2020, at least

1,209 federal inmates and 168 BOP staff at 66 facilities are active COVID-19 cases.[106]  35

percent of inmates who have received a test have tested positive for COVID-19.[107]  Positive

cases have infiltrated BOP facilities in every region of the country.[108]

       Judge Furman has written on this risk to the prison population:

> The country faces unprecedented challenges from the novel
> Coronavirus ("COVID-19") pandemic.  Those detained in jails and
> prisons face particularly grave danger.  Realistically, the best—
> perhaps the only—way to mitigate the damage and reduce the
> death toll is to decrease the jail and prison population by releasing
> as many people as possible.

*United States v. Nkanga*, No. 18-cr-713, 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020)

(citations omitted).

       The government has acknowledged the risk of infection to the federal prison population.

The Attorney General has issued a memorandum to the Director of the Bureau of Prisons on the

subject of "Prioritization of Home Confinement as Appropriate Response to COVID-19

Pandemic."[109]  In that memo, the Attorney General stated that "at-risk inmates who are non-

violent and pose minimal likelihood of recidivism" would be "safer serving their sentences in

home confinement rather than in BOP facilities."[110]  After passage of the CARES Act, the

---

[105] *See* Fed. Bureau of Prisons, *BOP: COVID-19 Update* (last visited June 16, 2020)
https://www.bop.gov/coronavirus/index.jsp.  That figure does not include individuals who have died in pretrial or
presentence detention at local facilities.

[106] *Id.*  These are open cases, only, and does not include those with symptoms, who have not been tested but are
presumed sick enough to be quarantined.  In addition, 4,940 inmates and 502 staff have recovered.

[107] *Id.*  BOP had completed 17,262 tests as of June 16, 2020, with 6,069 positives.

[108] *See Id.*

[109] Memorandum from Attorney General Barr to Director of Bureau Prisons (Mar. 26, 2020), available at
https://www.justice.gov/file/1262731/download.

[110] *Id.* at 1.

Attorney General directed BOP to review all at-risk inmates for transfer to home confinement.[111]
Accordingly, BOP has released thousands of at-risk inmates, including former State Senate
Majority Leader Dean Skelos, who served approximately 15 months imprisonment before his
release after contracting COVID-19 at Otisville.[112]

As Chief Judge Mauskopf recently noted, "[t]he public health emergency has not
abated. . . . [N]ew cases and additional fatalities continue, as does the significant risk that the
virus will spread and resurge."[113]  Mr. Silver is undeniably "at-risk."  His advanced age and pre-
existing health conditions place him among the most vulnerable to suffering severe
complications from COVID-19, including death.  A single day in a BOP facility could expose
him to contracting the virus from a seemingly healthy staff member or inmate.  BOP simply
cannot adequately assure Mr. Silver's safety.  We respectfully submit that these extraordinary
circumstances weigh heavily in favor of a sentence that includes a substantial term of home
confinement in lieu of a term of incarceration.[114]

---

[111] Memorandum from Attorney General Barr to Director of Bureau of Prisons 2 (Apr. 3, 2020), available at
https://www.justice.gov/file/1266661/download.

[112] A. Shapiro Letter, *United States v. Skelos*, 1:15-cr-00317 (S.D.N.Y. Apr. 23, 2020), ECF No. 521 (describing
defendant's condition); Gov't Letter, 1:15-cr-00317 (S.D.N.Y. Apr. 28, 2020), ECF No. 525 (confirming release).

[113] Administrative Order No. 2020-20, *In re Coronavirus Pandemic* (E.D.N.Y. June 15, 2020).

[114] Such a sentence would be consistent with the treatment of other at-risk defendants convicted of serious crimes.
For example, Judge Pauley recently sentenced an asthmatic 34-year old Goldman Sachs investment banker who
engaged in an insider trading scheme over a multi-year period to 1-year home confinement and 1,500 hours of
community service in light of the extraordinary circumstances of the COVID-19 pandemic.  Judgment, *United States
v. Cohen*, No. 19-cr-0741 (S.D.N.Y. June 9, 2020), ECF No. 47.  According to the government, the defendant in that
case had a privileged background and was in a position of trust at the investment bank.  Gov't Sentencing Mem. 1,
*United States v. Cohen*, No. 19-cr-0741 (S.D.N.Y. May 27, 2020), ECF No. 44.  The defendant accepted bribes and
shared in the proceeds of the scheme.  *Id.* at 2.  The defendant disclosed material non-public information for years to
a securities trader and attempted to hide his activities by using burner phones and arranging for cash payments.  *Id.*
We respectfully submit that the risk posed by COVID-19 to Mr. Silver is much more severe than that posed to
Cohen.  Similarly, due to the risk of COVID-19 infection, Paul Manafort was released from his 73-month sentence
to home confinement after having served 14 months imprisonment.  Manafort's Guideline range was 210-262
months imprisonment for his serious crimes, which included money laundering, witness tampering, tax fraud and
bank fraud.  Gov't Sentencing Mem 6–8, *United States v. Manafort*, No. 1:17-cr-00201 (D.D.C. Feb. 26, 2019),
ECF No. 528.  Manafort was also found to have repeatedly lied to the Special Prosecutor in an investigation

<u>Nature and Circumstances of the Offense</u>

The vacatur of Counts One, Two and Five alter the nature and circumstances of the offense considered by the Court at sentencing two years ago.  Nevertheless, Mr. Silver acknowledges the seriousness of the offenses of conviction, the seriousness of the conduct underlying the vacated counts, and the harm caused by his conduct.  Mr. Silver wrote to the Court, in part:

> People have lost faith in their government and my actions contributed to that loss of faith.  It is hard for me to describe how saddened I am by this.  Government can makes peoples' lives better.  I have seen it.  It was my life's work.  To know that my selfish actions damaged the public's trust in government and its elected officials is painful and sad for me every day.  I am sorry. . . . I am angry with myself, and over time that anger has turned into sadness.  For more than 35 years, I woke up every morning and tried to help people in this State and my community in matters large and small.  That is the truth.  I really loved doing it even though it was often hard work.  I believe I made a difference for the better in people's lives and for the State, and I was tremendously proud of that legacy.  But I ruined that legacy by using my office for personal financial benefit.  That was wrong, and I am ashamed of what I did.  I know I have brought this upon myself and worse, my family.

Ex. A, Sheldon Silver Letter at 1.  Mr. Silver has engaged in intense self-reflection and prayer over the past two years.  As his wife has observed:

> For the two years before the synagogue shut down as part of the quarantine, Shelly had been going to services every day without fail.  I know he has been doing a lot of thinking and praying.  I think this case is a big part of that.

Ex. B, Rosa Silver Letter at 2.  The sincerity of Mr. Silver's introspection is evident in his thoughtful and nuanced understanding of his conduct that led to his convictions.  Mr. Silver

---

concerning the President of the United States and national security.  Sentencing Tr. 35–36, *United States v. Manafort*, No. 1:18-cr-00083 (E.D. Va. Mar. 27, 2019), ECF No. 328.

explains that it is more complicated than simple greed.  He describes how he developed a sense

of entitlement and lost perspective after such a long time in office.  He further describes how, at

the time, he justified this sense of entitlement to himself.  Mr. Silver wrote:

> I do not believe that anyone, myself included, runs for political
> office out of greed or a desire for financial profit.  The Assembly is
> filled with good intentions.  But over time, as you gain more
> seniority and power, it is easy to lose perspective and develop a
> sense of entitlement.  I developed a sense of entitlement and it
> seemed normal.  I think that sense of entitlement was easier to
> justify because I thought I was keeping the best interests of the
> State and my constituents at heart.  Many will now doubt that, and
> that is my own doing.  If I was doing good for New York, after all
> of the years of work and sacrifice, I felt entitled to the financial
> windfalls that came my way while doing what I thought was good
> work.  But I was dead wrong.  I was hurting the State I love by
> undermining public confidence in our public officials and
> institutions, which we need now more than ever.  I rationalized the
> windfalls because I felt I earned them through a lifetime of work
> and connections that improved the State.  And it was not just about
> money, but also power, respect and above all, a mistaken belief
> that I deserved it.  As a public official, you are not entitled to
> anything.  You have to earn your votes every day and your rewards
> are in the satisfaction that you did good and earned the respect of
> the community, which are both deeply meaningful.  This has to be
> enough, otherwise find a new line of work.  It should have been
> enough for me but it wasn't and I am ruined.

Ex. A, Sheldon Silver Letter at 2.  The difference between mere greed and this sense of

entitlement Mr. Silver describes may be subtle, but we submit it is an important subtlety.

Current and future legislators may not recognize greed in themselves, but they might recognize

this sense of entitlement.  Mr. Silver does not want current and future legislators to make

mistakes similar to his own and sharing his experience of where he went wrong may help in this

regard.

<div align="center">

Deterrence

</div>

There is no risk Mr. Silver will offend again.  He is no longer in public service and has

been publicly humiliated.  This factor weighs in favor of a non-custodial sentence.  *See Pepper*,

<div align="center">31</div>

562 U.S. at 492 ("[T]he likelihood that [a defendant] will engage in future criminal conduct[] [is] a central factor this district court must access when imposing sentence."). We acknowledge, however, that the goal of general deterrence weighs in favor of a custodial sentence. We submit that the COVID-19 risks posed to Mr. Silver by a term of incarceration outweigh the marginal benefit, if any, to be gained in general deterrence by sentencing Mr. Silver to prison rather than home confinement.[115]  We submit that the United States Attorney's Office and this Court (and others) have sent a clear message to Albany. Given the extraordinary circumstances, we do not believe a sentence of home confinement and rigorous community service will dilute that strong message.

<u>Unwarranted Sentencing Disparities</u>

We understand that criminal defendants and offenses can be distinguished in myriad ways, but we ask the Court to carefully consider the case of former State Senator Dean Skelos when imposing sentence on Mr. Silver. Mr. Skelos was one of the so-called "three men in a room" together with Mr. Silver and Governor Cuomo.[116]  Mr. Skelos was convicted after trial of all counts: (1) one count of conspiracy to commit extortion under color of official right; (2) one count of conspiracy to commit honest services fraud; (3) three counts of extortion under color of official right; and (4) three counts of solicitation of bribes and gratuities.[117]

While Mr. Silver obtained more money from his conduct, in many ways, Mr. Skelos's conduct was far worse. In describing Mr. Skelos's offenses the government stated: "By almost any metric, the instant offenses were among the most serious public corruption crimes committed

---

[115] Research has shown that "increases in the severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Just. 1, 28 (2006).

[116] Gov't Sentencing Submission 2–3, *United States v. Skelos*, No. 1:15-cr-00317 (S.D.N.Y. April 4, 2016), ECF No. 173.

[117] Judgment 1–2, *United States v. Skelos*, No. 1:15-cr-00317 (S.D.N.Y. Oct. 31, 2018), ECF No. 467.

in New York State in recent memory."[118]  Mr. Skelos "demonstrated a brazen pattern of pressuring, bullying, and threatening those with substantial official business before the New York State Senate in order to extract payments for Adam Skelos."[119]  Mr. Skelos repeatedly made direct extortionate threats to businesses if they did not pay his son.[120]  In addition, Mr. Skelos committed perjury by testifying falsely during his trial.[121]  Judge Wood sentenced Mr. Skelos to 51 months' imprisonment, which included his punishment for perjury.[122]  After serving approximately 15 months of his sentence, Mr. Skelos was released to home confinement.[123]  We respectfully submit that sentencing Mr. Silver to a term of home confinement and rigorous community service would avoid an unwarranted sentencing disparity with Mr. Skelos's case. *See* 18 U.S.C. § 3553(a)(6).

<div align="center">Supplemental Presentence Investigation Report</div>

The Supplemental PSR downwardly revised Mr. Silver's offense level by two points to account for the vacatur of the convictions for Counts One, Two and Five by the Second Circuit. Supplemental PSR ¶ 3.  We do not contest the Probation Department's Guidelines calculation, but agree with the Court's previous statement that "[i]mposing a guidelines sentence would be Draconian, as it is far longer than is necessary to achieve the goals of sentencing."[124]

---

[118] Gov't Sentencing Submission 1, *United States v. Skelos*, No. 1:15-cr-00317 (S.D.N.Y. April 4, 2016), ECF No. 173.

[119] *Id.* at 5.

[120] Sentencing Tr. 27:18–28:1, *United States v. Skelos*, No. 1:15-cr-00317 (S.D.N.Y. Nov. 16, 2018), ECF No. 477.

[121] *Id.* at 33:22–34:4.

[122] *Id.*

[123] Gov't Letter, 1:15-cr-00317 (S.D.N.Y. Apr. 28, 2020), ECF No. 525 (confirming release).

[124] Sentencing Tr. 16:19-21 (July 27, 2018), ECF No. 460.

## Conclusion

Mr. Silver dedicated his life to public service and over decades of work he has helped many people in important matters in their lives.  During his long tenure in Albany, he developed a misplaced sense of entitlement and misused his office.  He knows it was wrong and deeply regrets the harm he has inflicted on the public trust.  He has undoubtedly been punished already. By appearances, this case has taken years away from Mr. Silver's life, and he has been publicly humiliated.  We acknowledge this is not enough, but Mr. Silver is 76-years old with multiple health conditions that significantly predispose him to the worst outcomes if infected with COVID-19, including death.  We ask the Court, under these extraordinary circumstances, to sentence Mr. Silver to a substantial term of home confinement, combined with a rigorous community service requirement approved by Probation, plus fines and forfeitures.  Such a sentence would be consistent with the treatment of other "at-risk" defendants and sufficient but not greater than that necessary to comply with the purposes of sentencing.

<div style="margin-left:40%">

Respectfully submitted,


  /s/ James P. Loonam
James P. Loonam
Meir Feder
Colleen Noonan Ryan
Abigael Bosch

Jones Day
250 Vesey Street
New York, NY 10281
Telephone: 212.326.3939
Facsimile: 212.755.7306

*Attorneys for Sheldon Silver*

</div>

34